UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COLLEEN LITTLEFIELD, | : | |
| | : | |
| Plaintiff, | : | C.A. No. 06-157 |
| | : | |
| v. | : | |
| | : | |
| CATHOLIC FAMILY LIFE INSURANCE COMPANY | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT CATHOLIC FAMILY LIFE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Defendant Catholic Family Life Insurance Company ("CFLI") hereby moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on all counts in Plaintiff Colleen Littlefield's Complaint. In support hereof, CFLI submits the accompanying Memorandum of Law, Statement of Undisputed Facts, and Affidavit of Kim Ingram, CFLI Vice President and Corporate Secretary. Selected portions of the record have been attached to the Statement of Undisputed Facts pursuant to Local Rule 56(b).

/s/ Patricia A. Sullivan
Patricia A. Sullivan (#2120)
Caroline F. Turcotte (#7165)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)

Attorneys for Defendant
Catholic Family Life Insurance Company

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of June, 2007, a true and accurate copy of the within *Motion for Summary Judgment* was served by ECF on:

Karen Davidson, Esq.
One Ship Street
Providence, RI 02903

/s/ Patricia A. Sullivan

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COLLEEN LITTLEFIELD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 06-157 |
| | : | |
| CATHOLIC FAMILY LIFE INSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |

**<u>DEFENDANT CATHOLIC FAMILY LIFE INSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Patricia A. Sullivan (#2120)
Caroline F. Turcotte (#7165)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)

Attorneys for Defendant
Catholic Family Life Insurance
Company

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ i

I. INTRODUCTION ........ 1

II. BACKGROUND FACTS ........ 2

A. Catholic Family Life Insurance Company Is a Fraternal Benefit Society ........ 2

B. CFLI Underwriting Procedures ........ 3

C. Michael Littlefield ........ 4

D. The 1997 Insurance Policies ........ 4

E. Mr. Littlefield’s Serious Medical Problem in 2003. ........ 6

F. Mr. Littlefield’s Insurance Application in 2003 ........ 10

G. The Decision To Issue The Policy/Underwriting ........ 20

H. Mr. Littlefield’s Acceptance of the Policy and Signature to Amendment to Policy ........ 21

I. The Decision To Deny The Claim ........ 23

J. The Medical Malpractice Claim ........ 24

III. LEGAL ARGUMENT ........ 25

A. Standard Of Review ........ 25

B. Material Misrepresentation Voids Life Insurance Contract as a Matter of Law. ........ 26

C. Rhode Island’s Statutory Mandate for Submission of Life Insurance Misrepresentation to a Jury is Not Applicable to Fraternal Benefit Societies. ........ 29

D. Summary Judgment is the Appropriate Stage for Disposition when the Misrepresentation Materially Affects the Risk Assumed by the Insurer as a Matter of Law. ........ 31

IV. CONCLUSION ........ 39

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) .................................................... 26

*Cassstevens v. Texas Standard Life Ins. Co*., 155 S.W.2d 916 (Tex. Comm'n App. 1941) .......................................................................................................... 31

*Crow v. Capitol Bankers Life Ins. Co.,* 891 P.2d 1206 (NM 1995)................................. 27

*Davis v. Integon Life Ins. Corp*., 645 F. 2d 494 (5th Cir. 1981)................................ 36, 37

*Evora v. Henry,* 559 A.2d 1038 (R.I. 1989) .................................................................... 28

*Fisher v. William Penn Life Ins. Co*., 1998 WL 887176 (2nd Cir. 1998)......................... 33

*Garde v. Inter-Ocean Ins. Co.,* 842 F. 2d 175 (7th Cir. 1988) ........................................ 34

*Glasgow v. Sovereign Camp, W.O.W.,* 191 P. 470 (Kan. 1920)...................................... 31

*Gordon v. Royal Neighbors of America*, 90 S.W.2d 198 (Mo. Ct. App. 1936)................ 31

*Guardian Life Ins. Co. of America v. Tillinghast,* 512 A2d 855 (R.I. 1986)............. 27, 28

*Halpert v. Rosenthal*, 267 A.2d 730 (R.I. 1970)............................................................. 28

*Holsey v. Ohio State Life Ins. Co.,* No. 93-2524, 1994 WL 592750 (4th Cir. 1994)........ 35

*Jones v. Allstate Life Ins. Co*., 1994 WL 28575 (6th Cir. 1994)................................ 34, 35

*Laura Campbell Trust v. John Hancock Life Ins. Co.,* 411 F. Supp. 2d 606 (D. Md. 2006).......................................................................................................... 33

*Mesnick v. General Electric Co.,* 950 F.2d 816 (1st Cir. 1991) ...................................... 26

*Miguel v. Metropolitan Life Ins. Co*., 200 Fed Appx. 961 (11 Cir. 2006)........................ 32

*Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731 (1st Cir. 1995) ....................... 26

*Nichols v. The Southern Life Ins. Co.,* 584 F. 2d 106 (5th Cir. 1978) ........................ 35, 36

*Onyon v. Truck Insurance Exchange*, 859 F. Supp. 1338 (W.D. Wash. 1994) ................ 33

*Paradise v. John Hancock Mutual Life Insurance Co*., 279 A2d 453, 108 R.I. 700 (1971).......................................................................................................... 28

*Parker v. Prudential Ins. Co. of America,* 900 F. 2d 772 (4th Cir. 1990) ........................ 35

*Paul Revere Life Ins. Co. v. Fish*, 910 F. Supp. 58 (D.R.I. 1996) ............................. 29, 30

*Pauley v. Modern Woodmen of America,* 87 S.W. 990 (Mo. Ct. App. 1905) .................. 31

*Peters v. Woodmen of the World Life Ins. Company,* No. 89-6220, 1991 WL 4701 (6th Cir. 1991).......................................................................................................... 37

*Prudential Ins. Co. of America v. Tanenbaum*, 167 A. 147 (R.I. 1933)........................... 27

*Quintero de Quintero v. Aponte-Roque,* 974 F.2d 226 (1st Cir. 1992)............................ 26

*Rochester Ford Sales, Inc. v. Ford Motor Co*., 287 F.3d 32 (1st Cir. 2002).................... 26

*Rutherford v. John Hancock Mutual Life Ins. Co.,* 562 F. 2d 290 (4th Cir. 1977) ........... 38

*Smith Ex Rel. Stephan v. AF&L Ins. Co*., 147 S.W. 3d 767 (Mo. CT. App. E.D. 2004) ........ 28

*Sovereign Camp of the Woodmen of the World v. Treanor*, 217 S.W. 204 (Tex. Civ. App. 1919) ........ 31

*Summit Insurance Co. v. Porcaro*, C.A. 99-2521, 2004 WL1067920 at *5 (R.I. Super. Ct. 2004) ........ 26, 27

*The Northwestern Mut. Life Ins. Co. v. Babyan*, 430 F.3d 121, 133 (3d Cir. 2005) ......... 37

*Wilhelm v. Security Ben. Ass'n*., 121 S.W.2d 295 (Mo. Ct. App. 1938) ........ 31

**Statutes**

26 U.S.C. § 501(c)(8) ........ 2

Kan. Stat. § 40-418 ........ 30

R.I. Gen. Laws § 27-25-19 (f) ........ 3, 18

R.I. Gen. Laws § 27-25-23 ........ 30

R.I. Gen. Laws § 27-4-10 ........ 30

R.I. Gen. Laws § 27-4-24 ........ 3

R.I. Gen. Laws § 27-4-24.1 ........ 3

R.I. Gen. Laws § 27-4-24.2 ........ 3

**Other Authorities**

16 Williston on Contracts § 49:99 (4th ed. 2005) ........ 27

*Am. Jur.* 2d ed. § 1023 "Innocent Misrepresentations" (May 2007) ........ 29

*Am. Jur*., 2d ed., § 1022, "Materiality of Misrepresentation" (May 2007) ........ 28

Couch on Insurance § 240:42 (3d ed. 2005) ........ 27

**Rules**

Fed. R. Civ. P. 56 ........ 26

# I. INTRODUCTION

This Motion for Summary Judgment seeks to resolve a sad but flawed claim by Colleen Littlefield, the widow of Michael Littlefield, to the proceeds of a $300,000 life insurance policy issued by Catholic Family Life Insurance Company ("CFLI") on September 9, 2003, less than two years prior to Mr. Littlefield's death on May 25, 2005, of metastatic adenocarcinoma of the cecum. The basis for this Motion is the undisputed fact that in the four months preceding his application for life insurance, Mr. Littlefield experienced serious medical symptoms following routine hernia surgery, for which he sought medical diagnosis and treatment, but, apart from the hernia repair itself, **none of this information was disclosed to CFLI.** If Mr. Littlefield had disclosed any of it, the policy would not have issued – thus, any one of these misrepresentations is sufficient to render the policy void. Cumulatively, they constitute a sound foundation for Summary Judgment in favor of CFLI.

Tragically, Mr. Littlefield's serious medical symptoms were apparently downplayed and/or ignored by the surgeon who performed the hernia surgery in April 2003.[1] Despite ongoing complaints of severe pain, palpable swelling, and a feeling like a hard "baseball in there," presented during five non-routine visits over four months, two additional visits to his primary care physician, a trip to the Emergency Room, a grossly abnormal CT scan, an inconclusive barium enema, the inability to work at his usual employment and the need for Vicodin to manage the pain,[2] Mr. and Mrs. Littlefield both

---

[1] Before his death, Mr. and Mrs. Littlefield brought a medical malpractice against Dr. John W. Abadier and his practice group in the Rhode Island Superior Court. *See Littlefield v. Abadier*, KC-2005-0334. Whether Dr. Abadier breached his duty to Mr. Littlefield may be an issue in that case, but in this case, this Court must assume that Dr. Abadier downplayed or ignored Mr. Littlefield's symptoms. *See infra* at 25-26.

[2] All of these material facts were omitted from the medical information provided to CFLI.

testified that Dr. Abadier kept reassuring him. The cancer, which killed him only ten months after it was diagnosed in July 2004, was located in the precise area where he felt the hard lump and experienced the pain in the spring and summer of 2003.

As a result of the deposition taken in his medical malpractice case before his death, the undisputed facts establish a yawning discrepancy between Mr. Littlefield's serious health issues in April through September 2003 and the representations he made to CFLI regarding his health in connection with his insurance application in August and September 2003. The undisputed facts further establish that these misrepresentations were material as a matter of law, and CFLI relied on them when it issued the $300,000 life insurance policy. Therefore, the policy is void, and summary judgment should enter in favor of CFLI.

## II. BACKGROUND FACTS

### A. Catholic Family Life Insurance Company Is a Fraternal Benefit Society

CFLI is a non-profit fraternal benefit society organized for the benefit of its members. *See* 26 U.S.C. § 501(c)(8). It seeks to bring people together on the common basis of a shared Catholic faith both spiritually and educationally. CFLI's Statement of Undisputed Facts ("Statement") at ¶ 2. A small company based in Milwaukee, Wisconsin, CFLI has fewer than fifty employees and just over fifty independent contractors (principally insurance agents) scattered over fifteen or sixteen states. *Id.* at ¶ 3. CFLI has written life, disability, and annuity policies in Rhode Island since it merged with Woonsocket-based Union Saint-Jean-Baptiste Insurance Company in 1992. *Id.* at ¶¶ 4, 5.

Insurance is a heavily regulated industry. In Rhode Island, life insurance policy forms (including the portion of the application incorporated into the policy) issued by

fraternal benefit societies, like other life insurance companies, must be filed with the Insurance Commissioner. *See* R.I. Gen. Laws § 27-25-19(f) (incorporating by reference R.I. Gen. Laws §§ 27-4-24 through 24.2). Once an insurance company files the policy form, there is a thirty-day waiting period before it becomes effective. R.I. Gen. Laws § 27-4-24.1. If the Insurance Commissioner finds a form that is contrary to the public interest, the Insurance Commissioner shall forbid the use of the form and notify the company in writing. R.I. Gen. Laws § 27-4-24.

The CFLI forms used for the 2003 policy at issue in this case were duly filed with the Insurance Commissioner and CFLI did not receive notice of disapproval during the applicable waiting period, R.I. Gen. Laws § 27-4-24.2. Statement at ¶ 62.

B. CFLI Underwriting Procedures

Kim Ingram, CFLI's Vice President and Corporate Secretary, described her extensive education and work experience in life insurance underwriting and testified as a designee pursuant to Rule 30 (b)(6) that CFLI's underwriting procedures for the issuance of life insurance in 2003 are based on industry norms, as well as to conform the Rhode Island regulatory requirements. *See* Statement at ¶ 63. The underwriting process is intended to identify and gather information regarding risks that might adversely impact an individual applicant's probable mortality through a sequence of general questions asked in two separate sessions with the applicant – first, in a face-to-face interview by an independent paramedic, and then by telephone with an experienced underwriter – with appropriate follow-up regarding any potential medical issues identified by the applicant to assemble enough information to determine what risk category the applicant falls into. *Id*. at ¶ 68. CFLI developed its questions from industry templates and uses open-ended questions to create multiple opportunities for the applicant to fully disclose any medical

issues. *See id*. at ¶ 70. The sequence of the questions and the structure of the inquiry minimize the invasion to the applicant's privacy, with the most probing inquiry on detailed medical issues done by an independent paramedic. *See Id*.

To avoid any disputes regarding the accuracy of the information relied upon to perform its risk assessment, CFLI also repeatedly requests that the applicant confirm in writing that the recorded information is correct, full, complete and true. *Id*. at ¶ 69 (application forms agreed to be "correct," or "full, complete and true by Mr. Littlefield who signed them in 2003).

The underwriting process, thus, imposes the responsibility on the applicant to provide complete and correct information, as well as to attest in writing that the information provided fairly depicts his true health condition at the time of application; if the information is not correct, CFLI is unable properly to classify the applicant from a risk perspective. Statement at ¶ 71.

C. <u>Michael Littlefield</u>

Born in 1969, Mr. Littlefield was thirty-four years old at the time of the insurance application in 2003, and thirty-six at the time of his death. Statement at ¶ 6. He had a bachelor degree in chemistry and had been married to Mrs. Littlefield since 1996; they had one child. *Id.* at ¶¶ 7, 8. Prior to the onset of abdominal pain in the spring of 2003, Mr. Littlefield's principal employment was running a house cleaning business, in which he did the physical work himself. *Id.* at ¶ 9. After abdominal pain made house cleaning difficult, his principal work was a desk job as a chemist in a laboratory. *Id*.

D. <u>The 1997 Insurance Policies</u>

In 1997, Mr. and Mrs. Littlefield each applied to CFLI for life insurance policies in the amount of $50,000. Deposition of Donald Demers ("Demers Dep.") at 33-34

(attached hereto as Exhibit 1). The application was taken by CFLI agent Donald Demers. *See id*. at 28-32. Both were present. *Id.* at 39. Pursuant to the underwriting procedure in effect in 1997 for a policy for $50,000, Mr. Demers did the only medical interview. *Id.* at 35-36, 146-47; Deposition of Kim Ingram ("Ingram Dep.") at 34-40 (attached hereto as Exhibit 2); s*ee also* Exh. 1, Demers Dep. at 56. *Compare* Exh. 1 Demers Dep.; Ex. 9 (1997 application) *with* Exh. 1, Demers Dep., Ex. 3 at CLF000529 (2003 application).

During his 1997 medical interview, Mr. Littlefield revealed no medical issues, as a result of which his policy issued at preferred rates, without any request for medical documentation. *See* Exh. 1, Demers Dep.; Ex. C. Mrs. Littlefield revealed heart problems during her medical interview. Exh. 1, Demers Dep. at 193-94; Ex. C. As a result, CFLI notified her that it had contacted her physicians for medical information. Exh. 1, Demers Dep. at 193-94. After a long delay, CFLI issued her policy at substandard rates. Exh. 1, Demers Dep., Ex. C.

When Mr. Littlefield applied for the 2003 policy at issue in this case, he told Mr. Demers that he wanted to cancel the 1997 policy. Exh. 1, Demers Dep. at 189. During his meeting with Mr. Demers on August 25, 2003, Mr. Littlefield signed forms affirming that he understood the significance of the decision to cancel. *Id*. at 187-88; Ex. 3 at CFL000535-36; Ex. B. When CFLI delivered the 2003 policy, it also tendered Mr. Littlefield a check for the unapplied premium on the 1997 policy, which he accepted and cashed. Exh. 1, Demers Dep. at 201-02. His wife affirmed all of the above facts. Deposition of Colleen Littlefield ("C. Littlefield Dep.") at 83-88 (attached hereto as Exhibit 3). Per his request, his 1997 policy was cancelled effective as of September 9, 2003. Deposition of Catherine Hartwig ("Hartwig Dep.") at 84-85, Ex. 10 (attached

hereto as Exhibit 4). Mrs. Littlefield testified that she was upset when Mr. Demers told Mr. Littlefield that he either had to have two policies or cancel the old policy and apply for a new policy because the 1997 policy could not be made part of the new policy. Exh. 3, C. Littlefield Dep. at 90-91; *see also* C. Littlefield Ex. 3 (Int. Ans. No. 5).

The 1997 policy is not in issue in this litigation. It is not referenced at all in the Complaint, which asserts a claim only for the 2003 policy. We include a detailed discussion of it here as background, but also because plaintiff's counsel has sent a letter claiming that CFLI's failure to pay it constitutes bad faith and has made repeated references to it in argument to this Court. If plaintiff seeks hereafter to amend her Complaint to add a claim based on the it, CFLI reserves the right to seek Summary Judgment on any such claim based on the undisputed cancellation of the 1997 policy.

E. <u>Mr. Littlefield's Serious Medical Problem in 2003.</u>

In April 2003, Mr. Littlefield was seen at Kent County Hospital for abdominal pain in the lower right quadrant. Statement at ¶ 10. The Hospital referred him to Dr. Abadier, a surgeon, who diagnosed a bilateral inguinal hernia and recommended a routine surgical repair, which was performed on April 24, 2003. *Id*. at ¶ 11. Dr. Abadier did not complete the repair. *Id*. at ¶ 12. In the recovery room, Dr. Abadier informed Mr. Littlefield that the hernia on the left side had not been repaired and that "the surgery was difficult because . . . he had to do a lot of dissecting . . . and it was complicated enough where he just had to wrap me up and call it a day because there was no way he was even going to get to the other side." *Id*. at ¶ 13.

Immediately after the surgery, Mr. Littlefield experienced severe pain and bruising in the lower abdominal area. *Id*. at ¶ 14. He returned to Dr. Abadier on May 1, 2003, not for a routine follow-up, but because, as he described it, "I was black and blue

and in severe pain." *Id*. at ¶ 15. "I'm in an awful lot of pain, and that in talking with other people I just – never heard of laparoscopic surgery having so many – so much black and blue." *Id*.

On May 15, 2003, Mr. Littlefield returned to Dr. Abadier for another urgent care visit due to pain. *Id*. at ¶ 16. Mr. Littlefield testified that this visit was "my wife prompting me to go because I just – I just couldn't believe I was in this much pain." *Id.* Again Dr. Abadier assured Mr. Littlefield that "everything was okay." *Id*.

On May 21, 2003, Mr. Littlefield was "cooped over in pain" and went to the Kent County Hospital Emergency Department. *Id*. at ¶ 17. After x-rays and laboratory tests, Mr. Littlefield walked out after waiting five hours. *Id*. After he left, the Hospital called his wife and told her to have him follow-up with Dr. Abadier. *Id*.

On June 2, 2003, Mr. Littlefield returned to Dr. Abadier for his third office visit. By this time, there was "a lot of swelling," and pain "emanating from in and around where the surgery was." *Id*. at ¶ 18. Dr. Abadier prescribed Vicodin for the pain and told Mr. Littlefield to return. *Id*. In addition, as of June 2, Mr. Littlefield could feel a hard mass in his right side, the size of a baseball, which he reported to Dr. Abadier. *Id*. at ¶ 19.

On June 10, 2003, Mr. Littlefield visited his family physician, Dr. Manzo, for a tick bite but also because of his ongoing abdominal pain. *Id.* at ¶ 20. Dr. Manzo palpated the swelling, confirmed that he could feel the mass and expressed concern. *Id*.

On June 12, 2003, Mr. Littlefield returned to Dr. Abadier for the fourth time since the surgery on April 24. *Id.* at ¶ 21. By this time, Mr. Littlefield realized that he could

not physically do his job because of the pain so he was not working. *Id.* Once again, Dr. Abadier reassured him. *Id.*

By June 16, 2003, Michael Littlefield's wife prompted him to return to Dr. Manzo because he was groaning at night in his sleep. *Id.* at ¶ 22. By this time he knew, "[s]omething's majorly wrong with me." *Id.* Dr. Manzo conferred with Dr. Abadier's office and arranged for Mr. Littlefield to have a CT scan. *Id.* Dr. Manzo told Mr. Littlefield that the CT scan was necessary because of the abdominal pain, the "noticeable swelling in his abdomen," and because his white blood cell count ("19000 – "horrendously high") was so elevated that he "almost needed to be – have instant intravenous antibiotics at that point." *Id.* Dr. Manzo palpated the swelling and told Mr. Littlefield, "you're going to have to have exploratory surgery for them to accurately diagnose what, if anything, is going on in there." *Id.*

On June 18, 2003, Mr. Littlefield went to Kent County Hospital for the CT scan. *Id.* at ¶ 23. The CT scan report describes an "[i]nflammatory mass in which there are fluid and solid components." *Id.* at ¶ 24. Within a half hour of his return home from the hospital, Dr. Abadier's secretary called to say "they were very concerned" because the CT scan showed "either an abscess or a tumor." *Id.*[3] Mr. Littlefield was told, "it was very serious" and was referred immediately for another test – "a barium enema x-ray test." *Id.* Again, he went to Kent County Hospital for the test, which was done two days

[3] Mrs. Littlefield testified that she spoke to her husband immediately after this telephone conversation and that he told her that the secretary's actual words were "abscess or mass." Statement at ¶ 24 n.3. By contrast, Mr. Littlefield testified emphatically that the secretary used the word "tumor." *Id.* ("Dr. Abadier's secretary w[as] very concerned, and noted that the result of the CAT scan showed that there was either an abscess or a tumor there. . . . That's what I was told."). This dispute is not material to the outcome of this Motion. In light of Mrs. Littlefield's testimony, this Court should assume that Mr. Littlefield was told that the CT scan depicted an "abscess or mass."

later on June 20, 2003. *Id*. at ¶ 25. Mr. Littlefield testified that the barium enema was a "very expensive and belittling experience." *Id.*

The barium enema report concluded that there is "no intrinsic mass" inside the colon. *Id.* However, the report continues that:

> "Mass extrinsic to colon in this region cannot definitely be excluded and should be correlated with the prior CT scan. **Small bowel follow through would be helpful to exclude an inflammatory process in the region of the terminal ileum or a *possible mass density* in this region."** (emphasis supplied). *Id.*

Despite the inconclusive nature of this test, Mr. Littlefield testified that Dr. Abadier called him after the test and told him that the test depicted a "pocket of blood" and "that it was okay, and that there was nothing to worry about, and that it would pass through, that it was not a problem." *Id.* at ¶ 26. Dr. Abadier's office notes, however, make no reference to the CT scan, the barium enema or to any contact with Mr. Littlefield during this period. *Id.*

Mr. Littlefield waited a "long time," *Id*. at ¶ 27, 28, before returning to Dr. Abadier for the fifth time on August 25, 2003. *Id*. at ¶ 28. The pain, however, did not abate – "I complained of pain for a long time before I went back." *Id*. at ¶ 27. Mrs. Littlefield testified that the appointment was made after she spoke to Dr. Abadier and told him that her husband was "having pain." *Id.* On that day, Mr. Littlefield told Dr. Abadier, "it feels like there's a baseball there." *Id*. at ¶ 29. Mr. Littlefield denies that Dr. Abadier recommended a repeat CT scan at that appointment,[4] stating he would certainly

---

[4] Dr. Abadier's office notes from that visit state, "We will get a repeat CT scan of the abdomen and pelvis area." Statement at ¶ 30.

have done any follow-up recommended, "especially with the pain I was in." *Id*.[5] Dr. Abadier told Mr. Littlefield he would see him again if there were more problems. *Id.*

Mr. Littlefield never returned to Dr. Abadier. Instead, he began to "manag[e] the pain by stopping all physical work."[6] *Id*. at ¶ 30. He testified, "I always complained of right lower abdominal pain and I eventually came to the conclusion, especially after having visited Dr. Abadier on five occasions, . . . that I did not have the physical capacity to do the physical work that I actually enjoyed. And so I started working at my old job." *Id*. ("especially with the pain I was in . . .I figured that's how my body was and so that's why I changed careers a week after I saw him"). Despite altering his work, he continued to experience intermittent pain, and to take Vicodin (and Tylenol or Ibuprofen while working) as needed for pain through to July 2004, when the cancer was diagnosed. *Id*.

When Mr. Littlefield returned to the hospital in July 2004, he gave a pre-diagnosis history that indicated that he had experienced right lower quadrant abdominal pain recurrent intermittently throughout the prior year. *Id*. at ¶ 31. After the cancer was diagnosed in July 2004, Mr. and Mrs. Littlefield asked the surgeon, Dr. Shahinian, whether "during the surgery . . . for the hernia . . . if [the cancer] would have been found at that point in time, would the cancer have been discovered and he said absolutely." *Id*. at ¶ 32.

F. Mr. Littlefield's Insurance Application in 2003

The application interview with the agent. The insurance application process begins with an interview, generally in the applicant's home, by the agent. Statement at ¶¶

---

[5] This appointment was on August 25, 2003, the same day that Mr. Littlefield met with Mr. Demers, the CFLI agent, to complete the insurance application. It is undisputed that, on August 25, 2003, Mr. Littlefield told Mr. Demers that "he was in good health." *See* Statement at ¶¶ 33, 34. *See infra* at 11-15.

[6] Mrs. Littlefield testified that he did not stop working, but rather cut back. Statement at ¶ 30 n.4.

33, 64. A principal purpose of this interview is for the agent and applicant to discuss the type, amount and pricing for insurance the applicant is seeking. *Id.* CFLI's underwriting guidelines instruct the agent that he is not to ask most of the medical questions associated with the application process; instead, the agent is instructed to "do a thorough job of pre-qualifying your client during the sales process to avoid unpleasant surprises when the underwriting is completed." *Id.* Recording information about medical history is done by an independent paramedic and by a trained underwriter. *Id.* at ¶ 66. As Ms. Ingram explained, "[i]t is not the agent's job . . . to follow-up on hernias. . . . It's the teleunderwriter and the paramedic's job to ask questions. His job is to ask the questions that are on the application." *Id.* The agent explains the underwriting process to the applicant, including the importance of the paramedical examination and interview, as well as the teleunderwriting interview. *Id.* at ¶ 65.

Mr. Demers went to the Littlefield home on August 25, 2003.[7] *Id.* at ¶ 33. At the meeting, Mr. Demers explained the underwriting requirements, including that an examination would be required and "whatever the requirements were and everything else." *Id.* at ¶ 34. Consistent with the limited purpose of the application interview, Mr. Demers asked only three medical questions. *See id.* at ¶ 34. Mr. Demers also filled in the Application with information provided by Mr. Littlefield and Mr. Littlefield signed the form after it was completed. Statement at ¶ 34.

---

7 The time of the appointment is disputed – Mr. Demer's calendar recorded that the appointment was at 7:00 in the evening, but Mrs. Littlefield testified that it was at 7:30 in the morning. Statement at ¶ 33. It is also disputed whether Mrs. Littlefield was present during her husband's application interview with Mr. Demers. *Id.* She claims that she was, while Mr. Demers testified that she was present for the application meeting in 1997, but not in 2003. *Id.* This factual dispute is immaterial to this Motion.

First, Mr. Demers asked the question on the application form whether Mr. Littlefield had been "treated for diabetes, cancer, heart disease, etc," and Mr. Littlefield said that he had not. *Id.*

Next, Mr. Demers asked the pre-qualifying question whether Mr. Littlefield was in good health. *Id.* This question is simply to identify potential health issues before the applicant goes to the trouble of the actual paramedical interview and the teleunderwriting interview – "to avoid surprises." *Id.* It is undisputed that Mr. Littlefield told Mr. Demers that he had no medical problems.[8] *Id.* ("he said he was in good health").

Finally, Mr. Demers reviewed the questions related to preferred rates. Statement at ¶ 34. As with the general health question, he reviews these questions with prospective insureds to avoid raising false expectations regarding the pricing of the policy and does not record the answers because all of these questions are asked again by the teleunderwriter. *Id.* If adverse medical history (such as many follow-up visits following routine hernia surgery, tests like an abnormal CT scan or an inconclusive barium enema, ongoing pain requiring Vicodin or undiagnosed conditions like a mass or tumor) had been disclosed during the application, Mr. Demers would have stopped the application process until he could contact the underwriting department to ask for guidance regarding how to proceed. *Id*.

[8] This is a misrepresentation – this is the same day as the last appointment with Dr. Abadier described *supra* at 9-10, in which Mr. Littlefield complained of pain so severe that he curtailed his business the following week and a hard swelling that felt like a baseball.

The balance of what was said during the application meeting is disputed. *Id.* at ¶ 35. Mrs. Littlefield claims that she was present during Mr. Littlefield's meeting with Mr. Demers[9] and that Mr. Littlefield told Mr. Demers that:

- He had been diagnosed with a hernia but that it had been surgically repaired. *Id.*[10]
- He had had complications from the hernia surgery and some tests were done, but the tests were negative. *Id.*
- He had a barium enema and a CT scan and they came out negative. *Id.*

Mrs. Littlefield described Mr. Demers' response to that he was told as follows:

> When Mr. Demers came and took notes and filled out some notes with my husband and myself, we discussed the barium enema tests and pocket of blood we were told they found during the tests. Mr. Demers asked Michael questions, if the – how the tests came out and **Michael said they were negative**, and he said well, we don't need that because hernia surgery is just that, we told him it was something to do with hernia surgery, and it was complications after the hernia surgery and we told him about we had thought that, you know, the doctor had nicked him when he did the operation and he said, well, don't worry about that, it's hernia surgery and these things happen and **he said we don't need to put that in**. I said okay." *Id.* at ¶ 36.

Mrs. Littlefield's claim that Mr. Demers told her "we don't need to put that in" is cannot defeat this Motion, not only because this health information she claims was discussed with Mr. Demers is still a misrepresentation in that it describes Mr. Littlefield

[9] This factual dispute (*see supra* at note 7) is not material to this Motion, except that Mrs. Littlefield's version of that happened affirms that Mr. Littlefield materially misrepresented his health to Mr. Demers when he said he was "in good health" and that the abnormal CT scan and inconclusive barium enema had come back negative.

[10] Mr. Demers was confused during his testimony whether Mr. Littlefield told him about the hernia surgery. Statement at ¶ 35 n.6. At certain points in his deposition, he testified vaguely that Mr. Littlefield did disclose it, (but he added "I'm not quite sure about."), but later he testified that he had been confused by having seen the reference to hernia in other documents and that he is certain that he did not hear of it from Mr. Littlefield. *Id*. Since it is undisputed that hernia surgery was disclosed to both the paramedic and teleunderwriter, *see infra* at 16, 19, this potential factual dispute is immaterial.

as in good health and the tests as negative, but also, among other reasons,[11] because the application form that Mr. Demers scribed, and Mr. Littlefield signed, did not require the agent to record any information pertaining to medical history except for the question referred to *supra* at 12. Thus, if Mr. Demers made this remark, it accurately states that such information does not need to be recorded on the application form.

The Paramedical Examination. This phase of the underwriting process is done by an independent paramedic. *See* Statement at ¶¶ 37, 72. The purpose of the paramedical interview is to "get the medical history . . . and to evaluate their health and qualification for the insurance." *Id.* CFLI relies on the answers given by the applicant in the paramedic interview form, which is signed by both the paramedic and the applicant, in determining risk selection. *Id.* at ¶ 39.

The paramedic uses a form provided by CFLI. *Id.* at ¶ 38. At the beginning of the interview, she asks for a driver's license for identification. *Id.* at ¶ 72. The paramedic then asks a series of general questions designed to elicit information about mortality risks. *Id.* Most of the detailed medical questions are asked during this interview. *Id*. at ¶ 37. The questions are crafted to elicit information that a lay person might have trouble giving if the inquiry used technical medical terms. *Id.* at ¶¶ 38, 72. The paramedic asks follow-up questions to any positive response to gather sufficient detail to allow the underwriters to evaluate risk, including whether to seek additional

[11] The most important reason why Mrs. Littlefield's claim about what Mr. Demers said does not create a fact issue sufficient to avoid summary judgment is that Mr. Littlefield was twice shown the written representations made to CFLI on which it relied, from which these tests were omitted, and twice affirmed the completeness and accuracy of the information provided. *See infra* at 15, 22-23. The cases make clear that a subsequent written affirmation of the completeness and correctness of the representations renders a claim of an oral discussion with the agent insufficient to avoid summary judgment as a matter of law. *See infra* at 36.

medical information. *Id.* at ¶ 72. At the end of the interview, the paramedic asks the applicant to sign the completed interview form. *Id.*

Mrs. Littlefield was not present for the paramedical examination. *Id*. at ¶ 37. The interview and examination were performed on August 28, 2003, by paramedical examiner Donna Carroll, who had no dealings with the CFLI agent. *Id.*

Paramedic Carroll confirmed that she follows the form precisely as required. *See id.* at ¶ 39. She also confirmed that she accurately records the answers given by the applicant. *Id.* After the two-sided[12] paramedical interview and exam form was filled in, Ms. Carroll presented it to Mr. Littlefield, who signed immediately below a statement that:

> I hereby agree that all statements and answers in this application are full, complete, and true to the best of my knowledge and belief, and shall become part of any policy or contract issued on the basis of this application. I further agree that the Society may rely upon any statements or answers made relating to my health or illness in determining whether to accept this application for insurance. *Id.* at ¶ 40.

Ms. Carroll tells applicants to read this statement before signing the form; she also tells them that "when they sign this form they are swearing that all this information they have given me is accurate and true and then they sign the form." *Id.*

There is no genuine issue that the paramedic portion of Mr. Littlefield's application (Statement at ¶ 41) contained numerous misrepresentations that were material to the underwriting process[13]:

> <u>Question</u>: "Date and reason [Dr. Manzo, the personal physician] last consulted" *Id.* at ¶ 41.

---

12 In the original, the form is two sided and the signature on page one applies to both pages. *Id.* at ¶ 40 n.8.

13 *Id.* at ¶ 41.

Answer: "Pain related to hernia surgery 5-03 – Had surgery 4-20-03" *Id.*

> This answer is materially false – Mr. Littlefield omitted his most recent consultation with Dr. Manzo on June 16, 2003, described *supra* at 8. This misrepresentation is material because, while pain immediately after hernia surgery is unremarkable, the continuation of pain two months after surgery would have resulted in a request for medical records. Statement at ¶¶ 52, 59. The reason for the consultation was pain causing him to groan in his sleep and his belief that "Something's majorly wrong with me." *Id*. at ¶ 22. At this appointment, he had pain, a noticeable swelling in his abdomen and "horrendously high" white blood cell count. *Id*. Dr. Manzo consequently ordered the CT scan, which was grossly abnormal. *See id.* at ¶ 22-24.

Question: "Treatment given or medication prescribed [by Dr. Manzo at last consultation]:" *Id.* at ¶ 41.

Answer: " – " Ms. Carroll testified that her dash meant that Mr. Littlefield told her there was no treatment given or medication prescribed. *Id.* at ¶ 41. If Mr. Littlefield had told Ms. Carroll that Dr. Manzo referred him to Dr. Abadier for a CT scan for pain, she would have recorded that information on the form. *Id.*

> This answer is materially false – at his last consultation with Dr. Manzo, on June 16, 2003, Dr. Manzo arranged for the CT scan at Kent County Hospital and told him that he would need exploratory surgery to make a diagnosis. *Id.* at ¶ 22. If Mr. Littlefield had forthrightly disclosed any of this, CFLI would have requested his medical records. *Id.* at ¶¶ 48, 52.

Question: "Have you ever been treated for . . . hernia? Details of "yes" answers: include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities." *Id.* at ¶ 41.

Answer: "Had Hernia Surgery 4-20-03 Dr. Abadier 300 Tollgate Rd Warwick RI 02886. Kent Court Hosp Warwick RI. Outpatient." *Id.*

> This answer is materially false – it omits all of the non-routine hernia follow up, including all the visits to Dr. Abadier, Dr. Manzo, and the Kent County Hospital for the abnormal CT scan, as well as the barium enema and the visit to the Emergency Room. If Mr. Littlefield had forthrightly disclosed any of this hernia follow-up, CFLI would have requested his medical records. *Id.* at ¶¶ 48, 52.

Question: "Are you now under observation, treatment, or taking medication?" *Id.* at ¶ 41.

Answer: "No" *Id.*

> This answer is materially false – it omits that Mr. Littlefield was taking Vicodin for pain and that he had just (three days before) seen Dr. Abadier again for pain and a swelling like a hard "baseball" in his lower right abdomen.

<u>Question</u>: "During the past seven years have you: [b]een examined or been treated by a physician . . . ? Details of "yes" answers: include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities." *Id.* at ¶ 41.

<u>Answer</u>: "Dr. Karen Blackmere . . . last seen 4 yrs ago physical. No problems." *Id.*

> This answer is materially false – it omits all of the visits to Drs. Abadier and Manzo. If Mr. Littlefield had forthrightly disclosed any of the follow-up appointments for pain and a swelling or mass the size of a baseball, CFLI would have requested his medical records. *Id.* at ¶¶ 48, 52. Ms. Carroll testified that she would have recorded these visits on the form if Mr. Littlefield had disclosed them to her. *See id.* at ¶ 39, 41.

<u>Question</u>: "During the past seven years have you: [h]ad an x-ray or electrocardiogram? Details of "yes" answers: include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities." *Id.* at ¶ 41.

<u>Answer</u>: "Had x-ray for sinus infection 2 yrs ago. E.R. Kent County Hosp." *Id.*

> This answer is materially false – it omits any reference either to the grossly abnormal CT scan performed only two months before or to the barium enema that Mr. Littlefield identified in his deposition as a "barium enema **x-ray** test." Statement at ¶ 24 (emphasis supplied). Like the sinus x-ray that was disclosed, both were performed at Kent County Hospital. If Mr. Littlefield had forthrightly disclosed the CT scan or the barium enema, CFLI would have requested Mr. Littlefield's medical records. *Id.* at ¶¶ 48, 52.

<u>Question</u>: "During the past seven years have you: [h]ad observation or treatment at a clinic or hospital? Details of "yes" answers: include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities." *Id.* at ¶ 41.

<u>Answer:</u> "No" *Id.*

> This answer is materially false – it omits all of the trips to Kent County Hospital for the abnormal CT scan, the barium enema that explicitly states

> that a mass extrinsic to the colon has not been ruled out and the visit to the Emergency Room for abdominal pain. If Mr. Littlefield had disclosed these hospital tests and visit during his paramedical interview, Ms. Carroll would have recorded it on the form. *See id.* at ¶ 39, 41. If Mr. Littlefield had forthrightly disclosed any of these hospital visits, CFLI's underwriter would have requested medical records. *Id.* at ¶¶ 48, 52.

The Teleunderwriting Interview. The teleunderwriting interview is conducted by an experienced underwriter after the agent has sold the product to the applicant; it involves a telephone call to ask additional questions about background and medical history. Statement at ¶ 74. At some point after 1997, but prior to the summer of 2003, and consistent with a change in industry standards, CFLI eliminated virtually all medical questions from the application taken by the agent and instead added the teleunderwriting interview to the underwriting process as an improvement to CFLI procedures to obtain better information. *Id.* If the applicant is potentially eligible for preferred rates, this interview reviews the thresholds questions regarding such coverage. *Id.* at ¶ 76. Importantly, the teleunderwriter also asks a critical general question regarding the applicant's last medical appointment and its purpose. *See id.*

Mr. Littlefield's teleunderwriting interview was conducted by CFLI underwriter Cathy Hartwig, who testified that she had worked for insurance companies doing underwriting and, since it was introduced into the industry, teleunderwriting, for twenty-seven years (since 1976) when she interviewed Mr. Littlefield in 2003. *Id.* at ¶ 43. In addition to her years of underwriting experience, she also has experience in summarizing medical reports to identify mortality issues for insurance companies. *Id.*

To conduct her interview of Mr. Littlefield, Ms. Hartwig used a two-page form, Statement at ¶ 44, the second page of which is filed with the Rhode Island Insurance Commissioner pursuant to R.I. Gen. Laws § 27-25-19 (f). *Id.* at ¶ 44. The critical second

page becomes a part of the policy pursuant to the Amendment procedure described at 21-23 *infra*. Statement at ¶ 45.

In conducting the interview, Ms. Hartwig asks the questions provided, and "ask[s] follow-up questions when needed for any yes answers." *Id.* at ¶ 45. For purposes of this litigation, the critical question that Ms. Hartwig asked Mr. Littlefield was:

> "9.) Full name and complete address of personal physician; the date, reason last seen, and diagnosis:" *Id.* at ¶ 46.

In response, Mr. Littlefield told her that in "May '03 that he had a follow-up after an April '03 hernia surgery." *Id.* at ¶ 47. She asked, "was everything okay?" He responded, "all okay." *Id.* She recorded his precise response on the form. *Id.* This form was attached to the Amendment to the policy that Mr. Littlefield signed and verified as true and accurate when he was presented the policy on September 19, 2003. *Id.*

Once Mr. Littlefield told her that everything was "all okay," Ms. Hartwig asked no more questions about the surgery. *Id.* at ¶ 48. "If he had told me that there were some problems with the hernia surgery, if he would have had to go back to that same doctor, then I would have found more details. . . . [H]e told me everything was okay, so we did not need to go any further with any questioning. If he had said he was having problems, then we would have asked further questions, but he did not." *Id.* (underwriting for Mr. Littlefield's 2003 policy did not include going to physicians for medical records "[b]ecause there was no need for it. There was no medical history.") Ms. Hartwig would have ordered Mr. Littlefield's medical records from his physicians if any of the non-routine symptoms, tests or appointments following the hernia surgery had been disclosed: "We always order records when they say that they did any testing such as that, that's not routine." *Id.* at ¶ 48.

G. The Decision To Issue The Policy/Underwriting

The information contained on the application, the paramedical interview and examination, the laboratory test results and the teleunderwriting interview are evaluated by an underwriter. Statement at ¶ 53, 77. The underwriter first determines whether the applicant disclosed any risk factors such as a medical history that might have an adverse impact on mortality. *Id*. at ¶ 78. If so, the underwriter uses the consent executed by the applicant to seek medical information directly from the applicant's physicians and health care providers ("Attending Physicians Statements," or "APS"). *Id.* Because of the adverse impact on the insured from the resultant delay in issuance of the policy, APS are requested only if necessary. *Id.* In determining whether to request APS, the underwriter relies on her experience and on underwriting guidelines used in the industry. *Id.* On the other hand, if the risks exposed by the application are "standard" the underwriter will authorize issuance of the policy without further inquiry and without requesting APS. *Id.* at ¶ 79.

In addition to conducting the teleunderwriting interview of Mr. Littlefield, Ms. Hartwig also was the underwriter; she reviewed all of the information collected in connection with the 2003 application and made the decision to issue the 2003 policy. *Id.* at ¶ 49. Because Mr. Littlefield's medical disclosures revealed only a routine hernia that had been surgically repaired in April 2003, and followed up in May, after which everything was "all okay," no APS were ordered. *Id.* at ¶ 50-51 ("They are of no mortality significance so unless there are symptoms or residuals from any hernia problems, we go no further.") Ms. Ingram confirmed that, from an underwriting perspective, "if a hernia has no complications, the surgery has been completed successfully and there are no residual effects, . . . a hernia that is not going to impact

mortality." *Id*. at ¶ 52 (CFLI underwriting guidelines provide that a hernia that has been surgically repaired with no complications is a standard risk, while ongoing complications that last more than a few weeks after surgery evidence a risk that is not standard). *Id.* Based on the information provided, Ms. Hartwig rated Mr. Littlefield as a standard risk eligible for preferred rates. *Id*. at ¶ 53.

On the other hand, if Mr. Littlefield had revealed either to the paramedic or the teleunderwriter that he had had a CT scan and/or a barium enema in June 2003, Ms. Hartwig would have ordered APS. *Id*. at ¶ 52. Likewise, if Mr. Littlefield had forthrightly disclosed <u>any</u> of the hernia complications, the ongoing pain, the noticeable swelling, the feeling that "there's a baseball in there," the five non-routine doctor's appointment to Dr. Abadier and the two non-routine appointments to Dr. Manzo, the Emergency Room visit, the Vicodin prescription, the grossly abnormal CT scan, the inconclusive barium enema, the pain so severe as to force the curtailment of his cleaning work, or the trips to hospital for tests, CFLI's underwriting protocols would have suspended further action on the policy until this medical issue was fully resolved. *Id*. at ¶ 59. Because Mr. Littlefield's medical issues would have made it impossible to assess risk, the 2003 policy would not have issued if Mr. Littlefield had provided truthful answers to CFLI. *Id.*

H. <u>Mr. Littlefield's Acceptance of the Policy and Signature to Amendment to Policy</u>

CFLI affords a final opportunity for the applicant to correct any medical omissions when the policy is delivered to the applicant. At that point, the applicant is directed to the paramedical interview and examination, which the applicant previously reviewed and signed, and the completed teleunderwriting interview form, which he had

not previously seen, and is asked to review both of them and to sign an affirmation of their accuracy. *Id*. at ¶¶ 54-56. This signed form (Statement at ¶ 55) is made part of the issued policy as an Amendment. *Id*. at ¶¶ 54, 55.

Mr. Demers presented the issued policy to Mr. Littlefield at his home on September 19, 2003. *Id*. at ¶ 54[14] Mr. Demers directed Mr. Littlefield to the Amendment to the policy, to which the paramedical examination form and the teleunderwriting interview were attached. *Id.* Mr. Demers said "I have to have the amendment signed saying that they have agreed to the information – the information on page two and three is correct, and I agree that the information upon the home office and telephone interview is correct and the paramedical facility is correct too. . . . I showed him the form, I said why don't you read it and if you want you can read it in detail." *Id*. at ¶ 55. Mrs. Littlefield also authenticated her husband's signature; she testified that her husband signed the Amendment after it was presented to him by Mr. Demers. *Id*. at ¶ 56.

The Amendment (Statement at ¶ 55) states:

> **"I have reviewed pages 2 and 3 of the application in this policy. I agree that the information obtained by the home office in a telephone interview or by a paramedical facility is correct."** (emphasis in original). *Id*. at ¶ 55.

When he placed his signature on the Amendment, Mr. Littlefield had his last opportunity to discharge his responsibility to CFLI to provide accurate and clear information regarding his medical condition:

> The applicant is responsible for answering all the questions correctly, honestly and something as simple as the dates and times of the doctor's office. The applicant is the one who is responsible for saying that my health is this way or that way because the applicant lives inside of their body. . . . So if a physician tells you that your head is fine, but your head is hurting, it is your responsibility

[14] There is an immaterial factual dispute whether Mrs. Littlefield was present for the delivery of the policy. Statement at ¶ 54.

> and not the physician's responsibility to tell us that your head hurts and then we can make a determination as to whether or not we can properly classify you in the correct risk classification. *Id*. at ¶ 56.

I. The Decision To Deny The Claim

After CFLI became aware of Mr. Littlefield's death within the contestability period (within two years of the issuance of the policy), it commenced a routine investigation by asking Mrs. Littlefield to identify physicians and by seeking medical records from those she identified. *Id*. at ¶ 57. After the medical records were collected, the entire insurance file and all of the medical records were turned over to CFLI's medical director, Dr. Nicola Charlton. *Id.* After review of these records, Dr. Charlton wrote her evaluation:

> The medical history this individual gave on his application is at odds with what has been found in his medical records . . . the grossly abnormal barium enema and abdominal l CT scan both showed evidence of a mass, tumor or abscess that is not disclosed at the time of application. Neither this information nor the fact he even needed or had done further testing is not disclosed at the time of application. The concern is if these facts were disclosed his application would have been denied or had his application postponed. The radio logic tests and barium exam finding are of such an abnormal nature it is beyond what is conceivably normal after a hernia repair.

*Id*. at ¶ 58. Dr. Charlton also noted that she relied on references in the medical records indicating that Mr. Littlefield was in pain at the time of his application. *Id.* In reliance upon Dr. Charlton's medical evaluation comparing the application and the medical records gathered for this purpose, CFLI denied payment on the policy. *Id.*

The decision to deny the claim was based not on the fact that Mr. Littlefield had had hernia surgery but rather on his failure to disclose of the many follow-up visits and tests that occurred in June and August 2003, after the single visit in May that he disclosed to both the paramedic and to the teleunderwriter. *Id*. at ¶ 59. Whether Mr. Littlefield knew he had a tumor or cancer is beside the point – he knew something was "majorly

wrong," *Id*. at ¶ 22, and had multiple tests and medical appointments none of which were disclosed to the paramedic or to the teleunderwriter. Mr. Littlefield would have been classified as a non-standard risk if CFLI had known only "he had ongoing complications that lasted more than a few weeks after his surgery." *Id*. at ¶ 59. If CFLI had been informed of any of the ongoing pain, the noticeable swelling, the feeling that "there's a baseball in there," the seven non-routine doctor's appointments, the Emergency Room visit, the Vicodin prescription, the grossly abnormal CT scan, or the inconclusive barium enema, CFLI's underwriter would sought addition medical records until the risk was capable of being assessed. *Id*. If CFLI had known about the medical information that it gathered after Mr. Littlefield's death, all of which has been confirmed by the information disclosed in discovery, CFLI would have classified him as an impaired risk and would not have issued the policy. *Id*.

Mrs. Littlefield was informed of the decision to deny payment on the policy by letter from Ms. Ingram dated September 7, 2003, which tendered a check for premiums paid. *Id*. The tender was rejected. *Id*.

J. The Medical Malpractice Claim

Prior to Mr. Littlefield's death, he initiated a lawsuit against Dr. Abadier, *see Littlefield v. John Abadier, M.D.*, KC-2005-0334, and testified regarding his condition, including his own perception of how he felt and what appointments, hospital visits, medications and tests he underwent during the period when he was under Dr. Abadier's care from April 2003 to the date of the testimony, just over one month prior to his death at the age of 36. Statement at ¶ 60. Mrs. Littlefield attended almost all of his deposition and assisted him in preparing for it. *Id*. at ¶ 21. At her own deposition, she affirmed her

husband's veracity and the accuracy of his testimony, with very limited exceptions. *Id.*, ¶ 21 n. 1.

The gravamen of the medical malpractice claim is that the mass depicted on the June 2003 CT scan is the same mass that was diagnosed as cancer in July 2004, and that, but for Dr. Abadier' negligence, the mass would have been removed in 2003 and Mr. Littlefield would have survived the cancer. Statement at ¶ 32. Both Dr. Manzo and Mr. Littlefield's 2004 surgeon, Dr. Shahinian, told him that the July 2004 CT scan, when laid over the June 2003 CT scan, showed that it was the same tumor, and that it had actually been bigger in 2003. *Id*. at ¶ 61. After his surgery in 2004, Dr. Shahinian told Mr. Littlefield that the June 2003 CT scan evidenced that the cancer had not yet broken through the abdominal wall, and that, if his appendix had been removed a year and half before, even if it had been cancer, he would have needed a couple of rounds of chemotherapy. *Id.* At her deposition, Mrs. Littlefield confirmed that they asked Dr. Shahinian, whether "during the surgery . . . for the hernia . . . if [the cancer] would have been found at that point in time, would the cancer have been discovered and he said absolutely." *Id.*

## III. <u>LEGAL ARGUMENT</u>

### A. <u>Standard Of Review</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is only "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir. 1995) (citing *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Once the movant has made the showing that no genuine issue of material fact exists, the non-moving party "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir. 2002); *Mesnick v. Gen. Electric Co.*, 950 F.2d 816, 820 (1st Cir. 1991).

When the material facts are undisputed, as in this case, the only question before the Court is whether the moving party should be granted judgment as a matter of law. *See Quintero de Quintero v. Aponte-Roque*, 974 F.2d 226, 228 (1st Cir. 1992) ("When, as in this case, the material facts are undisputed, the question on a motion for summary judgment becomes one of law.").

B. Material Misrepresentation Voids Life Insurance Contract as a Matter of Law.

It is a well settled matter under Rhode Island law, as elsewhere, that "a policy of insurance which has been issued upon a misrepresentation of material fact is . . . 'utterly void'." *Summit Ins. Co. v. Porcaro*, C.A. 99-2521, 2004 WL1067920, at *5 (R.I. Super. Ct. 2004) (citations omitted). Therefore, a refusal to honor a claim arising from a death in the contestability period is justified.[15] This has been true since "the earliest days of Rhode Island Jurisprudence." *Id*. Even though innocently made, the material

---

[15] The policy at issue here specifies that CFLI could not "contest this policy after it has been in force during the lifetime of the insured for two years . . . from the policy date." *See* Statement at ¶ 57. Death within the contestability period tolls an insurer's limitations on contesting that policy. 16 Williston on Contracts § 49:99 (4th ed. 2005) (the effect of language included in the Policy specifying that incontestability is contingent upon the insured's survival for a given period of time is that "if the insured died within the contestability period, the policy could never thereafter become incontestable"); *see also* Couch on Insurance § 240:42 (3d ed. 2005) ("where it is provided that the policy must be in force for a stated period during the lifetime of the insured, the death of the insured before the expiration of such period will have the effect of canceling the incontestable clause and will make the policy contestable at any time"); *Crow v. Capitol Bankers Life Ins. Co.*, 891 P.2d 1206, 1212 (N.M. 1995). Because Mr. Littlefield died prior to expiration of the two-year period following the issuance of Policy, CFLI was entitled to contest it.

misrepresentation mandates rescission of the insurance contract; there is no requirement for a showing of fraud. *Guardian Life Ins. Co. of Am. v. Tillinghast*, 512 A.2d 855, 859 (R.I. 1986). The prospective insured cannot avoid the consequences of his own misrepresentation by pointing to the inadequate conduct of the insurance agent in procuring the application. *Summit*, 2000 WL 1067920, at *7. The insurance company is entitled to rely upon the information provided by the prospective insured in evaluating risk. *Id*. Further, the withholding of information that could have materially affected the insurance company's determination to issue an insurance policy is a material misrepresentation as a matter of law, voiding the insurance agreement. *Id.* at *6.

Much has been written regarding what quantum of misrepresentation is sufficient to void an insurance agreement as a matter of law. The simplest articulation is whether the insurance company specifically asked for information regarding the matter withheld or misrepresented; the asking of the specific question establishes that materiality may be decided as a matter of law if the information withheld is such that it would be considered by all reasonable fact finders as affecting the insurer's acceptance of risk. "The fact that a specific answer is sought by the insurer in an application for an insurance policy makes that answer material. When such an answer is untrue the policy will ordinarily be forfeited." *Prudential Ins. Co. of Am. v. Tanenbaum*, 167 A. 147, 149 (R.I. 1933); *see also Evora v. Henry*, 559 A.2d 1038, 1040 (R.I. 1989) (if a representation on an insurance application is falsely made, it is a material misrepresentation sufficient to void the policy); *Halpert v. Rosenthal*, 267 A.2d 730, 735 (R.I. 1970) (even an innocent misrepresentation is actionable to forfeit an insurance policy); *Am. Jur.*, 2d ed., § 1022, "*Materiality of Misrepresentation*" (May 2007). Thus, a misrepresentation is "material"

such that an insurer can avoid a policy if an insurer, acting reasonably and in accordance with its custom and practice, would have relied on the representation. *Smith ex rel. Stephan v. AF&L Ins. Co.*, 147 S.W.3d 767, 774 (Mo. Ct. App. 2004). When the insured provides an untrue answer to a specific question asked by the insurer on application, the policy is forfeited and summary disposition is appropriate. *Prudential.*, 167 A. at 149.

A material misrepresentation in an insurance application is "any representation that induces the insurer to insure the applicant." *Evora*, 559 A.2d at 1040. If a representation on an application is falsely made, it is a material misrepresentation sufficient to void the contract. *Id*. There is no legal requirement that the prospective insured had actual knowledge of the seriousness of his health condition for his failure to provide information on an application to constitute a material misrepresentation. *Paradise v. John Hancock Mut.l Life Ins. Co*., 108 R.I. 700, 702-03 (R.I. 1971) (court properly declined to instruct the jury that it was necessary for the deceased to have had knowledge of the seriousness of his condition; failure to disclose tests and physician visits justified finding of material misrepresentation). Thus, the fact that the misrepresentation was made without knowledge of its falsity is immaterial. *See Guardian*, 512 A.2d at 859. As long as the misrepresentation induced the insured to assume a risk which it otherwise would not have taken, there is legal ground for avoidance. *See 44 Am. Jur*. 2d *Innocent Misrepresentations* § 1023 (2007).

In *Paul Revere Life Ins. Co. v. Fish*, 910 F. Supp. 58 (D.R.I. 1996), this Court struggled with application of these principles in a case, unlike this one, fraught with factual issues regarding whether the non-disclosed information materially affected the insurer's acceptance of risk as a matter of law where there was no evidence that the

non-disclosed condition (historical drug and alcohol abuse) still existed at the time that the insured applied for disability insurance. *Id.* at 66. Unlike Mr. Littlefield, whose undisclosed medical appointments included one on the same day he applied for the policy, in *Paul Revere*, plaintiff admitted to moderate drug and alcoholism mostly in a period ending six years prior to the making of the insurance application. *Id*. at 60. More importantly, the applicant testified that he signed a blank insurance application and provided accurate information to the insurance agent, who filled out the application without further review or signature by the applicant. *Id.* at 61. In stark contrast to the application process for Mr. Littlefield, only the agent signed the application containing the alleged misrepresentations; indeed, it was the agent alone who certified to the accuracy of the information supplied. *Id*. at 60-61.

Thus, the analysis employed by Judge Lagueux in *Paul Revere* confirms that summary judgment is the right result in this case.

C. Rhode Island's Statutory Mandate for Submission of Life Insurance Misrepresentation to a Jury is Not Applicable to Fraternal Benefit Societies.

In recognition of the eleemosynary purpose of fraternal benefit societies, Rhode Island expressly exempts them from "all other insurance law provisions unless they are expressly designated therein, or unless it is specifically made applicable by this chapter." R.I. Gen. Laws § 27-25-23.[16] Thus, CFLI is not subject to R.I. Gen. Laws § 27-4-10, which statutorily reserves for the jury the question whether a misrepresentation in a life

[16] R.I. Gen. Laws § 27-4-10 also requires life insurers that are not fraternal benefit societies to prove that the non-disclosed information not only is material, but also that it actually contributed to the death of the insured. CFLI is not subject to this requirement for the reasons discussed above. However, the undisputed facts in this case establish that the mass depicted on the CT scan from June 2003 that was not disclosed to CFLI is the same mass found to be a malignant tumor and diagnosed as the cancer that caused his death in 2005. Thus, CFLI could readily satisfy the second prong of R.I. Gen. Laws § 27-4-10. *See* Statement at ¶ 61.

insurance policy is material. *See Paul Revere,* 910 F. Supp. at 65 n.2 (Judge Lagueux characterizes this statutorily mandated jury trial, required even when the facts are undisputed, as "interestingly"); s*ee also Prudential*, 167 A. at 149-50 (narrow interpretation of this provision, finding ways to avoid its applicability where the misrepresentation is unambiguous as a matter of law).

While there are no Rhode Island cases specifically interpreting the fraternal benefit society exemption to exclude applicability of the statutorily mandated jury trial, other jurisdictions with analogous statutory schemes that have addressed the issue have uniformly held that the life insurance provision governing misrepresentation does not apply to insurance policies written by fraternal benefit societies.

For example, Kansas has a statute similar to that in Rhode Island on the effect of misrepresentation in life insurance applications (Kan. Stat. § 40-418); the provision does not apply to policies written by fraternal benefit societies:

> Because of differences in design and nature, the Legislature has placed these organizations in a class separate from insurance companies, and provided for each a distinct code of laws for their regulation and control. While benefit societies have insurance features, they are not designed to give indemnity or insurance for profit, as are insurance companies; but the theory on which they are organized is to provide mutual benefits and benevolences to members and their families, with no profit in view, and the benefits and relief extended are confined to those associated together in their lodges and societies. Most of the statutory provisions regulating insurance companies are inconsistent with those governing benefit societies, and to make the distinction clear and prevent the application of the governing rules of one organization to the operations of the other, it was expressly provided in the Fraternal Benefit Act [that benefit societies are exempt from the provisions of insurance laws].

*Glasgow v. Sovereign Camp, W.O.W.*, 191 P. 470, 471 (Kan. 1920); *see also Cassstevens v. Texas Standard Life Ins. Co.*, 155 S.W.2d 916, 918 (Tex. Comm'n App. 1941) (insurance statutes "which make provision with respect to misrepresentations, are not

applicable to, and do not regulate, the business of mutual aid and fraternal associations."); *Wilhelm v. Security Ben. Ass'n.*, 121 S.W.2d 295, 296-97 (Mo. Ct. App. 1938) ("a fraternal benefit association is exempt from the general insurance laws of this state, including . . . [the section] regarding misrepresentations"); *Gordon v. Royal Neighbors of Am.*, 90 S.W.2d 198, 199 (Mo. Ct. App. 1936) (because fraternal benefit societies are exempt from the application of the misrepresentation statute, false statements will prevent recovery. . . regardless of whether the particular matters misrepresented may be said to have contributed to the death of the insured or not."); *Sovereign Camp of the Woodmen of the World v. Treanor*, 217 S.W. 204, 206 (Tex. Civ. App. 1919) (emphasis added) (the law that misrepresentations do not void a policy unless material and actually contributes to the contingency "does not apply to fraternal benefit societies" where "the [fraternal benefit society/insurer] had the right to a truthful answer, and, failing to get one, the insurance was rendered void"); *Pauley v. Modern Woodmen of America*, 87 S.W. 990, 992 (Mo. Ct. App. 1905) ("the proviso regarding misrepresentations "is not contained in the article on fraternal benefit societies, but in the one on ordinary insurance, and is not binding on fraternal societies").

D. Summary Judgment is the Appropriate Stage for Disposition when the Misrepresentation Materially Affects the Risk Assumed by the Insurer as a Matter of Law.

There are many cases that make clear that summary judgment in favor of the insurer is mandated when the applicant has made misrepresentations that cause the insurer to issue a life insurance policy that either would not have been issued or would have been issued at higher rates if the true facts had been disclosed. The facts in many of these cases are sufficiently analogous to merit full discussion.

For example, in *Miguel v. Metropolitan Life Ins. Co*., 200 Fed Appx. 961 (11th Cir. 2006) the prospective insured responded to a question about treatment for chest pain and shortness of breath by disclosing a mild case of pneumonia, but reported "all OK;" she omitted that during the hospitalization only three months before the application she was treated for a heart attack, in addition to pneumonia. *Id*. at 964 (applicant read and signed application form, which includes a certification that her answers were true and complete). The court rejected plaintiff's argument that her disclosure of some adverse health information – here the name of the hospital where both the heart attack and pneumonia were treated – imposed a duty of inquiry on the insurer to request medical records.[17] *Id*. at 969. In the face of the insurer's evidence that the policy was issued on the basis of the responses she provided in her application and that the information solicited by the application's questions was material from an underwriting perspective, summary judgment was appropriate. *Id*. at 968.

Similarly, in *Laura Campbell Trust v. John Hancock Life Ins. Co.,* 411 F. Supp. 2d 606 (D. Md. 2006), while the insured had disclosed numerous serious health issues (including abnormal heart rate, cancer that had been treated, and other matters), she did not reveal the appointment with her physician two days before the application or the hospitalization for unresolved pneumonia and other problems a month before. *Id.* at 608-09. In granting the motion the court held that omitted information is material as a matter of law if it would reasonably influence the company's decision whether or not to

[17] In the second Count of her Complaint, plaintiff asserts that CFLI had a duty of inquiry because Mr. Littlefield had executed a release so that it could have obtained medical records. As *Miguel* makes clear, no such duty may be imposed as a matter of law. *Id*. at 969; *see also The Northwestern Mut. Life Ins. Co. v. Babyan*, 430 F.3d 121, 133 (3rd Cir. 2005); s*ee infra* at 38-39.

issue a policy; therefore, if the insurer clearly states that, if it had known the truthful answer, it would have denied coverage, summary judgment is appropriate. *Id*. 610.

Conversely, to show that the question not answered truthfully was immaterial, the plaintiff must demonstrate that the medical ailments the question would have brought to light likely would not have affected the decision whether to issue the policy. *Id*. Where (as in this case) the plaintiff offered no expert testimony that the undisclosed ailments were insignificant, the court affirmed that a material misrepresentation as a matter of law was established. *Id*. at 610-611; *see also Fisher v. William Penn Life Ins. Co.*, C.A. No. 98-7671, 1998 WL 887176, at *2 (2d Cir. 1998) (summary judgment in favor of the insurer affirmed because failure to disclose recent medical history was a material misrepresentation); *Onyon v. Truck Ins. Exch.*, 859 F. Supp. 1338, 1341 (W.D. Wash. 1994) (a misrepresentation will be considered material as a matter of law if a reasonable insurance company would attach importance to the fact misrepresented; summary judgment granted).

A misrepresentation is material as a matter of law not only where the non-disclosed facts reveal an unacceptable risk, but also where the undisclosed facts expose that the risk cannot reasonably be assessed. *See Garde v. Inter-Ocean Ins. Co.*, 842 F.2d 175, 178-79 (7th Cir. 1988) (when the facts omitted or misstated are material either to the acceptance of the risk by the insurer or the hazards to be assumed under the policy, summary judgment is appropriate). Thus, Mr. Littlefield's lack of a definitive diagnosis for the abnormality depicted on the CT scan, the pain, the palpable swelling, or the feeling "like there's a baseball there," meant that the true facts pertaining to his application at best made risk assessment impossible until these matters were resolved.

*See* Statement at ¶ 59. This is enough to establish materiality as a matter of law. *Id.* (true and complete disclosure of Mr. Littlefield's medical history would have caused him to be classified as an impaired risk so that the 2003 policy would not have issued).

By contrast, any claim by Mrs. Littlefield that Mr. Demers was told about the gravity of Mr. Littlefield's medical condition does not present a genuine issue of material fact. Claims by a surviving spouse that the agent was told the missing information but did not record it are unavailing where the applicant signed the completed form.[18] For example, in *Jones v. Allstate Life Ins. Co.*, C.A. No. 93-1102, 1994 WL 28575 (6th Cir. 1994), the widow claimed that she and her husband truthfully told the insurance agent about his smoking history and that the insurance agent affirmatively misrepresented when she wrote "no" on the application. As with Mr. Littlefield's 2003 application, it was undisputed in *Jones* that a copy of the completed application form was incorporated into the policy that was received by the decedent and his wife well before his death. Therefore, the court affirmed summary judgment in favor of the insurer based upon misrepresentations pertaining to weight and failure to identify bronchitis and pneumonia in response to a question about "lung disorder" based upon the insured's belief that the ailments were minor. *Id*. at *1. In affirming the judgment, the court emphasized the critical fact that the decedent "signed the application and declared, in doing so, that the

---

[18] As these cases make clear, Mr. Littlefield's repeated opportunities to review and correct the information recorded by paramedic and the teleunderwriter defeats any attempt to avoid summary judgment based on Mrs. Littlefield's claims about what happened in the meeting with Mr. Demers. In any event, here the claim that she and her husband told Mr. Demers about the CT scan and the barium enema is mooted because Mrs. Littlefield also testified that these tests were negative, which was false, and that, by the time of the application, Michael Littlefield was in good health, which was also false. Statement at ¶¶ 28, 29, 33. Finally, it is undisputed that it was not Mr. Demers' responsibility to record these answers and the form that he filled in (and that Mr. Littlefield signed) confirmed that, in that there are no questions on it that called for the disclosure of that information. *Id.* at ¶ 34.

representations contained in the application were truthful to the best of their knowledge." *Id*. at *2.

Nor surprisingly, the *Jones* court held that the applicant has a duty to read what he submits to the insurance company and, if the applicant signs the application, knowledge of the contents is imputed to him. *Id* at *4; *see also Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772, 777 n.7 (4th Cir. 1990) (directed verdict in favor of the insurer affirmed despite disputed testimony that decedent told the insurance agent about his smoking, and the agent decided to insert a negative response to get a lower premium, where the agent wrote the responses on the form, but the decedent read and signed the form after it had been filled out); *Holsey v. Ohio State Life Ins. Co.,* No. 93-2524, 1994 WL 592750, at *2-3 (4th Cir. 1994) (summary judgment affirmed despite widower's claim that his wife truthfully denied smoking because she was not smoking on the day of application; where insured signed the application, certifying that answers were accurate and complete, he is charged with the misrepresentations, and they are material if they "would reasonably influence the insurer's decision as to whether it would insure the applicant.").

In *Nichols v. The Southern Life Ins. Co.,* 584 F.2d 106 (5th Cir. 1978), the court affirmed the grant of summary judgment despite plaintiff's allegations of agent and insurer misconduct in reliance upon the agent's undisputed testimony – essentially the same as the testimony of the paramedic and teleunderwriter here – that he read the questions to the applicant, entered the applicant's responses and then gave the completed application form to the applicant to read and sign. *Id*. at 108. Where the applicant informed the insurance company of a visit to his physician for arthritis pain, but failed to disclose that the physician informed him that his blood pressure was elevated and

recommended a follow up visit, the court concluded that the application was materially incomplete as a matter of law because, "[i]f the insurer had known the fact of these visits, diagnosis, and treatment, it would have investigated their substance and import … but lacking this knowledge, it could not investigate and could neither refuse the risk nor readjust the premium rate. *Id*. at 108.

The fact that a medical provider may have told the applicant that his medical symptoms were not serious similarly does not defeat the insurer's ability to obtain summary judgment based on the applicant's failure to disclose tests and hospitalizations related to the symptoms. *See Davis v. Integon Life Ins. Corp.*, 645 F. 2d 494, 496 (5th Cir. 1981). In *Integon*, decedent was hospitalized and had four electrocardiograms for chest pain. The treating physician told decedent that the pain was muscular and that he had no heart trouble or heart disease. Three months after the tests and hospitalization, the decedent failed to disclose them when he applied for life insurance. In reliance upon testimony of the medical director of the insurer that the company would not have issued the policy if it been aware of the hospitalization, the Court had no difficulty finding that the answers given to the paramedical examiner were "material misrepresentations as a matter of law." *Id*. at 496-97.

The widow argued that there was a fact issue whether the answers were misrepresentations because the decedent had been told by his treating physician that the chest pains were merely muscular; the court rejected this argument, holding that the "no" response to the question asking for any hospitalizations eliminated any fact issue. "[I]it is inconceivable that a person acting in good faith, even if illiterate, could have failed to disclose a hospitalization occurring only three months before the interrogation." *Id.* at

498.[19] Thus, despite the "unwelcome" outcome in a case where the decedent is unavailable and despite the hardship visited on his estate, the Fifth Circuit concluded that summary judgment must be granted when the record so requires.[20] *Id.* at 497; *see also Peters v. Woodmen of the World Life Ins. Co.*, No. 89-6220, 1991 WL 4701 (6th Cir. 1991) (decedent's failure to disclose alcoholism because he did not believe he had a drinking problem is material misrepresentation).

The cases also make clear that the insurer has no affirmative duty to investigate the insured's statement or to follow up by requesting medical information from every medical provider identified, even where consent has been given by the prospective insured. *Rutherford v. John Hancock Mut. Life Ins. Co.*, 562 F.2d 290, 293 (4th Cir. 1977); *see also The Northwestern Mut. Life Ins. Co. v. Babyan*, 430 F.3d 121, 133 (3d Cir. 2005) (affirming summary judgment in favor of the insured, and declaring that "[i]t would be imprudent to adopt a rule that signing a waiver for the insurance company to retrieve medical information absolves the applicant of the obligation to provide truthful information"). The applicant in *Rutherford*, like Mr. Littlefield, told the agent that he was in good health and that he had seen his physician for a routine physical. He failed to disclose hospital treatment and consultation with the physician for alcohol intoxication. *Id*. at 292. The Court discounted the disputed allegation that the insurance agent knew that the applicant had a history of alcoholism. *Id*. at 293. In affirming the grant of

---

[19] In *Integon*, as here, the paramedical professional had no recollection of meeting with the applicant. It was undisputed, however, that she recorded all answers on the questionnaire correctly and that she routinely answers any inquiry of applicants concerning the questions on the questionnaire. *Integon.*, 645 F.2d at 498 n.6. Cf. Statement at ¶ 37-41 (does not recall meeting with Mr. Littlefield but asked all of the questions and accurately recorded his answers).

[20] At her deposition, Ms. Ingram clearly articulated this principle: "It is your responsibility and not the physician's responsibility to tell us that your head hurts and then we can make a determination as to whether or not we can properly classify you in the correct risk classification." Statement at ¶ 56.

summary judgment, the Court "emphasize[d] that we do not equate general knowledge of an alcoholic condition with specific knowledge of a condition as severe as that of [applicant]." *Id*. at 293. The court found it inappropriate to place the insurer on a duty of inquiry based on the disclosure of incomplete information pertaining to the non-disclosed condition.

In *Rutherford*, as here, the hospital visits were never revealed to the insurer – as a result, the false application was entirely innocuous on its face. Thus, mere knowledge of the prior alcoholism "was insufficient in and of itself to result in a waiver by the company **as a matter of law**." *Id.* at 293 (emphasis applied). As in *Rutherford*, Mr. Littlefield's disclosure of routine hernia surgery coupled with the affirmative representation that "all okay," resulted in an application that was entirely innocuous on its face, presenting a standard risk and justifying issuance of the policy without further inquiry. It is undisputed that, if CFLI had been aware of any of the hospital visits, the grossly abnormal CT scan, the inconclusive barium enema, the pain so severe as to require Vicodin and the curtailment of his work or his description that "it feels like there's a baseball there," it would not have issued the policy. Statement at ¶ 59. As in *Rutherford*, therefore, summary judgment in favor of the insurer is appropriate. *See also Peters*, 1991 WL 4701, at *5. (fact that applicant disclosed physician, but failed to disclose number of visits or symptoms related to visits, does not alter the materiality of the misrepresentation; as long as there is an undisputed discrepancy between the decedent's actual medical history and the medical history reported to his insurer, courts have no difficulty granting summary judgment in favor of the insurer).

Here Mr. Littlefield presented a true medical history of multiple visits to physicians and the hospital, a grossly abnormal CT scan, and inconclusive barium enema, ongoing pain so severe as to require alteration of his work, a palpable swelling like a hard baseball and aggressive pain medication – the undisputed evidence is that any one of these issues would have raised a serious question halting progress on the application until the risk was capable of being assessed. Cumulatively, under CFLI's underwriting protocols, disclosure of a true medical and complete history would have caused Mr. Littlefield to be classified as an impaired risk so that the policy would not have issued. Statement at ¶ 59.

## IV. CONCLUSION

Because the undisputed facts establish that Mr. Littlefield made multiple material misrepresentations to CFLI during his paramedic interview and his teleunderwriting interview, which misrepresentations he reaffirmed when he signed the Amendment to his policy, the insurance agreement with CFLI is void as a matter of law. Therefore, CFLI properly refused to pay on the policy after Mr. Littlefield's death within the contestability period and Summary Judgment must enter in its favor and against plaintiff.

/s/ Patricia A. Sullivan
Patricia A. Sullivan (#2120)
Caroline F. Turcotte (#7165)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200

(401) 276-6611 (fax)

Attorneys for Defendant
Catholic Family Life Insurance
Company

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of June, 2007, a true and accurate copy of the within *Memorandum in Support of Motion for Summary Judgment* was served by ECF on:

Karen Davidson, Esq.
One Ship Street
Providence, RI 02903

/s/ Patricia A. Sullivan