2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COLLEEN LITTLEFIELD
Plaintiff
vs. C.A. No. 06-157
CATHOLIC FAMILY LIFE INSURANCE COMPANY
Defendant

30(b)(6) DEPOSITION OF KIM INGRAM
Tuesday, February 20, 2007
9:30 a.m.
Law Office of Karen Davidson
One Ship Street
Providence, Rhode Island

---------- Ellen Zappia, RPR ----------
Capitol Court Reporting, Inc.
931 Jefferson Boulevard, Suite 2003
Warwick, Rhode Island 02886
(401) 739.3600



INDEX

WITNESS: KIM INGRAM
EXAMINATION BY: PAGE:
Ms. Davidson 4
PLAINTIFF'S EXHIBITS MARKED: PAGE:
1 Subpoena 29
2 Document Bates No. CFL000587-588 89
3 Document Bates No. CFL000553-557 96
4 Document Bates No. CFL000454-455 97
5 Document Bates No. CFL000091 98
6 Document Bates No. CFL000079,83
82,71,72,85,86,87,84,73 99
7 Document Bates No. CFL00014 107
8 Document Bates No. DC00005 108
9 Document Bates No. DC00001-4 108
10 Document Bates No. CFL000001-4 109
11 Document Bates No. CFL000006-7 114
12 Document Bates No. CFL000018-19 116
13 CFLI Illustration of Proposed
Coverage 118
14 Document Bates No. CFL000076 123
15 Document Bates No. CFL000077 125
16 Document Bates No. CFL000045,46
47,48,53,54,32,33,49,50,55,51,
52,35,34,67,30,25,24,31,28,27,29,
26,38,36,43,44,41,42,39,40 125
17 Document Bates No. CFL000447,452 145
18 Document Bates No. CFL000453 148



APPEARANCES

For Plaintiff:

KAREN DAVIDSON, ESQ.

LAW OFFICE OF KAREN DAVIDSON

One Ship Street

Providence, Rhode Island 02903

For Defendant:

PATRICIA A. SULLIVAN, ESQ.

EDWARDS ANGELL PALMER & DODGE LLP

2800 Financial Plaza

Providence, Rhode Island 02903



(Proceedings commenced at 9:30 a.m.)
KIM RENEE ELIZABETH INGRAM,
after having been first duly sworn under oath, was questioned and testified as follows:
EXAMINATION BY MS. DAVIDSON:
Q. May I have your full name, please.
A. Kim Renee Elizabeth Ingram.
Q. And where do you live, Kim?
A. In REDACTED
Q. And that's outside of Milwaukee?
A. Correct.
Q. And who lives with you there?
A. My husband and my daughter and my son.
Q. Could you briefly tell me what your educational background is.
A. Yes. I have an undergraduate degree from the College of Holy Cross in Worcester, Massachusetts. I have a graduate degree from Cardinal Stritch University. I have an associate's in insurance regulatory compliance. Chartered life underwriting degree. Chartered financial consultant degree. A fellowship in life insurance management degree. An associate's in customer service. Let's see. Licensed in four or five states for life,

Q. Who do you reinsure with?
A. Currently with Optimum Re.
Q. Optimum?
A. Optimum.
Q. And who did you reinsure with in 2003?
A. In 2003 the company that was involved in reinsurance for this particular case was BMA, that was purchased by Generali.
Q. When was it purchased by Generali?
A. I would be guessing at the date.
Q. Sometime in the 2000, 2001, 2003?
A. Sometime between 2000 and 2003.
Q. Are you aware of any specific guidelines or policies with regard to the treatment of hernias by CFLI?
MS. SULLIVAN: You mean underwriting guidelines?
A. We do have some underwriting guideline books used for the field just to help define and spell out what something is. It's to help an agent identify a condition and very limited, but we do have those and we did produce those for you.
Q. How are hernias treated by CFLI or how were they treated in 2003?



A. In 2003, depending on the type of hernia, if a hernia has no complications, the surgery has been completed successfully and there are no residual effects, depending on the type of hernia, the location of the hernia, the duration of the hernia, the cause of the hernia, that -- a hernia that is not going to impact mortality, and that hernia would be just noted on the application as one of the factors and...
Q. And do you determine all of those factors by obtaining medical records?
A. No.
Q. How do you determine those factors?
A. We ask the person. We ask a number of questions, and we'll ask about the surgery. We'll ask if the -- when was the surgery scheduled? Is it scheduled in the future? Is it scheduled now? Were there any complications? How do you feel now?
Q. And is this written out somewhere that the agents are supposed to be asking those questions?
A. It's not the agent's job to ask all of those questions.
Q. Whose job is it?
A. It's the job of the teleunderwriter and the



examiner.
Q. It is the -- are the rules written out for the teleunderwriter or the examiner?
A. The questionnaires are the basis for the questions that they ask and those questionnaires are printed.
Q. Have those questionnaires changed between '97 and 2003?
A. In 2003 the teleunderwriting application, that whole process was first created, and that's also noted in our underwriting guidelines. So the teleunderwriting application that was in place in 2003 was not in place in 1997.
Q. All right. I may be mistaken, but I don't believe I have underwriting guidelines that show that the teleunderwriter underwriting questions had changed.
A. They were first developed. So teleunderwriting did not occur in 1997.
Q. Okay.
Why did you decide to start using teleunderwriting?
A. Catholic Family, very active in a number of industry organizations, became one of the companies



that decided to adopt the process and say fast method of acquiring information. There were a number -- a number of different companies who were using it and one of the pioneers for the development of the teleunderwriting process said that you would actually get better information having a third party ask the applicant the question because it's over the phone, they don't feel as it's invasive, and they can give you better information about their medications and their doctors' addresses if you call them at home where they have all of this information. Something that doesn't necessarily occur during the application process with the agent. They might know the agent and they might not want to disclose some information. You get full disclosure of the information.
And implementing this process also saved sometime in the underwriting area because you can decide whether or not based on that person's answers if you need to get an attending physician's statement or what's called an APS. So based on the response from the applicant you can -- APS, depending on the doctor, could take a week to months and therefore they're waiting weeks to months to get

their insurance policy. And if they can give you enough information that you can look and say this person is a standard health risk then you can go ahead and issue that policy. If they give you information that says well, there are some things that are not of the norm of a healthy person, then you can go get attending physicians' statements and you can find out which ones by talking to the person, talking about their doctors' visits you need to get. So there are a number of companies who adopted this process and we were one of them.

Q. Are those conversations taped, the teleunderwriter speaking to the prospective applicant?

A. No.

Q. And are those conversations scripted?

A. Yes.

Q. And you provided for me a copy of the script, is that correct?

A. Yes.

Q. Now, you said that sometimes people have information at home. Don't the agents typically see these prospective applicants at home where they have information accessible to them?



A. They have the information that's accessible to them, however, people do not get up from the table and run to their bedrooms and get the medications and pull out the phone books and get the doctors' names and addresses, whereas if I tell you that you will be called then you can have that information ready when the person calls and the person can say, well, I can hold while you go get that information.

Q. And the agent couldn't do that in advance of coming to the house saying I need this information, get it out for me before I come?

A. Agents can.

Q. How --

A. We haven't found that to happen.

Q. How were the teleunderwriters trained in 2003?

A. We take actual experienced underwriters, people who select risk and have been trained in the selection of risk. And this particular person that we used came to us already trained.

Q. By whom?

A. By the companies that she worked for.

Q. And who is this particular person?



A. Cathy Hartwig.

Q. And is Cathy still your underwriter?

A. She's our teleunderwriter.

Q. Is she the only teleunderwriter?

A. She is the only teleunderwriter employed by Catholic Family.

Q. Did you ever have other teleunderwriters?

A. We use a third party vending service called Interviews by Underwriters, IBU. They also conduct teleunderwriting interviews for us.

Q. And how often do you use them?

A. On an as-needed basis. If Cathy is on vacation, sick, unavailable. If we have more applications submitted that -- than we would be able to get the interviews conducted. We like to get them conducted within a couple of weeks and if it looks like we have too many to make those calls and they can use them as an overflow.

Q. How long has Cathy Hartwig worked for the company?

A. She was there when I got there. So I'd say at least in 2003.

Q. When did you come in 2003?

A. July.



Q. With regard to teleunderwriting, the only document that I can recall that was provided to me was a sheet with various questions on it that was apparently read to Michael Littlefield. Are there any other documents that the teleunderwriters use?

MS. SULLIVAN: Objection. It might be helpful if you would show her what sheet you have in mind.

MS. DAVIDSON: I think she probably knows.

Q. Do you know? I'll show it to you later.

A. The documents that we use for teleunderwriting have been produced. There is a sheet that's a verification of information and then page two and page three, and that's a list of questions asked and it's asked by the interviewer, teleunderwriter and paramed.

Q. And were those questions previously asked primarily by the agent? And I mean previously in '97, '98.

A. Only some of them. If a paramed is involved that medical exam questionnaire is always asked by a paramed or a physician. That's not something that the agent would ask.