# 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COLLEEN LITTLEFIELD
vs. C.A. No. 06-157
CATHOLIC FAMILY LIFE
INSURANCE COMPANY

DEPOSITION OF COLLEEN LITTLEFIELD, the Plaintiff in the above-entitled case, taken on behalf of the Defendant, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Edwards, Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island on January 3, 2007 at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF......LAW OFFICE OF KAREN DAVIDSON
BY: KAREN DAVIDSON, ESQUIRE

FOR THE DEFENDANT......EDWARDS ANGELL PALMER & DODGE
BY: PATRICIA A. SULLIVAN, ESQ.

ALSO PRESENT: Vincent Morgera, Esquire

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

lot of stuff on my plate, more than most people do.
Q. And that's the only reason for omitting it?
MS. DAVIDSON: Objection.
A. I don't have any other reason.
Q. Now, you testified that you were also present when Mr. Demers delivered the policy?
A. Yes.
MS. DAVIDSON: First one or the second one? '97 or '03?
A. I was there for both.
MS. SULLIVAN: She said she was there for both.
MS. DAVIDSON: I want to know which one you're questioning about.
MS. SULLIVAN: I was questioning broadly about any.
A. Both of them. Both insurances.
Q. Incidentally, Mrs. Littlefield, do you recall your husband signing a form in connection with the replacement of life insurance policy at the meeting on August 25?
A. I sure do. We got into a little bit of an argument on that.



(DEFENDANT'S EXHIBIT 8 MARKED FOR IDENTIFICATION)
Q. Showing you Exhibit 8 and I'd just like you to take a look at the second page and the third page where it says on the second page, "(signed)," at the bottom and on the third page, "(signature of applicant)." Are those your husband's signatures?
A. Yes. Those are my husband's signatures.
Q. Were you present when he signed this form?
A. Oh, yes. Absolutely.
(DEFENDANT'S EXHIBIT 9 MARKED FOR IDENTIFICATION)
Q. Mrs. Littlefield, I'm passing you a document that we've marked as Exhibit 9. Do you recall seeing this document at the meeting on August 25?
A. Yes.
Q. Was this document filled out at the table?
A. He might have filled that out and then brought it back.
Q. When you say he, who are you referring to?
A. Mr. Demers.
Q. Brought it back another day?
A. I'm not sure. I know I've seen this and it's been done, but let me tell you how I know about this is because --



Q. Mrs. Littlefield, I haven't asked you a question.
A. Okey-dokey.
Q. I'd like to direct your attention to the third page of Exhibit 8. Do you see where it says, "I have received and read a copy of this comparative information form." If you look at the top title of Exhibit 9 it says "Comparative information form"?
A. Uh-huh.
Q. Does that refresh your recollection that the Exhibit 9 was delivered to your husband at the meeting on August 25, 2003?
A. This was.
Q. This, being Exhibit 8?
A. Yes.
Q. What about Exhibit 9?
A. I think this was brought the second time, not the first one, at the second one. He dropped it off. For some reason I think he filled it out after.
Q. I think you said the second meeting lasted 15 minutes?
A. No, I never said that.
Q. How long did the second meeting last?
A. Probably about 30 minutes, 40 minutes,



somewhere around there.
Q. What time of day was it?
A. The first meeting was about 7:30 in the morning.
Q. I was asking about the second meeting in 2003?
A. The second meeting, he came, it was after I had picked REDACTED trying to think if it was after I picked up from her preschool, which would have been after 1:00. After 1:00, I think.
Q. What time was the appointment?
THE WITNESS: On this one here?
Q. I'm asking you about the second meeting with Mr. Demers, what time was the appointment?
THE WITNESS: When he dropped this off?
Q. When he dropped off the policy?
A. I'm not sure of the second one when he dropped them off.
Q. You don't know what time it was?
A. No, I do not. I know the first appointment, but the second appointment, second appointment, it could have been after 1:00. I know I had to go pick the little one up. She had morning to afternoon. So, probably 12, 1:00, somewhere

Page 86

around there because I was there for when he came in.
Q. Do you have a memory it was in the middle of the day?
A. It would have to be before 2:30 because Mike went to work for 2:30, so it had to be before, like I said, 2:30. He left around 2:30 to go to second job and he worked from 8:00 in the morning until 2:00, 2:30 working on his janitorial services.
Q. What were his hours at his second job?
A. 3:30 until 12 -- usually got home between 12:30 and 1:00, somewhere around there.
Q. How many days a week did he work at the second job, focusing on 2003?
A. Five.
Q. What days did he get off?
A. He didn't.
Q. If there is seven days in the week, and five days that he worked --
A. He didn't have any days off. Michael worked seven days a week.
Q. He worked seven days a week at his second job?
A. On his first job. First job was the cleaning business. Second job was with Bunge as a chemist.

Page 87

Q. Focusing on the second job, how many days a week did he work?
A. Five.
Q. Which days?
A. He went in on Sunday -- got off Friday night at 12:00 and didn't have to be back in until Sunday night -- sorry, Monday, Monday he went in. Monday. 2:30 he would go in. He would get out 12:30 on a Friday.
Q. Where was the second meeting with Mr. Demers in 2003?
A. My home.
Q. Where in your home?
THE WITNESS: Where?
MS. SULLIVAN: Yes.
A. At the kitchen table.
Q. Did Mr. Demers have any papers with him?
A. Yes.
Q. What were they?
A. The policy, some other paperwork, his pad, a folder.
Q. Did he have any cancelled check on the policy that had been cancelled, the $50,000 policy?
A. He gave -- I believe he gave Michael a check the second time.

Page 88

Q. To your knowledge, did Michael cash that check?
A. Yes, he did.
Q. Did Michael sign any forms during that meeting?
A. That's when I think he brought this out.
Q. This being Exhibit 9?
A. I believe this was -- yes. He brought this one, I'm pretty sure he brought this one. He had Michael sign the first one, and then he brought this out.
Q. When you say he had Michael sign the first one, what are you referring to?
A. He had Michael sign this one the first time.
Q. You're referring now to Exhibit 8?
A. Yes.
Q. And then it's your testimony that Exhibit 9 was presented later in September; is that right?
A. He brought it back to show him when he brought the check. This wasn't with this.
Q. Do you remember whether Michael signed anything else?
A. Policies and stuff like that.
Q. He signed the policy?
A. Yeah.
Q. Do you remember what was discussed when Michael signed the policy?

Page 89

THE WITNESS: Didn't we just discuss that a little while ago?
Q. Not yet. What was discussed when Michael signed the policy?
THE WITNESS: You mean this part of this, right here?
Q. Strike that. I'm not referring to Exhibit 8, I'm talking about. You testified that Michael signed the policy during the meeting, the second meeting with Mr. Demers in 2003, correct?
A. Yes.
Q. And my question is when the policy was signed, what did Mr. Demers say?
A. I don't understand the question, because I think I've already answered all the questions about that already, about the policy, answering questions about the policy, didn't I?
Q. You told me what was said on August 25 of 2003, I'm asking you about the second meeting?
A. The second meeting. Oh, before Michael signed it? What Mr. Demers said to him?
MS. SULLIVAN: Yes.
A. He didn't say very much to him. He just asked him some more questions and it wasn't what Michael said to him. It was what I said to him.

Page 90

Q. What did you say?
A. I said I didn't think it was -- I didn't think it was right. Actually, that's not -- I still went on about that, that started way before when he came the first time, so I can't go into that right now. I wasn't happy about him getting the check and him doing it that way, but that's the way it had to be, Mr. Demers said that in order to get this insurance, he had to cancel out the other policy.
Q. The conversation that you are now recalling, that occurred on August 25, correct?
A. It occurred again when he brought it back.
Q. So you discussed the same thing again?
A. Oh, yeah.
Q. And did Mr. Demers tell you that in order to get the $300,000 policy with the premium and the preferred rates that your husband was applying for, that he wouldn't be able to get the same amount of insurance for the same price if he kept the earlier policy in place?
A. No. He never said it that way. He told us that Michael could not get the policy, this $300,000 policy with the other policy. He would have to do two distinctly different policies. He

Page 91

would not be able to incorporate both policies together. So Michael said, look, Mr. Demers asked Michael, he said, is that what you want to do? In order to get this insurance policy and do it like this, you have to do it this way. If you don't do it this way, we have to go back and you have to do two different policies, and Mike said, you know what, it's going too much paperwork, too much stuff, just do it this way then. So that's what he did.
Q. The conversation you're now describing, did that occur at the August meeting on August 25, 2003?
A. There and there, both times.
Q. So it happened at the second meeting as well?
A. Yes.
Q. Do you recall the date of the second meeting?
A. He dropped the paperwork off it was in September -- no, actually, no. September, no, I don't -- I'm sorry. September. September.
(DEFENDANT'S EXHIBIT 10
MARKED FOR IDENTIFICATION)
Q. Mrs. Littlefield, I'm passing you what we've marked as 10 and I'd like you to focus first of all on the "Signature of applicant/owner," and ask you if that's your husband's signature?

Page 92

A. Yes.
Q. Does this refresh your recollection that the date was September 19, 2003?
A. Yes. I thought it was the 22nd but it says the 19th, so I'm sure it must have been the 19th. I was going to say that, so instead of giving a wrong answer, I'd rather not give one at all.
Q. Is it your testimony that this amendment to the application was signed in your presence?
A. Yes.
Q. Other than what you already testified to, did Mr. Demers say anything else in connection with getting this part of the paperwork finished?
THE WITNESS: Repeat that one more time, please?
Q. Other than what you've already told me, did Mr. Demers say anything else at the time of completing this portion of the paperwork, Exhibit 10?
A. Said nothing. He just said, Michael sign this paper, that was it.
Q. During the meeting on September 19th was there any conversation about Michael's health?
A. Just asked him, you know, how he was feeling and that was it. Some other questions.

Page 93

Q. You said there were other questions?
A. Yeah. He was just asking him questions, asking him how he was, how was work over at Bunge and how things were going, just chitchat.
Q. Anything else that you can recall?
A. That was it.
Q. Other than what you've told me, have you now exhausted your memory for what occurred at that meeting on September 19th?
A. I don't know. I just have a headache right now.
Q. Mrs. Littlefield, you have to answer my question. Other than what you've told me, is there anything else that you remember regarding the meeting on September 19th?
A. I'm pretty sure what we discussed I've already -- we've already talked about both of these policies prior to this.
Q. When you say both of these policies, what are you referring to?
A. Both times that he was at the house.
Q. Both visits?
A. Sure. Yes.
Q. As opposed to both policies?
A. Sure. Yes.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

COLLEEN LITTLEFIELD

Vs C.A. No. 06-157

CATHOLIC FAMILY LIFE INSURANCE COMPANY

**PLAINTIFF'S ANSWERS TO DEFENDANT'S INTERROGATORIES**

Plaintiff objects to defendant's instructions, discovery is ongoing, and she will respond in accordance with Rule 33 of the Federal Rules of Civil Procedure.

1. Identify yourself in full by providing your name, your residence, your date of birth, and your social security number. To the extent that you consulted any other person or any documents in preparing any of your Answers to these Interrogatories, separately for each Interrogatory, identify all such persons and documents.

1. Objection, overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Colleen Littlefield, REDACTED 8. I have consulted with my attorneys in preparation of all these answers and with my sister, Victoria Metz, and we have looked at a few of the medical records provided and documents provided by defendant. This applies to all answers.

2. Identify all individuals whom you believe have knowledge of the facts at issue in this case. With respect to all such individuals identified herein, identify the facts over which you believe he or she has knowledge, and provide his or her residence and/or business address.

2. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, my attorney, Karen Davidson, my attorney, Vincent Morgera, defendant's attorneys, Donald C. Demers, information unknown, Donna Carroll, information unknown, plus the various physicians would have some medical knowledge and that information was provided in the application. My sister, Victoria Metz, and my brother, Glenn Ruzzo are familiar with the facts and both live in Florida. I believe I have also discussed this with various of my friends in general terms.

3. Itemize in detail the nature, scope and amount of any and all pecuniary or monetary losses that you claim you have sustained as well as any and all damages you claim. Identify all documents that evidence these claimed damages.

DEFENDANT'S EXHIBIT 13 1/3/07 KSL

3. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, I am making claim for the $60,000 policy, the $300,000 policy and these are contractual policies based on the insurance that was issued to my husband and of which I am the beneficiary. I have spent most of my savings and lost all interest on said money. Since my husband's death, I have taken over all monetary expenses for myself and my daughter and up until the time of his death, I assisted him in his care and did the majority of the work around the house. My claims are for bad faith, negligence and breach of contract. I have also been forced to retain attorneys whom I must pay to obtain this money that is contractually owed and have lost any monies I might have made on the $60,000 and the $300,000 policies from the time they should have been paid out until the present. Further, I have lost wages and have taken money from savings to support myself, so I have also lost interest on that money.

4. Identify all individuals that you intend to call as expert witnesses at a trial in this action. In each such case, provide the following:

(a) his or her full name;

(b) his or her business address;

(c) his or her relevant qualifications;

(d) the subject on which he or she is expected to testify;

(e) the substance of all facts and opinions to which he or she is expected to testify;

(f) a summary of the grounds for each such opinion.

4. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, unknown other than possibly some of the physicians. When this determination is made, it will be provided in accordance with the rules. Donald Demers and Donna Carroll, who are or were agents of the defendant, should be able to testify to various facts. My sister, Victoria Metz, from REDACTED and my brother, Glenn Ruzzo, from REDACTED ould also have information regarding various facts. Additionally, they would testify that my brother-in-law, John Metz, died from an asthma attack on June 13, 2003 in Florida and that my sister did not have adequate life insurance coverage from that. As a result and as my lawyer has told you, we were worried about our insurance coverage and therefore upped the policy another $300,000. I am not sure how "expert" their testimony would be. I would also expect that some of the treating physicians may testify and indicate that my husband was in excellent health and had no signs of cancer prior to applying for this policy, and we did not become aware of cancer for more than a year after receiving the policy.

5. Identify all communications that you have had with any person other than your attorney regarding the Application and Policy at issue in this litigation, as well as policy number

9711101, including the dates, times, persons involved in and the substance of any such communications.

5. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, as indicated, I had communications with Mr. Demers and Ms. Carroll regarding this application but no communication regarding this litigation. He came to our home and discussed the insurance policies and applicability with us as well as my husband's medical history. I have also spoken with them on the telephone subsequent to the original application but do not know exact dates and times. My husband also met with Ms. Carroll for the physical examination and I spoke with her on the telephone and she advised me that he was in excellent health and passed the physical with flying colors. This would have been within two weeks of the actual application. I also called the company and they referred me to Mr. Demers as he was the agent we used the first time. Mr. Demers came to the house and took notes and filled out some forms with my husband and myself at the table. We also discussed the barium enema test and the pocket of blood we were told they found during that test. Mr. Demers advised us we had to return and cancel the $50,000.00 policy in order to obtain the $300,000.00 policy. I disagreed with this as I thought we had already gone through the physical once and the two-year waiting period on that had long passed, and we discussed this and requested that the $50/60 policy be a rider or in addition to the $300,000 policy. After Mr. Demers left, I talked with my brother, sister and mother with regard to their knowledge of cancellation being necessary prior to upping the limits on a policy and they had never heard of this either. Mr. Demers advised us we would be covered in the interim between any cancellation and the new issuance if there were any lapse, and that the new policy wouldn't be issued leaving a gap of coverage.

6. Describe all communications that you have had with any representative, agent, or employee of CFLI, including the date, time, persons involved in and the substance of any such communications.

6. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. See answer to No. 5 above. Notwithstanding, I advised CFLI of my husband's demise and provided them with a copy of the death certificate and the medical authorizations that they requested so that they could obtain copies of the medical records which they desired. I was with my husband and Mr. Demers at the table during the application process and afterwards, there were various calls back and forth concerning the physical examination, his passing, and the issuance of the policy. I cannot tell you specific dates and times as I don't currently recall.

7. Identify all facts that you possess regarding the Application, how Michael Littlefield chose to purchase insurance from CFLI, how he came into possession of the Application, the circumstances under which Michael Littlefield completed the

Application, and the medical condition of Michael Littlefield before and at the time he completed the Application.

7. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, my husband applied for a $50,000 and a $300,000 policy and a $10,000 addition to the $50,000 policy. Ms. Carroll did the medical information and exam and Mr. Demers did the policy and some medical information. My husband completed the application with the assistance of a CFLI representative and provided all medical information that said representative indicated was necessary. He was advised during examination that he was extremely healthy and would certainly qualify. I can't currently recall facts other than that the cancer was diagnosed more than one year later.

8. Identify all times, dates, and locations by name, street, address, and city, where Michael Littlefield sought medical attention, including emergency room visits, physician's appointments, and testing appointments, as well as reasons for each appointment, and resulting diagnoses, treatments, and follow-ups, from 2000 to the present.

8. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, all of this information would be in his medical records that were provided to you. My husband and I have provided you with authorizations for release of medical records, both at the time of the application and I did at the time of my request for payment under the policy. Additionally, my attorney has provided you with all documentation that I have. Aside from the information on those particular records which speaks for itself, I would not have anything else.

9. Identify and describe all communications between Michael and/or Colleen Littlefield and any medical provider, including physicians, nurses, hospital or other medical facility employee regarding Michael Littlefield's health, from 2000 to the present, and identify all documents evidencing any such communications, including the present location of any document so identified.

9. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, I am sorry but I cannot begin to recall all those communications and I have provided you with all of the

information that I have. Neither my husband nor I withheld medical information with regard to his application. Any documents that might be responsive were given to you and if I find any more various communications are mentioned in the documents, I will certainly provide them. I believe that Dr. Shahanian said that Dr. Abadier could have done more tests and that some further testing might have discovered the cancer a little earlier.

10. State all facts and identify all documents related to the allegations in Paragraphs 6 and 7 of the Complaint that the Application for the Policy was completed by Michael Littlefield in North Kingstown, Rhode Island, on August 28, 2004, and that the Application was completed with the assistance of Donna Carroll.

10. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, I believe the application speaks for itself and my husband, Mr. Demers and Ms. Carroll signed said application which has been provided for you. Otherwise, I am not sure how you want me to answer this question and it speaks for itself and my husband, Mr. Demers and Ms. Carroll signed it.

11. State all facts and identify all documents related to the allegations in Paragraph 8 of the Complaint that "the Application included medical information and, as requested, authorized release of all medical records of Michael Littlefield to CFLI and/or its agents."

11. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, the application speaks for itself and included all medical information Mr. Demers wanted, and we provided releases for all medical records for Michael Littlefield. You have all of this information already. We also discussed his complete medical history with Mr. Demers and Mr. Demers took notes on this.

12. State all facts and identify all documents related to the allegations in Paragraph 9 of the Complaint.

12. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, I am not sure what else you want as I have answered above and provided everything, and those documents speak for themselves.

13. State all facts and identify all documents related to the allegations in Paragraphs 10, 22, and 27 of the Complaint that at the time of the Application and for nearly one year thereafter, there was no evidence of or diagnosis of cancer.

13. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, I am not sure what else you want as I have answered above and provided everything, and those documents speak for themselves. There is no mention of cancer in the medical records until more than a year after the application.

14. State all facts and identify all documents related to the allegations in Paragraph 11 of the Complaint.

14. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, I am not sure what else you want as I have answered above and provided everything, and those documents speak for themselves. The answer to these various questions referring to various paragraphs is in part contained in the answers above and I have given you all the documents that I have.

15. State all facts and identify all documents related to the allegations in Paragraph 12 of the Complaint.

15. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, I am not sure what else you want as I have answered above and provided everything, and those documents speak for themselves.

16. State all facts and identify all documents related to the allegations in Paragraph 13 of the Complaint.

16. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, I am not sure what else you want as I have answered above and provided everything, and those documents speak for themselves.

17. State all facts and identify all documents related to the allegations in Paragraphs 14 and 20 of the Complaint that the basis for CFLI's denial was that The

Policy was contestable for two years from date of issuance and that Michael Littlefield did not disclose a follow-up medical appointment.

17. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, I am not sure what else you want as I have answered above and provided everything, and those documents speak for themselves. According to you, the policy was contestable for two years from the date of issuance. I don't know why CFLI has that policy or why you are claiming he did not disclose a follow-up medical appointment. This is what your attorneys said and the letter I received from CFLI indicated this.

18. State all facts and identify all documents related to the allegations in Paragraph 15 of the Complaint that Michael Littlefield made proper disclosures of physicians and treatments on the Application, and that CFLI has continued to deny coverage for the death of Michael Littlefield.

18. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, I am not sure what else you want as I have answered above and provided everything, and those documents speak for themselves. CFLI still has not provided coverage for my husband's death and I have provided all of the disclosure information twice, once when he applied and secondly, when I requested that payout be made under the policy plus my lawyer has given you everything.

19. State all facts and identify all documents related to the allegations in Paragraph 21 of the Complaint that "the Application fully answers all questions asked by Defendant. In addition, Michael Littlefield provided for release of all medical information to CFLI. Defendant's conclusion that not specifically listing a follow-up appointment would allow CFLI to avoid payment under The Policy is wholly unreasonable."

19. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, I am not sure what else you want. All of the documents have previously been given to you. You have authorizations for all the medical information from me and had authorizations at the time my husband applied. It is unreasonable because you have not paid pursuant to the terms of the policy when you had all the information that was available to us. We told Mr. Demers everything and

he seemed to be writing everything down. We discussed my husband's hernia surgery and the results and subsequent testing.

20. State all facts and identify all documents related to the allegations in Paragraph 22 of the Complaint that "Defendant had an opportunity to and a duty to conduct a reasonable investigation of the circumstances predating The Application and clearly failed to do so. Additionally, no medical information available prior to The Application showed any cancer."

20. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Again, I don't know what you are looking for other than you had authorizations to obtain information both from the time of the $50,000 application and the $300,000 application. My husband and I signed all papers you requested us to sign, and answered all questions, and you could have obtained any information that we could have obtained.

21. State all facts and identify all documents related to the allegations in Paragraph 26 of the Complaint.

21. Objection as overly broad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence as well as being non-specific. Notwithstanding, all the documents that I previously gave you and have identified shows that this is true. The fact that you have refused to pay when we had no idea he had cancer, and none of the medical records showed he had cancer, proves that this is true.

22. Identify all persons that you intend to call as witnesses at trial, and for each, provide a description of their anticipated testimony.

22. Pursuant to the rules, we will respond. Presently, I will testify to all of the above and the information in the complaint and as best as I am able regarding the circumstances of the application, his medical history and your refusal to pay. Discovery is ongoing and as I also indicated in previous interrogatories, besides my attorneys, Donna Carroll, Donald Demers, my sister, my brother and my mother in Florida would have information and would testify. Basically, everyone will say that no one had any idea that my husband had cancer until more than a year after this application and that no information was withheld.

As to answers:

Colleen Littlefield

Subscribed and sworn to before me this 5th day of October, 2006.

Notary Public

As to objections:

Karen Davidson #3182
One Ship Street
Providence, RI 02903
(401) 453-6200
(401) 331-6110 fax

Subscribed and sworn to before me this 5th day of October, 2006.

Rachel Babiana
Notary Public

CERTIFICATION

I hereby certify that on the 5th day of October, 2006, a true copy of the within was mailed, postage prepaid, to

Attorney Patricia A. Sullivan
Attorney Caroline F. Turcotte
Edwards Angell Palmer & Dodge, LLP
2800 Financial Plaza
Providence, RI 02903

Rachel Babiana