# 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COLLEEN LITTLEFIELD,
Plaintiff, C.A. NO. 06-157

-vs-

VIDEOTAPE DEPOSITION OF CATHERINE HARTWIG

CATHOLIC FAMILY LIFE INSURANCE COMPANY,

Defendant. 5th of March, 2007

VIDEOTAPE DEPOSITION OF CATHERINE HARTWIG, before JANET LARSEN, a Registered Professional Reporter and Notary Public, in and for the State of Wisconsin, under and pursuant to the Federal Rules of Civil Procedure, at the offices of Quarles & Brady LLP 411 East Wisconsin Avenue, Suite 2040, Milwaukee, Wisconsin, on the 5th day of March, 2007, commencing at 10:58 a.m. and concluding at 1:32 p.m.

A P P E A R A N C E S

KAREN DAVIDSON, ATTORNEY AT LAW
One Ship Street
Providence, Rhode Island 02903
appeared by telephone on behalf of the Plaintiff.

QUARLES & BRADY LLP, by
KELLY H. TWIGGER, ATTORNEY AT LAW
411 East Wisconsin Avenue, Suite 2040
Milwaukee, Wisconsin 53202
appeared on behalf of the Defendant and the Witness.

EDWARDS ANGELL PALMER AND DODGE LLP, by
PATRICIA A. SULLIVAN, ATTORNEY AT LAW
2800 Financial Plaza
Providence, Rhode Island 02903
appeared by telephone on behalf of the Defendant and the Witness.



ALSO PRESENT: Marco Santilli, Videographer

I N D E X


| EXAMINATION BY: | PAGE |
|---|---|
| Ms. Davidson | 5 |
| Ms. Sullivan | 104 |

| EXHIBITS: | MARKED |
|---|---|
| 1 - Subpoena Duces Tecum | 3 |
| 2 - For used for telephone interview, CFL 457 and CFL 461 | 18 |
| 3 - Hernia guidelines, CFL 589-591 | 48 |
| 4 - BMA guidelines for a hernia | 64 |
| 5 - Paramedical exam form | 75 |
| 6 - Agent's Statement | 75 |
| 7 - Examination Management Services, Inc. | 76 |
| 8 - EMSI Work Order. | 77 |
| 9 - 8-27-03 New Business Worksheet | 81 |
| 10 - Interoffice Memo | 84 |
| 11 - Comparative Information Form | 86 |
| 12 - Collection of documents | 87 |
| 13 - Risk collection guide | 97 |
| 14 - Hiatal hernia guidelines from Generali Reinsurance | 99 |
| 15 - Lab work for Michael Littlefield | 104 |

| MATERIAL REQUESTED: | PAGE |
|---|---|
| None | |


QUESTIONS FOLLOWED BY INSTRUCTIONS NOT TO ANSWER:

None

(Original transcript supplied to Attorney Davidson)
(Originals of Exhibits 1 through 15 are attached to the original transcript. Photocopies are attached to copies of the transcript)



TRANSCRIPT OF PROCEEDINGS

(Exhibit 1 marked for identification)

THE VIDEOGRAPHER: We are now on the record. This is the beginning of tape No. 1 in the deposition of Cathy Hartwig. This deposition is being taken at the instance of the plaintiffs in the matter of Littlefield versus Catholic Family Life Insurance, Case 06-157 now pending in the U.S. District Court of Rhode Island.

This deposition is taking place at Quarles & Brady, 411 East Wisconsin Avenue, Milwaukee, Wisconsin. Today's date is March 5th, 2007. The time is 10:58 a.m. My name is Marco Santilli, working today on behalf of Ryker & Lyle Legal Video. The court reporter today is Janet Larsen with the firm of Collin Reed -- Colleen Reed Reporting.

Will the attorneys please identify themselves for the record, state the parties they represent. Then the court reporter will swear in the witness.

MS. SULLIVAN: This is Patricia Sullivan representing defendant Catholic Family Life, as well as the witness.

MS. TWIGGER: Kelly Twigger at Quarles &



Brady on behalf of Catholic Family Life and Cathy Hartwig.

MS. DAVIDSON: Karen Davidson on behalf the plaintiff, Colleen Littlefield.

MS. SULLIVAN: And before we begin the deposition, I just wanted to say for the record that Cathy Hartwig will be testifying today pursuant to a subpoena directed to her personally, so she is testifying as a fact witness. There has been a 30(b)(6) witness, 30(b)(6) deposition request in this case of Catholic Family Life to designate persons with knowledge of underwriting in 2003 as it relates to the Michael Littlefield insurance policy, and to the extent that questions arise within that topic where the answers have not already been provided by witness Kim Ingram, who was the principal designee for Catholic Family Life on that 30(b)(6), Ms. Hartwig will be designated as a witness to testify pursuant to that 30(b)(6). You may proceed.

MS. DAVIDSON: I take it there's no one else in the room, other than those who have been identified.

MS. TWIGGER: That's correct.

MS. DAVIDSON: Thank you.

Q. And it's actually four pages.
A. Yes.
Q. Dated at the top August 27th, '03. Is any of this your handwriting?
A. Some of it is.
Q. What's your handwriting?
MS. SULLIVAN: Let me -- Just wait a minute and make sure. Cathy, have you had a chance to look at all four pages?
THE WITNESS: Not in depth.
Q. Take your time and look at them, and I want to be sure it's marked Exhibit 9 now.
(Exhibit 9 marked for identification)
Q. Okay. I'm going to review them real quick.
A. Okay.
Q. Could you tell me what's your handwriting?
A. My handwriting is where it's -- I put the billed in 5-9, 160.
Q. I see it.
A. Plus zero, meaning that it's no additional debits that add to his mortality. I put the 108 over 80 for his blood pressure average. The as applied for X is mine, along with the approval date of 9-9-03, and my signature is C. Hartwig.
I also at the bottom right noted that a



test on the lab work, the alkaline phosphatase was elevated, noted that cholesterol reading of 147 and the ratio of 2.6, and I also notated from the motor vehicle record, that he had one speeding 12-01, 11 plus over, and another speeding 11-00, 1 to 10 over.
Q. Did those affect his rating, those things at the bottom right?
A. No.
Q. Does being self-employed affect your rating?
A. No.
Q. Do you know whose handwriting appears on the other parts of the document?
A. I do not.
Q. And then the next page you've got underwriter's notes, and you made no notes on that?
A. No notes from me.
Q. And those initials at the bottom, who are all those people?
A. I do not know.
Q. None of them is you?
A. No.
Q. Under the third page, reinsurance application, is any of this your writing?
A. Yes, it is.



Q. What's that?
A. I wrote the name.
Q. Yeah.
A. Littlefield, Michael, new insurance this case 300,000, retaining 150,000, standard and reinsurance to BMA is 150,000.
Q. Now why did you put standard for his rate?
A. That's the no -- It means no extra mortality.
Q. So he didn't get preferred, he got standard?
A. He did get preferred, but they don't recognize our preferred.
Q. Who's they?
A. The reinsurance company that this went to.
Q. Why don't they recognize your preferred?
A. All they want to know is if we rated the policy, charged an extra premium due to some medical history.
Q. Do you have to wait to issue a policy to see if the reinsurance company accepts their half of it?
A. We have an automatic of 600,000, so anything under that they take us at what we decide without any going back and forth.
Q. Yeah. So in this case, you didn't have to get any kind of approval for the reinsurance?
A. Correct.



Q. And then looking at page 4, CFL 4, is any of this your writing?
A. I checked the yes box after reinsurance.
Q. Yeah.
A. I checked the company BMA, and I also wrote, see session.
Q. What does that mean?
A. That was the session on the previous page 3. So if they had any questions, they could just look at the session form that was sent to BMA.
Q. Oh, the reinsurance session form?
A. Correct.
Q. Thank you. That's all with that document.
Could you look at what was marked Plaintiff's 11 at the other depo, and we're going to mark it 10, please. It says Interoffice Memo at the top.
A. Okay.
(Exhibit 10 marked for identification)
MS. SULLIVAN: Cathy, have you had a chance to look at it?
THE WITNESS: No. Looking now.
A. Okay.
Q. On page -- Well, first, what is this?
A. This is an interoffice memo that goes to someone

else in the company, and it's asking to cancel the previous policy as he specified he's replacing his previous policy with us.
Q. Who's Cathy Jo?
A. That's one of the girls in insurance services.
Q. Is she still there?
A. She is.
Q. What's her last name; do you know?
A. I do not.
Q. How many employees do you have there?
A. I do not know.
Q. Looking at page 2 of what we've marked Exhibit 10, can you tell me what that means, approved as applied for effective and then Cathy Jo cancel?
A. Once we approve a file, we actually put it on the notes, which means that the advisor would be privy to that information, so we're letting him know that we've approved it as applied for, the effective date of the coverage will be 9-9-03, and then we're also letting the advisor know that we're sending the file to Cathy Jo to cancel the previous as of the effective date.
Q. I'm not clear who the advisor is.
A. The advisor who wrote the coverage. Advisor agent.



Q. Oh, the agent?
A. Yeah.
Q. All right. So this goes to the agent?
A. Correct.
THE VIDEOGRAPHER: Fifteen minutes left on tape.
MS. TWIGGER: Did you hear that, ladies?
MS. DAVIDSON: Yes.
MS. SULLIVAN: Yes.
Q. I think the next document is the Ingram Exhibit 12.
A. Okay.
Q. Would you mark it, please?
(Exhibit 11 marked for identification)
Q. Did you get to look at both pages?
A. I am. Okay.
Q. Looking at this, does it show that he switched from a $60,000 policy to a $300,000 policy?
A. I'm looking to find where the information is. Yes.
Q. And he was 34 when he got this. Is that what this says?
A. Correct. The new policy he would be 34.
Q. Is that an unusual age to get a term policy?
MS. SULLIVAN: Objection.



A. No. We see that a lot.
Q. Now if you would, could you look at what was marked Exhibit No. 16 in Ingram, which starts with a computerized printout sheet.
MS. TWIGGER: This is a rather thick stack of documents.
MS. DAVIDSON: Yeah. Go through all of them, please.
MS. SULLIVAN: Go ahead and mark it, please.
(Exhibit 12 marked for identification)
A. I'm looking through them now.
Q. Okay.
A. Okay.
Q. Thank you. Can you tell me whose handwriting it is on the first page?
A. I cannot.
Q. And does this top part of the first page indicate that CFLI was notified of Michael's death on June the 1st of 2005?
A. You know, I do not interpret these reports.
Q. Okay.
A. So I could not tell you with uncertainty that that's the case.
Q. What is this report?



A. I don't know.
Q. Have you ever seen them before?
A. No.
MS. SULLIVAN: Let me just jump in, because this document is long and has a lot of parts to it. Which portions of the document?
MS. DAVIDSON: I'm looking at the first page, CFL 45.
MS. SULLIVAN: Okay. Just the first page, okay.
Q. And looking at the second page, it seems to be from the same place or generated from the same place. Is it fair to say you don't have anything to do with that one?
A. I do not.
Q. And the next few pages looks pretty much the same. You don't have anything to do with them?
A. Correct.
Q. Okay. And how about 053, is that something you have anything to do with?
A. No.
Q. And 054?
A. Same, same thing, I do not.
Q. And 032, whose handwriting is this?
A. I do not know.

# *INTEROFFICE MEMO*

**DATE:** September 9, 2003

**FROM:** Cathy Hartwig

**TO:** Kathy Jo

**RE:** Michael Littlefield #! REDACTED
Old # REDACTED

Kathy Jo,

Please cancel #! REDACTED

Thanks, Cathy

DEPOSITION EXHIBIT
Plfs 11
2-20-07

EXHIBIT NO. 10
COLLEEN REED REPORTING

CFL000006

Policy ID : **REDACTED** Owner : LITTLEFIELD, MICHAEL
Effective : 08/25/2003 Status P Unapplied receipts : 96.20

Type selection criteria or options. Press Enter.
4=Delete

| Note date | PIN ID | Note contains |
|---|---|---|

| Note date/ Notify on | PIN ID/ Reason | | Name/ Note |
|---|---|---|---|
| 09/09/2003 | CDH | U | HARTWIG, CATHY D |
| | CATHY | | APPROVED AS APPLIED FOR EFFECTIVE 9/9/03. TO KATHY JO TO CANCEL PREVIOUS # **REDACTED**9. |

F3=Exit F5=Refresh F9=Add F10=Pol Info F11=UW Reqs F12=Cancel
F13=Coverages F14=Pol Rels F15=Other Ins F18=UW History