UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COLLEEN LITTLEFIELD, | : | |
| | : | |
| Plaintiff, | : | C.A. No. 06-157 |
| | : | |
| v. | : | |
| | : | |
| CATHOLIC FAMILY LIFE INSURANCE COMPANY | : | |
| | : | |
| Defendant. | : | |

**STATEMENT OF UNDISPUTED FACTS OF CATHOLIC FAMILY LIFE INSURANCE**

Catholic Family Life Insurance Company ("CFLI") sets forth the Statement of Facts as to which Plaintiff does not dispute as follows:

1. CFLI is a non-profit fraternal benefit society organized under Section 501 (c)(8) of the Internal Revenue Code, 26 U.S.C. § 501(c)(8). Deposition of Kim Ingram, CFLI's Vice President and Corporate Secretary, at 14 ("Ingram Dep.") (attached hereto as Exhibit A).

2. CFLI is organized for the benefit of its members, and offers benefits to members to support the Catholic faith, spiritually and educationally, and to bring people together on the common basis of a shared Catholic faith. Exh. A, Ingram Dep. at 14 –15.

3. CFLI is based in Milwaukee Wisconsin with fewer than fifty employees and just over fifty independent contractors (principally insurance agents) scattered over fifteen to sixteen states. Exh. A, Ingram Dep. at 11-13.

4. CFLI's presence in Rhode Island derives from its 1992 merger with Woonsocket-based Union Saint-Jean-Baptiste Insurance Company. Deposition of Donald Demers at 16-18 ("Demers Dep.") (attached hereto as Exhibit B).

5. Throughout the relevant time period, CFLI has written life insurance, accident insurance and annuity policies. Exh. A, Ingram Dep. at 16.

6. Born in 1969, Michael Littlefield, the insured, was 34 at the time of the insurance application in 2003 and 36 at the time of his death. Complaint, Ex. 3 (death certificate) (attached hereto as Exhibit C).

7. Michael Littlefield had a bachelor degree in chemistry. Deposition of Michael Littlefield ("M. Littlefield Dep.") at 4-5 (attached hereto as Exhibit D).

8. Michael Littlefield married Plaintiff Colleen Littlefield in 1996 and they had one child together. Exh. D, M. Littlefield Dep. at 4; Deposition of Colleen Littlefield at 13-15 ("C. Littlefield Dep.") (attached hereto as Exhibit E).

9. Until the spring of 2003, Michael's principal employment was running a house cleaning business, in which he did the physical work himself. Starting in September of 2003, Michael Littlefield's principal work was a desk job as a chemist in a laboratory. Exh. D, M. Littlefield Dep. at 7, 55, 67; Exh. E, C. Littlefield Dep. at 86, 128.

10. In March, 2003, Michael Littlefield was seen at Kent County Hospital for abdominal pain and lower right quadrant pain. Exh. D, M. Littlefield Dep. at 10.

11. Littlefield was referred by the Hospital to surgeon Dr. John Abadier, who diagnosed a bilateral inguinal hernia and recommended a routine surgical repair. Exh. D, M. Littlefield Dep. at 11.

12. Dr. Abadier performed the surgery on April 24, 2003. Dr. Abadier did not complete the repair – the doctor was rushed because he was late and Michael was his last patient of the day. Exh. D, M. Littlefield Dep. at 11-12.

13. When Michael Littlefield woke up in the recovery room, Dr. Abadier informed him that the hernia on the left side had not been repaired. Instead, "the surgery was difficult because . . . he had to do a lot of dissecting . . . and that it was complicated enough where he just had to wrap me up and call it a day because there was no way he was even going to get to the other side." Exh. D, M. Littlefield Dep. at 12.

14. Immediately after the surgery, Michael Littlefield experienced severe pain and bruising in the lower abdominal area. He returned to Dr. Abadier on May 1, 2003, complaining of these symptoms, but Dr. Abadier dismissed his complaints. Exh. D, M. Littlefield Dep. at 13-14, 52.

15. Pain and bruising prompted Michael Littlefield's May 1, 2003 visit to Dr. Abadier. "I'm in an awful lot of pain, and that in talking with other people I just – never heard of laparoscopic surgery having so many – so much back and blue." The May 1 appointment was "because I was black and blue and in severe pain." Exh. D, M. Littlefield Dep. at 14, 52.

16. Michael Littlefield returned to Dr. Abadier on May 15, 2003 because his wife prompted him to go due to the pain he was feeling. "[M]y wife [was] prompting me to go because I just – I just couldn't believe I was in this much pain." Dr. Abadier assured Michael Littlefield that "everything was okay." Exh. D, M. Littlefield Dep. at 15, 54.

17. On May 21, 2003, Michael Littlefield was "cooped over in pain" and went to the Kent County Hospital Emergency Department. After x-rays and laboratory tests were taken, Michael left after waiting five hours. After he left, the Hospital called his wife and told her to have him follow-up with Dr. Abadier. Exh. D, M. Littlefield Dep. at 55-56.

18. Littlefield returned to Dr. Abadier's office on June 2, 2003. By this time, there was swelling and pain "emanating from in and around where the surgery was," in and around the

lower right quadrant. Dr. Abadier prescribed Vicodin for the pain and told Michael Littlefield to return. Because Michael was suffering from constipation, which exacerbated the pain from the abdominal swelling, Abadier also prescribed constipation medication. Exh. D, M. Littlefield Dep. at 16-17, 58-60.

19. Also on June 2, 2003, Michael could feel a hard mass in his right side, the size of a baseball, which he reported to Dr. Abadier. Exh. D, M. Littlefield Dep. at 17, 59-60.

20. On June 10, 2003, Michael Littlefield visited his family physician, Dr. Manzo, for a tick bite but also because of his ongoing abdominal pain. Dr. Manzo felt the mass, and expressed concern. Exh. D, M. Littlefield Dep. at 60 – 61.

21. Two days later, on June 12, 2003, Michael Littlefield returned to Dr. Abadier for the fourth time since the surgery on April 24. By this time, Littlefield could not physically do his job because of the pain, so he [took time off and then resumed his business].[1] Exh. D, M. Littlefield Dep. at 18. Once again, Dr. Abadier reassured him. *Id.* at 62.

22. On June 16, 2003, Michael Littlefield's wife prompted him to return to Dr. Manzo because he was groaning at night in his sleep due to the pain. Exh. D, M. Littlefield Dep. at 19; Exh. E, C. Littlefield Dep. at 130. At this point, Michael Littlefield knew, "Something's majorly wrong with me." Dr. Manzo conferred with Dr. Abadier's office and set up Michael Littlefield for a CT scan. Dr. Manzo told Michael Littlefield that the CT scan was indicated because of the

---

[1] Colleen Littlefield attended almost all of her husband's deposition, *see* ¶ 61, and assisted in preparing him for it. Exh. E, C. Littlefield Dep. at 39-41, 43-44. Mrs. Littlefield testified at her own deposition that her husband's deposition testimony was truthful and accurate, except that the CT scan depicted a "mass" and that the word "tumor' was not used, as well as that her husband cut back significantly on his cleaning business in September 2003, but did not stop it completely. Exh. E, C. Littlefield Dep. at 142 and Letter of Correction. At her deposition, Mrs. Littlefield was seeing her husband's transcript for the first time. Exh. E, C. Littlefield Dep. at 39. Because this was understandably distressing, CFLI agreed to suspend the deposition and to accept a letter from her describing her corrections to her husband's testimony. *See* Exh. E, C. Littlefield Dep. at 141-143, Letter of Correction. In this Motion, CFLI relies on the version of the facts regarding Michael Littlefield's testimony that are undisputed by Colleen Littlefield. Because her "corrections" affect quotations to his testimony, the undisputed version is shown in brackets, as here.

abdominal pain, the "noticeable swelling in his abdomen," and because his white blood cell count ("19,000" – "horrendously high") was so elevated that he "almost needed to be – have instant intravenous antibiotics at that point." Exh. D, M. Littlefield Dep. at 19-20, 63, 75-76; Exh. E, C. Littlefield Dep. at 130. Dr. Manzo palpated the swelling and told Michael, "you're going to have to have exploratory surgery for them to accurately diagnose what, if anything, is going on in there." Exh. D, M. Littlefield Dep. at 64, 74.

23. On June 18, 2003, Michael Littlefield went to Kent County Hospital for a CT scan. Exh. D, M. Littlefield Dep. at 22.

24. The results of Michael Littlefield's June 18, 2003 CT scan describes an "[i]nflammatory mass in which there are fluid and solid components." Exh. E, C. Littlefield Dep.; Ex. 12, K00004; Deposition of Dr. Nicola Charlton ("Charlton Dep.") at 48-58 (attached hereto as Exhibit F); CFL000337.[2] Within a half hour of his return home from the hospital, Dr. Abadier's secretary called to say "they were very concerned" because the CT scan showed "either an abscess or [mass]."[3] Exh. D, M. Littlefield Dep. at 22-23. Michael Littlefield was

---

[2] At her deposition, CFLI's medical director Dr. Charlton was provided with CFLI's entire production (CFLI000001-000591) and identified all of the medical records she relied upon in performing her medical evaluation of Michael Littlefield's death claim. Exh. F, Charlton Dep. at 17-19; 44-50. Because the deposition was taken telephonically and in light of the volume of the documents she reviewed, Exh. F, Charlton Dep. at 48, these documents were not marked at exhibits at her deposition; because she referred to the pages by reference to previously applied Bates numbers, there is no ambiguity regarding which documents she refers to. For purposes of this Motion, they are included with the record is if they had been marked. For example, CFL000337 is the copy of the CT scan from June 18, 2003, that she reviewed and relied upon. *Id*. at 51-52

[3] *See* note 1 *supra*. Colleen Littlefield testified that she spoke to her husband immediately after this telephone conversation and that he said that the secretary's actual words were "abscess or mass." Exh. E, C. Littlefield Dep. at 47. By contrast, Michael Littlefield testified emphatically that the secretary used the word "tumor." Exh. D, M. Littlefield Dep. at 23 ("Dr. Abadier's secretary...w[as] very concerned, and noted that the result of the CAT scan showed that there was either an abscess or a tumor there. . . . That's what I was told."). CFLI's medical director Dr. Charlton testified that, as a family practitioner, the impressions recorded on the CT scan of an "inflammatory mass . . . with solid components" describes something that can be labeled "tumor." Exh. F, Charlton Dep. at 54-56. This factual dispute is not material to the outcome of this Motion. In light of Colleen Littlefield's testimony, this Court should assume that Michael Littlefield was told that the CT scan depicted an "abscess or mass."

 

told that "it was very serious." He was referred immediately for another test, which he described as "a barium enema x-ray test." Exh. D, M. Littlefield Dep. at 23.

25. Michael Littlefield returned to Kent County Hospital on June 20, 2003, for the barium enema test. Exh. D, M. Littlefield Dep. at 23. Michael Littlefield considered the barium enema to be a "very expensive and belittling experience." Exh. D, M. Littlefield Dep. at 66. The barium enema report concludes that there is "no intrinsic mass" inside the colon. Exh. E, C. Littlefield Dep.; Ex. 12, K00002; Exh. F, Charlton Dep. at 51, 55-60; CFL000338. However, the report continues that:

> "Mass extrinsic to colon in this region cannot definitely be excluded and should be correlated with the prior CT scan. **Small bowel follow through would be helpful to exclude an inflammatory process in the region of the terminal ileum or a *possible mass density* in this region."** (emphasis supplied).

Exh. E, C. Littlefield Dep.; Ex. 12, K00002; Exh. F, Charlton Dep. at 51, 55-60; CFL000338.

26. Dr. Abadier called Michael Littlefield after the test and told him that the test depicted a "pocket of blood" and "that it was okay, and that there was nothing to worry about, and that it would pass through, that it was not a problem." Exh. D, M. Littlefield Dep. at 23-24. Dr. Abadier's office notes make no reference to the CT scan, the barium enema or to any contact with his patient during this period. Exh. E, C. Littlefield Dep.; Ex. 12, K00001.

27. Despite the test results, Michael Littlefield waited a "long time," before returning to Dr. Abadier. Exh. D, M. Littlefield Dep. at 24. However, the pain did not abate – "I complained of pain for a long time before I went back." *Id*. The appointment was made after Colleen Littlefield spoke to Dr. Abadier and told him that her husband was "having pain." Exh. E, C. Littlefield Dep. at 50.

28. Michael Littlefield's next appointment with Dr. Abadier was on August 25, 2003, Exh. D, M. Littlefield Dep. at 24, the same day that Michael Littlefield met with Don Demers to complete the insurance application, and also the same day that Michael Littlefield told Don Demers that "he was in good health." Exh. E, C. Littlefield Dep. at 69; Ex. 12, K00001.

29. As of his August 25, 2003 appointment, Michael Littlefield could feel something inside of him ("it feels like there's a baseball there"), and described this to Dr. Abadier. Exh. D, M. Littlefield Dep. at 24. Dr. Abadier's office notes from that visit state, "we will get a repeat CT scan of the abdomen and pelvis area." Exh. E, C. Littlefield Ex. 12. [Michael Littlefield denies that Dr. Abadier recommended a repeat CT scan at that appointment, Exh. D, M. Littlefield Dep. at 69, and confirms that, on that day, he would have done any follow up recommended, "especially with the pain I was in." Exh. D, M. Littlefield Dep. at 70.] Dr. Abadier told Mr. Littlefield that he would see him again if there were more problems. Exh. D, M. Littlefield Dep. at 69.

30. Michael Littlefield never returned to Dr. Abadier. Instead, he began to "manag[e] the pain by [cutting back] all physical work."[4] Exh. D, M. Littlefield Dep. at 71. Michael Littlefield "always complained of right lower abdominal pain and I eventually came to the conclusion, especially after having visited Dr. Abadier on five occasions, . . . that I just don't have the physical capacity to do the physical work that I actually enjoyed. And so I started working at my old job, which was a good job." Exh. D, M. Littlefield Dep. at 7, 70 ("especially with the pain I was in . . . I figured that's how my body was and so that's why I changed careers a week after I saw him" [on August 25, 2003]). Michael Littlefield continued to experience

[4] *See* note 1 *supra*. Colleen Littlefield disputes that her husband stopped all physical work in September 2003, but admits that her husband cut back on his physically taxing job as a house cleaner. Exh. E, C. Littlefield Dep. at 128.

intermittent pain, Exh. E, C. Littlefield Dep. at 132, and continued to take Vicodin (and Tylenol or Ibuprofen while working) as needed for pain from the appointment on June 2, 2003 with Dr. Abadier continuously through to July 2004, when the cancer was diagnosed. Exh. E, C. Littlefield Dep. at 107.

31. When Michael Littlefield returned to the hospital in July 2004, he confirmed his experience of continuous intermittent pain when he gave a prediagnosis history that indicated that he had experienced right lower quadrant abdominal pain intermittently throughout the prior year. Exh. D, M. Littlefield Dep. at 72.

32. After the cancer was diagnosed in July 2004, Michael and Colleen Littlefield asked the surgeon, Dr. Shahinian, whether "during the surgery . . . for the hernia . . . if [the cancer] would have been found at that point in time, would the cancer have been discovered, and he said absolutely." Exh. E, C. Littlefield Dep. at 133.

33. On August 25, 2003, the same day that he last saw Dr. Abadier, Michael Littlefield met with Don Demers, a representative of CFLI. Exh. B, Demers Dep. at 186; Ex. 3 at CFLI000549. [This exhibit also reflects the time of the appointment, which is disputed – the calendar entry recorded that the appointment was at 7:00 p.m. in the evening, but Colleen Littlefield testified that it was at 7:30 a.m. in the morning. Exh. E, C. Littlefield Dep. at 64. It is also disputed whether Colleen Littlefield was present during her husband's application interview with Don Demers. She claims that she was, while Mr. Demers testified that she was present for the application meeting for a different, earlier policy, in 1997, but not in 2003. Exh. B, Demers Dep. at 51. This dispute is not material.] The purpose of this interview is for the agent and applicant to discuss the type and amount of insurance the applicant is seeking and to fill out the

first portions of the application, which is also signed by the applicant. K. Ingram Affidavit at ¶ 5 (attached hereto as Exhibit G); Exh. B, Demers Dep.; Ex. 3, at CFLI000529.

34. On August 25, 2003, the initial meeting for the 2003 policy, Mr. Demers explained the underwriting requirements, including that an examination would be required and "whatever the requirements will be and everything else," Exh. B, Demers Dep. at 47, and asked Michael Littlefield the following questions:

(1) Whether Michael Littlefield had been "treated for diabetes, cancer, heart disease, etc," and Michael Littlefield said that he had not. This question and answer are recorded on the Application form that was filled in by Mr. Demers, Exh. E, C. Littlefield Dep. at 83, and signed by Mr. Littlefield. Exh. B, Demers Dep. at 107-108; Ex. 3, at CFL000529; Exh. E, C. Littlefield Dep. at 32-33

(2) Whether Michael Littlefield was in good health. This prequalifying question is simply to identify potential health issues before the applicant goes to the trouble of the actual paramedical interview and the teleunderwriting interview – "to avoid surprises." Exh. B, Demers Dep. at 177-179; Ex. 3 at CFL000520. Michael Littlefield told Don Demers that he had no medical problems. Exh. B, Demers Dep. at 178; Exh. E, C. Littlefield Dep. at 69 ("he said he was in good health"). Mr. Demers does not need to record anything pertaining to this question. *See infra* at ¶ 66.

(3) Demers also reviewed the questions for applicants to be considered for preferred rates. Demers reviews these questions with the prospective insured to avoid raising false expectations regarding the pricing of the policy. Exh. B, Demers Dep. at 47, 182-83, 205-206. Michael Littlefield's answers confirmed that he would likely qualify for preferred rates. Exh. B, Demers Dep. at 47. Demers does not record the answers as

all of these questions are asked again by the teleunderwriter. Exh. B, Demers Dep. at 180, 182. 205-06.

If adverse medical history is disclosed during the application process, Demers does not take the application but instead contacts the underwriting department to ask for guidance regarding how to proceed. Exh. B, Demers Dep. at 41-44, 197-200.

35. At the August 25, 2003 meeting with Demers,[5] Mr. Littlefield told Mr. Demers that:

- He had been diagnosed with a hernia but that it had been surgically repaired; Exh. E, C. Littlefield Dep. at 70.[6]
- He had had complications from the hernia surgery and some tests were done, but the tests were negative; Exh. E, C. Littlefield Dep. at 70.
- He had had a barium enema and a CAT scan and that they came out negative. Exh. E, C. Littlefield Dep. at 57-58.

36. According to Mrs. Littlefield, Mr. Demers responded to what he was told at the August 25, 2003 meeting as follows:

> "When Mr. Demers came and took notes and filled out some notes with my husband and myself, we discussed the barium enema tests and pocket of blood we were told they found during the tests. Mr. Demers asked Michael question, if the – how the tests came out and **Michael said they were negative**, and he said well, we don't need that because hernia surgery is just that, we told him it was something to do with hernia surgery, and it was complications after the hernia surgery and we told him about we had thought that, you

---

[5] *See* ¶ 33 regarding the dispute as to time of the August 25, 2003, meeting and the presence of Colleen Littlefield at the meeting. Solely for purposes of the Motion, the facts in paragraph 35 are undisputed.

[6] Mr. Demers was very confused during his testimony on whether Michael Littlefield told him about the hernia surgery. At certain points in his deposition, he testified vaguely that Michael did tell him (Exh. B, Demers Dep. at 58 (but he added "I'm not quite sure about"), but he later testified that he had been confused by having seen the hernia in other documents pertaining to the application and that he is certain that he did not hear of it from Michael Littlefield. Exh. B, Demers Dep. at 129, 132-33, 157.

> know, the doctor had nicked him when he did the operation and he said, well, don't worry about that, it's hernia surgery and these things happen and he said we don't need to put that in. I said okay." Exh. E, C. Littlefield Dep. at 57-58.[7]

37. On August 28, 2003, the second part of the application process, the paramedical examination, was performed by paramedical examiner Donna Carroll, who has no dealings with the CFLI agent and is employed by a company independent of CFLI. Deposition of Donna Carroll at 6, 26 ("Carroll Dep.") (attached hereto as Exhibit H). Colleen Littlefield was not present for the paramedical examination. Exh. E, C. Littlefield Dep. at 56. Most of the detailed medical questions are asked during this interview. Exh. A, Ingram Dep. at 40. The purpose of the paramedical interview is to "get the medical history. . . and to evaluate their health and qualification for the insurance." Exh. H, Carroll Dep. at 25.

38. The paramedic uses the form for her interview provided by CFLI. Exh. H, Carroll Dep. at 25; Exs. 3, 4. CFLI's paramedical interview form is filed with the Rhode Island Insurance Commissioner and is based on industry forms. Exh. A, Ingram Dep. at 51-52; Exh. G, K. Ingram Affidavit at ¶ 6. It involves the asking of general questions designed to allow the layperson to provide information pertinent to morbidity without using technical medical terminology. Exh. A, Ingram Dep. at 66-67; Exh. H, Carroll Dep. at 53. The questions are crafted to get information that a layperson might have trouble giving if the inquiry used technical medical terms. Exh. H, Carroll Dep. at 25; Exh. A, Ingram Dep. at 34-37, 66-68.

39. When asking questions, Paramedic Carroll follows the form precisely. Exh. H, Carroll Dep. at 38-40, 54-56. She also confirmed that she accurately records the answers given by the applicant. Exh. H, Carroll Dep. at 55. After she completes the form, she asks the applicant to review it and sign it. Exh. H, Carroll Dep. at 77-78; Ex. 3. CFLI relies on the

---

[7] This fact is undisputed solely for purposes of this Motion. *See supra* ¶ 33.

answers given by the applicant in the paramedic interview form, which is signed by both the paramedic and the applicant, in determining risk selection. Exh. A, Ingram Dep. at 102; Exh. H, Carroll Dep.; Ex. 3.

40. After the two-sided[8] paramedical exam form is completed by the paramedic, it is presented to Michael Littlefield, who signed immediately below a statement that:

> "I hereby agree that all statements and answers in this application are full, complete, and true to the best of my knowledge and belief, and shall become part of any policy or contract issued on the basis of this application. I further agree that the Society may rely upon any statements or answers made relating to my health or illness in determining whether to accept this application for insurance."

Exh. H, Carroll Dep. at 32-33, 77-78; Exs. 3 and 4. Donna Carroll tells her clients to read this statement before signing the form. She tells them that "when they sign this form they are swearing that all this information they have given me is accurate and true and then they sign the form." Exh. H, Carroll Dep. at 78.

41. The material answers to the questions posed by Donna Carroll, Exh. H, Carroll Dep.; Exs. 3, 4, to Michael Littlefield are as follows:

<u>Question</u>: "Date and reason [Dr. Manzo, the personal physician] last consulted"

<u>Answer</u>: "Pain related to hernia surgery 5-03 – Had surgery 4-20-03"

<u>Question</u>: "Treatment given or medication prescribed [by Dr. Manzo at last consultation]:"

<u>Answer</u>: "—" The dash meant that Michael Littlefield told her there was no treatment given or medication prescribed. Exh. H, Carroll Dep. at 36. If Michael Littlefield had told Carroll that Dr. Manzo referred him to Dr. Abadier for a CT scan for pain, she would have recorded that information on the form. Exh. H, Carroll Dep. at 72.

<u>Question</u>: "Have you ever been treated for . . . hernia? Details of "yes" answers: include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities."

---

[8] In the original, the form is two sided and the signature on page one applies to both pages. Exh. A, Ingram Dep. at 105.

<u>Answer</u>: "Had Hernia Surgery 4-20-03 Dr. Abadier 300 Tollgate Rd Warwick RI 02886. Kent Court Hosp Warwick RI. Outpatient."

<u>Question</u>: "Are you now under observation, treatment, or taking medication?"

<u>Answer</u>: "No"

<u>Question</u>: "During the past seven years have you: [b]een examined or been treated by a physician . . . ? Details of "yes" answers: include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities."

<u>Answer</u>: Dr. Karen Blackmere . . . last seen 4 yrs ago physical. No problems."

<u>Question</u>: "During the past seven years have you: [h]ad an x-ray or electrocardiogram? Details of "yes" answers: include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities."

<u>Answer</u>: "Had x-ray for sinus infection 2 yrs ago. E.R. Kent County Hosp."

<u>Question</u>: "During the past seven years have you: [h]ad observation or treatment at a clinic or hospital? Details of "yes" answers: include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities."

<u>Answer:</u> "No"

42. After the paramedical exam, Mr. Littlefield participated by telephone in the teleunderwriting exam on September 4, 2003. Cathy Hartwig Deposition at Ex. 2 ("Hartwig Dep.") (attached hereto as Exhibit I). Colleen Littlefield was not present during the teleunderwriting interview. Exh. E, C. Littlefield Dep. at 56.

43. CFLI underwriter Cathy Hartwig conducted the teleunderwriting exam. When she was asked to handle Mr. Littlefield's application in 2003, she had worked for insurance companies doing underwriting and teleunderwriting since 1976. Exh. I, Hartwig Dep. at 8. In addition, due to her years of underwriting experience, she also summarizes medical reports to identify mortality issues for insurance companies. Exh. I, Hartwig Dep. at 10-11.

44. Prior to commencing a teleunderwriting interview, Ms. Hartwig first obtains a copy of the application filled in by the agent – here she had the application filled out by agent Donald Demers. Exh. I, Hartwig Dep.; Ex. 5. In conducting the teleunderwriting interview, she uses a two-page form, the second page of which is filed with the Rhode Island Insurance Commissioner, Exh. I, Hartwig Dep. at 20; Ex. 2, pursuant to R.I. Gen. Laws § 27-25-19(f). Exh. A, Ingram Dep. at 51, Exh. G, K. Ingram Affidavit at ¶ 4-6.

45. The completed form for the Michael Littlefield's 2003 application is Hartwig Exhibit 2. The second page becomes a part of the policy pursuant to amendment. Exh. B, Demers Dep. at 184-185. In conducting the interview, Ms. Hartwig asks the questions provided, and "ask[s] follow-up questions when needed for any yes answers." Exh. I, Hartwig Dep. at 21.

46. In conducting the teleunderwriting interview of Michael Littlefield, Cathy Hartwig followed the procedure described above. Exh. I, Hartwig Dep. at 22-23. A critical question asked of Michael Littlefield is as follows:

> "9.) Full name and complete address of personal physician; the date, reason last seen, and diagnosis:" Exh. I, Hartwig Dep.; Ex. 2.

47. In response, Michael Littlefield told her that in "May '03 that he had a follow-up after an April '03 hernia surgery." Exh. I, Hartwig Dep. at 23-24; Ex. 2. She asked, "was everything okay?" He responded, "all okay." *Id*. at 23. She recorded his precise response on the form. Exh. I, Hartwig Dep. at 23-24 and Ex. 2. This form was attached to the Amendment to the policy that Michael Littlefield verified as true and accurate when he was presented the policy on September 19, 2003. Exh. B, Demers Dep. at 184-85; Exh. E, C. Littlefield Dep. at 91-92 and Ex. 10.

48. Once Mr. Littlefield told her that everything was okay, Ms. Hartwig asked no more questions about the surgery because "If he had told me that there were some problems with

the hernia surgery, if he would have had to go back to that same doctor, then I would have found more details. . . . he told me everything was okay, so we did not need to go any further with any questioning. If he had said he was having problems, then we would have asked further questions, but he did not." Exh. I, Hartwig Dep. at 24-25; *see also* Exh. B, Demers Dep. at 194-95 (underwriting for Michael Littlefield's 2003 policy did not include going to physicians for records "[b]ecause there was no need for it. There was no medical history"). Ms. Hartwig would have ordered medical records from Michael Littlefield's physicians if any of the non-routine symptoms, tests or appointments following the hernia surgery had been disclosed: "We always order records when they say that they did any testing such as that, that's not routine." Exh. I, Hartwig Dep. at 102.

49. In addition to doing the teleunderwriting interview of Michael Littlefield, underwriter Cathy Hartwig also acted as the underwriter on the policy. She reviewed all of the information collected in connection with the 2003 application and made the decision to issue the 2003 policy. Exh. I, Hartwig Dep. at 36; Exh. A, Ingram Dep. at 45.

50. As underwriter, Ms. Hartwig seeks copies of doctors' records only if the information provided by the applicant discloses a medical impairment. Exh. I, Hartwig Dep. at 35. If so, the underwriter uses the consent executed by the applicant to seek medical information directly from the applicant's physicians and health care providers ("Attending Physicians Statements," or "APS"). Exh. B, Demers Dep. at 114; Exh. I, Hartwig Dep. at 34-36, 46-49, 54-56; Exh. A, Ingram Dep. at 97. Because of the adverse impact on the insured from the resultant delay in issuance of the policy, APS are requested only if necessary. Exh. A, Ingram Dep. at 35-37. In determining whether to request APS, the underwriter relies on her experience and on

underwriting guidelines used in the industry. Exh. A, Ingram Dep. at 38, 44-46, 58-59; Exh. I, Hartwig Dep. at 24, 35, 46, 98-99, Ex. 3, 4, 13, 14.

51. Because Michael Littlefield's medical disclosures revealed only a routine hernia that had been surgically repaired in April 2003, and followed up in May, following which everything was "okay," no attending physician statements were ordered. Exh. I, Hartwig Dep. at 14, 46, 98 ("They are of no mortality significance, so unless there are symptoms or residuals from any hernia problems, we go no further.")

52. If Mr. Littlefield had revealed either to the paramedic or to the teleunderwriter that he had had a CT scan and/or a barium enema performed in June 2003, and if any of the information concerning follow-ups, swelling, and palpable mass had been revealed, Hartwig would have ordered doctor's reports. Exh. I, Hartwig Dep. at 61, 101-03. Ms. Ingram also confirmed that, from an underwriting perspective, "if a hernia has no complications, the surgery has been completed successfully and there are no residual effects, . . . a hernia that is not going to impact mortality." Exh. A, Ingram Dep. at 34, 150-51; *id*. at 146 and Ex. 17 (CFLI underwriting guidelines provide that a hernia that has been surgically repaired with no complications is a standard risk, while ongoing complications that last more than a few weeks after surgery evidence a risk that is not standard). A hernia that has been surgically repaired with no complications has no adverse impact on mortality. Exh. B, Demers Dep. at 43, 69, 76, 133. Any complications require follow up by underwriting. Exh. B, Demers Dep. at 153-55.

53. Based on the information provided by Mr. Littlefield, specifically the application form filled out by Mr. Demers and signed by Mr. Littlefield [see ¶ 34, 66 *supra*], the paramedic interview form filled out by Ms. Carroll and signed by Mr. Littlefield [see ¶ 38 *supra;* ¶ 66 *infra*], and the teleunderwriting interview information she acquired herself by a direct



PRV_889690_2.DOC/CFTURCOTTE

conversation with Mr. Littlefield, recorded by her on the teleunderwriting form [see ¶ 45-48 *supra*], Ms. Hartwig rated Michael Littlefield as a standard risk eligible for preferred rates. Exh. I, Hartwig Dep. at 83.

54. Mr. Demers presented the issued policy to Mr. Littlefield at his home on September 19, 2003. Exh. B, Demers Dep. at 184-85. Mrs. Littlefield was present for the delivery of the policy.[9] Exh. E, C. Littlefield Dep. at 91-92, *but compare* Exh. B, Demers Dep. at 186. Mr. Demers directed Mr. Littlefield to the Amendment to the policy, to which the paramedical examination form and the teleunderwriting interview were attached. Exh. B, Demers Dep. at 184; Exh. A, Ingram Dep. at 54-55, 123-24; Ex. 14.

55. The Amendment form requests the applicant's signature and testimony as to the truth of the information provided in the attachments to it. From the agent's perspective, "I have to have the amendment signed saying that they have agreed to the information – the information on page two and three is correct, and I agree that the information upon the home office and telephone interview is correct and the paramedical facility is correct too. . . . I showed him the form. I said why don't you read it and if you want you can read it in detail." Exh. B, Demers Dep. at 185.

The Amendment states:

> **"I have reviewed pages 2 and 3 of the application in this policy. I agree that the information obtained by the home office in a telephone interview or by a paramedical facility is correct."** (emphasis in original). Exh. E, C. Littlefield Dep.; Ex. 10.

56. Michael Littlefield read and signed the Amendment. Exh. B, Demers Dep. at 185; Exh. E, C. Littlefield Dep. at 91-92, Ex. 10. The purpose of the Amendment process is:

> "to review the application and attest to the statements on the application, and in the amendment, which would be that page two and three, those pages filled out by the

[9] *See* note 33 *supra*. This fact is undisputed solely for purposes of this Motion.

> teleunderwriter, to review that and then to also review the paramedical exam and question, a form that was signed at the time the of paramedical exam and then there's an amendment that's delivered and presented before the policy is actually given over, and they would again have to read and sign the statement that says I have now reviewed these questions and answers and they are representative of the statements in the way that I answered the questions, and then they would sign that off and that becomes part of that whole contract that is part of the offer to Catholic Family when you want insurance." Exh. A, Ingram Dep. at 55.

Furthermore:

> "The applicant is responsible for answering all the question correctly, honestly and something as simple as the dates and times of the doctor's office. The applicant is the one who is responsible for saying that my health is this way or way because the applicant lives inside of their body. . . . So if a physician tells you that your head is fine, but your head is hurting, it is your responsibility and not the physician's responsibility to tell us that your head hurts and then we can make a determination as to whether or not we can properly classify you in the correct risk classification." Exh. A, Ingram Dep. at 56-57

57. Mr. Littlefield died on May 25, 2005, within two years of the issuance of the Policy. Compl. Re-Filed Ex 1. at 13 (attached hereto as Exhibit J). CFLI decided to contest the claim, and commenced a routine investigation by asking Mrs. Littlefield to identify physicians and by seeking medical records from those she identified. Exh. A, Ingram Dep., Ex. 16. After the medical records were collected, the entire insurance file and all of the medical records were turned over to CFLI's medical director, Dr. Nicola Charlton, who is engaged to assist with medical issues that may arise. Exh. F, Charlton Dep. at 10, 20; Exh. I, Hartwig Dep. at 39, 94-95.

58. After review of these materials, Dr. Charlton wrote a memorandum that concluded:

> "The medical history this individual gave on his application is at odds with what has been found in his medical records . . . The grossly abnormal barium scan and abdominal 1 CT scan both showed evidence of a mass, tumor or abscess that is not disclosed at the time of application. Neither this information nor the fact he even needed or had done further testing is not disclosed at the time of application. The concern is if these facts were disclosed his application would have been denied insurance or had his

> application postponed. The radio logic tests and barium exam fining are of such an abnormal nature it is beyond what is conceivably normal after a hernia repair." Exh. F, Charlton Dep.; Ex. 4.

Dr. Charlton also noted that Michael Littlefield was in pain at the time of his application. Exh. F, Charlton Dep. at 61. In reliance on Dr. Charlton's medical evaluation, Ms. Ingram made the decision to deny payment on the policy. Exh. A, Ingram Dep. at 136-141, 154; Exh. G, K. Ingram Affidavit at ¶ 8, 9.

59. CFLI based its decision to deny the claim on Michael Littlefield's failure to disclose follow-up visits and tests that occurred in June and August 2003. Exh. A, Ingram Dep. at 154. Littlefield was a non-standard risk because "he had ongoing complications that lasted more than a few weeks after his surgery." Exh. A, Ingram Dep. at 146. If CFLI had been informed of <u>any</u> of the hernia complications, the ongoing pain, the noticeable swelling, the feeling that "there's a baseball in there," the five non-routine doctor's appointment to Dr. Abadier, the two non-routine appointments to Dr. Manzo, the Emergency Room visit, the Vicodin prescription, the grossly abnormal CT scan, the inconclusive barium enema, the pain so severe as to force the curtailment of his cleaning work, or the trips to hospital for tests, CFLI's underwriting protocols would have raised a serious question, halting progress on the application until the risk was capable of being assessed by obtaining medical records and further investigation. Exh. G, K. Ingram Affidavit at ¶ 8. Based on the medical information gathered by the time that CFLI made its decision to decline to pay in September 2005, confirmed by the medical information and testimony gathered in connection with this litigation, including without limitation Mr. Littlefield's deposition transcript, pursuant to CFLI's underwriting protocols, disclosure of a true medical and complete history would have caused Mr. Littlefield to be classified as an impaired risk so that the 2003 policy would not have issued. Exh. G, K. Ingram Affidavit at ¶ 9. As a result of its decision to deny the claim, Kim Ingram informed Mrs. Littlefield of her decision and the reasoning behind

it. Exh. E, C. Littlefield Dep.; Ex. 7. CFLI also returned to Mrs. Littlefield a check for the refund of premiums paid and interest. Exh. E, C. Littlefield Dep.; Exs. 5, 7. That tender was rejected.

60. Prior to Michael Littlefield's death, he initiated a lawsuit against Dr. Abadier. Michael Littlefield testified regarding his condition during the period when he was under Dr. Abadier's care from April 2003 to the date of the testimony, one month prior to his death at the age of 36. Exh. E, C. Littlefield Dep. at 51-52.

61. The malpractice suit is based on the fact that both Dr. Manzo and Dr. Shahinian told Michael Littlefield that the July 2004 CT Scan, when laid over the June 2003, CT Scan, showed the same mass and that it had actually been bigger in 2003. Exh. D, M. Littlefield Dep. at 30-31. As told by Dr. Shahinian to Michael Littlefield in 2004, as of the 2003 CT Scan, the cancer had not yet then broken through the abdominal wall, and that if his appendix had been removed a year and a half before, even if it had been cancer, he would have needed a couple of rounds of chemotherapy. Exh. D, M. Littlefield Dep. at 34-37. Dr. Shahinian further opined to Colleen and Michael whether "during the surgery . . . for the hernia . . . if [the cancer] would have been found at that point in time, would the cancer have been discovered and he said absolutely." Exh. E, C. Littlefield Dep. at 133.

62. Pursuant to Rhode Island law, the CFLI form used for the 2003 Michael Littlefield policy at issue in this case was duly filed with the Insurance Commissioner and CFLI did not receive notice of disapproval during the applicable waiting period. R.I. Gen. Laws § 27-4-24.2. Exh. G, K. Ingram Affidavit ¶¶ 4,5,6.

63. Kim Ingram, CFLI's Vice President and Corporate Secretary, has extensive education and work experience in life insurance underwriting. Exh. A, Ingram Dep. at 4-11.

CFLI's underwriting procedures for the issuance of life insurance in 2003 are based on industry norm, as well as to conform the Rhode Island regulatory requirements. The underwriting procedure is intended to identify and gather information regarding risks that might adversely impact an individual applicant's probable mortality through a careful sequence of open-ended questions. Exh. G, K. Ingram Affidavit ¶ 7; Exh. A, Ingram Dep. at 32-33.

64. The insurance application process begins with an interview, generally in the applicant's home, by the agent. Exh. B, Demers Dep. at 30-33. The purpose of this interview is for the agent and applicant to discuss the type and amount of insurance the applicant is seeking. *Id*. at 47; Exh. G, K. Ingram Aff. at ¶ 5. CFLI's underwriting guidelines in effect at the time of the Littlefield 2003 application instruct the agent that he is not to ask the medical questions associated the application process. Instead, the agent is instructed to "do a through job of pre-qualifying your client during the sales process to avoid unpleasant surprises when the underwriting is completed." Exh. B, Demers Dep.; Ex. 3 at CFL000520. In addition, the agent fills in the Application form with information provided by the applicant, who then signs the form after it is completed. Exh. E, C. Littlefield Dep. at 32-33, 83; Exh. B, Demers Dep. at 107-108; Ex. 3, at CFL000529.

65. The agent explains the underwriting process to the applicant, including the importance of the paramedical examination and interview, as well as the teleunderwriting interview. Exh. B, Demers Dep. at 47.

66. "It's is not the agent's job . . . to follow-up on hernias. . . . It's the teleunderwriter and the parameds job to ask questions. His job is to ask the questions that are on the application." Exh. A, Ingram Dep. at 152-53.

67. With three exceptions, the agent is not supposed to ask medical questions. Exh. B, Demers Dep. at 177-79; Ex. 3 at CFL000529, 000530. First, the agent asks an open-ended question about general health, this is intended to flag any serious medical conditions that might raise underwriting issues, this answer is not recorded on the Application form. Second, on the application form, the agent asks, and records the answer to a question about prior diagnoses for serious disqualifying diseases. Finally, if the applicant is likely to qualify for preferred rates, the agent checks on the disqualifying conditions to avoid surprises later; this answer is not recorded on the Application form. If the agent learns of a non-standard risk during the application process, he stops taking the application until he is able to get instructions from the Underwriting Department. Exh. B, Demers Dep. at 182-83, 197-99; Ex. 3 at CFL000520, CFL000529.

68. The underwriting process is intended to identify and gather information regarding risks that might adversely impact an individual applicant's probable mortality through a sequence of general questions asked in two separate sessions with the applicant – first, in a face-to-face interview by an independent paramedic, and then by telephone with an experienced underwriter – with appropriate follow-up regarding any potential medical issues identified by the applicant to assemble enough information to determine what risk category the applicant falls into. Exh. A, Ingram Dep. at 53-57.

69. The underwriting process builds in repeated requests for direct written confirmation from the applicant that the recorded information is correct, full, complete, and true. Exh. A, Ingram Dep. at 33-50; Exh. E, C. Littlefield Dep.; Ex. 10 (application forms agreed to be "correct" or "full, complete and true" by Michael Littlefield who signed them in 2003); Exh. G, K. Ingram Affidavit. ¶ 7.

70. The structure and content of CFLI's underwriting questions are developed from industry templates that ask open ended questions and create multiple opportunities for the applicant to fully disclose any medical issues. Exh. A, Ingram Dep. at 32-37, 52-59. The sequence of the questions and the structure of the inquiry seeks to minimize invasion into the applicant's privacy, with the most probing questions asked by an independent paramedical professional. Exh. A, Ingram Dep. at 38-41.

71. CFLI's underwriting process imposes the responsibility on the applicant to provide complete, correct, and clear information, as well as to attest that the information provided fairly depicts his true health condition at the time of application. If the information is not correct, CFLI will be unable to properly classify the applicant from a risk perspective. Exh. A, Ingram Dep. at 54-57,

72. Most of the medical history gathered for the underwriting process is done by an independent paramedical. The paramedic asks a series of open-ended questions designed to elicit information about mortality risks. Exh. H, Carroll Dep.; Exs. 3, 4. The questions are crafted to get information that a lay person might have trouble giving if the inquiry used technical medical terms. The paramedic asks follow-up questions regarding any positive response to elicit sufficient details to allow the underwriters to evaluate risk. At the beginning of the interview, she asks for a driver's license for identification. Exh. H, Carroll Dep. at 33. At the end of the interview, she asks the applicant to sign the completed interview form. Exh. H, Carroll Dep. at 32-33; Exh. G, K. Ingram Affidavit at ¶ 6, 7.

73. The paramedic uses the form for her interview provided by CFLI. Exh. H, Carroll Dep. at 25; Exs. 3, 4. CFLI's paramedical interview form is filed with the Rhode Island Insurance Commissioner and is based on industry forms. Exh. G, K. Ingram Affidavit at ¶ 6. It

involves the asking of open-ended questions designed to allow the layperson to provide information pertinent to morbidity without using technical medical terminology.

74. The teleunderwriting interview, is conducted by an experienced underwriter after the agent has sold the product to the applicant; it involves a telephone call to ask additional questions about background and medical history. Exh. I, Hartwig Dep. at 6; Exh. A, Ingram Dep. at 38, 42. At some point prior to 2003, and consistent with a change in industry standards, CFLI eliminated virtually all medical questions from the application taken by the agent and instead added the teleunderwriting interview to the underwriting process as an improvement to CFLI procedures. Exh. A, Ingram Dep. at 48-49; Exh. I, Hartwig Dep. at 53, 60-61.

75. The purpose of adding the teleunderwriting interview to the application process is to get better information. Exh. I, Hartwig Dep. at 53. The interview is done by a trained underwriter by telephone, asking the applicant a series of questions. Exh. A, Ingram Dep. at 38, 42.

76. If the applicant is potentially eligible for preferred rates, this interview reviews the thresholds questions regarding such coverage. Exh. I, Hartwig Dep. at 20-21, Ex. 2; Exh. B, Demers Dep. at 126, 178-182. The teleunderwriter also asks an open-ended question regarding the applicant's last medical appointment, and its purpose. Exh. I, Hartwig Dep.; Ex. 2.

77. After the application process is completed, the paramedical interview and examination and the teleunderwriting interview are evaluated by an underwriter. Exh. A, Ingram Dep. at 45.

78. The underwriter first determines whether the applicant disclosed any risk factors such as positive medical history that have an adverse impact on mortality. Exh. A, Ingram Dep. at 46. If so, he/she uses the consent executed by the applicant to seek medical information

directly from the application physicians ("Attending Physicians Statements," or "APS"). Exh. B, Demers Dep. at 114; Exh. I, Hartwig Dep. at 34-36; 46-49, 54-56; Exh. A, Ingram Dep. at 97; Exh. B, Demers Dep.; Ex. 3 at CFL000518. Because of privacy concerns and the adverse impact on the insured from the resultant delay in issuance of the policy, APS are requested only if necessary. Exh. B, Demers Dep. Ex. 3 at CFL000518; Exh. A, Ingram Dep. at 35-37. In determining whether to request APS, the underwriter relies on her experience and on underwriting guidelines used in the industry. If the risks exposed by the application are "standard" the underwriter will authorize issuance of the policy without further inquiry and without requesting APS. Exh. A, Ingram Dep. at 36-37, 97; Exh. B, Demers Dep. at 114; Exh. I, Hartwig Dep. at 34-36, 46-49, 54-56, 98-99; Exs. 3, 4, 13, 14 (various underwriting guidelines regarding hernia).

79. If the application reveals only "standard" risks, the underwriter authorizes issuance of the policy without further inquiry and without requesting APS.

/s/ Patricia A. Sullivan___________
Patricia A. Sullivan (#2120)
Caroline F. Turcotte (#7165)
EDWARDS ANGELL PALMER &
DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)

Attorneys for Defendant
Catholic Family Life Insurance Company

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of June, 2007, a true and accurate copy of the within *Statement of Undisputed Facts* was served by ECF on:

Karen Davidson, Esq.
One Ship Street
Providence, RI 02903

/s/ Patricia A. Sullivan___________