# A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COLLEEN LITTLEFIELD
Plaintiff
vs. C.A. No. 06-157
CATHOLIC FAMILY LIFE INSURANCE COMPANY
Defendant

30(b)(6) DEPOSITION OF KIM INGRAM
Tuesday, February 20, 2007
9:30 a.m.
Law Office of Karen Davidson
One Ship Street
Providence, Rhode Island

---------- Ellen Zappia, RPR ----------
Capitol Court Reporting, Inc.
931 Jefferson Boulevard, Suite 2003
Warwick, Rhode Island 02886
(401) 739.3600



INDEX


WITNESS: KIM INGRAM

| EXAMINATION BY: | PAGE: |
| --- | --- |
| Ms. Davidson | 4 |

| PLAINTIFF'S EXHIBITS MARKED: | PAGE: |
| --- | --- |
| 1 Subpoena | 29 |
| 2 Document Bates No. CFL000587-588 | 89 |
| 3 Document Bates No. CFL000553-557 | 96 |
| 4 Document Bates No. CFL000454-455 | 97 |
| 5 Document Bates No. CFL000091 | 98 |
| 6 Document Bates No. CFL000079,83 82,71,72,85,86,87,84,73 | 99 |
| 7 Document Bates No. CFL00014 | 107 |
| 8 Document Bates No. DC00005 | 108 |
| 9 Document Bates No. DC00001-4 | 108 |
| 10 Document Bates No. CFL000001-4 | 109 |
| 11 Document Bates No. CFL000006-7 | 114 |
| 12 Document Bates No. CFL000018-19 | 116 |
| 13 CFLI Illustration of Proposed Coverage | 118 |
| 14 Document Bates No. CFL000076 | 123 |
| 15 Document Bates No. CFL000077 | 125 |
| 16 Document Bates No. CFL000045,46 47,48,53,54,32,33,49,50,55,51, 52,35,34,67,30,25,24,31,28,27,29, 26,38,36,43,44,41,42,39,40 | 125 |
| 17 Document Bates No. CFL000447,452 | 145 |
| 18 Document Bates No. CFL000453 | 148 |




APPEARANCES

For Plaintiff:

KAREN DAVIDSON, ESQ.

LAW OFFICE OF KAREN DAVIDSON

One Ship Street

Providence, Rhode Island 02903

For Defendant:

PATRICIA A. SULLIVAN, ESQ.

EDWARDS ANGELL PALMER & DODGE LLP

2800 Financial Plaza

Providence, Rhode Island 02903



(Proceedings commenced at 9:30 a.m.)
KIM RENEE ELIZABETH INGRAM,
after having been first duly sworn under oath, was questioned and testified as follows:
EXAMINATION BY MS. DAVIDSON:
Q. May I have your full name, please.
A. Kim Renee Elizabeth Ingram.
Q. And where do you live, Kim?
A. In Menomonee Falls, Wisconsin.
Q. And that's outside of Milwaukee?
A. Correct.
Q. And who lives with you there?
A. My husband and my daughter and my son.
Q. Could you briefly tell me what your educational background is.
A. Yes. I have an undergraduate degree from the College of Holy Cross in Worcester, Massachusetts. I have a graduate degree from Cardinal Stritch University. I have an associate's in insurance regulatory compliance. Chartered life underwriting degree. Chartered financial consultant degree. A fellowship in life insurance management degree. An associate's in customer service. Let's see. Licensed in four or five states for life,

health. Recently was a principle for securities, registered with the NASD series.

Q. So that's what all the initials are after your name.

A. Yes.

Q. Okay.

A. I don't use all of them all of the time. I use the ones that are appropriate for business I'm conducting.

Q. Now, you went to school at Holy Cross. Did you ever live in Rhode Island?

A. No.

Q. And these extra degrees that you got were degrees that you got while you were working?

A. The extra ones?

Q. Yes.

A. Yes.

Q. And where were you working when you got all of those degrees?

A. Milwaukee Insurance, Catholic Knights, another fraternal insurance company, and Catholic Family. And with that there are -- there's subdivisions of the company. So Catholic Financial was another company owned by Catholic Knights.



Catholic Broker Service was a company owned by Catholic Knights. So a number of the degrees I received were in conjunction with the job responsibilities I had with the subsidiaries of that fraternal's company.

Q. How old are you?

A. Now that's the one -- I'm 46.

Q. When did you work at Milwaukee Insurance, about?

A. Okay. About end of 1983 until -- was it '83 -- until about January '87.

Q. What was your job there?

A. Well, I had a couple of different jobs. I started out in underwriting basically. I was an underwriting assistant. I worked in policyholder services. I did some special things with claims and illustration production.

Q. What's illustration production?

A. Illustrations are a numerical summary representing the cash values and premiums of insurance products, and at that time -- it was the very beginning of using computers to generate that kind of information that was used during the sales, and at that time in the industry those illustrations



were produced for agents at the home office, and the home office would mail those to the agents and the agents would use those to help explain how an insurance product worked when they were meeting with a proposed applicant.

Q. What was your undergraduate degree in at Holy Cross?

A. Biology.

Q. How did you switch from biology to insurance? How did that come about?

A. How did it come about?

Q. Yeah.

A. Let's see, after college I went to the University of Madison. I was exploring medical school and decided that I'd like to have more life in my life and studies. So during that time I explored a few other things. Worked at a hospital. Some grocery, and there was a position that was opened for life insurance and it asked things well, do you have some knowledge of terminology? Are you familiar with this and that? And I thought I could do that. So I applied and was offered the job.

Q. And that was at Milwaukee Insurance?

A. Correct.



Q. And after Milwaukee Insurance you went to Catholic Knights and some of its affiliates?

A. Well, I stayed at Catholic Knights. All of the affiliates are housed within the building so...

Q. Oh, is Milwaukee Insurance part of Catholic Knights?

A. No. Milwaukee Insurance is a -- was a large mutual company and I worked for the life division. Catholic Knights Insurance Society owned several subsidiaries, but they did not have a physical building. So let's say that you own a company within a company and I would work for those divisions, but there wasn't an actual building saying this is where the company is. It was just part of my job, as it was part of several other peoples' jobs to just offer those opportunities by having that company.

Q. Did you work full-time for Catholic Knights?

A. Yes.

Q. So you stopped working for Milwaukee Insurance and went to work at Catholic Knights?

A. Correct.

Q. And when you were working at Catholic Knights, what were your job duties?

A. And this would be a general -- my job duties varied over the number of years. I started in the sales department, and in the sales department I worked with agents training. I again worked with creating illustrations and proposing different sales plans for the field, resolving customer complaints. I worked in market conduct compliance. I served as the general agent and agent liaison for the field. I did some recruiting. Of course I led some training in motivational sections. I worked in the marketing area as a product marketing manager. I worked as -- let's see. In the actuarial area, developing new illustrations and needs analysis systems. And there were a number of jobs.

You wear a lot of hats in a small company so I worked in almost every area from policy service, claims. I did a stint in market conduct compliance where I helped resolve complaints from the insurance commissioner and worked on what's called the American Activity Compliance Committee, where we looked at compliance issues from multi-disciplines. So I worked in a variety of jobs.

Q. How large was Catholic Knights Insurance?

A. At the time I was there, around 100 people.



Q. And they were all housed in that building that you were in?

A. For the most part. The home office employees, they were general agents and some field office associates that were housed in particular agencies across various states. They were also considered employees.

Q. And what was your time period at Catholic Knights Insurance Company?

A. From 1987 until 2003.

Q. And what was the highest position you rose to there?

A. Product marking manager. But at the time I was also a compliance officer for our Catholic Financial. So the one that paid me was the product marketing manager. The other title was a title necessary for -- to run that other business.

Q. And then you switched to Catholic Family?

A. Correct.

Q. Was that in '03?

A. Yes.

Q. Why did you switch?

A. Because they had an opportunity for advancement, where I could earn more money. I had a



daughter who was going to college, that became important to me, as the college didn't give us as much money as we thought they might.

Q. And what was your job at CFLI when you joined in '03?

A. Vice president of insurance services.

Q. What does that mean?

A. It means that I run the insurance operations in administration areas. I'm responsible for the new business area where you submit applications. The claims area where waiver disability and death claims are processed. Photo records retention area. Various compliance functions. Product development areas. Policy service, member service production. Commissioner complaints. Just a variety of activities.

Q. Is your direct report the president?

A. Yes.

Q. And about how many people work under you?

A. Varying time, about 15. It has been more.

Q. What's your salary? About.

A. Okay. I was going to say. It's a little over 90,000.

Q. And the CFLI office you work at is located



at what address?

A. 1572 East Capitol Drive in Shorewood, Wisconsin. It's a suburb of Milwaukee.

Q. Is that the main location for the CFLI office national?

A. Yes, it is.

Q. And how many people work at that location for CFLI?

A. 45, 46.

Q. How many people work CFLI nationwide?

A. As employees? 48. 47, 48. Somewhere in there.

Q. So only a few more people are employed by CFLI other than the folks that are employed at the Milwaukee office?

A. Correct.

Q. And who are those few more people?

A. We have an assistant vice president and fraternal director who works out of the Woonsocket office.

Q. Who is that?

A. Louise Champingy.

Q. Could you spell that.

A. No. I can guess at it.

Q. Champingy?
A. C-H-A-M-P-I-N-G-Y. And that is a guess.
Q. Okay. And she's a vice president of?
A. She's the assistant vice president and she's the fraternal director for the New England region.
Q. And the other person employed in the Woonsocket office?
A. Well, we have -- it's a new person and her name is Donna Aguilera. And she does design marketing kinds of things.
Q. And then there are various agents that not only work for CFLI but work for other people, is that correct?
A. The agents are not employees. They're independent contractors. And they are all over the place.
Q. And how many independent contractors do you have?
A. This would be a guess, and I would say a little over 50.
Q. Are they in all the states?
A. No.
Q. What states are they in? What states are they not in? Which is easier?



A. We're in about 15 to 16 states. So a few in the midwest, California, Texas and some in the New England area.
Q. Which states in New England besides Rhode Island?
A. Massachusetts, Virginia. Let's see. Some of them work in various states. And Connecticut. But, yes, they live in one state, they might work in a few others.
Q. Now, what is CFLI?
A. It's a Catholic fraternal benefit society.
Q. What's that mean?
A. That means that we're organized under a 501 (c) 8 charter that we offer benefits to our members to support the Catholic faith, and that we offer as one of our benefits the opportunity to purchase insurance and other financial products to take care of their financial well-being. So we are organized not for the benefit of insurance, but for the benefit of our members, spiritually, educationally. We offer volunteer opportunities so that we can do good for the community and for each other.
Q. How do you help them spiritually?
A. We have, well, anything from bookmarks and



we support religious activities. There's first communion on benefit. We provide some scholarship assistance for some religious education, camps, and classes. We hold some masses, some special masses. We say prayers for different people. We donate to Catholic shrines.

There are activities where we might get together and spiritually worship within the activities that we're holding for our leadership, our volunteers. We have leadership training sessions and within that context we'll also have a religious service or a mass, and we'll have some prayers.

We have a magazine where we collectively talk about what's going on in the different areas and support Catholic education as a cause and we have several fund-raisers for our foundation, anything from Boston Pops, golf outings, chili dinners. And we bring people together to be connected on our common basis, which is our Catholic faith.
Q. What's the name --
MS. DAVIDSON: Karen, I'm sorry. Let me just jump in because I should have said this at the



beginning. As I have indicated to you in the past and in writing, in addition to testifying in her personal capacity, Kim is also the person designated by CFLI with knowledge of processing underwriting customs and practice as of 2003, and as they relate to Michael Littlefield.

My hope is that Kim's extensive knowledge may cover the waterfront so it may not be necessary for the company to designate somebody other than Kim. This may answer all of your questions, but we'll see. I had said to you previously that we said we thought we might need in addition to designate Dr. Charlton, who is the medical director of Catholic Family, and we'll sort of see where we are when we get to the end of today.
Q. What's the name of your magazine?
A. Family Friend.
Q. How many policyholders do you have?
A. Approximately 54,000. Give or take a thousand.
Q. And what types of policies do they have?
A. License policies, annuities. There are a few life insurance policies from years ago. And some accidental death policies.

I believe everything was part of the production.
Q. Are you aware of any documents that weren't produced for me?
MS. SULLIVAN: You mean responsive documents?
MS. DAVIDSON: Yeah.
A. The only documents that would not have been produced for you would have been privileged documents, but every other document pertaining to this case, to the best of my knowledge, you should have.
Q. All right.
MS. DAVIDSON: I'm going to show you the subpoena that was filed in this case and have that marked Exhibit 1, please, and ask you if you recognize it.
(Plaintiff's Exhibit 1, was marked for identification)
Q. Have you seen that subpoena before?
A. These look like the subpoenas that I looked at yesterday.
Q. And have you -- you've seen --
A. Yesterday.
Q. Have you seen Exhibit A before?



A. Yes.
Q. And to your knowledge have you produced all -- number one, all the documents relating and referring to the underwriting customs, practices and policies of CFLI during the period January 1st, '97 to present?
MS. SULLIVAN: Now, let me just interpose that we filed a written objection to that request to the extent that it goes back to 1997 and stretches forward to the present and --
MS. DAVIDSON: I understand.
MS. SULLIVAN: What we believe has been produced is all relevant documents for the period in question 2003. So I just want to make sure. I don't know if you want to mark the objection. If you want to go down that road.
MS. DAVIDSON: Yeah, I can mark the objection too, but I'm just trying to see what she -- if she's gone over this and if she's aware that the documents have been produced.
MS. SULLIVAN: Yeah. I understand. And I think why don't we not clutter -- if we just acknowledge that there's an objection, I think she can go where you want to go.



A. And I will acknowledge that we have produced all of the documents in response to these questions from the time period of 2003 that are pertinent to the Michael Littlefield case.
Q. So you didn't produce any of the documents with regard to the underwriting policies that were in existence when he got his first policy, which was in -- the policy was issued in February '98, he applied for in November of '97. You didn't produce any of those underwriting documents?
A. So I can explain this. The procedures that were in effect in 2003, some of those procedures were in fact in 1997. So unless we went through, you know, the hundreds of procedures and related documents, there is a policy that, yes, indeed some of the documents that were produced in regards to the 2003 case would have been some of the documents that were also in place in 1997.
Q. Okay. Specifically I'm interested in the treatment of hernias. Were the underwriting documents and the procedures changed with regard to the treatment of hernias from late '97 to 2003?
A. I do not know that answer.
Q. Who would know that?



A. The procedures as they pertain to hernias in general in the industry have not really changed over many, many years. I'm not sure that anyone could say was there a change specifically towards hernias somewhere between 1997 and 2003. I -- I'm not sure anyone would be able to answer that question.
Q. I was talking about CFLI. I wasn't talking about the industry.
A. CFLI would not have had a change in procedure in regards to 1997 to 2003 in the treatment of hernias.
Q. In your answer you referred to "the industry" and the implication is that the -- CFLI guidelines are identical to those in all of the other insurance companies or fraternal benefits society. Is that what you meant to imply?
MS. SULLIVAN: Objection. You may answer.
A. CFLI procedures are a lot like the industry procedures because we use the procedures and guidelines developed by reinsurance companies that work with several different companies. So it is therefore not uncommon that a lot of us have the same procedures.

Q. Who do you reinsure with?
A. Currently with Optimum Re.
Q. Optimum?
A. Optimum.
Q. And who did you reinsure with in 2003?
A. In 2003 the company that was involved in reinsurance for this particular case was BMA, that was purchased by Generali.
Q. When was it purchased by Generali?
A. I would be guessing at the date.
Q. Sometime in the 2000, 2001, 2003?
A. Sometime between 2000 and 2003.
Q. Are you aware of any specific guidelines or policies with regard to the treatment of hernias by CFLI?
MS. SULLIVAN: You mean underwriting guidelines?
A. We do have some underwriting guideline books used for the field just to help define and spell out what something is. It's to help an agent identify a condition and very limited, but we do have those and we did produce those for you.
Q. How are hernias treated by CFLI or how were they treated in 2003?



A. In 2003, depending on the type of hernia, if a hernia has no complications, the surgery has been completed successfully and there are no residual effects, depending on the type of hernia, the location of the hernia, the duration of the hernia, the cause of the hernia, that -- a hernia that is not going to impact mortality, and that hernia would be just noted on the application as one of the factors and...
Q. And do you determine all of those factors by obtaining medical records?
A. No.
Q. How do you determine those factors?
A. We ask the person. We ask a number of questions, and we'll ask about the surgery. We'll ask if the -- when was the surgery scheduled? Is it scheduled in the future? Is it scheduled now? Were there any complications? How do you feel now?
Q. And is this written out somewhere that the agents are supposed to be asking those questions?
A. It's not the agent's job to ask all of those questions.
Q. Whose job is it?
A. It's the job of the teleunderwriter and the



examiner.
Q. It is the -- are the rules written out for the teleunderwriter or the examiner?
A. The questionnaires are the basis for the questions that they ask and those questionnaires are printed.
Q. Have those questionnaires changed between '97 and 2003?
A. In 2003 the teleunderwriting application, that whole process was first created, and that's also noted in our underwriting guidelines. So the teleunderwriting application that was in place in 2003 was not in place in 1997.
Q. All right. I may be mistaken, but I don't believe I have underwriting guidelines that show that the teleunderwriter underwriting questions had changed.
A. They were first developed. So teleunderwriting did not occur in 1997.
Q. Okay.
Why did you decide to start using teleunderwriting?
A. Catholic Family, very active in a number of industry organizations, became one of the companies



that decided to adopt the process and say fast method of acquiring information. There were a number -- a number of different companies who were using it and one of the pioneers for the development of the teleunderwriting process said that you would actually get better information having a third party ask the applicant the question because it's over the phone, they don't feel as it's invasive, and they can give you better information about their medications and their doctors' addresses if you call them at home where they have all of this information. Something that doesn't necessarily occur during the application process with the agent. They might know the agent and they might not want to disclose some information. You get full disclosure of the information.
And implementing this process also saved sometime in the underwriting area because you can decide whether or not based on that person's answers if you need to get an attending physician's statement or what's called an APS. So based on the response from the applicant you can -- APS, depending on the doctor, could take a week to months and therefore they're waiting weeks to months to get

37

their insurance policy. And if they can give you enough information that you can look and say this person is a standard health risk then you can go ahead and issue that policy. If they give you information that says well, there are some things that are not of the norm of a healthy person, then you can go get attending physicians' statements and you can find out which ones by talking to the person, talking about their doctors' visits you need to get. So there are a number of companies who adopted this process and we were one of them.

Q. Are those conversations taped, the teleunderwriter speaking to the prospective applicant?

A. No.

Q. And are those conversations scripted?

A. Yes.

Q. And you provided for me a copy of the script, is that correct?

A. Yes.

Q. Now, you said that sometimes people have information at home. Don't the agents typically see these prospective applicants at home where they have information accessible to them?

38

A. They have the information that's accessible to them, however, people do not get up from the table and run to their bedrooms and get the medications and pull out the phone books and get the doctors' names and addresses, whereas if I tell you that you will be called then you can have that information ready when the person calls and the person can say, well, I can hold while you go get that information.

Q. And the agent couldn't do that in advance of coming to the house saying I need this information, get it out for me before I come?

A. Agents can.

Q. How --

A. We haven't found that to happen.

Q. How were the teleunderwriters trained in 2003?

A. We take actual experienced underwriters, people who select risk and have been trained in the selection of risk. And this particular person that we used came to us already trained.

Q. By whom?

A. By the companies that she worked for.

Q. And who is this particular person?

39

A. Cathy Hartwig.

Q. And is Cathy still your underwriter?

A. She's our teleunderwriter.

Q. Is she the only teleunderwriter?

A. She is the only teleunderwriter employed by Catholic Family.

Q. Did you ever have other teleunderwriters?

A. We use a third party vending service called Interviews by Underwriters, IBU. They also conduct teleunderwriting interviews for us.

Q. And how often do you use them?

A. On an as-needed basis. If Cathy is on vacation, sick, unavailable. If we have more applications submitted that -- than we would be able to get the interviews conducted. We like to get them conducted within a couple of weeks and if it looks like we have too many to make those calls and they can use them as an overflow.

Q. How long has Cathy Hartwig worked for the company?

A. She was there when I got there. So I'd say at least in 2003.

Q. When did you come in 2003?

A. July.

40

Q. With regard to teleunderwriting, the only document that I can recall that was provided to me was a sheet with various questions on it that was apparently read to Michael Littlefield. Are there any other documents that the teleunderwriters use?

MS. SULLIVAN: Objection. It might be helpful if you would show her what sheet you have in mind.

MS. DAVIDSON: I think she probably knows.

Q. Do you know? I'll show it to you later.

A. The documents that we use for teleunderwriting have been produced. There is a sheet that's a verification of information and then page two and page three, and that's a list of questions asked and it's asked by the interviewer, teleunderwriter and paramed.

Q. And were those questions previously asked primarily by the agent? And I mean previously in '97, '98.

A. Only some of them. If a paramed is involved that medical exam questionnaire is always asked by a paramed or a physician. That's not something that the agent would ask.

Q. How do you decide whether or not to use a paramed or a physician?
A. We use parameds all the time.
Q. How are files kept at CFLI when somebody comes in and applies for term life insurance? And this would be a renewed customer because Michael Littlefield as you know had a policy in February '98. So how are those policies kept?
A. There's no distinction between a term life policy and a permanent policy other than the color of the file and no, I cannot tell you the color of the file. I don't have file colors memorized.
The application would come in, whether it's faxed or mailed. The application would get screened, someone would look and make sure that the information in the application was complete. The application was signed. Make note of it, enter it into the computer system. The application gets handed off then to the person who would be the teleunderwriter.
Q. And what does she do with it? Does it go to her by computer or does it go to her in hard copy?
A. It -- if the teleunderwriter is a Catholic Family employed teleunderwriter, they can get it



physically handed to them or faxed. If it is a service or third party vendor, like IBU, then it is faxed to them and they actually have the pages on a computer. So they get a copy of the application. They actually have the pages on the computer and they populate those pages two and three when they ask the questions.
Q. And then what does the teleunderwriter do?
A. The teleunderwriter then would just ask the questions, answer the questions. Note the answers on the form.
Q. How long does it take to do that form?
A. 15 minutes to a half hour, depending on the medical conditions and the type of -- the person that you're talking with. The age of the person. Older people take a longer time.
Q. Now, in this instance there was a paramedical examination. How does the paramedical examination coordinate with the teleunderwriter person, if at all?
A. The paramedical examination is separate. It's something that's required due to age and face amount of the insurance applied for, whereas the teleunderwriting is done on all cases, all the life



cases except for a guaranteed issue case. So the coordination is not between the two people or the forms, it's something that's coordinated with the face amount and age of the applicant.
Q. So is it fair to say the teleunderwriter doesn't see the paramedical examination information and the paramedical examination taker doesn't see the teleunderwriter's information?
A. It's fair to say that the paramedical does not see any of the file information. They would only have their form that they send. The teleunderwriter, if employed by Catholic Family, will see the application and the paramedical exam depending on what case it is and when they're working. It is not an absolute every case kind of issue.
Q. Isn't there usually information on a paramedical information report that the teleunderwriter needs to know or wants to know?
A. If the teleunderwriter is the final underwriter in the process, yes. But as in the case for a third party vendor you're just gathering information and if you have that information, sure, they can help, but all of these happen at different



times. You might get the teleunderwriting interview conducted in the first couple of days, whereas the person might not be available for a paramedical exam for several weeks. So the sequence changes events. Sometimes information is available, sometimes it's not.
Q. What does the teleunderwriter do after they take that telephone interview?
A. It depends.
Q. In 2003?
A. It still would depend. Once you've taken that teleunderwriter interview then you have to give the teleunderwriting interview answers back to Catholic Family. The teleunderwriter, in our case because we're small, if our underwriter, our other underwriters happened to be out of the office they might actually come in and be the underwriter for that case. In other words, look at the entire file as a selection first. A vendor, independent contractor teleunderwriter would just submit that application and be done and never see anything.
Q. Do you know what Cathy Hartwig did in this instance?
A. In this instance Cathy Hartwig wrote this

45

case.
Q. She --
A. She underwrote this case as an underwriter.
Q. So she took the information and then she underwrote the case. And what does that mean?
A. She was the one who actually approved the case for issue.
Q. And when she approved the case she had medical authorizations for release of complete information on Michael Littlefield, didn't she?
A. Yes.
Q. Those are signed automatically when an agent takes the application, isn't that correct?
A. Yes.
Q. So Cathy Hartwig does the underwriting and what does she do when she did the underwriting? What does she do?
A. She reviews the answers on the application. The answers for the teleunderwriting interview. Reviews anything indicated on the medical exam. Looks at build, height, weight, medications taken. Last time the person's seen a physician. Any complaints that that person might have. Medications, herbals. Anything that might cause an

46

interaction. She would take into account hazardous occupation, avocations.
And she would look at that as compared to established guidelines and see if that person falls in a preferred standard, substandard or unacceptable risk and make that determination, and depending on the size of the case that determination could be made in conjunction with the underwriting standard of the reinsurer, so then she would have to send that information off to the reinsurer.
Q. Why do you use a reinsurer?
A. Because there's only so much risk that a small company can accept. So although large companies use reinsurers too. The reinsurer will insure that amount that's above your retention. So there's a part of the risk that you hold in your company against your actual reserves, assets, surplus and then there is a portion of that risk that you send to another company, and you pay that company. So they're an insurer who insures an insurer or reinsurer and they take on that risk above your retention.
Q. So if there were a pad on this policy and they were reinsured, the reinsured would actually

47

pay their share and CFLI would pay its share, correct?
A. Correct.
Q. Who in the company is in charge of this case, this litigation part of the case at CFLI?
A. Can you explain "in charge of this case"?
Q. Sure. Since I filed this lawsuit, who is it in the company who coordinates things for Attorney Sullivan?
A. I do.
Q. Do you know about how many term policies you pay out in a year in terms of percentages of all your policies?
A. No.
Q. Is it a lot? I really have no grasp of this.
A. We don't keep records in terms of that type of policies. I mean, there's an actuarial analysis that will review blocks of business to see who died, who didn't die, what's profitable, but as an insurer we don't see this percentage. I mean, we could, but I don't look at this and say oh, these were term, these were whole life. So I guess it would be, if I'm guessing, the term policies might be a smaller

48

number, but higher in face amount and that's just a guess. Because the average face amount of a term policy is higher than the average size of a face amount of a permanent policy. So in overall claims we might have a lot of $500, thousand dollar policies paid out and -- but I couldn't give you a percentage. I've never worked that out.
Q. Are there any special requirements for a term policy as opposed to a whole life policy?
A. No.
Q. And just to go back, to be sure I understand. You changed your procedures with regard to beginning to use a teleunderwriter as a result of an analysis that your company did and you learned about from other companies because it was faster you said, it was more efficient?
A. I'm not --
MS. SULLIVAN: I'm objecting to the question because it misstates the prior testimony, but go ahead and answer.
A. The word faster refers to the teleunderwriting process on the application process. Not to give the actual reasons why Catholic Family changed this. Catholic Family changed their

procedures in response to industry changes and practices. So that's more accurate a testimony.
Q. Where does it say that the industry changes and practices were changed around 2003?
A. The industry changes. We lag industry changes and practice, not by a lot, but we'll see it and then we can do it. And you would have to do research to find where that says that.
Q. So it's not something that's published for insurance companies.
A. Sure. Lots of publications. You asked me where could I find this information. I could not point you to one document, but I could point you to a number of sources where you could research that.
Q. Okay.
How -- when this change -- a teleunderwriter was effected at CFL, how did that information get passed along to the agents in terms of their taking the applications, was there a training?
MS. SULLIVAN: Karen, I'm sorry, I may have just logged out, but I didn't -- I really didn't understand that question. Could you read it again?



(Last question was read back by the reporter.)
A. Again, I'm guessing at the information that you're trying to get at. If you're asking how were our agents informed that we would now be doing a teleunderwriting process. There was a change in the actual application that was filed with the various states. So they would have received a different application. They would have received a sales force, or whatever they might have called that bulletin, at the time that says here is the new application.
These types of changes are interview -- introduced at different training conferences. They could have been called. And if you note in the life underwriting guidelines that was produced, and I believe it's in there, it actually says in a special -- it talks about the teleunderwriting process in that booklet.
Q. So in this instance Donald Demers would have gotten some sort of a bulletin from you and a new form and that's how he'd know to change his procedure when he went and took apps?
A. Yes. That's one of the ways.
Q. Sorry.



A. The change in the application would have forced a change.
Q. Where are these forms filed with the state when you have a change in forms?
A. With the insurance commissioner's office.
Q. That's a legal requirement, correct?
A. Yes.
Q. And it's before you make the change that you file a form saying we are going to make this change?
A. Yes.
Q. And you know it was in 2003, but you're not sure just when, is that right?
A. I did not say that I know it was in 2003. What you --
Q. My mistake.
A. You asked a question that had to do with the change in practices between 1997 and 2003. I said that I know at least there was a change in 2003 and there would have been a change because we have the new application, and there's a reference to these teleunderwriting guidelines. The teleunderwriting guidelines might have taken place before then. I do not have that particular date.
Q. Who makes up the forms? Who makes up those



questionnaires that the teleunderwriters use?
A. The forms come from a number of sources. I mean, there's sharing in the industry of applications and forms, and Catholic Family exchanges that information so we -- you might notice, if you look at a variety of the forms that our forms look a lot like other insurance company forms. So we start with some of those templates and then of course as we file those forms with the states, the states have particular ways that they allow you to answer questions. So then we would make and change those forms to comply with those state requirements until the state has actually approved the form and says yeah, from this date it's okay to use this form.
Q. So with regard to this form there isn't somebody in the company who made it up. They probably looked at a template.
A. There's probably a group of people who would look at several different templates and come up with something that works.
Q. And when you are trying to decide what to put in these forms for the underwriter or the agent, what is it you're trying to achieve? What's your

53

focus?

A. We're trying to get enough information about an individual to determine what risk category they fall into. So for a person who is a 27-year-old female, are you just as likely to die as another 27-year-old female, more likely or less likely. And these questions get at everything that can impact your mortality, your likelihood of dying. Your morbidity, your likelihood of getting sick that might lead to dying. And we try to get an informational picture to match that person up.

So that when we price these -- "we" being the industry, the actuary develops the cost for a product, they develop these based on the number of people expected to die at a particular age, at a particular time. And what we do is say when we have people who match this criteria they are here, and the people who are healthier than normal and less likely to die are in a preferred category, and those people who might have some impairments are therefore in a substandard category. And the pricing is a variation of that. And that's the purpose of the application is to elicit enough information to help us in making that determination.

54

Q. So if the information that's taken by the agent or the telemarketer or the paramedical examiner is incorrect, that affects your ability to make an accurate decision, doesn't it?

A. If the information taken by the teleunderwriter, the agent or the paramed is put on the application and then reviewed by the applicant, the applicant has the ability and the responsibility to indicate that these questions are incorrect or do not contain the information that was conveyed, or do not contain the information that may not have been conveyed, which should be contained, and then they sign and attest to the fact that these answers are representative of my health condition and the questions that are asked at this time. And if that information is not correct it will impact our ability to classify this person properly.

Q. So you're saying that in this instance Michael Littlefield would have had to look at everything Demers wrote down, everything the paramedical wrote down and everything the telemarketer (sic) wrote down and determine whether it was accurate?

MS. SULLIVAN: Objection. When you say

55

"telemarketer," do you mean teleunderwriter?

MS. DAVIDSON: Yeah.

A. I have to amend your question because your question was very inclusive, everything.

The job of the applicant is to review the application and attest to the statements on the application, and in the amendments, which would be that page two and three, those pages filled out by our teleunderwriter, to review that and then to also review the paramedical exam and question, a form that was signed at the time of the paramedical exam, and then there's an amendment that's delivered and presented before the policy is actually given over, and they would again have to read and sign the statement that says I have now reviewed these questions and answers and they are representative of the statements in the way that I answered the questions, and then they would sign that off and that becomes part of that whole contract that is part of the offer to Catholic Family when you want insurance.

I offer my statements, my application, along with money as a total financial offer and consideration, then you offer me back a contract,

56

and at that time, once these statements are made, that contract is offered, that person is given a free look period to think about this is whether something that they really want, and during that time if they have changed their mind they can undo that contract and get all their money back or they can accept and continue on with that contract.

Q. So if an applicant is told by his doctor that everything is fine and he tells the underwriter everything is fine, who's responsible if everything isn't fine?

MS. SULLIVAN: Objection.

Q. Are you going to answer?

MS. SULLIVAN: If you can.

Q. Unless your attorney instructs you not to answer, you're required to answer. Want to hear the question again? Let's hear the question again.

(Last question was read back by the reporter.)

A. The applicant is responsible for giving accurate and clear information of their medical condition. The applicant is responsible for answering all the questions correctly, honestly and something as simple as the dates and times of the doctor's office. The applicant is the one who is

responsible for saying that my health is this way or that way because the applicant lives inside of their body. The contract is between the applicant and the insurance company and not the physician. The physician does not have a responsibility in this application process.

So if a physician tells you that your head is fine, but your head is hurting, it is your responsibility and not the physician's responsibility to tell us that your head hurts and then we can make a determination as to whether or not we can properly classify you in the correct risk classification.

Q. Okay. What happens if you tell the agent or the underwriter of a problem and they say it's not important and they don't write it down?

MS. SULLIVAN: Objection.

A. It is your job as an applicant to read the statements and say that these are indeed representative of my answers, and it is your job to communicate that to us because that is part of your offer for insurance. The agent is also not a party of the contract.

Q. So an agent who's been with the company for



years and years, tells you we don't need to put that down, you shouldn't believe him? You should know not to believe him?

MS. SULLIVAN: Objection.

A. When you are asked a question by a paramed or the teleunderwriter the agent is not present. When they ask that question you have an obligation to give that answer if you are going to apply for insurance and represent that these statements are an accurate representation of your health.

If someone tells you that they are not important statements and you are asked that question, we would expect that you would answer the questions.

Q. You're assuming that the questions asked by the teleunderwriter, the agent and the paramed are the same, aren't you?

MS. SULLIVAN: Objection.

A. I'm not assuming that.

Q. They're not the same, are they?

A. The forms are different and therefore the questions asked should be different.

Q. How frequently in 2003 did CFLI actually get medical records with the authorizations that were



given by the prospective applicants?

A. I could not answer that question. Again, it depends, the age, the amount, active, conditions. So asking how frequently, I could not tell you how frequently we would ask.

Q. Could you tell me generally, was it frequent, infrequent, sometimes?

A. I don't think that those categories apply. Attending physician's statements were ordered when necessary.

Q. And who determines when necessary?

A. Typically the underwriter and guidelines established by reinsurers, sometimes the medical director.

Q. Does the medical director get involved in applications like Michael Littlefield's?

A. Again, it depends.

Q. On what?

A. On complications and whether or not there are records or exams that need to be determined or interpreted.

MS. SULLIVAN: Karen, when you hit a breaking point.

MS. DAVIDSON: Sure. We can break now.



(A recess was taken.)

Q. Do you know David Demers or Don Demers?

A. Yes.

Q. How long have you known him?

A. Just since I've worked for Catholic Family.

Q. And how do you know him?

A. As an agent who works for Catholic Family.

Q. Have you worked with him?

A. Let's see, how would you describe work for him. Since I'm in charge of the whole new business area and he submits applications. If there was a question or he had a problem and he called me, yes, but since he's located here and I'm all the way in Wisconsin, that's not something that occurs too frequently.

Q. So is it fair to say that your contact with him is infrequent?

A. Yes.

Q. Did you ever discuss this case with him?

A. We discussed his application. I requested a copy of his file. I communicated to him times and dates that people would be contacting him. We did not have a discussion of the case and its facts or positions or anything like that.

Q. When Mr. Littlefield got the $300,000 policy he turned in his February '98 policy to you. Do you still have that?
MS. SULLIVAN: Objection.
A. I would say probably not. I would actually have to go back and look at the files, and that policy, the old policy was replaced and there are several forms and comparisons that are turned in with the policy. And so at that time the policy could have been turned over or not have been turned over. I do not recall seeing that policy in the file. So my guess is that we were not given the policy.
Q. And how about the $300,000 policy, Colleen was asked to return that together with the death certificate and some other information. Do you have that in your file?
A. We have a copy of the $300,000 policy in the file that was actually provided from your discovery. We did not get the original $300,000 policy back from Mrs. Littlefield.
Q. You did not get it back.
A. No.
Q. Do you recall it was requested?



A. Yes. We requested it of her. Yes, we did.
Q. But you didn't get it back. Is that correct?
A. No.
Q. When a paramedical person does an examination in accordance with your form they're required to ask the questions on the form in the order that they appear, is that correct?
A. Yes.
Q. And they're not required to ask any other questions than the ones that are listed on your form, is that correct?
A. They might have to ask a question for clarification if they don't understand the answer given or if there's more explanation. So -- and that could vary from, you know, do you have a zip code for this? And I broke my arm. What part of your arm? So that would be a clarification question.
Q. It doesn't require to ask if he had a CAT scan or barium enema, does it?
MS. SULLIVAN: Objection.
A. It requires to ask if you've been under a doctor's care, if you've been observed. If you've



been treated, hospital, clinics. It's a very general question. So it doesn't expect a person to understand, as long as they understand that they were in a facility and they had a test, and that's why it's so general. The observations, when you see them, when you treated under doctor's care. So that the person doesn't have to be a medical professional to understand that they were seen by a doctor, that they had contact with a doctor, a medical physicians that they were part of some kind of test that was medically related.
Q. Let me ask you again. The form doesn't require that she ask whether Michael Littlefield had a CAT scan or a barium enema, does it?
A. The form requires that she ask if Michael Littlefield had any tests and any observations and that would be considered a response to that question.
Q. So is that to say if someone indicates that they've had hernia surgery they also have to say that they did a blood test before they did the surgery, they did a urine sample before they did the surgery? Is that what you're telling me?
MS. SULLIVAN: Objection.



A. There are questions that ask if you've had related medical tests and treatment and that's what they would have to indicate, yes.
Q. So I have hernia surgery and as part of my hernia surgery the doctor gives me a battery of tests; blood tests, urine test, blood pressure test, am I supposed to write that down?
A. You're supposed to indicate that you had a variety of tests as part of surgery; that you had a variety of tests after surgery; that you've had any tests up until the time that you're talking to that person. So you should indicate all of those visits, observations, treatments.
Q. Who's Judy Schmitt?
A. She is a member services person who processes claims.
Q. Who does she work under?
A. She works under me.
Q. She's a direct report of yours?
A. Yes.
Q. Do you talk to her every day?
A. I can't actually say that I talk to anybody every day. I'm in a number of meetings and a lot of times I'm in my office. I would say that I would

in this case Don Demers, who asked the medical questions as shown on page 554 and 555?
A. In this particular case and for this amount. If there was a higher amount then a paramed would have been involved asking the medical questions.
Q. And that was the case here.
A. Correct.
MS. DAVIDSON: Then this is four.
(Plaintiff's Exhibit 4, was marked for identification)
Q. Do you recognize Exhibit 4, which is CFL 454, 455?
A. Yes.
Q. And what is this?
A. It's a brochure developed to be given to an applicant to help prepare them for the people who might be calling and to tell them a little bit about scheduling tests and the teleunderwriting interview.
Q. And when is this sent to an applicant?
A. This is given to an applicant by the agent.
Q. Do you know if Michael Littlefield got one of these?
A. I don't believe that Michael got one of these.



Q. And why is that?
A. Because I believe this form was created after his application date.
Q. How can we tell that?
A. Because this is the latest form and I was actually with Catholic Family when this form was developed.
Q. And it says on this form, we can get copies of your medical records and you signed a HIPAA form letting us do that, right? I'm looking at the last paragraph.
A. Yes.
Q. And in the prior form did that also say we can get your medical records and you signed a form letting us do that?
A. I'm not sure if the prior form like this said this information. But the HIPAA form that you sign in the application process, somewhere in there it would have said you've signed this authorizing our ability to get those forms.
(Plaintiff's Exhibit 5, was marked for identification)
Q. And I'm going to show you what's marked as five and ask you if you recognize this.



A. Yes, I do.
Q. And this is a request from Michael Littlefield to up his policy by 10,000 from the $50,000, is that correct?
A. Yes, it is.
Q. And this is in response to a solicitation to Michael and like policyholders where you wouldn't have to have a medical examination. You just had to make out this form and send in a bigger premium.
A. Correct. This form is a response to a marketed -- mass marketed coverage to our present insureds.
Q. And Michael got that extra $10,000, correct?
A. Yes.
(Plaintiff's Exhibit 6, was marked for identification)
MS. SULLIVAN: Can we just say on the record that Exhibit 6 is a compilation of pages from various sources, that were not intended to purport to be a complete document.
MS. DAVIDSON: Right.
Q. Let's go through this one by one, if you would, with me, Ms. Ingram.
The first page CFL 79 seems to be



Michael's application, made out together with Don Demers on August 25th, '03. Is that what you recognize it to be?
A. Yes.
Q. And is this the form that CFLI was using back in '03, the standard form?
A. Yes, it was.
Q. And this page doesn't include any particular medical questions, is that correct?
A. Other than the box on the right-hand side that asks about diabetes, cancer, heart disease, alcoholism, drug abuse.
Q. It doesn't have the complete listing of medical questions that the other form has, is that right?
A. That is correct.
Q. And when you use these forms in your office to determine if someone should get insurance you assume that the information that the agent has written on here is correct, is that correct?
A. Yes. That is correct. We assume this information is correct.
Q. Let's go to the next page, which is CFL 83. Is this the HIPAA authorization that Michael

Littlefield would have signed with Don Demers on August 23rd, '03?
A. Yes, this looks like that form.
Q. Authorizing you to get all and any medical information you need to determine if he should be able to get a policy?
A. Yes.
Q. And the next page is CFL 82, and basically it's the same as the first one, but it's got a copy of a check there to Catholic Family for 96.20. So is it fair to say that when you apply with an agent and fill out one of these forms you give a first payment of some sort? Is that what this is?
A. Yes.
Q. And if you look at the next page -- two of them go together, CFL 71 and 72, is this the form created by Catholic Family Life Insurance for medical examinations done by paramedicals in 2003?
A. It's a form Catholic Family used in 2003 for their parameds in the State of Rhode Island, yes.
Q. And do you know when this form was developed?
A. I don't.
Q. And this form is as a result of a medical



examination that Michael had with someone named Donna Carroll on behalf of CFLI, is that right?
A. Correct.
Q. And when CFLI looks at this form to determine if insurance is appropriate for someone such as Michael Littlefield, you rely on the information on this form as completed by Donna Carroll, correct?
A. When we're reviewing our selection of risk we would rely on this information on this form as completed and signed by both the proposed insured and the medical examiner. The medical examiner is just there to ask the questions. It's the proposed insured's answers that we're relying on.
Q. So the handwriting, however, is all in Donna Carroll's handwriting except in the right lower signature page which is signed by Michael Littlefield, correct?
A. Correct.
Q. And on the second page, that is the CFL 72 page, why are these sections crossed out?
A. Because she did not perform this information. You could -- she didn't perform or didn't ask this information.



Q. And --
A. You'd have to ask Donna Carroll about that.
Q. But would that have been because CFL instructed you not to ask that information or did she just make her own determination that she wasn't going to ask that information?
A. This is information that she as a paramed would not have been qualified to ascertain for us. So she could not have asked this information.
Q. And Michael Littlefield didn't sign this one but Donna Carroll did, correct?
A. Correct.
Q. And one of the things required in 5E is an examination of the abdomen, correct?
A. My numbers are cut off here. So is this --
MS. SULLIVAN: My copy is also cut off. I know there are many copies that are not cut off in the file.
Q. Mine is good a one. Want to look at 5E?
A. This is a paramedical exam. She would not have asked that information.
Q. So she did not ask or examine for any abnormality in the abdomen, correct?
A. No. She did not ask the questions that were



crossed out. She would have asked the, "Do you have pertinent information not brought out above" question.
Q. So she didn't ask any of the questions, but she answered the last one? I don't follow.
A. She didn't ask the questions that are crossed out, and I'm quite sure you could ask Donna Carroll this. The question is, "Do you have pertinent information not brought out above?" There's an answer to this question, which would indicate that she would have asked that one. It is not crossed out, and there's an indication of her note.
Q. And that's not signed by Michael Littlefield, right?
MS. SULLIVAN: Objection. Isn't this a two-part document?
MS. DAVIDSON: It is.
MS. SULLIVAN: Two-page document.
MS. DAVIDSON: It is a two-page document.
Q. I'm asking if this page, 72, is signed by Michael Littlefield.
MS. SULLIVAN: Okay.

105

A. Because this page comes as a one-page two-sided document, this document is signed by Mr. Littlefield.
Q. So you're saying that the document, the signature on page one applies to the page two.
A. Correct.
Q. Now, the next thing is CFL 85, 86.
A. Looks like different --
Q. The next page.
A. Okay.
Q. 86, 87. And is this -- this is a notice that agents give to prospective insureds, is that right?
MS. SULLIVAN: Hang on a minute. And we're now talking about?
MS. DAVIDSON: 85.
MS. SULLIVAN: What is a three-page form, 85 through 87.
A. This is not a complete form. There's other information that goes along with this where they do a comparison of the policies. But is this notice regarding a replacement of life insurance? It's something that the agent would have had to have given to the proposed insured to sign before we

106

would have even considered looking at the new application, yes.
Q. And then the following page, which is CFL 84, I think is also a part of that. It's signed on the same day, August 25th, '03.
A. This piece is not a part. The illustration disclosure is not a part of the replacement paperwork. The illustration disclosure is part of the application paperwork that's presented on -- in the illustrated policy and that's determined by plan, face amount and it has nothing to do with whether or not you're replacing. So even if you're not replacing coverage, you would have to sign this form if it was appropriate to do so for that product.
Q. And then the last page, please, 73, dated September 12th, '03, is this a request of Don Demers to submit additional information to CFLI?
A. This is the policy transmittal that comes on top of the new policy and it's a request to our agent to get the following items completed and returned to the home office.
Q. That's it for that one.
And this one, which will be number

107

seven. Can you tell me what this is.
(Plaintiff's Exhibit 7, was marked for identification)
A. I think this is one page, and there's other pages that aren't with this, that the agent's statement and the reasoning for recommending replacement of existing insurance. So there's -- it's a two-step process. There's a process where they have the applicant sign all of the required forms by state and the notice. And it says that take a look at this, think about this before you move on. That has to come in before we can do any underwriting in the case. And then this is a Catholic Family, please now, Mr. Agent, give us some more information about what's going on with this case and what's involved when there's replacement of a case.
Q. And what's he give as the reason for replacement?
A. "Does not" -- whatever that is, "meet" I'm guessing at some of this handwriting. This would -- I guess that the next word is "insured's" -- I can throw out a possibility of words and I would say if I was guessing, and I am, that this is "needs."

108

Q. So that's the reason Don Demers issued this or did this application.
MS. SULLIVAN: Objection. Go ahead.
A. This is to say that these are the reasons that you're proposing replacement of existing insurance. Existing life insurance in favor of a new life insurance policy.
(Plaintiff's Exhibit 8, was marked for identification)
Q. Looking at Exhibit 8, which is DCO 5 and asking you is this your request to EMSI to do certain work with regard to Mr. Demers?
A. This is EMSI's form. We just send them a note electronically or verbally and say we need these tests and this paramed. They generate. This is not our document. This is a document that it's generated on their side.
Q. So they create this at your request. Is that right?
A. They create the -- for their records. They do the tests, they conduct the paramedical interviews at our request.
(Plaintiff's Exhibit 9, was marked for identification)

nontobacco. Based on 300,000, quarterly premium, $96.20.
Q. And could you look for me at CFL 46, top of the page, it says payment of proceeds.
MS. SULLIVAN: 86.
MS. DAVIDSON: What did I say?
MS. SULLIVAN: 46.
Q. Do you see that payment of proceeds?
A. Yes.
Q. So what does this mean, when a death certificate is provided to you typically you pay out within 30 days?
A. Actually, that's not what this means.
Q. Okay.
A. What this says is once we receive due proof of insured's death, which means all documents that are relating to proving how, when, what, where the insured died, so once we get all of the documents, the death certificate is only one of the documents that we receive. A claimant statement, any medical records, all of that information is considered due proof and once we have that final document and make a decision then we'll pay that out.
Q. And the second paragraph there it says



"interest shall accrue on the death benefit proceeds from the date of death to the date of benefit and the rate is going to be determined by us." What's the rate?
A. An interest rate.
Q. But what it is, is it -- do you know?
A. Interest rates vary by state. So I would not have that rate memorized. We would look and see what rate was applicable.
Q. Who sets the rate?
A. The states. The states set the rate. So you can pay that rate, and I think it actually says it, does it, but never less than the rate required by law. So we will pay at least what the state mandates that we pay.
Q. And we don't know what that is. What is it usually, is it like one percent or something?
A. Three percent. It might be higher from time to time.
Q. Department of insurance specifies?
A. It's actually in the state regs. So depending on the state. Some are common. The insurance commissioner offers and it all depends on how it's filed.



Q. And if you look at CFL 493, which is page three at the bottom, it says "incontestability." And this allows you to contest, except in some states, two years from the date that the policy went in force, is that right?
A. Yes.
Q. And that's what you're basing your contest on in this case, correct?
A. Yes. Contest during two years in force during the lifetime of the insured.
(Plaintiff's Exhibit 14, was marked for identification)
Q. I'm showing you CFL 76, Exhibit 14, and 77. And it's signed by Michael Littlefield and Don Demers on September the 19th. And I think this is a document you were referring to earlier when you said that he, being Michael Littlefield, is supposed to look at what the paramedical says and the telemarketer says or the tele -- whatever it is, underwriter says, and then sign this together with the amounts of money that he could be charged a year?
MS. SULLIVAN: Can I, just again, I'm not sure that page two, while they're sequentially



Bates numbered, I'm not sure that this is page two of page one. You might want to make sure that this is a single document.
Q. It's actually -- you can see it's dated September 22nd. And the other one is dated the 19th. So they were given to Michael and signed separately.
A. Correct. They are not part of the same document.
Q. Right. And the second one just shows we can increase your rate to 1,339, but no more than that. Is that what that says?
A. This again is a piece of information that is required by various states and it's a disclosure of cost and benefits of the information. So a person has a chance to look over the policy during the pre-look and say, okay, this is another document where I acknowledge that I understand the benefits in this policy that I'm purchasing. Page CFL 76 becomes a part of the actual contract.
MS. SULLIVAN: And again, it's a little confusing that the second page is numbered page two. Let me just clarify that.
MS. DAVIDSON: You can do a new exhibit

direct, send check to agent and Don wanted to be involved in the check delivery process. So it says "send check to agent."

Q. But what check?

A. A contestable claim does not mean we're not going to pay the claim. A contestable claim just means that we have to investigate a claim. So when you contest a claim the thought process is that you will eventually pay the claim and therefore you need to gather the information and documents and inform the agent and do that procedure. The only thing that's different is that you have to go get records and make sure that there wasn't fraud, misrepresentation, or any of the other things that would prevent you from paying a claim. But the thought process in June of 2005 was that we're going to pay the claim.

Q. And "send check to agent" really means keep agent in the loop?

A. No.

MS. SULLIVAN: Objection.

Q. No.

A. No. "Send check to agent" means send check to agent. The agents are not in a loop in the claim



process. Send check -- as I --

Q. So even though there's no check it says "send check to agent." All right.

A. There wouldn't be a check yet. We're just gathering information.

Q. CFL 034, a handwritten note by Colleen dated June 10th, received June 14th. She sends you the death certificate and points out the fact that the doctor says he only had cancer for nine months, and then attached is the death certificate. And then 024, what's happening here on June 16th?

A. I don't see the detail, but June 16th should represent the time that Jody, who is an underwriting assistant, would have gotten HIPAA and those kind of forms from the claims area and would have put the orders out there. It's an electronic request.

Q. So when you send out the request you send them out electronically, you don't send like letters?

A. We can send letters. We can send faxes. It depends on how the doctor or the clinic or the hospital operates. And they all operate differently.

Q. And then -- so June 30th she sends for Dr.



Manzo's, M-A-N-Z-O, records?

A. And that's Cathy as opposed to Jody.

Q. And then July 8th, Colleen calls and asks did you get the records. But as far as I can tell you've only sent for Manzo's at this point, correct?

A. I can tell that we sent for Manzo's records June 30th. Looking at the June 16th from Jody, I cannot tell which doctor was requested or which clinics were requested at that time.

Q. And Colleen calls again on the 22nd, 030 asking if she --

A. Which page?

Q. 030. Asking if you've gotten the medicals and you don't have them. And then July 27th --

MS. SULLIVAN: Wait a minute. I think my document is missing a couple of pages. I'll look on as long as -- I jumped from --

MS. DAVIDSON: Off the record.

(A discussion was held off the record.)

Q. 030 Colleen is trying to find out what's going on. And then July 27th is this Cathy Hartwig who is trying to get medical information now?

MS. SULLIVAN: Wait. What page are you on?



MS. DAVIDSON: It's CFLI 28 and it looks like this and the CFLI number is cut off. See this one, Pat. That's it.

Q. So has Cathy Hartwig gotten involved now and she's sending for records, is that what's happening here?

A. Yes.

Q. And why is it that Cathy Hartwig is involved now?

A. During a contestable claim process the file goes back to the underwriting area and the records are reviewed by the underwriters. We only have a couple. So those people will review the files and request that medical information. If the medical information seems incomplete, maybe there are things that are missing or there are other doctors, they're the ones who pick that up. "They" being the underwriters say, okay, now you need this record and this record.

Q. So that looks like what's going on the next few pages. Cathy is trying to get the medical records.

A. The next page is Stephanie asking for medical records.

137

Q. And Stephanie is who?
A. Stephanie is also an underwriter.
Q. Is she an outside underwriter? Because you told me that Cathy was the only inside underwriter.
A. I did not tell you that. I told you Cathy was our only teleunderwriter. Cathy is a part-time person who is a teleunderwriter. Stephanie is a full-time, works in the home office, underwriter.
Q. Cathy doesn't work in the home office?
A. A couple hours, twice a week.
Q. She works from her home?
A. Correct.
Q. Could you go to CFL 038, which is a letter, I'm not sure who it goes to, from Nicola Charlton, M.D.?
A. Okay.
Q. Do you know who this went to?
A. It's a file. It didn't go to anyone. It's not a letter.
Q. So this would be what she did as a result of your handing her the file or someone handing her the file to look at?
A. Correct.
Q. This would be her response and she'd put it

138

in the file and then what happens?
A. She would meet with the underwriting team. She comes in a couple of hours twice a week, sometimes less than that. She'd meet with the underwriting team, tell them her recommendation, and this is whether it's new business or a claim, and jot some notes down in the file. As this one was more involved, she did a separate summary.
Q. So there's no notes of the meeting, but it's her summary.
A. Correct.
Q. Were you at the meeting?
A. No, I was not.
Q. Do you know who was?
A. I would say by procedure that Dr. Charlton and at least one of our underwriters was probably there.
Q. We can't tell from looking at this what records she looked at, can we, aside from a CAT scan, a barium enema and some subsequent hospital admission?
A. I can tell that she looked at the application. It says --
Q. I'm talking about medical records.

139

A. It indicated that the tests that's described.
Q. The next page, CFL 036 is yours. Why did you write this?
A. My position is vice president of insurance services. I rarely get phone contact with our members, beneficiaries. So it is rare, and when I actually get contact you make notes, and Mrs. Littlefield informed me that she would be talking to her attorney. So that would be another reason to actually take notes on the conversation.
Q. I don't have anything between August 25th when we have Dr. Charlton's note and September 1st. So somehow it looks as though Dr. Charlton or someone conveyed to you that this claim should be denied. Do you remember how you found out?
A. Actual detailed memory, no. What probably happens, and the part I do remember is reviewing the file. These notes attached to the file would have been on my desk or given to my assistant or put on my chair so that I would have to take a look at them. So I would take a look at that note and based on this note, I would -- here it says "Called and left a message on answering machine." So I probably

140

received this information close to this time and I called Mrs. Littlefield to let her know what we were doing. And then Mrs. Littlefield returned my call.
Q. And before you called Mrs. Littlefield, did you discuss it with the president or discuss it with Dr. Charlton?
A. Again, remembering exactly, I could have discussed it with Dr. Charlton and because she is only in the office for a very limited amount of time, and sometimes that does not coincide with my schedule, I cannot say for sure that we sat down and we had a face-to-face conversation. And that she's available if I need to talk to her. But I do not remember having a conversation where we discussed this. That doesn't mean it doesn't happen. I'm just saying...
Q. And you didn't make any notes so you can't tell.
A. No.
Q. And what about talking to the president about it? Do you remember talking to him about it?
A. I would have mentioned this to the the president, but not until we have some conversation about attorneys.

Q. About what?
A. Conversation here about attorneys. I have the authority to approve the pay claims. I don't get his authority to approve and pay or to deny claims.
Q. And somebody calculated that the return on premium is 796.61, it looks like, on the next two pages, is that right?
A. Yes. This looks like a calculation for return of premiums plus interest.
Q. And then on 41 and 42 it's your letter dated September 7th to Mrs. Littlefield, correct?
A. Correct.
Q. And who helped you write this letter?
A. As stated earlier, this is a combination of information I would have drafted, some information from our underwriters and suggestions by counsel.
Q. So did you pass this letter around for comments to other people before you sent it?
A. What happens is that other people pass me their comments, and I couldn't swear to it, I might have passed it to counsel. I may have not.
Q. Maybe what?
A. I said I may have passed it to counsel, I



may have not. That input was given to me, I composed the letter.
Q. So there's nothing in here to show whether you sent it to your lawyer or not, is that what you're saying?
A. What I'm saying is that I would have gotten information from my lawyer possibly what to include in the letter. And I could have used that information to compose this. And I would use the information that was sent to me. I -- this particular exact letter, I doubt it.
Q. How frequently do you speak to counsel about anything?
A. This date -- this case notwithstanding, less than once a month.
Q. And then the last two pages are CFL 039 and 040 and it's an underwriting log sheet. Do you know whose writing this is?
A. These two pages, the underwriting log sheet represents the different people who would have been involved on this claim. So this would be several different people, depending on the stage that it was at. So there's handwriting from a number of different people.



Q. And on the second page it says left a message for Cynthia, it looks like R-E-D-I-O, at Opt, Optimum? Do you see that?
A. Yes. Optimum Re.
Q. And then it says spoke with Sandra Long at Optimum Re since Generali was notified prior to July 1st, they, Generali will be retaining it. What does that mean?
A. That means that even though Generali sold their block of business to Optimum Re and Optimum Re became the reinsurance for our in force and future business, because Generali was notified and therefore on the risk, that they accepted they had been notified on this claim, that piece of business stayed with Generali. Whereas all of the other business that moves forward moved with Optimum Re.
Q. You mean notified that he died?
A. Generali, back in the note there, I think it was Mary somewhere, that it noted that we contacted her regarding the fact that this was a contestable claim.
Q. So because you reported it before July 1st, Generali retains?
A. Correct.



Q. And then underneath it says per Mary - just send letter and reasoning -- reasoning for denial?
A. I am reading the next sentence because I can't really answer that first part. Reading the second, see Jeff Shepard. Jeff Shepard works for Generali. Would like copies of the file after decision and beneficiary notified. So this to me says that the decision had not been made yet and therefore that comment before per Mary just send letter and reasoning, and then it got transferred to Jeff. I think it's the -- my guess is the letter and reasoning that it should be a Generali claim versus an Optimum re claim. Because there isn't...
Q. All right. And then it's got his e-mail address. So was it e-mailed over to him?
A. I believe that's just contact information. It also says feature 701, which is a speed dial. And then following, spoke with Jeff Shepard, wants to review documentation for these records.
Q. Did you have any contact with Jeff Shepard about this?
A. The contact I had with Jeff Shepard had nothing to do with review of the documentation. We've had contact as far as I have to update him on

the sales of the contested claim.
MS. DAVIDSON: Would you mark that, please.
(Plaintiff's Exhibit 17, was marked for identification)
Q. Can you tell me what this is.
A. It's a photocopy of pages from our life underwriting guidelines.
Q. That were in effect when?
A. It says revision from December of 2000. So they were in effect from that time and still are.
MS. SULLIVAN: I just note that I think the last page of the exhibit is a different document.
Q. So could you go through this risk selection for me.
I did not receive the whole booklet, but these the -- are the pages I did receive, and I also did not mark it up. So I'm not sure why...
A. You didn't have a question. You just had statements.
Q. But you looked really confused. So I just wanted to ask you some questions about it.
Who uses this booklet and for what?



A. The field force. The agents use this booklet as a way of describing where a person might possibly fit. Our underwriters can refer to this as one of the many tools in trying to figure out risk. If an agent calls on the phone and wants a quick, hey, I've got an X, Y, Z, can you give me some ballpark as to where they might fall.
Q. And there's a section on hernia, which is page CFL 0449. And it gives a description. "Protrusion of an organ or tissue from its normal position through an opening in the wall of the cavity containing the organ or tissue." And it says "Ask about: Include location of hernia. Ask if surgery was performed or is planned in future." And "Probable action: Usually standard. May be necessary to postpone if surgery is planned."
Now, Michael had already had his surgery, right --
A. Yes.
Q. -- when he did this AP. And he had no future surgery planned at the time he did the AP. So why isn't he standard?
A. Because he had ongoing complications that lasted more than a few weeks after his surgery.



Q. And it doesn't say that anywhere. That's just something you know because you've been in the business for a long time.
A. This is a definition for the field. They are just getting a ballpark and indication and here are some definitions. We are not attempting to underwrite individuals from this documentation. We are attempting to just let our agent know what -- you know, some capacity, guess what kind of risk placement a person might be in.
Q. And then it also had marked tumor on the next page, 451. Do you believe that Michael was aware that he had a tumor or did have a tumor when he applied in August 25th of 2005 or 3? Sorry. It's 2003.
A. We believe that there was some kind of abnormal growth, cell, sac, something abnormal and that Michael was aware that he had something abnormal.
Q. Despite the fact that a doctor's records say nothing's wrong?
MS. SULLIVAN: Objection.
A. Michael is in his body. He knows that he's not normal. You know when you're not normal. And



the doctor tells you there's nothing wrong, it doesn't mean that you don't feel like you normally do.
Q. So you think he knew something was wrong and he didn't follow up on it?
MS. SULLIVAN: Objection.
A. I think he knew that he had this cell, pocket, whatever, tissue, something abnormal because he went to the doctor and said there was something abnormal.
Q. And they told him it was a pocket of blood.
MS. SULLIVAN: Objection.
A. He was told that there was something that was abnormal. I don't recall exactly what they told -- whatever they told him, it was abnormal. It was not normal. He was not feeling normal. He did not communicate to us any of these things.
Q. Now, the page we took off, CFL 453, could you take a look at that. It says "Hiatal hernia diaphragmatic." What's this from?
MS. SULLIVAN: Do you want to mark this as 18?
MS. DAVIDSON: Yeah, please.
(Plaintiff's Exhibit 18, was marked for

identification)
Q. Could you tell me what Exhibit 18 is.
A. This is a copy of a page from the Generali underwriting guidelines, and if you look at the bottom, it's from online. It tells you exactly where it came from.
Q. Do you know what usalifere is?
A. Generali USA Life Insurance Reinsurance Company. So life reinsurance company.
Q. And this is a guide that you keep and work from at your business when you're doing --
A. It's an electronic guide that we have access to.
Q. And this is the guide that was in effect in May 25th of 2005 and September of '03?
MS. SULLIVAN: The reason why we produced this yesterday was because you will see that this is a '04 document.
MS. DAVIDSON: Copyright '04.
MS. SULLIVAN: Yes.
Q. So this '04 document is not what you used at the time that Michael Littlefield applied for his insurance, is that correct?
A. That is correct.



Q. The document that you used is our Exhibit No. 2, is that correct?
A. The correct statement would be that the document, CFL 587, was available as an underwriting resource tool during 2003.
Q. Was it available to Donald Demers?
A. No. Underwriting guides for reinsurers are not available to agents.
Q. I took Donald Demers' deposition. Did you read it?
A. No, I have not.
Q. Did you read any of the depositions?
A. No, I have not read any depositions.
Q. When I took his deposition, he -- and I'm going to make a generalization about his testimony. He generally pooh-poohed hernias as being a significant condition that would prevent Michael Littlefield from getting a policy. Do you know why he did that?
MS. SULLIVAN: Objection. Foundation. Misstates. Answer if you can.
A. I don't know why Don does or says things that he does or says. I can only say that just having a hernia repair, with no more follow-ups and



no incidents is not going to preclude you from getting a life insurance policy.
Q. Well, he said that the company only cared if they hadn't had surgery yet.
MS. SULLIVAN: Objection. Misstates the testimony.
A. I cannot answer that.
MS. SULLIVAN: Is that a question?
MS. DAVIDSON: It doesn't matter. She can't answer it anyway.
MS. SULLIVAN: Because it wasn't a question.
Q. He said that CFLI restricted his investigation and limited his investigation to the form that he filled out. Is that incorrect?
MS. SULLIVAN: Objection. Misstates the prior testimony of Mr. Demers completely. Go ahead and answer.
A. The application --
Q. Yeah.
A. -- that we ask our agents to fill out --
Q. Yeah.
A. -- is the information that we want them to ask and be on record for asking.



Q. There was an implication that CFLI changed to a teleunderwriting system to save money rather than having the agents ask questions in the field. Do you think that that's accurate?
MS. SULLIVAN: Objection. Totally misstates Mr. Demers' testimony.
A. I will make this comment. It is more expensive to pay an additional individual to ask these questions. So we did not save any money by hiring a teleunderwriter.
Q. You have one teleunderwriter who works a couple of hours a week, is that what you told me?
A. Correct.
Q. Demers said he didn't make any notes of the hernia, as that was the company policy. Do you know why he would say that?
MS. SULLIVAN: Objection. Misstates the testimony. Go ahead.
A. I don't know why he would say that.
Q. Do you know why he'd say "I don't follow up on hernias. Hernias aren't a big deal"?
MS. SULLIVAN: Objection. Go ahead.
A. It is not the agent's job, Don Demers' job to follow up on hernias.

Q. Oh, it is not his job?
A. No. It's the teleunderwriter and parameds job to ask questions. His job is to ask the questions that are on the application.
Q. He also said that someone who's had hernia surgery, according to the company, is not a risk. It's when they haven't had the surgery that there's the risk. Do you know why he said that?
A. No, I do not.
Q. Is there anything that I haven't asked you that you think would -- is relevant to CFLI's denial of payment on this claim?
MS. SULLIVAN: Objection.
MS. DAVIDSON: Grounds?
MS. SULLIVAN: That's a hopelessly overbroad question that leaves a witness, who's been testifying without a break for several hours, in a very difficult position. She may have an answer. I'm not instructing her.
Q. Do you need a break to answer this question?
A. Read the question one more time, please.
Q. Is there anything I haven't asked you that you think is relevant to CFLI's denial of payment on Michael Littlefield's policy?



MS. SULLIVAN: Objection. You may answer.
A. You have not asked me if having the hernia was the basis for our denial of the claim.
Q. Is having the hernia the basis for the denial of your claim?
A. No. It is not.
Q. What is the basis for the denial of your claim?
A. Misrepresentation of the doctor and follow-up visits that occurred before the application and after that May date that was stated on the paramed.
Q. That's what you previously told me.
MS. DAVIDSON: Thank you. I don't have any further questions. Thank you.
MS. SULLIVAN: No questions.
(Deposition concluded at 1:41 p.m.)



CERTIFICATE OF COURT REPORTER

I, Ellen Zappia, Registered Professional Reporter and Commissioner of the State of Rhode Island and Providence Plantations, hereby certify that on February 20, 2007, at the time and place specified above, KIM RENEE ELIZABETH INGRAM, the deponent herein, was duly sworn by me to testify to the truth and was thereafter examined under oath by counsel.

I certify that the questions asked of the deponent and the answers given were taken down by me stenographically and transcribed using computerized translation software; and that the foregoing is a true and accurate transcript thereof; and that a review of the transcript by the deponent was requested.

I certify also that I am not counsel, attorney, or relative of any party litigant, nor otherwise interested in the event of this suit.

______________________

Ellen Zappia, RPR

My commission expires: April 8, 2007

Catholic Family Life Insurance

DEPOSITION EXHIBIT

2-20-07 Pl's 14 GL

*Families are the heart of what we do.®*

# Amendment of Application

It is hereby understood and agreed that the application forming a part of Policy Number 99903082701 amended as follows:

**I have reviewed pages 2 and 3 of the application in this policy. I agree that the information obtained by the home office in a telephone interview or by a paramedical facility is correct.**
**All statements made in any application and medical forms attached to the policy are subject to all the general provisions listed in "The Contract" section of the policy.**

A copy of this Amendment and Alteration of Application, the signed original of which is to be recorded at the Home Office of the Society, shall be attached to and shall apply to any policy issued thereon.

I certify that the health of the person proposed for coverage has not changed since the date of the original application.

SIGNATURE OF APPLICANT/OWNER Michael Fitzgerald

SIGNED AT North Kingstown, RI
(City and State)

DATED 9/19/05

WITNESSED BY Donald C. Denn

**TWO COPIES ARE TO BE SIGNED, DATED AND WITNESSED;**
**ONE COPY IS IN THE POLICY**
**ONE COPY IS TO BE RETURNED TO THE HOME OFFICE**

U-465-1100

**Death of Policy** CFL - CATHOLIC FAMILY LIFE INSURANCE

Edit View Functions Tools Help

Cancel | Exit | Refresh | Home | Print | Calculator | Word | Excel | Help

Catholic Family Life Insurance

- Fast Path
- Home
- xit
- efresh
- ancel
- rans to New Polices
- eneficiaries
- esignate Primary Insur
- dit Mult Death Rsn

DFND0161PV **Death of Policy** ENTER

Insured

| | | | | |
|---|---|---|---|---|
| Eff Date | 05/25/2005 | Pin ID | Tax ID | V |
| Decedent | LITTLEFIELD, MICHAEL | REDACTED | T | REDACTED |
| Owner | LITTLEFIELD, MICHAEL | | T | |
| Cmp CFL | REDACTED 001 | Plan 20YT PRERD | BAS P | |

| | | | | |
|---|---|---|---|---|
| Une/Unc/Susp/Prem Dep | 111.16 | .00 | .00 | .00 |
| Loan/Lien/Div/Term Div | .00 | .00 | .00 | .00 |
| PIN Dep/Pay/Nxt Div | .00 | .00 | .00 | |

| | Base | Term Riders | Accum Riders | Acc Death | Paid up Adns |
|---|---|---|---|---|---|
| Death benefit | 300000.00 | | | | |
| Surr value | .00 | | | | |
| Pmts-With | .00 | | | | |
| Cost basis | 769.60 | | | | |
| Proceeds | 300000.00 | | | | |

Notified date 06/01/2005 | Claim # 00000064507 | Death rsn

Proof requested | Received | ☐ Div

Total distribution 300111.16 | Taxable income .00

Enter

Caller - Colleen Littlefield (W1)
Send claim form to address listed in system.

Death - May 25 2005

✓ Notes

DEPOSITION EXHIBIT
Plfs 16
2-20-07

Work with Contracts by Person CFL - CATHOLIC FAMILY LIFE INSURANCE

File Edit View Functions Options Tools Help

Cancel Exit Refresh Home Print Calculator Word Excel Callog Docs Help

Catholic Family Life Insurance

- Fast Path
- Home
- Exit
- Refresh
- Calculate Values
- PIN Relations
- Cancel
- Death Claim
- Minimum Distribution
- PIN Maintenance
- PIN Notes

DCON0404DF **Work with Contracts by Person** - DISPLAY

| Name / Mailing Address | Pin / Tax ID | | Birth Date | Sex |
|---|---|---|---|---|
| LITTLEFIELD, MICHAEL | REDACTED | T | | M |
| REDACTED | | | Psn Y | |

Values Method D Effective Date 05/25/2005 Request Date 05/25/2005

| Cmp | Policy | Ins | Own | Pyr | Ben | Asg | Effective Date | S | Base Units | Base Mne Plan |
|---|---|---|---|---|---|---|---|---|---|---|
| CFL | | | | | | | | | | |
| CFL | REDACTED | | 0 | Y | | | 05/24/1999 | T | 1200.0000 | 95A FLEX N |
| CFL | | | 0 | Y | | | 02/03/1998 | T | 50.0000 | 20YT M NS |
| CFL | | | 0 | Y | | | 09/09/2003 | T | 300.0000 | 20YT PRERD |

Contract Chg | Pol Details | Own Pol Val | Ins Pol Val | More > | Correspo

6/01/2005 11:51:32 AM Enter

CFL000046

Display Beneficiary Text CFL - CATHOLIC FAMILY LIFE INSURANCE

File Edit View Tools Help

Cancel Exit Refresh Home Print Calculator Word Excel Docs Help

Catholic Family Life Insurance

Fast Path

Home

Exit

Refresh

Cancel

DCON0529DF **Display Beneficiary Text** DISPLAY

**REDACTED**

Policy ID

Eff date

06/01/2005

Eff date / Text

08/27/2003

W1 COLLEEN LITTLEFIELD

C **REDACTED**

Enter

Display Policy Summary CFL - CATHOLIC FAMILY LIFE INSURANCE

File Edit View Functions Tools Help

Cancel Exit Refresh Home Print Calculator Word Excel Calico Docs Help

Catholic Family Life Insurance

Fast Path
Home
Exit
Refresh
Notes
Cancel
Coverage
Display Premium
Fund History
Substandard
Financial Activity
Coverage Insured
Policy Relations
Details

DCON0211DF **Display Policy Summary** DISPLAY

REDACTED

Sex PIN

Policy ID Ins LITTLEFIELD, MICHAEL M REDACTED

As of/sts 06/01/2005 A DOB REDACTED UW C

Trm date REDACTED

Issue date 09/09/2003 Pyr LITTLEFIELD, MICHAEL M

MEC date

Pdto date 09/09/2005 REDACTED

Last paid 05/13/2005

Premium 96.20

Freq/skip Q Meth D 1 REDACTED

Dividend APL Own LITTLEFIELD, MICHAEL M

DBO NFO Ben

Stop bill 1035 Pro DEMERS, DONALD C M 039325620AA Z

Rpl AsO

| Cov | Plan | Ben | Sts | Issue Date | Sts | Units | Age | Smk | Tax | Occ | Rei | Premium | Sst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | 20YT PRERD | BAS | P | 09/09/2003 | A | 300.0000 | 34 | N | | P | | 96.20 | |

6/01/2005 11:48:52 AM Enter

Catholic Family Life Insurance

JUN 14 2005

*Families are the heart of what we do.®*

June 3, 2005

COLLEEN LITTLEFIELD
**REDACTED**

RE: PENDING CLAIM FOR MICHAEL LITTLEFIELD
POLICY NUMBER **REDACTED** CONTESTABLE)

Dear Mrs Littlefield:

May we offer our condolences to you and your family.. In review of the above referenced policy number **REDACTED** find at this time the policy is in a state of contestability. The policy is contestable for two years from the effective date of issue. The date of issue is September 9, 2003. If death occurs during the two years after issue, the policy is considered contestable.

This is not to say that we will not pay the claim, but that we need medical information in order to complete our review of the claim. I have enclosed several forms that need to be completed. Please provide, in the blanks below, as much information as possible including names, addresses, and phone numbers.

**Names, addresses and phone numbers of all physicians who attended the deceased during his/her last illness and during three years prior:

| Physician Name: | Address & Phone: |
|---|---|
| 1. Dr. Pierre Manzo | 1351 South County trail Suite 301 East Greenwich RI 02818 401-398-0860 |
| 2. Dr Joseph (Playhill) Joseph | 1220 Pontiac Ave Crans RI 02920 401-943-4660 |
| 3. Dr Thomas K. Shahinian | 2 Dudley Providence RI 401-553-8308 |
| 4. | |

JUN 14 2005

Catholic Family Life Insurance

*Families are the heart of what we do.®*

I, Colleen Littlefield, authorize any physician who has ever attended the insured, any hospital were the insured was a patient, or other informant, to furnish and disclose any information thus acquired to CATHOLIC FAMILY LIFE INSURANCE. A photo copy of this authorization shall be as valid as the original.

Date 06-10-05

Signature of Beneficiary/or Authorized Representative Colleen M. Littlefield

If you have any questions regarding this matter, please feel free to contact me at 800-227-2354 ext 256. As always we try to provide you with the best service possible.

Fraternally,
CATHOLIC FAMILY LIFE INSURANCE

Judy Schmitt

Judy Schmitt
Claims Specialist/Member Services

1572 E. Capitol Drive • P.O. Box 11563 • Milwaukee, Wis. 53211-0563 • 414/961-0500 • Toll Free 800/227-2354 • FAX 414/961-2059 • mail@cfli.org