# B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COLLEEN LITTLEFIELD
Plaintiff
vs. C.A. No. 06-157
CATHOLIC FAMILY LIFE INSURANCE COMPANY
Defendant

VIDEOTAPED DEPOSITION OF DONALD DEMERS
Thursday, December 28, 2006
10:00 a.m.
Law Office of Karen Davidson
One Ship Street
Providence, Rhode Island

---------- Ellen Zappia, RPR ----------
Capitol Court Reporting, Inc.
931 Jefferson Boulevard, Suite 2003
Warwick, Rhode Island 02886
(401) 739.3600





APPEARANCES:

LAW OFFICE OF KAREN DAVIDSON
Karen Davidson, Esq.
One Ship Street
Providence, Rhode Island 02903
for Plaintiff

LAW OFFICES OF VINCENT D. MORGERA
Vincent D. Morgera, Esq.
Turks Head Place, Suite 1110
Providence, Rhode Island 02903
for Plaintiff

EDWARDS ANGELL PALMER & DODGE LLP
Patricia A. Sullivan, Esq.
2800 Financial Plaza
Providence, Rhode Island 02903
for Defendant

ALSO PRESENT:
Colleen Littlefield
William White, videographer
Bert Tomassone, videographer





INDEX


WITNESS: DONALD DEMERS

| EXAMINATION BY: | PAGE: |
|---|---|
| Ms. Davidson | 4 |
| Ms. Sullivan | 175 |
| Ms. Davidson | 202 |

| PLAINTIFF'S EXHIBITS MARKED: | PAGE: |
|---|---|
| 1 Amended notice of deposition | 4 |
| 2 EMSI Work Order | 86 |
| 3 Life Underwriting Guidelines | 88 |
| 4 CFLI 2003 Application for Membership and Life Insurance | 99 |
| 5 Illustration of Proposed Coverage for Michael Littlefield | 114 |
| 6 CFLI Comparative Information Form | 140 |
| 7 Document entitled "Death Claims" | 142 |
| 8 Memo to Kim from Steph | 142 |
| 9 CFLI 1997 Application for Membership and Life Insurance | 143 |
| 10 Letter from CFLI to Michael Littlefield, dated August 23, 2004 with attachments | 147 |







| | |
|---|---|
| 11 Application of Funds From Old Contracts to New Business | 150 |
| 12 Risk Selection Life Underwriting Guidelines | 152 |

| DEFENDANT'S EXHIBITS MARKED: | PAGE: |
|---|---|
| A Preferred Underwriting Guidelines | 177 |
| B Agent's Statement | 186 |
| C Documents Bates numbered CFL000564 to CFL000585 | 192 |

A. Yes, I can.
THE WITNESS: Do I have to?
MS. SULLIVAN: Yes.
A. Okay. One is for Parkinson's disease, one for high blood pressure and cholesterol.
**Q. So those are the three problems that you have?**
A. Yes.
**Q. And for those problems you take the seven pills?**
A. Yes.
**Q. Do you take those seven pills everyday?**
A. Yes.
**Q. I'm going to ask that you provide me with the names of the medications. I understand you don't have it here today, but I'm going to ask that you provide it for me after this deposition is concluded.**
MS. SULLIVAN: Don't respond. We'll respond at another time.
**Q. Mr. Demers, how long have you had Parkinson's, sir?**
A. Do I answer that?
MS. SULLIVAN: Yes. I mean, I think we



can go a short way down this road and frankly, if you go too far down this road I think we're going to have to go see the judge. Go ahead. You can answer that.
A. How long have I had Parkinson's disease? Let me think here. I had it for about 15 years and I -- it was diagnosed as a -- by my doctor about 11 years ago.
**Q. What are your symptoms, sir?**
MS. SULLIVAN: Relevance.
MS. DAVIDSON: Ability to take the -- take these applications down correctly.
**Q. What are your symptoms, sir?**
MS. SULLIVAN: Are you asking as of now?
MS. DAVIDSON: Yeah.
THE WITNESS: Do you want me to answer that?
MS. SULLIVAN: To the best of your ability.
A. Okay. Tremors, and that's about it.
**Q. Have you ever had any other symptoms?**
A. Trem -- besides the tremors?
**Q. Yes.**
A. No. That's the main thing for Parkinson's



disease.
**Q. I'm asking if you've had any other symptoms. I understand that tremors are the main one. Have you had any other symptoms?**
A. No, I didn't. I -- I had -- no. Tremors is about the only one I have.
**Q. And in 2003 was tremors the only symptom you had from the Parkinson's?**
A. Yes.
**Q. And in 1997 was tremors the only symptom you had from the Parkinson's?**
A. Yes.
**Q. How many pills do you take for the Parkinson's currently?**
A. Three pills a day.
**Q. And the rest are for the high blood pressure and the cholesterol?**
A. Yeah. Well, there's really -- four pills, sorry.
**Q. And the other three pills are for the high blood pressure and cholesterol?**
A. Right.
**Q. Is your ability to think or express yourself affected by the Parkinson's disease?**



A. No.
MS. SULLIVAN: Objection. Compound.
**Q. Who is your primary doctor for the Parkinson's?**
MS. SULLIVAN: You can answer.
A. Dr. Joseph Friedman.
**Q. How long has Dr. Friedman been your doctor?**
A. 11 years. He's a specialist.
**Q. Now, you indicated you've worked for CFLI for 14 years. What did you do before that?**
A. I worked for Catholic Family Life Insurance, which is -- which was merged with Catholic Family Life.
**Q. When was that?**
A. In '92. 1992.
**Q. And how long did you work for Catholic Family Life?**
A. Since 197 -- give me a second here. Since 1973.
**Q. Has your entire working life been with Catholic Family Life or its successor Catholic Family Life Insurance company?**
A. No. It was with -- my -- from 1993 to 1992 we were with Union Saint-Jean-Baptiste and that

merged with Catholic Family Life in 1992.
**Q. And before you worked for Saint-Jean-Baptiste, did you work for Catholic Family Life?**
A. What do you mean? I don't understand that.
**Q. I don't understand who you were working for from 1973 until 1972 (sic).**
A. Union Saint-Jean-Baptist Insurance Company.
MS. SULLIVAN: And I think you misspoke, Karen. I think you said '72. You meant to say '92. So from '73 to '92 is I think what you meant to ask him.
A. Yes.
**Q. Prior to '73 did you have a working history?**
A. No. I went to college.
**Q. Where did you go to college, sir?**
A. Roger Williams University.
**Q. And what degree did you get?**
A. Management.
**Q. And when was that degree?**
A. What?
**Q. When did you receive that degree?**
A. 1993 -- 19 -- one second. 1973 graduated.
**Q. Did you take any specialized courses in insurance at that time?**



A. At college?
**Q. Yes.**
A. No.
**Q. Subsequent to college did you take any specialized courses in insurance?**
A. Yes, I did.
**Q. And what courses and approximately when did you take them?**
A. I took -- worked for a degree called FLMI.
**Q. Could you tell me what FLMI stands for?**
A. Fraternal Management Life Insurance.
**Q. And who provided that --**
A. It was a home --
**Q. -- education?**
A. The company that I dealt with, Union Saint-Jean-Baptist.
**Q. So that was an in-house program you took?**
A. Yes.
**Q. How long did that last?**
A. It lasts as long as I worked there. They used to have a course here and there taken.
**Q. When is the last time you took a class?**
A. For that degree?



**Q. Uh-huh.**
A. I'm not quite sure at all.
**Q. Is it -- have you taken a class within the last three or four years?**
A. No, I didn't.
**Q. Have you taken a class within the last ten years?**
A. Well, that's -- that's only given to home office people. So last time I went there was -- let me see here. '93 -- I think around 1988 last time I took the last one.
**Q. So would that be the last class you took in insurance, 1988?**
A. That's home office, for that FLMI, last time I took a course was 1988.
**Q. Did you take other courses since 1988 in the insurance industry?**
A. To what, now, present?
**Q. To the present, yes.**
A. Yeah. I'm required by law to take 15 -- 15 credit CU units per year. So I have to take some course -- I take a lot of courses.
**Q. Where do you take those?**
A. It's given -- I'm trying to figure out. It's given through different type organizations and different ways I receive it.



**Q. Are there organizations that specialize in this updating insurance agent's classes?**
A. Yes, there is.
**Q. And that's where you take these various --**
A. Yeah.
**Q. -- classes?**
A. I have to have -- by law I have to have 15 continuous CU courses credit hours per year. So every year I have -- I take different type courses. Depends who gives what in different things.
**Q. So how many various courses make up 15 units?**
A. How many courses? Well, it's 15 credit hours, which is 15 credit units.
**Q. And is each course one unit?**
A. No. Each course is -- it varies.
**Q. From what to what?**
A. It varies anything from one unit to three units.
**Q. So you take these courses at various times throughout the year, not in just one day, is that correct?**

A. I can't describe him. I can't actually describe how he looks or anything like this.
**Q. How do you remember him?**
A. I recognize him -- I remember there was a big fish tank behind -- the table we sat on there was a big fish tank right there and I remember I -- and I recognize -- I remember what he did for a living.
**Q. Did you look at documents before you came here today?**
A. What do you mean "documents"?
**Q. Pieces of paper, documents.**
MS. SULLIVAN: Today?
MS. DAVIDSON: Yes. Before he came here today.
A. Yes.
**Q. And are all those documents documents you've provided to me?**
A. Yes.
**Q. And did those documents refresh your recollection of Michael Littlefield?**
MS. SULLIVAN: Objection. Are you asking about his physical appearance?
MS. DAVIDSON: I'm asking about any



recollection he's got --
MS. SULLIVAN: Okay.
MS. DAVIDSON: -- of Michael Littlefield.
A. Repeat the question again.
MS. DAVIDSON: Could you repeat it.
(Last question was read back by the reporter.)
MS. SULLIVAN: And I objected. I think what she means is did the documents help you to remember better --
THE WITNESS: Yes.
MS. SULLIVAN: -- in any way.
A. Yes.
**Q. What else do you remember about the first meeting?**
A. What did I remember.
MS. SULLIVAN: Objection. Do you want to hear inch by inch through the first meeting? I mean what --
MS. DAVIDSON: I want to know what he remembers about the first meeting with Michael Littlefield.
MS. SULLIVAN: Just very generally.
MS. DAVIDSON: Generally.



MS. SULLIVAN: Okay. Just very generally, what do you remember about the first meeting?
A. Okay. I remember that Mrs. -- Mrs. Littlefield was there and she came in late because she was jogging. I remember that. I remember the fishbowl -- the fish tank, the big fish tank in the back. That was a big... because we sat in the kitchen or the dining area, I'm not quite sure. And he talked a lot about his job, what he did. He was self-employed. Who he worked for, where I worked for. Kind of interested in that. And his education. We talked a little bit about that. And he talked about -- and he talked about how he needed life insurance and what he wanted -- we didn't get into detail of what he wanted for life insurance. And that's about it.
**Q. Did you make suggestions as to what type of life insurance would be appropriate for a man his age?**
A. Yeah. Well, he had a direct mail response which -- so he knew the products and the amount of money and he says let me start off with 50,000 because I can't -- couldn't afford or he couldn't



see right away what he could buy, and he left it -- so we left it like that.
**Q. And did you have him sign papers when you were there?**
A. What do you mean "papers," like?
**Q. Any kind of an application or information?**
A. Yes. When I was there the first time we completed an application and -- and also on Mrs. Littlefield too.
**Q. On both of them?**
A. Yes.
**Q. How long was Mrs. Littlefield at the meeting?**
A. That first meeting? How long. Well, she was there mostly all the meeting. She came in a little late. She was jogging or something.
**Q. How long do you think you spent there that day?**
A. Approximately an hour, hour and a half.
**Q. Is that the time of your typical appointment?**
A. Yeah.
**Q. Can you tell me the procedure. After you go to someone's home and they apply for insurance, what**

**happens next when they're applying for life insurance?**
A. Right.
MS. SULLIVAN: Is this in '97?
**Q. This is in '97.**
A. Okay. '97. What happens at that point?
**Q. Yeah.**
A. Let me see. They apply for life insurance, they give me the first month check and everything else. If everything is all right. And it's sent to the underwriting department and the underwriter does underwrite it and then after -- then after it's underwritten, and if it's approved, then after it goes to the policy issue department and it's sent to me after for delivery.
**Q. It goes to the what department?**
A. Policy issue.
**Q. Oh, policy issue. Okay. And is the policy issue department in Rhode Island or is that in Milwaukee?**
A. This is all Milwaukee.
**Q. And after the policy is issued you bring it to the customer?**
A. Yes.



**Q. Is that what you did on the case of Michael and Colleen Littlefield in '97?**
A. Yes, I did.
**Q. And both of them obtained a $50,000 policy, is that correct?**
THE WITNESS: Was that correct?
MS. SULLIVAN: If you remember. If it would help you to refresh your recollection with a document, maybe we can do that. But do you remember?
A. Yeah, it was $50,000 each. That's our minimum amount is 50,000.
**Q. And in the case of Michael and Colleen Littlefield, did you ask for authorization to obtain medical records?**
A. This is '97?
**Q. '97.**
A. Did I ask for medical records?
**Q. Yes.**
A. I don't ask for medical records. It's done by the underwriting office at Catholic Family Life.
**Q. So you don't have them sign anything saying I authorize you to release medical records?**
MS. SULLIVAN: I think that's a



different question. You asked him if he asked for medical records. Now you're asking him whether he got an authorization --
MS. DAVIDSON: You're right.
MS. SULLIVAN: -- for medical records.
MS. DAVIDSON: You're right.
**Q. Did you ask them for an authorization for obtaining medical records?**
A. Yeah. Part of the application is the authorization already built in.
**Q. And who decides whether or not to send for medical records?**
A. That's done by the home office.
**Q. You don't have anything to do with that?**
A. No.
**Q. Is the procedure that you've just described to me the same as the procedure you used in 2003?**
MS. SULLIVAN: Objection.
A. No, it isn't.
**Q. And how is the procedure different?**
A. Because the one in 2003, he applied for 300,000. So the underwriting medical requirements are more -- are larger or more required -- more underwriting requirements are requested.



**Q. Is the type of form that you make out with him any different?**
MS. SULLIVAN: From '97 to '93?
MS. DAVIDSON: No, to '03.
MS. SULLIVAN: Sorry. Sorry.
A. The application is different. It changed.
**Q. The application changed?**
A. Yeah.
**Q. How did the application change?**
A. How did it change. I'm not quite sure.
**Q. What in the application changed?**
A. The -- I'm trying to figure it out. I know right now -- the application we are using right now changed. I'm not quite sure if that changed or not.
**Q. Did you provide me with the applications from '97 and '03?**
A. Yes.
**Q. So by looking at those, I would be able to tell all of the changes between the two of them?**
A. Yes, you could.
**Q. Did you get a new sort of a booklet instructing you to do different kinds of examinations between '97 and '03 or questioning?**
A. Yes.

Q. Did you provide that booklet?
A. Yes, I did.
Q. I don't remember seeing that booklet. Could you tell me exactly what it is so that I can request it?
MS. SULLIVAN: You have it.
Is this what you're talking about, Mr. Demers?
THE WITNESS: Yeah.
Q. That's the change? All right.
And could you read me the name on that booklet.
A. Life Underwriting Guidelines.
Q. When did that come out?
A. I'm not quite sure.
Q. What booklet did you use for '97 or pamphlet or instructions?
A. It was a different one.
Q. Did you provide that?
MS. SULLIVAN: I don't believe it was asked for.
A. No.
MS. DAVIDSON: Anything related to the application of Michael Littlefield.



MS. SULLIVAN: Well, I thought this case was focused on the 2003 application but...
MS. DAVIDSON: It actually says both.
MS. SULLIVAN: I'll review the request --
MS. DAVIDSON: And I would like that.
MS. SULLIVAN: -- and if it's covered, and if it's still in existence we'll provide it.
MS. DAVIDSON: Thank you.
Q. How many times did you meet with Michael Littlefield over the years?
A. Basically four times.
Q. Could you tell me what those four times were.
A. In '97 -- in '97 when the policy was issued -- application was taken first time. Then in '97 again when the policy was delivered. Then later on in 2003 when we took the application again, and 2003 when I delivered the policy.
Q. Those are the only meetings you had?
A. Yes.
Q. Did Michael Littlefield purchase any other type of insurance from you or was it solely these life insurance policies?



A. Solely life insurance.
Q. And did all of the meetings take place at Michael Littlefield's home?
A. Yes.
Q. And was Colleen Littlefield there for all of the meetings?
A. Now, which meeting?
Q. You've told me about four meetings. You've told me she was there for the first '97 meeting when you took the application information. Correct?
A. Yes.
Q. Was she there for the '97 meeting when you delivered the policy?
A. Yes.
Q. Was she there for the '03 meeting when you took another policy application?
A. No.
Q. Was she there for the delivery of the '03 policy?
A. No.
Q. What notations did you make, other than making out the forms, when you went to the '97 meeting for Michael Littlefield?
MS. SULLIVAN: Objection.



Q. Do you keep a notebook?
A. I'm not sure...
Q. In 1997, when you went to get information from the Littlefields for a policy, did the information you took down get taken down solely on the forms of the insurance company, or did you also keep a pad of paper or a notebook with information?
A. Well, I kept a diary of what my appointment book was.
Q. When you say you kept a diary of your appointment book, would that be simply the time of the appointment and the place of the appointment?
A. Yes.
Q. It didn't have any information with regard to the actual application or history or medicals or anything, did it?
A. No.
Q. How about in '03 when you went to take the policy application, did you simply make out the form as provided to you by CFLI or did you take other information down in any kind of a notebook or papers?
A. Did I take -- repeat that. I'm not quite sure what you want.

**Q. When you went to Mr. Littlefield's house in '03 for the second life insurance policy --**
A. Right.
**Q. -- you made out certain papers that CFLI provided, correct?**
A. Application and things like this.
**Q. Yes.**
A. Okay.
**Q. In addition to that, did you write information anywhere else?**
A. No, I didn't.
**Q. Never had a notebook?**
A. No, I didn't. The only note I had was -- basically was the appointment time. That's it.
**Q. You didn't write any information down on a separate pad of paper.**
A. No.
**Q. Did you ever do that for any of your appointments?**
A. Additional -- yes, I do. Once in awhile I do.
**Q. And why did you not write down any additional information for the '03 appointment?**
A. Because I just thought that time it wasn't



needed.
**Q. When do you write down additional information?**
A. When I think it's necessary.
**Q. Like, what would be a circumstance that would require it?**
A. When do I require. When a person has a severe medical problem or something like this that I know about.
**Q. And what would constitute a severe medical problem?**
A. Through my -- that's a hard one to explain, you know what I mean? Through -- basically through my -- my experience of what -- I'm not quite sure about that question.
**Q. Can you tell me examples of situations where you've written down additional information because there was what you call a severe medical problem?**
A. Let me see here. What would be a severe problem.
MS. SULLIVAN: I think what she's --
MS. DAVIDSON: That's the question --
A. It's a very general idea, you know what I mean, that's why I'm not -- I can't focus into



what's happening.
MS. SULLIVAN: I think she's asking you for a specific instance, not with the Littlefields, but with someone else where you wrote something down, without revealing obviously the name of the person.
A. Okay. A person has -- a person has three heart attacks, okay.
**Q. That would be a severe problem?**
A. It's a severe problem.
**Q. Okay.**
A. A person has -- hang on one second. MS, severe problem. You know, you go on and on and on like this.
**Q. How about a hernia, is that a severe medical problem?**
A. No, it isn't.
**Q. How about a tumor, is that a severe medical problem?**
MS. SULLIVAN: Objection. You're talking about a tumor that hasn't been diagnosed, as to whether or not it's cancer?
MS. DAVIDSON: Absolutely.
A. Is that considered a severe problem?



**Q. I'm asking you, is that what you consider a severe medical problem?**
A. It depends what phase it is in.
**Q. And what if they don't know?**
A. What?
**Q. What if they don't know what phase?**
A. From an underwriting point of view it's considered a -- still a severe problem.
**Q. From your point of view I'm asking you, do you consider a tumor, unknown phase, to be a severe medical problem?**
MS. SULLIVAN: In the sense that he used the term so that he would write it down on a --
MS. DAVIDSON: Yes, that's what we're discussing.
MS. SULLIVAN: -- piece of paper. I just want to make sure that's clear. Do you understand the question now?
THE WITNESS: No. I'm having trouble with the question.
MS. SULLIVAN: I think she's asking you whether a tumor that hasn't been diagnosed is a serious medical problem that you would write down when you're taking an application.

A. Yes.

**Q. Do you recall anything particular about the discussion you had with Michael Littlefield during the '03 visit for a new application?**

MS. SULLIVAN: Objection.

THE WITNESS: I'm not quite sure what she wants.

MS. SULLIVAN: Where exactly doesn't it make sense?

A. I'm not quite sure what you want.

**Q. You had a visit with Michael Littlefield in 2003 --**

A. Right.

**Q. -- to obtain additional insurance, correct?**

A. Right.

**Q. What do you recall from that visit you made to his home?**

MS. SULLIVAN: Again, are you looking for very general recollections or do you -- are you looking for a narrative answer to explain everything that happened?

MS. DAVIDSON: I want a narrative answer explaining everything he remembers from that 2003 visit to Michael Littlefield.



MS. SULLIVAN: Objection. Try to do your best, Don. Go ahead and answer.

THE WITNESS: Do I answer?

MS. SULLIVAN: Yes.

A. Okay. Things I -- okay. Michael Littlefield gave me a call saying that he just moved into a new house -- well, it was his grandmother's house, which he inherited, and he needed more life insurance. He thought that 50,000 was just too small at that point. He told me that he needed -- on the telephone he wanted $300,000, to bring the proposals for that amount, which I did.

I went over to his house. I set up an appointment, and it was a different house from the '07 -- the '97 one. He explained, telling me that he needed more life insurance because he had this house. The house was basically built, that year it was inherited from his grandmother or something like this, I'm not quite sure, and he needed more life insurance.

**Q. I want to be sure I understand you. He said he needed more life insurance because he had inherited that house?**

A. Yeah. He thought that 50,000 was -- wasn't



enough.

**Q. Did he give you any other reasons why he wanted more life insurance?**

A. Why -- no. Because -- if he did, I don't remember.

**Q. Okay.**

A. Okay. And I gave him the premiums, the prices and everything else and he said it was what he wanted. He said that he -- the other $50,000 one -- then it was 60,000 because he had raised it. That $60,000 premium, he says he wanted to cancel that one and to issue another one for 30,000, but he didn't want to cancel it until the $300,000 one was already taken at that point. Already approved. Which we did.

At that point we took an application and I told him underwriter requirements, what would be -- like an examination would be required and whatever the requirements will be and everything else. Also I explained to him that these were preferred rates that I gave him, and preferred rates and I asked him, "Are you in good health?" And he says, "Yes, I am." And I asked him also, "Do you have any medical history?" And he says, "I have no



medical history at all." And he left like that.

**Q. And that was the end of it, you took the information down and left? No more discussion you recall?**

MS. SULLIVAN: Objection. Go ahead.

A. Okay. After the application was taken -- let me think. Yeah. After the application was taken and I explained to him about the non-medical rules, the preferred rate rules and everything else, after that we had a little chitchat, then after I left at that point.

**Q. Was the chitchat about him or his health or just generally?**

A. Generally about everything, the house and everything else, you know what I mean.

**Q. How long did your appointment last?**

A. It's hard to say. I can't -- I don't keep records of how long appointments are.

**Q. Was anybody there at any time during that 2003 appointment other than you and Michael Littlefield?**

A. No.

**Q. Was the dog there?**

MS. SULLIVAN: Objection. Foundation.

A. I don't know if they have a dog.
**Q. Was Colleen there?**
MS. SULLIVAN: Objection. Asked and answered.
A. No, she wasn't.
**Q. Was his daughter Elizabeth there?**
A. I can't tell you. I'm not quite sure about her.
**Q. You indicated to me that he said he wanted more insurance because of his house. Did he say anything about wanting more insurance because of his daughter Elizabeth?**
A. If he did, I don't remember it.
**Q. You also talked about a $60,000 policy. Could you tell me how he went from the 50 to the 60.**
A. There was a promotion done that if a person has $50,000 you can apply for another additional simple issue to -- they bump it up to 60,000. It was a home office -- I never got involved in it. It was a home office amount contest or something.
**Q. So did you have anything to do with Michael when he bumped his insurance up from 50 to 60?**
A. No.
**Q. Totally home office?**



A. Yes.
**Q. Did you get advised that it had been bumped up from 50 to 60?**
A. Yes, I was told.
**Q. And you made no phone calls or anything with regard to that that you recall?**
A. No. He completed the forms, whatever has to be done and he -- then after they issue -- they did everything by mail.
**Q. Okay.**
**Did you recommend to Michael that the policy should be 300,000 or did he tell you that's what he wanted?**
A. He told me.
**Q. Did you discuss with him any other type of policy?**
A. Yeah. We generally talked about other policies. But he was so interested in this ten-year term for 300,000 because he had the premiums already and this is what he wanted. So basically he wasn't interested in selling and buying any other policies. So I just focused into that. We just took it from there.
**Q. Did you explain to him that he would have to**



**have a new medical examination for this policy?**
A. Yes.
**Q. Did you explain to him that he would have to have another two-year waiting period as a result of this policy?**
A. Yes, I did.
**Q. What did you tell him about that?**
A. That -- tell him that $300,000 will have a new contestability period for 300,000 -- because it is 300,000 you have to have a new contestability period, and I just left it like that.
**Q. Did he discuss that with you?**
A. No. He says -- he said something like "I know" or something like this.
**Q. You don't remember Colleen interjecting at that point and --**
MS. SULLIVAN: Objection.
A. No. Because Colleen wasn't there at that time.
**Q. And did you sit again by the fish tank at the table?**
A. No -- what year is this now?
**Q. This is the 2003 visit.**
A. The fish tank was in '97.



**Q. Was the fish tank there in '03?**
A. Not that I know of.
**Q. Where did you sit?**
A. Where did I sit?
**Q. Yeah. When you went to Michael's house to take the application and you had your chat with him, where did you sit?**
MS. SULLIVAN: In 2003?
**Q. In 2003.**
A. 2003. I'm not quite sure it was the kitchen or the dining room.
**Q. At a table?**
A. At a table, yeah.
MS. SULLIVAN: Karen, we've been going an hour. When you hit a break point I'd appreciate it.
MS. DAVIDSON: We can break now.
MS. SULLIVAN: I have a need.
MS. DAVIDSON: Sure. We can break now.
THE VIDEOGRAPHER: We're off.
(A recess was taken.)
THE VIDEOGRAPHER: Back on the record.
**Q. Mr. Demers, we just took a little break. Did you have to take any medication during the**

break?
A. No.
Q. Now, I'd like to go back to the '03 meeting that you said occurred at Mr. Littlefield's grandmother's house. You have said that no one was there at that meeting, correct?
A. Yes.
Q. Are you certain of that?
A. Yes, I am.
Q. You don't remember Colleen Littlefield sitting at the table with you and Mr. Littlefield?
A. No.
Q. You don't remember Colleen Littlefield interjecting and having a heated discussion with you with regard to the policy change from 60,000 to 300,000?
A. No.
Q. You don't recall Colleen Littlefield telling you that it was ridiculous that Michael had to take another medical examination if he had already done one?
A. No. He did not have one for the first one.
Q. Didn't the first insurance policy have a two-year wait period?



A. Yes, it did.
Q. So, in fact, his wait period was over after the first policy was issued in '99, correct?
A. Yes.
Q. And after the 2003 policy was issued by you he had to begin a new wait period, correct?
A. Yes.
Q. And you don't recall Michael and Colleen discussing with you that they did not think it was fair that he'd have to endure another wait period?
MS. SULLIVAN: Objection. Compound. Are you asking him whether he had that conversation with either, both? I'm not sure how that question is.
Q. Do you recall any conversation at the 2003 home visit with Michael Littlefield -- with either Michael or Colleen --
A. Colleen was not there at that time.
Q. I understand that that's your assertion. I'm asking you, do you recall any argument with regard to the wait period in 2003?
A. No.
Q. Do you recall Elizabeth being there, that she is the child, in 2003?



A. No, I don't.
Q. Don't you recall Michael Littlefield saying he wanted to up his insurance policy because he had had a child?
A. Did he mention it?
Q. Don't you recall Michael Littlefield saying he wanted to up his insurance policy because he had had a child?
A. No, I don't.
Q. Don't you recall being introduced to Elizabeth?
A. No, I don't.
Q. Don't you recall Michael and/or Colleen Littlefield telling you they wanted to up the insurance policy because her brother-in-law had died very young without adequate insurance?
A. Do I remember him saying that?
Q. Him or her.
A. No, I don't.
Q. Do you recall Michael Littlefield getting up and having to let the dog out?
A. No.
Q. And you've already told us you don't recall the dog being in the room. Is that right?



A. Yeah. Yes.
Q. Did Colleen Littlefield, to your knowledge, apply for the $10,000 increase on her $50,000 policy when Michael did?
A. That I'm not quite sure on.
Q. You indicated that the process for taking applications in 2003 has changed now. What is the current process for taking applications?
A. The process is the same thing, except that you go from 50,000 or $60,000 to $300,000 it's completely different.
Q. What is the change?
A. Well, the only thing is because of the higher amount they require a paramedical examination, urine, blood work and -- that type of -- that -- they require additional information.
Q. Has the form itself that CFLI provides you with changed from 2003 to the present?
A. I'm not quite sure. I know you have the forms. If you compare one to the other you can see if there's any difference.
Q. But you don't recall -- you don't know?
A. Not that I know of. I'm not quite sure unless I look at them both.

57

**Q. Did Michael Littlefield tell you he wanted to roll the $60,000 policy into the $300,000 policy?**
A. Yes, he did.
**Q. And what do you recall with regard to that?**
A. He wanted the $300,000 -- he wanted -- he wanted $300,000 and the $60,000 one he just wanted to cancel it.
**Q. Oh, you don't recall Michael Littlefield saying he wanted to roll the $60,000 policy into the $300,000 policy?**
A. What's the definition of roll in?
**Q. Not cancel the $60,000 policy, make it a part of the $300,000 policy.**
A. No. He wanted to cancel that $60,000 one.
**Q. Did you advise him he had to cancel it in order to get the $300,000 policy?**
A. No. No. Of course not.
**Q. Could he have kept the $60,000 policy and gotten the $300,000 policy?**
A. Yes. If he wanted to.
**Q. Did you advise him of that?**
A. No. Because he wanted to cancel the -- he told me right out he wanted to cancel the 60,000, take the 300. So his decision was made -- made at

58

that point. He's the one that made the decision. I didn't.
**Q. And did you discuss it with him or did he just tell you?**
A. Oh, I discussed it broadly with him, but his mind was made up that he wanted the 300 -- he wanted to cancel that one.
**Q. Now, you indicated that after you did the actual application process you and he chitchatted a little bit about general things. Was he easy to get along with?**
A. Oh, yeah. Very nice.
**Q. Did he seem to answer all of your questions completely and honestly?**
A. Yes, he did.
**Q. Did you have discussions other -- that went beyond any particular question?**
MS. SULLIVAN: Objection.
A. What do you mean?
**Q. Let me give you an example. He indicated he'd had a hernia surgery, correct?**
A. Yes. I'm not quite sure about.
**Q. Oh, you don't remember that?**
A. The hernia operation?

59

**Q. Do you remember that Michael Littlefield had hernia surgery?**
MS. SULLIVAN: Let me just jump in and instruct him not to answer to the extent that his sole source of information is communications with counsel. So you should answer as to whether you know that Michael Littlefield had hernia surgery from any source other than communications with counsel.
A. Yeah, he told me on the application.
**Q. Did you discuss the hernia surgery with him?**
A. No.
**Q. Well, he had just had that hernia surgery, hadn't he?**
MS. SULLIVAN: Argumentative. Objection.
A. He just had -- it was done by the -- he was going to have the paramedical examination so he didn't need -- it was going to be told on that examination.
**Q. No. I'm asking you only about your examination. You had an examination meeting with him in August of 2003 to make out a new policy, correct?**

60

A. Right.
**Q. And Michael Littlefield had had hernia surgery several months before and you noted that hernia surgery, didn't you?**
A. Yeah.
**Q. Did you not discuss it with him?**
A. I did discuss it with him. He told me that he had it, but that's where it ended right there. He didn't go into great details about it.
**Q. Did you ask him any questions other than when did you have it?**
MS. SULLIVAN: Objection.
A. I would say no.
**Q. Were there any questions you asked Michael Littlefield with regard to his health, other than those listed on the actual application process?**
MS. SULLIVAN: Objection. Asked and answered.
A. No.
**Q. How did you learn that Michael Littlefield contracted cancer?**
A. The only time I found out was -- let me try to figure out when. When did I find out that he had cancer. I'm not quite sure, you know.

**Q. Even though he told you he had had a hernia surgery?**
A. Hernia surgery to my experience is not a serious medical problem. It's worse if he has a hernia, he didn't have the medical – he didn't have the operation versus having the hernia operation, like that.
**Q. So you felt more comfortable because Michael had actually had the surgery?**
A. Yes.
**Q. Who denied payment on this claim?**
A. I have no idea.
**Q. Was the decision to deny payment on this claim discussed with you?**
A. No.
**Q. Did you ever speak with Colleen with regard to the denial of the claim?**
A. No.
**Q. Do you know what Michael died from?**
A. Right now?
**Q. Yeah.**
A. Yes. Just cancer.
**Q. Who told you that?**
A. I found out before – I already gave you --



I already talked about that. I found out when he wanted to cancel his – his annuity.
**Q. You told me that you only did two types of policies with Michael. Did you in fact do a third policy for an annuity?**
A. Yes.
**Q. Were there any other policies you haven't disclosed?**
A. No.
**Q. Where are the original documents that you produced as a result of your meetings with Michael in 1997?**
A. Where are they?
**Q. Yes.**
A. They're at the underwriting department at the home office.
**Q. And where are the original documents that you created in 2003 as a result of your meeting with Michael?**
A. Same spot. Same area.
**Q. Who's in charge of that underwriting department?**
A. Geez, I forgot her name. I can't remember her name.



**Q. Who would have had information on Michael Littlefield's 2003 policy application besides you?**
MS. SULLIVAN: Objection.
A. Repeat that.
**Q. Who would have had information on Michael Littlefield's 2003 policy application besides you?**
MS. SULLIVAN: Objection. Calls for speculation.
THE WITNESS: Do I answer it?
MS. SULLIVAN: Do your best.
A. Who has it right now?
MS. DAVIDSON: Want to repeat the question again, please.
A. Yes.
(Last question was read back by the reporter.)
MS. SULLIVAN: I think this question calls for him to speculate about anyone in the family, to list anyone who might have had any contact with the policy and in the -- in the company.
**Q. CFLI. That's all I'm interested in.**
A. CFLI. I thought you meant what department or something.
**Q. No. Who?**



A. Who.
**Q. Who at CFLI would have information on Michael's 2003 policy application?**
MS. SULLIVAN: So we're leaving out the paramedic?
MS. DAVIDSON: Oh, yeah.
MS. SULLIVAN: None of that was clear from your questioning. I think it might be advisable to put a better question.
**Q. Go on. Answer the question.**
A. Okay. The underwriting department initially found out, since then the claims department and that's about it.
**Q. I'm asking you who, not which department. I was just wanting to know who.**
A. I don't know who.
**Q. You have nothing to do with it.**
A. No.
THE VIDEOGRAPHER: Karen, can we go off the record for one second?
MS. DAVIDSON: Yeah.
THE VIDEOGRAPHER: This is the end of tape one.
(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record. This is the beginning of tape two. Thank you.
BY MS. DAVIDSON:
**Q. When you took the 2003 application from Michael Littlefield, did you know he had a daughter?**
A. He probably told me that he had a daughter.
**Q. Did you discuss with him that the daughter might be a reason to up the policy?**
A. No. I gave -- I got the feeling, I don't remember why, he was more concerned with his house than anything else.
**Q. What's the logo for Catholic Family Life Insurance?**
A. Logo. What?
**Q. You're holding up a document? Is there something on there that's a logo?**
A. Right there.
**Q. Is the logo "Families are the heart of what we do"?**
A. Yes. That's -- that's just a -- yeah. All right.
**Q. What does that mean to you?**
A. The way it says, family are the -- families.
**Q. So you don't know what it means other than**



**"Families are the heart of what we do"?**
A. Yes. The way it says.
**Q. Are most of the people you write policies for families as opposed to individuals?**
A. Yes. It depends -- it's about 50/50.
**Q. Do you have to be Catholic to get a policy with Catholic Family Life Insurance?**
A. Yes.
**Q. And was Michael Littlefield Catholic?**
A. Yes.
**Q. Do you know or have you ever worked with Mary Reynolds?**
A. Mary Reynolds? No.
**Q. Do you know who -- have you ever worked with King Ingram -- I'm sorry, Kim Ingram?**
A. Yes.
**Q. How do you know her?**
A. She's a -- I forgot her title. I talk to her on the telephone and I met her at meetings and different things before.
**Q. Did you ever talk to her about this case?**
A. No.
**Q. When's the last time you saw her?**
A. About a year ago, year and a half ago.



**Q. Do you know who Judy Schmidt is?**
A. I think she's in claims, isn't she?
**Q. Do you work with her?**
A. No.
**Q. Do you know who Kelly Twigger, T-W-I-G-G-E-R, is?**
A. No.
**Q. How do you decide who's going to do the medical examination in a case -- application like Michael Littlefield's 2003?**
A. What company we're going to use?
**Q. Yes.**
A. Just a matter of -- I basically choose -- they have a list of four companies and the one who I feel comfortable with, I usually go with that. So I use ESMI (sic). So I just use them and then make the contacts.
**Q. So you pretty much always use ESMI (sic)?**
A. Yeah.
**Q. How often do you use them in a month, say?**
A. Depends how many applications I write that requires a paramedical examination.
**Q. And what's your average?**
A. Average is about between six to two -- six



to eight per month.
**Q. In 2003 was it also six to eight per month?**
A. I can't tell you. I'm not quite sure.
**Q. Do you know how much they get paid for those exams?**
A. No idea.
**Q. It's nothing to do with you?**
A. Nothing to do with me.
**Q. Do you know who Donna Carroll is?**
A. No.
**Q. When you took the application from Michael Littlefield and he told you he had a hernia, did you do any kind of a risk analysis with regard to what should be done knowing he had a hernia?**
A. No. His hernia is not considered a major problem.
**Q. Do you know if there was a specimen policy in effect in 1987?**
A. What do you mean "specimen policy"?
**Q. It's called a specimen policy. You said you provided Michael Littlefield with a specimen policy?**
MS. SULLIVAN: Objection.
**Q. A sample policy.**
A. I provided --

105

Q. You can't read what that says?
A. REDACTED k.
Q. Do you know that that's not her Social Security number?
A. No. But the office does -- she has a policy with us. They'll use that information from it to --
Q. So --
A. -- clarify it.
Q. Are you telling me it doesn't matter that you get it right because the office has a different number?
MS. SULLIVAN: Objection.
A. No. You're supposed to have it right.
Q. You made a mistake.
A. Yeah.
Q. Contingent beneficiary, and what does that say?
A. REDACTED
Q. How did you spell REDACTED
A. REDACTED
Q. And how did you spell Littlefield?
A. L-I-T-T-L-E.
Q. So you misspelled it there.
A. Right.

106

Q. And then it says "Relationship to proposed insured" and I read D-A, is that a V?
A. U.
Q. And then I see an A.
MS. SULLIVAN: Objection.
Q. What do you see there?
MS. SULLIVAN: Go ahead. What does that word say?
A. T-H-E-R.
Q. It says what, D-A-U?
A. T-H.
MS. SULLIVAN: G-H.
MS. DAVIDSON: He said T, Pat.
MS. SULLIVAN: I --
A. That was a mistake.
Q. So that was a mistake too.
MS. SULLIVAN: What does the word say?
Q. Did you know what that word said, sir?
A. What are we looking at?
MS. SULLIVAN: Right there.
A. Daughter.
Q. Underneath that there are several more questions. It says, "Does it replace any existing policy?" And you wrote "yes," CFL -- I think that's

107

says CFLI --
A. Yeah.
Q. -- is that right?
A. Yes.
Q. And you said he's a citizen. He doesn't use tobacco and he is Catholic. And then it says, "Has the Proposed Insured ever been told he/she had or been treated for diabetes, cancer, heart disease, alcoholism, drug abuse, or high blood pressure"? And you checked "no," is that correct?
A. Yes.
Q. So he told you he had never been treated for cancer, correct?
A. Yes.
Q. And then under that it says, "Has the Proposed Insured ever had insurance or reinstatement refused, postponed, limited, or offered on a substandard basis"? And you wrote "no." Right?
A. Right.
Q. And down at the bottom, signed at city and state, it looks like N, is it K-I-N-G-T-O-W-N?
A. Yes.
Q. And the date you thought was August 23rd, 2003 or '03, it actually says, is that right?

108

MS. SULLIVAN: I thought he said 25.
A. 25.
MS. DAVIDSON: Thank you.
Q. And to the right of that, is that your signature?
MS. SULLIVAN: Are you talking about this one?
MS. DAVIDSON: Yes.
A. That's Michael's.
Q. And you saw him sign that?
A. Yes.
Q. Did you read him the information above before you had him sign it?
A. The one on top of his signature?
Q. Yeah. Where it says "Authorized to obtain and disclose information."
A. No. I gave it to him. He glanced through it and that was it.
Q. And that authorizes you to get medical records, correct?
A. Right.
Q. So Michael authorized you, being CFLI, to get whatever medical records you wanted, correct?
A. Right. Yes.

A. No. That's done by the teleunderwriting.
**Q. So this goes with the page before it?**
A. Right.
**Q. And did you ever see this?**
A. No.
**Q. Looking at the fourth page of Exhibit 4, which says, "Medical department" at the top. Who made this out?**
A. This is the nurse.
**Q. Did you ever see it?**
A. No.
**Q. Looking at the fifth page of Exhibit 4, who made this out?**
A. Same thing, the nurse.
**Q. And did you ever see it?**
A. No. ESMI (sic) is at the bottom.
**Q. Did your application form for Michael Littlefield include anything other than Exhibit 4, page one, which is CFL 529?**
MS. SULLIVAN: Could I hear that question again?
(Last question was read back by the reporter.)
MS. SULLIVAN: Are you asking whether the form consists of a page other than this or was



there other information -- other forms that were filled out and signed by Michael Littlefield during the application process?
MS. DAVIDSON: I'm asking if Mr. Demers filled out anything other than this page one, CFL 529, when he did the Michael Littlefield application.
A. Yes.
**Q. And what else did you fill out when you did the Michael Littlefield application?**
A. Right here. 533. The HIPAA.
**Q. And 533 is a HIPAA authorization so that CFLI can get medical information on Michael Littlefield, correct?**
A. Right.
**Q. And you saw him sign that and it was dated August 25th, 2003?**
A. Yeah.
**Q. And there are no restrictions there. CFLI could get whatever medical information they wanted to, is that correct?**
A. Yes.
**Q. The following page is labeled an "Illustration disclosure." It is CFL 534. Did you**



**make that out?**
A. Yes, I did.
**Q. And I can't read your writing at the bottom, month, day, year. Can you tell me what that says?**
A. 5/25/03.
**Q. 5/25/03?**
A. Yeah.
**Q. It doesn't say --**
A. No. 8/25/03.
**Q. Okay. And this illustration disclosure indicates that you provided him with something else, is that right?**
A. Yeah. We talked about -- I don't have it with me. The proposal meeting.
**Q. You provided him with a proposal?**
A. Yes.
**Q. And that's what this indicates?**
A. Yes. It basically...
MS. DAVIDSON: Can you mark it as five.
(Plaintiff's Exhibit 5, was marked for identification)
**Q. You're looking at what's been marked Exhibit 5, and it says, "An illustration of proposed coverage for Michael Littlefield presented**



**September 11th, 2003 by Donald Demers," correct?**
A. Right.
**Q. When did you give this to Michael Littlefield?**
A. This correct one for 300,000 was given to him at the time when I delivered the policy.
**Q. All right. But it says that on this illustration disclosure, which is dated August 25th, 2003, that he acknowledges that the illustration provided to him did not conform to the policy. What's he talking about, if you didn't give him this illustration until --**
A. In other words, one second. When I go up -- let's say he wanted 300,000. I don't know what happened at that point, if I didn't have that amount -- the minute that the illustration -- let's say I only -- I had an illustration for 300 -- for 200,000. I can't tell what illustration I had or not. I'm not quite sure. But I explain to him, I says the premiums are wrong -- premiums are wrong because it's based -- you want 300,000, but I've only got one for 200,000 now, an illustration.
**Q. So you're saying you gave him some sort of a proposal, but we don't have it here, is that**

was supposed to review it. Which he looked at it. Now, if he actually reviewed it or not when I gave it to him, I can't tell you.

**Q. Back to my long ago original question. On page one of Exhibit 4 --**

A. Here's one, two -- where's three? Here's four, here's five.

**Q. Is that the only information you took from Michael Littlefield with regard to his health?**

A. That little question?

**Q. This whole page, is this the only information you took from Michael Littlefield with regard to his health?**

A. Yes.

MS. SULLIVAN: You mean that's written on the form?

**Q. No. I'm asking him, did you take any other medical information from Michael Littlefield other than what you wrote on CFL 529?**

MS. SULLIVAN: Does "take" mean did he ask any questions?

A. Yes.

**Q. What other medical information did you take from Michael Littlefield?**



A. Well, I asked him, because this is a preferred whole life policy.

**Q. Yes.**

A. Preferred 20-year -- 20-year top. Preferred meaning is that you're better than normal -- you have a better than normal history.

**Q. Yes.**

A. I did ask him before -- I ask everybody before I even talk about rates, I ask him, Are you in good health? Do you have any medical problems? And he said no. Then I presume and start talking about the preferred rates. If he said I have some other problem then I don't do the -- the preferred rates. I turn to regular nonspoken rates.

**Q. Where is that written down that you asked him did he have any problems and he said no?**

A. I don't mark it down.

**Q. Oh. You're remembering this?**

A. I do it on every single one -- every one that comes in.

**Q. Do you have a specific memory of asking Michael Littlefield this?**

A. Specific himself?

**Q. Yeah.**



A. No. Just that everybody who automatically does it gets -- applies for it does get it.

**Q. Well, why don't you write it down?**

A. Because I -- why not write it down?

**Q. Yeah.**

A. Because I do it on every single one. That's why.

**Q. But you don't write down the information, is that correct?**

A. Yes.

**Q. What other information did you not write down that you took from Michael Littlefield?**

A. That was it.

**Q. That was the only question?**

A. Yeah.

**Q. Now, you told me --**

A. Because there's nothing -- I can't -- I can't write medical history or anything like this, you know.

**Q. You told me Michael Littlefield had a hernia. Where did you write that down?**

A. I didn't mark it down any place.

**Q. But you remember that?**

A. The reason I remember it because it was on



the application. That's the only thing.

**Q. On what application?**

A. It was on the -- the non-medical applications.

**Q. Could you tell me what page you're referring to? I'm not sure what you're referring to.**

A. Right here.

**Q. You're looking at Exhibit what?**

MS. SULLIVAN: I think it's Exhibit 4, which doesn't have pages. So which page, Don, were you referring to? Is it this page?

THE WITNESS: Yeah. Hernia operation.

MS. SULLIVAN: The third page.

**Q. All right.**

A. Hernia operation.

**Q. But you told me you didn't see this.**

A. Also on here, hernia operation.

**Q. And you're looking now at the last --**

A. Second to the last page.

**Q. Okay. Which is actually CFL 499. You told me you hadn't seen this.**

A. Most of the time I did not.

**Q. So, in fact, you actually did see Exhibit 4, page 498 and 499?**

A. Yeah.
Q. You did see it. Okay. And it says that he had a hernia, right?
A. Right.
Q. And did you discuss it with him? Do you remember that now?
A. No.
Q. You never discussed it with him. Did he tell you about his surgery?
A. No.
Q. You don't remember him showing you his scar?
A. No.
Q. Do you remember Colleen discussing the surgery of the hernia with you?
A. No. She wasn't there at that point.
Q. At any point do you remember Colleen discussing the hernia surgery with you?
A. No. I think I should take a break.
MS. SULLIVAN: Okay.
MS. DAVIDSON: That's fine.
(A luncheon recess was taken.)
THE VIDEOGRAPHER: We're on the record. This is tape number three.
BY MS. DAVIDSON:



Q. Mr. Demers, we're continuing our deposition after our approximately one hour lunch break, and I'm asking you to look, please, at Exhibit No. 3, CFL 519. Do you have that page in front of you?
A. Yeah.
Q. Looking at the top right-hand column, the last sentence in the first paragraph, it says, "Applications with unanswered questions or incomplete or unclear responses will be returned to the writing agent for completion." Are you the writing agent?
A. Yes, I am.
Q. Did the application ever get returned to you for unanswered questions?
A. No.
Q. Does that happen sometimes, that applications get returned to you for unanswered questions?
A. Yes. Once in a great while.
Q. But not typically.
A. No.
Q. And then further down that column it says, "Purpose of conditional receipt." Last sentence of the first paragraph, "Protect your client and CFLI



by sending the full modal premium with each application." Did you send the full modal premium --
A. Yeah.
Q. -- in for this one? Yeah. Okay.
Then the next page, which is page 520, under special underwriting application instructions it says, "Effective 1/1/03 the teleunderwriting application must be used for all life cases." Did you use that?
A. Yes.
Q. And that would be the two pages that the teleunderwriter --
A. Completed.
Q. -- made out themselves, correct?
A. Yes.
Q. And then the next paragraph it says "The medical history and any pertinent underwriting information will be obtained through a telephone interview arranged through the New Business Department, so be sure to prepare your client for this." Did you do that?
A. Yes, I did.
Q. And that telephone interview, according to



your earlier testimony, resulted in pages two and three of what was marked as Exhibit No. 4, is that correct?
A. Two and three.
Q. Are those the two pages from the teleunderwriting interview or are there more?
A. No, that's it.
Q. And -- now, do you believe you did a thorough job on this application for Michael Littlefield of 2003?
A. Yes, I did.
Q. Are you aware of anything that you left out at all?
A. Whatever he told me I put down.
Q. So where did you write down that he had a hernia?
A. That was the mistake. I did not make -- I did not say it at the beginning. This is the only thing I complete.
Q. You complete that page one of Exhibit No --
A. That's it.
Q. -- 4. And you told me you wrote down everything he told you. You told me he also told you that he had had a hernia, but you did not write

133

that down, correct?
A. Correct. No. I don't think he told me that he had a hernia.
Q. Oh, you don't think he told you now.
A. No. I must have looked at the -- the medical examination pages and just kind of forgot about it.
Q. And so when was it you realized he had a hernia, was it before his application -- his policy was issued?
A. Before it was issued?
Q. Yeah. I understand it was issued in September. Did you realize he had a hernia before September 10th or 9th when the policy was issued?
A. Yes.
Q. And how did you realize that?
A. By looking at the medical examination.
Q. And is it the underwriter's job to inquire further with regard to a hernia that someone has?
A. Hernia operations are -- hernias are not considered major problems for underwriting. In order to cut down costs and speed the underwriting process, hernia operations are not -- are just considered not a major -- major problem. Don't

134

spend the money and time.
Q. And who says don't spend the money and time to further inquire with regard to hernias?
A. Usually the underwriting department does it. Their guidelines tell them to do this.
Q. All right. Looking at CFL 523.
A. 523. All right. 524. 22. Okay. I got it.
MS. DAVIDSON: Pat, here's one.
Q. Looking at that page, can you tell me what that is?
A. 523?
Q. Yeah.
A. That's the delivery letter, which -- when the policy is sent to me it has the policy transmittal report, which I say the policy is in force, okay, signed and underwriting amendment -- signed underwriting amendment. Sales proposal and member services corr -- that's a refund of a check.
Q. All right. So this was sent to you because they wanted you to get the signed underwriting amendment, the sales proposal and the member services correspondence?
A. Yes.

135

Q. Is that something you normally do after a policy is issued?
A. Yeah. When I deliver the policy and I have all these requirements, these things, and it just tells me.
Q. Okay.
Who -- at the bottom of that page, who is Mary extension 261?
A. That's one -- that's the underwriting clerk.
Q. Is she the one who did the underwriting on this policy?
A. Yes. She doesn't work there anymore.
Q. What's Mary's last name?
A. I don't know. She doesn't work for them anymore.
Q. When did she leave?
A. I have no idea.
Q. So she was their underwriter on Michael Littlefield's 2003 policy?
A. Yeah. She's the -- she's not the underwriter. She's the policy issue clerk.
Q. Oh, okay. She's the clerk.
On 524, can you tell me what that handwritten language is there at the bottom

136

right-hand corner? Do you see that handwritten --
A. Yeah. "Status. Michael and Colleen."
Q. Did you write that?
A. I probably did.
Q. What does that mean?
A. I don't know.
Q. The next page, 525. What is this document called?
A. This is the illustration. The policy illustration in force, and this is just a signed copy saying that they received it.
Q. I don't understand the date difference. If the policy was issued on September 9th, why is this dated September 19th, 2003?
A. That's the time we -- the policy is dated the 9th. So this girl Mary typed it up and mailed it to me as of the 9th. Okay. Time I got it and time I made an appointment. They don't do it right away. So then I deliver the policy, which was the 19th.
Q. And when you delivered the policy to Michael Littlefield's home, was Colleen there?
A. Which date now, the one --
Q. That would be September the 19th you told me

**Q. Do you ever work with her?**
A. No.
(Plaintiff's Exhibit 12, was marked for identification)
**Q. I'm going to show you what's been marked Plaintiff's 12, and ask if you recognize it. It's also marked CFL 447 through CFL 453. Did you recognize that Mr. Demers?**
A. Yeah. This is just life underwriters guidelines.
**Q. Do you use the life underwriter guidelines?**
A. Once in a while I use it when I need it.
**Q. For 2003, Michael Littlefield's application, did you use it?**
A. No. There's no need for me to use it at that time.
**Q. And do you know when this was issued? Can you tell from looking at it.**
A. I think -- 6/90. June '90.
**Q. Has it been changed since June '90?**
A. Yeah. It seems like it's been revised.
**Q. Do you know when it was revised?**
A. No. No.
**Q. It looks like it says "rev 1200." Do you**



**see that?**
A. Yeah.
**Q. So does that mean revised in December 2000?**
A. Oh, yeah. That could be. Yes.
**Q. And you're telling me you didn't use this for Michael Littlefield for the 2003 application he made with you, correct?**
A. Yes.
**Q. Are you familiar with CFL 449, hernia? It goes onto the next page. It goes onto 450. Are you familiar with that?**
A. Yes.
**Q. What's that used for?**
A. What do you mean used for?
**Q. Well, it says description of a hernia and then it says "Ask about." Who are they telling to ask about it?**
A. Most of the time it's the agent.
**Q. So they're telling the agent "Ask about: Include location of hernia. Ask if surgery was performed or is planned in the future." Is that correct?**
A. Yes. They're more concerned about -- on hernias, once the operation is done it's all



right. Okay? And it says -- it says "Usually standard. May be necessary to postpone if surgery is planned." If you have a hernia and you're for the operation next week, then after they would postpone it until they do the operation. Not so much the operation, but when they put you to sleep and all that stuff. That's what they're mainly concerned about.
**Q. I guess my question is, if you're not the underwriter, why do you use this life underwriting guidelines?**
A. That's a good question.
**Q. But you do. That's part of your practice?**
A. No. This is only if I really get into problems and I don't know which way to go. You know, either way -- I can go either way. And let's say I'm at so and so house and discover that she has a medical problem or he has a medical problem and I want a little guidance, but it's 7:00 o'clock at night, so what do you do? So I look at this. At least it gives me a little guidance. That's all it is.
**Q. Where do you write that information down? I don't see a place on CFL 529, Exhibit 24.**



A. All right. On the application?
**Q. Yeah. I don't see a place for you to write down.**
A. There isn't.
**Q. Well, where are you supposed to write down this information?**
A. You're supposed to write them a letter.
**Q. You're supposed to write whom a letter?**
A. The underwriting department or give them a call. Most of the time we give them calls. We just give them a call at night saying that, you know, I talked to such and such and she has or he has such and such and...
**Q. I'm very confused now.**
**If -- you've told me you don't ask medical questions in an application of the sort you did with Michael Littlefield for 2003.**
MS. SULLIVAN: Objection.
**Q. Is that correct?**
MS. SULLIVAN: Objection. Misstates the prior testimony.
**Q. Do you ask medical questions or did you ask medical questions of Mr. Littlefield when you did the application in 2003?**

A. The only thing I could answer -- could say was that application -- not that one. The application for 2003, there's a few medical questions and that's all we can ask.
**Q. That's all you can ask.**
A. But if a person comes up and says, you know, I have this problem and I have this, this, this, this, this then we can say -- then after we can say something at that point.
**Q. So if Michael Littlefield had volunteered and told you that he had a hernia and had had hernia surgery --**
A. Right.
**Q. -- before this 2003 application, you could have inquired further, is that your testimony?**
A. If he volunteered that he had a hernia operation and he told me that he had a hernia operation and there's no problems and he's in good health, at that point I could say, well, let's forget about it. Because it says -- I could -- I could stop the application at that point.
**Q. Did you say okay, let's forget about it?**
A. That I told you. We didn't -- he didn't tell me that he had a hernia operation.



**Q. So the times you use Exhibit 12 --**
A. Are very slim.
**Q. -- are when people decide to volunteer to you various medical information, is that correct?**
A. Yeah.
MS. SULLIVAN: Objection.
**Q. Is that the only time you use Exhibit 12?**
A. Yes. Most of the time it is.
**Q. And who else uses Exhibit 12?**
A. Just agents really.
**Q. It's not for underwriting?**
A. They've got their own manuals.
**Q. Well, this says "Life Underwriting Guidelines" on the front page, CFL 447. Are you telling me this is not for underwriting, even though it says "Life Underwriting Guidelines"?**
A. They have -- they have computerized type -- more detailed. They don't -- they use this, but very few.
**Q. They use it but very few. What do you mean?**
A. Very few cases. In other words, they have their own guidelines. Their guide -- they make this -- they update this and they make this through their guidelines. Through their under -- their own



underwriting manuals.
**Q. And where would their guidelines be listed?**
A. It's computerized.
**Q. And are those computerized guidelines of underwriting something that would have been used for Michael Littlefield's application of 2003?**
A. Yes.
MS. DAVIDSON: Pat, I didn't receive those computerized underwriting guidelines. I'd like to get a copy of those, please.
MS. SULLIVAN: I'm not aware of their existence. I'll inquire.
MS. DAVIDSON: Thank you.
MS. SULLIVAN: By the way, I didn't comment. I think in light of Mr. Demers' health we'd like to take breaks once an hour.
MS. DAVIDSON: I'm actually almost done.
**Q. Mr. Demers, when your attorney answered my complaint in this case she raised various defenses and I am asking you your layman's opinion, not your professional, you know, opinion, your layman's opinion of what this means and if you have any facts with regard to it.**
**One of the defenses raised is waiver or**



**estoppel. Do you know if Michael Littlefield in any way waived his claims under the 2003 insurance policy?**
MS. SULLIVAN: Objection. Foundation.
**Q. And all I want are what you know.**
MS. SULLIVAN: If you have any idea what those words mean.
**Q. Do you know what waiver means?**
A. Yeah.
**Q. Do you know have any --**
A. You stop the actual policy premium.
**Q. Do you have any facts to show that Michael Littlefield waived his right to get death claims under that insurance policy of 2003?**
A. No.
**Q. Do you have any facts to show that Michael Littlefield had unclean hands, that means did he do something wrong --**
MS. SULLIVAN: Objection.
**Q. -- with regard to the 2003 application for life insurance?**
MS. SULLIVAN: Answer based on what you know. If you understand the question.
A. Can you repeat it once more.

177

you've got there is Exhibit 3. Yes. Those underwriting -- life underwriting guidelines. And I apologize that my voice is going, so it's definitely not loud enough. I'm working on it.

Mr. Demers, could you turn to page 520 of that document, which I believe is the third -- fourth page. And I want to direct your attention to the left-hand column, the very last paragraph. Do you see that?

A. By this application?

Q. Yes. I want to focus your attention on where it says, "This makes it all the more important to do a thorough job of pre-qualifying your client during the sales process to avoid unpleasant surprises when the underwriting is completed." Do you see that?

A. Yeah.

Q. In the case of the 2003 application that you took from Michael Littlefield, did you do anything that constituted pre-qualifying Mr. Littlefield in connection with that application?

A. I'd say no.

Q. Did you ask Mr. Littlefield any general health questions before you began to fill out the

178

application form?

A. Yes, I did.

Q. What general health questions did you ask him before you began to fill out the form?

A. I just asked him a general question before I went into the preferred rates and the rates were basically saying that are you in good health? Do you have any medical problems? He answered me no.

Q. Did you ask him any other questions in connection with the preferred rate?

A. No, I didn't. Just those medical questions on the application, which is required, but that's about it.

MS. SULLIVAN: Can we mark this, please.

(Defendant's Exhibit A, was marked for identification)

Q. Mr. Demers, can you identify for us what's been marked as Exhibit A?

A. It's "Preferred Underwriting Guidelines." Those are the guidelines we use for any kind of preferred rates. Preferred rates meaning cheaper premium because they have better than normal life span.

Q. Were these rates employed in connection with

179

Michael Littlefield's 2003 policy?

A. Yes, they were.

Q. In addition to the other questions that you asked Mr. Littlefield during that meeting that you had on August 25, did you ask him any of the questions that appear on Exhibit A?

A. Yes.

Q. Now, you mentioned a moment ago that you asked him general questions about whether he was in good health, correct?

A. Right.

Q. And then you asked him the questions that appear on Exhibit A, correct?

A. Right.

Q. Do those questions constitute pre-qualification of your client?

A. Yes, it does.

Q. And why do you ask those questions before you take the application, Mr. Demers?

A. Because if we answer these questions -- these questions are preferred rates -- questions for preferred rates. In order for us to -- in order for the underwriting department to issue preferred rates they have to -- all these questions have to be

180

answered positively yes and -- because there's a pretty big difference in premium on the situation.

Q. And when you go through the questions that we just went over, the general question about whether the individual is in good health, as you testified to several times throughout today, and the preferred rate questions that appear on Exhibit A, in the case of Mr. Littlefield's application did you write anything down?

A. What do you mean "write anything down"?

Q. Did you -- after you asked these questions, is there a form or a box on this page where you write down the answers?

A. No, there isn't.

Q. Is there anything on the application form itself -- and let's get it out. I think this is your application form, you're looking now at Exhibit 4, the first page, which does not have a Bates number on it. Is there anything on that form that reflects --

A. Preferred rates.

Q. -- that the application is at preferred rates?

A. No, there isn't. Because the reason is is

181

that this application was made before the preferred rates came out. So that when these rates -- when this application -- when these -- when these application was used the preferred rates right at the beginning were not used. They weren't developed yet.

MS. DAVIDSON: Pat, what's the date? What's the date?

MS. SULLIVAN: Of the piece of paper that he's looking at?

MS. DAVIDSON: Yeah.

MS. SULLIVAN: This is the August 25, 2003 form.

**Q. Now, Mr. Demers, when you filled the information in on this form you wrote that the application was for preferred rates, correct?**

A. Yeah. They tell us just to write it in, preferred rate, as long as they knew about it, then after they would do the -- now, all these questions are reasked. We don't have to ask the questions, but I make it a good policy and they suggest that too, that you do it, actually write the preferred rates down or ask the preferred rates because a lot of people have problems which they consider not that

182

important and for them -- and it's all right, they could be just a little overweight. You know, they consider themselves, you know, within normal weight.

Like I'll tell you, I'm six feet tall right now. The preferred rate building chart is 223. I'm 243. I don't consider myself overweight, but according for this I couldn't qualify for it. So I can't qualify for the rate, for a preferred rate because I'm a little overweight.

**Q. And I think you testified that these health questions are asked again during the paramedic exam and during the teleunderwriting interview?**

MS. DAVIDSON: Objection. Knowledge.

**Q. Is that correct?**

A. Yes. Not on both. It's only off of the telemarketing is the only one that does it. The nurse itself does not answer these questions. She asks other questions.

**Q. And is your purpose in asking the general health questions and the preferred underwriting questions to avoid surprises --**

A. Yeah.

**Q. -- for the client later?**

A. For the client and me. I just don't want to

183

have a situation where the person comes in, because he's a little overweight saying that he's not offered the preferred rate and then it goes up 20, 30, 40 percent more for life insurance and the person has -- has medical problems.

**Q. Now, let's put this exhibit over and go back to Exhibit 3, I think.**

**Can you go to page 526. Actually, no. I think that's not Exhibit 3. Sorry. I'm confused because I didn't get Exhibit 3.**

A. 526?

**Q. Oh, there it is. Actually, let me show you --**

MS. DAVIDSON: What's the front of Exhibit 3, Pat?

MS. SULLIVAN: This is Exhibit 3.

MS. DAVIDSON: What's the front of it say?

MS. SULLIVAN: What's the front --

THE WITNESS: Underwriting guidelines. Life Underwriting Guidelines.

MS. SULLIVAN: Yeah.

**Q. And then you've got -- I'm directing your attention --**

184

A. 526.

**Q. -- to page 526. And, Don, I'd also like to put in front of you Exhibit 5, page 495. Do you see that?**

A. Yeah.

**Q. Now, when Ms. Davidson was asking you questions, she asked you questions about what are pages two and three of the application that's referred to on the form, that is, page 526 in Exhibit 3, and page 495 in Exhibit 5, and I believe you testified that those pages are page 497 and page 498. Is that correct?**

A. Yeah. This is the medical. Yes, it is.

**Q. So I'd like to direct your attention now to page 526. This is that amendment form filled out, is that right?**

A. Yes, it is.

**Q. When was that form filled out?**

A. 9/19/03.

**Q. And --**

A. Nine --

**Q. Would you describe the circumstances under which this form was filled out.**

A. Yeah. When I delivered the policy the --

185

when I deliver the policy I have to have the amendment signed saying that they have agreed to the information -- the information on page two and three is correct, and I agree that the information upon the home office and telephone interview is correct and the paramedical facility is correct too.

**Q. And did you go over this form with Mr. Littlefield?**

A. No. Actually going over the form itself, I told him -- I showed him the form. I says why don't you read it and if you want you can read it in detail. And he glanced at it and that's about it.

**Q. Did he look at the two attached pages that he is directed towards?**

A. Yes.

**Q. After he reviewed it, did he sign it in your presence?**

A. Yes, he did.

**Q. And is that his signature which appears on the line that says "signature of applicant/owner"?**

A. Yes.

**Q. And did you sign the form also?**

A. Yes.

**Q. Where were you when you -- you and he went**

186

**over these pages?**

A. Outside of his house delivering the policy.

**Q. Other than Mr. Littlefield and yourself, was anyone else present?**

A. No. Not that I know of. I don't know about the dog.

**Q. I'd like to direct your attention, stay with Exhibit 3, to the very end of the exhibit where your calendar pages appear.**

A. Okay.

**Q. For the appointment in -- on August 25 of 2003, what time of day was that appointment?**

A. Oh, 7:00 o'clock.

**Q. 7:00 in the evening or 7:00 in the morning?**

A. 7:00 in the evening.

**Q. When you met with Mr. Littlefield to deliver the policy, did you also deliver to him the check?**

A. For $39 and something? Yes, I did.

**Q. Yes. And did you tell him what that check was for?**

A. Well, he already signed the papers. He knew what it was for.

**Q. Did he understand, based on what you said to him --**

187

A. Yes.

**Q. -- that that policy was cancelled?**

MS. DAVIDSON: Objection. Foundation, speculation.

**Q. You can answer.**

A. Okay. When I delivered the policy to him we started off by -- I started off by giving him the check the first thing because that's a check, and I told him that was the cancellation of it -- the cancellation of the thing. He knew what it was about so I just didn't -- I didn't have to explain it to him.

MS. SULLIVAN: Could you mark this, please.

(Defendant's Exhibit B, was marked for identification)

**Q. Mr. Demers, I've passed you a document that we've marked Exhibit B. First of all, take a moment to look at this two-page document, which is Bates numbered 14 and 15. Can you identify these pages?**

A. Yeah. This is supposed to -- these are part of the replacement form. It's an agent statement which has to be completed every time there's a replacement form.

188

**Q. And when you say "replacement form," replacement for what?**

A. Replacing the one policy with another policy.

**Q. Why is this form filled out?**

A. Because it was replacing the -- it was replacing the '78 form with the 2003 form.

**Q. Did Mr. Littlefield sign the form?**

A. Yes, he did.

**Q. Did he sign it in your presence?**

A. Yes, he did.

**Q. And is that his signature that appears on the second page where it says "signature of applicant"?**

A. Yeah.

**Q. And you signed the form too?**

A. Yes.

**Q. And I think you said that there -- there was, pardon me, more to this form, is that correct?**

A. Yes, there is.

**Q. Have you seen the other pages of this form during your testimony today?**

A. Yes, but I don't know where it is.

**Q. Because I'm not sure myself whether it's in**

193

THE VIDEOGRAPHER: This is tape four. Back on the record.
MS. SULLIVAN: Could I have that marked, please.
(Defendant's Exhibit C, was marked for identification)
**Q. Don, would you take a look at what we have marked as Exhibit C, which is Bates ranges 564 through 585, and tell me whether you can identify that as coming from one of your files or constituting complete contents of one of your files. I should frame the question that way. Take a moment.**
**(Pause.)**
A. Okay.
**Q. Can you identify this document, Exhibit C?**
A. Yeah. All these are -- looks like they're Kathleen (sic) Littlefield's underwriting files of her files.
**Q. And are these your files that you located in your office in response to the subpoena?**
A. Yes.
**Q. After Mrs. Littlefield's medical problem was identified, did she receive letters notifying her**

194

**that doctors had been -- that inquiry had been made of one or more physicians?**
A. Can you repeat that question a different way. I didn't quite understand it.
**Q. After you met with Mr. and Mrs. Littlefield and you took the application and Mrs. Littlefield identified a health problem, was -- first of all, let me ask a threshold question, as far as you know, was inquiry made directly of her physicians regarding her health circumstances?**
A. Yes.
**Q. And when the inquiry was sent to her physicians, did she receive a letter notifying her that inquiry had been made of her physicians? And I direct your attention to page 579 of that document.**
A. Yes.
**Q. And is page 579 a true copy of a letter that you maintained in your file, sent to Mrs. Littlefield informing her that her physicians had been asked to provide medical records?**
A. Yes.
**Q. In connection with Michael Littlefield's 2003 application, to your knowledge did the underwriting process include going to his physicians**

195

**and getting copies of actual medical records?**
A. No.
**Q. Why not?**
MS. DAVIDSON: Objection. Speculation.
**Q. You can answer.**
A. No. Because there was no need for it. There was no medical history.
**Q. And what is your basis for saying that there was no medical history? What do you mean by that?**
A. Meaning there was no substantial medical history which they would make a -- they would charge extra premiums for or anything like this.
**Q. And is that based on the information that Michael Littlefield provided to you, to the nurse, and to the teleunderwriter?**
MS. DAVIDSON: Objection. Speculation.
A. Yes.
**Q. And I apologize if I already asked you this question. When Mrs. -- Mrs. Littlefield ultimately did receive the $50,000 policy, correct?**
A. Right.
**Q. But it took a long time, right?**
A. Yes.
**Q. And when the policy issued it was for a**

196

**higher premium, is that right?**
A. Yes.
**Q. When Michael Littlefield signed the application form, which has been marked as Exhibit 4, did you direct his attention to the portion of the form that's in the big box above the signatures, and specifically I am interested in the second sentence which says, "All responses are true and complete to the best of my (our) knowledge and belief"? Did he have an opportunity to read that before he signed it?**
MS. DAVIDSON: Objection. Asked and answered.
A. I'm not quite sure if he read it or not.
**Q. Did you give --**
A. I gave him permission -- not permission. I gave him the -- I told him if you want you can just read it. Take the time he wants to read it, but actually reading sentence and sentence, I don't think he did.
**Q. And did you give him that opportunity to read it before he signed it?**
A. Yes.
MS. DAVIDSON: Objection.

**Q. And did he sign it in your presence?**
A. Yes.
**Q. And that was on August 25 of 2003.**
A. Yes.
**Q. If Mr. Littlefield had told you that he had had a CT scan that revealed a mass, but had no diagnosis for that mass, what would you have done on August 25, 2003?**
MS. DAVIDSON: Objection. Speculation. Foundation.
**Q. You can answer.**
A. Can I answer?
**Q. Yeah.**
A. What do I do? If it was during the day I would give the underwriting department a call and I would send them a fax, you know, here's what we have. Being at night at 7:00 o'clock or 7:30 at night you can't call them up or you can't ask them any questions. At that point I would probably just tell him that -- get as much information I have and if it's that serious, and then after I would -- I would give them a call the next day, the underwriting department, and ask them what their opinion is. And give him a call back, everything



else. I would not take an application at that point for that -- that type of serious problem.
**Q. If Mr. Littlefield had told you that he had been sent for a barium enema immediately after that CAT scan, what would you have done with that information?**
MS. DAVIDSON: Objection. Speculation, foundation.
**Q. You can answer.**
A. Well, that's even worse because now he has two tests to determine if he's got a medical problem or not, you know. Even if I would have taken an application without any money, without any situation like this, at that point the underwriting department would reject it and turn it right back to me. Send it right back to me with everything else, but the best way would be for -- get all the information as well and at that point -- and make an inquiry the next day to the underwriting department to see what their opinion is.
**Q. If Mr. Littlefield had told you that he had been back to Dr. Abadier five times over the course of the summer of 2003 complaining of pain and a mass in his abdomen, what would you have done?**



MS. DAVIDSON: Objection. Speculation, foundation.
**Q. You can answer.**
A. Basically I'd do the same thing. I would -- I would take the information, get the information, then after I would -- and I'd talk to the underwriting department concerning what their opinion is and they could tell me what it is. And if they were to say -- well, if they were to say we need more information what that mass is first before they would underwrite it any further, and then we take it from there.
**Q. If Mr. Littlefield had told you that he was experiencing pain that had resulted in a prescription for Vicodin and it was causing him to change his job and stop working as -- with his cleaning business, what would you have done?**
MS. DAVIDSON: Objection. Foundation, speculation.
**Q. You may answer.**
A. I would do the same thing. I would get the information, as much as possible, and I would return it -- I would call the underwriting department the next day and tell them that -- what the situation is



and see from there.
**Q. In any of those instances, is it correct that you would not have continued to take the application or take the check?**
MS. DAVIDSON: Objection. Speculation. Foundation.
A. Repeat that again, please.
**Q. In any of the instances that I just asked you about --**
A. Right.
**Q. -- would you have stopped filling out the application form and not taken the check?**
MS. DAVIDSON: Objection. Foundation, speculation.
A. No. I would do as I talked about.
**Q. Okay.**
**If Mr. -- strike that.**
**When you asked Mr. Littlefield, as part of the pre-qualifying process, the general health questions about whether he was in good health, did he say anything to you that caused you to believe that any of the conditions that I just outlined may in fact have been true?**
MS. DAVIDSON: Objection. Speculation,

**Q. How do you know that? I don't see it anywhere here.**
A. Because the minute that they apply for a preferred rate I usually answer -- I will -- I will automatically trigger these questions and ask them.
**Q. So it's something you say you do automatically, but you don't have a recollection in this specific instance, is that fair to say?**
MS. SULLIVAN: Objection.
A. What do you mean I don't have a recollection?
**Q. I'm asking you, when you took the policy application for Mr. Littlefield in 2003, do you specifically remember at that time asking him these questions?**
A. No. But I do ask every single one who takes a preferred rate.
**Q. But we don't have any way of confirming that, do we?**
A. No.
**Q. You don't write the answers down anywhere, do you?**
A. No.
**Q. Why do they tell you to ask these questions**



**and then not write the answers down?**
A. Because the underwriting -- the underwriting department will double-check it.
**Q. So the underwriting went through everything that you went through --**
A. In other words.
**Q. Wait a second. The underwriting department went through everything you went through on Exhibit A, is that correct?**
A. Yes.
**Q. And you were going to say what, sir?**
A. All right. See, I don't mark anything down because this is just to tell you if he can qualify or not qualify for it. You just don't want any, you know, you hate to quote somebody a premium and it comes back X amount of dollars more. So basically the -- you don't have to answer that -- you don't have to give this answer if you don't want to. You don't have to ask the questions if you don't want to, but if it comes back and it's not -- preferred rates are not guaranteed, are not issued then you got -- then you've got a problem, you know. Because the underwriting department will issue -- will ask each one and keep them facts at that point.



**Q. It's in your issue -- in your interest to have policies issued, correct?**
A. Right.
**Q. With regard to Exhibit C, could you turn to CFL page 583, please.**
A. 583?
**Q. Please. It says "Lead report form" at the top of it.**
A. Yeah.
**Q. It says at the top, "Here's a sales lead for you from our term stuffers." What is a "term stuffer"?**
A. Term stuffer. If you went on page 582, the one right before, that's a term stuffer. What happens is that we keep -- came out with a term -- one page, we insert it in the paper, local paper and it has the rates and at the bottom it has a -- you tear it off and you're supposed to send it in for leads. Saying you want term leads.
**Q. I understand.**
**And you're telling me that these term stuffers appeared in the local paper?**
A. Yeah.
**Q. And were they sometimes mailed out?**



A. Yeah.
**Q. Were they ever placed in churches?**
A. No. It's something I don't -- some agents do. I don't do that.
**Q. How are you assigned people to work with? Is it everybody gets a chance or how does it go?**
A. There aren't that many agents in the Rhode Island area.
**Q. How many agents are there in Rhode Island?**
A. One, two -- including myself, three.
**Q. And in '99 or '97 how many were there?**
A. '97?
**Q. Yes.**
A. About -- one, two, three, four -- about five.
**Q. And in 2003 how many were there?**
A. About the same thing as now. What did I tell you?
**Q. About three.**
A. Yeah. About that.
**Q. And how do the prospective new clients get passed out among the three or five of you, whatever it is?**
A. Well, some -- some of -- some of the clients

## Additional Financial Information Requirements–$500,001 & above

All applications:
*Agent Memo regarding purpose/need for insurance.*

Personal coverage:
*1. Net Worth Statement*
*2. Prior year's personal income tax return with all supporting schedules & an audited financial statement, or*

Business coverage:
*Audited financial statements*
(Balance Sheet and Profit and Loss Statement)

## Catholic Membership is Required

Catholic Family Life Insurance is a Catholic fraternal benefit society. All applicants must be practicing Catholics or the non-Catholic spouse or non-Catholic child in the legal custody of a current CFLI member. Please refer to Sales Force Memo 99-2 for further details.

## Determining the Correct Application

Insurance is state regulated; and because of that, our applications vary from state to state. Be sure you are using the correct one. If you have questions, please call Sales or New Business.

**New Business reserves the right to request additional information on any case, if deemed necessary by the underwriter.**

Catholic Family Life Insurance
New Business
PO Box 11563
Milwaukee WI 53211-0563

Phone: 414.961.0500
Toll Free: 1.800.227.2354
Fax: 414.961.2059

***24-hour voice mail line***
***Leave message anytime—Day or Night***

A-578-399 (REV 1202)

# Life Underwriting Guidelines

Catholic Family Life Insurance

P.O. Box 11563 • Milwaukee, WI 53211-0563
1 800 227-CFLI • 414 961-0500

PLAINTIFF'S EXHIBIT
3
12-28-06 92

*This pamphlet is designed to give you a brief overview of Catholic Family's Underwriting Guidelines. Please keep it with you in your briefcase so you can refer to it during and between calls.*

## Catholic Family Life Insurance Standard Medical/Non-Medical Limits

Effective January 1, 2003

| Age Inclusive | 18-39** | 40-64 | 65 & Up |
|---|---|---|---|
| ParaMed* Exam HOU | $100,000 and over | $100,000 and over | $25,000 and over |
| Blood Profile*** | $100,000 and over | $100,000 and over | $100,000 and over |
| Inspection Report | $500,000 and over | $500,000 and over | $200,000 and over |
| EKG (12-Lead) | N/A | $500,001 and over | $250,001 and over |

***Non-English Speaking Applicants:** Translation Certificate (U432-296) must accompany each exam done on a non-English speaking applicant.

**Please contact an underwriter for requirments on ages 0-17 for $100,000 and over.

***A special HIV Consent Form is required with blood profiles in certain states. Check with New Business if you have any questions about this requirement in your state.

**Any requirement may be ordered at lesser face amounts at the discretion of the underwriter.**

## Para-Medical & Medical Exams

Please follow the Medical Limits Guidelines on the first panel. If you have any questions about setting up a paramed exam, call New Business. We recognize the following paramed firms:

APPS (American ParaProfessional Systems, Inc.)
EMSI (Exam Management Services, Inc.)
Exam One.
Portamedic (Hooper Holmes)

New Business will order your exams if you are using the telunderwriting application. Please contact us at extension 251 to set up this service.

## (HOU) Home Office Urine Specimen

If a paramed exam is specified, a HOU is required. A HOU may also be requested by underwriters, as needed.

## Inspection Report

Inspections are ordered by New Business. CFLI requires inspections at the ages and face amounts indicated. Always include the phone number and best time to call the applicant. Inspections may be ordered at lesser face amounts at the discretion of the underwriter.

## (APS) Attending Physician's Statement

APS Limits*

| 18-39 | 40-64 | 65 &Up |
|---|---|---|
| $200,000 and over | $150,000 and over | $50,000 and over |

The underwriter may also request an APS at his/her discretion for additional information as needed due to medical history, confidential information, or for results of recent physician visits. Always provide complete names/addresses/phone numbers for all physicians, clinics, and hospitals. If a physician is associated with a clinic, please provide that name also.

CFLI requires the full modal premium on all applications (except trial and add-on applications) for amounts that do not exceed $500,000. However, the amount of coverage bound under the Conditional Receipt remains at $100,000 even though we accept money with applications for amounts up to $500,000.

Applications involving coverage of $500,001 and up, or those submitted on a trial basis, must be sent COD. SEND NO MONEY and leave the Conditional Receipt attached to the application. Checks received with these applications will be returned to the applicant with a cover letter sent by registered mail. The agent will receive a copy of the letter.

## Special Teleunderwriting Application Instructions

Effective 1/1/03, the teleunderwriting application must be used for all life cases (except Jump Start and E-Z Life) if it has been approved in your state. Please contact the New Business department if you have any questions on the status of this application in your state.

A separate application needs to be completed for each covered insured to be included in each policy. The medical history and any pertinent underwriting information will be obtained through a telephone interview arranged through the New Business department, so be sure to prepare your client for this, and indicate the applicant's preference for the time of the call in the space provided on the application.

Do not collect a premium if a "yes" answer is given for the health history question, or the adverse underwriting question pertaining to previous insurance on the application. You are authorized only to collect a full modal premium, and leave the conditional receipt if the answer to both questions is "no."

The agent is still responsible for completing any other required forms, such as illustration disclosures, HIV Consent forms, etc. as required by state statute, and submitting them along with the application.

By using this application, you will not be asking the normal medical questions associated with the application process. This makes it all the more important to do a thorough job of pre-qualifying your client during the sales process to avoid unpleasant surprises when the underwriting is completed. You are encouraged to call New Business at any time if you have questions.

## Financial Guidelines

CFLI Underwriting financial guidelines for income and amount of coverage are shown in the table below.

| Acceptable Multiples of Gross Earned Income | | |
|---|---|---|
| Age | Personal | Key Employee Business |
| 0-30 | 18 | 10 |
| 31-35 | 16 | 10 |
| 36-40 | 14 | 10 |
| 41-45 | 12 | 10 |
| 46-50 | 10 | 10 |
| 51-55 | 8 | 10 |
| 56-60 | 6 | 10 |
| 61-UP | 5 | 5 |

*Income Exceeds these Multiples:* If the amount of insurance applied for and in force exceeds these multiples, justification for the coverage is based upon the following needs:

*a.) Key employee: Explain the value of the client to the business whether the owner or not. List special skills, knowledge, or abilities.*

*b.) Estate settlement costs funding: Include Net Worth Statement.*

*c.) Buy-sell plan funding: Include a copy of the Agreement.*

*Single Premium Plan:* If a single premium plan is being applied for, we will consider a 20% increase in the maximum amount of insurance derived from the stated multiples.

*Children's Plans:* These guidelines apply to insurance on adults. Life Insurance on children is subject to normal underwriting requirements and a separate set of guidelines.

 CFL000529

Catholic Family Life Insurance

Application for Membership and Life Insurance to:
Catholic Family Life Insurance, 1572 E. Capitol Drive Milwaukee, Wisconsin 53211 • (800)2
(Please print in black ink.)

Proposed Primary Insured ✓ Proposed Other Insured ____
Name: Michael Littlefield
First Last
Street: REDACTED
City: p: 02852
Home Phone: Gender: M
Social Security Number:
Previous Name(s)
Occupation: State of Birth: RI
Birthdate: REDACTED Age last birthday: 34
Where can you be reached for additional information?
Phone: REDACTED
Best Days: M T W TH F
Best Times: ANY DAY ☐ a.m. ☑ p.m.

Amount remitted with this application in exchange for the Society's receipt: $ 96.30
(See Receipt and Conditional Life Insurance Agreement)
Primary Beneficiary: Colleen Littlefield
Relationship to Proposed Insured: WIFE
Social Security Number: REDACTED
Contingent Beneficiary:
Relationship to Proposed Insured: Daughter
Social Security Number:

Is this policy to replace any existing insurance or annuity(ies)? ☑ Yes ☐ No
If yes, indicate company names(s)
Is the Proposed Insured a U.S. Citizen? ☑ Yes ☐ No
Has the Proposed Insured used tobacco in any form in the past 12 months? ☐ Yes ☑ No
Is the Proposed Insured Catholic? ☑ Yes ☐ No
Parish:

Face Amount: $ 300,000 ☐ Tobacco ☑ Non-Tobacco
Plan of Insurance: 20 YR PREF Term
Mode: ☐ Ann. ☐ Semi-Ann. ☑ Quarterly ☐ EFT ☐ 1 ☐ 15
(UL only) Option: ☐ #1 Level ☐ #2 Increasing
UL planned premium: $

Has the Proposed Insured ever been told he/she had or been treated for diabetes, cancer, heart disease, alcoholism, drug abuse, or high blood pressure? ☐ Yes ☑ No
Has the Proposed Insured ever had insurance or reinstatement refused, postponed, limited, or offered on a substandard basis? ☐ Yes ☑ No

Riders: ☐ WP (OL3 or term) ☐ Waiver of Monthly deduction (UL)
☐ Waiver of Planned Premium (UL) $ ☐ ADB (UL or OL3 only) $ ☐ GIR(UL or OL3)$
☐ Term Rider (Primary Insured) $ ☐ Acceleration of Death Benefit Rider (UL)
☐ Term Rider (Other Insured) $ (Complete a separate application for each person.)
☐ Children's Term ____ Units (Complete a separate application for each child.)

Authorization to obtain and disclose information: I (we) have read all the questions and answers in the application. All responses are true and complete to the best of my (our) knowledge and belief. No coverage will be in effect until: a full application has been signed by the Proposed Insured; and a policy has been issued: and the full first premium has been received by the Society; and any amendments are signed. Any coverage will be subject to the terms and conditions of the policy.

I (we) have received the notification about the Federal Fair Credit Reporting Act and the Medical Information Bureau.

I AUTHORIZE the following to release information about me to Catholic Family or its reinsurers. Those authorized include a physician, medical practitioner, hospital, clinic, other medical or medically related facility, insurance or reinsuring company, the Medical Information Bureau, a consumer reporting agency, and/or employers. I UNDERSTAND that this information may include diagnosis, treatment, and prognosis with respect to any physical or mental condition and/or treatment, and other non-medical information concerning me. I authorize all sources, except MIB, to give records or knowledge to any agency employed by Catholic Family Life Insurance. I authorize them to collect and transmit such information. I UNDERSTAND they will use the information obtained through this Authorization to determine eligibility for insurance. Any information obtained will not be released to any person or entity EXCEPT to reinsuring companies, or other persons or organizations performing business or legal services with my application. The Society may release this information when lawfully required, or as I further authorize.

I KNOW that I may request a copy of this Authorization. I AGREE that a photographic or faxed copy of this Authorization shall be as valid as the original. I ACKNOWLEDGE that I received the "Notice to Applicant" form. I AGREE this Authorization shall be valid for one year from the date shown below.

Signed at (city and state) N. Kingstown RI — Michael Littlefield
Signature of Proposed Insured (if age 18 or over)

Date signed (Month/day/year) 8/25/03
Signature of Owner/Applicant, if other than Proposed Insured

Representative: To the best of your knowledge, will this policy replace or change any existing life insurance or annuity certificate(s)
☑ Yes ☐ No

Donald C. Demers — Donald C Demers 1074
Signature of Representative — Print Representative's name and number

# AGENT ADVISE MEMO

DATE: AUGUST 28, 2003

CATHOLIC FAMILY LIFE INSURANCE
NEW BUSINESS DEPARTMENT

TO: DON DEMERS

FROM: JODY

RE: MICHAEL LITTLEFIELD, # REDACTED

THE ABOVE NUMBERED POLICY IS PENDING DUE TO THE ITEMS HIGHLIGHTED BELOW. PLEASE MAKE THE NECESSARY ARRANGEMENTS IF YOU HAVE NOT ALREADY DONE SO.

PARAMED EXAM/HOU
MEDICAL EXAM BY MD
BLOOD PROFILE
HIV CONSENT FORM
ELECTROCARDIOGRAM
WE HAVE WRITTEN TO A DOCTOR/CLINIC FOR A STATEMENT OF MEDICAL HISTORY
INSPECTION REPORT (ordered by Home Office)
MOTOR VEHICLE REPORT (ordered by Home Office)
ILLUSTRATION DISCLOSURE
REPLACEMENT FORM
QUESTIONNAIRES

- ALCOHOL/DRUG
- DIABETIC
- HAZARDOUS ACTIVITIES

ADDITIONAL COMMENTS:

Underwriter: Joni

[redacted]

# AUGUST

**2003** ANNUAL EDITION

**25** MONDAY 237

[redacted]

**26** TUESDAY 238

[redacted]

**27** WEDNESDAY 239

[redacted]

**28** THURSDAY 240

**29** FRIDAY 241

[redacted]

**30** SATURDAY 242

**31** SUNDAY 243

JULY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

SEPTEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

Redacted