E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COLLEEN LITTLEFIELD
vs. C.A. No. 06-157
CATHOLIC FAMILY LIFE
INSURANCE COMPANY

DEPOSITION OF COLLEEN LITTLEFIELD, the Plaintiff in the above-entitled case, taken on behalf of the Defendant, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Edwards, Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island on January 3, 2007 at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF......LAW OFFICE OF KAREN DAVIDSON
BY: KAREN DAVIDSON, ESQUIRE

FOR THE DEFENDANT......EDWARDS ANGELL PALMER & DODGE
BY: PATRICIA A. SULLIVAN, ESQ.

ALSO PRESENT: Vincent Morgera, Esquire

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

Q. What about 2003, were you employed?
A. No.
Q. Did you have employment prior to 2003 that ended?
A. I think it was prior to 2002.
Q. And what employment was that?
A. I worked for the church, I took care of a priest.
Q. And after -- at some point that employment ended, correct?
A. Yes. I was ill from the car accident.
Q. This is the car accident that resulted in your deposition in 2004?
A. Yes.
Q. When was that car accident?
A. 2003. I was employed in 2002.
Q. Do you recall when in 2003 the car accident occurred?
A. Yes.
Q. When?
A. March 18th. I believe it was March 18th.
Q. After the car accident you were unable to work; is that correct?
A. Yes.
Q. During the summer of 2003, were you -- what was your physical condition, that is, were you able to



get out and about, or were you housebound?
A. I was housebound.
Q. At what point after the car accident did you resume normal activities?
THE WITNESS: What type of normal activities are you asking me about, work?
Q. Well, I don't know if you went back to work or not, but at what point would you have been able to go back to work?
A. I have not gone back to work.
Q. Have you been continually disabled as a result of the car accident since it occurred in 2003?
A. I am somewhat better now.
Q. Are you physically able to work now?
A. I'm physically able, yes.
Q. At what point in time after the car accident did your health improve to the point where you were physically able to work?
A. I've just recently gotten to the point where I can go to work.
Q. Has the car accident litigation ended?
A. Yes.
Q. Did you receive any financial payment as a result of that litigation?
A. Yes.



Q. How much did you get?
A. I'm not sure of the whole payoff. I think it was under $20,000 for the whole thing.
Q. Do you have medical records pertaining to your physical condition during the summer of 2003 that you collected in connection with the car accident litigation?
MS. DAVIDSON: Medical records in her possession, custody and control?
MS. SULLIVAN: Yes. That would, of course, include in the possession of your attorney.
A. Yes.
Q. How did you prepare for your deposition today?
A. I read some paperwork.
Q. What papers did you read?
A. Paperwork Karen had in her office.
Q. Would you describe the documents you saw?
A. I believe they were the documents from the last deposition.
Q. That's the deposition of Mr. Demers?
A. Yes.
Q. Did you review your deceased husband's deposition?
A. No.
Q. What about the documents in connection with Nurse



Carroll's deposition, did you review those?
A. No.
Q. Did you review the transcript of Nurse Carroll's deposition?
A. No.
Q. How about the transcript of Mr. Demers' deposition?
A. No.
Q. Did you meet with your counsel?
A. Yes.
Q. How many times, to prepare, I'm talking about?
A. Just this morning.
Q. Other than your counsel, have you discussed your testimony today with anyone?
A. No.
Q. Did you discuss it with your daughter?
A. She's seven.
Q. Mrs. Littlefield, let me kind of back up and get some other background information. Michael Littlefield, who is now deceased, was your husband, correct?
A. Yes.
Q. When did you and he marry?
A. July 12, 1996.
Q. Have you had any other marriages?

A. Yes.
Q. Would you tell me just dates and names?
A. July 8, 1976. My oldest daughter's father, Robert Lahey.
Q. Did that marriage end in divorce?
A. Yes.
Q. Any other marriages?
A. No.
Q. You've mentioned that your daughter -- you have a daughter who is 7, correct?
A. Yes.
Q. And would you identify that daughter by name, please?
A. REDACTED efield.
Q. And F is the daughter of you and Michael Littlefield?
A. Yes.
Q. Do you have any other children?
A. Yes.
Q. Would you name them, please?
A. Robin-Jeanne Marie Lahey.
Q. Any others?
A. No.
Q. Is Robin a daughter?
A. Yes.



Q. How old is Robin?
A. 27.
Q. During the period of 2003, 2004, did Robin live with you and Mr. Littlefield?
A. No.
Q. lived with you and Mr. Littlefield?
A. Yes.
Q. Other than , did anyone else share your home during that period of 2003, 2004?
A. My family came and visited. They live in Florida, and they would come to visit periodically.
Q. Anybody else?
A. No.
Q. During 2003 did you have a dog?
A. Yes.
Q. What kind of dog?
A. A yellow Labrador Retriever.
Q. How long did you have the dog?
A. Four and a half years.
Q. Do you still have the dog?
A. No.
Q. When did you first get the dog?
A. Myself and the breeders, we bred them, the parents, and we bred them and I had first pick of



the litter for taking care of the pups.
Q. Do you remember when that was?
A. Yes.
Q. When was that?
A. May 8th.
Q. Of what year?
A. 199 -- no, 2004. No, excuse me, I'm sorry. 2002.
Q. Are you sure it was 2002?
A. No. She's two years younger than my baby, so she would have been going to be five and a half, so she was -- 2001, I'm sorry.
Q. Mrs. Littlefield, we've marked two documents as Exhibits 1 and 2. I'd like you to just a take a look at them and tell me whether you've seen them before and I'm going to ask you some questions.
(PAUSE)
A. Yes, I've seen them.
Q. And do you agree that what we've marked as Exhibit 2 is the subpoena duces tecum that was served upon you in connection with this deposition, served by your counsel's acceptance?
A. Yes.
Q. And Exhibit 1 is the amended notice that changed the time of the deposition to 10:00 to accommodate



you; is that correct?
A. Yes.
Q. Now, did you review the Exhibit A that is appended to Exhibit 1, and Exhibit A is appended to Exhibit 2. Do you have it in front of you?
THE WITNESS: What do you want me to see?
Q. I think if you turn to the next page, which is the last page of Exhibit 2, do you see Exhibit A there?
A. Sure. Yes.
Q. That's a list of documents?
A. Yes.
Q. And you're aware, I believe, that your counsel and I discussed the fact that the exhibit, all of the requests should be interpreted as limited to the time period January 1, 2002, you understand that?
A. Yes.
Q. Did you search for documents after you received this subpoena duces tecum?
A. Yes.
Q. What did you do?
A. I searched through all the drawers in the filing cabinet.
Q. Did you find any documents?

Page 30

A. Yes. It completely seized up right after Michael died. So it would be after May 25th, 2005.
Q. And I take it you didn't make any attempt to deliver the remains of the computer to your attorney to see whether these E-mails might have been able to be resurrected?
A. No.
Q. You just threw it away?
A. I didn't think it was pertinent.
(DEFENDANT'S EXHIBIT 4 MARKED FOR IDENTIFICATION)
Q. Mrs. Littlefield, I'm passing you what we've marked as Exhibit 4, and I'd ask you to confirm that this is a copy of the complaint that has been filed in your -- with you as plaintiff in this case?
A. I've seen all of these pages.
Q. I'm sorry, Mrs. Littlefield?
A. I've seen all of these.
MS. DAVIDSON: Pat, we're missing pages 8 and 10 and 12. Does your copy have those?
MS. SULLIVAN: No. Are you relying on the fax numbers at the top?
MS. DAVIDSON: No, I was looking at

Page 31

the page numbers on the bottom that are from the insurance policy.
MS. SULLIVAN: I think this is a complete copy of what was in the complaint. So if those are pages are missing --
(OFF THE RECORD)
MS. SULLIVAN: On a break I'll look at our -- this is copy from our file copy of the complaint, and so if the pages were missing, they have been missing for a long time from this document.
Q. Mrs. Littlefield, your attorney has commented that some -- there may be missing pages from what is attached as Exhibit 1 to this document, the policy. So I'm not going to ask you questions about that right now, but I do have some other questions about this complaint. Have you seen it before?
A. Most of it, yes.
Q. When you say most of it, what parts have you not seen?
A. Well, if there's pages missing, those pages I might not or might have seen, I'm not sure.
Q. Directing your attention to the portion of it that is the actual complaint itself, and I'm going to

Page 32

rely on the page numbers that appear in the upper right-hand corner. So I want to focus you on pages 5 through 9; do you see those?
A. Yes.
Q. Are you familiar with Pages 5 through 9; have you seen them before?
A. Yes.
Q. Directing your attention on Page 5 to Paragraphs 6 and 7, take a moment and just read those two.
(PAUSE)
Q. Is it correct, Mrs. Littlefield, what's been attached to this complaint as Exhibit 2 is a true copy of the application that was completed and signed by your husband, and Page 20 is the -- actually, Page 19 is the beginning of Exhibit 2?
MS. DAVIDSON: We're also missing Page 6.
THE WITNESS: What was the question?
Q. I'd like you to affirm for me that the document that is attached to this complaint as Exhibit 2 is a true copy of the application that was signed by your husband?
A. I believe it is.
Q. And that's -- directing your attention to the page you're looking at, which is Page 20 down at the

Page 33

bottom where it says signature of proposed insured, that's your husband's signature?
A. Yes.
Q. Going to the next page, Page 21, again, bottom right, is that your husband's signature?
A. Yes.
MS. DAVIDSON: There are markings on these documents that are not in the original documents. They include a star on the page you've been referring to at Number 7 and another star on Number 10 in the complaint.
MS. SULLIVAN: Thank you.
Q. Mrs. Littlefield, you were not present, correct, when Nurse Carroll sat with your husband and took medical information in connection with the insurance application?
A. No. I was not there, I was not present.
Q. And it's true, is it not, that it's your position that the application is complete is based upon the fact that your husband authorized release of medical records, correct?
A. My husband authorized release, yes.
Q. And as you have asserted in Paragraph 8 on Page 5, the fact that medical records were authorized to be released is the basis for your position that

Blackmer.
Q. What is your factual basis for saying that these three physicians will testify that your husband was in excellent health in the summer of 2003?
A. He had a physical, he had been told that he was in good physical health. He had blood tests and a physical and they said he was in very good health.
Q. What physical are you referring to?
A. He had physicals. He went back for some doctors' appointments to Dr. Abadier and Dr. Manzo, Dr. Blackmer.
Q. In the summer of 2003?
MS. DAVIDSON: Is the question limited to the summer of 2003 or just that he was in good general health? Because the interrogatory doesn't specify the summer of 2003. I'm wondering if it's your intent to limit it that way?
MS. SULLIVAN: I think my question was limited, and I think my question was clear.
A. During the summer he was better from -- he had the surgery and he was better from the surgery, from the hernia surgery.
Q. My question, Mrs. Littlefield, was whether your husband saw all three physicians during the summer



of 2003?
A. I'm not sure which ones he saw. It could have been -- it didn't say here on this what time frame, so I just put that in. I'm not even sure who -- you know, what other doctor he might have seen. There might have been more, but those are the ones that I can remember.
Q. Your husband testified before he died, did he not?
A. Yes.
(DEFENDANT'S EXHIBIT 6 MARKED FOR IDENTIFICATION)
Q. I pass you a transcript we've marked Exhibit 6. This is the copy of the deposition that was produced in this case by your counsel. First of all, have you ever seen the transcript of this deposition?
A. No.
Q. Have you ever seen the videotape that was prepared?
A. Absolutely not.
Q. Do you know where the videotape is located?
A. I believe Attorney Morgera has it.
Q. You were present at the deposition, were you not?
A. Yes.
Q. And you actually participated at times in the



deposition, correct?
A. Somewhat, yes.
Q. Indeed, Mr. Morgera had to tell you you weren't supposed to say anything, correct?
A. Correct.
Q. You remember that happening?
A. Yes.
Q. You were present for the entire deposition?
A. Most of it.
Q. Did your husband testify truthfully, to your knowledge?
A. For the time that I was there, yes.
Q. Is there any portion of the deposition where you were not present?
A. I'm not sure. I've never read it or seen it, so I can't tell you.
Q. Do you have any memory of leaving the deposition?
A. I might have.
Q. You don't remember one way or the other?
A. I might have gotten up, left and then came back or might have left at the end for a while.
Q. I will represent to you, Mrs. Littlefield, that there is no indication on this transcript that you left at any time during the deposition. Do you have a recollection of leaving?



A. Yes, I did.
Q. I'd like you to take a look at the transcript and tell me where in the deposition you were not present?
A. I'm looking through it.
(PAUSE)
MS. DAVIDSON: I think you're making an assumption that the deposition would note when she came and left the room. I'm not sure all depositions necessarily note that.
MS. SULLIVAN: It's my experience that all depositions always note when persons are present and not present.
MR. MORGERA: Well, it didn't happen this time, for your information.
MS. SULLIVAN: Why don't we take a short break and you can look at the transcript.
(PAUSE)
MS. SULLIVAN: Let's go back on the record.
Q. Can you tell me what page you're referring to, Mrs. Littlefield?
A. Page 25.
Q. Is that the page that begins with the line, "Still intact, and there was nothing."

A. 26. Page 25, Paragraph 26.
MS. DAVIDSON: This is page 25.
A. Okay, Page 25 to 28.
MS. DAVIDSON: It's Page 26.
Q. You're referring now to Page 26?
A. Yes.
Q. And if you'd look up at the top of Page 27, you were actually speaking on the record at that point.
A. I was speaking on the record on Page 26.
Q. Would you look at the top of Page 27.
A. Yes.
Q. Do you see that?
A. Yes.
Q. You're speaking on the record there?
A. Yes.
Q. When did you leave?
A. Right after Michael said, "I knew that was going to happen."
Q. When did you return?
(PAUSE)
Q. Mrs. Littlefield, you're now reading the transcript. I think we should take a break rather than just sit here and watch you read.
A. I came back to --



Q. What page is that?
A. 28.
Q. 28?
A. Yes.
Q. So you were absent for -- from the top of 27 until some point on Page 28?
A. When they started -- Michael started talking about his lump, and I came back when he was telling them he lost the page out of his pad.
Q. So you were back by Line 22 of Page 28; is that correct?
A. Yes.
Q. And after that, were you present for the remainder of the deposition?
A. Yes.
Q. And it is your testimony today that everything that you heard your husband testify to under oath during his deposition was true, to your knowledge?
A. No, there's something in here that's not right.
Q. What's that?
A. I'm not sure on the timeline of all these, that's the whole thing. I'm not sure on the timeline. I can't say that this is exactly what happened and, you know, the timeline for his



illness -- for what things he saw the doctors for. I can't say that that's -- I can't say that these are exactly the dates that he went because I don't have it in front of me.
Q. Other than the dates, is there anything else in the transcript that it's your testimony today is untrue?
A. I'd have to read the whole thing. I've never read it before, so I'd have to read the whole thing.
Q. Mrs. Littlefield, at the time that your husband was testifying, he had some notes to assist him, did he not?
A. Yes.
Q. Who prepared those notes?
A. He did and I did. There were a few things, mostly it was himself.
Q. Where are those notes today?
A. I'm not sure. I'm not sure where they are. I'm not exactly sure where they could possibly be. I don't know.
Q. Did you give them to Mr. Morgera?
A. I'm not sure if I did or not.
Q. Have you searched for them in your home?
A. Yes.



Q. Did you find them?
A. No.
Q. When did you look for them?
A. Soon after Michael died. I was trying to get things in perspective.
Q. Other than the notes that you and your husband prepared, did your husband prepare any other statements or written materials regarding his health prior to his death?
A. He may have made out some paperwork in Mr. Morgera's office. He might have did some initial paperwork there. I'm not sure. I think it was just question and answering for Mr. Morgera at the very beginning when we went there to apply for his services.
Q. Now, at the time that you were sitting with your husband and he was testifying, was there any point where you were aware that your husband was giving an answer that was false?
THE WITNESS: Did at any time -- that it was false?
MS. SULLIVAN: Yes.
A. Yes, I believe there was one time there was a false statement, but I was told not to say anything so I couldn't say anything.

Page 46

Q. What was the false statement?
A. I believe it was something to do with the tumor.
Q. What was what to do with the tumor?
A. We did not know -- this is the CAT scan at Kent in '03 and '04 there was a tumor, but we didn't know there was a tumor until after, but Michael was calling it at a tumor at this point because we found out after it was a tumor. We didn't know it was a tumor at the time. We were told it was an abscess or a pocket of blood, but I couldn't correct Michael on that because I was already told that it was something I was not supposed to break into again and say. So I had to sit and just be quiet.
Q. Michael testified, did he not, that he was told -- was called up by Dr. Abadier's secretary and they were very concerned and noted that the result of the CAT scan showed there was either an abscess or tumor there, reading from his testimony on Pages 22 and 23. Then Mr. Morgera asked, "That's what you were told?" Answer, "That's what I was told." Do you see that testimony?
A. They never said tumor.
Q. How do you know, did you talk to the secretary?

Page 47

A. I talked to the doctor and the secretary and they never said tumor, they said some sort of mass, abscess or mass, it could be something to do with the --
Q. Is it your testimony today, Mrs. Littlefield, that when your husband testified under oath that that's what the secretary said --
A. I think he was confused. He was on an awful lot of medication and I think what he meant -- he knew there was a tumor there after. He did not know there was a tumor there prior. He knew there was an abscess, but he was told it was an abscess after, and that's what the doctor had said that he thought it was on the onset when he came in. He said he believed it was an abscess or a pocket of blood when he checked Michael, and he said that showed up in the tests afterward.
Q. I'd like to go back to the first that you were aware that a CAT scan was being ordered for Michael in June of 2003; do you remember that?
A. Yes.
Q. Where did he have the CAT scan done?
A. It was done at the hospital.
Q. Before the CAT scan was done, did you know that it was going to be done?

Page 48

A. Yes -- no, no, no, no, no, I did not know. Everything was -- he set up the appointments. I think the appointments were done -- Michael set those up. He told me, you know, when he set the appointments up. No, I didn't know they were supposed to be done before that, no.
Q. And after the CAT scan was completed, when did you first become aware that he had had a CAT scan?
A. Oh, he told me he made an appointment.
Q. So you knew before the CAT scan took place that he had an appointment for the CAT scan?
A. Yes.
Q. And after the CAT scan was completed, when next did you talk to Michael about the CAT scan?
A. There was nothing to talk about. They give the results later on.
Q. How long after the CAT scan did you first become aware of results?
A. When Michael went back to Dr. Abadier's office, he had a follow-up appointment for the test and we were both pretty, you know, apprehensive. So, he went and I sat there and I came home and he said there's nothing, it was a false alarm. I said, what are you talking about. I said they just sent you for all those tests,

Page 49

it's just a pocket of blood. He said, yeah, it's just an abscess or pocket of blood. I'll have to deal with the pain and that was it; it will heal up.
Q. Were you with your husband when he saw Dr. Abadier?
MS. DAVIDSON: Which time?
MS. SULLIVAN: The time she just testified about.
A. No.
Q. So your basis for that answer is what your husband told you afterwards?
A. Yes.
Q. Other than what you just testified to that your husband told you afterwards, do you have any other information from any source whatsoever regarding the results of that CAT scan?
MS. DAVIDSON: Besides the medical records we've produced, Pat?
MS. SULLIVAN: Yes.
THE WITNESS: I'm sorry, repeat that one more time?
Q. Other than the conversation that you just told me about where you talked to your husband, do you have any other information regarding the results

of the CAT scan, and I want to limit you to information that you learned in the summer of 2003, June and thereafter in 2003?
A. Now, see, I'm not really sure about the time frame, but Dr. Abadier was also my surgeon also. We had conversations about Michael's hernia surgery and other things that had gone wrong like with his -- the black on his private parts and stomach being black and blue from the hernia surgery, so we talked about different things. And I'm not sure of the time frame, but I was assured that Michael was going to be okay and that that was just a process of healing, and that's all he told me.
Q. That was a separate conversation that you had with Dr. Abadier?
A. Dr. Abadier himself, yes. I also said Michael was having pain, and he said, well, have him come back and see me, and that's it. And Mike went back and seen him and that was it.
Q. I take it then that you did not have conversation with Dr. Abadier's secretary?
A. Yes. I had many conversations with Dr. Abadier's secretaries.
Q. Regarding the results of the CAT scan?



A. I'm not sure if it was about that, but there were other things we had conversations about.
Q. What about Dr. Manzo, did you talk to Dr. Manzo about the results of the CAT scan?
A. Not the first one, but the second one that was done at -- when he went back to Dr. Manzo complaining of pain and they did the second results (sic) and he ended up in the hospital in July.
Q. So you never had conversations with Dr. Manzo about the first CAT scan?
A. No. I'm not sure if I did or not, but I'm pretty sure it was the second time.
Q. Other than what you've told us about, is there anything else that you remember as you sat there listening to your husband testify that you knew to be false?
A. I didn't read through this whole thing, so I can't tell you.
Q. Well, I'd like to first probe your memory. You were sitting with your husband, he was testifying under oath. You understood that, correct?
A. Yes.
Q. And the deposition was in connection with a lawsuit that your husband had brought against Dr.



Abadier, correct?
A. Yes.
Q. And my question is whether, at the time as you were listening to the testimony, there was anything that you recall hearing that you knew to be false?
A. Not that I remember, just about him saying about calling -- saying it was a tumor when I never knew it was a tumor, and he never said it was a tumor. We never even found that out -- I never found that out, and I don't believe Michael found that out until the hospital, until he went in for the surgery for the second time in July.
Q. But if that were word "tumor" was used by Dr. Manzo or Dr. Abadier's secretary, and your husband didn't tell you, then you wouldn't know it?
A. No. I was standing there when he took the call, I remember that, and she said it could be an abscess or a mass. They didn't know what it was, but for him to go down and have more tests. I was standing right there when he took the call and he repeated to me verbatim as he was talking to her on the phone.
Q. How do you know it was verbatim?
A. Because he was repeating what she was saying.



Q. How do you know?
THE WITNESS: Why would he lie to me?
Q. Did he tell you he was repeating it verbatim?
A. Yes. Why would he lie? He said, "She's telling me I have an abscess or a mass and I need to have more tests," and I said, "Go. Go do it, go do what you have to do."
Q. I'd like to go back to Exhibit 3, please, the Interrogatory answers.
MR. MORGERA: Excuse me, would it be inconvenient to take a short break?
MS. SULLIVAN: For what reason?
MR. MORGERA: To go to the men's room.
MS. SULLIVAN: We'll take a break in a couple of minutes.
MR. MORGERA: If I get up suddenly you will know why.
(OFF THE RECORD)
(MR. MORGERA LEFT THE ROOM AT THIS POINT)
Q. Mrs. Littlefield, do you have the Interrogatory answers in front of you? I want to direct you now to Page 5.
A. Yes.

Q. Is it your testimony that you were present during the insurance application meeting with Mr. Demers and your husband?
MS. DAVIDSON: First or the second?
MS. SULLIVAN: I'm asking generally.
A. Well, there were three different times that Mr. Demers came to the house, so it was approximately six times that he came back and forth.
Q. And were you present for any of those meetings?
A. I was present for two and not one.
Q. You were present for two meetings and not present for one meeting?
A. Of the three. So, there was six. So I was present for four and not two.
Q. Which four were you present for?
A. Both times for the insurance, the $300,000 policy and the original $50,000 policy.
Q. And which two were you not present for?
A. For the annuity. I was not there either time when he came, and when he brought the policy back I was not there.
Q. Are you certain that Mr. Demers came to your home in connection with the annuity?
A. Yes.



Q. How can you be certain?
A. Because my husband had an appointment with him, and at the time I was working.
Q. How did you know your husband had an appointment?
A. I'm not sure how I knew he had an appointment. I'm sure he must have had an appointment, otherwise, he wouldn't have had this done.
Q. Other than assuming that he had an appointment because he ultimately got an annuity, do you have any other basis for your testimony that there was a meeting between your husband and Mr. Demers in connection with the annuity, in person?
A. I was not there for the meeting. I was not there at all. I don't know what took place or --
(MR. MORGERA RETURNED AT THIS POINT)
Q. It's your testimony under oath, Mrs. Littlefield, that there was a meeting, correct -- two meetings?
A. Yes. There were -- the annuity, I don't know where it is, somewhere in there, but it was done with Mr. Demers and Michael. I was not there for it.
Q. And my question is, other than assumption, what is the basis for your testimony that there was a face-to-face meeting between Mr. Demers and Michael?
A. Because Mr. Demers came to the house for the others.
Q. So other than that, you have no basis for saying that there was -- there were meetings in connection with the annuity in your home?
A. Correct. I'm assuming that he came to the house.



Q. Now, you testified that you were there for two different meetings in connection with the 1997 insurance policies?
A. Yes.
Q. And then it's your testimony that you were present twice in 2003 when Mr. Demers came to your home?
A. Yes.
Q. Other than the two meetings in person where Mr. Demers was present, are there any other communications that your husband had with any representative of Catholic Family Life in 2003 that you were present for?
A. Not that I know.
Q. In your interrogatory answer that appears on Page 5, Answer Number 5, you provided information describing your recollection of the communications between your husband and Mr. Demers; is that correct?



A. Say it one more time, please.
Q. In your interrogatory answer you provided under oath, your recollection of the communications between your husband and Mr. Demers in 2003 pertaining to the insurance contract, correct?
A. Yes.
Q. Is there anything that you left out of this answer?
A. Yes.
Q. What's that?
A. When Mr. Demers came and took notes and filled out some notes with my husband and myself, we discussed the barium enema tests and pocket of blood we were told they found during the tests. Mr. Demers asked Michael questions, if the -- how the tests came out and Michael said they were negative, and he said well, we don't need that because hernia surgery is just that, we told him it was something to do with hernia surgery, and it was complications after the hernia surgery and we told him about we had thought that, you know, the doctor had nicked him when he did the operation, and he said, well, don't worry about that, it's hernia surgery and these things happen and he said

Page 58

we don't need to put that in. I said, okay. But we definitely told him about those tests.
Q. When you say those tests, what are you referring to?
A. The barium enema test and the CAT scan, we told him about those.
Q. Where in this interrogatory answer did you say that you informed Mr. Demers about the CAT scan?
A. I left that out also in here. It was just some quick stuff that we had took down.
Q. Mrs. Littlefield, you understood when you signed these answers that you were signing them under oath, correct?
A. Yes.
Q. And understood it was important that your answers be complete, correct?
A. Well, to the best of my knowledge at that point in time.
Q. How is it that you now can recall that you mentioned the CAT scan?
A. Because I remember asking -- he asked Michael -- we told him about the tests.
Q. What was Mr. Demers wearing when he came to your home in 2003?
A. I think he was wearing a sweater.

Page 59

Q. What color was it?
A. Not in 2003. Wait a minute. 2003? I believe he was wearing a pair of blue pants, light-colored shirt.
Q. What color was his hair?
A. Same color it is now.
Q. How long was Mr. Demers present in your home in 2003?
MS. DAVIDSON: Which visit?
MS. SULLIVAN: Any visit.
A. Could have been -- the first time that he came to take the application was probably 45 minutes or longer.
Q. Was there a second time when he came to your home?
A. The second time to drop off the policy.
Q. How long was he there?
A. Probably a half hour.
Q. What was he wearing?
A. I'm not sure what he was wearing the second time he came.
Q. Did you sit at the table and speak to him during the second time?
A. Yes.
Q. Were you present for the entire meeting?
A. Yes.

Page 60

Q. And were you present for the entire meeting the first time?
A. Yes.
Q. Is there a reason why you omitted that information when you provided this answer under oath?
A. I never said that I was or I wasn't.
Q. That's right, Mrs. Littlefield, you just left it out, because it didn't happen; isn't that right?
MS. DAVIDSON: Objection.
A. No. I absolutely was there. I'm the one that made these appointments, both times I made these appointments, not my husband. I made these appointments. I handed the phone to my husband, I called Mr. Demers, handed the phone to my husband and said make the appointment. I put him on the phone. The first time I filled out the application for the $50,000 for both of us. My husband had nothing to do with any of these insurance policies, I did it all.
Q. Back in 1997, you and Mr. Demers and your husband did have an interview regarding medical history, did you not?
A. Yes.
Q. And during that interview, you revealed that you had some heart issues, correct?

Page 61

A. I have a pacemaker. I've had a pacemaker for years.
Q. And is it correct that as a result of the fact that you indicated, truthfully, that you had a pacemaker, that there was a delay in the issuance of the insurance policy?
A. Yes, I believe there was, but I wasn't worried about it at all because I wasn't -- actually, I wasn't concerned with the insurance one way or the other.
Q. And wasn't it also true, Mrs. Littlefield, that you knew that the insurance company was inquiring of your physicians because you received a letter telling you that they were doing medical follow-up?
A. Yes.
Q. And your husband didn't get any letters in 1997, did he?
A. No.
Q. So you knew that if an insurance applicant gave a clean medical history, there would be no follow-up with the physicians, correct?
MS. DAVIDSON: Based on that?
MS. SULLIVAN: I'm asking.
A. I only based it on my own medical history and

my own getting insurance. I don't know how other people get their insurance. All I know is I had prior insurance, life insurance, and dropped it, and then after that point in time went to get insurance, and was upfront with every single insurance person. I have a pacemaker, can you insure me? Even with my health insurance, can you insure me? If they said no, I did not pursue it, I went on to the next person. I have a health problem, can you insure me? No, we can't.

That's why I didn't make -- it didn't bother me one way or another if I got the insurance or didn't.

Q. And when the insurance issued for you in 1997, it was at a much higher premium, correct?

A. No. The premium was the same that it was going to be on the policy. It was exactly the same on the original policy. It was about the same -- I knew mine was going to be more than Michael's because of my age and because he had put it in that way. I don't think it was any more money. If it was, it wasn't very much.

Q. We can look at that. I'd like to go back to the meeting in 2003 where you testified that Mr. Demers was wearing blue pants. Where did the



meeting take place?

MS. SULLIVAN: Yes.

A. In my kitchen.

Q. Is there a fish tank there?

A. No, ma'am.

Q. Was there ever a fish tank?

THE WITNESS: You're talking in 2003?

MS. SULLIVAN: I'm talking about in any of your homes that you and Michael shared.

A. There was a fish tank in my home.

Q. In 1997?

A. Yes.

Q. Do you have a recollection of what was said at the kitchen table in 2003 when Mr. Demers was wearing blue pants?

A. Yes. He asked -- he said hello, he came in, I came out from the bedroom and Michael said Mr. Demers is here. I said okay. I said, are you going to be able to get to work on time, and he said yup. He said I don't have a client to do until -- I can squeeze this one in at 9 A.M. I said oh, okay, that's fine, you're going to leave here after, okay. No problem. Got up, I threw a house dress on, and came out and my little one was



going back and forth, back and forth, and I just put her in front of the TV and said sit there for a little while, mommy and daddy have to do something. Okay. The dog was in the kitchen, and everybody was around and he sat down and he was chitchatting with us and asked why we needed more insurance, and I explained to him that my sister's husband died and we just needed more insurance. Actually, Michael had said he started a new job, and I was now a stay-at-home mom, I wasn't working, so if anything ever happened, he would want to make sure that -- you know, money for college and stuff like that. Mr. Demers is like, yeah, I understand. So that was basically what was said. Then he started filling out the application.

Q. What time of day did this meeting occur?

A. In the morning, it was 7:30 in the morning.

Q. Do you have any records that confirm that?

A. All I can confirm is it could not have been 7:30 at night because Michael worked third shift at Bunge, and he left at 2:30 in the afternoon.

Q. Incidentally, do you have any employment records for Bunge?

A. No it would have to be from the company



itself.

Q. Do you have tax returns?

A. Yes.

Q. The tax returns wouldn't reflect to what extent your husband was working at Bunge during 2003?

A. I'm not sure. I haven't even look at those, I never looked at them.

Q. Are the tax returns the only document that you have that would reflect your work at Bunge?

A. No. The company would have the records.

Q. Have you attempted to produce the records?

A. No.

Q. So I take it that the only document you have is the document -- that is the tax returns?

A. If I have it. If I look in the file, and it's there.

Q. Is it your practice to keep copies of your tax returns?

A. It was Michael's practice to keep copies of the tax returns.

Q. And how about you, Mrs. Littlefield, what's your practice?

A. Just Michael took care of all that.

Q. And today do you believe that you still have copies of your tax returns?

Page 66

A. Yes, I didn't file last year.
Q. You haven't yet filed for 2005?
A. No, I'm still too messed up. I just didn't do it. Just didn't do it.
Q. But for the earlier period, you and Michael filed for 2003, correct?
A. 2003.
Q. You're nodding, Mrs. Littlefield?
A. 2003? I'm not sure. I'll have to go look at those files. I don't know. I might have them, I might not have them. He took care of all the bills. I never saw a bill, all I did is pay my own credit cards.
Q. Other than the tax returns, I take it your testimony is that you have no other documents reflecting Mr. Littlefield's work for Bunge?
A. No. He cleaned everything -- most of the stuff is cleaned out. It's all cleaned out.
Q. Does Mr. Morgera have documents pertaining to Michael's employment?
A. I have no knowledge. I don't know. I'm not sure.
Q. And I take it in connection with the subpoena you did not inquire of Mr. Morgera whether he had documents pertaining to Michael's employment?

Page 67

A. I'm not sure if my attorney sought that answer from Mr. Morgera.
Q. In 2003, had you and your husband recently acquired or your husband recently acquired property?
A. There was a home left to him from his grandmother. His grandmother suddenly passed away.
Q. And when did he come into ownership of that building?
A. Approximately a year after her -- of her dying.
Q. Which was when?
A. April of the next year, I believe, or June of the next year.
Q. I'll sorry, I don't know what you mean by the next year. You have to give me a year.
A. Michael's grandmother died, I believe it was 2001 or '2, and it was the year after that that -- it was in April she died and Michael -- we were living there before the house was legally -- it was in the will that the house was Michael's, and as soon as she died, we went into that house because we had another house and we couldn't get the bills -- pay the bills on both homes, so we

Page 68

sold one house and he went to keep his grandmother's house. So we went to his grandmother's house.
Q. Did you ever hear your husband tell any representative of Catholic Family Life that the ownership of the home was a reason for getting life insurance?
A. Why would that -- no. He would never say that. He would say he got the house from his grandmother, but he would never say he needed insurance for that. We had homeowners'.
Q. My question was different. It was whether you ever heard him say that.
THE WITNESS: That he needed insurance because he got the house?
MS. SULLIVAN: Yes.
A. No. Absolutely not.
Q. Do you recall hearing him tell Mr. Demers about the house?
A. Yes, in conversation.
Q. What did he say, your husband?
A. I assume the conversation was when Mr. Demers came and said, very nice house, and talked about it and my husband said, yes, it was my grandmother's house. And we had the conversation

Page 69

how she passed away and the house was left to him in the will, and that's how he got the house.
Q. Beyond what you've already told me at the meeting where Mr. Demers was wearing the blue pants, was there anything else pertaining to medical history that was discussed?
THE WITNESS: Anything else that was discussed about medical history?
MS. SULLIVAN: Yes.
A. We just talked about the hernia surgery. We talked about the hernia surgery. There was a couple of other things, if Michael was in good health, how did he feel. That was it.
Q. What did Michael tell Mr. Demers when Mr. Demers asked whether he was in good health?
A. He said he was in good health.
Q. You mentioned in your answer other things, what are the other things?
A. Other things? Just he asked Michael, you know, had he had the flu or anything else like that or, you know, how his health had been in general. Had he been to the doctor's.
Q. Was this a series of questions that Mr. Demers asked?
A. Yeah, it was. Some of it was from before the

policy was bought and some of the questions were after the policy was brought.
Q. I'd like to focus on the first meeting that you recall with Mr. Demers. I want you to tell me every question that you can remember him asking.
MS. DAVIDSON: I'm going to ask for a break now. This is obviously going to go for a while. I want to eat, I have to eat.
MS. SULLIVAN: Why don't we get an answer to this question, since I'd rather not take a break with a question pending, and then we'll take a break. Do you have the question in mind, Mrs. Littlefield? Your attorney interrupted.
(PENDING QUESTION READ)
Q. -- about health?
A. He asked how Michael's health was, you know, was there anything different from the other policy, and Michael answered yes, he had recently had hernia surgery and had had some complications, had some tests done, went into that a little bit, and Mr. Demers said were the tests negative, and Michael said yes, it's just a hernia surgery don't worry about it, that's exactly the way he put it. So that was it.
Q. Any other questions?



THE WITNESS: Questions about his health or questions in general?
MS. SULLIVAN: Questions about his health.
A. Was he in good health. Michael answered yes.
Q. Anything else?
A. He said is there anything else you can tell me? And Michael just went into a few details about different little things, he had a tick bite or this or that, sinus infection, just little things, not anything in particular. It was just nonsensical medical chitchat.
MS. SULLIVAN: Take a break.
(LUNCH RECESS 12:06 TO 1:17 P.M.)
(MR. MORGERA NO LONGER PRESENT)
(DEFENDANT'S EXHIBIT 4A MARKED FOR IDENTIFICATION)
Q. Mrs. Littlefield, during the break we went to the court's file and downloaded a copy of the complaint that has been filed in your name in this case and we've marked it Exhibit 4A, it actually is missing the same pages as the one that you were previously looking at, and I'd just like you to take a quick look at that so that we can --
A. It's the same one.



Q. This is 4A, this is a copy of the complaint. You had been testifying this morning about the complaint, and your counsel raised a complaint?
A. Okay.
Q. Now, Mrs. Littlefield, during the lunch break, did you discuss anything with your attorney that refreshed your recollection regarding any of the answers that you gave this morning?
A. Yes.
Q. What was that?
THE WITNESS: You asked me so many questions, where would you like me to start?
Q. Begin with -- I'm focusing on the answers that you discussed with your attorney where you refreshed your recollection. So I want you to limit your answer to that.
A. You asked me some questions about why I left some things out of this on 4A or 4, and the truth of the matter is, I haven't been well. I have had -- I had just recently got over, before Michael's death I had been in the hospital and had three operations back-to-back for my heart, and I wasn't well. So after Michael died, there's a lot of different things that happened. So I need to let you know that my little one is home-schooled,



she can no longer go to school because she has post-traumatic stress disorder because of her father's illness and because of the fact that she watched her father die. She does not go to school, she stays home, she cannot be put in school.
So these are the reasons why there might be some things that are left out. I might not have understood all the questions at the time. I had a lot on my mind, being sick, home-schooling my daughter, taking care of my daughter when this was going on, picking up my daughter from school before I home-schooled her. I had to pick her up three and four times a week screaming hysterical. So a lot of these things through this case I have to think about and go over and over in my mind because some of the things it's hard for me to concentrate because of all the things that have happened, and now with these new illnesses that I've got now, it's even harder for me to concentrate. If something in fact happens to me, who will watch -- who will take care of my child, how will she be raised? This is the problem. So, these are the things that I think about.
Q. Are there any specific answers that you gave this

that she sent me.
Q. When did you first become aware that the insurance company had not known about the barium enema or the CAT scan?
A. I didn't know anything about this. I kept calling this woman, countless number of times, this Kim Ingram. I do not know when this letter was sent to me. All I know is that I called her prior to this and asked her, it might have been a week before, it might have been days before when I asked her when she was going to send me -- when my check was coming, and she said there's a letter coming that's going to tell you our decision, and that's when I got this letter. Then I called her back after this.
Q. Mrs. Littlefield, I'd like you to listen to my question. I'm asking you about whether you have any recollection of a conversation with Kim Ingram about the reasons why the insurance company decided to decline the policy? My specific question was whether at what point did you become aware that the CAT scan and the barium enema not being disclosed was a reason?
A. Well, we did disclose it to Don Demers, we did tell him. Both of us told him. So I do not



know why it was not disclosed. I don't have any idea he didn't tell him. Only the fact that he just said it was a hernia surgery, it was not a big deal. I don't understand -- when I got this --
Q. Mrs. Littlefield, I'm not asking when you got that letter, I'm asking you --
A. That's when I -- this is when I found out when I got the letter, this is when I found out when I got the letter. This is how I found out, how else would I have known? She gave me this letter, she sent it to me, this is how I know.
Q. Did you tell Kim Ingram that the reason why you believed that your husband's medical disclosures had been complete was because he had given the company access to medical records?
A. I believe she asked me.
Q. And you told her that?
A. And I said we signed a paper that stated -- she said, did you sign a paper -- her words were, I'm sure, "Did you sign a paper stating that we could go into his medical records?" And I said of course. I didn't have anything to hide. I still don't have anything to hide; do all the paperwork they want.



Q. And didn't you also say to her that the insurance company could have gotten medical information because the doctor's names had been disclosed?
A. No, I didn't say that. I didn't tell them how to do their job at all, no. That would be telling them how to do their job. This is what they sent me. My question was they had already said that in my letter, they said their research. So if they had known about it, I mean, I don't know what the problem is. They had this information. My question to her was if you had already known it, then why would you give us insurance? That was my question to her. Why would you give us insurance if you had all this information to begin with? That was my question.
Q. Mrs. Littlefield, did you ever tell Kim Ingram what you testified to this morning that you told Don Demers that your husband had had a CAT scan and barium enema?
A. Yes, I did.
Q. You told Kim Ingram that?
A. Absolutely. She asked me, and I told her. Yes, I did know. It's in the paperwork, we had a discussion about it. Absolutely. I admitted to everything. I said this is nothing that I'm going



to hide. Why should I? You have all the paperwork. What do I have to lie about? Nothing.
Q. I'm not sure you've responded to my question, Mrs. Littlefield. My question is whether you told Kim Ingram that back on August 25, 2003 you told Don Demers that your husband had had a CAT scan and a barium enema?
A. Yes.
Q. You're certain of that?
A. Positive.
Q. And is there any reason other than the one that you talked about, not feeling well, why that information is omitted from everything that has been filed in this case until today?
MS. DAVIDSON: Objection. I'm not sure that you're showing her a place where it should have been included.
MS. SULLIVAN: You can answer my question.
MS. DAVIDSON: You can answer the question.
A. I did say tests. I didn't put CAT scan, I might have just -- it was an oversight. When he was -- I was doing all this paperwork. It might have been an oversight, it probably was. I have a

Page 86

around there because I was there for when he came in.
Q. Do you have a memory it was in the middle of the day?
A. It would have to be before 2:30 because Mike went to work for 2:30, so it had to be before, like I said, 2:30. He left around 2:30 to go to second job and he worked from 8:00 in the morning until 2:00, 2:30 working on his janitorial services.
Q. What were his hours at his second job?
A. 3:30 until 12 -- usually got home between 12:30 and 1:00, somewhere around there.
Q. How many days a week did he work at the second job, focusing on 2003?
A. Five.
Q. What days did he get off?
A. He didn't.
Q. If there is seven days in the week, and five days that he worked --
A. He didn't have any days off. Michael worked seven days a week.
Q. He worked seven days a week at his second job?
A. On his first job. First job was the cleaning business. Second job was with Bunge as a chemist.

Page 87

Q. Focusing on the second job, how many days a week did he work?
A. Five.
Q. Which days?
A. He went in on Sunday -- got off Friday night at 12:00 and didn't have to be back in until Sunday night -- sorry, Monday, Monday he went in. Monday. 2:30 he would go in. He would get out 12:30 on a Friday.
Q. Where was the second meeting with Mr. Demers in 2003?
A. My home.
Q. Where in your home?
THE WITNESS: Where?
MS. SULLIVAN: Yes.
A. At the kitchen table.
Q. Did Mr. Demers have any papers with him?
A. Yes.
Q. What were they?
A. The policy, some other paperwork, his pad, a folder.
Q. Did he have any cancelled check on the policy that had been cancelled, the $50,000 policy?
A. He gave -- I believe he gave Michael a check the second time.

Page 88

Q. To your knowledge, did Michael cash that check?
A. Yes, he did.
Q. Did Michael sign any forms during that meeting?
A. That's when I think he brought this out.
Q. This being Exhibit 9?
A. I believe this was -- yes. He brought this one, I'm pretty sure he brought this one. He had Michael sign the first one, and then he brought this out.
Q. When you say he had Michael sign the first one, what are you referring to?
A. He had Michael sign this one the first time.
Q. You're referring now to Exhibit 8?
A. Yes.
Q. And then it's your testimony that Exhibit 9 was presented later in September; is that right?
A. He brought it back to show him when he brought the check. This wasn't with this.
Q. Do you remember whether Michael signed anything else?
A. Policies and stuff like that.
Q. He signed the policy?
A. Yeah.
Q. Do you remember what was discussed when Michael signed the policy?

Page 89

THE WITNESS: Didn't we just discuss that a little while ago?
Q. Not yet. What was discussed when Michael signed the policy?
THE WITNESS: You mean this part of this, right here?
Q. Strike that. I'm not referring to Exhibit 8, I'm talking about. You testified that Michael signed the policy during the meeting, the second meeting with Mr. Demers in 2003, correct?
A. Yes.
Q. And my question is when the policy was signed, what did Mr. Demers say?
A. I don't understand the question, because I think I've already answered all the questions about that already, about the policy, answering questions about the policy, didn't I?
Q. You told me what was said on August 25 of 2003, I'm asking you about the second meeting?
A. The second meeting. Oh, before Michael signed it? What Mr. Demers said to him?
MS. SULLIVAN: Yes.
A. He didn't say very much to him. He just asked him some more questions and it wasn't what Michael said to him. It was what I said to him.

Q. What did you say?
A. I said I didn't think it was -- I didn't think it was right. Actually, that's not -- I still went on about that, that started way before when he came the first time, so I can't go into that right now. I wasn't happy about him getting the check and him doing it that way, but that's the way it had to be, Mr. Demers said that in order to get this insurance, he had to cancel out the other policy.
Q. The conversation that you are now recalling, that occurred on August 25, correct?
A. It occurred again when he brought it back.
Q. So you discussed the same thing again?
A. Oh, yeah.
Q. And did Mr. Demers tell you that in order to get the $300,000 policy with the premium and the preferred rates that your husband was applying for, that he wouldn't be able to get the same amount of insurance for the same price if he kept the earlier policy in place?
A. No. He never said it that way. He told us that Michael could not get the policy, this $300,000 policy with the other policy. He would have to do two distinctly different policies. He



would not be able to incorporate both policies together. So Michael said, look, Mr. Demers asked Michael, he said, is that what you want to do? In order to get this insurance policy and do it like this, you have to do it this way. If you don't do it this way, we have to go back and you have to do two different policies, and Mike said, you know what, it's going too much paperwork, too much stuff, just do it this way then. So that's what he did.
Q. The conversation you're now describing, did that occur at the August meeting on August 25, 2003?
A. There and there, both times.
Q. So it happened at the second meeting as well?
A. Yes.
Q. Do you recall the date of the second meeting?
A. He dropped the paperwork off it was in September -- no, actually, no. September, no, I don't -- I'm sorry. September. September.
(DEFENDANT'S EXHIBIT 10 MARKED FOR IDENTIFICATION)
Q. Mrs. Littlefield, I'm passing you what we've marked as 10 and I'd like you to focus first of all on the "Signature of applicant/owner," and ask you if that's your husband's signature?



A. Yes.
Q. Does this refresh your recollection that the date was September 19, 2003?
A. Yes. I thought it was the 22nd but it says the 19th, so I'm sure it must have been the 19th. I was going to say that, so instead of giving a wrong answer, I'd rather not give one at all.
Q. Is it your testimony that this amendment to the application was signed in your presence?
A. Yes.
Q. Other than what you already testified to, did Mr. Demers say anything else in connection with getting this part of the paperwork finished?
THE WITNESS: Repeat that one more time, please?
Q. Other than what you've already told me, did Mr. Demers say anything else at the time of completing this portion of the paperwork, Exhibit 10?
A. Said nothing. He just said, Michael sign this paper, that was it.
Q. During the meeting on September 19th was there any conversation about Michael's health?
A. Just asked him, you know, how he was feeling and that was it. Some other questions.



Q. You said there were other questions?
A. Yeah. He was just asking him questions, asking him how he was, how was work over at Bunge and how things were going, just chitchat.
Q. Anything else that you can recall?
A. That was it.
Q. Other than what you've told me, have you now exhausted your memory for what occurred at that meeting on September 19th?
A. I don't know. I just have a headache right now.
Q. Mrs. Littlefield, you have to answer my question. Other than what you've told me, is there anything else that you remember regarding the meeting on September 19th?
A. I'm pretty sure what we discussed I've already -- we've already talked about both of these policies prior to this.
Q. When you say both of these policies, what are you referring to?
A. Both times that he was at the house.
Q. Both visits?
A. Sure. Yes.
Q. As opposed to both policies?
A. Sure. Yes.

Q. I'm passing you a document we marked Exhibit 14, Mrs. Littlefield. I'll direct your attention to the physician name in the upper corner there, and my question is whether this refreshes your recollection that your husband saw Dr. Blackmer in June of 2003?
A. Well, if Karen has a record of it, then it's absolutely when she saw him.
MS. DAVIDSON: You're referring to Dr. Blackmer, not to me, correct?
THE WITNESS: Yes, I'm sorry.
Q. In that answer you were talking about the physician, Blackmer?
A. I'm sorry. I'm on a first name basis with her, I've had her for so many years.
Q. Based on your review of this document, you believe that your husband may have seen Dr. Blackmer during June of 2003?
A. I'm sure he did.
Q. During 2003 did your husband have a cell phone?
A. Yes.
Q. Did he carry the cell phone with him?
A. Yes.
Q. Do you have phone records from his cell phone?
A. No.



Q. Were you aware, Mrs. Littlefield, that your husband was prescribed Vicodin for pain in June of 2003?
A. Yes.
Q. How long did he continue to take the Vicodin?
A. He only took them when he had pain.
Q. And over what period of time did he continue taking it throughout the year until he finally was diagnosed in July of 2004?
A. No. No. No. As a matter of fact, I threw a bottle of it away. He never finished taking it. He didn't take the Vicodin when he was diagnosed with cancer. He was on something else.
Q. Is it your testimony that from June of 2003 until July of 2004 he was intermittently taking Vicodin for pain?
A. Intermittently. Mostly he would take a Tylenol or an Ibuprofen. He worked and he did chemistry. He didn't want to take them while he was working. So, he would take a Tylenol or Ibuprofen, he wouldn't take it while he was working. He would take it while he came home or while doing his other job. He could not afford to make a mistake. It was too intricate.
Q. Your husband was also prescribed antibiotics in



June of 2003; were you aware of that?
A. Yes.
Q. How long did he continue to take the antibiotics?
A. I believe it was about ten days, about ten days, somewhere around those lines. Ten days. I'm not quite sure how long it was.
Q. Did you participate in telephone conversations with Dr. Manzo regarding the results of the CT scan and/or the barium enema?
A. I believe it was the second time.
Q. The following year?
A. Yes.
Q. So you didn't participate in any such communications in 2003?
A. No.
Q. With Dr. Manzo?
A. No. Not that I recall. If he has paperwork to say otherwise, then it's true. But if not, like I said --
Q. Now, is it true that your husband was suffering from lower right quadrant pain throughout the entire year preceding July of 2004 when he was admitted to Rhode Island Hospital?
A. No. He had intermittent pain. He had pain on and off. If he lifted something or if he



twisted, or if he over-exerted himself like lifting up -- picking up the dog or picking up the baby and throwing her around or, you know, just things that men do. You know, if you lift too hard. Mike was the type of guy, if a bigger guy could do it, he could do it, he had the small guy syndrome.
Q. The intermittent pain that you were describing, is it correct that that pain continued unabated, intermittent but unabated from June of 2003 until July of 2004, and then continued after July?
MS. DAVIDSON: Okay.
A. No, it was intermittent. He only had the pain if he moved -- picked things up, twisted a certain way. That's why he thought it was still a hernia -- there was still a hernia, that's what our belief was, the doctor didn't take the hernia out, that's what we figured.
Q. Were you with Michael when he gave the history of what his medical condition had been for the year preceding his admission at Rhode Island Hospital in July of 2004?
THE WITNESS: His admission prior to going into the hospital or while he was there?
Q. All of the history, conversations that he provided

diagnosed what was wrong with your husband when he saw him in June and then in August of 2003?
MS. DAVIDSON: Objection. Go ahead and answer.
A. Did I believe that Dr. Abadier should have -- could you repeat it, please?
(QUESTION READ)
MS. DAVIDSON: Same objection.
A. I'm not sure how to answer that.
Q. Isn't that the basis for your claim?
MS. DAVIDSON: Objection. Calls for a legal conclusion. Go ahead and answer if you can.
A. I don't have an answer for it.
Q. You have no understanding as a layperson regarding the basis for the claim that you are asserting against Dr. Abadier?
MS. DAVIDSON: Objection. Go ahead and answer.
A. I just know that they're filing for misdiagnosis, that's as far as I know.
Q. Are you aware that Dr. Abadier has asserted the defense of assumption of the risk?
A. I don't know what that means. I'm sorry, you will have to explain it to me.



Q. Has Dr. Abadier taken the position that your husband failed to follow medical directions given to him by Dr. Abadier?
THE WITNESS: Are you asking me if my husband did not follow Dr. Abadier's directions?
Q. I was actually asking whether Dr. Abadier claims that your husband failed to follow Dr. Abadier's direction?
MS. DAVIDSON: Objection as to what Dr. Abadier claims.
A. I don't know what Dr. Abadier says or doesn't say. I haven't spoken to the man.
Q. Have you seen the answer that he filed in the case that you filed against him?
A. No, ma'am.
Q. Did your husband fail to follow Dr. Abadier's directions?
A. Not to my knowledge.
Q. Did your husband -- was your husband told by Dr. Abadier on August 25, 2003 that he should get another CT scan?
A. No.
Q. How do you know?
A. Not to my knowledge.



Q. Did your husband go to the Kent County Emergency Room because of abdominal pain and then walk out at some point during the summer of 2003?
THE WITNESS: Are you still waiting for my answer? Was that a question?
MS. SULLIVAN: Yes.
A. I have no knowledge of that.
Q. Is it true that your husband stopped working at the cleaning job in August or September of 2003 because of the pain?
A. No. He cut back. He still had clients.
Q. But he cut back because of the pain?
A. No. I think he -- I'm not sure why he did. I know he cut back, I'm not exactly sure the reason as to why he cut back. I don't know if it was because he was working too many hours at the chemist job or whatever it was, I'm not quite sure about what it was. I'm not sure it was about pain or anything else like that. I don't know. My thoughts were it was because he had so much work, he was doing so much. I think another thing was we had a bit of a tiff about him working too many hours and Elizabeth wasn't seeing him enough. That may have been a contributing factor of him not working so many hours. I'm not quite sure. I



know we had had little disagreements from time to time about him working too many hours. I don't know if it was because of pain or whatever. I don't have any -- I don't recall what -- exactly what the conversations had been. I know there were a few tiffs about it.
Q. I want to go back to a question I asked about a moment ago because I think I misstated something. I asked you whether you were aware of your husband walking out of the Kent County Emergency Room where he had gone for pain, for abdominal pain and I think I said the summer, and I should have said in May of 2003, but you're not aware of that?
A. No.
Q. Now, Mrs. Littlefield, I think you testified that your husband saw Dr. Manzo several times in June of 2003?
A. I don't know if it was several. I don't exactly know how many times it was. I know he saw him a few times, but I don't know exactly how many. I can't give you a precise number.
Q. Do you know that he saw Dr. Manzo for a tick bite thinking that might be the cause of the pain on June 10 of 2003?
A. I know he had a tick bite, yes.

Q. Does it sound right, consistent with your recollection that that was on June 10 of 2003?
A. Probably, yes.
Q. So, if Dr. Manzo's records show that on June 10 of 2003 he saw your husband, that would be true?
A. If Dr. Manzo said he saw him, then he saw him.
Q. And on June 16 of 2003, your husband saw Dr. Manzo again?
MS. DAVIDSON: Answer if you remember.
A. I don't remember, but if she can tell me why, I could give her the answer.
Q. Do you recall that he went to Dr. Manzo at your suggestion because he was groaning at night from pain?
THE WITNESS: When was that?
MS. SULLIVAN: June 15, 2003.
A. Yes.
Q. And that as a result of that visit with Dr. Manzo, Dr. Manzo conferred with Dr. Abadier and arranged for the CT scan?
A. Yes.
Q. Did your husband actually see Dr. Abadier when the CT scan was ordered, or did he just see Dr. Manzo?



A. I'm not sure.
Q. Your husband saw Dr. Abadier on August 25, 2003?
MS. DAVIDSON: Answer if you remember.
A. I don't remember exactly what the dates were.
Q. If Dr. Abadier's medical history regarding his visits with your husband indicate that he saw him on August 25 of 2003, do you have any reason to believe that's inaccurate?
A. I don't know if it's accurate or not.
Q. Do you have a recollection that your husband saw Dr. Abadier on the same day that you met with Mr. Demers?
A. No.
Q. If your husband testified at his deposition that he saw Dr. Abadier on August 25, 2003, that would be correct, wouldn't it?
MS. DAVIDSON: Objection. She already answered what she knows.
A. I don't know if he saw him or not. I know he had a doctor's appointment, but I didn't know it was on the same day.
Q. Do you know what time of day the appointment was?
A. No, I don't. Is it there? The time?
MS. SULLIVAN: No.



Q. Why did your husband stop seeing Dr. Abadier?
A. Because he said he was fine.
Q. But your husband continued to experience the intermittent pain, correct?
A. Yes.
Q. Is it your testimony that you're not aware that Dr. Abadier claims that he told your husband he really should go for another CT scan on August 25 of 2003? I'm focusing on whether you know Dr. Abadier claims that?
A. No. I never heard anything about that.
Q. You don't remember that your husband was asked questions about that by Dr. Abadier's attorney during the deposition?
A. I don't remember.
Q. Who is Dr. Shahinian?
A. Dr. Shahinian, he performed surgery on Michael on July 28th. He's the one that found the cancer.
Q. That's in 2004?
A. Yes.
Q. Are you aware of any reports that Dr. Shahinian has prepared regarding what Dr. Abadier should have done?
A. No.



Q. I'd like to direct your attention to Exhibit 3 which is somewhere in your pile. Do you have Exhibit 3 there? On Page 7 -- -- actually, the question and answer begins on Page 6, I'm directing your attention to question -- your answer to Question 9. Did you find it?
A. Yes.
Q. My question focuses on the portion of your answer under oath where you said, "I believe that Dr. Shahinian said that Dr. Abadier could have done more tests and some further testing might have discovered the cancer a little earlier." What is the basis for that belief?
A. After the surgery, Michael had a follow-up with Dr. Shahinian, and we asked a lot of questions. Michael asked a lot of questions and I only had one question to ask, and the question that I had was after all the questions were answered, and Dr. Abadier said the cancer was there and it had been growing for a while, he didn't know how long. My question was during the surgery he had for the hernia, I asked him if it would have been found at that point in time, would the cancer have been discovered, and he said absolutely.

of course, you tell your mother things, my sister and my brother, my other brother and, you know, everybody was worried, you know, what's going on, what's going on. At that point in time I was more homebound because of the car accident so I didn't really tell many of my friends, mostly my family, and then after we got the results back that said that Michael was fine, everybody, you know, his father, especially, said, "Oh, that was a close one." I was like yeah, aren't we lucky.

Q. So all of these people whom you've just named would be able to testify that, your understanding, at least, was that Michael was fine after he got the test results?

A. Yeah. That's the whole problem, we thought he was fine.

Q. When Mr. Demers came to talk with you and Michael in 2003 the first time, that would be around August 25th or 28th, did he write down everything that you said?

A. Not everything, but he did write some things down. He had a note pad, a little note pad he wrote some things down in.

Q. What kind of a note pad?

A. Just a regular little note pad, like one of



those little --

Q. Spiral bound?

A. Yes, a little bound, but it was a spiral on the top, not on the side. You flip it up. He was flipping it.

Q. He didn't write down, actually, Michael's answers on a form?

A. No, he was writing some things down. Some things he wasn't writing down.

Q. Did you withhold any medical information that you had from Mr. Demers?

THE WITNESS: For myself?

MS. DAVIDSON: Yes, for you.

A. No.

Q. And how about for Michael?

A. No.

MS. DAVIDSON: Objection.

MS. SULLIVAN: Objection.

Q. Did you hear Michael withhold any information from Mr. Demers on that meeting in the late August of 2003?

A. Well, he might have you know -- there's so many things we go to the hospital for, back and forth, just little nitpicky things. I'm sure we didn't put down every single little tiny thing we



went for, but as far as, to be redundant, I'm going to say that we did tell him about the hernia surgery and about the tests he had.

Q. Was Mr. Demers concerned with all these tiny, tiny little things?

A. No.

Q. Did he tell you all he cared about were serious illnesses?

A. Yes. He was more interested in, you know, does anyone in your family have cancer, you know, those are the --

Q. Did anyone in Michael's family have cancer?

A. No.

Q. Michael's parents are both alive and they're how old?

A. Michael's father turned 70. He was born December 1935.

Q. And is there anything else you'd like to add or supplement that neither Attorney Sullivan or I brought out or anything you'd like to clarify?

MS. SULLIVAN: Objection.

THE WITNESS: Do you want me to answer?

MS. DAVIDSON: Yes.

A. She said objection. There really isn't much



more I can add to this, unless I'm asked a specific question, but I want it to be known that Michael wasn't a liar, nor am I, we pretty much tell the truth. Like I said, bluntly sometimes my mom said my faults have been to be brutally honest and people that do know me, know that I'm brutally honest to a fault where I wouldn't even jay-walk, that's just the way I am. I try to be straight and narrow. That's all I can say.

MS. DAVIDSON: I have no further questions.

MS. SULLIVAN: I have one question.

FURTHER EXAMINATION BY MS. SULLIVAN

Q. Michael was not a liar, correct?

A. Correct.

Q. And Michael told the truth when he testified under oath shortly before he died, correct?

A. Michael was on, I don't know how many milligrams of Dilaudid being pumped into his system every five minutes, plus being on other pain pills he was taking orally. I don't know some of the things that Michael said, he might have misconstrued in his own mind. He's not a liar. No, he's not a liar. He might have misinformed -- by using a word that should not

have been used in one context that he used in another, yes, he might have done that, but he's not a liar, no.

Q. So you told us about the one instance where that occurred?

A. Yes. My opinion is because he had been told it was a tumor, after he had been using it as a tumor, just to put a label on whatever it was inside of him.

Q. Other than that, as far as you know, Michael told the truth?

MS. DAVIDSON: Objection. She hasn't had an opportunity to read the deposition.

MS. SULLIVAN: I think we need to do that.

MS. DAVIDSON: That's fine.

THE WITNESS: Do you want me to read it?

MS. SULLIVAN: Yes.

MS. DAVIDSON: While she's reading the whole deposition, can you and I do our paperwork thing?

MS. SULLIVAN: I think she's already read a great deal of it, I think you should read the rest of what you haven't already read.



MS. DAVIDSON: I agree. I'm asking you while she's doing that.

(OFF THE RECORD)

THE WITNESS: There are some things in here.

MS. DAVIDSON: Do you want to mark them and do them all at once?

(WITNESS READING DOCUMENT)

(RECESS)

MS. SULLIVAN: Very understandably, Mrs. Littlefield is very upset and we're not going to continue with the deposition at this time. Karen Davidson and I have discussed the possibility that we might enter into a stipulation and avoid the necessity for any additional testimony, but Karen has told me if additional testimony is essential, then we'll proceed on another day when Mrs. Littlefield is feeling better.

MS. DAVIDSON: That's correct.

MS. SULLIVAN: Thank you very much Mrs. Littlefield. I'm sorry.

MS. DAVIDSON: I'll have a mini.

(DEPOSITION ADJOURNED AT 3:42 P.M.)

Catholic Family Life Insurance

*Families are the heart of what we do.®*

September 23, 2005

Karen Davidson, Attorney At Law
One Ship Street
Providence, RI 02903

RE: Contested death claim Policy **REDACTED** ichael Littlefield
Beneficiary- Colleen Littlefield

Dear Ms. Davidson:

In response to your letter dated September 19, 2005 received in our office September 23, 2005, please find enclosed a copy of the correspondence mailed to Colleen Littlefield along with a refund check September 7, 2005. Please feel free to contact me at 1-414-967-1260, if you are in need of additional information or clarification.

Sincerely,

Kim Ingram

Kim Ingram, ACS, AIRC, CLU, ChFC, FLMI
Corporate Secretary and Vice President, Insurance Services

they had access to Dr.'s notes

could have gotten info from med records

didn't ask re: docs + tele conv

9/26 called her
27 " " said sent voided check

DEFENDANT'S EXHIBIT 5 1/3/07 PENGAD 800-631-6989

ML00391

Catholic Family Life Insurance

*Families are the heart of what we do.®*

September 7, 2005

DEFENDANT'S EXHIBIT 7

Mrs. Michael Littlefield
REDACTED

Re: refund of premium for Mr. Michael Littlefield effective September 9, 2003- policy number
REDACTED

Dear Mrs. Littlefield:

Catholic Family extends its condolences to you and your family at this difficult time. As you know, your husband applied for life insurance with Catholic Family and was issued a policy dated September 9, 2003.

This policy is less than two years old and therefore is contestable under the general provisions of this policy. Upon review of your husband's application and medical records, we regret to inform you that we are unable to pay the proceeds. This decision is based on material misrepresentation and omission of his medical procedures related to his hernia surgery on the additional follow-up visit in June 2003. Had we been aware of these procedures, we would not have issued a policy on his life at that time. We have summarized the statement that led us to our decision below.

- **Amendment of Application signed by Mr. Littlefield read as follows:**

*It is hereby understood and agreed that the application forming a part of Policy Number amended as follows:*

*I have reviewed pages 2 and 3 of the application in this policy. I agree that the information obtained by the home office in a telephone interview or by a paramedical facility is correct. All statements made in any application and medical forms attached to the policy are subject to all the general provisions listed in "The Contract" section of the policy.*

*A copy of this Amendment and Alteration of Application; the signed original of which is to be recorded at the Home Office of the Society, shall be attached to and shall apply to any policy issued thereon.*

*I certify that the health of the person proposed for coverage has not changed since the date of the original application.*

- **Statement page 3 of the teleunderwriting application question #9.** *Full name and complete address of personal physician; the date, reason last seen and diagnosis:*

Answer: Dr. Manzo, Greenwich, RI 5/03 follow-up after 4/03 hernia surgery all OK.

- **The Medical Examination Report dated August 28, 2003 and signed by Mr. Michael Littlefield;** question 1b- Date and reason last consulted: answer pain related to hernia surgery 5-03- had surgery 4-2003.

Question 2 e *Have you ever been treated for or had any indication of Jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion or other disorder of the stomach intestines, liver or gallbladder?* **Answer-yes and hernia was underlined.**

*Under the details of the Yes answers for 2e: include diagnoses, dates, durations and names and addresses of all attending physicians and medical facilities.* **Our research indicated that there was information omitted.** Had we known of the ongoing follows-up for pain and subsequent medical visits and procedures, we would not have issued the insurance policy on your husband.

We have enclosed a check for the refund of premium and interest and copies of the application, medical exam, alteration and amendment, as well as the original death certificate. Please feel free to contact us with any questions and concerns you may have about this decision.

Again please accept our condolences and may God grant you strength and your loved ones peace and perseverance during this period of grief.

Fraternally yours,

Kim Ingram ACS, AIRC, CLU, ChFC, FLMI
Vice President, Insurance Services and Corporate Secretary of Catholic Family Life Insurance

Cc: Don Demers

Catholic Family Life Insurance

*Families are the heart of what we do.®*

# Amendment of Application

It is hereby understood and agreed that the application forming a part of Policy Number 99903082701 amended as follows:

**I have reviewed pages 2 and 3 of the application in this policy. I agree that the information obtained by the home office in a telephone interview or by a paramedical facility is correct.**
**All statements made in any application and medical forms attached to the policy are subject to all the general provisions listed in "The Contract" section of the policy.**

A copy of this Amendment and Alteration of Application, the signed original of which is to be recorded at the Home Office of the Society, shall be attached to and shall apply to any policy issued thereon.

I certify that the health of the person proposed for coverage has not changed since the date of the original application.

SIGNATURE OF APPLICANT/OWNER [signature]

SIGNED AT North Kingstown, RI
(City and State)

DATED 9/19/02

WITNESSED BY [signature]

**TWO COPIES ARE TO BE SIGNED, DATED AND WITNESSED;**
**ONE COPY IS IN THE POLICY**
**ONE COPY IS TO BE RETURNED TO THE HOME OFFICE**

U-465-1100

DEFENDANT'S EXHIBIT 18 1/3/07 LSh

PAGE 2 Michael Littlefield

## 8. LIFE INSURANCE IN FORCE OR PENDING ☒ YES ☐ NO (If yes, complete below.)

| Name of Proposed Insured | Company | Amount |
|---|---|---|
| Michael | CFLI | |
| | | |
| | | |

## 9. UNDERWRITING INFORMATION - PART 1

PROPOSED INSURED(S) MUST COMPLETE ALL QUESTIONS. ALL "YES" ANSWERS MUST BE EXPLAINED AND REFERENCED IN THE BOX AT THE BOTTOM OF THIS PAGE!

| Has or does the person(s) proposed for insurance coverage: | YES | NO |
|---|---|---|
| 1.) Ever engaged in or expect to engage in any of the following: | | |
| a. Aviation activities as a pilot or crew member? If yes, attach Aviation Questionnaire. | ☐ | ☒ |
| b. Skin or Scuba Diving; motor vehicle or motor boat racing; mountain climbing, professional rodeo competition; skydiving; other hazardous activities? If yes, attach Hazardous Activities Questionnaire. | ☐ | ☒ |
| 2.) a. Drink alcoholic beverages? If yes, how much per week? (One drink = 12 oz. beer, 4 oz. wine, or 1 oz. hard liquor.) Amount: 1-2 / 2weeks | ☒ | ☐ |
| b. Now or ever been a user of heroin, cocaine, marijuana, or illegal, restricted or controlled substance, except as prescribed by a physician? If yes, attach Drug and Alcohol Questionnaire. | ☐ | ☒ |
| c. Ever had or been advised by a physician, practitioner, or court of law to have treatment for alcohol, drug, or substance abuse? If yes, attach Drug and Alcohol Questionnaire. | ☐ | ☒ |
| 3.) a. Had insurance or reinstatement refused, postponed, limited, offered, or quoted on a rated or substandard basis? | ☐ | ☒ |
| b. Will this insurance replace or change any existing life insurance or annuity contract? CFLI | ☒ | ☐ |
| c. Within the past 5 year… …plied for or received disability or Worker's Compensation Benefits? | ☐ | ☒ |
| 4.) a. Driver's License No. REDACTED State RI | | |
| b. Ever been cited for driving while… , or driving under the influence (DUI)? | ☐ | ☒ |
| c. Ever been cited for any other driving violation in the past 3 years? If yes, please provide full details. | ☒ | ☐ |
| d. Ever been convicted in a court of law for any reason? | ☐ | ☒ |
| 5.) Have you lived or traveled outside the United States within the past 12 months or do you plan to travel or live outside of the United States within the next 12 months? | ☐ | ☒ |
| 6.) Are you a U.S. citizen, or do you have permanent residence status? If not a U.S. citizen, please provide I-151 (green card) number ______ | ☒ | ☐ |
| 7.) Do you now use or have you ever used tobacco or nicotine in any form? If yes, indicate the type of tobacco used; (cigarettes, pipe, cigar, chewing tobacco, other) and if applicable, the date you stopped. | ☐ | ☒ |
| 8.) a. Have a history in parents, brothers or sisters of mental illness, diabetes, heart, kidney or liver disease, high blood pressure, stroke or cancer? If yes, name person(s), relationship(s), age(s), condition(s), and age when disease began. | ☐ | ☒ |
| b. Give name, cause and age at death of father, mother, brother(s), sister(s) if deceased. None | | |

9.) Full name and complete address of personal physician; the date, reason last seen, and diagnosis:

Dr Manzo
Greenwich, RI > 5/03 followup after 4/03 hernia surgery
All OK.

| Question Number | Details |
|---|---|
| 4C | Speeding |
| | |
| | |
| | |

CFL000457

Compl 9/4/03

U-416-595

REDACTED

MEDICAL DEPARTMENT

Please print names and addresses.

Supplement to Application to: CATHOLIC FAMILY LIFE INSURANCE

MEDICAL EXAMINATION REPORT - Part 1
P.O. Box 11563, Milwaukee, Wis., 53211

PROPOSED INSURED: (Print Full Name) MICHAEL LITTLEFIELD

DATE OF BIRTH: Month REDACTED Day ______ Year ______

1a. Name and address of your personal physician (IF NONE, SO STATE): DR Pierre Manzo So. County TR E. Greenwich RI 02818

b. Date and reason last consulted: Pain Related To hernia Surgery 5-03 - Had Surgery 4-20-03

c. Treatment given or medication prescribed: —

| 2. Have you ever been treated for, or had any indication of: | Yes | No |
|---|---|---|
| a. Disorder of eyes, ears, nose or throat? | ☐ | ☒ |
| b. Dizziness, fainting, convulsions, headache; speech defect, paralysis or stroke; mental or nervous disorder? | ☐ | ☒ |
| c. Shortness of breath; persistent hoarseness or cough, blood spitting; bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? | ☐ | ☒ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? | ☐ | ☒ |
| e. Jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, or other disorder of the stomach, intestines, liver or gallbladder? | ☒ | ☐ |
| f. Sugar, albumin, blood or pus in urine; venereal disease; stone or other disease of kidney, bladder, prostate or reproductive organs? | ☐ | ☒ |
| g. Diabetes; thyroid or other endocrine disorders? | ☐ | ☒ |
| h. Neuritis, sciatica, rheumatism, arthritis, gout or disorder of the muscles or bones, including the spine, back or joints? | ☐ | ☒ |
| i. Disorder of skin, lymph glands, cyst, tumor or cancer? | ☐ | ☒ |
| j. Allergies; anemia or other disorder of the blood? | ☐ | ☒ |
| k. Deformity, lameness, or amputation? | ☐ | ☒ |
| 3. Have you ever been treated for the use of alcohol or any habit-forming drugs? If so give complete details. | ☐ | ☒ |
| 4. Have you smoked cigarettes in the past year or used any other nicotine products? If so, which? | ☐ | ☒ |
| 5. To the best of your knowledge are you now pregnant? If "Yes" give date of expected delivery. | N/A | ☐ |
| 6. Has a member of the medical profession ever diagnosed you as having, or treated you for AIDS (Acquired Immune Deficiency Syndrome), ARC (AIDS Related Complex), or any other immunological disorder? | ☐ | ☒ |
| 7. Are you now under observation, treatment, or taking medication? | ☐ | ☒ |
| 8. During the past seven years, have you: | | |
| a. Been examined or been treated by a physician, chiropractor or psychologist? | ☒ | ☐ |
| b. Had an x-ray or electrocardiogram? | ☒ | ☐ |
| c. Had observation or treatment at a clinic or hospital? | ☐ | ☒ |
| d. Had a surgical operation scheduled or completed? | ☒ | ☐ |
| e. Made claim for or received payment for sickness or injury? | ☐ | ☒ |
| 9. Have you ever had military service deferment, rejection or discharge because of a physical or mental condition? | ☐ | ☒ |
| 10. Were you ever postponed, declined, rated, or offered a modified plan for Life, Accident, or Health Insurance? | ☐ | ☒ |

DETAILS of "Yes" answers (IDENTIFY QUESTION NUMBER; CIRCLE APPLICABLE ITEMS; Include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities.

2E. Had Hernia Surgery 4-20-03 DR Abadier 300 Tollgate Rd Warwick RI 02886. Kent County Hosp Warwick RI. out patient

8A - DR Karen Blackmere So. County TR. East Greenwich RI Last seen 4 YRS ago physical. No problems

8B - Had X-ray For Sinus infection 2 YRS ago. E.R. Kent County Hosp.

8D - See # 2E

CFL000459

11. Family Record: (Indicate family history of tuberculosis, diabetes, cancer, high blood pressure, heart or kidney disease, mental illness or suicide.)

| | If Living State of Health (If poor, give reason) | Deceased Age at Death | Cause of Death |
|---|---|---|---|
| Father | | 68 | |
| Mother | | 59 | |
| Brothers/ Sisters | B - | 39 | |

I hereby agree that all statements and answers in this application are full, complete, and true to the best of my knowledge and belief, and shall become part of any policy or contract issued on the basis of this application. I further agree that the Society may rely upon any statements or answers made relating to my health or illness in determining whether to accept this application for insurance.

Dated at: No. Kingstown RI (City, State) this 28th day of August 2003 (Date)

Examiner's Signature Donna Carroll Proposed Insured's Signature X [signature]

U-16-1168 (Rev 699)

DEFENDANT'S EXHIBIT 12

# Kent General & Vascular Surgeons, Inc

Doctor: ABADIER Insurance: NEIGHBOR HOOD HEALTH

# General History

Name: MICHAEL LITTLEFIELD DOB: REDACTED Age: 34

Address: REDACTED Phone: Date: 04/07/03

Referring Physician: DR. BANSAL ALLERGIC TO:

Diagnosis: HERNIA

MEDICATIONS:

History:

04/07/03 Patient was seen today, a patient of Dr. ~~Manzo~~ Bansal sent to us for right inguinal hernia. He has bilateral inguinal hernias. I am going to do the right side first. If I can do the left side at the same time, I will. If I can't, then we will do it at a different time.

4/24/03 – Bil. ing. hernia Rep.

05/01/03 Patient was seen today, a gentleman status post laparoscopic right inguinal hernia who is doing well. We took out his stitches today. The wound is healing fine. I will see him again in 3 weeks.

05/15/03 Patient was seen today, he is doing all right, status post right inguinal hernia. I checked his left side, it is small. He still is getting some shooting pains. I reassured him and I will see him again as is needed.

06/02/03 Patient was seen today, a gentleman I did a right inguinal hernia on. He did some floor waxing for 3 hours and developed pain in the right groin. I examined him, he doesn't have a recurrent hernia, but he is tender there. I am going to put him on Advil around-the-clock for 10 days and an anti-inflammatory. Also, I have given him another script for Vicodin and told him to rest. I will see him again in 10 days.

06/12/03 Patient was seen today, he is feeling better. The pain is now just a dull ache in one area. He was reassured and he will be seen again as is needed.

08/25/03 Patient was seen today, he is doing better. He gets the pain occasionally when he does a lot of work; otherwise he doesn't. We will just see him again if he has any problems. We will get a repeat CT of the abdomen and pelvis area.

KENT COUNTY MEMORIAL HOSPITAL
455 TOLL GATE ROAD
WARWICK, R.I. 02886
DEPARTMENT OF RADIOLOGY

PATIENT NAME: LITTLEFIELD, MICHAEL BILLING#: REDACTED

ADDRESS:

REDACTED

EXAM DATE: 06/20/2003 X-RAY NO: 231973
REQUESTED BY: JOHN W ABADIER
BIRTH DATE: REDACTED AGE: 34 SEX: M PHONE: REDACTED
MED REC #: 0567563 ROOM NO: POP
SHIELD:
TEST TYPE: BE PREGNANT:
INSURANCE #1: 103691200- NEIGHBORHOOD HEALTH
INSURANCE #2: -
RADIOLOGIST: DAVID ROGOVITZ, MD REQ #: 7821100
TECHNOLOGIST: DEB M./DEB V.
CLINICAL INFORMATION: RIGHT LOWER QUADRANT MASS/ABSCESS

BARIUM ENEMA WITH DOUBLE CONTRAST (74280)

Scout film of the abdomen reveals multiple surgical coiled sutures seen over the right inguinal region. The remainder of the abdomen is unremarkable. There is no evidence for obstruction or ileus.

There is no obstruction or delay to the retrograde flow of the barium air contrast. There is no area of persistent narrowing seen in the colon. The colonic mucosa is unremarkable.

No contrast refluxed into the terminal ileum or the appendix. No persistent polyp or defects are demonstrated throughout the colon.

IMPRESSION:

1. No intrinsic mass or mucosal abnormality is demonstrated in the colon.
2. No evidence for reflux into the appendix or terminal ileum. Mass extrinsic to the colon in this region cannot definitely be excluded and should be correlated with prior CT scan. Small bowel follow through would be helpful to exclude an inflammatory process in the region of the terminal ileum or a possible mass density in this region.

DAVID ROGOVITZ, MD

dc
D: 06/20/2003 13:22
T: 06/20/2003 16:49

Name [redacted]

Exam# 231973

Rm#

Date 6/20/03

☐ Stat

**EXAM(S)**

LITTLEFIELD, MICHAEL XRAY
059242974 M XX 6/20/03
**REDACTED** MR000567563
RI 02852
ABADIER, JOHN
1400 103691200
Y

XR - BE

No intrinsic colonic mass
No reflux into terminal ileum or appendix
SB follow thru may be helpful to R/o inflammatory changes in T.I or F/u CT scan.
DR

Call Report
Dr. Abadier 738-6611 or X 1174

FAX # 738-0013

**INTERPRETATION**

- ☐ DR. ARMADA
- ☐ DR. BINEK
- ☐ DR. BRUZZESE
- ☐ DR. DOI
- ☐ DR. GABRIELLE
- ☐ DR. PAOLELLA
- ☐ DR. SHANNON
- ☐ TELERAD
- ☐ OTHER: ______ (Initials)

☐ CALLED DATE: ____________

☐ FAXED DATE: ____________

DISCUSSED W/DR. ____________

FOLLOW-UP ____________

**E.R. Physician Remarks:**

E.R. Physician Signature: ____________

K00003

**KENT HOSPITAL**
E.R. DIAGNOSIS FORM

DISTRIBUTION: WHITE - RADIOLOGY, CANARY - E.R., PINK - Patient

KENT COUNTY MEMORIAL HOSPITAL
455 TOLL GATE ROAD
WARWICK, R.I. 02886
DEPARTMENT OF RADIOLOGY

**PATIENT NAME:** LITTLEFIELD, MICHAEL **BILLING#:** 59232975

**ADDRESS:**

**REDACTED**

2

| | | | |
|---|---|---|---|
| **EXAM DATE:** | 06/18/2003 | **X-RAY NO:** | 231973 |
| **REQUESTED BY:** | JOHN W ABADIER | | |
| **BIRTH DATE:** | AGE: 34 SEX: M | **PHONE:** | **REDACTED** |
| **MED REC #:** | 0567563 | **ROOM NO:** | POP |
| | | **SHIELD:** | |
| **TEST TYPE:** | CT | **PREGNANT:** | |
| **INSURANCE #1:** | 103691200- NEIGHBORHOOD HEALTH | | |
| **INSURANCE #2:** | - | | |
| **RADIOLOGIST:** | CLAIRE A. BEETLESTONE, M.D. | **REQ #:** | 7820495 |
| **TECHNOLOGIST:** | L. VANASSE | | |

**CLINICAL INFORMATION:** S/P LAP INGUINAL HERNIA RT SIDE – RLQ PAIN

ABDOMINAL AND PELVIC CT SCAN: (74160/72193)

This is a computed tomogram of the abdomen and pelvis performed from the level of the lower lung fields to the ischial tuberosities. Oral contrast material was administered during this procedure.

The liver and spleen are normal. The gallbladder is shown to be unremarkable as is the pancreas. The retroperitoneal vasculature is unremarkable.

The right and left adrenal glands are not enlarged. The kidneys are normal.

There is a focus of inflammation demonstrated extending from the plane just above the umbilicus to the plane of the pelvis anteriorly to the right. This area of fluid density and surrounding inflammation associated with a colonic loop measures approximately 11 cm. x 5 cm. in two horizontal dimensions. The findings are consistent with an inflammatory focus intimately associated with a bowel loop. There is variegated attenuation within the pathological area suggesting the presence of some fluid and some solid component.

There is some reactive adenopathy but no other abnormalities are demonstrated.

IMPRESSION:

Inflammatory mass in which there are fluid and solid components in the right lower zone extending from above the plane of the umbilicus down into the pelvis. The findings are consistent with inflammation and some abscess formation.

CLAIRE A. BEETLESTONE, M.D.

sc
D: 06/18/2003 17:28
T: 06/19/2003 07:13

K00004

Electronically signed on 06/21/2003 3:38 PM by CLAIRE A BEETLESTONE 

**PATIENT NAME:** LITTLEFIELD, MICHAEL **BILLING #:** 059242974

**ADDRESS:** **REDACTED**

**EXAM DATE:** 06/20/2003 **X-RAY NO:** 231973
**REQUESTED BY:** JOHN W ABADIER
**BIRTH DATE:** **AGE:** 34 **SEX:** M **PHONE:** **REDACTED**
**MED REC #:** 0567563 **ROOM NO:** POP
**SHIELD:**
**TEST TYPE:** BE **PREGNANT:**
**INSURANCE #1:** 103691200- NEIGHBORHOOD HEALTH
**INSURANCE #2:** -
**RADIOLOGIST:** DAVID ROGOVITZ, MD **REQ #:** 7821100
**TECHNOLOGIST:** DEB M./DEB V.
**CLINICAL INFORMATION:** RIGHT LOWER QUADRANT MASS/ABSCESS

BARIUM ENEMA WITH DOUBLE CONTRAST (74280)

Scout film of the abdomen reveals multiple surgical coiled sutures seen over the right inguinal region. The remainder of the abdomen is unremarkable. There is no evidence for obstruction or ileus.

There is no obstruction or delay to the retrograde flow of the barium air contrast. There is no area of persistent narrowing seen in the colon. The colonic mucosa is unremarkable.

No contrast refluxed into the terminal ileum or the appendix. No persistent polyp or defects are demonstrated throughout the colon.

IMPRESSION:
1. No intrinsic mass or mucosal abnormality is demonstrated in the colon.
2. No evidence for reflux into the appendix or terminal ileum. Mass extrinsic to the colon in this region cannot definitely be excluded and should be correlated with prior CT scan. Small bowel follow through would be helpful to exclude an inflammatory process in the region of the terminal ileum or a possible mass density in this region.

DAVID ROGOVITZ, MD

dc
D: 06/20/2003 13:22
T: 06/20/2003 16:49

PRELIMINARY

K00005

Patient Name: LITTLEFIELD, MICHAEL
Medical Record: 0567563
Room Number: N/A ER
Doctor Name: KARL F MACHATA
Admit Date: 09/28/2003
Discharge Date: 9/28/03

**KENT COUNTY MEMORIAL HOSPITAL**
455 Toll Gate Road • Warwick, RI • 02886

# REPORT OF OPERATION

**DATE:** 09/28/2003

**PREOPERATIVE DIAGNOSIS:** "Bilateral inguinal herniae"

**OPERATION:** LAPAROSCOPIC REPAIR OF RIGHT INGUINAL HERNIA

**POSTOPERATIVE DIAGNOSIS:**

**SURGEON:** JOHN W ABADIER, MD
**ASSISTANT:**

PROCEDURE: Under satisfactory general anesthesia, patient was prepped and draped in the supine position. Following which a 1 cm incision was made just below the umbilicus. Through that, we were able to dissect the posterior sheath on the right side and the balloon introducer was introduced down through that space and down to the pubis. This was removed and a 10 mm trocar was introduced through that space and inflated. On entering, it looked like the wound had broken the posterior peritoneum in places and we were in the abdomen. In some places we were able to dissect the indirect sac which was quite large, on the right side, off the cord. This was done with two more 5 mm ports placed into that space. After that was taken off the cord, that was refracted back up into the abdomen and a piece of mesh was then fashioned with a cut in it to fit around the cord. That was stapled to Cooper's ligament, ileopubic tracked laterally and the rectus superior. Following which, the space was desufflated from CO2. The 10 mm trocar site was closed with 3-0 Vicryl suture and clips were used for the skin. Dry, sterile dressing applied. Patient was taken to the recovery room in satisfactory condition.

Signature: ____________________
JOHN W ABADIER, MD

0747 / kmb
D: 10/09/2003 08:20
T: 10/21/2003 07:17

K00006

Patient Name: LITTLEFIELD, MICHAEL
Medical Record: 0567563
Room Number: ASU
Doctor Name: JOHN W ABADIER, MD
Admit Date: 04/24/2003
Discharge Date:

**KENT COUNTY MEMORIAL HOSPITAL**
455 Toll Gate Road • Warwick, RI • 02886

MEDICAL CHART HISTORY

## MEDICAL CHART HISTORY

DIAGNOSIS: Bilateral inguinal hernia.

HISTORY OF PRESENT ILLNESS: This is a 34-year-old gentleman, a patient of Dr. Bansal, who was seen for a **bilateral inguinal hernias. We are going to plan to do the right side first and do the left if it is feasible.** The patient is otherwise healthy.

MEDICATIONS: He is on no medications.

**ALLERGIES: NO KNOWN ALLERGIES.**

## PHYSICAL EXAMINATION

HEENT: Normocephalic/atraumatic. Pupils equal, round reactive to light and accommodation.

LUNGS: Lungs were clear.

HEART: Heart was regular.

ABDOMEN: Examination of the abdomen was benign. There was bilateral inguinal hernia, the right much bigger than the left.

RECTAL: Unremarkable.

NEUROLOGIC: Grossly intact.

IMPRESSION:
Bilateral inguinal hernias.

Signature: ______________________
JOHN W ABADIER, MD

9579 / dar
D: 04/23/2003 19:07
T: 04/24/2003 01:05

K00007

| | | | |
|---|---|---|---|
| PATIENT NAME: | LITTLEFIELD, MICHAEL | ACCOUNT #: | 058791062 |
| MEDREC: | 567563 | DOB/AGE: | REDACTED 034 Y |
| DOCTOR: | ABADIER, JOHN W | DATE/TIME COLL: | 14-APR-2003 09:23 AM |
| D/A DATE: | A 14-APR-2003 | DATE RECEIVED: | 14-APR-2003 |
| LOC: LABT | SEX: M | DATE/TIME REP: | 15-APR-2003 05:30 AM |
| SPECIMEN ID: | 13706 | | |

| TEST NAME | RESULT | ABNORMAL | REFERENCE RANGE |
|---|---|---|---|
| COLLECTION DATE | 04/14/2003 | | |
| COLLECTION TIME | 0923 | | |
| TYPE | ROU | | |

## HEMATOLOGY

| TEST NAME | RESULT | ABNORMAL | REFERENCE RANGE |
|---|---|---|---|
| WBC | 11.1 | | 4.5-12.5 K/CMM |
| RBC | 4.96 | | 4.30-5.90 M/CUMM |
| HGB | 14.7 | | 13.9-16.3 GM/DL |
| HCT | 43.6 | | 39.0-55.0 % |
| MCV | 87.8 | | 80.0-100.0 U3 |
| MCH | 29.5 | | 25.4-34.6 UUG |
| MCHC | 33.6 | | 32.0-36.4 % |

## PLATELET SUFFICIENCY

Interpretation:
Peripheral Blood Smear Platelet Estimates:
HI-greater than 440,000.
NORM - 140,000 to 440,000.
LO - less than 140,000.

---

| TEST NAME | RESULT | ABNORMAL | REFERENCE RANGE |
|---|---|---|---|
| PLT CT | 288 | | 140-440 K/CUMM |

JOHN ABADIER MD
300 TOLLGATE ROAD
WARWICK RI 02886

*** LITTLEFIELD, MICHAEL,15-APR-2003 AT 05:30 *** FINAL REPORT

K00008

| | | | |
|---|---|---|---|
| NAME: | LITTLEFIELD, MICHAEL | ACCOUNT #: | 058791062 |
| : | 567563 | DOB/AGE: | REDACTED 034 Y |
| DOCTOR: | ABADIER, JOHN W | DATE/TIME COLL: | 14-APR-2003 09:23 AM |
| A/A DATE: | A 14-APR-2003 | DATE RECEIVED: | 14-APR-2003 |
| LOC: LABT | SEX: M | DATE/TIME REP: | 15-APR-2003 05:30 AM |
| SPECIMEN ID: | 13706 | | |

| TEST NAME | RESULT | ABNORMAL | REFERENCE RANGE |
|---|---|---|---|

## COAGULATION STUDIES

Interpretation:
Oral Anti-Coagulant Therapy:
INR STANDARDS DOSE: 2.0-3.0 HIGH DOSE: 2.5-3.5

Heparin Therapy:
APTT THERAPEUTIC RANGE: 41.3-68.8 SECONDS

---

| TEST NAME | RESULT | ABNORMAL | REFERENCE RANGE |
|---|---|---|---|
| PT THR/17.7-29.5 | 11.2 | | 10.7-12.8 SEC |
| INR | 0.9 | | |
| APTT | 33.2 | | 20.4-34.6 SEC |

## URINALYSIS-MACROSCOPIC

| TEST NAME | RESULT | ABNORMAL | REFERENCE RANGE |
|---|---|---|---|
| COLOR | YELLOW | | |
| APP | CLEAR | | |
| SP.GR | 1.005 | | 1.005-1.030 NONE |
| LEUK | NEG | | NEG |
| PH | 7.0 | | 5.0-8.0 NONE |
| NITRATE | NEG | | |
| PROT | NEG | | 0-10 mg/dl |
| GLU-URINE | NEG | | 0-0 GM/DL |
| KETO | NEG | | NEG |
| UROB | NEG | | 0.1-1.0 NONE |
| BILI | NEG | | NEG |
| BLD | NEG | | NEG |
| MACRO COMMENT | MICROSCOPIC EXAM NOT INDICATED BY DIPSTICK RESULTS | | |

---

JOHN ABADIER MD
300 TOLLGATE ROAD
WARWICK RI 02886

*** LITTLEFIELD, MICHAEL,15-APR-2003 AT 05:30 *** FINAL REPORT

K00009

Pts wife 4/9/03

KENT HOSPITAL
455 Toll Gate Rd.
Warwick, RI 02886
736-1988

# TESTING & ADMITTING CENTER PRE-ADMISSION ORDERS

FAXED 4/8/03

***Please Bring*** this form and your health insurance cards with you on the day of your tests *(Tests cannot be done without them).*

Name: Michael Littlefield Phone #'s REDACTED Date of Birth: REDACTED

Date of Surgery: 4/21/03 Arrival Time: 6:15 am. Anesthesia Type: Gen Surgeon: Abadie

☐ Special Proc. ☐ Case Room ☐ Endoscopy ☐ 23 Hour Observation
☒ Outpatient Surgery ☐ Minor Surgery ☐ Other: ☐ Same Day Admission

Pre-op Diagnosis: Bilateral inguinal hernia

Procedure 1: Laparoscopic bilateral inguinal hernia Repair

Procedure 2:

Comments: ☐ Nursing Home Patient

## PHYSICIAN ORDERS

**LAB** **WAIVED** ☐

☒ 1. CBC
☐ 2. CBC with Diff.
☐ 3. Platelets
☒ 4. PTA
☒ 5. APTT
☐ 6. Clot Retraction & Lysis
☒ 7. Urinalysis
☐ 8. Pregnancy Urine
☐ 9. Urine for C & S
☐ 10. Blood Sugar
☐ 11. BUN
☐ 12. Creatinine
☐ 13. Electrolytes
☐ 14. Hepatic Profile
☐ 15. Type & Screen
☐ 16. Type & Cross ______ Units
☐ 17. Autologous
☐ 18. Prad

☐ Other Lab:

## INSURANCE COVERAGE

Name: Neighborhood Health
Number: 1036912-00
Name:
Number:
Insurance Authorization #. None

☐ Medical Clearance Needed

Dr.

Please send additional copies of results to:

**Anticoagulants: Patient should stop ______ (Number of days before surgery).**

☐ 20. **EKG** If done in past three months, date and location:
(female - over 50 / males - over 45)

☐ 21. Crutch Training Teaching Needs:

☐ 22. Breast Teaching Program ☐ Yes ☐ No Breast Teaching: ☐ Jackson Pratt ☐ Hemovac

**DIAGNOSTIC IMAGING SERVICES (DIS):**

☐ 23. Chest X-Ray Reason: ______ If done in past year, date and location:

☐ Other DIS:

**SKIN PREPARATION:** ☐ Phisohex ☐ Betadine Scrub ☐ Hibiclens ☐ Dial Soap ☐ No Skin Preparation

K00010

4/8/03
Date

W. J. [signature]
Physician Signature

KENT GENERAL & VASCULAR SURGEONS, INC.

Patient's Name: Michael Little Field

DOB: REDACTED Age: 34 Male ✓ Female

Address: REDACTED St. City: Zip REDACTED

Home Phone: Work Phone: Same SS#:

Employer: Diversified Services Address: same

**REASON FOR VISIT:** Abdominal Pain

Referring physician Kent ER Primary Care Physician Dr. Manzo

Is this a work-related injury? no Date of injury: Feb 03

*If so, how did injury happen:*

*Work Comp. Ins. info:*

*PAST SURGERIES:* n/a

**ALLERGIES TO MEDICATIONS:**

Do you now or have you had: (check if yes)

| | | | |
|---|---|---|---|
| ___ Cancer | ___ Heart problems | ___ Bleeding disorders | ___ Diabetes |
| ___ Stomach ulcers | ___ Liver disease | ___ Blood clots | ___ Stroke |
| ___ Colitis | ___ High blood pressure | ___ Vascular disease | ___ Anemia |

Other significant illness: none

**PRESENT MEDICATIONS** none

| | |
|---|---|
| 1. | 5. |
| 2. | 6. |
| 3. | 7. |
| 4. | 8. |

**AUTHORIZATION OF INSURANCE BENEFITS**

I hereby authorize direct payment of surgical/medical benefits to KGVS, Inc. for services rendered by them. I understand that I am financially responsible for any balance not covered by my insurance. I certify that the information given by me in applying for payment is correct. I acknowledge that it is my obligation to make KGVS, Inc. aware of any changes to my insurance coverage. Should I fail to provide the information necessary to have my claim properly adjudicated within the filing limits of my insurance carrier, I agree to assume financial responsibility for services rendered by my physician. If I am in a managed care insurance program, I will take responsibility to obtain pre-authorization. If I do not obtain pre-authorization, I understand that I may be liable to pay the entire cost.

K00011

**AUTHORIZATION TO RELEASE INFORMATION**

I authorize KGVS, Inc. to release any medical or incidental information that may be necessary for either medical care or in processing applications for payment of services rendered.

Michael Littlefield (signature) Date 4-7-03

 Received 1/12/07

**Karen Davidson**
Attorney At Law

COPY

January 10, 2007

Patricia Sullivan, Esquire
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, Rhode Island 02903

Re: <u>Littlefield v. Catholic Family Life Insurance Company</u>

Dear Pat:

Enclosed please find my request for production for expert information.

Also, you had requested at Colleen's deposition that she review the April 14, 2005 transcript of her husband. She has done so with the following comments:

Page 8, line 20 – is September 2003.

Page 9, line 6 through 24 – should read September 2003.

Also, he stopped working at Colfax in the 90's not in 2003.

Re: line 9, should read and after "I had hernia surgery I had the opportunity..."

Line 20-22, he worked for both companies for 18 months.

Page 18 – line 5 thru 12 is confused. He took time off and then resumed his business.

Page 23, line 4 - the word tumor was never used until July 2005. The doctor used abscessed or massed.

Page 28, lines 4 thru 7 – he postponed work and rescheduled customers.

Page 30, line 21 thru page 31, line 3 – The doctor used the word mass or abscesses, not tumor until after July 2004.

Page 55, line 2 – stopped should be rescheduled.

One Ship Street, Providence, RI 02903
401-453-6200; Fax 401-331-6110
kldavidsonjd@yahoo.com

Page 59 – the entire page is very confused Basically Dr. Abadier said it was swollen from Michael continuing to work and if he stopped working and slowed down the mass would go down.

Page 61, line 8 – I think he said it was a pocket of blood not a mass.

Page 65, line 2 thru 8 – is confused, I think he said pocket of blood or mass and did not use the word tumor until July 2004. No one knew it was a tumor until July 2004.

Page 67, line 7, 8, 9, 10 – He did not stop doing business until August 2004

These are the changes or corrections that Mrs. Littlefield is aware of.

Kindly advise if you feel the need to continue her deposition and I will get you available dates.

Very truly yours,

Karen Davidson

KD/sdr