# F

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

---

COLLEEN LITTLEFIELD,

Plaintiff, C.A. NO. 06-157

-vs-

VIDEOTAPE DEPOSITION OF NICOLA CHARLTON, M.D.

CATHOLIC FAMILY LIFE INSURANCE COMPANY,
Defendant.

8th of March, 2007

---

VIDEOTAPE DEPOSITION OF NICOLA CHARLTON, M.D., before COLLEEN REED, a Registered Professional and Notary Public, in and for the State of Wisconsin, under and pursuant to the Federal Rules of Civil Procedure, at the offices of Quarles & Brady LLP 411 East Wisconsin Avenue, Suite 2040, Milwaukee, Wisconsin, on the 8th day of March, 2007, commencing at 9:58 a.m. and concluding at 11:49 a. m.

A P P E A R A N C E S

KAREN DAVIDSON, ATTORNEY AT LAW
One Ship Street
Providence, Rhode Island 02903
appeared by telephone on behalf of the Plaintiff.

EDWARDS ANGELL PALMER AND DODGE LLP, by
PATRICIA A. SULLIVAN, ATTORNEY AT LAW
2800 Financial Plaza
Providence, Rhode Island 02903
appeared by telephone on behalf of the Defendant.
QUARLES & BRADY LLP, by
KELLY H. TWIGGER, ATTORNEY AT LAW
411 East Wisconsin Avenue, Suite 2040
Milwaukee, Wisconsin 53202
appeared on behalf of the Defendant.
ALSO PRESENT: Ryan Scott, Videographer

Page 2

I N D E X


| EXAMINATION BY: | PAGE |
|---|---|
| Ms. Davidson | 4, 82 |
| Ms. Sullivan | 78 |

| EXHIBITS: | MARKED |
|---|---|
| 1 - Subpoena Duces Tecum | 14 |
| 2 - Application, CFL 79 | 24 |
| 3 - CFL 71 and 72, Medical Department, Medical Examination Report | 25 |
| 4 - 8-25-05 memo by Dr. Charlton, CFL 38 | 27 |
| 5 - Tele-underwriting application supplement, CFL 461 and 457 | 32 |

MATERIAL REQUESTED: PAGE
None

QUESTIONS FOLLOWED BY INSTRUCTIONS NOT TO ANSWER:
None


(Original transcript supplied to Ms. Davidson)
(Originals of Exhibits 1-5 attached to original transcript. Copies of the exhibits attached to copies of the trasncript)

DISK ENCLOSED

Page 3

TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER: We are on the record. This is the beginning of tape No. 1 of the deposition of Dr. Nicola Charlton. This deposition is being taken at the instance of the plaintiff. This is in the matter of Colleen Littlefield versus Catholic Family Life Insurance Company. This is pending in the U.S. District Court, District of Rhode Island. Case No. 06-157. This deposition is taking place at Quarles & Brady, 411 East Wisconsin Avenue, Milwaukee, Wisconsin. Today's date is March 8th, 2007. The time is 9:58 a.m. My name is Ryan Scott with the firm of Ryker & Lyle Legal Video Service, Pewaukee, Wisconsin. The court reporter today is Colleen Reed with the firm of Colleen Reed Reporting.

First we will have counsel introduce themselves and state who they are representing, and then the court reporter will swear in the witness.

For the plaintiff?

MS. DAVIDSON: Karen Davidson on behalf of Colleen Littlefield.

MS. SULLIVAN: Patricia Sullivan

Page 4

representing defendant Catholic Family Life Insurance Company.

MS. TWIGGER: Kelly Twigger, Quarles & Brady in Milwaukee, representing Catholic Family Life Insurance Company.

NICOLA CHARLTON, M.D., having been first duly sworn, was examined and testified as follows:

E X A M I N A T I O N

BY MS. DAVIDSON:

Q. Dr. Charlton, could you kindly state your full name, please.
A. Dr. Nicola Marie Charlton.
Q. And where do you reside?
A. In REDACTED
Q. Where is that in relation to Milwaukee?
A. It's 30 minutes north along the lake.
Q. And with whom do you reside there?
A. My husband and four children.
Q. And could you give me your name -- or I'm sorry. Could you give me your age, please.
A. Forty-eight.
Q. And how old are your children?
A. Five, eleven, thirteen and sixteen.
Q. They are all home with you. Correct?
A. That's correct.

Q. Could you tell me how much you work there?
A. It varies from two to maybe eight hours a week, depending on what needs to be done.
Q. And how did it happen that you were appointed by the board at CFLI? Did you apply for that?
A. I applied for the position.
Q. So you don't have a contract with them. It's simply an appointment?
A. That's correct.
Q. And has it been two to eight hours per week from 1998 through the present?
A. That's correct.
Q. How are you paid?
A. Monthly.
Q. Is it a set salary?
A. Yes.
Q. What is it?
A. In 19 -- in 2005 it was approximately $1,200 a month.
Q. And now what it is?
A. $1300 a month.
Q. Is that the rate that you get, no matter how many hours a week you work?
A. That's true.
Q. And what does your work as medical director at



CFLI consist of?
A. It involves reviewing applications, the underwriters would have asked me. Reviewing contracts with their lab companies. Reviewing claims. Answering questions. Whatever they need me to do.
Q. How do you get your work?
A. What do you mean by that question?
Q. Well, when you go to their offices, how do they give you work? What is the mechanism?
A. They usually put the cases that they have questions on on my desk with the questions.
Q. Just with handwritten notes?
A. Yes.
Q. And then what do you do after you get these cases that are left on your desk?
A. I review them and write my recommendations on the form that's provided and sign and date it.
Q. So do you have interaction with the para-underwriters or the underwriters? I'm sorry. Do you have interaction with the tele-underwriters or the underwriters?
A. I have interaction with the underwriters.
Q. And was this the same now as it was in 2005?
A. Yes.



Q. And how do you interact with the underwriters?
A. We usually meet together and talk about the cases.
Q. Is that every week?
A. Yes.
MS. SULLIVAN: I think you interrupted the witness.
Dr. Charlton, did you complete your answer?
THE WITNESS: Yes.
MS. SULLIVAN: Okay.
MS. TWIGGER: I don't know if you heard the complete answer, but she completed her answer. Do you want to have it read back?
MS. SULLIVAN: No. That's fine.
Q. I understood you meet together during the week; is that correct?
A. That's correct. If they have questions.
Q. Are there times when you don't even speak with them, you simply answer the form that is left for you or the question that is left for you and leave the file somewhere?
A. Yes.
Q. And where do you leave the files when you answered whatever the questions are?



A. On their desk.
Q. And you said that there's some sort of a form that they ask you to make out?
A. Yes.
Q. Is it the same with all of the cases?
A. Yes.
Q. And what does that form consist of?
A. Just has blank lines where they write their question and an area for me to sign and date with my recommendations.
Q. That's all the information that's required?
A. What do you mean by that?
Q. Is that all that you are required to complete? You sign, you date and you answer the question. Is that it?
MS. SULLIVAN: Objection. You mean from this form?
Q. Yeah. From the form.
A. Yes.
Q. Do you type your answers or handwrite your answers?
A. I handwrite my answers.
Q. Do you keep any records outside of those records that are kept in the office?
A. No.

CFLI's production, which includes all of the documents that are responsive to the various requests that have been propounded.
Q. My question is specific as to No. 9, which is the records that you relied on or related or are related to your August 25, 2005 decision. Do you understand the question?
A. I understand it to mean that the medical records that Catholic Family Life had that I looked at were the ones that I used for my decisions. I had no other records.
Q. And what records --
A. Nor do I keep any other records.
Q. What records were those?
A. Those were the hospital records and the doctors' records.
Q. Okay. What hospital records?
A. Kent Hospital. Rhode Island Hospital. His primary care physician. And ER notes.
Q. Okay. The primary care physician being Dr. Manzo?
A. That's correct.
Q. And the ER notes from what?
A. I believe it was --
MS. SULLIVAN: Let me just suggest the



witness can refresh her recollection by reviewing the produced documents.
MS. DAVIDSON: Absolutely.
MS. TWIGGER: Do you have a document you want me to show her?
MS. DAVIDSON: No. My inquiry is, what documents did she look at or rely on to make the August 25, 2005 decision.
MS. SULLIVAN: And what I would like to clarify is, this is a question probing your recollection at this point, because Ms. Davidson has not suggested any documents to review. So just based on your recollection, Dr. Charlton, what do you recall being the documents that you relied upon?
A. Well, the ones I mentioned were the ones I recall.
Q. Okay. And was your recollection refreshed yesterday when you reviewed the documents that CFLI has provided?
A. Yes. As far as I recall, those were the documents I reviewed.
Q. Did you make any notes as a result of that review?
A. No.



Q. So what you're telling me is the documents you recall reviewing are the Kent County Hospital documents, the Rhode Island Hospital documents; is that right?
A. That's correct.
Q. Dr. Manzo's documents and some ER notes from Kent?
A. Yes. And some radiographic studies that I think were done at Kent.
Q. And those are all the documents that you feel are responsive to that request No. 9.
MS. SULLIVAN: Objection.
THE WITNESS: Should I answer the question?
MS. TWIGGER: You can answer.
A. Yes.
Q. Have you ever been deposed before?
A. No.
Q. If you don't understand a question I ask you, just tell me right away, because otherwise I'm going to assume you understand.
A. Okay.
Q. And please answer as fully and completely as you can. All right?
When do you first recall having contact with Michael Littlefield's file?



MS. SULLIVAN: Objection. Asked and answered.
A. I remember them giving me a file to review for a death claim.
Q. And who is them?
A. Cathy Hartwig.
Q. Did she personally give it to you?
A. I don't recall.
Q. Did you look at any documents yesterday that would refresh your recollection with regard to that?
A. No.
Q. Now, you have told me that typically you get a handwritten note with the case file that you are required to look at by the underwriters; is that right?
A. That's correct.
Q. I don't have in the documents that were produced to me any such handwritten note.
A. They may not have been. It's typical, but not always.
Q. So what do you remember about your first dealings with the Michael Littlefield death claim file?
A. I just remember they had me review it as a routine death claim.
Q. Cathy Hartwig.

MS. TWIGGER: Do you want me to show the witness those Bates range documents?
MS. DAVIDSON: I do.
MS. TWIGGER: Give me the numbers again, please.
MS. SULLIVAN: 154 through 258. 291 through 411.
MS. TWIGGER: 154 through --
MS. SULLIVAN: 258. 291 --
MS. TWIGGER: Just a minute, please. Do you want this whole pack marked as one exhibit?
MS. DAVIDSON: No. I want Dr. Charlton to tell me what medical records she looked at when she made her memo of August 25, '05. I don't care what records have been produced since. I don't care what Attorney Sullivan or you gave her subsequent to this August 25, '05 memo. All I want to know is what she looked at. And there is nothing that I have seen that shows me what she looked at, which is why I'm trying to find out.
Q. Do you understand what I'm looking for, Dr. Charlton?
MS. TWIGGER: I need to understand the rest of the Bates range of documents that you



would like her to look at.
MS. DAVIDSON: Yeah. And I don't want her to look at anything at this point. I want to know what she looked at and how I can tell what she looked at as of August 25, '05.
MS. SULLIVAN: Let me --
MS. DAVIDSON: There is no memo in the file that I can see or that was created identifying what she looked at.
MS. TWIGGER: That's a simple question. Are you asking her whether one exists?
A. No.
MS. DAVIDSON: Does it exist? She told me it doesn't.
MR. TWIGGER: Well, then there is your answer. What do you want, Karen? I mean you can't just expect the witness to answer your questions without showing her documents.
MS. SULLIVAN: She testified generally what her recollection of what she reviewed. She has available in the room and it's available in this room, the produced documents, which are responsive to your request. And she can go through them and tell you which ones she looked at, if that's what you want to do. If you want to



rely on her recollection, you've already asked her that.
Q. Dr. Charlton, what I want to know, is there any document that shows me as of August 25, '05 what you looked at when you wrote that memo?
A. Let me understand. You want to know if there is a document recording what records I looked at at the time?
Q. Yes.
A. No.
MS. SULLIVAN: You mean separate from the records themselves.
A. No. Other than my recollection of what I looked at.
Q. So you don't have any kind of a summary or an itemization or a compilation of what documents you looked at in making your August 25, '05 decision; is that correct?
A. That's correct.
Q. All you have is your memory. Is that correct?
A. That's correct.
Q. And your memory is, has just been supplemented to include Dr. Abadier and include Kent County Hospital, Rhode Island Hospital, Dr. Manzo, ER notes and radiographic studies. Is there anything



else you can recall?
A. There are none more that I recall.
Q. Looking at 15 -- Bates Nos. 154 to 258, and 291 to 411, can you tell me what documents you looked at in making your decision, if any of those?
MS. TWIGGER: 291 to 411.
MS. DAVIDSON: Please.
MS. SULLIVAN: I think the beginning, Kelly, was 154 through 258. That block first.
MS. TWIGGER: Yeah. I have that block already.
MS. SULLIVAN: Okay.
MS. TWIGGER: Thank you. I'm handing the witness the first block of documents for her to look through.
A. Okay. You want me to pick out ones? Okay.
Q. First, let me ask you this: When is the last time you saw those documents?
A. Yesterday when I was going through what we had.
Q. And looking at those documents now, did you look at every single one of those documents when you wrote your August 25, '05 memo?
A. I looked through all the documents we had at the time very carefully.
Q. And what were those documents?

A. I'm going through them right now. You will have to wait.
MR. TWIGGER: Would you like the witness to identify them as she goes through them?
MS. DAVIDSON: Sure.
A. Okay.
Q. As you find one that you looked at in August of 2005, why don't you identify it by Bates number and title of the document. If there are multiple pages, identify all the pages.
THE WITNESS: Okay. So this number here.
MS. TWIGGER: Yes.
A. CFL 155, Rhode Island Hospital discharge summary.
MS. TWIGGER: And that's a two-page document.
A. Three-page document.
MS. TWIGGER: Three-page document.
A. CFL 158, Rhode Island Hospital. 159, 160, 161, 162, 163, 164, 165.
Q. Are those all Rhode Island Hospital documents?
A. That's correct. I am happy to go through them, but I had all these, 168, 169, 170, 171, 72, 73, 74, 75, 76, 77.
MS. TWIGGER: Can we group all the Rhode



Island Hospital documents together? Do you have some sort of grouping together here?
MS. DAVIDSON: Sure. We can do that.
A. Let me just make sure I had them all.
MS. DAVIDSON: I think the Rhode Island Hospital records --
A. We had those.
MS. DAVIDSON: -- continues through 258.
MS. TWIGGER: Through 258, so this whole packet.
MS. DAVIDSON: Yeah.
Q. So the question, Dr. Charlton, is whether that entire packet was reviewed by you prior to writing your memo.
A. Yes.
Q. And you did review that packet?
A. Yes.
Q. And you're telling me that those documents were provided to you prior to August 25, '05. Is that correct?
A. Yes.
Q. Do you know how CFLI in 2005 obtained medical records?
A. No.
Q. Do you know how one typically obtains medical



records?
A. As a patient?
Q. As anybody.
A. They usually write a request and send it to the office.
Q. Typically there is a written request; correct?
A. That's correct.
Q. Medical records are not traditionally historically produced without a written request and an authorization from the patient. Is that correct?
A. That's correct.
Q. And that's usually in writing. Correct?
A. That's correct.
Q. Do you have a copy of any of those requests for medical records?
A. No.
Q. Okay. Let's go to the next packet. Bates 291 to 411.
MS. TWIGGER: I'm handing the witness that packet. You don't want to mark the first packet at all?
MS. DAVIDSON: I don't see the necessity for marking it, do you, Pat, if we have the Bates numbers?



MS. SULLIVAN: Yes. I think it probably makes sense to rely on the Bates numbers.
MS. DAVIDSON: So, Kelly, the answer is no, we are not going to mark it because it's such a large exhibit. We are going to rely on the Bates numbers.
MS. TWIGGER: Okay. Do you want to identify for the record what is it you had out of this pack?
THE WITNESS: I had Dr. Manzo's notes.
MS. TWIGGER: Give the Bates numbers, too.
THE WITNESS: Oh. CFL 291 through CFL 316. CFL 316 through 322.
Q. And whose records are those?
A. These are Rhode Island Medical Imaging. I had CFL 328, which is Kent Hospital Emergency Services.
MS. TWIGGER: This is a big stack. Do you know how far the emergency services records go?
MS. SULLIVAN: I actually think Kent Hospital goes all the way to 411.
A. Okay. Yeah. I had these. CFL 337.
Q. Kent Hospital records from various time periods.

Page 49

A. Kent Hospital. Memorial Hospital. 340. Oh. Kent Hospital. Memorial Hospital. 340. Okay?
MS. TWIGGER: Did you have all the records in that stack?
THE WITNESS: Yeah.
MS. TWIGGER: Through 410? You have to answer out loud.
THE WITNESS: Yes. I had all the records.
MS. SULLIVAN: And they comprise Kent ER Services and what else did you say?
THE WITNESS: Kent County Memorial Hospital. The hernia repair report. Surgical report. I had all these records.
Q. Okay. Other than Kent ER and Kent Hospital, what else did you say you had?
A. What did I just say? Dr. Manzo --
Q. I'm sorry.
A. Dr. Manzo's records.
Q. Yep.
A. Rhode Island Medical Imaging.
MS. TWIGGER: We haven't gone through 377 to 411 page by page because of the representation those are all Kent Hospital records.

Page 50

Q. And it's your testimony that all of these were provided to you in advance of your writing the August 25, '05 memo. Is that what you said?
A. Yes.
Q. And you say in your memo that these records indicate a much more serious problem. What was the much more serious problem?
A. Well, at various times he, it indicated he had pain.
Q. You mean subsequent to the policy issuance?
MS. SULLIVAN: Objection.
A. From the medical records it appears that he had had pain since his hernia surgery.
Q. Which was April of '03?
A. That's correct.
Q. Through when?
A. Through July of '04.
Q. And you're telling me that this is not typical.
A. Yes.
Q. And how does that indicate a much more serious problem?
A. The medical records indicated it was a more serious problem because of the other tests ordered.
Q. And if the doctor tells the patient everything is

Page 51

fine, how does he know it's a much more serious problem?
A. I don't know.
Q. Well, you wrote -- Okay. You also noted that, the grossly abnormal barium scan. What, what was so grossly abnormal about the barium scan?
MS. SULLIVAN: In the records that you just reviewed, Dr. Charlton, I believe that CLF 338.
THE WITNESS: Yes. 338.
A. The radiologist mentions there is a mass extrinsic to the colon in this region that cannot be excluded that should be correlated with the prior CT scan. The radiologist suggested other studies at the time.
Q. It says -- And you say it showed evidence of a tumor. Where does it say there is a tumor?
A. Shows evidence on the tumor on 337. CFL CT report.
Q. Do you know if Michael Littlefield was told about this?
A. I don't know what Michael Littlefield was told.
Q. I'm looking at the Kent County Memorial Hospital CAT scan report.
MS. SULLIVAN: The 337?

Page 52

Q. Of July '03 -- I'm sorry. Of June '03, June 18th. Where does it say there's a tumor?
MS. TWIGGER: Is that document CFL 337?
MS. DAVIDSON: Yes.
A. When it mentions some solid component in the radiologist's report.
Q. Where are you reading from, please?
A. It's on the third paragraph of the upper part. Findings are consistent with an inflammatory focus intimately associated with a bowel loop. There is variegated attenuation within the pathological area suggesting the presence of some fluid or some solid component.
Q. I don't see where it says tumor.
A. Solid component assumes tumor.
Q. It says, at the bottom under impression, the findings are consistent with inflammation and some abscess formation. It says nothing about tumor.
A. To be completely thorough, you need to read the whole report.
Q. And that's what we are doing now, and I assume you read the whole report when you wrote your memo of August 25th, didn't you?
A. That's correct.
Q. Are you an expert in reading abdominal and pelvic

CAT scans?
A. No. But I do read thousands of radiology reports.
Q. And you're telling me that this physician who personally read this report should have written down that there was a tumor?
MS. SULLIVAN: Objection.
A. I'm saying that to be a thorough physician, you would read the whole report, not just the impressions.
Q. Okay. Reading the whole report, I don't see anything about a tumor.
MS. SULLIVAN: Objection. Is that a question?
A. I'm --
Q. Yeah. Where does it say tumor?
MS. SULLIVAN: Asked and answered. Go ahead, Dr. Charlton.
MS. TWIGGER: You can answer again.
MS. SULLIVAN: You can answer again.
A. It says solid component.
Q. Does that say tumor?
A. No.
Q. Solid component is not necessarily a tumor, is it?



MS. SULLIVAN: Objection.
Go ahead. You may answer.
A. That's true.
Q. You just decided it was a tumor and wrote tumor in your August 25, '05 note?
A. Well, I had the fortitude of knowing he had a tumor from looking at his later records.
Q. Well, that was over a year later, wasn't it.
A. That's correct. Those are the records I was asked to review.
Q. So you are looking at a CAT scan that was done before this policy was issued, and you're telling me because you know what happened over a year, in fact, nearly two years after the policy issued, you're inferring that there was a tumor; is that right?
A. No.
MS. SULLIVAN: Objection.
Q. Pardon?
A. No.
Q. Well, I don't understand what you're telling me. Where do you get this tumor word from?
MS. SULLIVAN: Objection.
A. He had a solid component on his CT scan.
Q. And it says --



A. Which could have been labeled tumor, depending on the discretion of the doctor, or mass.
Q. It says the findings are consistent with inflammation and some abscess formation. It doesn't say a thing about tumor.
MS. SULLIVAN: Objection.
A. You need -- I have already mentioned you need to read the whole report and not just the impression.
Q. So are you telling me a solid mass couldn't be an abscess?
A. No. A solid mass is not an abscess.
Q. Let's look at the barium enema report from Kent County Memorial Hospital, dated June 20th, 2003. Do you see that?
A. Could you give me the number, please?
Q. It's Bates CFL 338.
A. Yes.
Q. Where does it say tumor there?
MS. SULLIVAN: Objection.
A. It doesn't say tumor. It says possible mass density in this region.
Q. And it also says inflammatory process. Correct? Do you see that on the last line?
A. Yes.



Q. Doesn't say tumor anywhere on this, does it?
A. Yes. It does.
Q. Where?
A. It says, no evidence, let's read the whole sentence, no evidence of reflux into the appendix or terminal ileum. Mass extrinsic to the colon in this region cannot be definitely excluded and should be correlated with the prior CT scan. Small bowel follow through would be helpful to exclude an inflammatory process in this region of the terminal ilium or a possible mass density in this region.
Q. I don't see tumor. Do you see tumor?
A. I see mass.
Q. And you as a family practitioner have decided to equate mass with tumor?
MS. SULLIVAN: Objection.
Q. Is that correct? Is that correct?
MS. SULLIVAN: Objection.
Q. Dr. Charlton --
A. Yes.
Q. -- unless your attorney instructs you not to answer a question, if you understand it, would you please answer the question.
A. The term mass or tumor is interchangeable, and

myself as a family practitioner would say that.
Q. Let's go back to what has been marked as Exhibit 4, which is your letter or your memo, excuse me, of August 25th of '05. Do you have that in front of you?
A. Yes. I do.
Q. What further testing do you think he should have had?
A. I don't know. I'm not his physician. I'm looking at it only from an insurance viewpoint.
Q. And what's the difference between an insurance viewpoint and a physician's viewpoint?
A. I'm looking at the records I had here and not at his records as his personal physician.
Q. So you're looking at records that were a year to almost two years after he got this policy. Correct?
A. I was also looking at records around the time he got the policy and soon after.
Q. You basically had the benefit of 20-20 hindsight; isn't that right?
MS. SULLIVAN: Objection.
A. No. I had medical records at the time of his policy.
Q. And medical records that I can't even verify that



you had. Correct?
MS. SULLIVAN: Objection.
Q. Isn't that true?
A. I thought we verified the records I had included his visits to his primary care physician and ER where he visited for abdominal pain soon after his hernia surgery.
Q. And which you think is not common after hernia surgery.
A. I know it's not common after hernia surgery.
Q. You know as a family practitioner.
A. That's right. As a family practitioner.
Q. So if he had specifically listed a barium scan and an abdominal CAT scan, would that have automatically meant denial of this policy?
A. No.
MS. SULLIVAN: Objection.
Q. Do you have any evidence that Michael Littlefield had any knowledge that he had anything other than an abscess, pocket of blood or mass at the time he applied for this policy?
MS. SULLIVAN: Could I hear that one again?
MS. TWIGGER: Can you repeat the question?



Q. Let me withdraw the question.
Do you have any evidence that Michael Littlefield knew something was wrong or that he had cancer when he applied for this policy?
MS. SULLIVAN: Objection. Compound. Why don't you break that into two questions.
Q. Can you answer the question?
A. Could you repeat the question, please.
MS. DAVIDSON: Could you kindly, court reporter.
(Question read)
A. No.
Q. His doctors were telling him he was fine, weren't they?
MS. SULLIVAN: Objection.
A. I don't know what his doctor told him.
Q. Do you see any evidence in the record that his doctors were telling him that anything was wrong?
MS. SULLIVAN: Objection.
A. No.
Q. Did you also look at the death certificate when you made your memo of August 25, '05?
A. No.
Q. You never looked at the death certificate?



A. I don't recall doing that.
Q. So you don't know that the coroner listed cause of death as metastatic colon cancer?
A. I know that's what he died of.
Q. During nine months?
A. Um-hm.
Q. Isn't that significant to you?
A. No.
Q. And why not?
A. Because he had -- Whether he had a tumor or not at the time of his application, he was not healthy at the time of his application.
Q. Where does it indicate that he wasn't healthy at the time of his application?
A. He had thought he had an abscess, or could you repeat what the lawyer had said to the court reporter?
MS. TWIGGER: You want the question read back?
THE WITNESS: No. She had mentioned what he knew at the time of application.
MS. TWIGGER: You want to have part of the testimony read back?
THE WITNESS: No. The question --
A. What did you mention at the time of his

Page 61

application, that you mentioned that he knew he had an abscess? Excuse me?
Q. I'm sorry. I'm not following your confusion. My question was, where, where does it indicate to you that Michael Littlefield knew he wasn't healthy at the time of his application?
A. Mr. Littlefield had pain at the time of his application and had subsequent tests that are not normal.
Q. Where does it indicate that he was even told the results of those tests?
A. I don't know.
Q. You have the medical records. Do you see that?
A. I don't have the medical records from his surgeon.
Q. You don't have Dr. Abadier's medical records?
A. No.
Q. You testified that you had Dr. Abadier's medical records when you did your August 25, '05 memo?
MS. SULLIVAN: No. She testified that she has the Kent County Hospital records, which contain some of Dr. Abadier's notes.
Q. You told me that you had Dr. Abadier's records --
A. No.
Q. -- at the time you wrote the August 25, '05

Page 62

application or memo.
A. No. I had his operative report and his physical exam that was in the Kent County records.
Q. So you didn't have Dr. Abadier's records themselves.
A. No.
Q. Why not?
A. I didn't need them.
Q. You didn't need the surgeon's medical records when you made your determination of August 25, '05?
A. That's correct.
Q. So you don't think it's significant that Dr. Abadier's records say June 12th, '03, patient was seen today. He's feeling better. Pain is now just a dull ache in one area. He was reassured. He will be seen again as needed. You don't think that's relevant?
A. No.
MS. SULLIVAN: Objection.
Q. No? You don't think it's relevant that on August 25, '03 Dr. Abadier says he is doing better. He gets the pain occasionally when he does a lot of work. Otherwise he doesn't.
MS. SULLIVAN: I think it's only fair for counsel to finish reading the record. We will see

Page 63

him again if he has any problems. We will get a repeat CT scan of the abdomen and pelvis areas.
Q. Is that not relevant to you?
A. No.
Q. You indicate in your last sentence of your August 25, '05 memo in a subsequent hospital admission he related that these studies were done at the time and related the results showed either tumor or mass in the abdomen. That subsequent hospital admission was over one year later, isn't it?
A. That's correct.
Q. After the cancer was diagnosed. Correct?
A. No.
Q. What hospital admission are you talking about?
A. His hospital admission to Rhode Island.
Q. And when was that?
A. It was in July of '04.
Q. That was one year later, was it not? Or eleven months. Excuse me.
A. Right. That's correct.
Q. Eleven months later. That doesn't indicate that he knew anything was wrong eleven months prior, does it?
MS. SULLIVAN: Objection.

Page 64

A. He mentions at various times that he had had pain for a year and that per patient, he had a CT and BE exam that showed either a mass or a tumor.
Q. This is after he knew he had cancer. Correct?
A. No.
Q. You are talking about the July '04 hospital admission. Correct?
A. Correct.
Q. That's when they diagnosed the cancer. Correct?
A. That's correct.
Q. So he knew he had cancer. Correct?
MS. SULLIVAN: Objection. Go ahead.
A. He did at the end of that hospitalization.
Q. Okay. I'm going to take you back to an exhibit we marked earlier.
A. Okay.
Q. And that would be Exhibit No. 3. That's CFL 71 and 72. Do you have that there?
A. Yes.
Q. Now, is there anything on here that you find significant, other than what you have already told me, at the time you wrote your August 25, '05 --
A. Yes. I find it significant he remembers he had sinus x-rays two years ago in the hospital, but didn't remember he had a CAT scan and barium enema

Re: Michael Littelfield

The medical history this individual gave on his application is at odds with what has been found in his medical records during the routine review of his insurance claim. The medical records indicate a much more serious problem than just common post- operative problems from what is presented as an uneventful laparoscopic hernia repair. The grossly abnormal barium scan and abdominal l CT scan both showed evidence of a mass, tumor or or abscess that is not disclosed at the time of application. Neither this information nor the fact he even needed or had done further testing is not disclosed at the time of application. The concern is if these facts were disclosed his application would have been denied insurance or had his application postponed. The radio logic tests and barium exam finding are of such an abnormal nature it is beyond what is conceivably normal after a hernia repair. , In fact, in a subsequent hospital admission he related that these studies were done at the time and related the results showed either tumor or mass in the abdomen.

Nicola Charlton M.D.
Medical Director
08/25/05

Charlton
EXHIBIT NO. 4
3-8-07 ck
COLLEEN REED REPORTING

PATIENT NAME: LITTLEFIELD, MICHAEL BILLING#: 59232975

ADDRESS:

**REDACTED**

EXAM DATE: 06/18/2003 X-RAY NO: 231973
REQUESTED BY: JOHN W ABADIER
BIRTH DATE: AGE: 34 SEX: M PHONE: **REDACTED**
MED REC #: 0567563 ROOM NO: POP
SHIELD:
TEST TYPE: CT PREGNANT:
INSURANCE #1: 103691200- NEIGHBORHOOD HEALTH
INSURANCE #2: -
RADIOLOGIST: CLAIRE A. BEETLESTONE, M.D. REQ #: 7820495
TECHNOLOGIST: L. VANASSE
CLINICAL INFORMATION: [redacted]

ABDOMINAL AND PELVIC CT SCAN: (74160/72193)

This is a computed tomogram of the abdomen and pelvis performed from the level of the lower lung fields to the ischial tuberosities. Oral contrast material was administered during this procedure.

The liver and spleen are normal. The gallbladder is shown to be unremarkable as is the pancreas. The retroperitoneal vasculature is unremarkable.

The right and left adrenal glands are not enlarged. The kidneys are normal.

There is a focus of inflammation demonstrated extending from the plane just above the umbilicus to the plane of the pelvis anteriorly to the right. This area of fluid density and surrounding inflammation associated with a colonic loop measures approximately 11 cm. x 5 cm. in two horizontal dimensions. The findings are consistent with an inflammatory focus intimately associated with a bowel loop. There is variegated attenuation within the pathological area suggesting the presence of some fluid and some solid component.

There is some reactive adenopathy but no other abnormalities are demonstrated.

IMPRESSION:

Inflammatory mass in which there are fluid and solid components in the right lower zone extending from above the plane of the umbilicus down into the pelvis. The findings are consistent with inflammation and some abscess formation.

CLAIRE A. BEETLESTONE, M.D.

sc
[redacted]
T: 06/19/2003 07:13

**Electronically signed on 06/21/2003 3:38 PM by CLAIRE A BEETLESTONE** Page 1

| | | | |
|---|---|---|---|
| **PATIENT NAME:** | LITTLEFIELD, MICHAEL | **BILLING#:** | 59242974 |
| **ADDRESS:** | **REDACTED** | | |
| **EXAM DATE:** | 06/20/2003 | **X-RAY NO:** | 231973 |
| **REQUESTED BY:** | JOHN W ABADIER | | |
| **BIRTH DATE:** | **AGE:** 34 **SEX:** M | **PHONE:** | **REDACTED** |
| **MED REC #:** | 0567563 | **ROOM NO:** | POP |
| | | **SHIELD:** | |
| **TEST TYPE:** | BE | **PREGNANT:** | |
| **INSURANCE #1:** | 103691200- NEIGHBORHOOD HEALTH | | |
| **INSURANCE #2:** | - | | |
| **RADIOLOGIST:** | DAVID ROGOVITZ, MD | **REQ #:** | 7821100 |
| **TECHNOLOGIST:** | DEB M./DEB V. | | |
| **CLINICAL INFORMATION:** | RIGHT LOWER QUADRANT MASS/ABSCESS | | |

BARIUM ENEMA WITH DOUBLE CONTRAST (74280)

Scout film of the abdomen reveals multiple surgical coiled sutures seen over the right inguinal region. The remainder of the abdomen is unremarkable. There is no evidence for obstruction or ileus.

There is no obstruction or delay to the retrograde flow of the barium air contrast. There is no area of persistent narrowing seen in the colon. The colonic mucosa is unremarkable.

No contrast refluxed into the terminal ileum or the appendix. No persistent polyp or defects are demonstrated throughout the colon.

IMPRESSION:

1. No intrinsic mass or mucosal abnormality is demonstrated in the colon.
2. No evidence for reflux into the appendix or terminal ileum. Mass extrinsic to the colon in this region cannot definitely be excluded and should be correlated with prior CT scan. Small bowel follow through would be helpful to exclude an inflammatory process in the region of the terminal ileum or a possible mass density in this region.

DAVID ROGOVITZ, MD

dc
D: 06/20/2003 13:22
T: 06/20/2003 16:49