# H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COLLEEN LITTLEFIELD
Plaintiff
vs. C.A. No. 06-157
CATHOLIC FAMILY LIFE INSURANCE COMPANY
Defendant

DEPOSITION OF DONNA CARROLL
Thursday, December 14, 2006
9:30 a.m.
Law Office of Karen Davidson
One Ship Street
Providence, Rhode Island

---------- Ellen Zappia, RPR ----------
Capitol Court Reporting, Inc.
931 Jefferson Boulevard, Suite 2003
Warwick, Rhode Island 02886
(401) 739.3600





APPEARANCES:
LAW OFFICE OF KAREN DAVIDSON
Karen Davidson, Esq.
One Ship Street
Providence, Rhode Island 02903
for Plaintiff

EDWARDS ANGELL PALMER & DODGE LLP
Patricia A. Sullivan, Esq.
2800 Financial Plaza
Providence, Rhode Island 02903
for Defendant

ALSO PRESENT:
Colleen Littlefield





INDEX

WITNESS: DONNA CARROLL


| EXAMINATION BY: | PAGE: |
| --- | --- |
| Ms. Davidson | 4 |
| Ms. Sullivan | 69 |
| Ms. Davidson | 78 |

| EXHIBITS MARKED: | PAGE: |
| --- | --- |
| 1 Subpoena | 15 |
| 2 EMSI Work Order | 18 |
| 3 Document entitled "Medical Department" | 18 |
| 4 Document entitled "Catholic Family Life Insurance" | 18 |
| 5 Heritage Labs document | 18 |
| 6 EMSI Customer Specifications | 18 |
| 7 Application for membership and life insurance to CFLI | 62 |






(Proceedings commenced at 9:30 a.m.)
DONNA CARROLL,
after having been first duly sworn under oath, was questioned and testified as follows:
MS. DAVIDSON: This is a deposition of Donna Carroll being taken in the federal court, case of Colleen Littlefield versus Catholic Family Life Insurance Company. Present at the deposition are my client, Colleen Littlefield. I am here representing her. Attorney Patricia Sullivan is here representing Donna Carroll.
EXAMINATION BY MS. DAVIDSON:
**Q. Could I just have your full name and address, please.**
A. Donna Carroll; REDACTED
**Q. And with whom do you live at that address, if anyone?**
A. I'm living alone.
**Q. Now, I'm going to ask you a series of questions, and if you answer the questions I'm going to assume that you understand the questions I've asked. Is that all right?**
A. Okay.

**Q. Have you ever been deposed before?**
A. No.
**Q. If you don't understand anything, please tell me right away. If there's a word that you're not quite sure of the meaning, just tell me and I'll rephrase for you. Is that okay?**
A. That's fine.
**Q. And everything needs to be answered orally as opposed to by gesture --**
A. Okay.
**Q. -- such as nodding your head because the court reporter can't get everything down.**
A. Okay.
MS. SULLIVAN: And the other secret is wait until she finishes talking before you start to talk because the stenographer can't take down both of you at once.
A. Okay.
**Q. Excellent.**
**Are you taking any medications here today that would inhibit you from answering all of these questions accurately?**
A. No.
**Q. Could you tell us your educational**



**background.**
A. I had one year of college after graduating from high school and then I went to St. Joseph's Hospital school of medical technology for a year, and I became a lab technician there for 17 years. I worked in the chemistry department. And then I've been doing this job working for EMSI for approximately 15 years, I think it is.
**Q. You are what we call a steady employee?**
A. Yeah.
**Q. Are you from Rhode Island, Donna?**
A. I was born in Connecticut, but I came to Rhode Island at the age of six.
**Q. And I'm not familiar with the St. Joseph school of medical technology. Where is that located?**
A. It's located right at the hospital. They have, you know, classroom and then you have practical work in the lab. You know, they combine courses with working right in the laboratory.
**Q. And in the many years that you've been working for EMSI, have you taken any additional kind of training for the job or classes?**
A. No. You know, when I was first hired they,



you know, give you an in-house training on how to do these exams.
**Q. When you talk about "these exams", what exams are you speaking of?**
A. The insurance exams.
**Q. And is the in-house training conducted by your employer or does someone come in and actually teach you?**
A. No. By the employer.
**Q. And how long did that training take?**
A. It's been a while. I really don't remember. I mean it's --
**Q. Was it hours or days or...**
A. Just probably hours. I mean, it's just a matter of going over forms. I mean, I knew how to draw blood. I knew how to do blood pressures, you know. It's just basically how to deal with the medical form.
**Q. Are there various insurance companies for which you do these physical examinations?**
A. Oh, yes.
**Q. And are the forms for the various insurance companies different?**
A. Slightly different, but they basically all



ask the same type of questions.
**Q. And what other companies besides Catholic Family Life Insurance do you do examinations for?**
A. Oh, there are so many. New York Life, Metropolitan. Oh, boy. Let me think.
**Q. Just lots of them, is that fair to say?**
A. There's a lot of different ones.
**Q. Now, EMSI stands for what?**
A. Examination Management Services, Inc.
**Q. And is this a national company?**
A. Yes, it is.
**Q. And there's a local franchise that you work for, is that right?**
A. Correct. In Cranston.
**Q. And your supervisor is who?**
A. Jennifer Cullinan.
**Q. How do you spell her last name, please.**
A. C-U-L-L-I-N-A-N.
**Q. And how long has Ms. Cullinan been your supervisor?**
A. Probably 12 -- 12 years.
**Q. Most of the time that you've been --**
A. Yeah.
**Q. -- with the company, is that right?**

mean, that's what I was told. I don't know what else to say because I don't really deal with, you know, that part of the office part.

**Q. What is the purpose of this insurance examination, to your knowledge?**

A. To get the medical history. They run blood tests on clients and to I guess evaluate their health and qualifications for the insurance.

**Q. Does CFLI, Catholic Family Life Insurance, have a particular form that it always followed back in 2003?**

MS. SULLIVAN: Objection. Foundation. I think you should answer the question based solely on your experience.

A. Well, this is the form that I used at the time. So this was the appropriate form.

**Q. So did CFLI always provide you with the form that is marked Exhibit 3 and 4 to complete?**

A. Right. We have a file cabinet with all the different insurance forms.

**Q. And would the protocols also be in that file cabinet?**

MS. SULLIVAN: Objection. Foundation.

A. The protocols for?



**Q. For the examinations.**

MS. SULLIVAN: Objection.

A. No.

MS. SULLIVAN: Foundation.

A. No.

**Q. Where would the protocols be?**

MS. SULLIVAN: Objection. Foundation.

A. That's strictly what the office deals with. I just can't answer that. I mean, I -- this is what I get.

**Q. All right.**

A. As far as what goes on when the agents call or something is faxed over, I don't deal with that. So I really can't answer that.

**Q. So is it fair to say you never would have spoken with the agent that was handling this claim?**

A. Oh, no. I -- I -- I have no dealings with the agent. That goes through the office.

**Q. Do you know Mr. Donald Demers?**

A. No, I don't. I only know the name. I don't know him.

**Q. And I take it you deal with many agents --**

A. Right.

**Q. -- from many different companies?**



A. Different companies, right.

**Q. Okay. Now, could we go through this exhibit page by page.**

**Looking at Exhibit No. 2 first, if you would. It says at the top EMSI work order, received August 26th, 2003. Is that when you receive it?**

A. That's when it comes into the office.

**Q. And typically do you get it the same day?**

A. Usually.

**Q. And looking at this, what does this require you to do?**

A. It requires me to, you know, look at the client's name, the address. Make sure that it's in my area. That it's given to the right examiner. Then I go to the insurance company and then I would look down to where I mentioned previously where the requirements would be, and I would go to the file cabinet, get the forms that I need, get the lab kit that I need, and from there call the client and set up the appointment.

**Q. For this particular exam, what lab kit would you have needed?**

A. That was Heritage Labs.

**Q. And each lab company has its own particular**



**lab kit?**

A. Correct.

**Q. Who decides which lab company to use?**

A. The -- I believe it's the insurance company.

**Q. So --**

A. They use different labs.

**Q. Is it fair to say to your knowledge CFLI used Heritage Labs back at that time?**

MS. SULLIVAN: Objection. Foundation.

A. Only because it's here, you know. I mean, I would have followed whatever was written for me.

**Q. Looking at Exhibit 2, it has Mr. Littlefield's age listed as 37. Do you know who put that number there?**

A. When they type in the information they put the date of birth in.

**Q. And the date of birth is** REDACTED **to this, correct?**

A. Correct.

**Q. And the exam was August 26th, 2003. Correct?**

A. Uh-huh.

**Q. So he wouldn't have been 37, would he?**

A. No.

Q. But you had nothing to do with that --
A. No.
Q. -- age being put there?
And looking at the form it says amount 300,000. Do you know what that signifies?
A. The amount of the insurance applied for.
Q. Did your examination, the type of examination you did, depend upon the amount of insurance that was applied for?
A. You mean the medical requirements?
Q. Yes.
A. Yes. It pertains to that -- to the amount of the insurance, the age of the client. They have different requirements.
Q. So for someone who is, according to this, age 37 and $300,000, what were the CFLI requirements back in 2003 for your exam?
MS. SULLIVAN: If you know.
Q. Oh, yeah, everything is if you know.
A. Well, only because of what is in front of me, you know, that they required the medical history, vital signs and a blood and urine.
Q. Is there any other information on page two that's significant to you?



MS. SULLIVAN: Objection.
A. No.
Q. Other than the documents that we have here today that would be marked Exhibit 1 through 6, did you review any other documents before coming to this examination in preparation of the exam?
A. No.
Q. Let's look at what's marked as Exhibit 3 and which is Bates number DC 2.
What is this?
A. This is the Catholic Family Life Insurance form to obtain the medical history on the client.
Q. And is this the form that Catholic Family Life Insurance typically used in 2003?
MS. SULLIVAN: Objection. Foundation.
A. As far as I know.
Q. As far as you know, is this still the form that Catholic Family Life Insurance uses?
A. I don't know.
Q. Who would know that?
A. Well, what's -- there are forms in our file. You know, anyone could check that and make sure that they're updated in the office.
Q. Do you continue to do exams for Catholic



Family Life Insurance?
A. Yes, if I -- if they come in. I mean, I don't, you know, it isn't like something I can say that I've done ten of them in the past month or something. You know, they come in randomly so it's hard for me to say, but I would, you know, if it was in my area of location, you know.
Q. And so is it fair to say that you probably have done a Catholic Family Life Insurance exam in the past year?
A. I really -- I really don't know.
Q. So is it fair to say you don't know if there were any changes in the Catholic Family Life Insurance form from 2003 to today?
A. I really couldn't say.
Q. You never compare the forms one to the another?
MS. SULLIVAN: Objection.
A. When we get new forms the old forms are taken out of the file and that's what we go by.
Q. And is it fair to say you're used to certain forms?
MS. SULLIVAN: Objection.
Q. You use that same form over and over.



A. For different companies they each have their own form, correct.
Q. And is it fair to say that you, and your job, is to answer all of the questions on the particular form that is provided to you?
A. Correct.
Q. And you did do that in this particular case?
A. Yes.
Q. Let's take a look at this document DC 2, which is marked Exhibit 3.
Is all of the handwriting on this document your handwriting?
A. Yes.
Q. With the exception of Michael Littlefield at the bottom?
A. Yes, it is.
Q. And do you recognize Michael Littlefield's signature at the bottom right-hand side of the page?
A. I don't know what you mean by do I recognize it. I mean --
Q. Is it your handwriting?
A. -- his signature?
Q. Is it your handwriting or is it his handwriting?

A. It's his handwriting. It's not my handwriting.

**Q. Everything else is completed by you, correct?**

A. Correct.

**Q. When you go to meet your typical client or in 2003 when you did, what did you first do when you went in to somebody's home?**

A. When I first go in, you know, they already know my name from making the appointment on the phone and I go in, I introduce myself. We usually sit down at a table. I start off by asking the client for their driver's license for identification, and I'm trying to think. That -- the driver's license number is put on the lab slip. And I usually ask them what time they ate last.

**Q. What is the significance of that for you?**

A. For the blood work for the lab. Especially if they're checking for cholesterol or glucose, it's important for them to know what time the client ate last and...

**Q. Do you give the client instructions when you call to make the appointment, with regard to what they are to eat or not to eat?**



A. Right. Yes. I will tell them -- a lot of times they will put on the ticket -- this one I don't see it -- but there was a place for fasting. But I usually tell the client it's better if they're fasting.

**Q. Was he required to fast?**

A. I really can't remember, but it is my practice to tell the client that it's better if they can fast. I usually ask them if there's any medical condition that would cause them not to fast. You know, you don't want someone to get sick from fasting. Some people do. And, you know, we try to set up the time according to that so they're not fasting that long.

**Q. Can you tell looking at these exhibits what time this examination was conducted?**

A. This was at 9:00 a.m.

**Q. And where do you see that?**

A. On the lab slip on Exhibit 5, almost to the bottom before the signatures.

**Q. And I see next to that ten hours.**

A. And that was -- yeah. Hours since last food or drink. So...

**Q. In this case you probably had told him to**



**fast and he had fasted for ten hours?**

A. And he fasted.

**Q. All right. Let's go back to DC 2, which is Exhibit 3.**

**Did you read these questions out loud to Mr. Littlefield and he answered the questions?**

A. Yes.

**Q. Looking at 1a, name and address of your personal physician and it says there Dr. Pierre Manzo, South County Trail, East Greenwich. You asked him that question and he answered that?**

A. Yes.

**Q. And you wrote down the answer?**

A. Correct.

**Q. And then it says date and reason last consulted. And as I read it it says pain related to hernia surgery 5-03 - surgery 4/2003, is that correct?**

A. Correct.

**Q. And is that the sort of information that you would always want to know for 1b?**

MS. SULLIVAN: Objection.

A. Yes. You know, you ask them first who their doctor is and then they want to know when the doctor



was last seen and they give -- you know, the client will tell you the reason and approximate date if they, you know, can't remember the exact date, but, you know, he told me it was in May and that the surgery, the hernia surgery was on April 20th. So I wrote that down.

**Q. So you completed the form just as it was required to be completed, is that correct?**

A. Correct.

**Q. And then c1 says treatment given or medications prescribed. And I see a dash there. Did you put that?**

A. Yes, I did.

**Q. And what does that mean?**

A. That means that he told me there was none.

**Q. There was no treatment given or medication prescribed?**

A. Correct.

**Q. He told you that there was no treatment or medication from hernia surgery?**

MS. SULLIVAN: Objection. Witness has answered the question.

**Q. I want this clarified. It says in the above line he had a hernia surgery. And underneath it**

37

**says treatment given or medication prescribed and you have a dash.**
MS. SULLIVAN: Wait until she asks you a question.
A. Okay.
**Q. Is it fair to say it was your understanding he received no treatment or medication from the hernia surgery?**
A. No. The question is related to when he saw the doctor, and he told me he went to see the doctor. Now, I'm not remembering this other than from this paper, that he went because he had pain related to the hernia surgery and I -- the next question is did he give you any treatment or medication related to that visit, and he must have said no, because I put the dash. If he told me he gave him painkillers or -- I would have put that down.
**Q. So that is Dr. Pierre Manzo?**
A. Correct.
**Q. So you asked the question and completed the form exactly as you are required.**
A. Correct.
**Q. Let's go to part two. I see a series of no**

38

**answers to various questions about problems and then going down to e. It says have you ever been treated for or had any indication of e, jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion or other disorder of the stomach, and hernia is underlined. Did you underline the hernia?**
A. Correct.
**Q. Because he, in fact, as you wrote above, had had hernia surgery. Is that correct?**
A. Correct.
**Q. So you checked the X or put an X in the yes box.**
A. Correct.
**Q. And then in the right-hand column it says details of yes answers. Is that right?**
A. Correct.
**Q. And you are to include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities. Is that correct?**
A. Correct.
**Q. And what did you write there under 2e?**
A. That he had the hernia surgery on April 20, '03. I put the doctor's name, Dr. Abadier, his

39

address, where he had it, Kent County Hospital, and as an outpatient.
**Q. So you completely answered every question that was asked of you under this column details of yes answer, didn't you?**
A. Yes.
**Q. You left nothing out. You completed the form as it was required to be completed. Correct?**
A. Correct.
**Q. There was no other information you were supposed to put in this column, is that correct?**
MS. SULLIVAN: Objection. No other information that was provided.
**Q. Was there any other information that you were required to put in this column that you did not put in the column?**
A. No. I only put what the client tells me.
**Q. And the client told you the diagnosis, correct? You put it down.**
A. Correct.
**Q. Is that right?**
A. Correct.
**Q. The date, you put it down, correct?**
A. Correct.

40

**Q. The duration. I don't see a duration. Do you see a duration?**
A. The duration would be that it was an out-patient procedure, you know, as opposed to a patient being admitted. You know, then I would have put he was in the hospital for five days or...
**Q. So you completed that.**
A. (No verbal response.)
**Q. And it says names and addresses of all attending physicians and medical facilities and you put Dr. Abadier, his address and Kent County Hospital, correct?**
A. Correct.
**Q. So you completed every part of the question that was asked of you --**
A. Correct.
**Q. -- by this form, didn't you?**
A. Correct.
**Q. Back to the left-hand column, please.**
A. Okay.
**Q. Going down, I see that the rest of the answers are no, other than are you pregnant. Except for 8a, and that is asking if during the last seven years have you ever been examined or treated by a**

53

correct?
A. Question 8b, you know, says, Have you had an X-ray or an electrocardiogram? And then c says, Have you had observation or treatment at a clinic or a hospital? Sometimes those things can come up under those questions.
**Q. But you don't specifically ask that, do you?**
A. No.
**Q. You follow the form exactly, don't you?**
A. Correct.
**Q. And you did in this instance.**
MS. SULLIVAN: Objection.
A. Correct.
**Q. Did you, looking at this form, ever ask Mr. Littlefield if he had any additional testing, other than the information that you wrote down?**
A. The only question that I think that would come under was the one I said, 8c, you know, did you have any other observation or treatment at a clinic or a hospital. That could cover different treatments or any other type of medical conditions that weren't, like, specifically asked.
**Q. So when you ask that question, During the past seven years have you had observation or**

54

**treatment at a clinic or hospital, do you go further than that question?**
A. It's hard for me to say if I did it at this appointment because I don't remember.
**Q. But what was your typical procedure? Did you ask the question and put the answer down?**
A. I don't understand.
MS. SULLIVAN: Let's stick with one question at a time. I think that was compound. What's your typical procedure, was the question.
A. For?
**Q. What is your typical procedure when you complete this form, is it to ask the question and write down the answer?**
A. Yes.
**Q. So you ask the question just as it's listed here and you write down the answer.**
MS. SULLIVAN: Objection.
**Q. Correct?**
A. Sometimes if a client doesn't understand what the question means I may have to elaborate a little, but, you know, that particular question, you know, have you had any other observations or treatments at a clinic or hospital, I mean, usually

55

people understand, you know, have you gone to the hospital for any other reason other than these other questions, but I can't really answer if I said anything else to Mr. Littlefield because I don't remember.
**Q. I guess my question to you is, did you follow the form in accordance with the way that it is laid out?**
A. Yes.
**Q. That is your job, correct?**
A. Correct.
**Q. And you did your job, correct?**
A. Correct.
**Q. You answered the -- you asked the questions as they were listed on the form and then wrote down the answers in the answer column, correct?**
A. Correct.
**Q. You did your job. Correct?**
A. Correct.
**Q. This form does not ask you to elaborate in any way that you didn't, does it?**
MS. SULLIVAN: Objection.
A. Only -- no, it does not ask me that, but it's important for me to make sure the client

56

understands if there's a question and sometimes they'll say, well, what do you mean by treatment or observation? And, you know, so I would elaborate at that point, but I cannot tell you if I did that at this exam.
**Q. But you did write down that he had the hernia surgery?**
A. Correct.
**Q. And where he had it and who the doctor was and it was out-patient, and you wrote anything down.**
A. Correct.
**Q. And you don't remember this exam. If I showed you his picture would you remember him?**
A. I don't know.
**Q. Not sure? Okay.**
**You don't even remember if you had any kind of dialogue with him.**
A. No.
**Q. Is it fair to say with these examinations that you don't just ad-lib, you follow the form?**
MS. SULLIVAN: Objection.
A. Ad-lib the questions on the form? No. No. I read -- I read the form.
**Q. Are you certain that the physical**

**Q. Do you feel that in any way you did not do your job with --**

A. No.

**Q. -- regard to the completion of the Michael Littlefield form?**

A. No. I feel I did my job.

**Q. And you did it completely, correct?**

A. Correct.

MS. DAVIDSON: Let me -- I'm done questioning. Let me -- I would like to apologize to you publicly for serving you. I understand it was a very difficult time in your life and I'm very sorry if I in any way or my process server in any way upset you.

THE WITNESS: Okay.

MS. DAVIDSON: That's it.

MS. SULLIVAN: I'm going to have a couple of questions, but I think we ought to take a little break.

MS. DAVIDSON: Want a little break, get some coffee, some water?

(A recess was taken.)

EXAMINATION BY MS. SULLIVAN:

**Q. Donna, just a couple of questions I hope.**



A. Okay.

**Q. First of all, I think Karen asked you whether you had thought you had seen Ms. Littlefield before. Is it correct that it's your belief that you have never seen her before?**

A. Correct.

**Q. And while you were testifying, did Mrs. Littlefield make an indication to you that she in fact was not present during the examination that you performed?**

A. She said I never met you.

**Q. I'd like to turn to your medical form, which is Exhibit 3. When you go through the form with a client like Mr. Littlefield, do you stop at each question, in your normal practice, after you've read the question to him, to make sure that he understands the question before you take his answer?**

A. Yes.

**Q. You answered a lot of questions about the sub parts of question eight, and I'd like you to take a look down there. When you ask sub part C about an X-ray or electrocardiogram, do you have a practice regarding explaining to the client the range of tests that would be covered by that**



**question?**

MS. DAVIDSON: Objection, foundation, time.

**Q. Go ahead. You may answer.**

A. I know I have, you know, stated any type of X-ray. A lot of people will think of MRIs or CAT scans as X-rays and a lot of times a client will ask me, you know, do you mean this type of test or so, you know, sometimes I do have to elaborate, whether I feel they don't understand what I'm saying or they will offer, you know, and ask me do you mean this type of a test?

**Q. If a client informs you that they have had a CAT scan, would you include that information in response to this question?**

A. Yes, I would.

**Q. I'd like to go back up to the very top of the form where you filled in information about the last consultation with his personal physician. Do you see where I am?**

A. Yes.

**Q. Do you have an understanding as to the purpose of asking the client for when he last consulted his personal physician?**



MS. DAVIDSON: Objection. Foundation.

A. That is to obtain the most recent medical records on the client.

**Q. Do you mean medical information?**

A. Right. Medical -- you know, their -- the most recent time that a doctor would have medical information on a client.

**Q. If Mr. Littlefield had told you that Dr. Manzo had referred him back to Dr. Abadier, who had performed the hernia surgery, to see whether a CAT scan would be necessary to follow up on the pain he was experiencing, would you have indicated that information somewhere on the form?**

MS. DAVIDSON: Objection. Foundation. Speculative.

A. I believe I would have, only because the reason that I wrote down was pain related to hernia surgery, and if there was any more history on it I would have written it down.

**Q. Is that information that you would've written under treatment given or medication prescribed?**

A. Yes.

MS. DAVIDSON: I need an objection in

**Q. So based on your practices and based on the form that we're looking at, Michael Littlefield did not tell you about a barium enema, correct?**
MS. DAVIDSON: Objection.
A. No, he did not.
**Q. Similarly, Michael Littlefield did not tell you about a CAT scan, correct?**
A. Correct.
MS. DAVIDSON: Objection.
**Q. Similarly, Michael Littlefield did not tell you about ongoing treatment for pain and for a mass in his abdomen that felt like a baseball?**
MS. DAVIDSON: Objection. Foundation. Speculation.
A. No, he did not.
**Q. Now, at the very bottom of the form, underneath the line there are some printed material in between that line and then where the handwriting on the place and the signatures appears, that begins, I hereby agree. Do you see where I am now?**
A. I do.
**Q. Do you read that information to the client before they sign the form?**
A. I usually will tell them what of the



paragraph says, that they're swearing to all this information. I also tell them, you know, to read it and then show them where they sign.
**Q. Is it your practice with your clients to make clear to them that the information -- the statements and answers on the form are supposed to be full, complete and true?**
MS. DAVIDSON: Objection.
A. Yes. I -- like I said, I tell them that when they sign this form they are swearing that all this information they have given me is accurate and true and then they sign the form.
MS. SULLIVAN: That's all I have.
FURTHER EXAMINATION BY MS. DAVIDSON:
**Q. I have a follow up. As I understand your testimony, an examination of this type would take approximately 15 minutes, sometimes 20?**
MS. SULLIVAN: Objection. Misstates the testimony.
**Q. I believe that's what you told me earlier.**
A. I think I said 20 to 30 minutes when we have to do the medical history, vitals and a blood and urine, which is what I did on Mr. Littlefield. If it's just a blood and urine that can maybe take, you



know, 15 minutes, but because of a medical history that's a little more involved.
**Q. And the space that's provided for the medical history on the right-hand side of Exhibit 3, and there's about three inches or so, maybe three and a half.**
A. Uh-huh.
MS. SULLIVAN: Objection.
**Q. Is that correct?**
A. (No verbal response.)
**Q. Now, as I thought I understood your testimony, you don't recall ever having anyone volunteer to you that they had had a barium enema, is that correct?**
MS. SULLIVAN: Objection.
A. I just -- I don't know how to answer that. I mean people -- I work for different companies, different forms, you know, it's -- I mean, it's hard for me to say. I mean, people -- sometimes when I say have you had any testing, it might not even say X-rays, it might just say testing and, you know, people will just tell you what tests they've had.
**Q. So I guess you can't answer the question.**
A. I mean, I can't off the top of my head say



somebody told me they had a barium.
**Q. Are the forms that you use typically two-page forms like the CFLI form we've examined?**
A. Yes.
**Q. And are the questions in the other forms from other companies that you use identical to or different from these questions?**
A. They are very similar. They're not identical. I mean, they all have their different ways of asking things. Some ask a few more questions, you know, but they're similar. I mean, they cover, you know, the major illnesses, but they're not exactly the same.
**Q. And they're not specific with regard to specific testing, is that correct?**
A. Some can be.
**Q. What companies use forms that are specific for specific testing?**
A. I could not tell you that off the top of my head.
**Q. Is it fair to say, however, that some of the companies you do do work for ask more specific questions than CFLI?**
A. Oh, boy. I'm trying to think. I believe

NOV-16-2006 THU 02:03 PM EMSI FAX NO. 401 943 0406 P. 02

# MEDICAL DEPARTMENT

Please print names and addresses.
Supplement to Application to: CATHOLIC FAMILY LIFE INSURANCE

MEDICAL EXAMINATION REPORT - Part
P.O. Box 11563, Milwaukee, Wis., 5321

PROPOSED INSURED: (Print Full Name) MICHAEL LITTLEFIELD

DATE OF BIRTH: Month REDACTED Day ____ Year ____

1a. Name and address of your personal physician (IF NONE, SO STATE): DR Pierre Manzo So. County TR E. Greenwich RI 02818

b. Date and reason last consulted: Pain Related to hernia surgery 5-03 - Had surgery 4-20-03

c. Treatment given or medication prescribed:

| 2. Have you ever been treated for, or had any indication of: | Yes | No |
|---|---|---|
| a. Disorder of eyes, ears, nose or throat? | ☐ | ☒ |
| b. Dizziness, fainting, convulsions, headache; speech defect, paralysis or stroke; mental or nervous disorder? | ☐ | ☒ |
| c. Shortness of breath; persistent hoarseness or cough, blood spitting; bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? | ☐ | ☒ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? | ☐ | ☒ |
| e. Jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, or other disorder of the stomach, intestines, liver or gallbladder? | ☒ | ☐ |
| f. Sugar, albumin, blood or pus in urine; venereal disease; stone or other disease of kidney, bladder, prostate or reproductive organs? | ☐ | ☒ |
| g. Diabetes; thyroid or other endocrine disorders? | ☐ | ☒ |
| h. Neuritis, sciatica, rheumatism, arthritis, gout or disorder of the muscles or bones, including the spine, back or joints? | ☐ | ☒ |
| i. Disorder of skin, lymph glands, cyst, tumor or cancer? | ☐ | ☒ |
| j. Allergies; anemia or other disorder of the blood? | ☐ | ☒ |
| k. Deformity, lameness, or amputation? | ☐ | ☒ |
| 3. Have you ever been treated for the use of alcohol or any habit-forming drugs? If so give complete details. | ☐ | ☒ |
| 4. Have you smoked cigarettes in the past year or used any other nicotine products? If so, which? | ☐ | ☒ |
| 5. To the best of your knowledge are you now pregnant? If "Yes" give date of expected delivery. | N/A | ☐ |
| 6. Has a member of the medical profession ever diagnosed you as having, or treated you for AIDS (Acquired Immune Deficiency Syndrome), ARC (AIDS Related Complex), or any other immunological disorder? | ☐ | ☒ |
| 7. Are you now under observation, treatment, or taking medication? | ☐ | ☒ |
| 8. During the past seven years, have you: | | |
| a. Been examined or been treated by a physician, chiropractor or psychologist? | ☒ | ☐ |
| b. Had an x-ray or electrocardiogram? | ☒ | ☐ |
| c. Had observation or treatment at a clinic or hospital? | ☐ | ☒ |
| d. Had a surgical operation scheduled or completed? | ☒ | ☐ |
| e. Made claim for or received payment for sickness or injury? | ☐ | ☒ |
| 9. Have you ever had military service deferment, rejection or discharge because of a physical or mental condition? | ☐ | ☒ |
| 10. Were you ever postponed, declined, rated, or offered a modified plan for Life, Accident, or Health Insurance? | ☐ | ☒ |

DETAILS of "Yes" answers (IDENTIFY QUESTION NUMBER, CIRCLE APPLICABLE ITEMS: Include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities.

2E - Had Hernia Surgery 4-20-03 DR Abadier 300 Tollgate Rd Warwick RI 02886 - Kent County Hosp Warwick RI. outpatient

8A - DR Karen Blackmore So. County TR. East Greenwich RI last seen 4 yrs ago physical. No problems

8B - Had X-ray for Sinus infection 2 yrs ago - E.R. Kent County Hosp.

8D - See # 2E

11. Family Record: (Indicate family history of tuberculosis, diabetes, cancer, high blood pressure, heart or kidney disease, mental illness or suicide.)

| | If Living: State of Health (If poor, give reason) | Deceased: Age at Death | Deceased: Cause of Death |
|---|---|---|---|
| Father | | 68 | |
| Mother | | 57 | |
| Brothers/ Sisters | B - | 37 | |

I hereby agree that all statements and answers in this application are full, complete, and true to the best of my knowledge and belief, and shall become part of any policy or contract issued on the basis of this application. I further agree that the Society may rely upon any statements or answers made relating to my health or illness in determining whether to accept this application for insurance.

Dated at: No. Kingstown RI (City, State) this 28th day of August 2003 (Date)

Examiner's Signature [signature] Proposed Insured's Signature [signature]

11-10-1168 (Rev 6/99)

DC00002

NOV-16-2006 THU 02:03 PM EMSI FAX NO. 401 943 0406 P. 03

**CATHOLIC FAMILY LIFE INSURANCE** Medical Examination Report - Part 2

Name: Michael Littlefield D.O.B. **REDACTED** Details of "Yes" answers. (Identify item.)

Identification: ☐ Driver's License ☐ Other

1.

| HEIGHT (in shoes) | WEIGHT (clothed) | CHEST (full inspiration) | CHEST (forced expiration) | ABDOMEN, at umbilicus relaxed |
|---|---|---|---|---|
| 5 ft. 9 in. | 160 lbs. | 40 in. | 37 in. | 32 in. |

Did you weigh? ☒ Yes ☐ No Did you measure? ☒ Yes ☐ No

Weight change in past year? ____ lbs. ☐ Gain ☐ Loss - Cause? ________

Is appearance unhealthy or older than stated age? ☐ Yes ☒ No

2. Blood Pressure (Record all readings)

| | AT REST | AFTER EXERCISE | 3 MINUTES LATER |
|---|---|---|---|
| Systolic | 108 | | |
| Diastolic | 80 | | |

3. Pulse:

| | AT REST | AFTER EXERCISE | 3 MINUTES LATER |
|---|---|---|---|
| Rate | 68 | | |
| Irregularities Per Min. | | | |

4. Heart: (a) Is there any cyanosis, dyspnea, edema, arteriosclerosis, peripheral, vascular, or other cardiovascular disorder? ☐ Yes ☐ No

(b) Is heart enlarged? ☐ Yes ☐ No (If yes, describe)

(c) Is murmur present? ☐ Yes ☐ No (If yes, complete (d))

(d) **Murmur is:**

☐ Constant
☐ Inconstant
☐ Transmitted
☐ Localized
☐ Systolic
☐ Presystolic
☐ Diastolic
☐ Apical
☐ Basal
☐ Other

☐ Soft (Gr. 1-2)
☐ Mod (Gr. 3-4)
☐ Loud (Gr. 5-6)

**After Exercise:**

☐ Unchanged
☐ Decreased
☐ Increased
☐ Absent

**Show location of murmur.**

Apex by X
Area of murmur by outline ◯
Point of greatest intensity ●
Transmission →
Your Impression:




5. Is there on examination any abnormality of the following: (Check applicable and give details.)

| | Yes | No |
|---|---|---|
| a. Eyes, ears, nose, mouth, pharynx? (If vision or hearing is markedly impaired, indicate degree correction.) | ☐ | ☐ |
| b. Skin (incl. scars); lymph nodes; blood vessels (incl. varicose veins)? | ☐ | ☐ |
| c. Nervous system (include reflexes, gait, paralysis)? | ☐ | ☐ |
| d. Respiratory system? | ☐ | ☐ |
| e. Abdomen (including scars)? | ☐ | ☐ |
| f. Genitourinary system (include prostate)? | ☐ | ☐ |
| g. Endocrine system (include thyroid and breasts)? | ☐ | ☐ |
| h. Musculoskeletal system (incl. spine, joints, amputations, deformities)? | ☐ | ☐ |
| 6. Evidence of cigarette smoking or other nicotine use? | ☐ | ☐ |
| 7. Do you have pertinent information not brought out above? | ☐ | ☒ |

8. Urinalysis: SPECIFIC GRAVITY ____ ALBUMIN ____ SUGAR ____

Send specimen to laboratory as instructed.

EMSI #284
989 Reservoir Avenue
Cranston, RI 02910
401-943-0084

I certify that I made this examination at [illegible] a.m. ____ p.m. on 8-28-03 (Date)

Examination made at ☐ My office ☒ Individual's home

Examiner's Name/Company EMSI #284 989 Reservoir Avenue Cranston, RI 02910 401-943-0084 Examiner's Signature Donna Carroll

Are you in any way related to the proposed insured or to the agent? ☐ Yes ☒ No

Name of agent requesting examination: Donald Demers Tax I.D. Number ________

Address ________ City/State/ZIP ________

U-16-1168 (Rev 8/99) **PLEASE COMPLETE REVERSE SIDE**