I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

---

COLLEEN LITTLEFIELD,
Plaintiff, C.A. NO. 06-157

-vs-

VIDEOTAPE DEPOSITION OF CATHERINE HARTWIG

CATHOLIC FAMILY LIFE INSURANCE COMPANY,

Defendant. 5th of March, 2007

---

VIDEOTAPE DEPOSITION OF CATHERINE HARTWIG, before JANET LARSEN, a Registered Professional Reporter and Notary Public, in and for the State of Wisconsin, under and pursuant to the Federal Rules of Civil Procedure, at the offices of Quarles & Brady LLP 411 East Wisconsin Avenue, Suite 2040, Milwaukee, Wisconsin, on the 5th day of March, 2007, commencing at 10:58 a.m. and concluding at 1:32 p.m.

A P P E A R A N C E S

KAREN DAVIDSON, ATTORNEY AT LAW
One Ship Street
Providence, Rhode Island 02903
appeared by telephone on behalf of the Plaintiff.

QUARLES & BRADY LLP, by
KELLY H. TWIGGER, ATTORNEY AT LAW
411 East Wisconsin Avenue, Suite 2040
Milwaukee, Wisconsin 53202
appeared on behalf of the Defendant and the Witness.

EDWARDS ANGELL PALMER AND DODGE LLP, by
PATRICIA A. SULLIVAN, ATTORNEY AT LAW
2800 Financial Plaza
Providence, Rhode Island 02903
appeared by telephone on behalf of the Defendant and the Witness.



ALSO PRESENT: Marco Santilli, Videographer

I N D E X


| EXAMINATION BY: | PAGE |
|---|---|
| Ms. Davidson | 5 |
| Ms. Sullivan | 104 |

| EXHIBITS: | MARKED |
|---|---|
| 1 - Subpoena Duces Tecum | 3 |
| 2 - For used for telephone interview, CFL 457 and CFL 461 | 18 |
| 3 - Hernia guidelines, CFL 589-591 | 48 |
| 4 - BMA guidelines for a hernia | 64 |
| 5 - Paramedical exam form | 75 |
| 6 - Agent's Statement | 75 |
| 7 - Examination Management Services, Inc. | 76 |
| 8 - EMSI Work Order. | 77 |
| 9 - 8-27-03 New Business Worksheet | 81 |
| 10 - Interoffice Memo | 84 |
| 11 - Comparative Information Form | 86 |
| 12 - Collection of documents | 87 |
| 13 - Risk collection guide | 97 |
| 14 - Hiatal hernia guidelines from Generali Reinsurance | 99 |
| 15 - Lab work for Michael Littlefield | 104 |

| MATERIAL REQUESTED: | PAGE |
|---|---|
| None | |


QUESTIONS FOLLOWED BY INSTRUCTIONS NOT TO ANSWER:

None

(Original transcript supplied to Attorney Davidson)
(Originals of Exhibits 1 through 15 are attached to the original transcript. Photocopies are attached to copies of the transcript)



TRANSCRIPT OF PROCEEDINGS

(Exhibit 1 marked for identification)

THE VIDEOGRAPHER: We are now on the record. This is the beginning of tape No. 1 in the deposition of Cathy Hartwig. This deposition is being taken at the instance of the plaintiffs in the matter of Littlefield versus Catholic Family Life Insurance, Case 06-157 now pending in the U.S. District Court of Rhode Island.

This deposition is taking place at Quarles & Brady, 411 East Wisconsin Avenue, Milwaukee, Wisconsin. Today's date is March 5th, 2007. The time is 10:58 a.m. My name is Marco Santilli, working today on behalf of Ryker & Lyle Legal Video. The court reporter today is Janet Larsen with the firm of Collin Reed -- Colleen Reed Reporting.

Will the attorneys please identify themselves for the record, state the parties they represent. Then the court reporter will swear in the witness.

MS. SULLIVAN: This is Patricia Sullivan representing defendant Catholic Family Life, as well as the witness.

MS. TWIGGER: Kelly Twigger at Quarles &



Brady on behalf of Catholic Family Life and Cathy Hartwig.

MS. DAVIDSON: Karen Davidson on behalf the plaintiff, Colleen Littlefield.

MS. SULLIVAN: And before we begin the deposition, I just wanted to say for the record that Cathy Hartwig will be testifying today pursuant to a subpoena directed to her personally, so she is testifying as a fact witness. There has been a 30(b)(6) witness, 30(b)(6) deposition request in this case of Catholic Family Life to designate persons with knowledge of underwriting in 2003 as it relates to the Michael Littlefield insurance policy, and to the extent that questions arise within that topic where the answers have not already been provided by witness Kim Ingram, who was the principal designee for Catholic Family Life on that 30(b)(6), Ms. Hartwig will be designated as a witness to testify pursuant to that 30(b)(6). You may proceed.

MS. DAVIDSON: I take it there's no one else in the room, other than those who have been identified.

MS. TWIGGER: That's correct.

MS. DAVIDSON: Thank you.

Could you please swear the witness.
CATHERINE HARTWIG, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. DAVIDSON:
Q. Could I have your complete name, please?
A. Catherine Hartwig.
Q. And where do you live?
A. Grafton, Wisconsin.
Q. How long have you lived there?
A. Since 1998.
Q. What's your educational background?
A. I have two years of college and a one-year -- I'm trying to think of what it was. It was an executive certificate from a stenographer school.
Q. Are you a court stenographer, also?
A. No.
Q. And what's your age, please?
A. Oh, 49.
Q. Thank you. I'm sorry to ask that question, but I can't see you.
A. That's all right.
Q. Could you please tell me where you're employed?
A. Catholic Family Life Insurance.



Q. Is that a full-time position?
A. It is a part-time position.
Q. And could you describe the part-time specifics of that position?
A. I do tele-underwriting, which is making the phone calls, and I also underwrite.
Q. Okay. Could you describe specifically for me what tele-underwriting is?
A. Tele-underwriting is the process after the advisor has sold the product to the client. Then I make the phone call to ask additional questions concerning their background and medical history.
Q. And how long have you been doing that for Catholic Family Life Insurance?
A. For six years.
Q. So you began that process in 2001?
A. Correct.
Q. And how much of your time does that take up a week, average?
A. It's anywhere 10 hours, 15 hours, usually.
Q. And in the 10 and 15-hour period, how many applications do you tend to do?
A. It varies. It could be only 20 a week on up, depending on the production at that point in time.



Q. Twenty a week up to what?
A. It varies.
Q. So your high would be how many?
A. We really don't know a high. It depends on what the advisors write on a given week.
Q. What kind of training do you have for tele-underwriting?
A. I have tele-underwritten with a company back in Barrington, Illinois, called International Underwriting Services, who started the process.
Q. When did they begin that process?
A. I'm not exactly sure what date it was. I worked there back in the '90s, and I worked there for six years, also.
Q. What was your job title there?
A. Same thing. I did tele-underwriting and underwriting.
Q. Why did you decide to move to the CFLI?
A. The company actually got bought out, and they moved the company and did not take any of the current people with them, so then I moved to Wisconsin with my husband and his job.
Q. Prior to doing tele-underwriting work with International Underwriting, for whom did you work?
A. Federal Kemper.



Q. What kind of company is that?
A. It's a life insurance company, also. I worked on the life end doing the same, just the underwriting portion.
Q. Did you have specific training for that job?
A. I did.
Q. What was that?
A. I actually started my career back in 1976 with Prudential, back in Indiana.
Q. Yeah. And from '76 forward, you've worked for insurance companies doing tele-underwriting and underwriting. Is that fair to say?
A. Yes.
Q. How much of your job is underwriting? You told me 10 to 15 hours is tele-underwriting. How much is underwriting?
A. That's on an as-needed basis, also. I probably do maybe another 10 hours a week on up.
Q. So your average work week is 20 hours, 25 hours?
A. Basically, yes.
Q. Do you travel for the company?
A. I do not.
Q. And how are you paid?
A. On a part-time basis.
Q. Does that mean --

9

A. Hourly.
Q. Does that mean you're paid by the hour?
A. Yes.
Q. And how much is your hourly rate?
A. $21 an hour.
Q. Do you get benefits in addition to that?
A. I do not.
Q. Do you have any other jobs besides this job?
A. I actually also work for a company called EMSI part time, also.
Q. What do you do with EMSI?
A. I summarize doctors' reports.
Q. How long have you been with them?
A. Just a year.
Q. When you say you summarize doctors' reports, what does that mean?
A. They actually e-mail actual doctors' reports, and I just summarize the reports for other underwriters.
Q. Do you have training for that?
A. Basically, the training that I've had with all my underwriting experience.
Q. So you don't summarize it for yourself, you summarize it for other underwriters?
A. Correct.

10

Q. And how are you paid at EMSI?
A. As -- On an hourly basis, also.
Q. What is that rate?
A. It's probably similar. Probably about $20 an hour.
Q. And how many hours a week did you say you worked for them typically?
A. Usually I work there when I'm not with Catholic Family, so 10 hours a week.
Q. Are they located in the same building as Catholic Family?
A. They are not. They're actually out of Texas.
Q. So you work out of your home?
A. Yes.
Q. Do you have anything to do with the EMSI office here in Rhode Island?
A. I do not.
Q. Do you know any of the people in the EMSI office in Rhode Island?
A. No, I don't.
Q. When you summarize these medical records, what is it you're looking for?
A. Basically, the mortality of whatever impairments they may have.
Q. And how do you determine that?

11

A. Based on my underwriting experience.
Q. Who's your direct report at CFLI?
A. I'm sorry. I missed that.
Q. Who is your direct report at CFLI? To whom do you report?
A. Kim Ingram.
Q. Directly to her?
A. Yes.
Q. Who else do you work with?
A. The other underwriters in the company.
Q. And could you tell me who those people are?
MS. SULLIVAN: Today, Karen?
MS. DAVIDSON: Yes.
A. Stephanie Ania.
Q. Stephanie Ania?
A. Correct. Curt Vlock.
Q. Yeah.
A. Those are the two other underwriters that I work with.
Q. Do they work part time or full time?
A. Full time.
Q. So you're the only part-time employee?
A. Yes.
Q. And there was some discussion that CFLI also hired temporary part-time people to do

12

tele-underwriting. Is that accurate?
A. That is correct.
Q. Do you work with those temporary people?
A. They're off-site.
Q. And are they hired to do only tele-underwriting or also underwriting?
A. Only tele-underwriting.
Q. How many of those are there; do you know?
A. We work with two now.
Q. And how about back in '03, you were employed by CFLI then?
A. Yes. We use them on as as-needed basis.
Q. Were those people trained by you?
A. No.
Q. Do you have any kind of classes or training whatsoever at CFLI now or over the last six years?
A. We do meet with the --
MS. SULLIVAN: Objection. Go ahead.
A. Oh, I'm sorry. We do meet with the medical director that we have for just little mini classes.
Q. And who is that medical director?
A. Dr. Nicola Charlton.
Q. How long has she been your medical director?

A. She was there when I got there.
Q. And you say she gives little mini classes. What do they consist of?
A. Whatever subject we pick for her to talk on, or we just ask questions. It's very informal.
Q. So could you give me some examples?
A. Diabetes, heart history, anything that we would choose that we feel we need some additional training on.
Q. And what does she train you on, the symptoms or --
A. Everything. You know, what is it, what could some of the symptoms be, how would you resolve it, what kind of medications are taken.
Q. And why would you need this for your job?
A. The medical history is always changing. Everything is forever changing. What was used last year is not used this year. So she just keeps us up-to-date as far as what's the new thing in the medical industry.
Q. When you say a medical history is always changing or the medical procedures are always changing, I'm not sure I understand what that means.
A. If you --
Q. To do the underwriting?



A. Yes. Yes. Actually, you look at things different, depending on what went on, you know, coronary bypass, last year they did very invasive procedures, this year it's less invasive. So she just keeps us abreast of what's going on in the medical community.
Q. Do you remember her ever giving you a class on hernias?
A. No, she did not.
Q. Has anyone ever given you a class on hernias?
A. No.
Q. So that's a field that you're relatively familiar with then?
A. Yes.
Q. And why is that?
A. There's not much mortality significance to hernias unless they're symptomatic or there's some residuals after it's been taken care of.
Q. Is this something you commonly see, hernias?
A. Yes.
Q. How common would that be in an average week?
A. Sometimes you can go for weeks without seeing anybody that's had a hernia.
Q. So in a year say, how many would you see?
A. That I really can't say.



Q. Have the underwriting procedures for hernias changed significantly over the last six years?
A. Not --
MS. SULLIVAN: Objection.
A. Not at all.
Q. Not at all?
A. No.
Q. Do you work primarily or almost exclusively with Kim Ingram?
MS. SULLIVAN: Objection. Go ahead and answer, if you understand the question, Cathy.
A. I guess I really don't understand the question.
Q. With whom do you work primarily at CFLI?
A. I actually work with the other underwriters directly on a daily basis.
Q. And how does that go in your average day?
MS. SULLIVAN: Objection.
A. I don't understand what you're looking for.
Q. Do you consult one another on cases?
A. At times, yes.
Q. How else do you work with the underwriters every day?
A. That's pretty much it.
Q. So is it fair to say that you actually work in the CFLI office for all of your work time?



A. No. Actually, I do some of the tele-underwriting out of my home in the evenings.
Q. How much of your day is at home, and how much of your day is at work?
A. At the present, I am not doing anything from home.
Q. Why did that change?
A. We lost our tele -- or, excuse me, our senior underwriter, and we now have a new one who is in training, so I'm in the office with him.
Q. And in 2003, how much work did you do at home, and how much did you do at your office?
A. It was probably more at-home tele-underwriting.
Q. All right. So tell me how that procedure would work. How do you get, for instance, your file to work on?
A. If I'm at home, it comes by fax, and they just fax me the actual application form that the agent has filled out.
Q. Is that the one-page form?
A. Correct. And I make the call from that form.
Q. That's the only document you have when you make the call?
A. Yes.
Q. Okay. And is that the only document you had when

you made calls back in 2003?
A. Yes.
Q. And when you call somebody, what do you say to them?
A. I identify myself as Cathy Hartwig from Catholic Family Life Insurance calling to complete a telephone interview with them, and I also identify the advisor that wrote the case.
Q. And then do you just go right into a form type interview?
A. Yes.
Q. Could you take a look at that document that your counsel pulled out, CFL 498. It's also, it's also 457, the same document.
MS. TWIGGER: The copy that I have is CFL 457. Would you like it marked as an exhibit?
MS. DAVIDSON: Yes. May I have that marked, please.
MS. TWIGGER: We already marked the subpoena as, as No. 1.
MS. DAVIDSON: Okay. I can go back to the subpoena.
MS. TWIGGER: Okay. This one has been Exhibit No. 2. So CFL 457 has been marked as Plaintiff's Exhibit 2.



(Exhibit 2 marked for identification)
Q. Thank you. Can you take a look at this document and tell me if you recognize it.
A. Yes, I do.
Q. What is it?
A. It is the page 2, which is the first, actually, the second page that I do when I do my interviews.
Q. Where is the first page?
MS. TWIGGER: I'm showing Karen the first page.
Q. That's 461. Do you have that CFL 461 document there?
MS. SULLIVAN: That was the document, Kelly, that you removed from the two-page document.
THE WITNESS: That's the tele-underwriting supplement.
MS. TWIGGER: Do you remember what the sticker was that you had on it, Pat?
MS. SULLIVAN: J.
MS. TWIGGER: Thank you.
THE WITNESS: There it is.
MS. TWIGGER: Okay. I'm handing the witness CFL 461.



Q. Okay. Is that the page 1 that you normally do on your telephone interview?
A. Yes.
Q. Okay. And can, can you go through -- First thing, do you remember actually doing the telephone interview with him?
A. No, I do not.
Q. Do you keep notes when you --
MS. SULLIVAN: I don't want to interrupt, but I will interrupt. I think we should mark the, and I would suggest marking both Exhibit 2 as a two-page document, the first page of which is CLF 461, and the second page is CLF 457. Is that all right?
MS. DAVIDSON: Yes.
MS. TWIGGER: Can I just take the exhibit sticker off the second page and put it on the first?
MS. SULLIVAN: Yes.
MS. DAVIDSON: That's fine.
MS. TWIGGER: Okay. Plaintiff's exhibit, it is now a two-page document, CFL 461 is page 1 and CFL 457 is page 2.
MS. SULLIVAN: Good.
MS. DAVIDSON: Thank you.



Q. So you don't recall making this one out specifically; is that correct?
A. Not specifically, no.
Q. Okay. Is this the form that you always used for CFLI tele-underwriting interviews?
A. Correct.
Q. For the whole time you've been there at CFLI, this is the one you've used; right?
A. The tele-underwriting supplement, the page 2 is specific to certain states.
Q. Okay. And Rhode Island is obviously one of those states?
A. Correct.
Q. You didn't make up this form; did you?
A. No.
Q. It was provided to you by CFLI?
A. Correct.
Q. And how long does it typically take for you to make out a form like this?
MS. SULLIVAN: You mean to do the interview?
MS. DAVIDSON: Yes.
A. To do the interview, 10 plus minutes.
Q. Okay. So you make out this form having received one, a one-page cover sheet from the agent, and

that's all the information you've got; right?
A. Correct.
Q. So what are you looking for when you do this form?
A. What am I looking for when I do the interview?
Q. Yeah.
A. Actually, when I do the interview, I'm not specifically looking for anything. I just do the interview.
Q. Okay.
A. I just ask the questions provided.
Q. Do you ask any questions other than the questions that are listed here?
A. If I have a yes answer, then I go on.
Q. Is it possible looking at page 2 of this exhibit and seeing that there are some yes answers to know if you had asked follow-up questions?
A. Yes.
Q. How can you tell if you asked follow-up questions?
A. I ask any follow-up questions when needed for any yes answers.
Q. So how can we tell looking at this sheet if you asked follow-up questions?
A. Would you like me to go over the ones that had yes answers?



Q. Sure. Let's go to that 2A, drink alcoholic beverages.
A. Okay. And then there's an amount there.
Q. Yeah.
A. So I did ask for the amount.
Q. Okay.
A. The next one would be 3B --
Q. Yes.
A. -- stated that it is a replacement. So I did ask who he was replacing, and he was replacing a Catholic Family Life Insurance policy.
The next one is the 4C, any driving violations in the last three years, so I asked some details because it says if yes, please provide full details. Details are below.
Q. For speeding?
A. One speeding. And he is a U.S. citizen, so that was a yes that did not need any additional information.
Q. All right. Now when you, when you're --
MS. SULLIVAN: Are you finished with your answer --
THE WITNESS: Yes.
MS. SULLIVAN: -- on follow-up questions?
THE WITNESS: Yes. As far as the yes



answers go.
Q. When you do these interviews, you don't have access to the paramedical exam form that's been done on this applicant; is that correct?
A. That's correct.
Q. So under No. 9 where it asks for that full name and complete address of the personal physician, I don't see the complete address there.
A. That means that he did not have it.
Q. I see. And you apparently asked him when he had hernia surgery in follow-up, and then you wrote all okay; is that correct?
A. Correct.
Q. Did you ask him any other questions about that?
A. Actually, from the information that I'm looking at, he told me he had the follow-up in May '03 after an April '03 hernia surgery. And then I apparently asked --
THE COURT REPORTER: Wait.
MS. TWIGGER: We're having technical difficulties.
(Discussion off the record)
A. Actually, from the information that I'm looking at here, he told me May '03 that he had a follow-up after an April '03 hernia surgery, and then I



asked was everything okay, and he said all okay.
Q. Do you write down exactly what the applicant said, or do you just sort of summarize?
A. I try to write down what they say.
Q. So if -- You did not ask, apparently, who did his hernia surgery?
A. No.
Q. And why not?
A. We really didn't need that at that point.
Q. When do you need that?
A. If he had told me that there were some problems with the hernia surgery, if he would have had to go back to that same doctor, then I would have found more details.
Q. Do you have some sort of a pamphlet that instructs you to do that?
A. It's actually just from my underwriting experience.
Q. So if he went back to the hernia doctor for follow-up, as one does after hernia surgery, you wouldn't be interested in that, generally?
MS. SULLIVAN: Objection.
MS. TWIGGER: You can answer.
A. He actually told me that he went to see Dr. Manzo as the follow-up to the hernia surgery.

25

Q. He went to see his personal physician for the follow-up for the hernia surgery. Is that what he told you?
A. He told me he went to see Dr. Manzo in Greenwich, Rhode Island, for follow-up after his hernia surgery.
Q. And he's listed as a personal physician; right?
A. In this case, yes.
Q. So we didn't know that, who did the hernia surgery; correct?
A. We did not.
Q. And you didn't ask anything about that, other than when it was done and the date that there was some follow-up?
A. Right.
Q. Okay. So you asked more details under what circumstances. He said there was follow-up; correct?
A. Right. And follow-up is typical for surgery. And he told me everything was okay, so we did not need to go any further with any questioning. If he had said he was having problems, then we would have asked further questions, but he did not.
Q. So the doctor told him everything was okay, so he told you everything was okay?

26

MS. SULLIVAN: Objection.
A. That is what he told me.
Q. And once you asked the questions on these two pages marked as Exhibit 2, was your conversation with Mr. Littlefield finished?
A. At this point then, because he's having an exam, I do let him know that the examiner will be his next call, if he hasn't already received it, give him a little background on the exam, if he needs any questions answered, and then that's the end of the conversation.
Q. All right. I see looking at the bottom of my Exhibit 498 that it says c-o-m-p-l 9-4-03. Is that your writing?
A. Yes, it is.
Q. What's that mean?
A. That means that the call was completed on September 4th, 2003.
Q. Okay. The examiner -- I'm going to tell you this. The exam was done on August 28th, so he already had his exam.
A. Okay.
Q. So were you not aware of that, or you were aware of that?
A. When I did the interview, he probably told me that

27

at the end of the conversation.
Q. Okay. But still it wouldn't be your practice to look at the paramedical report?
A. No.
MS. SULLIVAN: As part of the tele-underwriting.
Q. Okay. So now you finished this two-page document, and what happens next?
A. It is matched up with the file and then goes back to the underwriter.
Q. Well, what do you do with it?
A. I actually give it to the assistants, who mark it received on the computer and match it up to the file.
Q. To what assistants?
A. The underwriting assistants. There's two underwriting assistants at Catholic Family.
Q. Who are they?
A. Currently?
Q. Sure.
A. Jody Cofta and Kiechieko.
Q. And who were they before in 2003?
A. I do not recall.
Q. But they were different, you say?
A. Jody was there.

28

Q. All right. So when you transfer this information to them, do you give them like a memo or a fax or anything other than the two pages?
A. No. That's it.
Q. You just hand it to them?
A. Yes.
Q. Okay. And does that complete your tele-underwriting part of the job?
A. Yes, it does.
Q. What else do you do with regard to a file after you finish your tele-underwriting on it? Do you discuss it with anybody?
A. No.
Q. What happens, it just sort of goes off to the next stage in the company and doesn't come back to you?
MS. SULLIVAN: Objection.
A. If I'm underwriting that day, it will come back to me. If not, it will go in another direction to one of the other underwriters.
Q. And were you underwriting that day?
A. Yes. I believe I was.
Q. So you say it comes back to you. How does it come back to you?
A. Once the underwriting assistant receipts the information that the tele-underwriting was done,

Q. Did anybody give you a bunch of documents to look at before you came to the deposition?
A. I was given some documents to look at.
Q. And who gave those to you?
A. They were given to me by the --
MS. TWIGGER: Lawyers.
A. -- the lawyers.
MS. TWIGGER: She was pointing at me, and I just supplied lawyers.
MS. DAVIDSON: That sounds like Kelly.
MS. TWIGGER: It was.
MS. DAVIDSON: You've got the lawyer label on your forehead.
Q. Could you go over this Exhibit A with me, please? I'm asking on No. 1 for all the documents relating and referring to underwriting customs, practices and policies of CFLI from January 1, '97 to the president -- present. Do you know what that would consist of?
MS. SULLIVAN: Objection.
A. I'm assuming that it would be all the documents that we would have used to try to make a decision on this case.
Q. And what would those documents be besides the agent's report, the paramedical report, the two



old files we talked about and your tele-underwriting interview?
MS. SULLIVAN: Other than what she's already testified about? Okay.
Q. And, again, the company has objected to this request except focusing in on the 2003 time period and limited to Michael Littlefield. So I think, Cathy, focus, your answer on what you actually used in this case.
A. What I actually used was the agent's form that he used to sell the product, which was that first form that we received, the tele-underwriting supplement, the page 2 that we just looked at, also, exam form.
Q. Would that be the paramedical exam form?
A. Yes.
Q. Okay.
A. And any old files. That's what would have been used for the underwriting decision.
Q. All right. Did you refer to any books or charts or instructions when you were doing your tele-under -- or your underwriting evaluation?
A. I did not, no.
Q. Do you typically?
A. Depending on the involvement of medical history, I



may. In this case, I did not need to.
Q. With regard to medicals, how do you decide whether or not you're going to send for medical records?
A. There is a form that gives us just guidelines as far as whether we, based on a medical impairment, whether we would need to see doctors' records.
Q. What is that for?
A. It is the -- It's an APS or Attending Physician's Statement Risk Selection.
Q. Is it like a little booklet?
A. Yes.
Q. All right.
MS. SULLIVAN: All right. That's been produced for me.
Q. With regard to request No. 2, the whole claim file of Michael and Colleen, did you ever see the whole claim file of Michael and Colleen?
A. I did not see the whole claim file.
Q. So you don't know what would be in them?
A. No.
Q. And you didn't look for them as part of this subpoena?
A. No.
Q. No. 3, all the documents that relate or refer to information gathering or consideration of a



payment or evaluation on Michael Littlefield's life insurance policy. Did you look for that?
A. I did not look for anything with regards to any claim forms.
Q. Would there be any?
A. That I'm not aware of.
Q. Are there typically?
A. I actually was just involved in the tele-underwriting and underwriting process, basically, of this file.
Q. Yeah. So are you telling me that you weren't involved in whether or not this claim should be paid out?
A. I reviewed the medical history at the -- when everything was in, and it was a joint decision.
Q. When you say you reviewed the medical history when everything was in, what everything was in?
A. When all the records that were requested with regards to the medical history.
Q. And none of those records were requested in the 2003 application period; is that right?
A. That's correct.
Q. So subsequent to Michael's death and pursuant to a HIPAA form his wife signed, you got the medical records; correct?

A. Yes.
Q. And you looked at all of those?
A. I did, yes.
Q. And then you participated in some sort of a meeting?
A. Correct.
Q. With whom?
A. Dr. Charlton.
Q. Who else?
A. And I believe one of the other underwriters was involved, also.
Q. Who else?
A. I believe that was it initially.
Q. And who -- Which underwriter was involved?
A. I was one of the underwriters, and I, to be honest with you, can't remember who else was involved in the actual looking at it. I don't remember who was there then.
Q. How would I find that out?
A. Kim would probably have that information.
Q. Now what medicals did you look at when you were having this meeting with Dr. Charlton?
A. She had requested the doctors' reports that she thought we should look at.
Q. She had requested it of whom?



A. Our underwriting assistant actually ordered the records that she asked her to order.
Q. And what one did you look at?
A. I looked at the records that we had that she had ordered.
Q. But, specifically, what ones did you look at?
A. I actually do not remember who, which doctor was which.
Q. So as we sit here today, you have no idea what you looked at specifically when you were having that meeting with Dr. Charlton; is that correct?
MS. SULLIVAN: Objection. You could show her some documents. The documents are all in the record.
Q. Is that correct?
A. Yes.
Q. Do you have an independent memory of what you looked at at that meeting with Dr. Charlton?
A. No.
Q. Do you keep any notes from that meeting?
A. No.
Q. How long did that meeting last? Do you have any idea?
A. I do not recall.
Q. So you had that one meeting with Dr. Charlton and



another underwriter, you don't know who it is; right?
A. Correct.
Q. And during that meeting, did you look at the medical documents, or did you look at them before?
A. We looked at them before.
Q. And what was the outcome of that meeting; do you recall?
A. I do recall that we did not, we believed that we should not pay the claim on this case.
Q. And what did you do after you decided you shouldn't pay the claim on the case?
A. Dr. Charlton took it from there.
Q. So we have not -- According to you, we have nothing in writing to indicate who was actually at that meeting or what was said at that meeting or exactly what you looked at; is that right?
A. That's correct.
MS. SULLIVAN: Objection.
MS. TWIGGER: If you want this to be on the record, ladies, you've got to speak up.
MS. SULLIVAN: I said, I'm sorry, the basis for my objection was that that misstates the record. There is a writing.
Q. Now after that Dr. Charlton meeting, what



happened?
A. I was out of the picture at that point.
Q. Were you ever back in the picture?
A. No.
Q. Did you ever speak with Michael Littlefield except the one time you did the tele-underwriting interview?
A. I did not.
Q. Did you ever speak with Colleen Littlefield?
A. I believe the only time that I spoke with her was to leave a message to have him call me back to participate in the interview.
Q. Do you recall that conversation?
A. I do not.
Q. But you recall you may have spoken with her; correct?
A. I do know that I did.
Q. Did you take any notes on that?
A. On the application supplement?
Q. Yes.
A. There is a note that I talked with her, and she would have him call me back.
Q. Okay. Going back to that document request, I take it that you didn't look for any of the documents in No. 4. But are you aware of any documents that

45

Q. Have you ever seen a hernia turn into cancer before?
A. I have not personally, no.
Q. Do you know anybody who has?
A. No.
MS. TWIGGER: This is Kelly. I need to step out of the room for just one minute. Do you want to take a short break or --
MS. SULLIVAN: Why don't we take a short break, because Karen just told me she needs to go to the ladies room. I'm going to leave the line open.
MS. TWIGGER: That's fine. We'll just leave the line open, and let's take 10 minutes?
MS. SULLIVAN: Yeah.
MS. TWIGGER: That's great.
THE VIDEOGRAPHER: Going off the record at 11:50 a.m.
(Break taken)
THE VIDEOGRAPHER: Back on the record. 12:08 p.m.
Q. Thank you. We just took a break. Did you talk to your attorney while you were gone?
A. No.
Q. Good. Let's go back --

46

A. Good answer.
Q. Very good answer.
Let's go back to Exhibit A.
A. Okay.
Q. Did you look at any, for any documents, or are you aware of any documents responsive to No. 6?
A. No. 6. I do not work with that, no.
Q. Okay. And how about No. 7, are you aware of any documents responsive to that?
A. Yes, I am.
Q. And what would those be?
A. Our guidelines from our reinsurance company.
Q. And are you talking about present time, or are you talking about back in 2003?
A. I'm talking about present time.
Q. Okay. And what are your guidelines from the reinsurance company now?
A. With regards to hernias?
Q. Yeah.
A. They are of no mortality significance, so unless there are symptoms or residuals from any hernia problems, we go no further.
Q. And which reinsurance company does that come from?
A. That comes from both of our reinsurance companies that we use now, which are Optimum Re and

47

Generali.
Q. All right. How about back in '03, in 2003, were there guidelines that would be responsive to that question 7?
A. They were actually the same.
Q. Thank you.
MS. SULLIVAN: And I would just note that we produced this week, in addition to what has previously been produced, additional guidelines that Ms. Hartwig located, which were produced to you, I believe you received them by e-mail.
Q. All right. Now I'm confused. I did get two additional documents on Friday afternoon, and I'm advised that you located those; is that correct?
A. Yes, I did.
Q. And where did you locate those?
A. From other companies within our office. I believe one was Optimum.
MS. DAVIDSON: Okay. I -- Let's mark this as an exhibit, if we could, please. It'll be 3.
MS. SULLIVAN: It's at the very bottom of the pile. There are actually two documents, the last three pages in the pile.
MS. TWIGGER: CFL 589, 590, and 591?

48

MS. DAVIDSON: Yes.
MS. TWIGGER: Would you like them all marked as one exhibit or two?
MS. DAVIDSON: Please. One exhibit, please.
(Exhibit 3 marked for identification)
MS. TWIGGER: There were two exhibit stickers on these, marked as two separate exhibits. I'm taking off the second sticker.
MS. DAVIDSON: Thank you.
MS. TWIGGER: Sort of, because it doesn't want to come off. It's now torn. So --
THE WITNESS: Okay. I have them.
MS. TWIGGER: So Exhibit -- Plaintiff's Exhibit 3 has three pages, CFL 589 through 591.
Q. Now you've told me that you located these documents; is that correct?
A. Yes, I did.
Q. But you also told me that you didn't search for any documents in response to the subpoena I sent you.
A. Yes, I did. And I'm sorry, actually, this was last minute.
Q. Did somebody ask you to make a last-minute search for some documents?

A. Pat and I had talked about it, yes.
Q. And so you sent these documents. Then I got them Friday afternoon. What is this?
A. These are some of the hernia guidelines. The 589 and 590 are from Optimum. That's who we are currently using.
Q. Did you --
A. And --
Q. -- use Optimum back in 2003?
A. It was available to us, but our main reinsurance company was Generali at the time.
Q. Okay. You weren't using Optimum on this case; were you?
A. No.
Q. So these documents aren't relevant to this case; are they?
A. No.
Q. And these documents are dated May '99; is that right?
A. That is correct. The two Optimum ones.
Q. And what information is on these three pages, actually? Is the third page also from Optimum?
A. The third page, I believe, is, it's from another reinsurance company that we just have the book just for -- it's an FYI type thing.



Q. And do we know what reinsurance company that is or when this document pertains to in terms of time?
A. I see the 1993, January 1st, '93 on the bottom. I'm not exactly sure what company it was.
Q. Where did you find it?
A. It was in our office. As an underwriter we sometimes have other sources where we can get information just to read as far as on a certain impairment.
Q. Did you use this '93 form in any way for evaluating Michael Littlefield's claim?
A. No.
Q. Is it relevant to Michael Littlefield's claim?
MS. SULLIVAN: Objection. Go ahead and answer, Cathy.
A. It is not relevant. The relevancy lies in just the hernia information, just an overview.
Q. So -- Well, how is it relevant then?
MS. SULLIVAN: Objection. It's responsive to your request. It's not relevant.
THE COURT REPORTER: I'm sorry. I can't hear you if you're saying something.
MS. SULLIVAN: I said it's responsive to the request. It's not relevant.
Q. To be clear, I just want to be clear, this



document 591 is not relevant to you, and you don't think it's relevant to this case; correct?
MS. SULLIVAN: Objection.
Q. Go ahead.
A. It was not used.
Q. And 589 and 590 weren't used either; correct?
A. Correct.
Q. Did you look for any other documents that would be responsive?
A. No.
Q. Is there any information on this Exhibit 3 that's contrary to the evaluation recommendations that you've used to evaluate hernias?
A. I did not use this information.
Q. I'm going to change the subject now.
How do you keep your files?
MS. SULLIVAN: Objection.
A. You're looking for the, the way we, the what comes first, second, and third in the file as we're looking at it?
Q. I'm looking at how you personally keep your files.
A. Personally, I keep my files in the order, the sheet from the advisor would be first. The application supplement would be next. Page 2 would be next and then the exam. Those are the



pertinent files, file pieces that I would be looking at. Everything else would be behind that.
Q. And where do you actually keep these files, in your home, in your office on the computer?
A. They are actually in the Catholic Family office.
Q. Are they also on the computer?
A. There's some information on the computer with regards to the file. No actual documents.
Q. So is it fair to say that you have no actual documents pertaining to Michael Littlefield, other than those documents you've already produced?
A. Correct.
Q. Do you know why the policy was changed so the paramedical examinations were used?
MS. SULLIVAN: You mean in the underwriting process?
Q. Yeah. In the underwriting process.
A. Why paramedical exams were used over what?
Q. Over anything. I mean, didn't the agents used to ask a bunch of medical questions?
MS. SULLIVAN: Karen, you meant to ask the changes to tele-underwriting.
MS. DAVIDSON: Oh, to tele-underwriting.
MS. SULLIVAN: Yeah. Let's withdraw the

question and maybe reframe it.
Q. Do you know why the procedure was changed from the agent asking medical questions to the tele-underwriters asking medical questions?
A. It was changed basically to get better information.
Q. Do you know who changed it?
A. I do not.
Q. Do you know when it was changed?
A. I do not.
Q. Well, what information do you get that the agent didn't get?
MS. SULLIVAN: Objection.
A. Actually, they have underwriters doing the interviews, and we know the information that we would want to gather to make the most precise determination on a file.
Q. But you're asking lots of questions than the agent used to ask on his form?
MS. SULLIVAN: Objection.
MS. TWIGGER: Is that a question?
MS. DAVIDSON: Yeah.
MS. TWIGGER: What's the question?
Q. The question is, why do you think you're getting more information when you're asking fewer



information than the agents were asking on their form?
MS. SULLIVAN: Objection. I think that question misstates the record, but go ahead and answer, if you can, Cathy.
A. And I actually believe that you're talking about when, when there's an exam done, the tele-underwriter only does the page 2. When there's not an exam done, the underwriter or tele-underwriter will do page 2 and page 3, which includes the medical questions. So in this case, there was an exam done, and the tele-underwriter, myself, only had to do page 2.
Q. Okay. When you say page 2, didn't you actually fill out two pages?
A. Right. The page 2 is listed at the top of 457.
Q. Right. Do you know Donald Demers?
A. Not personally.
Q. Have you ever had to work with him on a case?
A. Over the phone, yes.
Q. Was it this case?
A. I don't believe I had any contact with Don on this case.
Q. When you get a medical authorization, that HIPAA form that's signed by a prospective applicant, who



decides if you're going to send for the medical information? Is it the tele-underwriter, the underwriter?
A. The underwriter.
Q. So you would have decided in this instance whether or not to ask for additional medical information on Michael Littlefield; correct?
A. Correct. Yes.
Q. You had the authorization that would allow you to get any records you wanted; correct?
A. Yes.
Q. Is this policy, this 2003 policy, the first time you were ever aware of Michael or Colleen Littlefield?
A. Yes.
Q. How frequently percentage-wise do you actually get the medical records?
A. It depends on the information that we obtained.
Q. I understand that, but how frequently does it happen that you get the medical records? Is it one out of every hundred aps, generally, is it one out of every 200?
A. I really couldn't say. It depends on the information that we obtained. In the tele-underwriting process we try to get more



information so as not to order reports from a doctor.
Q. And why do you not want to order doctor reports?
A. We feel that we can make a determination on just the information that we obtain from the client.
Q. In a week, do you have a case where you send for medical information from a doctor or hospital?
A. Yes.
Q. So in one week, you will send for medical information from how many?
A. That depends on the cases. There's really no set amount.
Q. Okay. Can you give me any kind of best estimate as to how frequently percentage-wise you send for medical records on an application case like this?
MS. SULLIVAN: Objection.
A. No, I can't.
Q. Do you know anybody who could?
A. No.
Q. Do they keep records of how many cases they send for medical records on?
A. I'm sure someone within the company probably keeps those kind of documents.
Q. Who would keep that?
A. That I don't know.

Q. Does Dr. Charlton ever make the decision to how many medical or if medical records are going to be ordered?
A. If we have to refer to her on a case, she may make that determination.
Q. In a week, how frequently do you refer to Dr. Charlton?
A. She --
MS. SULLIVAN: Objection. Go ahead.
A. Oh, she comes in on a weekly basis once or twice a week. If we have cases to talk to her about, we'll do so at that time.
Q. And how frequently do you talk to her about your cases?
A. As needed.
Q. Okay. How frequently is that? Is that once a month? Is that every time she comes in?
A. That depends on the cases that we get in the house. We don't know.
Q. I'm asking you for your best estimate. How frequently do you have to refer to Dr. Charlton for making medical determinations?
MS. SULLIVAN: Objection.
A. I can't even make a determination on that.
Q. Do you keep any statistics, or does anybody keep



stats on that?
A. As far as what?
Q. How frequently she's asked to look at files.
A. No. No one keeps stats on that.
Q. So is Dr. Charlton in this week?
A. She will be, yes.
Q. And she'll be in every week pretty much?
A. Yes.
Q. When she's not available, who takes over for your medical reviews?
A. If we need someone and she's not available, we can go to our reinsurance company.
Q. One of your two reinsurance companies?
A. Yes.
Q. Did you decide that there should be reinsurance on this Littlefield policy?
A. No.
Q. Who decided that?
A. Due to the face amount --
Q. Yeah.
A. -- it's an automatic reinsurance, according to the treaty that we have with them.
Q. Yeah. And how did you decide to use BMA and Generali?
A. That is our reinsurance company our main



reinsurance company.
Q. Okay. You've got two, though; right?
A. Yes.
Q. And you just used it because it was your main company?
A. Correct.
Q. And when you're going to use the reinsurance policy, do you have to call somebody and talk to them about it, or do you just automatically do it?
A. If it's, if it's within our automatic retention, we do not need to discuss the case with them.
Q. So this was within your automatic retention, so you would not have discussed the case with them; is that right?
A. Correct.
Q. So is it fair to say that nobody at that BMA company or Generali company looked at the Michael Littlefield application prior to his dying?
A. That is correct.
Q. Does your company reinsure for anybody?
A. No.
Q. Is your relationship with Kim Ingram a friendly relationship or a professional relationship or both?



A. Professional.
Q. And how about with Dr. Charlton?
A. Professional, also.
Q. About how many policies have you worked on that are 300,000 or over since you've been at CFLI?
A. That I don't know, either.
Q. Well, is it something that occurs once a month or once every three or four months or --
A. We have quite a few that are usually a hundred thousand and over.
Q. Quite a few. Is that 25 percent?
A. I don't know the percentage.
Q. So this past week how many policies did you look at that were over, 300 or over?
A. I could not tell you.
Q. Is the tele-underwriting a faster way of getting information rather than having the agent get information?
A. Not necessarily faster.
Q. But who -- Why did you decide to switch over to the tele-underwriting then rather than have the agent?
MS. SULLIVAN: Objection. Answer, if you know.
A. It's -- The industry standards now is to use

tele-underwriting.
Q. When did the industry standard change?
A. I don't know exactly when that was.
Q. Sometime before '03?
A. Yes.
Q. Have you ever had a case involving a CAT scan or barium enemas before?
A. Yes.
Q. Okay. And what were those occasions? Can you recall?
A. No. I really can't. There's lots of different impairments that they may use those tests to determine what's going on.
Q. So is it something you see frequently or infrequently or just some of the time?
A. I would say infrequently.
Q. When is the last time you saw it?
A. That I couldn't say.
Q. And when you see a CAT scan or a barium enema test being done, what do you do about it, if anything?
A. Normally we order doctors' reports. It's not a routine test.
Q. Do you have any kind of guidelines that tell you to do that?



A. No.
Q. You don't ask in your tele-underwriting interview if anybody's had a CAT scan or a barium enema; do you?
A. No.
MS. SULLIVAN: Objection.
Q. Was your answer no?
A. It was, yes.
Q. And why not?
A. It's not part of the questioning.
Q. Why not?
A. We just ask basics on that part of the, on question 9. That might be part of the answer.
Q. When you send for medical records, are you the person who reviews those medical records before a policy is issued, or do you review them together with Dr. Charlton?
A. It could be both.
Q. But sometimes do you make an independent determination?
A. Yes.
Q. Without Dr. Charlton?
A. Yes.
Q. How often?
A. Most of the time.



Q. And then on what occasions do you bring Dr. Charlton?
A. If we have any questions on the findings.
Q. Did you have any role in writing the denial of coverage letter that was sent to Colleen Littlefield?
A. No.
Q. Do you have any information with regard to whether or not the insurance agent, insurance agents out in the field are instructed to sort of pooh-pooh hernias and have had surgery already performed?
MS. SULLIVAN: Objection. Misstates the record. Go ahead and answer.
A. I do not.
Q. I want to go over some more documents with you, so I'm going to ask you to pull out that pile of documents that that you've got there, please.
MS. SULLIVAN: That would be the Kim Ingram pile.
A. Do you want all these back?
Q. Have you got those there?
MS. TWIGGER: Yeah. Just a second.
MS. DAVIDSON: Okay.
MS. TWIGGER: I'm going to put these in a file here that are numbered 1, 2, and 3 so that we



have them in order. Okay. The witness has the pile of documents that were marked as the ones at her depo -- at Kim Ingram's deposition.
Q. That's right. And I'm looking at what was marked at her deposition Plaintiff's 2 at the bottom in big letters, marked in big letters BMA. Do you see that?
MS. TWIGGER: Just a second. Yes.
MS. DAVIDSON: We're going to mark that Exhibit 4 for this deposition, please.
(Exhibit 4 marked for identification)
Q. Could you take a look at that, Ms. Hartwig, and tell me if you recognize it?
A. I do, yes.
Q. What is it?
A. It is the BMA guidelines for a hernia.
Q. And when is this used?
A. It's used if we have any questions regarding how to proceed.
Q. Was it used in '03?
A. It was not.
Q. When was it used?
A. It would be used if there's any symptoms currently.
Q. So this is a document that's used at present but

Q. And it's actually four pages.
A. Yes.
Q. Dated at the top August 27th, '03. Is any of this your handwriting?
A. Some of it is.
Q. What's your handwriting?
MS. SULLIVAN: Let me -- Just wait a minute and make sure. Cathy, have you had a chance to look at all four pages?
THE WITNESS: Not in depth.
Q. Take your time and look at them, and I want to be sure it's marked Exhibit 9 now.
(Exhibit 9 marked for identification)
Q. Okay. I'm going to review them real quick.
A. Okay.
Q. Could you tell me what's your handwriting?
A. My handwriting is where it's -- I put the billed in 5-9, 160.
Q. I see it.
A. Plus zero, meaning that it's no additional debits that add to his mortality. I put the 108 over 80 for his blood pressure average. The as applied for X is mine, along with the approval date of 9-9-03, and my signature is C. Hartwig.
I also at the bottom right noted that a



test on the lab work, the alkaline phosphatase was elevated, noted that cholesterol reading of 147 and the ratio of 2.6, and I also notated from the motor vehicle record, that he had one speeding 12-01, 11 plus over, and another speeding 11-00, 1 to 10 over.
Q. Did those affect his rating, those things at the bottom right?
A. No.
Q. Does being self-employed affect your rating?
A. No.
Q. Do you know whose handwriting appears on the other parts of the document?
A. I do not.
Q. And then the next page you've got underwriter's notes, and you made no notes on that?
A. No notes from me.
Q. And those initials at the bottom, who are all those people?
A. I do not know.
Q. None of them is you?
A. No.
Q. Under the third page, reinsurance application, is any of this your writing?
A. Yes, it is.



Q. What's that?
A. I wrote the name.
Q. Yeah.
A. Littlefield, Michael, new insurance this case 300,000, retaining 150,000, standard and reinsurance to BMA is 150,000.
Q. Now why did you put standard for his rate?
A. That's the no -- It means no extra mortality.
Q. So he didn't get preferred, he got standard?
A. He did get preferred, but they don't recognize our preferred.
Q. Who's they?
A. The reinsurance company that this went to.
Q. Why don't they recognize your preferred?
A. All they want to know is if we rated the policy, charged an extra premium due to some medical history.
Q. Do you have to wait to issue a policy to see if the reinsurance company accepts their half of it?
A. We have an automatic of 600,000, so anything under that they take us at what we decide without any going back and forth.
Q. Yeah. So in this case, you didn't have to get any kind of approval for the reinsurance?
A. Correct.



Q. And then looking at page 4, CFL 4, is any of this your writing?
A. I checked the yes box after reinsurance.
Q. Yeah.
A. I checked the company BMA, and I also wrote, see session.
Q. What does that mean?
A. That was the session on the previous page 3. So if they had any questions, they could just look at the session form that was sent to BMA.
Q. Oh, the reinsurance session form?
A. Correct.
Q. Thank you. That's all with that document.
Could you look at what was marked Plaintiff's 11 at the other depo, and we're going to mark it 10, please. It says Interoffice Memo at the top.
A. Okay.
(Exhibit 10 marked for identification)
MS. SULLIVAN: Cathy, have you had a chance to look at it?
THE WITNESS: No. Looking now.
A. Okay.
Q. On page -- Well, first, what is this?
A. This is an interoffice memo that goes to someone

Q. I must not have phrased my question correctly.
Did it have anything to do with your determination with regard to whether or not there should be payout on the policy?
A. It did, yes.
Q. And how did that influence you?
A. It was a nine-month from the time they actually diagnosed it. And then the rest was done by the medical director. She took it from there with her expertise as far as conditions and things.
Q. I see.
THE VIDEOGRAPHER: Five minutes left on tape. Five minutes.
MS. DAVIDSON: Thank you.
Q. So during the determination process of whether or not the claim should be paid out, you never spoke to Colleen Littlefield; is that right?
A. Correct.
Q. Did you ever speak to her again?
A. No.
Q. And with regard to obtaining the medical records, which you told me you started on July the 27th of '05, did you get all of the medical records you wanted to examine?
A. That was not my determination.



Q. Okay. Who determined that?
A. Dr. Charlton.
Q. Now I'm going to ask you this again. You can't tell from looking at this what records you actually reviewed when you were trying to decide what to do with the payout on this policy; is that correct?
A. I'm assuming that I looked at all of the files, all of the cases from the doctors.
Q. How, how --
A. There's --
Q. Okay. How do these files get to you?
A. There was a packet that the medical director had.
Q. Yeah.
A. And she just, she shared that with the underwriters.
Q. So there were no memos that went back and forth or transmittal forms or anything?
A. No.
Q. She just handed it to you?
A. Yes. It was her determination whether to pay the claim or not.
Q. All right. I understand that. I guess I just wonder when you had an opportunity to look at the



medical records.
A. When everything was in, then we looked at it and discussed it with her, and she made the final determination.
Q. Did you look at it and make the determination at the same time, or did you have an opportunity to review the medical records before you made your own mind up?
A. We reviewed them together. We were in the same meeting.
Q. Okay. So you never reviewed those medical records before that meeting; right?
A. Correct.
Q. Do you have any notes from that meeting?
A. No.
Q. Do you know if any kind of writing was generated as a result of that meeting, other than what is marked here as CFL 38?
A. To my knowledge, that was it.
Q. And we're speaking with regard to the letter from Nicola Charlton?
A. Right.
Q. August 25th, '05. Who did this go to; do you know?
A. I do not know.



Q. Do you routinely get things from Dr. Charlton with regard to her reasons for determinations on policies?
A. No.
Q. You don't know who gets it?
A. No.
Q. And I believe you testified that you didn't have anything to do with sending out the letter to Ms. Littlefield telling her she was not going to get paid under the policy; is that right?
A. Correct.
Q. Looking at the last two pages of this exhibit, CFL 39 and CFL 40, do you know whose handwriting that is?
A. I do not.
Q. That's it for this exhibit. Thank you.
Do you need to stop the tape now?
THE VIDEOGRAPHER: Yes, please. This is the end of tape 1, the deposition of Cathy Hartwig, 1:13 p.m., March 5th, 2007. We are off the record.
(Break taken)
THE VIDEOGRAPHER: This is the beginning of tape No. 2, the deposition of Cathy Hartwig, 1:19 p.m., March 5th, 2007. We are on the

97

record.
Q. Thank you. Could we go back to Plaintiff's 17 in the Kim Ingram deposition. It's CFL 447 through 452.
A. Okay.
MS. TWIGGER: We have it.
Q. Could I have it marked, please.
(Exhibit 13 marked for identification)
A. Let me peruse it real quick. Okay.
Q. What is this?
A. This is a Risk Selection Guide. It's only guidelines given to the agent or advisors so that they're aware of what the underwriting process is looking at and what their possibilities are as far as possible ratings and what kind of extra documents we may order, if we need them.
Q. When did this come out; do you know?
A. When did the brochure come out?
Q. Yeah.
A. It looks like 12-00, the left-hand side on the bottom.
Q. Yeah. So do you know whether or not this was used by the agents in the field in 2003?
A. Yes.
Q. It was?

98

A. Yes.
Q. And could you tell me, did you have any part in creating this document?
A. I did not.
Q. And under page 449 hernia and 450 hernia, what information does that give you?
A. It actually gives the agent information on what a hernia is, what we're going to ask about, including the location, if there's surgery performed or planned in the future and probable action, usually standard, may be necessary to postpone if surgery is planned.
Q. So, basically, that means that the agent is supposed to write down information with regard to hernias?
A. No.
Q. They are not; is that correct?
A. Correct.
Q. Then why is hernias of so little interest?
MS. SULLIVAN: Objection.
Q. Could you answer?
A. Yes. Actually, hernias are really no mortality significance.
Q. Yeah.
A. Unless there's some symptoms or some problems.

99

Q. Looking at the next exhibit, which is marked 18, and it says Hiatal Hernia Diaphragmatic at the top?
A. Okay.
Q. Do you see it?
A. Yeah.
Q. Could we mark it please, Exhibit 14.
(Exhibit 14 marked for identification)
Q. Thank you. What is this?
A. This is guidelines from Generali Reinsurance with regards to hiatal hernias.
Q. And it's got a date on here of '04. Was this available in '03; do you know?
A. I do not know.
Q. Did you ever use it?
A. Are you talking about this case?
Q. No. I'm just talking about you.
A. Yes.
Q. When did you use it?
A. I've used it if I had any questions with regards to anyone with a hiatal hernia.
Q. Is that relevant here?
A. No.
Q. Then I'm just going to take a minute and review my notes and make sure that I've gotten all the

100

questions out I need to.
A. Okay.
Q. Once again, I want to get clear on something. Did you ask Dr. Charlton to get the medical records, or did Dr. Charlton ask you to get the medical records or some other scenario?
A. It was another scenario.
Q. And what was that?
A. We have a death claim area. They initially review the information, and they initially ordered some doctors' records, and then Dr. Charlton, as she looked over them, requested more if she needed them.
Q. Who's in the death claim area?
A. That I don't know.
Q. You don't work with them at all?
A. No.
Q. Is it people who just work with death claims?
A. Yes.
Q. And then they interact with Charlton, you believe?
A. I believe so.
Q. Were they in any way involved in the decision making as to whether or not there should be a payout on the policy?
A. That I'm not aware.

Q. Do you know where the actual insurance policy is?
A. No.
Q. Do you know what misrepresentations Michael Littlefield is alleged to have made?
MS. SULLIVAN: Objection. Answer if you understand the question and if you know.
A. No, I don't.
Q. Are there any documents you're aware of that would show that CFLI would have treated this policy differently if, if Michael had disclosed that he had a CAT scan or a barium enema?
A. There are actually no documents.
Q. Is there anything?
MS. SULLIVAN: Objection.
A. It's the -- at the underwriting expertise whether or not to order some additional requirements based on if we would have known about additional testing.
Q. Yeah. So it would have been your expertise that you would have used in this instance?
A. Correct.
Q. And, and you've told me with regard to CAT scans and barium enemas, you don't have any specific recollections of asking for those in cases; is that right?



MS. SULLIVAN: Objection.
A. He did not advise that he had those tests done according to the tele-underwriting interview that was on record, so we did not ask any further questions.
Q. I understand that, but I'm asking you in your experience, when you see that there's been a CAT scan or a barium enema, do you order those medical records?
A. Yes.
MS. SULLIVAN: Objection. Asked and answered.
A. Yes, I do.
Q. Always?
A. Yes.
Q. How often?
A. As needed.
Q. And you told me you can't tell me how many times; is that correct?
A. No.
Q. Oh, how many times?
A. No, I cannot say how many times I order records on those instances. We always order records when they say that they did any testing such as that that, that's not routine.



Q. You always order them?
A. Yes.
Q. When is the last time you ordered them on one of your cases?
A. That I cannot tell you. It depends on the details that I get, and I don't know when the last time someone told me that they had a CAT scan or barium enema.
Q. Okay. And you don't remember how many you've had over the years?
A. No.
Q. Is it less than five?
A. I couldn't tell you.
Q. And just to be perfectly clear, there's no sort of procedural manual or memo or instruction that says if there's a CAT scan or barium enema, we always send for the records; is that, is that correct?
A. That's correct.
Q. Is it fair to say you didn't have anything to do with regard to sending Generali copies of this policy denial?
A. Correct.
Q. Did you ever deal with Jeff Shephard at Generali?
A. I have not personally, no.
MS. DAVIDSON: I have no further



questions. Thank you very much.
THE WITNESS: Thank you.
MS. SULLIVAN: I have one question.

EXAMINATION

BY MS. SULLIVAN:
Q. Cathy, I'd like to just have you take a look at a document which is in the stack. I had pre-marked it as exhibit, Defendant's Exhibit K.
MS. TWIGGER: Just a minute.
THE WITNESS: We're getting it.
MS. SULLIVAN: It's CFL 259. It's a one-page document.
MS. TWIGGER: Do you want to have it re-marked?
MS. SULLIVAN: Yeah.
(Exhibit 15 marked for identification)
Q. Cathy, have you had a chance to take a look at what we've marked as Exhibit 15?
A. Yes.
Q. Can you identify it?
A. It is the lab work for Michael Littlefield.
Q. Is this a document that was available to you when you did the underwriting process on this case?
A. Yes.
Q. Is there any handwriting that appears on this

Michael Littlefield

# TELEUNDERWRITING APPLICATION SUPPLEMENT

POLICY NUMBER ____________ AGENT ____________

1. VERIFICATION OF APPLICATION INFORMATION
   a. Correct name/spelling? ☑Yes ☐No
   b. Date of Birth correct? ☑Yes ☐No
   c. Social Security # correct? ☑Yes ☐No
   d. Beneficiary correct? ☑Yes ☐No
   e. Are you Catholic? ☑Yes ☐No

2. What is the purpose of this insurance (family income replacement, estate taxes, debt coverage, etc.)? ____________

Employer Self Empl Occupation Cleaning Business

What is your income? (Ask for amounts over $150,000 only)
- ☐ $0-$25,000
- ☐ $26,000-$50,000
- ☐ $51,000-$75,000
- ☐ $76,000-$100,000
- ☐ $100,000+

28K

Do you have any unearned income? ☐Yes ☐No Amount and source:

4. Have you declared bankruptcy in the last 7 years, or ever had any suits, judgements or liens against you? ☐Yes ☑No Discharged date?

5. What is your height 5'9" and weight? 160

6. Do you currently take any medication? If yes, What? Why? How Much? No

7. Do you currently take any herbs, vitamins, mineral supplements or other non-prescription remedies? ☑Yes ☐No

Reason? Multi Vit

Dosage or how often? ____________

Special Attention

9/4 11 Am Per wife, she'll have him call

Plaintiffs EXHIBIT NO. 2 3-5-07 COLLEEN REED REPORTING

CFL000461

Michael Littlefield

LIFE INSURANCE IN FORCE OR PENDING ☒ YES ☐ NO (if yes, complete below.)

| Name of Proposed Insured | Company | Amount |
|---|---|---|
| Michael | CFLI | |
| | | |
| | | |

## 9. UNDERWRITING INFORMATION - PART 1

PROPOSED INSURED(S) MUST COMPLETE ALL QUESTIONS. ALL "YES" ANSWERS MUST BE EXPLAINED AND REFERENCED IN THE BOX AT THE BOTTOM OF THIS PAGE!

| Has or does the person(s) proposed for insurance coverage: | YES | NO |
|---|---|---|
| 1.) Ever engaged in or expect to engage in any of the following: | | |
| a. Aviation activities as a pilot or crew member? If yes, attach Aviation Questionnaire. | ☐ | ☒ |
| b. Skin or Scuba Diving; motor vehicle or motor boat racing; mountain climbing, professional rodeo competition; skydiving; other hazardous activities? If yes, attach Hazardous Activities Questionnaire. | ☐ | ☒ |
| 2.) a. Drink alcoholic beverages? If yes, how much per week? (One drink = 12 oz. beer, 4 oz. wine, or 1 oz. hard liquor.) Amount: 1-2 / 2weeks | ☒ | ☐ |
| b. Now or ever been a user of heroin, cocaine, marijuana, or illegal, restricted or controlled substance, except as prescribed by a physician? If yes, attach Drug and Alcohol Questionnaire. | ☐ | ☒ |
| c. Ever had or been advised by a physician, practitioner, or court of law to have treatment for alcohol, drug, or substance abuse? If yes, attach Drug and Alcohol Questionnaire. | ☐ | ☒ |
| 3.) a. Had insurance or reinstatement refused, postponed, limited, offered, or quoted on a rated or substandard basis? | ☐ | ☒ |
| b. Will this insurance replace or change any existing life insurance or annuity contract? CNT | ☒ | ☐ |
| c. Within the past 5 years applied for or received disability or Worker's Compensation Benefits? | ☐ | ☒ |
| 4.) a. Driver's License No. REDACTED State RI | | |
| b. Ever been cited for driving while intoxicated (DWI), or driving under the influence (DUI)? | ☐ | ☒ |
| c. Ever been cited for any other driving violation in the past 3 years? If yes, please provide full details. | ☒ | ☐ |
| d. Ever been convicted in a court of law for any reason? | ☐ | ☒ |
| 5.) Have you lived or traveled outside the United States within the past 12 months or do you plan to travel or live outside of the United States within the next 12 months? | ☐ | ☒ |
| 6.) Are you a U.S. citizen, or do you have permanent residence status? If not a U.S. citizen, please provide I-151 (green card) number ______ | ☒ | ☐ |
| 7.) Do you now use or have you ever used tobacco or nicotine in any form? If yes, indicate the type of tobacco used; (cigarettes, pipe, cigar, chewing tobacco, other) and if applicable, the date you stopped. | ☐ | ☒ |
| 8.) a. Have a history in parents, brothers or sisters of mental illness, diabetes, heart, kidney or liver disease, high blood pressure, stroke or cancer? If yes, name person(s), relationship(s), age(s), condition(s), and age when disease began. | ☐ | ☒ |
| b. Give name, cause and age at death of father, mother, brother(s), sister(s) if deceased. None | | |

9.) Full name and complete address of personal physician; the date, reason last seen, and diagnosis:

Dr Manzo
Greenwich, RI — 5/03 followup after 4/03 hernia surgery
All OK.

| Question Number | Details |
|---|---|
| 4C | Speeding |
| | |
| | |
| | |

CFL000457

Compl 9/4/03

DISORDERS OF MOTILITY (continued)

Esophageal Diverticulum – *a pouch or sac, perhaps several, in the esophagus.* May be congenital or acquired. Usually asymptomatic when small and discovered accidentally on barium swallow x-ray. If large, may entrap food

| | Life Rating | WP | ADB |
|---|---|---|---|
| All cases | Usually 0 | Yes | Yes |

Esophageal Spasm – consider similar to Achalasia, page GI-1.

Esophageal Stricture – *abnormal narrowing of the esophagus.* Acid or lye burns most common. Rule out suicide attempt. Medical examination by a medical doctor required.

| | Life Rating | WP | ADB |
|---|---|---|---|
| Still under treatment | | | |
| Mild | +50 | No | Yes |
| Severe | +100 up | No | No |
| Presumed cured | | | |
| 0 - 2 years | +50 | No | Yes |
| Thereafter | 0 | Yes | Yes |

Hernia – *abnormal protrusion of an organ or part thereof through an abnormal opening.* Abnormal hernias include incisional, inguinal, femoral, scrotal, umbilical and ventral (epigastric). They are described as being reducible, irreducible, complete or incomplete, direct or indirect, single or double, history of strangulation or no such history.

All Abdominal Hernias

| | Life Rating | WP | ADB |
|---|---|---|---|
| Not operated | | | |
| Reducible, no history of strangulation, no symptoms | 0 | Yes | Yes |
| Irreducible or with symptoms, no history of strangulation | 0 | No | Yes |
| History of strangulation (add to above) | | | |
| Unoperated | +50 up | No | No |
| Operated, successful repair | 0 | Yes | Yes |
| Operation | | | |
| Contemplated | PP until after surgery | | |
| Cured | 0 | Yes | Yes |
| Recurrence | Rate as Not Operated above. | | |

Plaintiff's EXHIBIT NO. 3 3-5-07 COLLEEN REED REPORTING

| GASTROINTESTINAL | Life Rating | WP | ADB |
|---|---|---|---|

Hiatal Hernia (diaphragmatic, paraesophageal) – *the rupture, herniation, or protrusion of the upper part of the stomach or other abdominal contents up through the diaphragm into the chest cavity.* With recent techniques for x-ray examination of the GI tract, many "sliding" herniations can be seen. Symptoms, when they occur, are due mostly to regurgitation of acid-septic gastric juices into the lower esophagus. The pain may mimic angina pectoris, peptic ulcer or gallbladder disease, any of which may co-exist.

| | Life Rating | WP | ADB |
|---|---|---|---|
| Asymptomatic or minor symptoms only | 0 | Yes | Yes |
| Moderately symptomatic | +50-0 | Yes | Yes |
| Others, with bleeding or displacement of heart of lung | +100-50 up | No | IC |
| Operation contemplated | PP | | |
| Operated, no recurrence | 0 | Yes | Yes |

Irritable Colon, Spastic Colon, Mucous Colitis – *abdominal pain, constipation, diarrhea, abdominal "fullness," passage of excessive mucous in the colon are the usual complaints.* Characterized by a variety of symptoms that accompany emotional tension and the individual's response to non-specific stress. It accounts for more than half of all GI illness and ranks with the common cold as a leading cause of recurrent minor disability.

| | Life Rating | WP | ADB |
|---|---|---|---|
| Mild, infrequent episodes | 0 | IC | Yes |
| Severe, prolonged | | | |
| 0 - 1 year | +100-50 | No | Yes |
| 1 - 2 years | +50-0 | No | Yes |

Intestinal Obstruction (Adhesions, Ileus, Intussusception, Volvulus) – *any impairment which arrests, impedes, or reverses the normal flow of intestinal contents.* Due to fibrous adhesions (bands) between loops of the intestine resulting from prior inflammation or hemorrhage within the peritoneal cavity or previous abdominal surgery. Other causes include benign and malignant tumors in the intestinal wall, inflammatory stricture due to diverticulitis, regional enteritis and least commonly, fecal impaction, intussusception, foreign bodies, gallstones, and large worms within the lumen or cavity of the intestine. One other large group of cases is due to general or regional failure of peristalsis (adynamic ileus) which frequently is associated in a mild form in almost every acute infection. (Intussusception is the slipping of a length of intestine into an adjacent portion. Volvulus is a twisting of the intestine upon itself.)

| | Life Rating |
|---|---|
| Cause known | RFC |
| Cause unknown | |
| No surgery, no recurrence | |
| 0 - 6 months | PP |
| Thereafter | 0 |
| With surgery, no recurrence | |
| Full recovery | 0 |
| Others | PP |
| With recurrence | Refer to M.D. |

DEFENDANT'S EXHIBIT

CFL000591

| HERNIA | LIFE | AD-WP | MED EXPENSE | INCOME REPLACE |
|---|---|---|---|---|
| Protrusion of organ through defect in containing wall. | | | | |
| **Hiatus hernia.** (Diaphragmatic hernia.) | | | | |
| Permits abdominal organs to enter chest. | | | | |
| May be painful, bleed, perforate, ulcerate, mimic coronary artery disease. | | | | |
| PRESENT. | | | | |
| Discovered accidentally, never symptomatic. | 0 | 0 | 20% to 0 | [S] |
| Symptomatic; no hemorrhage. | | | | |
| Controlled with medication and diet. | 0 | 0 | 60 to 40% | [S] |
| Not controlled by medication and diet. | T2 to 0 | 0 | W 306 | [S] |
| Symptomatic; hemorrhage at some time. | | | | |
| Controlled with medication and diet. | | | | |
| Observed 3 mos. - 36 mos. | T2 to 0 | 0 | W 306 | [S] |
| Observed 37 mos. up. | 0 | 0 | W 306 | [S] |
| Not controlled by medication and diet. | T4 to T2 | 2x | W 306 | [S] |
| [S] W 306 for EP less than 90 days, 20% to 0 for EP 90 days or longer. | | | | |
| AFTER SUCCESSFUL OPERATION, RC 3 MOS. UP. | 0 | 0 | 20% to 0 | 20% to 0 |
| (W 306) | | | | |
| **Inguinal or femoral hernia.** Also called a "rupture." Some can be controlled by a truss but only surgery can be curative. | | | | |
| PRESENT. | 0 | 0 | W 306 | [S] |
| AFTER SURGICAL REPAIR. | | | | |
| No recurrence. RC 2 mos. up. | 0 | 0 | 20% to 0 | 20% to 0 |
| With recurrence. | | | | |
| Not operated. | 0 | 0 | W 306 | [S] |
| After repeat surgery, RC 6 mos. up. | 0 | 0 | 40 to 20% | 20% to 0 |
| [S] W 306 for EP less than 90 days, 20% to 0 for EP 90 days or longer. | | | | |
| (W 306) | | | | |
| **Ventral or incisional hernia.** A hernia affecting the belly. Most often occurs after major abdominal surgery; may be congenital. | | | | |
| Underwrite as INGUINAL HERNIA. | | | | |

## Gastritis, Duodenitis, Pylorospasm, Hyperacidity, Hyperchlorhydria

Symptoms include epigastric discomfort and nausea, and often are associated with peptic ulcer disease. The symptoms of these disorders, however, may be confused with those of coronary artery disease. The possibility of malignancy must also be considered, especially in individuals over age 45 experiencing recurrent symptoms. In addition, alcohol use must also be considered.

| | Life | Disability Income | |
|---|---|---|---|
| | | <90 | ≥90 |
| Cause known | Rate for cause | Rate for cause | |
| Others | | | |
| Mild, infrequent episodes | Standard | Consider waiver | Standard |
| Severe or repeated episodes | | | |
| 0-1 year | 50 | Waiver | Standard |
| 1 year up | 0 | Consider waiver | Standard |
| With significant weight loss and/or hemorrhage | | | |
| 0-1 year | Postpone | Postpone | |
| 1-2 years | 100 | Waiver | |
| 2-3 years | 0-50 | Waiver | |
| 3 years up | 0 | Consider waiver | Standard |

## Gastroenteritis

An acute inflammation of the stomach and intestines with cramps, vomiting, and diarrhea. It may be due to viral or bacterial infections, or dietary indiscretion.

| Life | Disability Income | |
|---|---|---|
| | <90 | ≥90 |
| Usually Standard | Consider waiver | Standard |

Plaintiff's EXHIBIT NO. 4 3-5-07 COLLEEN REED REPORTING

## Hiatal Hernia (Diaphragmatic)

The protrusion of the upper part of the stomach through the diaphragm. Symptoms are due to reflux esophagitis and include heartburn, retrosternal pain, difficulty swallowing and hemorrhage. Symptoms can be confused with those of coronary artery disease.

| | Life | Disability Income | |
|---|---|---|---|
| | | <90 | ≥90 |
| Small/moderate, no significant symptoms | Standard | Consider waiver | Standard |

| | | |
|---|---|---|
| Large, displacing heart of lung, or history of hemorrhage | 50 up | Waiver |
| Surgically repaired, including prosthesis | Standard | Standard |

## Peptic Ulcer Disease

An ulceration of the mucous membrane caused by a breakdown of the natural barrier on the mucous membrane surface which protects the stomach lining from gastric acid. Factors which may facilitate the development of ulcers include: cigarette smoking, anxiety and stress, medications (aspirin, non-steroidal anti-inflammatory drugs, corticosteroids), caffeine, alcohol, and bacterial infection with Helicobacter pylori. Symptoms include recurring epigastric pain and tenderness, sometimes with nausea and vomiting. Duodenal ulcers are more common than gastric ulcers. Chronic gastric ulcers have a potential for malignancy, especially at the older ages. With the availability of histamine (H2) receptor blockers (Tagamet, Pepcid) and sucralfate, the medical management of PUD has, in most cases, replaced the need for surgery. Surgery is usually reserved for those individuals with complications of their PUD, such as intractable bleeding, 'outlet obstruction', or perforation. Surgical procedures include vagotomies, pyloroplasties, and various gastrectomies (e.g. Billroth's I & II).

| | Life | Disability Income <90 | Disability Income ≥90 |
|---|---|---|---|
| No current or past operative complications | | | |
| 0-1 year | 0-50* | Waiver | |
| 1 year up | 0 | Consider waiver | Standard |

*2 or 3 episodes, no hemorrhage, definite diagnosis of duodenal ulcer - may be considered standard.

However, if
- There is a history of hemorrhage, or
- Surgery was other than simple closure/oversew, or
- Ulcer is gastric with benign biopsies, then

| | Life | Disability Income <90 | Disability Income ≥90 |
|---|---|---|---|
| 0-1 year | 50-100 | | |
| 1-2 years | 0-50 | Waiver | |
| 2 years up | 0 | Consider waiver | Standard |
| If ulcer is gastric without biopsy | Postpone until completely healed (documented by endoscopy) | Postpone | |
| With Dumping Syndrome (symptoms of weakness, dizziness, nausea, and vomiting following gastrectomy) | | | |
| Mild/Moderate | 0-50 | 100 | Standard |
| Severe | 50-100 | Decline | |

Catholic Family Life Insurance

Application for Membership and Life Insurance to:
Catholic Family Life Insurance, 1572 E. Capitol Drive Milwaukee, Wisconsin 53211 • (800)227-2354
*(Please print in black ink.)*

Proposed Primary Insured ✓ Proposed Other Insured ____
Name: Michael Littlefield
First Middle
Street 37 REDACTED
City: Zip:
Home Phone: Gender: M
Social Security Number:
Previous Name(s)
Occupation: [illegible] State of Birth: RI
Birthdate: Age last birthday: 34
Where can you be reached for additional information?
Phone: REDACTED
Best Days: M T W TH F
Best Times: [illegible] ☐ a.m. ☑ p.m.

Face Amount: $ 300,000 ☐ Tobacco ☑ Non-Tobacco
Plan of Insurance: 20 yr [illegible] Term
Mode: ☐ Ann. ☐ Semi-Ann. ☑ Quarterly ☐ EFT ☐ 1 ☐ 15
(UL only) Option: ☐ #1 Level ☐ #2 Increasing
UL planned premium: $

Amount remitted with this application in exchange for the Society's receipt: $ 96.30
(See Receipt and Conditional Life Insurance Agreement)
Primary Beneficiary: [illegible] Littlefield
Relationship to Proposed Insured: Wife
Social Security Number: REDACTED
Contingent Beneficiary:
Relationship to Proposed Insured: [illegible]
Social Security Number:

Is this policy to replace any existing insurance or annuity(ies)? ☑ Yes ☐ No
If yes, indicate company names(s) [illegible]
Is the Proposed Insured a U.S. Citizen? ☑ Yes ☐ No
Has the Proposed Insured used tobacco in any form in the past 12 months? ☐ Yes ☑ No
Is the Proposed Insured Catholic? ☑ Yes ☐ No
Parish:

Has the Proposed Insured ever been told he/she had or been treated for diabetes, cancer, heart disease, alcoholism, drug abuse, or high blood pressure? ☐ Yes ☑ No
Has the Proposed Insured ever had insurance or reinstatement refused, postponed, limited, or offered on a substandard basis? ☐ Yes ☑ No

Riders: ☐ WP (OL3 or term) ☐ Waiver of Monthly deduction (UL)
☐ Waiver of Planned Premium (UL) $ ☐ ADB (UL or OL3 only) $ ☐ GIR(UL or OL3)$
☐ Term Rider (Primary Insured) $ ☐ Acceleration of Death Benefit Rider (UL)
☐ Term Rider (Other Insured) $ (Complete a separate application for each person.)
☐ Children's Term Units (Complete a separate application for each child.)

Plaintiff's EXHIBIT NO. 5 3-5-07 COLLEEN REED REPORTING

Authorization to obtain and disclose information: I (we) have read all the questions and answers in the application. All responses are true and complete to the best of my (our) knowledge and belief. No coverage will be in effect until: a full application has been signed by the Proposed Insured; and a policy has been issued: and the full first premium has been received by the Society; and any amendments are signed. Any coverage will be subject to the terms and conditions of the policy.

(we) have received the notification about the Federal Fair Credit Reporting Act and the Medical Information Bureau.

AUTHORIZE the following to release information about me to Catholic Family or its reinsurers. Those authorized include a physician, medical practitioner, hospital, clinic, other medical or medically related facility, insurance or reinsuring company, the Medical Information Bureau, a consumer reporting agency, and/or employers. I UNDERSTAND that this information may include diagnosis, treatment, and prognosis with respect to any physical or mental condition and/or treatment, and other non-medical information concerning me. I authorize all sources, except MIB, to give records or knowledge to any agency employed by Catholic Family Life Insurance. I authorize them to collect and transmit such information. I UNDERSTAND they will use the information obtained through this Authorization to determine eligibility for insurance. Any information obtained will not be released to any person or entity EXCEPT to reinsuring companies, or other persons or organizations performing business or legal services with my application. The Society may release this information when lawfully required, or as I further authorize.

I KNOW that I may request a copy of this Authorization. I AGREE that a photographic or faxed copy of this Authorization shall be as valid as the original. I ACKNOWLEDGE that I received the "Notice to Applicant" form. I AGREE this Authorization shall be valid for one year from the date shown below.

Signed at (city and state) N. Kingstown RI [signature]
Signature of Proposed Insured (if age 18 or over)
Date signed (Month/day/year) 8/25/98
Signature of Owner/Applicant, if other than Proposed Insured

Representative: To the best of your knowledge, will this policy replace or change any existing life insurance or annuity certificate(s)
☑ Yes ☐ No
[signature] Donald C. Demers 1074
Signature of Representative Print Representative's name and number

POLICY DATE | POLICY NUMBER | SERIAL NUMBER

CFL000079

Catholic Family Life Insurance
572 E. Capitol Drive • Milwaukee, WI 53211
(414)961-0500 • 1 800 227-CFLI

HIPAA AUTHORIZATION
LIFE NEW BUSINESS

## HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT ("HIPAA")

*Authorization to Obtain and Disclose Information*

hereby authorize all of the people and organizations listed below to give Catholic Family Life Insurance Company and ɿeir authorized representatives, including agents and insurance support organizations (collectively, the "Recipient",) the ɔllowing information:

- any and all information relating to my health (except psychotherapy notes) and my insurance policies and claims, including, but not limited to, information relating to any medical consultations, treatments, or surgeries; hospital confinements for physical and mental conditions; use of drugs or alcohol; and communicable diseases including HIV or AIDS.

hereby authorize each of the following entities to provide the information outlined above:

- any physician or medical practitioner;
- any hospital, clinic or other health care facility;
- any insurance or reinsurance company (including the Recipient for purposes of disclosing information related to other insurance policies that provide me with insurance coverage;)
- any consumer reporting agency or insurance support organization;
- my employer, group policy holder, or benefit plan administrator; and
- the Medical Information Bureau (MIB.)

understand that the information obtained will be used by the Recipient to:

- determine my eligibility for insurance;
- underwrite my application for insurance;
- determine my eligibility for benefits under any temporary insurance; and
- if a policy is issued, determine my eligibility for benefits and contestability of the policy.

hereby acknowledge that the insurance company listed above is subject to federal privacy regulations. I understand that nformation released to the Recipient will be used and disclosed as described in the Catholic Family Life Insurance Notice of Health Information Privacy Practices, but that upon disclosure to any person or organization that is not a health plan or ɿealth care provider, the information may no longer be protected by federal privacy regulations.

may revoke this authorization at any time, except to the extent that action has been taken in reliance on this authorization or other law allows the Recipient to contest a claim under the policy or to contest the policy itself, by sending a written equest to: Catholic Family Life Insurance, PO Box 11563, Milwaukee, WI 53211-0563. I understand that my revocation of his authorization will not affect uses and disclosures of my health information by the Recipient for purposes of underwriting, claims administration and other matters associated with my application for insurance coverage and the administration of any policy issued as a result of that application.

understand that the signing of this authorization is voluntary; however, if I do not sign the authorization, the Company may ɿot be able to obtain the medical information necessary to consider my application.

This authorization will be valid for 24 months. A copy of this authorization will be as valid as the original. I understand that am entitled to receive a copy of this authorization.

Michael Littlefield (handwritten) — Name of Proposed Insured

8 25 03 (handwritten) — Date

(signature) — Signature of Proposed Insured or ... Personal Representative

Description of Authority of Representative

CFL000083

Application for Membership and Life Insurance to:
Catholic Family Life Insurance, 1572 E. Capitol Drive Milwaukee, Wisconsin 53211 • (800)227-2354
(Please print in black ink.)

Proposed Primary Insured ✓ Proposed Other Insured ____
Name: Michael Litchfield
Street:
City:
REDACTED
Zip:
Home
Gender: M
Social Security Number:
Previous Name(s)
Occupation: State of Birth: RI
Birthdate: Age last birthday:
Where can you be reached for additional information?
Phone: REDACTED
Best Days: M T W TH F
Best Times: ☐ a.m. ☑ p.m.

Face Amount: $ 300,000 ☐ Tobacco ☑ Non-Tobacco
Plan of Insurance: 20 YR PREF Term
Mode: ☐ Ann. ☐ Semi-Ann. ☑ Quarterly ☐ EFT ☐ 1 ☐ 15
(UL only) Option: ☐ #1 Level ☐ #2 Increasing
UL planned premium: $

Amount remitted with this application in exchange for the Society's receipt: $ 96.20
(See Receipt and Conditional Life Insurance Agreement)
Primary Beneficiary: Colleen Litchfield
Relationship to Proposed Insured: Wife
Social Security Number:
REDACTED
Contingent Beneficiary:
Relationship to Proposed Insured: Daughter
Social Security Number:
Is this policy to replace any existing insurance or annuity(ies)? ☑ Yes ☐ No
If yes, indicate company names(s)
Is the Proposed Insured a U.S. Citizen? ☑ Yes ☐ No
Has the Proposed Insured used tobacco in any form in the past 12 months? ☐ Yes ☑ No
Is the Proposed Insured Catholic? ☑ Yes ☐ No
Parish:
Has the Proposed Insured ever been told he/she had or been treated for diabetes, cancer, heart disease, alcoholism, drug abuse, or high blood pressure? ☐ Yes ☑ No
Has the Proposed Insured ever had insurance or reinstatement refused, postponed, limited, or offered on a substandard basis? ☐ Yes ☑ No

Riders: ☐ WP (OL3 or term) ☐ Waiver of Monthly deduction (UL)
☐ Waiver of Planned Premium (UL) $ ☐ ADB (UL or OL3 only) $ ☐ GIR(UL or OL3)$
☐ Term Rider (Primary Insured) $ ☐ Acceleration of Death Benefit Rider (UL)
☐ Term Rider (Other Insured) $ (Complete a separate application for each person.)
☐ Children's Term Units (Complete a separate ... each child.)

Authorization to obtain ... s in the application. All responses are ... ect until: a full application has been ... s been received by the Society; and ... olicy.
... al Information Bureau.
... Those authorized include a physician, ... or reinsuring company, the Medical ... information may include diagnosis, ... nd other non-medical information ... employed by Catholic Family Life ... will use the information obtained ... be released to any person or entity ... services with my application. The ... or faxed copy of this Authorization shall be ... Notice to Applicant" form. I AGREE this Authorization shall be ...

2321
57-168/115
DIVERSIFIED SERVICES 06/97
REDACTED
Date 8-25-03
Pay to the order of Catholic Life $ 96.20
Ninety-six and 20/100 Dollars
BANKRI
BANK RHODE ISLAND
For
REDACTED
⑆011501682⑆ 2321

(city and state) N. Kingstown RI
Signature of Proposed Insured (if age 18 or over)
Date signed (Month/day/year) 8/25/03
Signature of Owner/Applicant, if other than Proposed Insured

Representative: To the best of your knowledge, will this policy replace or change any existing life insurance or annuity certificate(s)
☑ Yes ☐ No
Signature of Representative
Donald C. Duncan
Print Representative's name and number

CFL000082

MEDICAL DEPARTMENT

Please print names and addresses.
Supplement to Application to: CATHOLIC FAMILY LIFE INSURANCE

MEDICAL EXAMINATION REPORT - Part I
P.O. Box 11563, Milwaukee, Wis., 53211

PROPOSED INSURED: (Print Full Name) MICHAEL LITTLEFIELD

DATE OF BIRTH: Month REDACTED Day ___ Year ___

a. Name and address of your personal physician (IF NONE, SO STATE): DR Pierre Manzo So. County TR E. Greenwich RI 02818

b. Date and reason last consulted: Pain Related to hernia Surgery 5-03 - Had Surgery 4-20-03

c. Treatment given or medication prescribed: —

| Question | Yes | No |
|---|---|---|
| 2. Have you ever been treated for, or had any indication of: | | |
| a. Disorder of eyes, ears, nose or throat? | ☐ | ☒ |
| b. Dizziness, fainting, convulsions, headache; speech defect, paralysis or stroke; mental or nervous disorder? | ☐ | ☒ |
| c. Shortness of breath; persistent hoarseness or cough, blood spitting; bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? | ☐ | ☒ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? | ☐ | ☒ |
| e. Jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, or other disorder of the stomach, intestines, liver or gallbladder? | ☒ | ☐ |
| f. Sugar, albumin, blood or pus in urine; venereal disease; stone or other disease of kidney, bladder, prostate or reproductive organs? | ☐ | ☒ |
| g. Diabetes; thyroid or other endocrine disorders? | ☐ | ☒ |
| h. Neuritis, sciatica, rheumatism, arthritis, gout or disorder of the muscles or bones, including the spine, back or joints? | ☐ | ☒ |
| i. Disorder of skin, lymph glands, cyst, tumor or cancer? | ☐ | ☒ |
| j. Allergies; anemia or other disorder of the blood? | ☐ | ☒ |
| k. Deformity, lameness, or amputation? | ☐ | ☒ |
| 3. Have you ever been treated for the use of alcohol or any habit-forming drugs? If so give complete details. | ☐ | ☒ |
| 4. Have you smoked cigarettes in the past year or used any other nicotine products? If so, which? | ☐ | ☒ |
| 5. To the best of your knowledge are you now pregnant? If "Yes" give date of expected delivery. | N/A | ☐ |
| 6. Has a member of the medical profession ever diagnosed you as having, or treated you for AIDS (Acquired Immune Deficiency Syndrome), ARC (AIDS Related Complex), or any other immunological disorder? | ☐ | ☒ |
| 7. Are you now under observation, treatment, or taking medication? | ☐ | ☒ |
| 8. During the past seven years, have you: | | |
| a. Been examined or been treated by a physician, chiropractor or psychologist? | ☒ | ☐ |
| b. Had an x-ray or electrocardiogram? | ☒ | ☐ |
| c. Had observation or treatment at a clinic or hospital? | ☐ | ☒ |
| d. Had a surgical operation scheduled or completed? | ☒ | ☐ |
| e. Made claim for or received payment for sickness or injury? | ☐ | ☒ |
| 9. Have you ever had military service deferment, rejection or discharge because of a physical or mental condition? | ☐ | ☒ |
| 10. Were you ever postponed, declined, rated, or offered a modified plan for Life, Accident, or Health Insurance? | ☐ | ☒ |

DETAILS of "Yes" answers (IDENTIFY QUESTION NUMBER; CIRCLE APPLICABLE ITEMS: Include diagnoses, dates, duration, and names and addresses of all attending physicians and medical facilities.

2E - Had Hernia Surgery 4-20-03 DR Abadier 300 Tollgate Rd Warwick RI 02886. Kent County Hosp Warwick RI. outpatient

8A - DR Karen Blackmore So. County TR. East Greenwich RI Last seen 4 yrs ago physical. No problems

8B - Had X-Ray for Sinus infection 2 yrs ago. E.R. Kent County Hosp.

8D - See # 2E

11. Family Record: (Indicate family history of tuberculosis, diabetes, cancer, high blood pressure, heart or kidney disease, mental illness or suicide.)

| | If Living: State of Health (If poor, give reason) | Deceased: Age at Death | Deceased: Cause of Death |
|---|---|---|---|
| Father | | 65 | |
| Mother | | 59 | |
| Brothers/Sisters | B - | 39 | |

I hereby agree that all statements and answers in this application are full, complete, and true to the best of my knowledge and belief, and shall become part of any policy or contract issued on the basis of this application. I further agree that the Society may rely upon any statements or answers made relating to my health or illness in determining whether to accept this application for insurance.

Dated at: No-Kingstown RI (City, State) this 28th day of August 2003 (Date)

Examiner's Signature Donna Carroll Proposed Insured's Signature [signature]

6-1168 (Rev 6/99)

CFL000071

CATHOLIC FAMILY LIFE INSURANCE

Medical Examination Report - Part

Name: Michael Littlefield D.O.B. **REDACTED**

Details of "Yes" answers. (Identify item.)

Identification: ☐ Driver's License ☐ Other

| HEIGHT (in shoes) | WEIGHT (clothed) | CHEST (full inspiration) | CHEST (forced expiration) | ABDOMEN, at umbilicus relaxed |
|---|---|---|---|---|
| 5 ft. 9 in. | 160 lbs. | 40 in. | 37 in. | 32 in. |

Did you weigh? ☒ Yes ☐ No Did you measure? ☒ Yes ☐ No

Weight change in past year? _____ lbs. ☐ Gain ☐ Loss - Cause? __________

Is appearance unhealthy or older than stated age? ☐ Yes ☒ No

SEP 0 2 2003

Blood Pressure (Record all readings)

| | AT REST | AFTER EXERCISE | 3 MINUTES LATER |
|---|---|---|---|
| Systolic | 108 | | |
| Diastolic | 80 | | |

| Pulse: | AT REST | AFTER EXERCISE | 3 MINUTES LATER |
|---|---|---|---|
| Rate | 68 | | |
| Irregularities Per Min. | | | |

Heart: (a) Is there any cyanosis, dyspnea, edema, arteriosclerosis, peripheral, vascular, or other cardiovascular disorder? ☐ Yes ☐ No

(b) Is heart enlarged? ☐ Yes ☐ No (If yes, describe)

(c) Is murmur present? ☐ Yes ☐ No (If yes, complete 4d)

(d) Murmur is:

☐ Constant
☐ Inconstant
☐ Transmitted
☐ Localized
☐ Systolic
☐ Presystolic
☐ Diastolic
☐ Apical
☐ Basal
☐ Other
☐ Soft (Gr. 1-2)
☐ Mod (Gr. 3-4)
☐ Loud (Gr. 5-6)

After Exercise:

☐ Unchanged
☐ Decreased
☐ Increased
☐ Absent

Show location of murmur.

Apex by X

Area of murmur by outline ◌

Point of greatest intensity ○

Transmission →

Your Impression:




9/4/03

Is there on examination any abnormality of the following: (Check applicable and give details.)

| | Yes | No |
|---|---|---|
| a. Eyes, ears, nose, mouth, pharynx? (If vision or hearing is markedly impaired, indicate degree correction.) | ☐ | ☐ |
| b. Skin (incl. scars); lymph nodes; blood vessels (incl. varicose veins)? | ☐ | ☐ |
| c. Nervous system (include reflexes, gait, paralysis)? | ☐ | ☐ |
| d. Respiratory system? | ☐ | ☐ |
| e. Abdomen (including scars)? | ☐ | ☐ |
| f. Genitourinary system (include prostate)? | ☐ | ☐ |
| g. Endocrine system (include thyroid and breasts)? | ☐ | ☐ |
| h. Musculoskeletal system (incl. spine, joints, amputations, deformities)? | ☐ | ☐ |
| Evidence of cigarette smoking or other nicotine use? | ☐ | ☐ |
| Do you have pertinent information not brought out above? | ☐ | ☒ |

E M S I #284
989 Reservoir Avenue
Cranston, RI 02910
401-943-0084

| Urinalysis: | SPECIFIC GRAVITY | ALBUMIN | SUGAR |
|---|---|---|---|
| | | | |

Send specimen to laboratory as instructed.

ertify that I made this examination at EMSI #284 a.m. ________ p.m. on 8-28-03 (Date)

amination made at ☐ My office 989 Reservoir Avenue ☐ Medical office ☒ Individual's home

aminer's Name/Company Cranston, RI 02910 401-943-0084 Examiner's Signature Donna Carroll

e you in any way related to the proposed insured or to the agent? ☐ Yes ☒ No

me of agent requesting examination: Donald Demers Tax I.D. Number ____________

dress ____________ City/State/ZIP ____

CFL000072

-1163 (Rev 6/09) PLEASE COMPLETE REVERSE SIDE

Catholic Family Life Insurance

*Financial security with the fraternal touch.- since 1868.*

To Agent: This form to be used where the existing and proposed policies are written by the same company.

## IMPORTANT NOTICE REGARDING REPLACEMENT OF LIFE INSURANCE

Our agent is recommending that you purchase a life insurance policy from us. In connection with this purchase you have indicated, either as a result of his recommendation or at your own initiative, that you may terminate or change your existing policy issued by our company or that you may obtain a loan from our company against your existing policy to pay premiums on the proposed policy. Any of these actions is a replacement of life insurance. This notice must be given to you along with a Comparative Information Form which includes preliminary information comparing the proposed policy with your existing policy to be replaced. Please read this notice and the Comparative Information Form carefully.

Whether it is to your advantage to replace your existing insurance coverage, only you can decide. It is in your best interest, however, to have adequate information before a decision to replace your present coverage becomes final so that you may understand the essential features of the proposed policy and of your existing insurance coverage.

To this end, we are required to give you a Policy Summary including complete information on the proposed policy no later than when the policy is delivered to you. In addition, we will at your request furnish you with additional information concerning your existing policy. You may want to discuss your purchase with other advisors. The information you receive will be of value to you in reaching a final decision.

If either the proposed policy or the existing insurance you intend to replace is a participating policy, you should be aware that dividends may materially reduce the cost of insurance and are an important factor to consider. Dividends, however, are not guaranteed.

1572 East Capitol Drive • Milwaukee, Wisconsin 53211 • 414/961-0500 • FAX 414/961-2059

You should also recognize that a policy which has been in existence for a period of time may have certain advantages to you over a new policy. If the policy coverages are basically similar, the premiums for a new policy may be higher because rates increase as your age increases. Under your existing policy, the period of time during which our company could contest the policy because of a material misstatement or omission on your application, or deny coverage for death caused by suicide, may have expired or may expire earlier than it will under the proposed policy. Your existing policy may have options which are not available under the policy being proposed to you or may not come into effect under the proposed policy until a later time during your life. Also, your proposed policy's cash values and dividends, if any, may grow slower initially because the company will incur the cost of issuing your new policy. On the other hand, the proposed policy may offer advantages which are more important to you.

If you are considering borrowing against your existing policy to pay the premiums on the proposed policy, you should understand that in the event of your death, the amount of any unpaid loan, including unpaid interest, will be deducted from the benefits of your existing policy thereby reducing your total insurance coverage.

After we have issued your policy, you will have ten days from the date the new policy is delivered to you to cancel the policy issued on your application and receive back all payments you made to us.

**CAUTION**

If, after studying the information made available to you, you do decide to replace the existing life insurance with our company with a new life insurance policy issued by our company, you are urged not to take action to terminate or alter your existing life insurance coverage until after you have been issued the new policy, examined it and have found it acceptable to you. If you should terminate or otherwise materially alter your existing coverage and fail to qualify for the life insurance for which you have applied, you may find yourself unable to purchase other life insurance or able to purchase it only at substantially higher rates.

I have received and read a copy of the Replacement Notice.

(Signed) [signature] Date 8-25-03

AGENT'S CERTIFICATION

I hereby certify that prior to taking an application for a certificate, I have provided the applicant with the Notice Regarding Replacement of Life Insurance and that the information in this Comparative Information Form is true and correct to the best of my knowledge and belief.

(Signature of Agent) (Date) 8/25/89

I have received and read a copy of this Comparative Information Form.

(Signature of Applicant) (Date) 8/25/89

Catholic Family Life Insurance
1572 E. Capitol Drive • Milwaukee WI 53211

# Illustration Disclosure

(This form is to be used when an illustration was not given to the applicant/owner at the time of application for life insurance or the applicant applied for coverage other than illustrated.)

Please Initial One:

__________ I acknowledge that no illustration of the policy was provided and I understand that an illustration conforming to the policy as issued will be provided no later than at the time of policy delivery.

✓ I acknowledge that the illustration provided to me did not conform to the policy for which I applied. I understand that an illustration conforming to the policy as issued will be provided no later than at the time of policy delivery.

____________________ 8/25/03
Signature of Owner Month/Day/Year

I hereby certify to the information above regarding the use of no illustration or an illustration that does not conform to the policy for which the applicant applied.

____________________ 8/25/03
Signature of Agent Month/Day/Year

**Instructions to Agent**

Submit white copy to home office with application. Blue copy is for agent's records.

Donald DeMers

POLICY TRANSMITTAL

PLEASE CALL YOUR ATTENTION TO THE ITEMS MARKED X BELOW. IF THERE IS A PROBLEM OF ANY KIND, PLEASE CALL US IMMEDIATELY. THANK YOU FOR YOUR HELP IN PLACING THIS POLICY.

Status:

X This policy is IN FORCE, and has been put on the system.

____ This policy is STILL PENDING, and will remain on your pending report until we receive the following items in the Home Office. PENDING REQUIREMENTS MUST BE RECEIVED WITHIN 30 DAYS FROM THE DATE OF THIS TRANSMITTAL.

X SIGNED TELEUNDERWRITING AMENDMENT

____ SIGNED ALTERATION OF APPLICATION

____ BALANCE DUE OF $

X SALES PROPOSAL (ALL PAGES)

____ SIGNED HEALTH STATEMENT

____ EFT IS SCHEDULED TO START ____________ @ ________

X MEMBER SERVICES CORRESPONDENCE

____ OTHER ______________________________

**PLEASE RETURN SIGNED DELIVERY RECEIPT**

Agent: Donald DeMers

General Agent:

Insured: Michael LittleField

Pol Number: **REDACTED**

Date: 9-12-03

MARY x261

CFL000073

DEPOSITION EXHIBIT
PIf's 17
2-20-07

# Risk Selection

## Life Underwriting Guidelines



Catholic Family Life Insurance

P O Box 11563 · Milwaukee, WI 53211-0563
1 800 227-CFLI · 414 961-0500

U319-690 (rev.1200)

EXHIBIT NO. 13
3-5-07
COLLEEN REED REPORTING

# Risk Selection

## Life Underwriting Guide

This Life Underwriting Guide has been prepared to provide you with guidelines to help you in your field underwriting. Impairments are listed alphabetically.

A brief description, tools required and specific questions or areas to "ask about" are included, as applicable, along with the probable action (rating) you can anticipate.

Keep in mind that this is intended only to provide you with GUIDELINES, not a final decision, and to help you prepare your client for the possibility of a rated contract.

### Rating Table Information

Our ratings start at Table 2 and go through Table 16.

| | |
|---|---|
| Low | Tables 2 - 3 |
| Moderate | Tables 4 - 6 |
| High | Tables 7 - 16 |

Waiver of Premium and Accidental Death are sometimes available on rated policies, and may be rated also. See each listing for details.

Prepared by

New Business Department
Catholic Family Life Insurance



CFL000448

## GONORRHEA

(See SEXUALLY TRANSMITTED DISEASES)

## GOUT

Inflammatory arthritis from a disorder of the body's handling of uric acid. A disorder of uric acid metabolism which causes painful arthritic attacks in the great toe or joints in other parts of the body.

**Ask About:** Ask how severe and disabling the attacks have been, how frequently they have occurred, the date of the last one and what type of medication was prescribed.

**Probable Action:**

Mild: Usually Standard

Moderate to Severe: Standard to Low. No WP

## GRAVES DISEASE

(See THYROID DISORDERS)

## GUILLAIN-BARRÉ SYNDROME

Disorder of unknown cause, involving peripheral and cranial nerves, often following respiratory infections.

**Tools:** APS

**Probable Action:**

Present: Postpone

Recovered: Standard

## HEADACHE

(See also MIGRAINE HEADACHES)

**Ask About:** Include frequency, severity, diagnosis (if any), treatment and length of time symptoms have been present.

**Probable Action:** Usually Standard

## HEART ATTACK

(See MYOCARDIAL INFARCTION)



## HEART MURMUR

Sound caused by the flow of blood through an abnormal heart valve or a normal valve not functioning properly. A murmur may be congenital or acquired.

**Tools:** APS

**Ask About:** Ask for medical terminology used to describe murmur. Is there a history of rheumatic fever or other illness which may have caused the murmur or has it been present since birth? Ask about special testing, echocardiograms.

**Probable Action:**

Functional, not affecting heart's performance: Usually Standard

Others: Moderate to Decline

## HEMORRHOIDS

**Probable Action:** Usually Standard

## HEPATITIS

Inflammation of the liver; may be acute or chronic.

**Tools:** APS and Blood Profile, all cases

**Ask about:** Treatment, liver biopsy results, TYPE (Hepatitis A/B or C)

**Probable Action:**

Hepatitis A: Single acute attack, 3 months after recovery with normal liver function tests: Usually Standard

Hepatitis B:

Acute episode, complete recovery: Standard

Chronic: Moderate to Decline

Hepatitis C: Moderate to Decline, depending on liver enzymes and biopsy report.

## HERNIA

Protrusion of an organ or tissue from its normal position through an opening in the wall of the cavity containing the organ or tissue.

### HERNIA (cont'd)

**Ask About:** Include location of hernia. Ask if surgery was performed or is planned in future.

**Probable Action:** Usually Standard. May be necessary to postpone if surgery is planned.

### HERPES SIMPLEX

(See also SEXUALLY TRANSMITTED DISEASES)

Viral infection of the skin occurring generally on the lips and face as fever blister or cold sore. Rarely may also involve lungs, mouth, eyes, urinary tract or brain.

**Tools:** Current blood profile

**Probable Action:** Usually Standard

### HIV INFECTION

(See AIDS)

Infection with the Human Immunodefinciency Virus (HIV) ultimately leads to the clinical condition, AIDS.

**Probable Action:** Decline

### HODGKIN'S DISEASE

(See CANCER)

A malignant lymph node tumor.

**Tools:** APS

**Ask About:** If possible, find out stage of involvement, symptoms and type of treatment.

**Probable Action:** Only the best cases will be considered. A rating will usually be required, but some cases may be Standard after 5 years have elapsed since last symptoms and treatment.

### HYPERCHOLESTEROLEMIA

(See Cholesterol, elevated)

### HYPERTENSION

(See BLOOD PRESSURE)

Term used to indicate elevated blood pressure.



### HYSTERECTOMY

Total or partial removal of uterus and ovaries.

**Ask About:** Ask for name of condition necessitating surgery. Is there any indication of malignancy and any chemotherapy or radiation treatment or follow-up care?

**Probable Action:**

Usually Standard after recovery, if no malignancy.

If malignant, cancer ratings would apply.

### IRITIS

An inflammation in the iris of the eye

**Probable Action:** Usually Standard

### IRRITABLE BOWEL SYNDROME

(Functional Colitis, See COLITIS, others: spastic, mucous, irritable colon)

### ISCHEMIA

(See CORONARY ARTERY DISEASE)

### JUVENILE RHEUMATOID ARTHRITIS

**Tools:** APS

**Probable Action:**

Present, under treatment, controlled: Moderate

Recovered:

0-1 years: Low Rating

1-2 years: Standard to Low

2+ years: Standard

### KIDNEY REMOVAL (Nephrectomy)

Surgical removal of a kidney

**Tools:** APS to determine reason and urinalysis to ensure remaining kidney is functioning normally.

**Probable Action:** Usually Standard. If malignant, cancer ratings would apply.



CFL000450

## TOXEMIA OF PREGNANCY (Pre-eclampsia, Eclampsia)

Complications of pregnancy including fluid retention, high blood pressure, excessive weight gain and protein in the urine. Complications occurring late in pregnancy or during labor. May include convulsions, muscular spasms, unconsciousness, elevated blood pressure and edema.

**Tools:** APS

**Ask About:** Include dates, if currently pregnant, and if Toxemia occurred during more than one pregnancy. Is she now past her menopause? Has there been a history of elevated blood pressure and/or urinary findings?

**Probable Action:**

Usually Standard

Current pregnancy: Postpone

## TUMOR

Abnormal growth of tissue or cells which functions independently and in no way benefits the rest of the body.

**Tools:** APS, including full pathology results

**Ask About:** Obtain exact medical term for diagnosis, treatment administered and the dates of treatment.

**Probable Action:**

Benign: Usually Standard unless size or location causes complications

Malignant: See CANCER Section

## TRANSIENT ISCHEMIC ATTACK (TIA)

Temporary interruption of blood flow through the vessels supplying blood to the brain. Also referred to as minor stroke.

**Tools:** APS

**Probable Action:**

1-2 episodes:

0-6 months: Postpone

6 months - 5 years: Low to Moderate

5+ years: Standard to Low

3 or more episodes: refer to STROKE.

## BRAIN TUMOR

(See CANCER)

Malignant or benign tumor

**Tools:** Trial App within 5 years. APS

**Ask About:** Type and grade of tumor, benign or malignant. Type of treatment. Any surgery done or planned? Any brain damage?

**Probable Action:**

No surgery or recent surgery: Decline.

1-3 years after surgery: High to Decline.

## BRONCHIECTASIS

Chronic lung disorder caused by widening of the walls of the bronchi from recurrent infection.

**Probable Action:**

Symptom free with normal pulmonary function: Standard

Others: Low to Decline, depending on pulmonary function test results and chest X-ray results from an APS.

## BRONCHITIS

Inflammation of the bronchial tubes in the lungs, may be acute or chronic

**Probable Action:**

One episode & recovered: Standard

Chronic or severe: Low to Decline, depending on pulmonary function test and chest X-ray results from APS.

## BURSITIS

Inflammation of a bursa

**Probable Action:**

Mild: Standard

Chronic or severe: Standard. No WP



## BYPASS SURGERY (CORONARY ARTERY)

A nonessential blood vessel is removed and patched into an existing artery to bypass an area of obstructed blood flow to the heart or other areas of the body.

**Tools:** APS which must include heart catheterization report and documented follow up. Trial app within 5 years from surgery date.

**Probable Action:**

0-6 months: Postpone

6 months-6 years: High to Decline

6+ years: Low to Decline

## CANCER

A malignant tumor (carcinoma, sarcoma, etc.)

**Tools:** Trial Application within 5 years. APS with complete pathology and operative report

**Ask About:** Type of tumor, location, stage or grade of tumor, date of surgery or other treatment.

**Probable Action:**

One episode (depends on type and severity of tumor):

0-5 years: Moderate to Decline

5+ years: Low to Decline

Recurrent or metastasis: Decline

## CARDIOMYOPATHY

A progressive disease of the heart muscle which may cause it to enlarge or its walls to thicken.

**Probable Action:** Decline

## CATARACT

Whitish clouding of the eye's lens

**Tools:** APS to distinguish between congenital, trauma or disease as cause

**Probable Action:** Usually Standard. No WP

## Hiatal Hernia Diaphragmatic:

The protrusion of the upper part of the stomach through the diaphragm. It is frequently asymptomatic. Symptoms are due to reflux esophagitis and include heartburn, retrosternal pain, difficulty swallowing and hemorrhage. Symptoms can be confused with those of coronary artery disease.

| Small or Moderate | |
|---|---|
| No significant symptoms | Standard |
| **Large** | |
| Displacing heart or lung, or history of hemorrhage | +50 up |
| Surgically repaired, including prosthesis | Standard |

Copyright © 2004 by Generali USA Life Insurance | Contact Us with Questions or Comments
Acknowledgement: LifeArt Collection images Copyright © 1989-97 Techpool Studies

DEPOSITION EXHIBIT
18

EXHIBIT NO. 14
3-5-07
COLLEEN REED REPORTING

CFL000453