UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COLLEEN LITTLEFIELD | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | C.A. No. 06-157 ML |
| | : | |
| CATHOLIC FAMILY LIFE INS. CO. | : | |
| | : | |
| Defendant | : | |

PLAINTIFF COLLEEN LITTLEFIELD'S
STATEMENT OF DISPUTED FACTS

Plaintiff Colleen Littlefield ("Littlefield") submits the following Statement of Disputed facts in Support of her Objection to Defendant's Catholic Family Life Ins. Co.'s (the "Insurer") Motion for Summary Judgment and disputes the facts as submitted by the Insurer:

1. Littlefield's husband, Michael Littlefield ("Michael"), of approximately 9 years (they were married on July 12, 1996) died prematurely and tragically on May 25, 2005 at the age of thirty-six years old. See Littlefield Deposition at p. 13, l. 24 attached hereto as Exhibit A and Death Certificate of Michael Littlefield attached hereto as Exhibit B.
2. Michael was born on February 16, 1969 and died on May 25, 2005. See Exhibit B.
3. The Littlefields have a young daughter Elizabeth who was born on March 12, 1999 and was only six years old when her father died. See Littlefield Deposition at p. 14, ll. 9-17 attached hereto as Exhibit C.
4. Michael died of metastatic colon cancer. See Exhibit B.

5. He suffered from this condition for approximately nine months prior to his death. See Exhibit B.
6. Michael and Littlefield each purchased life insurance from the Insurer in 1997. See Demers Deposition at p. 34, ll. 1-12 attached hereto as Exhibit D.
7. Michael responded to a direct mailing offered by the Insurer. See Demers Deposition at p. 31, line 21 through p. 32 line 2 attached hereto as Exhibit E.
8. Michael initially sought $50,000 in life insurance because he couldn’t afford to purchase more. See Exhibit E.
9. Both Michael and Littlefield each applied for and obtained $50,000 in life insurance from the Insurer as a result of their response to the Insurer’s direct mailing solicitation. See Exhibit D.
10. Additionally, Michael also purchased an annuity policy from the Insurer using the same Agent. See Demers Deposition at p. 149, ll. 3-7 attached hereto as Exhibit F.
11. In June 2003 Littlefield’s sister’s husband died prematurely and tragically. See Littlefield Deposition p. 25, ll. 17-25; p. 26, ll. 1-4; p. 26 ll. 19-21 attached hereto as Exhibit G.
12. This prompted Littlefield and Michael to re-evaluate their life insurance needs. See Exhibit G.
13. Prior to this, Michael had also obtained a $10,000 rider to his policy in February 2003 which had increased his benefits from $50,000 to $60,000. See Exhibit G.

14. In August 2003, Michael and Littlefield contacted the Insurer and sought to increase coverage on Michael from $60,000 to $300,000. See Demers p. 35, ll. 21-22 and p. 50, ll. 11-20 attached hereto as Exhibit H.

15. The Insurer issued the term life insurance policy in the amount of $300,000 with a term of September 9, 2003 through September 9, 2023. The Insurer then cancelled Michael's $50,000 policy with the $10,000 rider. See Demers deposition at p. 47 ll. 7-15 attached hereto as Exhibit I and Hartwig deposition at p. 86, ll. 17-18 attached hereto as Exhibit J.

16. In fact, Littlefield claims that Michael disclosed to the Insurer's Agent all the facts surrounding the hernia and the subsequent follow-up treatment at length in their meeting. See Littlefield deposition p. 57 line 12 though p. 58 line 6, p. 70, ll. 16-23 and p. 71, ll. 8-12 attached hereto as Exhibit K.

17. From an insurance point of view, however, a hernia was not a severe medical problem. See Demers Deposition at p. 43 ll. 15-17 attached hereto as Exhibit L.

18. Additionally in the Insurer's own "Risk Selection Life Underwriting Guidelines" for Hernia the only thing the Underwriters are instructed to ask about for a Hernia condition is the location and whether surgery has been performed or whether it is planned in the future. It is considered "Usually Standard. May be necessary to postpone if surgery is planned." See Attached "CFL000449" and "CFL000450" as Exhibit M.

19. "Hernia operations are – hernias are not considered major problems for underwriting. In order to cut down costs and speed the underwriting process,

hernia operations are not – are just considered not a major - - major problem. Don't spend the money and time." See Demers deposition at p. 133 line 20 – p. 134 line 1 attached hereto as Exhibit N.

20. Prior to becoming a sales advisor in 1992 he was an Underwriting Manager and admits to currently being aware of underwriting requirements. See Demers deposition at p. 21 ll. 16-23 attached hereto as Exhibit O.

21. In August, 2004 Michael was diagnosed with cancer of the appendix. See Manzo Medical Records Bates 0000041-0000045 and 0000060-0000067 attached hereto as Exhibit P.

22. On August 8, 2004 Michael and his wife "openly and frankly" discussed his condition and cancer diagnosis with Dr. Manzo when it was discovered. See Exhibit P.

23. In a surgical pathology report from a procedure Michael underwent on July 29, 2004 in a report printed on August 3, 2004, it is reported for the first time, *inter alia*, that Michael has a tumor directly invading other organs and the muscularis propria, and that distant metastasis cannot be assessed. A true copy of the report is attached hereto as Exhibit Q.

24. The so-called "paramedical"exam performed by the Insurer was not conducted by a physician or even a nurse. The person who performed it (Carroll) did not even fill out the entire form that contained more specific medical questions. See form attached hereto as Exhibit R.

25. The “paramedical’s” training was only a matter of hours. “It’s just basically how to deal with the medical form.” See Carroll deposition at p. 7, ll. 14-18 attached hereto as Exhibit S.

26. Carroll testified that she did not complete the entire form because she was instructed not to by the insurance company presumably in order to same time and money. See Carroll deposition at p. 19, ll. 11-18 attached hereto as Exhibit T.

27. Carroll believes she spent about 20-30 minutes with Michael although she has no specific recollection of the meeting. See Carroll deposition p. 10, ll. 15-23, p. 50 ll. 16-19 and p. 58, ll. 14-16 attached hereto as Exhibit U.

28. Most of that time would have necessarily been occupied by taking Michael’s blood pressure, obtaining a urine sample and a blood sample, and weighing and measuring Michael. See Carroll deposition at p. 29, ll. 15-22, and p. 47 line 15 through p. 48 line 14 attached hereto as Exhibit V.

29. Additionally, as part of the application process Michael gave HIPPA releases to the Insurer entitling the Insurer to obtain all of Michael’s medical records. See Demers deposition p. 108, ll. 9-24 and p. 114, ll. 9-22 attached hereto as Exhibit W.

30. Not filling out the form in its entirety was a time saver. “Don’t spend the money and time.” See Demers Deposition at p. 133 line 18 through p. 134 line 5 attached hereto as Exhibit X.

31. Michael's hernia doctor (Dr. Abadier) did not know or tell Michael of any problems following the April 2003 surgery. In Dr. Abadier's patient notes he indicates that on May 1, 2003 Michael was seen and "is doing well." See Abadier Medical Records Bates 0000001-0000006 attached hereto as Exhibit Y.

32. Two weeks later, Dr. Abadier's notes indicate that Michael "is doing all right….I reassured him and I will see him again as is needed." See Exhibit Y.

33. On June 2, 2003 Dr. Abadier's notes state that Michael developed pain in the right groin after vigorously waxing some floors. Dr. Abadier's notes reveal that Michael did not have a recurrent hernia thereafter despite some pain. Dr. Abadier prescribed painkillers and an anti-inflammatory. He was to be seen in 10 days. See Exhibit Y.

34. In ten days on June 12, 2003, it was noted that Michael "is feeling better." Dr. Abadier again "reassured" Michael. See Exhibit Y.

35. There is no indication that either Dr. Abadier or Dr. Manzo wrote any prescriptions for painkillers or any other prescription after June 2, 2003. See Exhibit Y. See also Exhibit P.

36. When the "paramedic" (Carroll) saw Michael on August 28, 2003 she asked and Michael acknowledged candidly that he had been treated for a hernia. See Exhibit R and Carroll deposition at p. 35 line 5 through p. 39 line 20 attached hereto as Exhibit Z.

37. The word "hernia" is underlined and the boxed is checked as "yes". Under details it is disclosed that Michael "had hernia surgery 4-20-03 Dr. Abadier, 300 Tollgate Rd., Warwick, RI 02886. Kent County Hospital, Warwick RI. Outpatient." See Exhibit R.

38. Moreover, Michael disclosed that he had surgery in response to the inquiry in question. See Exhibit R.

39. Michael disclosed the hernia and the attendant appointments to the Insurer's Agent (Demers) when he applied for the $300,000 policy. See Littlefield deposition at p. 137 line 17 through page 140 line13 attached hereto as Exhibit AA. See also Exhibit K.

40. The Agent, however, told Michael (and Littlefield) that as long as he had already had the surgery it was not a concern to the Insurer. See Exhibit K.

41. In reviewing all of the forms used by the Insurer, there is no question that asks whether an applicant has undergone a barium enema or CT Scan. See Exhibit R. The Agent form is attached as Exhibit BB. The Teleunderwriter form is attached as Exhibit CC. See also Carroll Deposition at p. 52 line 15 through p. 53 line 13 attached hereto as Exhibit DD.

42. The paramedical (Carroll) could not recall even one instance where any applicant responded in response to any of the questions that they had had a barium enema. See Carroll deposition at p. 79 line 11 through p. 80 line 1 attached hereto as Exhibit EE.

43. The paramedical (Carroll) and the teleunderwriter both testified that they followed the forms as written without explanation or further inquiry. See Carroll deposition at p. 55 ll. 6-19 and p. 56 ll. 19-23 attached hereto as Exhibit FF and Hartwig deposition at p. 20 line 9 through page 23 line 1 attached hereto as Exhibit GG.

44. In fact, the "teleunderwriter" interview only took about ten minutes. See Exhibit GG.

45. Instead, the form asks about "x-rays and electrocardiograms." See Exhibit R.

46. Michael told the insurer about his x-rays for a sinus infection. And, he had already informed the Insurer of his Hernia operation and all of the doctors he treated with for that ailment. See Exhibit R. See also Littlefield deposition at p. 57 line 12 through p. 58 line 6 attached hereto as Exhibit HH. See also Exhibit FF.

47. Michael was told that the barium enema and CT Scan were fine and that it was just a pocket of blood. See Exhibit HH.

48. Littlefield also testified that Michael never had nor was he advised to have further follow-up following the barium enema and CT Scan and that she and Michael were never shown the reports from the tests. See Littlefield deposition at p. 108, ll. 7-14 and p. 137 line 23 through p. 138 line 16 attached hereto as Exhibit II.

49. In a different interview completed by the Insurer by its teleunderwriter, Michael disclosed that he had hernia surgery and was treated with Dr. Manzo for his follow up. See Exhibit CC.

50. In fact, the Agent (Demers) in his deposition admits that Michael answered the questions "completely and honestly." See Demers deposition at p. 58 ll. 13-15 attached hereto as Exhibit JJ.

51. Michael's doctor thought his symptoms might be Lyme Disease. See Exhibit P.

52. Michael's follow-up to the tests performed for Lyme Disease were equally unremarkable. The report of Dr. Manzo states on June 16, 2003: "Seen last week with abdominal pain, status-post surgery about 1 month or so back. He had symptoms which I felt might have been consistent with Lyme with a tick bite with a negative Lyme titer. However responded nicely to Doxycycline. He is Afebrile. His abdominal discomfort is still present **but improved**." (Emphasis added). See Exhibit P.

53. Importantly, the vicodin was prescribed on June 2, 2003 by Dr, Abadier. On June 12, 2003, Dr. Abadier stated that Michael is "feeling better. The pain is now just a dull ache in one area. He was reassured and he will be seen again as is needed." See Exhibit Y.

54. Littlefield testified in her deposition that Michael did not take vicodin unless he had pain. She stated that she threw a bottle of it away because he did not take it. "Mostly he would take Tylenol or ibuprofen." See Littlefield deposition p. 107, ll. 1-24 attached hereto as Exhibit KK.

55. Dr. Manzo is part of the same group of doctors whom he sees including Dr. Blackmere and he had already been disclosed to the Insurer when he met with the Insurer's Agent. See Littlefield deposition at p. 37 line 23 through p. 38 line 1 attached hereto as Exhibit LL. See also Exhibit P.

56. Carroll wrote that Michael's father died at age 68, Mother died at age 59 and brother died at age 39 when all three were in fact still alive. See Carroll deposition at p. 41 line 18 through p. 43 line 14 attached hereto as Exhibit MM. See also Exhibit R.

/s/ Karen Davidson

Karen Davidson (# 3182)
One Ship Street
Providence, RI 02903
401.453.6200 (Tel.)
401.331.6110 (Fax)

Attorney for the Plaintiff
Colleen Littlefield

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of September, a true and accurate copy of the within Statement of Disputed Facts in Support of Objection to Motion for Summary Judgment was served by ECF on:

Patricia A. Sullivan (#2120)
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903

The exhibits attached to the Statement of Disputed Facts were filed manually and served via hand-delivery to the above-referenced counsel of record.

/s/ Karen Davidson