UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COLLEEN LITTLEFIELD | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | C.A. No. 06-157 ML |
| | : | |
| CATHOLIC FAMILY LIFE INS. CO. | : | |
| | : | |
| Defendant | : | |

PLAINTIFF COLLEEN LITTLEFIELD'S MEMORANDUM OF LAW
IN SUPPORT OF HER OBJECTION TO
DEFENDANT CATHOLIC FAMILY LIFE INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT

I. Introduction

This matter is before this Honorable Court on the Objection of the Plaintiff Colleen Littlefield ("Littlefield") to Defendant Catholic Family Life Insurance Company's (the "Insurer") motion pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment.

Because the record indicates that genuine issues of material fact exist in this case, Littlefield submits the within memorandum arguing that this court should deny the Insurer's Motion for Summary Judgment for the reasons set forth in detail below.

II. Standard of Review

This Court should only grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997).

An issue is "genuine" if the pertinent evidence is such that a rational factfinder could resolve the issue in favor of either party, and a fact is "material" "only when it possesses the capacity, if determined as the nonmovant wishes, to alter the outcome of the lawsuit under the applicable legal tenets." *Roche v. John Hancock Mutual Life Ins. Co.*, 81 F.3d 249, 253 (1st Cir. 1996).

The moving party, however, bears the heavy burden of demonstrating to the Court that no genuine issue of material fact exists. *Id.* Summary judgment involves shifting burdens between the moving and nonmoving parties. First, the moving party has the burden to demonstrate "an absence of evidence to support the nonmoving party's case." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990) (quoting *Celotex Corp. v.* Catrett, 477 U.S. 317, 325 (1986)). Once the movant has made the requisite showing, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but … must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party must oppose the motion by presenting facts that demonstrate a genuine trial worthy issue remains. *Cadle*, 116 F.3d at 960. The Court must view all the facts and draw all reasonable inferences in the light most favorable to the nonmoving party, here, Littlefield, and against the movant, here, the Insurer. *Continental Casualty Co. v. Canadian Universal Insurance Co.*, 924 F.2d 370 (1st Cir. 1991). Moreover, the burden of the nonmoving party can be satisfied by presenting

"enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993).

Applying the summary judgment standard here leads to the inescapable conclusion that "genuine" issues of "material" fact exist and summary judgment should therefore be denied.

III. Background Facts

Littlefield's husband, Michael Littlefield ("Michael"), of approximately 9 years (they were married on July 12, 1996) died prematurely and tragically on May 25, 2005 at the age of thirty-six years old. Statement of Disputed Facts at ¶ 1. Michael was born on February 16, 1969 and died on May 25, 2005. Statement of Disputed Facts at ¶ 2. The Littlefields have a young daughter Elizabeth who was born on March 12, 1999 and was only six years old when her father died. Statement of Disputed Facts at ¶ 3. Michael died of metastatic colon cancer. Statement of Disputed Facts at ¶ 4. He suffered from this condition for approximately nine months prior to his death as clearly stated in his death certificate. Statement of Disputed Facts at ¶ 5.

While the Insurer would like the Court to believe that Michael recently purchased life insurance from his Insurer, this is not the case. Michael and Littlefield each purchased life insurance from the Insurer in 1997. Statement of Disputed Facts at ¶ 6. Michael responded to a direct mailing offered by the Insurer. Statement of Disputed Facts at ¶ 7. He initially sought $50,000 in life insurance because he couldn't afford to purchase more. Statement of Disputed Facts at ¶ 8. Both Michael and Littlefield each applied for and obtained $50,000 in life insurance from the Insurer as a result of their response to the Insurer's direct mailing solicitation. Statement of Disputed Facts at ¶ 9.

Additionally, Michael also purchased an annuity policy from the Insurer using the same Agent. Statement of Disputed Facts at ¶ 10.

In June 2003 Littlefield's sister's husband died prematurely and tragically. Statement of Disputed Facts at ¶ 11. This prompted Littlefield and Michael to re-evaluate their life insurance needs. Statement of Disputed Facts at ¶ 12. Prior to this, Michael had also obtained a $10,000 rider to his policy in February 2003 which had increased his benefits from $50,000 to $60,000. Statement of Disputed Facts at ¶ 13. After the brother-in-law's death, it became clear to the Littlefields that given that Littlefield was a stay-at-home mom with a small child, additional life insurance was needed. In August 2003, Michael and Littlefield contacted the Insurer and sought to increase coverage on Michael from $60,000 to $300,000. Statement of Disputed Facts at ¶ 14. The Insurer issued the term life insurance policy in the amount of $300,000 with a term of September 9, 2003 through September 9, 2023. The Insurer then cancelled Michael's $50,000 policy with the $10,000 rider. Statement of Disputed Facts at ¶ 15.[1]

It is undisputed that Michael had a hernia repair operation at the end of April 2003. It is also undisputed that Michael fully disclosed this information to the Insurer at the time of his reapplication for additional life insurance.[2] In fact, Littlefield claims that Michael disclosed to the Insurer's Agent all the facts surrounding the hernia and the subsequent follow-up treatment at length in their initial re-application meeting. Statement of Disputed Facts at ¶ 16. From an insurance point of view, however, a hernia

[1] The Insurer notes in its Memorandum that the issue of the Insurer's liability for the $60,000 is not at issue in this lawsuit. Littlefield has recently moved to amend her complaint to include counts with respect to Michael's $50,000 policy and $10,000 rider. The Insurer has refused to pay on either policy.

[2] At his meeting with the Insurer on August 25, 2003 to reapply for additional life insurance benefits, Michael was asked if he had "ever been told he/she had or been treated for diabetes, cancer, heart disease, alcoholism drug abuse, or high blood pressure?" Michael answered honestly and truthfully that he had not. Statement of Disputed Facts at ¶ 41 (Exhibit BB). No other medical questions appear on the reapplication form.

was not a severe medical problem. Statement of Disputed Facts at ¶ 17. Additionally in the Insurer's own "Risk Selection Life Underwriting Guidelines" under Hernia the only thing the Underwriters are instructed to ask about for a Hernia condition is the location and whether surgery has been performed or whether it is planned in the future. It is considered "Usually Standard. May be necessary to postpone if surgery is planned." Statement of Disputed Facts at ¶ 18. Here, the surgery had already been performed. Demers could not have been any clearer in his deposition:

> Hernia operations are – hernias are not considered major problems for underwriting. In order to cut down costs and speed the underwriting process, hernia operations are not – are just considered not a major - - major problem. Don't spend the money and time.

Demers deposition at p. 133 line 20 through p. 134 line 1. Statement of Disputed Facts at ¶ 19. The Agent for the Insurer would know about the underwriting practice for the Insurer since prior to becoming a sales advisor in 1992 he was an Underwriting Manager and admits to currently being aware of underwriting requirements. Statement of Disputed Facts at ¶ 20.

What was not known in August 2003 at the time Michael increased his life insurance benefits, is that in August 2004, nearly one year later, he would be diagnosed with cancer of the appendix. Statement of Disputed Facts at ¶ 21. A review of Michael's medical records indicate that on August 8, 2004 Michael and his wife "openly and frankly" discussed his condition and cancer diagnosis with Dr. Manzo (one of his personal physicians) when it was discovered. Statement of Disputed Facts at ¶ 22. In a surgical pathology report printed on August 3, 2004 from a procedure Michael underwent on July 29, 2004, it is reported for the first time, *inter alia*, that Michael has a tumor

directly invading other organs and the muscularis propria, and that distant metastasis cannot be assessed. Statement of Disputed Facts at ¶ 23.

At the time Michael reapplied for additional life insurance benefits, he had to participate in a medical examination conducted by the Insurer. The so-called "paramedical"exam[3] performed by the Insurer was not conducted by a physician or even a nurse. The person who performed it (Carroll) did not even fill out the entire form that contained more specific medical questions. Statement of Disputed Facts at ¶ 24. Carroll testified that she did not complete the entire form because she was instructed not to by the insurance company presumably in order to same time and money and because the order slip for the exam did not include completing the entire form. Statement of Disputed Facts at ¶ 26. (Carroll depo) Carroll believes she spent about 20-30 minutes with Michael although she has no specific recollection of the meeting. Statement of Disputed Facts at ¶ 27. Most of that time would have necessarily been occupied by taking Michael's blood pressure, obtaining a urine sample and a blood sample, and weighing and measuring Michael. Statement of Disputed Facts at ¶ 28. Additionally, as part of the application process Michael gave HIPPA releases to the Insurer entitling the Insurer to obtain all of Michael's medical records. Statement of Disputed Facts at ¶ 29. Similarly, the Insurer's Agent (Demers) testified that not filling out the form in its entirety was a time saver. "Don't spend the money and time." Statement of Disputed Facts at ¶ 30.

Michael's hernia doctor (Dr. Abadier) did not know or tell Michael of any problems following the April 2003 surgery. In Dr. Abadier's patient notes he indicates that on May 1, 2003 Michael was seen and "is doing well." Statement of Disputed Facts

[3] In fact, the "paramedic's" training was only a matter of hours. "It's just basically how to deal with the medical form." Statement of Disputed Facts at ¶ 25.

at ¶ 31. Two weeks later, Dr. Abadier's notes indicate that Michael "is doing all right….I reassured him and I will see him again as is needed." Statement of Disputed Facts at ¶ 32. On June 2, 2003, Dr. Abadier's notes state that Michael developed pain in the right groin after vigorously waxing some floors at work. Dr. Abadier's notes reveal that Michael did not have a recurrent hernia thereafter despite some pain. Dr. Abadier prescribed painkillers and an anti-inflammatory. He was to be seen in 10 days. Statement of Disputed Facts at ¶ 33. In ten days on June 12, 2003, it was noted that Michael "is feeling better." Dr. Abadier again "reassured" Michael. Statement of Disputed Facts at ¶ 34. There is no indication that Dr. Abadier or Dr. Manzo wrote any presecriptions for painkillers or any other prescription after June 2, 2003. Statement of Disputed Facts at ¶ 35. Thus, it is disputed that Michael was taking vicodin when he re-applied for life insurance benefits with the Insurer.

To suggest or argue that somehow Michael should have known one year in advance of his diagnosis that he would have cancer is preposterous. Clearly, had Michael known he had cancer he would have sought treatment. Indeed, this is what occurred one year later. What is even more absurd is the Insurer's denial of the payment of benefits he purchased and paid for based upon an alleged "misrepresentation" on Michael's part. When the "paramedic" (Carroll) saw Michael on August 28, 2003 she asked and Michael acknowledged candidly that he had been treated for a hernia. Statement of Disputed Facts at ¶ 36. The word "hernia" is underlined and the boxed is checked as "yes". Under details it is disclosed that Michael "had hernia surgery 4-20-03 Dr. Abadier, 300 Tollgate Rd., Warwick, RI 02886. Kent County Hospital, Warwick RI. Outpatient." Statement of Disputed Facts at ¶ 37. The information requested on the form was provided in full.

Moreover, Michael disclosed that he had surgery in response to the inquiry in question. Statement of Disputed Facts at ¶ 38. Michael disclosed the hernia and the attendant appointments to the Insurer's Agent (Demers) when he applied for the $300,000 policy. Statement of Disputed Facts at ¶ 39. The Agent, however, told Michael (and Littlefield) that as long as he had already had the surgery it was not a concern to the Insurer. Statement of Disputed Facts at ¶ 40. Michael believed the Insurer's Agent and responded accordingly thereafter. In short, the form was filled out truthfully. Michael made no misrepresentations. Michael could not have anticipated that a year later he would be diagnosed with cancer. In reviewing all of the forms used by the Insurer, there are no questions that asks whether an applicant has undergone a barium enema or CT Scan. Statement of Disputed Facts at ¶ 41. The paramedic (Carroll) could not recall even one instance where any applicant responded in response to any of the questions that they had had a barium enema. Statement of Disputed Facts at ¶ 42. The Insurer cannot now be heard to complain that Michael did not disclose the barium enema or CT Scan when the Insurer's own form never asked for this information. The paramedic (Carroll) and the teleunderwriter both testified that they followed the forms as written without explanation or further inquiry. Statement of Disputed Facts at ¶ 43.

Moreover, the teleunderwriter interview only lasted approximately ten minutes. Statement of Disputed Facts at ¶ 44.

Instead, the form asks about "x-rays and electrocardiograms." Statement of Disputed Facts at ¶ 45. And, Michael told the insurer about his x-rays for a sinus infection. And, he had already informed the Insurer of his hernia operation and all of the doctors he treated with for that ailment. Statement of Disputed Facts at ¶ 46. Michael

was told that the barium enema and CT Scan were fine and that it was just a pocket of blood. Statement of Disputed Facts at ¶ 47. Littlefield also testified that Michael never had further follow-up following the barium enema and CT Scan and that she and Michael were never shown the reports from the tests. Statement of Disputed Facts at ¶ 48.

In a different interview completed by the Insurer, Michael disclosed that he had hernia surgery and was treated with Dr. Manzo for his follow up.[4] Statement of Disputed Facts at ¶ 49. Michael's hernia doctor (Abadier) repeatedly told him everything was fine and "reassured him." Statement of Disputed Facts at ¶32 – 34, Exhibit Y. Believing his doctors, Michael so advised the Insurer.

Following Michael's tragic pre-mature death on May 25, 2005, Littlefield, as beneficiary made a claim with the Insurer for the proceeds of Michael's life insurance policy. The Insurer denied Littlefield's claim. This lawsuit followed.

## IV. ARGUMENT

### A. Fraternal Benefit Societies Including the Insurer in this Case are Subject to Rhode Island's Mandate for a Jury Trial as a Matter of Law.

Rhode Island law is clear and unequivocal in this regard; Littlefield is entitled to a jury trial on the issue of alleged material misrepresentations. The Insurer attempts to further disregard its obligations and responsibilities to its policyholders and beneficiaries including Littlefield by attempting to circumvent R.I. Gen. Laws § 27-4-10. This provision states:

[4] The form states that his follow up occurred in May 2003. The Insurer claims that because it occurred in June 2003 this voids the policy. Clearly, this discrepancy is not "material" and was not a misrepresentation. Michael did in fact see Dr. Manzo for follow up to his hernia surgery. To somehow suggest that if the Insurer had known that the follow up was in June instead of May it would not have issued the policy is absurd. Equally ludicrous is the idea that if the Insurer knew that the follow up was in June instead of May it would have known that Michael actually had cancer then, when no one else did, including Michael and his own doctors.

> No misstatement made in procuring a policy of life insurance shall be deemed material or render the policy void unless this matter represented shall have actually contributed to the contingency or event on which the policy is to become due and payable. Whether this matter represented contributed to that contingency or event shall be a question for the jury.

While no court in Rhode Island has ruled on this provision as it relates to Fraternal Benefit Societies, Rhode Island statutory law is clear that it does. However, other jurisdictions follow different rules in this regard. Littlefield asserts that the more reasoned rule is one that does not exempt Insurers (whether the Insurer is a so-called Fraternal Benefit Society or not) from Rhode Island's clear mandate for a jury trial on the issue of materiality of any misrepresentation.

A full reading of Rhode Island's law with respect to Fraternal Benefit Societies makes clear that the exemption for Fraternal Benefit Societies is "**Except as provided in this chapter**, societies shall be governed by this chapter and are exempt from all other insurance law provisions unless they are expressly designated therein, **or unless it is specifically made applicable by this chapter.**" R.I. Gen. Laws § 27-25-23 (emphasis added). The General Assembly made it clear twice that those laws specified in Chapter 25 of the General Laws would be applicable to Fraternal Benefit Societies.

R.I. Gen. Laws § 27-25-34 specifically states that "[e]very society authorized to do business in this state shall be subject to the laws and regulations of the commissioner of insurance prohibiting unfair trade practices, including laws and regulations concerning discrimination, rebating, and **misrepresentation**…" (Emphasis added). R.I. Gen. Laws § 27-4-10 is a law with respect to misrepresentation.

Thus, Fraternal Benefit Societies are not exempt from the mandate of the Rhode Island Legislature that "reserves for the jury the question [of] whether a misrepresentation in a life insurance policy is material." Insurer's Memorandum at pp. 29-30 (citations omitted).[5]

While the Insurer has cited cases from Kansas, Texas and Missouri to the contrary, it is in all likelihood a certainty that those states do not have a corresponding statute making Fraternal Benefit Societies subject to insurance laws with respect to misrepresentations as Rhode Island does. In fact, each of the cases cited by the Insurer is with respect to "misrepresentations." See Insurer's Memorandum pp. 30-31.

Alabama, Georgia and Delaware have all held that Fraternal Benefit Societies are subject to insurance laws with respect to misrepresentations. See *Accident Ins. Dept. of Order of Railway Conductors of America v. Brooks*, 216 Ala. 605, 114 So. 6 (1926) (finding that code provisions with respect to misrepresentations and warranties, apply to contracts of insurance by secret fraternities or other organizations of like kind, insuring members or others, or negotiating for such insurance contracts); *Sovereign Camp Woodmen of the World v. Beard*, 26 Ga. App. 130, 105 S.E. 629 (1921) (holding that exemption of benefit societies from insurance laws did not apply with respect to allegations regarding an untrue statement contained in an application); and *Keatley v. Grand Fraternity*, 198 F. 264 (D. Delaware 1912) (finding that insured had the benefit of defenses statutorily mandated with respect to representation or statements made "in good faith" even when brought with respect to a fraternal organization).

---

[5] The mere fact that one labels itself a Fraternal Benefit Society does not necessarily mean the exemption applies. See R.I. Gen. Laws §27-25-38. Because the fraternal exemption does not include an exclusion from the laws relating to misrepresentations, Littlefield will not here challenge the Insurer's claim that it qualifies as a Fraternal Benefit Society.

While there are no cases that interpret Rhode Island law in this regard, the clear and unambiguous language contained in R.I. Gen. Laws § 27-25-34 renders R.I. Gen. Laws §27-24-10 applicable to all insurers in Rhode Island including the Insurer in this case regardless of its status as a so-called Fraternal Benefit Society.

Given the applicability of R.I. Gen. Laws § 27-24-10 here, summary judgment is clearly inappropriate as a jury trial on the issue of materiality is mandated and therefore the Insurer's motion should be denied.

**B. Even if the Jury Mandate did not apply, the Insurer is Not Entitled to Summary Judgment as the Disputed Material Facts Demonstrate that Michael did not make Misrepresentations to the Insurer when Re-applying for additional Life Insurance Benefits.**

The statements given to the Insurer's Agent (Demers), the "so-called" Paramedic (Carroll) and the teleunderwriter (Hartwig) by Michael were truthful and did not contain misrepresentations. But what is more interesting is that even with respect to the alleged "misrepresentations" the Insurer does not claim that it would not have insured Michael, but rather, that it would have obtained his medical records.[6] See Insurer Memorandum of Law pages 10 – 19.

1. The Agent Interview

The Insurer admits that the Agent for the Insurer only asks three medical questions in his interview. See Insurer's Memorandum at p. 11. It is undisputed that, when asked, Michael denied treatment for "diabetes, cancer, heart disease, etc," The

[6] There were clear errors on the form made by the "so-called" Paramedic (Carroll). She listed all of Michael's immediate family as being deceased. His father incorrectly dead at the age of 68; his mother incorrectly dead at the age of 59 and most shockingly his brother incorrectly dead at the age of 39. See Statement of Disputed facts at ¶ 24, Exhibit R and ¶ 56, Exhibit MM. If this did not spur the Insurer to obtain copies of Michael's medical records, it is difficult to imagine what would have.

Insurer does not claim that he had these maladies, nor did he, and thus Michael made no misrepresentation in this regard.

The second area of inquiry was with respect to Michael's general health. He stated that it was "good." Michael's health was generally good was having undergone his hernia repair and associated pain and having been "reassured" by his doctors that everything was fine. Statement of Disputed Facts at ¶ 32 - 34. Again, Michael made no misrepresentation.[7]

The final question is not even specified by the Insurer. See Insurer's Memorandum at p. 12. Presumably, the Insurer is referencing the question with respect to preferred rates, *to wit*, whether the Insured ever had insurance or reinstatement refused, postponed, limited, or offered on a substandard basis. Statement of Disputed Facts at Exhibits R, BB and CC. Michael's answer was truthful and accurate, he had not and there is no evidence that he had. See *id*. In fact, the Agent (Demers) in his deposition admits that Michael answered the questions "completely and honestly." Statement of Disputed Facts at ¶ 50.

Thus, it is undisputed that Michael did not make misrepresentations (or at a minimum issues of material fact exist in this regard) to the Insurer's Agent (Demers) during his interview and thus summary judgment on that basis should be denied.

2. The Paramedic Interview

[7] While not claimed in the body of the Insurer's memorandum, the Insurer drops a footnote claiming that it was a misrepresentation to state he was in good health given an appointment with Dr. Abadier on that same day for hernia follow up and pain. See Insurer's Memorandum at p. 12, fn. 8. First, it is disputed whether Michael saw Dr. Abadier before or after he met with the Agent (See Insurer's Memorandum at p. 11 fn. 7). Second, the note from Dr. Abadier's office reads, "Patient was seen today, he is doing better. He gets the pain occasionally when he does a lot of work, otherwise he doesn't. We will see him again if he has any problems. We will get a repeat CT of the abdomen and pelvis area. [implying if Michael has further problems]" Statement of Disputed Facts at ¶ 34, Exhibit Y. There is nothing in the doctor's notes to suggest that Michael is not in general "good" health. The claim of misrepresentation on the Insurer's part is unfounded.

With respect to the "so-called" Paramedic (Carroll) interview, the Insurer claims that Michael misrepresented answers to seven questions. See Insurer's Memorandum at pp. 14-18. Each of these seven questions will be discussed seriatim below.

First, Michael was asked about the date and reason he last consulted his personal physician. The Insurer claims that he misrepresented that he had follow-up to his hernia surgery in May 2003 when in fact he saw Dr. Manzo (his personal physician) in June 2003. The difference of a few days is not as a matter of law materially false.[8] What is interesting is that the visit was related to fatigue Michael was experiencing. Michael's doctor thought his symptoms might be Lyme Disease. Statement of Disputed Facts at ¶ 51. The report from Dr. Manzo on June 10, 2003 reads as follows:

> Patient had a tick bite approximately 8 weeks ago. He had a part of it surgically removed. He did not have any obvious bulls eye rash, however, over the last few weeks of (sic) so has felt feverish a few times, fatigued, malaise. No headaches but legs feel weak and rubbery. He also is status-post approximately 6 weeks ago inguinal hernia repair which was attempted bilaterally however they were unable to complete the left side. After his procedure at work while cleaning he had some increased discomfort on his right side. He has a F/U with surgeon this week. He is not having any obvious signs of depression or anxiety at this time.

There is simply nothing in this medical report that would have alerted the Insurer that more than a year later, Michael would be diagnosed with terminal cancer. The pain Michael was experiencing at that time was believed to have been caused by overexertion from cleaning at his business and/or a tick bite.

Michael's follow-up to the tests performed for Lyme Disease were equally unremarkable. The report of Dr. Manzo states on June 16, 2003: "Seen last week with

---

[8] Can the Insurer truly assert that if the follow-up occurred on May 31, 2003 that would not have made a difference but June 1, 2003 would have?

abdominal pain, status-post surgery about 1 month or so back. He had symptoms which I felt might have been consistent with Lyme with a tick bite with a negative Lyme titer. However responded nicely to Doxycycline. He is Afebrile. His abdominal discomfort is still present **but improved**." (Emphasis added). Statement of Disputed Facts at ¶ 52.

Again Michael did not misrepresent the facts. From all outward appearances at that time everything was routine. Had the Insurer chosen to use the HIPPA releases Michael provided and obtain Michael's medical records it would not have discovered the cancer that caused his death. Moreover, the Insurer's own guidelines suggest that if the hernia surgery is complete, there is no further need for action. Statement of Disputed Facts at ¶ 18. Dr. Abadier obviously thought the surgery was "complete" as he scheduled no follow-up surgery or tests. This was confirmed by the Insurer's Agent who indicated that a hernia operation was not a severe medical problem. Statement of Disputed Facts at ¶ 17. Moreover, the Agent told Michael that as long as the hernia operation had occurred, the Insurer did not care about the hernia condition. Statement of Disputed Facts at ¶ 40.

The second area that the Insurer claims Michael misrepresented is with respect to treatment given or medication prescribed. (See Insurer's Memorandum of Law at p. 16) The Insurer claims that the paramedic's dash ("-") means that Michael said there was no treatment given or medication prescribed. While even this is open to interpretation (the dash could also mean that she did not ask the question or that Michael did not respond verbally or that Michael gave an answer that duplicated information he had given earlier) Michael did not misrepresent the facts. He told the Insurer repeatedly he was being

treated for "follow-up." Statement of Disputed Facts at ¶ ¶ 36, Exhibit R, ¶ 49, Exhibit CC and ¶ 41, Exhibit BB.

Moreover, the Insurer claims that had it known Michael had a CT Scan it "would have requested his medical records." See Insurer's Memorandum at p. 16. The Insurer had no actual written policies in effect but claims it would have sent for the test results. Littlefield disputes that this is true in the first instance since Michael's surgery had already taken place and since Michael had told the Insurer's Agent and the paramedic and the teleunderwriter about it. Additionally, even if the Insurer had requested and reviewed the medical records, as discussed previously, the records would not have disclosed anything different than what Michael had already disclosed to the Insurer. Nor, would it have disclosed anything that would have actually contributed to Michael's death. As contained in Rhode Island Law, alleged misrepresentations are not material unless the matter represented actually contributes to the contingency or event on which the policy is to become due and payable (here death). See R.I. Gen. Laws 27-4-10.[9] Thus, the fact that the Insurer would have received the medical records is irrelevant to the issue of misrepresentation in the first instance and to the issue of materiality in the second instance.

The third area of alleged misrepresentation is almost comical. The Insurer alleges that Michael misrepresented his treatment for hernia by stating "Had Hernia Surgery 4-20-03 Dr. Abadier 300 Tollgate Rd Warwick RI 02886. Kent Court (sic) Hosp Warwick RI. Outpatient."[10] See Insurer's Memorandum at p. 16. It is unfathomable that Michael misrepresented anything in this regard. Certainly the Insurer is not suggesting that it

[9] The issue of Fraternal Benefit Societies was discussed sup*ra*.
[10] The form clearly states that the treatment was at Kent County and not Kent Court. The reference is clearly a typographical error on the Insurer's part. See Insurer's Memorandum at p. 16.

believed that Michael did not see the doctor either before or after the surgery and simply walked in on the date in question and had the surgery, was given no medicines or associated tests, and left and never went back. Moreover, the question does not ask about follow up treatment. It asks about historical treatment "Have you ever been treated for…." It is also worth noting that the size of the form does not promote the paramedic's writing down everything that is said. In truth, there is little room to write even the most basic information. It is a checklist that highlights the relevant information. See Statement of Disputed Facts at ¶ 24, Exhibit R. It accurately recorded that Michael had hernia surgery at the end of April 2003 and who his doctor was. That information was given to the Insurer truthfully and forthrightly. No misrepresentation. Moreover, as indicated above, the fact that this would have allegedly prompted the Insurer to request Michael's medical records would have not availed the Insurer. First, because the records show what Michael disclosed to the Insurer. That Michael was "reassured." Statement of Disputed Facts at ¶ 32 - 34, Exhibit Y. And second, because that did not lead to Michael's death. Michael was not diagnosed with cancer until nearly a full year later.

The fourth area of misrepresentation specified by the Insurer relates to Michael's then current treatment. The Insurer claims that since the records indicate that Michael had been prescribed Vicodin for pain this answer is not only false, but materially false. See Insurer's Memorandum at pp. 16-17. The Insurer does not even attempt to allege that this caused it not to seek medical records or would have caused the Insurer not to underwrite the risk. This is routine follow-up care that was temporary in nature. It was not a permanent treatment. Clearly, this is not a misrepresentation. Moreover, given that Michael had already disclosed his follow-up care, it is not likely that anything additional

was needed by the Insurer, whether Michael stated it to the "paramedic" for the Insurer or not. Importantly, the Vicodin was prescribed on June 2, 2003 by Dr. Abadier. On June 12, 2003, Dr. Abadier stated that Miichael is "feeling better. The pain is now just a dull ache in one area. He was reassured and he will be seen again as is needed." Statement of Disputed Facts at ¶¶ 31-35, Exhibit Y. Thus, there is a disputed fact whether Michael misrepresented whether he was currently taking medication at the time of his re-application for life insurance. It had been nearly three months since any notes indicate that he had been prescribed vicodin. In fact, Littlefield testified in her deposition that Michael did not take vicodin unless he had pain. She stated that she threw a bottle of it away because he did not take it. "Mostly he would take Tylenol or ibuprofen." Statement of Disputed Facts at ¶ 54.

What is clear, however, is that Michael not only supplied the Insurer with HIPPA releases, but he also gave the Insurer blood and urine samples which were tested by the Insurer. If there had been drugs in his system, the blood and/or urine sample should have indicated that fact.

The fifth area of alleged misrepresentation is disingenuous at best. The question relates to other treatment by a physician in the last seven years. See Insurer Memorandum at p. 17. Michael disclosed the name of the other doctor he had seen but not yet disclosed to the Insurer -- "Dr. Karen Blackmere." Surely, Michael was not going to once again tell the Insurer about Dr. Abadier or Dr. Manzo both whom he had already disclosed. Furthermore, Dr. Manzo is part of the same group of doctors whom he sees with Dr. Blackmere and he had already disclosed Dr. Manzo's name to the Insurer when he met with the Insurer's Agent. Statement of Disputed Facts at ¶ 55. Again, however,

the Insurer claims that this simply would have resulted in its request for medical records. It did not cause or contribute to Michael's untimely death. The records would have confirmed what Michael was told by his healthcare providers -- that everything was fine.

The Insurer's sixth claim of misrepresentation is with respect to whether Michael had had an "x-ray or electrocardiogram." See Insurer's Memorandum at p. 17. Michael admitted having an x-ray for a sinus infection two years earlier. *See id*. This is true. Michael had already disclosed his treatment and follow-up for the hernia. Moreover, the question is not stated with respect to barium enemas and CT Scans. It simply asks about x-rays and electrocardiograms. What is insulting here is the Insurer's statement that Michael's answer is "materially false" because it "omits any reference either to the **grossly abnormal** CT scan…" See Insurer's Memorandum at p. 17. Michael had not seen the reports. Statement of Disputed Facts at ¶ 48. Michael did not know what it said and it is certainly disputed to this day whether the reports did in fact disclose any information that was out-of-the-ordinary.[11] What is undisputed, however, was that Michael was told repeatedly that his recovery was normal and that he was fine. But, even if the Insurer had obtained the records, as it alleges it would have, this would only have confirmed what Michael was told and what Michael had already told the Insurer. The outcome would not have been different for either Michael or the Insurer.

The seventh and final area of alleged misrepresentation set forth by the Insurer with respect to Michael's interview with the Insurer's "paramedic" relates to whether he had "observation or treatment at a clinic or hospital" within the past seven years. See Insurer's Memorandum at p. 17. Mindful that Michael has already disclosed his hernia

[11] The allegedly "grossly abnormal CT Scan" is a self-serving post-death statement of the Insurer and its' doctor (Charlton) and has never been so characterized by anyone else, certainly not Michael's doctors.

and follow-up treatment and his x-rays (sinus), there was nothing else for him to disclose. The Insurer would have this Court believe that this is where he should have disclosed the barium enema and the CT Scan. The question does not ask about testing. It asks about observation and treatment. Neither observation nor treatment occurs with a barium enema or CT Scan. If the Insurer wanted to know if Michael had a barium enema, it should have asked him. Likewise, if it wanted to know if he had a CT Scan, it should have asked him. To suggest that Michael misrepresented the facts with respect to tests performed when no one asked him about them is unfair. Certainly, a reasonable jury could find that this is not tantamount to a misrepresentation and summary judgment should therefore be denied.

3. The Teleunderwriting Interview

Of all the questions given and taken by the teleunderwriter, the only answer that the Insurer claims would have made it order Michael's medical records is his response to the question "Full name and complete address of personal physician; the date, reason last seen, and diagnosis:" See Insurer's Memorandum at pp. 18-19. Statement of Disputed Facts at ¶ 41, Exhibit CC. Michael told the teleunderwriter (Hartwig) that his doctor was Dr. Manzo in (East) Greenwich RI, 5/30 follow up after 4/03 hernia surgery – all OK. The teleunderwriter did not interview Michael until September, 2003. By then everything was "OK." Michael had been "reassured." Statement of Disputed Facts at ¶ 41, Exhibit CC.

The teleunderwriter claims that if Michael had told her there were problems with the hernia surgery…I would have found more details…." See Insurer's Memorandum at p. 19. The truth is, however, that Michael did not have problems with the surgery.

Michael was repeatedly "reassured" that everything was OK. Statement of Disputed Facts at ¶32 – 34, Exhibit Y. Michael did not misrepresent anything to the Insurer.

The teleunderwriter (Hartwig) also claims that had she been told about "non-routine symptoms, tests or appointments…" she would have ordered Michael's medical records. See Insurer's Memorandum at p. 19. In the first instance, Michael did not have non-routine symptoms. The symptoms, tests and appointments Michael had were all consistent with the follow-up of a hernia operation. The follow-up was disclosed to the Insurer. In the second instance even if the Insurer had requested the medical records, it would have confirmed the truthful information that Michael told them.

Michael did not make any misrepresentations to the teleunderwriter (Hartwig). Thus, summary judgment based upon Michael's alleged "material" misrepresentations in this regard should be denied as triable issues of material fact exist for a jury to determine.

### C. Even if the Jury Mandate did not Apply to the Case, any inaccuracies in the applications were not Material and Materiality is certainly a Genuine Issue for the Jury and therefore this Court Should Deny the Insurer's Motion for Summary Judgment.

The Insurer claims that alleged inaccuracies in the application process were material and therefore this Court should absolve it from its obligations pursuant to the insurance contract without letting a jury decide whether it believes the Insurer or Littlefield. The Case of *Paul Revere Life Ins. Co. v. Fish*, 910 F.Supp. 58 (R.I. 1996) is instructive on the issue of materiality. In *Fish*, the insured had answered that he had not used stimulants, hallucinogens, narcotics or any controlled substance other than prescribed by a physician, or been counseled or treated for excess use of alcohol or drugs on an application for disability benefits. In his deposition, however, Fish admitted that he

used cocaine twice a day, consuming approximately one gram per week; used one-half an ounce of marijuana per month and imbibed several alcoholic beverages a day in the 1980s. Fish also answered that he had never been treated for a mental or emotional disorder despite the fact that in his deposition he admitted he had seen a counselor for depression and had been taking an antidepressant in the recent past. *Fish* at 60-61. The claim in *Fish* was for disability benefits. Chief Judge Lagueux found that the applicable standard was **that materiality of a misrepresentation in an insurance application is generally a question of fact;** however, certain information materially affects the insurer's acceptance of the risk as a matter of law. *Id*. at 65 (emphasis added).[12] The Court in *Fish* found that Fish's previous use of cocaine, marijuana and alcohol and history of depression was "not the type of information that would be considered by all reasonable fact finders as affecting the insurer's acceptance of the risk." *Id*. at 66. The same is true in the case at bar. Any discrepancy in information is not necessarily the type of information that would be considered by all reasonable fact finders as affecting the insurer's acceptance of the risk and thus, summary judgment is inappropriate.

Here, Michael's alleged misrepresentations are so benign so as to be nonexistent. Michael disclosed his hernia operation and all his doctors. Statement of Disputed Facts at ¶ 16. The underwriting guidelines for the Insurer here indicate that given that the surgery had already occurred, the condition was "standard." Statement of Disputed Facts at ¶ 18. The agent for the Insurer testified in his deposition to the same effect. Statement of Disputed Facts at ¶ 19. The Agent said if the surgery had already occurred then the

[12] The court notes that in the case of life insurance policies it is statutorily mandated that the materiality of misstatements is a question for the jury. *Id*. The case at bar is a case involving life insurance as opposed to disability insurance. The Insurer argues that it is not subject to the provisions of the mandate. Here any misrepresentation is so clearly a question of fact for the jury that summary judgment should be denied.

Insurer did not care about the hernia. Statement of Disputed Facts at ¶ 40. While the Insurer has offered an affidavit from someone who was not present at the time and has no written policy to support that statement, to the contrary, this is clearly a genuine issue of material fact for the fact finder. "As several other courts have observed, self serving declarations of materiality by an underwriter are not always conclusive." *Id.* at 67 (citations omitted).[13]

With respect to the issue of a barium enema and a CT Scan, the issue of materiality is even more apparent. The Insurer claims that Michael made a material misrepresentation by failing to disclose that he had undergone a barium enema and CT Scan. (See Insurer's Memorandum at p. 17. In truth, however, Michael was never asked if he had undergone a barium enema and a CT Scan. The question posed and relied on by the Insurer related to "x-rays." Statement of Disputed Facts at ¶ 41. Likewise, the answer related to "x-rays." Based upon the Court's analysis in *Fish*, this clearly presents a triable issue of material fact for the jury. Littlefield respectfully suggests that reasonable minds could conclude that a barium enema and a CT Scan are not "x-rays." Or, reasonable minds could conclude that Michael didn't understand a barium enema and a CT Scan to be an "x-ray." Or, that Michael understood the question to be cumulative so that given all the information given with respect to the hernia to three different Insurer Agents, he was only giving information he had not already given to the examiner. Thus, not disclosing their existence could not constitute a material misrepresentation on Michael's part.

[13] Technically, the Insurer's Affidavit is from a Vice President testifying with respect to Underwriting standards.

With respect to Michael's cancer, it had not yet been diagnosed. Statement of Disputed Facts at ¶ 5, 21 and 22. Michael first learned he had cancer in August, 2004 – nearly a full year after he reapplied for additional life insurance benefits from the Insurer. Statement of Disputed Facts at ¶ 21 and 22. Michael's death certificate indicates that he had had cancer for nine months at the time of his death on May 25, 2005. Statement of Disputed Facts at ¶ 5. This would mean that his cancer was first evident at the time of his diagnosis in August, 2004. Thus, Michael could not have made a material misrepresentation in this regard as there was nothing to misrepresent.

**D. The Insurer relies on Unpublished Opinions.**

It is worth pointing out to this Court in more than a passing way or footnote, that much of the "authority" in the Insurer's memorandum of law are from unpublished opinions. The Insurer relies on *Fisher v. William Penn Life Ins. Co.; Holsey v. Ohio State Life Ins. Co.; Jones v. Allstate Life Ins. Co.; Miguel v. Metropolitan Life Ins. Co.;* and *Peters v. Woodmen of the World Life Ins. Co.* all "Unpublished" opinions. What is even more remarkable is the fact that the Insurer does not even mention or disclose to this Court or to Littlefield the fact that these cases are "not for publication."

With respect to the Sixth Circuit cases (*Jones* and *Peters*), the following warning precedes the case:

> NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

(Original Emphasis).

A similar notice appears with respect to the Fourth Circuit *Holsey* decision.

> **NOTICE:** [*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

(Original Emphasis). The Second Circuit has a nearly identical warning with respect to the *Fisher* case relied on by the Insurer.

> **NOTICE:** [*1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

(Original Emphasis).

With respect to the *Miguel* decision from the 11th Circuit the notice is plain and simple, "**NOTICE:** [**1] NOT FOR PUBLICATION." (Original Emphasis).

The rules from this First Circuit are not dissimilar. In fact, Local Rule 36.0(c) makes clear that "a panel's decision to issue an unpublished opinion means that the panel sees no precedential value in that opinion." And, Local Rule 32.1.0(a) requires that the party "must note in its brief or other filing that the disposition is unpublished." The fact that the Insurer would not even reference the fact that cases it relied upon were unpublished in an attempt to deprive a litigant of a jury trial is shameful. This is especially true here where the issue of misrepresentation and materiality are so plainly reserved for the jurors as fact finders.

**E. The Cases Relied upon by the Insurer with respect to Material Misrepresentation and Summary Judgment are Factually and/or Legally Distinguishable from the Facts and Law Applicable to the Instant Case and thus this Court Should Deny the Request for Summary Judgment.**

The cases cited by the Insurer in Section D of its Memorandum are factually and legally distinguishable from those presented in this case. See Insurer's Memorandum Section D pp. 31-39.[14] When the Court views the appropriate facts and law, it becomes evident that triable issues of genuine material fact exist in this case and summary judgment is therefore inappropriate and should be denied.

1. *Miguel v. Metropolitan Life Ins. Co.*

The case of *Miguel v. Metropolitan Life Ins. Co.*, 200 Fed. Appx. 961 (11th Cir. 2006) (Not for Publication) is clearly distinguishable from the instant case. In addition to the fact that the case was not published, it was also heard on a non-argument calendar. In *Miguel*, the insurer issued a policy in 2002 and the insured died in 2003 from cardiopulmonary arrest. The insured made misstatements and omissions regarding a prior hospitalization and past medical treatment. The insured had been transported by ambulance on September 5, 2001 to a local hospital complaining of chest pains. She was 73 years old at the time. The cardiologist that had been called into the ER to determine if she had suffered a heart attack found her to be in acute distress and determined her condition to be critical. *Id*. at 963. Testing conducted by the cardiologists confirmed that the insured had suffered or was currently suffering an acute heart attack. She was admitted to the hospital and her condition steadily deteriorated and she began to have increased breathing difficulties and renal failure. Two days later she met with a

[14] This is especially true given the applicability of R.I. Gen. Laws § 27-4-10 to the facts in this case.

pulmonologist who noted that the insured appeared to be suffering from congestive heart failure. She was also noted to exhibit symptoms consistent with COPD (chronic obstructive pulmonary disease). *Id*. The insured was also examined by a nephrologist on September 8 who found her to be suffering from mild underlying chronic kidney insufficiency. The insured steadily improved and was discharged on September 14, 2001.

Unlike the instant insured, in *Miguel*, the insured stated she had not be treated for "shortness of breath or chest pain." Here, Michael admitted his treatment for his hernia repair. Statement of Disputed Facts at ¶ 24. Exhibit R. The insured also answered "no" when asked if she had ever been treated for a "heart disorder" or a "disorder of the …kidneys." *Id*. at 964. Instead, the insured in *Miguel* claimed she had pneumonia that was mild and that everything was "OK." *Id*. The insured again denied treatment for chest pain, heart disorder or any disease of the kidney in Part B of her application. Here, Michael not only disclosed the fact that he had issues with a hernia, he disclosed that he had had surgery, the date of the surgery, the name and address of his doctors and that he had had follow-up treatment for pain. Statement of Disputed Facts at ¶ 24, Exhibit R, ¶41, Exhibits BB and CC. Michael also gave the Insurer HIPPA releases to obtain any and/or all of his medical records. Statement of Disputed Facts at ¶29.

Legally, the Court in *Miguel* (in an unpublished opinion) found that not only were the statements made by the insured false, but also that the insured did not believe her statements to be true at the time she made them. The court employed a knowledge and belief requirement that knowledge not defy belief. *Id*. at 966-967.

The facts and law are such that this case has no applicability to the facts and law presented here. The instant case is more similar to the facts in *William Penn Life Ins. Co. of New York v. Sands*, 912 F.2d 1359 (11th Cir. 1990) cited by the Court in *Miguel*. In *Sands*, an insured and a friend each applied to the insurer for life insurance policies each naming the other as primary beneficiary in case of death. Subsequently, the insured tested positive for Human Immunodeficiency Virus (HIV) and was diagnosed as having Acquired Immune Deficiency Syndrome (AIDS). The friend died as a result of AIDS and the insurer refused to pay death benefits to the insured, as beneficiary and initiated an action to rescind both policies. The insured counterclaimed seeking payment of the benefits under the friend's policy and a declaration that his own policy continued to be valid. The district court granted the insurer's motion for summary judgment. On appeal to the 11th Circuit the court vacated the judgment and remanded because the truthful response of the insured to a question based on his knowledge and belief could not be considered a misstatement or misrepresentation. *Id*. at 1362. In the instant case, Michael had no idea he had metastatic colon cancer. Statement of Disputed Facts at ¶ 5, 21 and 22. Thus, this court should deny the Insurer's motion for summary judgment.

2. *Laura Campbell Trust v. John Hancock Life Ins. Co.*

The instant case is also clearly distinguishable from the case *Laura Campbell Trust v. John Hancock Life Ins. Co.*, 411 F.Supp.2d 606 (D. Md. 2006) cited by the Insurer at p. 32 of its memorandum. In *Laura Campbell*, the insured had numerous health problems and denied that she had seen her doctor within the last six months. The insured had a myriad of health problems including gastroesophageal reflux disease, a benign goiter, arthritis of the hips, high cholesterol, cancer and an abnormally high heart

rate. The insured applied for life insurance on October 2, 2002 at the age of 73. *Id*. at 608. While the application was under consideration, the insured decided that it was in her best interest not to be the owner of the proposed policy and a trust was established for the benefit of the insured disabled daughter and a new application dated November 21, 2002 was completed. The insured died on March 21, 2004 of metastatic lung cancer. The insurer in *Laura Campbell* successfully argued not only that the insured made misstatements (facts not present here), but also that if it had known the truthful answer it would have denied coverage. *Id*. at 710. Here the Insurer merely argues that it would have obtained Michael's medical records. See Insurer's Memorandum at pp.15-18. Moreover, the standard applying Virginia law is more beneficial to the Insurer than the standard in Rhode Island. Virginia does not follow the rule that most issues of materiality are resolved by the trier of fact. Instead, Virginia finds that a "fact is material to the risk to be assumed by an insurance company if the fact would reasonably influence the company's decision whether or not to issue a policy." *Id*. at 610 (citations omitted). In Rhode Island materiality of a misrepresentation by an insured in an insurance application is normally a question of fact. *Fish, supra*, at 65 *citing Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 377 (1st. Cir. 1991).[15]

Thus, the *Laura Campbell* case has no application here and summary judgment should be denied.

3. *Fisher v. Willliam Penn Life Ins. Co.*

The Insurer's cite to *Fisher v. William Penn Life Ins. Co.*, 1998 U.S. App. LEXIS 31461 (2d Cir. 1998) (Unpublished) is also distinguishable from the facts in the instant

[15] This does not take into account the argument that the standard is in fact that found in R.I. Gen. Laws § 27-4-10 which statutorily mandates a jury trial on the issue of materiality of a misrepresentation.

case. In *Fisher* summary judgment was granted to an insurer because the insured failed to disclose recent medical history which was found to be a material misrepresentation. *Id.* at 4-5. A review of the case, however, demonstrates that the issue on appeal was not the material misrepresentation. The issue on appeal was when the lapsed policy had been re-instated. "Accordingly, even accepting plaintiff's contention the Dr. Fisher's premium-payment obligation dated from the policy's June 25, 1991 date of issue, the policy lapsed on January 25, 1992, because he had not by then paid the premium that was due on December 25, 1991." *Id*. In *Fisher,* it was **stipulated** that the insured reinstatement application contained a material misrepresentation and made a material omission with regard to a change in his medical status. *Id*. at 2 (emphasis added).

Here, there is no such stipulation and the facts demonstrate a triable issue for the jury and thus summary judgment should be denied.

4. *Onyon v. Truck Ins. Exch.*

The Insurer's citation to *Onyon v. Truck Ins. Exch.*, 859 F.Supp. 1338, 1341 (W.D. Wash. 1994) is indicative of the weakness of the Insurer's claim here. Not only is *Onyon* a District Court decision from Washington State, but it is also a case that involves a claim against a commercial property insurance policy for the collapse of a retaining wall that damaged a parking lot and the foundation of the building in which the commercial market was located. *Id*. at 1339. Moreover, the misrepresentation in *Onyon* was not in connection with the issuance of the policy, but rather in connection with the facts surrounding whether the collapse was a covered loss. *Id*. The insured in *Onyon* argues that his misrepresentation was not material. He did not deny giving two different statements to the Insurer. The facts in the instant case are inapposite. Michael repeatedly

told every person he met with about his hernia operation. Statement of Disputed Facts at ¶ 36, 39, 46, 49, 50. He told the Insurer the date. Statement of Disputed Facts at ¶ 36, 39, 46, 49, 50. He told the Insurer the doctor's name. Statement of Disputed Facts at ¶ 36, 39, 46, 49, 50. He told the Insurer the doctor's address. Statement of Disputed Facts at ¶ 36, 39, 46, 49, 50. He even told the Insurer that he had been treated for follow-up pain. Statement of Disputed Facts at ¶ 36, 39, 46, 49, 50. See also Insurer's Memorandum at p. 16. The only thing Michael did not tell the Insurer was something he did not know and no one else knew, that being that he would get cancer. Michael would not learn this until August 2004 – a year later. Statement of Disputed Facts at ¶ 22. Therefore, summary judgment should be denied.

5. *Garde v. Inter-Ocean Ins. Co.*

The Insurer cites to *Garde v. Inter-Ocean Ins. Co.*, 842 F.2d 175 (7th Cir. 1988) in support of its motion for summary judgment. See Insurer's Memorandum at p. 33. In *Garde* the plaintiffs were named beneficiaries in a $100,000 life insurance policy application. The insurer had not issued a policy but its agent had given the insured a conditional receipt. The application was made on February 2, 1983 and the insured died on February 25, 1983 in a drowning "accident." The insurer learned that within the six months prior to the insured death he had obtained or applied for some 20 other life insurance policies totaling in excess of $1.5 million from at least 17 other companies. *Id*. at 176. It was also discovered that the insured was experiencing significant financial difficulties at the time he applied for the insurance. *Id*. The insured only disclosed one application for $300,000 worth of life insurance and failed to disclose 20 other policies totaling over $1.5 million which the insured had taken out or applied for with other

companies in the previous six months. *Id*. at 177. The Insurer unequivocally states that if it had known about the other applications, it would not have issued the binder. *Id*. The Court relying on two other decisions involving the insured and other insurers (Garde I and Garde II) to be dispositive on the issue of material representation. *Id*. at 176.

The facts in the instant case are clearly distinguishable. Summary judgment has no analogous application in this case.

6. *Jones v. Allstate Life Ins. Co.*

The Insurer's reliance on *Jones v. Allstate Life Ins. Co.* 1994 U.S. App. LEXIS 1796 (6th Cir. 1994) (Unpublished) is equally unavailing. See Insurer's Memorandum at p. 34. *Jones* is a *per curiam* unpublished opinion from the 6th Circuit Court of Appeals. The insured died within seven months of his application for insurance of coronary heart disease at the age of 43 years old. On the death certificate "hypertension, obesity and history of smoking" are listed as "'other significant conditions contributing to death.'" *Id*. at 2. In *Jones* the beneficiary argued that many of the facts had been truthfully disclosed to the Insurer's Agent but given pressures from the Insurer she felt obligated to misstate the information so that the applicant would fall within the insurance guidelines in order to meet her sales goals. The Court in *Jones* acknowledged that Michigan law adheres to the principle that statements made to an insurer's agent are imputed to the insurer unless the insurer can prove fraud or collusion between the agent and the insured or fraud against it by its agent. *Id*. at 8-9 (citations omitted). The court in *Jones* noted however that with respect to the insured's weight there was no truthful disclosure to the agent (and thus the insurer) and therefore a material misrepresentation existed on the application. *Id*. at 10. Here the opposite is true. Littlefield alleges that a full and

complete disclosure was made to Demers, the Insurer's Agent. Statement of Disputed Facts at ¶ 16. Thus, even putting aside the fact that the cited case is unpublished and the standard of proof is different in Michigan, the cases are factually distinguishable and summary judgment is clearly not appropriate.

7. *Parker v. Prudential Ins. Co. of Am.*

This case is also distinguishable from *Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772 (4th Cir. 1990). In *Parker* the beneficiary tries to argue that the insured did not make a misrepresentation with respect to smoking and taking drugs in the past claiming that the question was ambiguous with respect to who the "person to be covered" refers to. *Id*. at 778. The Court categorically rejects this argument finding that the question "makes clear that it is the health of the person whose death triggers the benefits that is the important question for the insurance company, not the health of his beneficiary." *Id.* While Maryland law may differ from Michigan law with respect to statements made to the insurer's agent, here the distinction is without difference as the facts are so clearly controverted in the instant case with respect to the information supplied to the Insurer. Summary judgment is clearly not an appropriate avenue to determine the dispute at issue here.

8. *Holsey v. Ohio State Life Ins. Co.*

The *Holsey v. Ohio State Life Ins. Co.* 1994 U.S. App. LEXIS 30442 (4th Cir. 1994) (Unpublished) case also involves an insured's claim of ambiguity in a policy – an issue not present in this case. The beneficiary to a life insurance policy claimed that the question with respect to the insured history of smoking was ambiguous. It asked "Do any of the proposed insured smoke cigarettes? Yes No If yes, who? If no, when did they

stop? For what reason?" The insureds answered "no" and did not answer when they had stopped or for what reason. This was true despite the fact that the insured had a history of smoking a pack per day for at least sixteen years by the beneficiary's account and for twenty years eleven months after the application for insurance according to medical records. *Id*. at 6-8. The Court did not buy the beneficiary's argument that the question with respect to "If no, when did they stop?" was addressed to a third person, "presumably the insurance agent completing the application." *Id*. The information was particularly material in the unpublished *Holsey* case as the company issued non-smoker policies to them. *Id*. at 11.

This analysis has no application to the instant case where Michael was repeatedly open and honest with respect to his hernia operation. Statement of Disputed Facts at ¶ 36, 39, 46, 49, 50. Thus, summary judgment on the issue of materiality is inappropriate where as here there are multiple genuine issues of material fact that exist and the Insurer cannot demonstrate that it is entitled to judgment as a matter of law.

9. *Nichols v. The Southern Life Ins. Co.*

The case of *Nichols v. The Southern Life Ins. Co.*, 584 F.2d 106 (5th Cir. 1978) is also distinguishable from the facts in the instant case. See Insurer's Memorandum at p. 35. [16] In *Nichols* the insured had failed to disclose his recent visits to the doctor and the doctor's diagnosis of high blood pressure. On his application he denied ever having consulted a physician for blood pressure and denied all treatment within the prior five years. The insured applied for insurance on June 3, 1975. On September 25, 1974 at one

---

[16] The Insurer's citation to this case is extremely misleading. The Circuit Court for the 5th Circuit did not render an opinion with respect to this case. Instead it affirmed the judgment on the basis of the Order of the District Court and attached a copy as an appendix. The Insurer's citation is to the body of the District Court's Order as attached as the appendix.

of his doctor visits and treatment the doctor told the insured that his blood pressure was elevated and that he wanted to see him for a follow-up visit. This was not disclosed to the insurer and on November 26, 1976 the insured died from *inter alia* malignant hypertension. The District Court found and the 5th Circuit Court of Appeals affirmed that the misrepresentation was one repeatedly held to be material within the meaning of Georgia's statutory provision. *Id*. at 108. Moreover, the court concluded that the insured "had, at least, actual knowledge of his visits to the doctor, if not also, a memory of the doctor's diagnosis." Plaintiff has not disputed the fact of these visits and the nature of the diagnosis." *Id*. Here, Michael did disclose his visits and his diagnoses. Statement of Disputed Facts at ¶ 16, 36, 39, 46, 49, 50. He could not disclose what he did not know – that he would have cancer. Thus, the *Nichols* case from Georgia on a settled area of materiality has no application to the instant case and therefore this court should deny the Insurer's motion for summary judgment.

10. *Davis v. Integon Life Ins. Co.*

The Insurer's reliance on *Davis v. Integon Life Ins. Co.*, 645 F.2d 494 (5th Cir. 1981) is so misplaced so as to be mystifying.[17] In *Integon* the insured was hospitalized and had four electrocardiograms for chest pain. The Court found that the insured knowingly made false statement on the application for insurance. The court "further found those misrepresentations fraudulent as a matter of law." *Id*. 497. In fact, the 5th Circuit Court of Appeals states that, "[t]hough the district court did not apply the

[17] Again, the Insurer's citation is extremely misleading. The Insurer claims that the "Court had no difficulty finding that the answers given to the paramedical examiner were 'material misrepresentations as a matter of law.' *Id*. at 496-97. In fact, the 5th Circuit never reviewed that finding by the District Court. "Because the district court correctly found Decedent's representations were fraudulent, we need not and do not reach an issue of whether those representations were material as a matter of law to the risk assumed by Integon as an insurer. *Id*. at 498 fn. 7.

label "fraudulent" to Decedent's representations, its reference to 'knowingly false' is an adequate synonym." *Id.* at 498.[18] There is no reasonable corollary to the facts in the instant case. Michael did not act fraudulently. This case has no application and summary judgment is likewise inappropriate where as here the issue of fraud is not raised and does not exist.

11. *Peters v. Woodmen of the World Life Ins. Co.*

*Peters v. Woodmen of the World Life Ins. Co.*, 1991 U.S. App. LEXIS 883 (6th Cir. 1991) (Unpublished) is another case that has no application to the facts at issue here. In *Peters*, the insured denied having been hospitalized within the past five years. He also denied kidney problems, diabetes, any weight loss or gain within the last year as well as any other illness or injury in the last five years. The only examination he admitted to was for "check ups." *Id* at 2. It is undisputed that the facts "were seriously at odds" with the insured's representations. *Id.* The insured had been hospitalized less than three months prior to the completion of the application. *Id*. at 3. "He had been treated on a regular basis for ailments related to excessive alcohol consumption. Serious liver problems plagued Mr. Peters from the time of his first visit to Dr. Arnett, his treating physician, in 1984 until his death. Specifically, Mr. Peters suffered from cirrhosis of the liver." *Id*. Prior to applying for insurance the insured was diagnosed with "diabetes, high blood pressure, liver damage, alcohol withdrawal, alcoholic hepatitis, obesity and significant weight variations." *Id*. None of this was disclosed to the insurer. Here the facts are inapposite. Michael listed all his doctors and all his diagnoses. Statement of Disputed Facts at ¶ 36, 39, 46, 49, 50. What he did not list he did not know and no one knew.

---

[18] Littlefield could not find a reference to the "unwelcome" outcome reference in Insurer's Memorandum with respect to this case as well. See Insurer's Memorandum at p. 37 citing *Integon*, *supra*, at 497.

Michael was "reassured" after his surgery that everything was fine. Statement of Disputed Facts at ¶ 32 - 34. He could not misrepresent what he did not know and what the doctors were yet to learn. In *Peters* perhaps the insured was in denial about his alcoholism. In the first instance the denial was not reasonable given the facts of the case. Secondly, this denial would not justify the insured not admitting to have, for example, diabetes. As noted by the Court in *Peters* "misrepresentations due to diabetes alone was sufficient to void a policy." *Id*. fn. 1 (citations omitted). Michael owned up to his hernia. He did not have other problems. Statement of Disputed Facts at ¶ 36, 39, 46, 49, 50. See also Statement of Disputed Facts at ¶ 21, Exhibit P.

The unpublished opinion of *Peters* has no application to the facts in this case and precludes entry of summary judgment accordingly.

12. *Rutherford v. John Hancock Mutual Life Ins. Co.*

The first striking distinction of the *Rutherford v. John Hancock Mutual Life Ins. Co.* 562 F.2d 290 (4th Cir. 1977) case is the fact that the appeal occurred following the grant of the insurer's motion for a directed verdict and not a motion for summary judgment. Second, factually, as in the *Peters* case, this case is clearly distinguishable. *Rutherford* involved an alcoholic. While the court found it a "much closer question" on the insured's waiver argument, it ultimately upheld the district court's grant of a directed verdict. *Id*. at 293. The Fourth Circuit Court of Appeals could not overlook the various misrepresentations made by the insurer. While the Court was willing to acknowledge that the Insurer might have had some knowledge that those in this group policy had been treated for alcohol issues in the past, the Court was unwilling to impute the "specific knowledge of a condition as severe as that of Grose, who had, in the recent past, required

hospital confinement on three separate occasions, one of them for a period as long as six weeks." *Id*. Again, there is no correlating misrepresentation made by Michael in this case. Michael truthfully listed his doctors and his ailments -- hernia and pain. Statement of Disputed Facts at ¶ 36, 39, 46, 49, 50. See also Insurer's Memorandum at p. 16. Whereas in *Rutherford* the insured did not list anything that was even slightly abnormal despite having been hospitalized for as long as six weeks. Here Michael listed his doctors, listed his surgery, listed that he had follow up, listed that he had pain. Statement of Disputed Facts at ¶ 36, 39, 46, 49, 50. See also Insurer's Memorandum at p. 16. There was nothing else for Michael to tell that had not already been disclosed. Under these circumstances imposing broader duties to investigate on insurers may be appropriate as is noted as a possibility by the *Rutherford* court. *Id*. at 294 citing *Prudential Ins. Co. v. Barden*, 424 F.2d 1006 (4th Cir. 1970). In fact, a review of the *Barden* decision demonstrates facts much more similar to those at issue here than the ones presented in *Rutherford.* In *Barden*, *supra*, the Fourth Circuit Court of Appeals reversed a lower court's decision on summary judgment rescinding two life insurance policies based upon alleged material misrepresentations by the insured in his application. *Id*. at 1006-1007. The Court in *Barden* found that the insurer failed to prove that the insured made misrepresentations on his application for insurance, as the results of his doctor visits prior to the time of the application were favorable and the insured had answered the applications' broad questions; the insurer had notice of the insured's health history; and the insurer waived any imperfections that might have been in the insured's application by failing to inquiry further into the insured's health prior to issuing the policy. "Where the answers may not be precise, they are not shown to be knowledgeably

so to the applicant." *Id*. at 1010. And, while there was a dissenting opinion in *Barton* the facts in the instant case are even more compelling than those at issue in *Barton*. Thus, this court should deny the Insurer's motion for summary judgment.

13. *The Northwestern Mut. Life Ins. Co. v. Babyan*

The Insurer's reference to *The Northwestern Mut. Life Ins. Co. v. Babyan*, 430 F.3d 121 (3d Cir. 2005) is misplaced.[19] *Babyan* involves an insured that was found to have omitted information to the insurer in bad faith. This is clearly not an issue here. Bad faith on the part of Michael has never been alleged or argued. In fact, the Insurer goes to great lengths to argue that even innocent misrepresentations void the policy. See Insurer's Memorandum at p. 28. In *Babyan* the insured argues for a bright line rule that bad faith could never be inferred as a matter of law. The *Babyan* court rejected that bright line rule and found that the uncontroverted evidence did not raise an issue of fact for summary judgment. *Id*. at 132-133. In *Babyan* the insured had visited five different physicians on a number of occasions relating to problems with her knees and back, and diagnostic tests confirmed that she had knee and back problems which the insured knew. Despite this, the insured denied treatment for such ailments in her application for disability insurance. Having granted summary judgment based upon the insured's bad faith, it is clear this case has no application to the instance case and summary judgment should be denied.

A review of the cases cited by the Insurer demonstrates that the Insurer has not met its burden of showing entitlement to judgment as a matter of law as the facts and law

[19] The reference also contains a typographical error that makes the reference more confusing. The references states that summary judgment was affirmed in favor of the insured. See Insurer Memorandum at p. 37. The reference should read that summary judgment in favor of the insurer was affirmed.

are clearly distinguishable in the cases cited by the Insurer from those in the instant case. This Court should therefore deny the Insurer's motion for summary judgment.

V. CONCLUSION

Given that a jury trial is mandated by Rhode Island law in this case, summary judgment should be denied. Moreover, even were the mandate to be found to be inapplicable, the facts and circumstances are such that genuine issues of material fact exist in this case and summary judgment should be denied.

/s/ Karen Davidson

______________________________

Karen Davidson (# 3182)
One Ship Street
Providence, RI 02903
401.453.6200 (Tel.)
401.331.6110 (Fax)

Attorney for the Plaintiff
Colleen Littlefield

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of September, a true and accurate copy of the within Memorandum in Support of Objection to Motion for Summary Judgment was served by ECF on:

Patricia A. Sullivan (#2120)
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903

/s/ Karen Davidson

______________________________