**C**

Supreme Court of Alabama
ACCIDENT INS. DEPARTMENT OF ORDER OF RAILWAY CONDUCTORS OF AMERICA
v.
BROOKS.
**6 Div. 491**

Nov. 4, 1926
Rehearing Denied April 21, 1927
Further Rehearing Denied Oct. 20, 1927

Appeal from Circuit Court, Jefferson County; Jno. Denson, Judge.

Action by J.T. Brooks against the Accident Insurence Department of the Order of Railway Conductors of America. Judgment for plaintiff, and defendant appeals. Affirmed.

West Headnotes

**[1] Insurance ⚿3571**
217k3571 Most Cited Cases
(Formerly 217k815)
In action on accident insurance certificate, complaint held to sufficiently state substance and legal effect of executed contract.

**[2] Insurance ⚿3571**
217k3571 Most Cited Cases
(Formerly 217k815)
In action on accident insurance certificate, allegation as to certain by-laws being applicable held not to exclude relevant and applicable by-laws.

**[3] Insurance ⚿1734**
217k1734 Most Cited Cases
(Formerly 217k130(1))
Accident insurance contract held completed when parties' minds met as indicated by their writings.

**[4] Insurance ⚿2986**
217k2986 Most Cited Cases
(Formerly 217k723)
Statutory provisions as to misrepresentation and warranties apply to contracts of insurance by secret fraternities or like organizations. Code 1923, §§ 8049, 8364, 8507.

**[5] Insurance ⚿2955**
217k2955 Most Cited Cases
(Formerly 217k253)
To constitute defense to action on insurance policy, false statement relied on by insurer must have been made with intent to deceive concerning matters intrinsically material to risk. Code 1923, § 8364.

**[6] Insurance ⚿2958**
217k2958 Most Cited Cases
(Formerly 217k255)
Statute declaring that to be defense matter warranted in insurance policy must be so material as to increase risk of loss relieves against common-law rule as to warranties. Code 1923, § 8364.

**[7] Insurance ⚿2086**
217k2086 Most Cited Cases
(Formerly 217k765.1)
In action on accident insurance certificate, defendant had burden of proving failure to give notice of dismemberment as alleged.

**[8] Insurance ⚿1767**
217k1767 Most Cited Cases
(Formerly 217k730.2)
In action on accident insurance certificate, submission of various evidences of complete contract to jury for consideration together held not error.

**[9] Trial ⚿29(2)**
388k29(2) Most Cited Cases
Statement by trial judge to attorneys in presence of jury that he would give an affirmative charge *held* not error, though charge was subsequently refused.
*7 The following statement was made by the court: "I am going to give the general charge for the plaintiff in this case. If you gentlemen want to argue to the jury, all right; if you don't, all right."

J.M. Grimm, of Cedar Rapids, Iowa, and Coleman,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Coleman, Spain & Stewart, of Birmingham, for appellant.

W.A. Weaver and Theo. J. Lamar, both of Birmingham, for appellee.

THOMAS, J.

The suit is on a contract or certificate of insurance in the accident insurance department of the Order of Railway Conductors of America, and resulted in a verdict for the plaintiff.

[1][2][3] The overruling of demurrer to counts 2 and 3 of the complaint, setting out the substance and legal effect of the contract of insurance declared upon, was without error. These pleadings proceeded upon the theory that the application for insurance, insurance certificate, and the laws of the order that were applicable to insurance constituted the contract of insurance, and alleged that the insurance was in full force and effect at the time in question. Knights, etc., v. Gillespie, 14 Ala.App. 493, 71 So. 67; W.O.W. v. Adams, 204 Ala. 667, 86 So. 737; W.O.W. v. Eastis, 206 Ala. 49, 89 So. 63. The use of the words in count 3, "together with certain by-laws and regulations of said department, was a contract of insurance between" the parties, in the context of that count, had not the effect of excluding relevant and applicable by-laws and regulations of the department; it meant all by-laws of the defendant order that had application. In Providence, etc., Co. v. Pruett, 141 Ala. 688, 37 So. 700, the sufficiency of a plea was under discussion, and the rule is different for a complaint. The contract of the parties was completed when their minds met in the manner indicated by their writings. Cherokee Life Insurance Co. v. Brannum, 203 Ala. 145, 82 So. 175. The substance and legal effect thereof was sufficiently stated in the pleading. George v. Roberts, 207 Ala. 191, 92 So. 1.

[4] The provisions of the statute (Code of 1907, § 4572; Code of 1923, §§ 8049, 8364, 8507), as to misrepresentations and warranties, have been made to apply to contracts of insurance by a secret fraternity or other organization of like kind, which insures its members or others, or in the negotiation of such a contract of insurance or application therefor or proof of loss thereunder.

It is declared by the statute that written or oral misrepresentation or warranty shall not avoid the contract, or prevent its attaching, unless such misrepresentation is made with actual intent to deceive (Empire Life Ins. Co. v. Gee, 171 Ala. 435, 55 So. 166; Mutual Life Insurance Co. v. Allen, 174 Ala. 511, 56 So. 568), or unless the matter misrepresented ***8** increased the risk of loss (Sovereign Camp v. Hutchinson, 214 Ala. 540, 108 So. 522). The effect of warranties the parties may make in insurance contracts was the subject of discussion in Brotherhood, etc., v. Riggins, 214 Ala. 79, 107 So. 44; Sovereign Camp v. Hutchinson, 214 Ala. 540, 108 So. 520, and Massachusetts Mutual Life Insurance Co. v. Crenshaw, 195 Ala. 263, 70 So. 768.

[5] The effect of the decisions under the statute is that a plea setting up a misrepresentation as a defense to an action on a policy of insurance is demurrable where it fails to allege (as in cases of deceit, Sovereign Camp v. Hutchinson, 214 Ala. 540, 543 [2-3], 108 So. 520), that (a) false statements have been made (b) with intent to deceive, that (c) related to matters intrinsically material to the risk, (d) and that the insurer relied on them. Empire Life Ins. Co. v. Gee, 171 Ala. 435, 55 So. 166; Travelers' Ins. Co. v. Whitman, 202 Ala. 388, 391, 80 So. 470; Sovereign Camp v. Hutchinson, 214 Ala. 540, 543, 108 So. 520; Heralds of Liberty v. Collins (Ala.Sup.) 110 So. 283.

[6] The effect of the statute was to relieve against the common-law rule as to warranties the subject of contract, and to declare that the matter warranted must be material--such as increased the risk of loss. Brotherhood of Railway, etc., v. Riggins, 214 Ala. 79, 107 So. 44.

It follows that the trial court did not commit error in sustaining demurrers to pleas setting up fraudulent misrepresentations that failed in such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

averment of facts embraced within one of the alternatives. It may be further observed that pleas 5A and 10 do not specifically aver that plaintiff was not a passenger conductor at the time of the application for insurance. Amer. Ins. Co. v. Wright, 205 Ala. 186, 87 So. 577.

[7] Plea 2 set up the law of the order as to notice of total disability, and did not indicate that such failure was a condition precedent to recovery in that this was a forfeiture of all right to indemity, as for dismemberment, in accord with the certificate sued upon, providing that the principal sum is payable for death of assured or dismemberment, etc. And it is averred in plea 9:

> "Defendant denies the allegations of said count as liability for 52 weeks' indemnity, and the defendant says that it is provided in and by the certificate sued on that:
>
> " 'The principal sum will be payable to Sarah Brook relationship, wife, if his death should be caused by accident unless as excepted in article 13 of the accident insurance laws.'
>
> "And article 13 of the accident insurance laws makes provisions and exceptions in the following language and none other:
>
> " 'Article 13. Death and Dismemberment Claims.--When the death by accident of a member of this department occurs, or, when dismemberment in accord with the provisions of article 11 occurs, proof of such death or dismemberment shall be made upon blanks prepared and furnished by the department, and it shall be obligatory on part of claimant to furnish all the information said blank calls for. Said blank shall be filed with the general secretary of the department, who shall immediately refer same to the trustees of the department, for action thereon. If a majority of the trustees approve the claim, the general secretary shall, upon receipt of such approved claim, forward check covering same to claimant in full payment of all liability against this department on account of such death or dismemberment.
>
> " 'No death indemnity will be paid when loss of life has been incurred because of fits, intemperance, recklessness, disreputable or illegal acts, disappearance, injuries, fatal or otherwise, where there is no external contusion, unless certified to by a medical expert designated by the department; suicide or self-inflicted injuries, whether sane or insane; surgical operation for any disease, sickness or affliction of any nature whatsoever, other than accidental injury, as this insurance department does not cover or indemnify against same.'
>
> "And defendant avers that the alleged accident caused a dismemberment within the provisions of section 11 and plaintiff did not make proof of such dismemberment as required by article 13 above quoted, within a reasonable time after such dismemberment."

Article 11 provides, among other things, for the loss of a leg, foot, arm, hand, or eye, due to accident, the sum of $2,500. Adverting to plea 2, it does not aver that the notice referred to was a condition precedent to the right of recovery. Provident Life & Accident Ins. Co. v. Elliott, 198 Ala. 230, 73 So. 476; Royal Exch. Assur. of London, England, v. Almon, 206 Ala. 45, 89 So. 76; Amer., etc., Co. v. Waters, 133 Miss. 28, 96 So. 739. It is provided by the rule obtaining (article 12):

> "If any member of this department becomes totally disabled by accident, so that he is unable to perform his regular or other employment, he shall make report of such disability on blank prepared and furnished by the department, giving all the information called for on such blank, within ten days from the date of accident, and file it with the general secretary of the department."

It should be said that plea 9 properly presents the issue of fact and that the burden of proof as to it was upon the defendant. The several pleas to which demurrer was sustained sought to set up the same defense as that contained in pleas to which demurrer was overruled.

[8] The evidence discloses that in article 7 of the by-laws of the department a member of the order "in good standing" is eligible to become a "member of this department" (membership therein being

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

voluntary) upon due application therefor accompanied by the premium for the first quarter, forwarded to the general secretary of the department; that when application is in due form and the general secretary knows no reason why it should not be accepted, he "shall accept it" and ***9** make due "entry of such acceptance thereon," and notify the applicant that the same became in "force from 12 o'clock noon of the day upon which said application was accepted." We are not informed of any other required certificate or any other prescribed form of the notice of acceptance. This notice is for the benefit of the assured, the acceptance being binding upon the insurer. When the application, in due form, accompanied by the required dues, is accepted, the relation of assured and assurer exists. Thereafter the former would be entitled to the protection of the class of insurance to which he belonged pursuant to the contract evidenced by the application, certificate, and by-laws of the order. W.O.W. v. Alford, 206 Ala. 18, 89 So. 528. The trial court had the various evidences of the complete contract before it, and considered the same together. There was no error in submitting that evidence to the jury as tending to show plaintiff's right to recover for a total disability and dismemberment--the loss of an eye-- due to accident. It is immaterial by which of the parties the accident insurance certificate was offered. It was in evidence, and will be read in connection with the by-laws, etc., having application.

The issue was tried upon pleas of whether or not plaintiff, within a reasonable time after the injury, had been discovered, gave defendant due notice thereof; and the replication numbered 1 to the several pleas, that plaintiff, long before the suit, furnished defendant full information as to his said injuries, disabilities and dismemberment on blanks "sent plaintiff by defendant, and that thereafter the defendant advised the plaintiff in writing in substance that defendant was not going to pay the full amount due by reason of the fact that plaintiff had changed his occupation without reporting the same to defendant. Wherefore plaintiff says that defendant has waived any other right it might have which could be set up as a defense to this cause of action." See authorities in Caledonian Ins. Co. v. Jones, 214 Ala. 520, 108 So. 331.

The letter of February 11, 1924, exhibited to defendant's rejoinder to the replication, was to the effect that the department had received information that plaintiff had changed his occupation from passenger to freight conductor, and that such change was required to be reported by article 15 of defendant's by-laws, and that no report had been made. The letter adverted to the fact that the required notice of dismemberment on specific blanks had not been given, or that such notice of disability as was given was made upon the blanks provided for members making application for weekly indemnity; expressed the opinion or declared that this fact was immaterial; indicated that the claim of disability would be re-examined and if payment was made it would be made on the basis of the purported change of occupation from passenger to freight conductor.

[9] The statement of the trial judge as to the affirmative charge was directed to the attorneys, and, though in the presence of the jury, was without reversible error. The fact that the court thereafter reconsidered and declined to give the charge for the plaintiff, and defendant had opportunity to argue the case, discloses no error to reverse. The jury were fully informed as to the controverted issues of fact to be ascertained from the several tendencies of the evidence. If it had been thought by counsel that the charge was not sufficiently comprehensive under the several pleadings and tendencies of evidence, the court should, by special charges, have been duly invoked thereto or reminded of the deficiency. W.O.W. v. Maynor, 209 Ala. 443, 96 So. 352; Lewis v. Martin, 210 Ala. 401, 98 So. 635.

The general affirmative charges requested by defendant were properly refused.

The judgment of the circuit court is affirmed.

Affirmed.

ANDERSON, C.J., and SOMERVILLE and BOULDIN, JJ., concur.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

On Petition for Rehearing.

THOMAS, J.

When the whole proceedings are considered together--pleadings and evidence-- the trial of the issues of fact were on the theory that the contract of the parties was evidenced by the application and certificate of insurance into which entered the laws of the order that were applicable, and that the issue was whether plaintiff gave the required notice of his injury within a reasonable time after he had discovered that injury. To the pleas of the defendant were directed several replications, 1 to 4, inclusive, and to which demurrer was overruled as to some and sustained as to No. 4. Thus were presented the issues of fact discussed on the original hearing.

In the trial of the cause, plaintiff offered testimony tending to prove his complaint; the defendant's testimony tended to prove that the notice indicated in its plea had not been given by the plaintiff within a reasonable time; and plaintiff offered testimony tending to show that the notice was given within a reasonable time and also to prove the special replication. The issue presented to the jury and tried by it was a disputed question of fact, being that of whether or not the said notice was given within a reasonable time. On this question, the jury found for the plaintiff. It was, therefore, not necessary that the plaintiff should prove all the replications he saw fit to introduce.

It is well established that, where the fact of agency rests in parol or by way of inference ***10** from the conduct of the principal, and there is evidence to show the agency, the acts and declarations of the agent are admissible, and the fact of agency vel non is usually a question for the jury. The letter of E.P. Curtis was a declaration of the purported agent (its general secretary and treasurer) and it supported the issue of waiver of other notice, or such was the reasonable inference that the jury may draw therefrom. Roberts & Sons v. Williams, 198 Ala. 290, 73 So. 502; Robinson & Co. v. Greene, 148 Ala. 434, 43 So. 797. The letter from Curtis as general secretary was competent evidence, since there was other evidence from which the authority in the premises might be inferred. Gambill v. Fuqua, 148 Ala. 448, 42 So. 735; Eagle Iron Co. v. Baugh, 147 Ala. 613, 41 So. 663. The writer of this letter (and other letters in evidence) was holding himself out as the agent of the defendant in handling the claim, acting as said agent generally in the matters of the sufficiency of notices and of all claims. Defendant had the direct control of this agent or agency, and had the possession of all of his correspondence as such alter ego, and knew that Mr. Curtis was so acting in that behalf, and in passing upon the fact of whether or not a claim was regular or questionable. It was within the line of his duty to inform the claimant, if the claim as made was objectionable, and to state to a member the reasons why.

Curtis was the general secretary of the defendant; had more than limited authority; was the alter ego of defendant for the purposes indicated in the by-laws and constitution of the defendant. In article 5 it is provided:

> "The general secretary shall keep a true record of all the business of the department, a register of the members, receive and hold in trust all funds of the department, and shall pay to the proper person or persons, upon receipt of unquestionable proof of injury or death caused by accident, such amount as such person or persons are entitled to receive in full as indemnity for loss of time, dismemberment, or death. He will pay no questionable claim for indemnity for loss of time, or dismemberment or death unless approved by trustees. He shall be held under his bond in the Order of Railway Conductors for the faithful performance of his duties as general secretary of this department."

And in article 12 it is further provided:

> That said official shall pay disability claimants, if the proof thereof is unquestionable, and, "if the proof of claim for disability is questionable, the general secretary will refer it to the trustees of the department for action thereon, and, if a majority of the trustees approve the claim, the general secretary shall, upon the receipt of such approved

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claim, forward check covering same to claimant in full payment of all liability against this department on account of such disability."

Thus he was more than a limited agent, and was clothed with judgment and authority to act in the matter of requiring immediate payment of a claim, or to refer it to the trustees of the department for further consideration.

As we have stated, the issues of fact presented were whether or not plaintiff was injured and gave due and seasonable notice of his injuries. Defendant's pleading presented said issues, and plaintiff's replies were that of waiver. The evidence or inferences therefrom was submitted in support of the respective insistances. The jury found for plaintiff under the issues as made up. The failure of plaintiff to prove one of several replications to a plea does not warrant a judgment on the pleas for the defendant, if other replication thereto be proven and is an answer to the plea (Fidelity & Deposit Co. v. Mobile County, 124 Ala. 144, 151, 27 So. 386; Glass v. Meyer, Son & Co., 124 Ala. 332, 335, 26 So. 890), and such is the case as to the verdict rendered.

The application for rehearing is overruled.

216 Ala. 605, 114 So. 6

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Supreme Court of the United States
James Earl BYRD, Petitioner,
v.
BLUE RIDGE RURAL ELECTRIC COOPERATIVE, Inc.
**No. 57.**

Reargued April 28, 29, 1958.
Decided May 19, 1958.
Rehearing Denied June 23, 1958.

See 357 U.S. 933, 78 S.Ct. 1366.

Diversity action against electric company for injuries sustained by lineman, who was employed by construction contractor, while connecting power lines to a new substation constructed by contractor pursuant to contract with electric company, which raised affirmative defense that lineman was its statutory employee and his exclusive remedy was under state workmen's compensation laws, wherein lineman, in view of trial court's erroneous construction of statute had no occasion to introduce evidence to meet the affirmative defense, which was stricken by the trial court. The United States District Court for the Western District of South Carolina, entered judgment for the lineman and the electric company appealed. The Court of Appeals, 238 F.2d 346, reversed the trial court and directed entry of judgment for the company, and the Supreme Court granted certiorari. The Supreme Court, Mr. Justice Brennan, held that Court of Appeals, in reversing trial court and holding that statute granted company immunity if proofs established company's crews performed like work as contractor, erred in making its own determination on the record that lineman was statutory employee instead of remanding to give lineman opportunity to introduce further evidence on issue whether lineman was statutory employee of power company under correct interpretation of statute.

Reversed and remanded.

Mr. Justice Whittaker dissented in part, Mr. Justice Frankfurter and Mr. Justice Harlan dissented.

West Headnotes

**[1] Federal Courts 452**
170Bk452 Most Cited Cases
(Formerly 106k383(1))
Ordinarily, Supreme Court will accept interpretation of local law by Court of Appeals, especially when neither party disputes the interpretation.

**[2] Federal Courts 937.1**
170Bk937.1 Most Cited Cases
(Formerly 170Bk937, 106k406.9(9))
In diversity action against electric company for injuries sustained by lineman, who was employed by construction contractor, while connecting power lines to new substation constructed by contractor pursuant to contract with electric company, which raised affirmative defense that lineman was its statutory employee and his exclusive remedy was under state workmen's compensation laws, wherein lineman, in view of trial court's erroneous construction of statute had no occasion to introduce evidence to meet affirmative defense, which was stricken by trial court, Court of Appeals, in reversing trial court and holding that statute granted company immunity if proofs established company's crews performed like work as contractor, erred in making its own determination on the record that lineman was statutory employee instead of remanding to give lineman opportunity to introduce further evidence on issue whether lineman was statutory employee of power company under correct interpretation of statute. Code S.C.1952, §§ 12-1025, 72-111, 72-121, 72-123.

**[3] Federal Courts 938**
170Bk938 Most Cited Cases
(Formerly 106k406.9(9))
In diversity action against electric company for injuries sustained by a lineman, who was employed by a construction contractor, which contracted with company for construction of new lines and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

substations, wherein company raised affirmative defense that lineman was its statutory employee and his exclusive remedy was under state workmen's compensation statute, lineman's motion to dismiss affirmative defense was analogous to a defendant's motion for involuntary dismissal of action after plaintiff has completed presentation of his evidence, and lineman, upon reversal by Court of Appeals of trial court's action in striking affirmative defense at close of all evidence, was entitled to opportunity to try issue under Court of Appeals' interpretation of the case. Code S.C.1952, §§ 12-1025, 72-111, 72-121, 72-123; Fed.Rules Civ.Proc. rule 41(b), 28 U.S.C.A.

**[4] Federal Civil Procedure ⚷1837.1**
170Ak1837.1 Most Cited Cases
(Formerly 170Ak1837)
In diversity action against electric company by lineman who was employed by construction contractor, which had contract for construction of new lines and new substations, for injuries sustained while connecting line to a new substation, wherein company urged as affirmative defense that lineman was its statutory employee and his exclusive remedy was under state workmen's compensation law, and trial court granted motion to dismiss defense on ground that under court's interpretation of statute defense was not sustained, lineman did not submit issue of whether he was statutory employee upon the evidence in the case and concede that he had no evidence of his own to offer. Code S.C.1952, §§ 12-1025, 72-111, 72-121, 72-123; Fed.Rules Civ.Proc.
rule 41(b), 28 U.S.C.A.

**[5] Federal Courts ⚷955**
170Bk955 Most Cited Cases
(Formerly 106k406.9(21))
In diversity action against electric company for injuries sustained by lineman, who was employed by construction contractor, while connecting power lines to a new substation constructed by contractor pursuant to contract with electric company, which urged as affirmative defense that lineman's exclusive remedy was under state workmen's compensation law, lineman, on remand of case to trial court, was entitled to a jury determination of factual issues raised by defense in accordance with federal practice, notwithstanding state practice. Code S.C.1952, §§ 12-1025, 72-111.

**[6] Courts ⚷41**
106k41 Most Cited Cases
(Formerly 106k1)
A state may distribute functions of its judicial machinery as it sees fit.

**[7] Federal Civil Procedure ⚷2153.1**
170Ak2153.1 Most Cited Cases
(Formerly 170Ak2153)
State practice of having court rather than jury determine issue whether plaintiff is statutory employee of defendant and therefore barred by Workmen's Compensation Act from suing defendant at law is merely a form and mode of enforcing the immunity and not a rule intended to be bound up with definition of state-created rights and obligations of the parties and federal court, in a diversity case, is not bound under rule of Erie v. Tompkins to follow the state practice.

**[8] Federal Civil Procedure ⚷51**
170Ak51 Most Cited Cases
Federal court should conform as near as may be, in absence of other considerations, to state rules of form and mode where state rules may bear substantially on question whether litigation would come out one way in the federal court and another way in the state court if the federal court failed to apply a particular local rule.

**[9] Federal Courts ⚷3.1**
170Bk3.1 Most Cited Cases
(Formerly 170Bk3, 106k255)
The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction.

**[10] Federal Civil Procedure ⚷2141**
170Ak2141 Most Cited Cases
Under the federal judicial system, determination of disputed questions of fact in civil common-law action is for the jury. Code S.C.1952, § 72-111.

**[11] Federal Civil Procedure ⚷2111**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170Ak2111 Most Cited Cases
The policy of uniform enforcement of state-created rights and obligations cannot in every case exact compliance with a state rule which disrupts federal system of allocating functions between judge and jury.

**[12] Federal Civil Procedure ⚷2111**
170Ak2111 Most Cited Cases
Policy of uniform enforcement of state-created rights and obligations cannot in every case exact compliance by federal court in a diversity case with a state rule, not bound up with rights and obligations, which disrupts federal system of allocating functions between judge and jury.

**[13] Federal Civil Procedure ⚷2111**
170Ak2111 Most Cited Cases
There is a strong federal policy against allowing state rules to disrupt judge-jury relationship in federal courts.

**[14] Federal Civil Procedure ⚷1969**
170Ak1969 Most Cited Cases

**[14] Federal Civil Procedure ⚷2339**
170Ak2339 Most Cited Cases
Trial judge in federal system has powers denied judges of many states to comment on weight of evidence and credibility of witnesses, and discretion to grant a new trial if the verdict appears to him to be against weight of evidence.

**[15] Federal Civil Procedure ⚷2153.1**
170Ak2153.1 Most Cited Cases
(Formerly 170Ak2153)
Likelihood of different result if disputed factual issue, as to whether defendant was statutory employer immune from suit by plaintiff in negligence action, was determined by jury rather than by court was not so strong as to require federal practice of jury determination of disputed factual issues to yield to contrary state rule in interest of uniformity of outcome. 28 U.S.C.A. § 1332; Code S.C.1952, §§ 12-1025, 72-111, 72-121, 72- 123.
****895 *526** Mr. Henry Hammer, Columbia, S.C., for petitioner.

Messrs. Wesley M. Walker and Ray R. Williams, Greenville, S.C., for respondent.

Mr. Justice BRENNAN delivered the opinion of the Court.

This case was brought in the District Court for the Western District of South Carolina. Jurisdiction was based on diversity of citizenship. 28 U.S.C. s 1332, 28 U.S.C.A. s 1332. The petitioner, a resident of North Carolina, sued respondent, a South Carolina corporation, for damages for injuries allegedly caused by the respondent's negligence. He had judgment on a jury verdict. The Court of Appeals for the Fourth Circuit reversed and directed the entry of judgment for the respondent. 238 F.2d 346. We granted certiorari, 352 U.S. 999, 77 S.Ct. 557, 1 L.Ed.2d 544, and subsequently ordered reargument, 355 U.S. 950, 78 S.Ct. 530, 2 L.Ed.2d 527.

The respondent is in the business of selling electric power to subscribers in rural sections of South Carolina. The petitioner was employed as a lineman in the construction crew of a construction contractor. The contractor, R. H. Bouligny, Inc., held a contract with the respondent in the amount of $334,300 for the building of some 24 miles of new power lines, the reconversion to higher capacities of about 88 miles of existing lines, and the construction of 2 new substations and a breaker station. ***527** The petitioner was injured while connecting power lines to one of the new substations.

One of respondent's affirmative defenses was that under the South Carolina Workmen's Compensation Act, [FN1] the petitioner--because the work contracted to be done by his employer was work of the kind also done by the respondent's own ****896** construction and maintenance crews--had the status of a statutory employee of the respondent and was therefore barred from suing the respondent at law because obliged to accept statutory compensation benefits as the exclusive remedy for his injuries. [FN2] Two questions***528** concerning this defense are before us: (1) whether the Court of Appeals

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

erred in directing judgment for respondent without a remand to give petitioner an opportunity to introduce further evidence; and (2) whether petitioner, state practice notwithstanding, is entitled to a jury determination of the factual issues raised by this defense.

FN1. S.C.Code, 1952, provides:

's 72--111. Liability of owner to workmen of subcontractor.

'When any person, in this section and s 72--113 and 72--114 referred to as 'owner', undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (in this section and s 72--113 to 72--116 referred to as 'subcontractor') for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any workman employed in the work any compensation under this Title which he would have been liable to pay if the workman had been immediately employed by him.'

's 72--121. Employee's rights under Title exclude all others against employer.

'The rights and remedies granted by this Title to an employee when he and his employer have accepted the provisions of this Title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee, is personal representative, parents, dependents or next of kin as against his employer, at common law or otherwise, on account of such injury, loss of service or death.'

's 72--123. Only one remedy available.

'Either the acceptance of an award under this Title or the procurement and collection of a judgment in an action at law shall be a bar to proceeding further with the alternate remedy.'

FN2. In earlier proceedings the case was dismissed on the ground that the respondent, a nonprofit corporation, was immune from tort liability under South Carolina law. D.C., 118 F.Supp. 868. The Court of Appeals reversed and remanded the case for trial, 4 Cir., 215 F.2d 542.

I.

The Supreme Court of South Carolina has held that there is no particular formula by which to determine whether an owner is a statutory employer under s 72--111. In Smith v. Fulmer, 198 S.C. 91, 97, 15 S.E.2d 681, 683, the State Supreme Court said:

> 'And the opinion in the Marchbanks case (Marchbanks v. Duke Power Co., 190 S.C. 336, 2 S.E.2d 825, said to be the 'leading case' under the statute) reminds us that while the language of the statute is plain and unambiguous, there are so many different factual situations which may arise that no easily applied formula can be laid down for the determination of all cases. In other words, 'it is often a matter of extreme difficulty to decide whether the work in a given case falls within the designation of the statute. It is in each case largely a question of degree and of fact."

The respondent's manager testified on direct examination that three of its substations were built by the respondent's own construction and maintenance crews. When pressed on cross-examination, however, his answers left his testimony in such doubt as to lead the trial judge to say, 'I understood he changed his testimony, that they had not built three.' But the credibility of the manager's testimony, and the general question whether the evidence in support of the affirmative defense presented ***529** a jury issue, became irrelevant because of the interpretation given s 72--111 by the trial judge. In striking respondent's affirmative defense at the close of all the evidence [FN3] he ruled that the respondent was the statutory employer of the petitioner only if the construction work done by respondent's crews was done for somebody else, and was not the statutory employer if, as the proofs showed, the crews built facilities

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

only for the respondent's own use. 'My idea of engaging in the business is to do something for somebody else. What they (the respondent) are doing--and everything they do about repairing lines and building substations, they do it for themselves.' On this view of the meaning of the statute, the evidence, even accepting the manager's testimony on direct examination as true, lacked proof of an essential element of the affirmative defense, and there was thus nothing for the petitioner to meet with proof of his own.

FN3. The trial judge, in spite of his action striking the defense, permitted the respondent to include the affirmative defense as a ground of its motions for a directed verdict and judgment non obstante veredicto.

[1][2] The Court of Appeals disagreed with the District Court's construction of s 72--111. Relying on the decisions of the Supreme Court of South Carolina, among others, in Marchbanks v. Duke Power Co., 190 S.C. 336, 2 S.E.2d 825, and Boseman v. Pacific Mills, 193 S.C. 479, 8 S.E.2d 878, the Court of Appeals held that the statute granted respondent immunity from the action if **897 the proofs established that the respondent's own crews had constructed lines and substations which, like the work contracted to the petitioner's employer, were necessary for the distribution of the electric power which the respondent was in the business of selling. We ordinarily accept the interpretation of local law by the Court of *530 Appeals, cf. Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 534, 69 S.Ct. 1233, 1235, 93 L.Ed. 1520, and do so readily here since neither party now disputes the interpretation.

However, instead of ordering a new trial at which the petitioner might offer his own proof pertinent to a determination according to the correct interpretation, the Court of Appeals made its own determination on the record and directed a judgment for the respondent. The court noted that the Rural Electric Cooperative Act of South Carolina [FN4] authorized the respondent to construct, acquire, maintain, and operate electric generating plants, buildings, and equipment, and any and all kinds of property which might be necessary or convenient to accomplish the purposes for which the corporation was organized, and pointed out that the work contracted to the petitioner's employer was of the class which respondent was empowered by its charter to perform.

FN4. S.C.Code, s 1952, s 12--1025.

The court resolved the uncertainties in the manager's testimony in a manner largely favorable to the respondent: 'The testimony with respect to the construction of the substations of Blue Ridge, stated most favorably to the (petitioner), discloses that originally Blue Ridge built three substations with its own facilities, but that all of the substations where were built after the war, including the six it was operating at the time of the accident, were constructed for it by independent contractors, and that at the time of the accident it had no one in its direct employ capable of handling the technical detail of substation construction.' 238 F.2d 346, 350.

The court found that the respondent financed the work contracted to the petitioner's employer with a loan from the United States, purchased the materials used in the work, and entered into an engineering service contract with an independent engineering company for the design *531 and supervision of the work, concluding from these findings that 'the main actor in the whole enterprise was the Cooperative itself.' Ibid.

Finally, the court held that its findings entitled the respondent to the direction of a judgment in its favor. '* * * (T)here can be no doubt that Blue Ridge was not only in the business of supplying electricity to rural communities, but also in the business of constructing the lines and substations necessary for the distribution of the product * * *.' Id., at page 351.

While the matter is not adverted to in the court's opinion, implicit in the direction of verdict is the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

holding that the petitioner, although having no occasion to do so under the District Court's erroneous construction of the statute, was not entitled to an opportunity to meet the respondent's case under the correct interpretation. That holding is also implied in the court's denial, without opinion, of petitioner's motion for a rehearing sought on the ground that '* * * '(T)he direction to enter judgment for the defendant instead of a direction to grant a new trial denies plaintiff his right to introduce evidence in contradiction to that of the defendant on the issue of defendant's affirmative defense, a right which he would have exercised if the District Judge had ruled adversely to him on his motion to dismiss, and thus deprives him of his constitutional right to a jury trial on a factual issue.'

We believe that the Court of Appeals erred. We do not agree with the petitioner's ****898** argument in this Court that the respondent's evidence was insufficient to withstand the motion to strike the defense and that he is entitled to our judgment reinstating the judgment of the District Court. But the petitioner is entitled to have the question determined in the trial court. This would be necessary even if petitioner offered no proof of his own. Although the respondent's evidence was sufficient to withstand the motion under the meaning given the ***532** statute by the Court of Appeals, it presented a fact question, which, in the circumstances of this case to be discussed infra, is properly to be decided by a jury. This is clear not only because of the issue of the credibility of the manager's vital testimony, but also because, even should the jury resolve that issue as did the Court of Appeals, the jury on the entire record--consistent with the view of the South Carolina cases that this question is in each case largely one of degree and of fact-- might reasonably reach an opposite conclusion from the Court of Appeals as to the ultimate fact whether the respondent was a statutory employer.

[3][4] At all events, the petitioner is plainly entitled to have an opportunity to try the issue under the Court of Appeals' interpretation. His motion to dismiss the affirmative defense, property viewed, was analogous to a defendant's motion for involuntary dismissal of an action after the plaintiff has completed the presentation of his evidence. Under Rule 41(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., in such case 'the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.' The respondent argues, however, that before the trial judge ruled on the petitioner's motion, the petitioner's counsel, in effect, conceded that he had no other evidence to offer and was submitting the issue of whether the respondent was a statutory employer on the basis of the evidence already in the case. The judge asked petitioner's counsel: 'In the event I overrule your motion, do you contemplate putting up any testimony in reply?' Counsel answered: 'We haven't discussed it, but we are making that motion. I frankly don't know at this point of any reply that is necessary. I don't know of any evidence in this case--.' The interruption which prevented counsel's completion of the answer was the trial judge's ***533** comment: 'I am inclined to think so far it is a question of law but I will hear from Mr. Walker (respondent's counsel) on that. I don't know of any issue of fact to submit to the jury. It seems to me under the testimony here there has been--I don't know of any conflict in the testimony, so far as that's concerned, so far.' The judge turned to respondent's counsel and there followed a long colloquy with him, [FN5] at the conclusion of which the judge dismissed the defense upon the ground that under his interpretation of the statute the defense was not sustained without evidence that the respondent's business involved the doing of work for others of the kind done by the petitioner's employer for the respondent. Upon this record it plainly cannot be said that the petitioner submitted the issue upon the evidence in the case and conceded that he had no evidence of his own to offer. The petitioner was fully justified in that circumstance in not coming forward with proof of his own at that stage of the proceedings, for he had nothing to meet under the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

District Court's view of the statute. He thus cannot be penalized by the denial of his day in court to try the issue under the correct interpretation of the statute. Cf. Fountain v. Filson, 336 U.S. 681, 69 S.Ct. 754, 93 L.Ed. 971; Weade v. Dichmann, Wright & Pugh, Inc., 337 U.S. 801, 69 S.Ct. 1326, 93 L.Ed. 1704; ****899**Globe Liquor Co. v. Sam Roman, 332 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177; Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849.

FN5. The only remarks thereafter made by the petitioner's counsel reiterated his statement that he pressed his motion to dismiss the affirmative defense.

II.

[5] A question is also presented as to whether on remand the factual issue is to be decided by the judge or by the jury. The respondent argues on the basis of the decision of the Supreme Court of South Carolina in ***534**Adams v. Davison- Paxon Co., 230 S.C. 532, 96 S.E.2d 566, [FN6] that the issue of immunity should be decided by the judge and not by the jury. That was a negligence action brought in the state trial court against a store owner by an employee of an independent contractor who operated the store's millinery department. The trial judge denied the store owner's motion for a directed verdict made upon the ground that s 72--111 barred the plaintiff's action. The jury returned a verdict for the plaintiff. The South Carolina Supreme Court reversed, holding that it was for the judge and not the jury to decide on the evidence whether the owner was a statutory employer, and that the store owner had sustained his defense. The court rested its holding on decisions, listed in footnote 8, infra, involving judicial review of the Industrial Commission and said:

FN6. The decision came down several months after the Court of Appeals decided this case.

'Thus the trial court should have in this case resolved the conflicts in the evidence and determined the fact of whether (the independent contractor) was performing a part of the 'trade, business or occupation' of the department store-appellant and, therefore, whether (the employee's) remedy is exclusively under the Workmen's Compensation Law.' 230 S.C. at page 543, 96 S.E.2d at page 572.

The respondent argues that this state-court decision governs the present diversity case and 'divests the jury of its normal function' to decide the disputed fact question of the respondent's immunity under s 72--111. This is to contend that the federal court is bound under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, to follow the state court's holding to secure uniform enforcement of the immunity created by the State. [FN7]

FN7. See Cities Service Oil Co. v. Dunlap, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196; West v. American Tel. & Tel. Co., 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139; Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079; Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832; Ragan v. Merchants Transfer Co., 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520; Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524; Cohen v. Beneficial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528; Bernhardt v. Polygraphic Co., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199; Sampson v. Channell, 1 Cir., 110 F.2d 754, 128 A.L.R. 394.

***535** First. It was decided in Erie R. Co. v. Tompkins that the federal courts in diversity cases must respect the definition of state-created rights and obligations by the state courts. We must, therefore, first examine the rule in Adams v. Davison-Paxon Co. to determine whether it is bound up with these rights and obligations in such a way that its application in the federal court is required. Cities Service Oil Co. v. Dunlap, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[6][7] The Workmen's Compensation Act is administered in South Carolina by its Industrial Commission. The South Carolina courts hold that, on judicial review of actions of the Commission under s 72--111, the question whether the claim of an injured workman is within the Commission's jurisdiction is a matter of law for decision by the court, which makes its own findings of fact relating to that jurisdiction. [FN8] The South Carolina ****900** Supreme Court states no reasons in Adams v. Davison-Paxon Co. why, although the jury decides all other factual issues raised by the cause of action and defenses, the jury is displaced as to the factual issue raised by the affirmative defense under s 72--111. The decisions cited to support the holding are those listed in footnote 8, which are concerned solely with defining the scope and method of judicial review of the Industrial ***536** Commission. A State may, of course, distribute the functions of its judicial machinery as it sees fit. The decisions relied upon, however, furnish no reason for selecting the judge rather than the jury to decide this single affirmative defense in the negligence action. They simply reflect a policy, cf. Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598, that administrative determination of 'jurisdictional facts' should not be final but subject to judicial review. The conclusion is inescapable that the Adams holding is grounded in the practical consideration that the question had theretofore come before the South Carolina courts from the Industrial Commission and the courts had become accustomed to deciding the factual issue of immunity without the aid of juries. We find nothing to suggest that this rule was announced as an integral part of the special relationship created by the statute. Thus the requirement appears to be merely a form and mode of enforcing the immunity, Guaranty Trust Co. of New York v. York, 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079, and not a rule intended to be bound up with the definition of the rights and obligations of the parties. The situation is therefore not analogous to that in Dice v. Akron, C. & Y.R. Co., 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398, where this Court held that the right to trial by jury is so substantial a part of the cause of action created by the Federal Employers' Liability Act, 45 U.S.C.A. s 51 et seq. that the Ohio courts could not apply, in an action under that statute, the Ohio rule that the question of fraudulent release was for determination by a judge rather than by a jury.

FN8. Knight v. Shepherd, 191 S.C. 452, 4 S.E.2d 906; Tedars v. Savannah River Veneer Co., 202 S.C. 363, 25 S.E.2d 235, 147 A.L.R. 914; McDowell v. Stilley Plywood Co., 210 S.C. 173, 41 S.E.2d 872; Miles v. West Virginia Pulp & Paper Co., 212 S.C. 424, 48 S.E.2d 26; Watson v. Wannamaker & Wells, Inc., 212 S.C. 506, 48 S.E.2d 447; Gordon v. Hollywood-Beaufort Package Corp., 213 S.C. 438, 49 S.E.2d 718; Holland v. Georgia Hardwood Lumber Co., 214 S.C. 195, 51 S.E.2d 744; Younginer v. J. A. Jones Construction Co., 215 S.C. 135, 54 S.E.2d 545; Horton v. Baruch, 217 S.C. 48, 59 S.E.2d 545.

[8] Second. But cases following Erie have evinced a broader policy to the effect that the federal courts should conform as near as may be--in the absence of other considerations--to state rules even of form and mode where the state rules may bear substantially on the question whether the litigation would come out one way in the federal court and another way in the state court if the federal ***537** court failed to apply a particular local rule. [FN9] E.g., Guaranty Trust Co. of New York v. York, supra; Bernhardt v. Polygraphic Co., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199. Concededly the nature of the tribunal which tries issues may be important in the enforcement of the parcel of rights making up a cause of action or defense, and bear significantly upon achievement of uniform enforcement of the right. It may well be that in the instant personal-injury case the outcome would be substantially affected by whether the issue of immunity is decided by a judge or a jury. Therefore, were 'outcome' the only consideration, a strong case might appear for saying that the federal court should follow the state practice.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN9. Cf. Morgan, Choice of Law Governing Proof,58 Harv.L.Rev. 153; 3 Beale, Conflict of Laws, s 594.1; Restatement of the Law, Conflict of Laws, pp. 699--701.

****901** [9][10][11][12] But there are affirmative countervailing considerations at work here. The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence--if not the command [FN10]--of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury. Jacob v. City of New York, 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166. [FN11] The policy of uniform enforcement of state-created ***538** rights and obligations, see, e.g., Guaranty Trust Co. of New York v. York, supra, cannot in every case exact compliance with a state rule [FN12]--not bound up with rights and obligations--which disrupts the federal system of allocating functions between judge and jury. Herron v. Southern Pacific Co., 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857. Thus the inquiry here is whether the federal policy favoring jury decisions of disputed fact questions should yield to the state rule in the interest of furthering the objective that the litigation should not come out one way in the federal court and another way in the state court.

FN10. Our conclusion makes unnecessary the consideration of--and we intimate no view upon--the constitutional question whether the right of jury trial protected in federal courts by the Seventh Amendment embraces the factual issue of statutory immunity when asserted, as here, as an affirmative defense in a common-law negligence action.

FN11. The Courts of Appeals have expressed varying views about the effect of Erie R. Co. v. Tompkins on judge-jury problems in diversity cases. Federal practice was followed in Gorham v. Mutual Benefit Health & Accident Ass'n, 4 Cir., 1940, 114 F.2d 97; Diederich v. American News Co., 10 Cir., 1942, 128 F.2d 144; McSweeney v. Prudential Ins. Co., 4 Cir., 1942, 128 F.2d 660; Ettelson v. Metropolitan Life Ins. Co., 3 Cir., 1943, 137 F.2d 62; Order of United Commercial Travelers of America v. Duncan, 6 Cir., 1955, 221 F.2d 703. State practice was followed in Cooper v. Brown, 3 Cir., 1942, 126 F.2d 874; Gutierrez v. Public Service Interstate Transportation Co., 2 Cir., 1948, 168 F.2d 678; Prudential Ins. Co. of America v. Glasgow, 2 Cir., 1953, 208 F.2d 908; Pierce Consulting Engineering Co. v. City of Burlington, 2 Cir., 1955, 221 F.2d 607; Rowe v. Pennsylvania Greyhound Lines, 2 Cir., 1956, 231 F.2d 922.

FN12. This Court held in Sibbach v. Wilson & Co., 312 U.S. 1, 655, 61 S.Ct. 422, 85 L.Ed. 479, that Federal Rules of Civil Procedure 35 should prevail over a contrary state rule.

[13] We think that in the circumstances of this case the federal court should not follow the state rule. It cannot be gainsaid that there is a strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts. In Herron v. Southern Pacific Co., supra, the trial judge in a personal-injury negligence action brought in the District Court for Arizona on diversity grounds directed a verdict for the defendant when it appeared as a matter of law that the plaintiff was guilty of contributory negligence. The federal judge refused to be bound by a provision of the Arizona Constitution which made the jury the sole arbiter of the question ***539** of contributory negligence. [FN13] This Court sustained the action of the trial judge, holding that 'state laws cannot alter the essential character or function of a federal court' because that function 'is not in any sense a local matter, and state statutes which would interfere with the appropriate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

performance of that function are not binding upon the federal court under either the Conformity Act or the 'Rules of Decision' Act.' Id., 283 U.S. at page 94, 51 S.Ct. at page 384. Perhaps even more clearly in light of the influence of the Seventh Amendment, the function ****902** assigned to the jury 'is an essential factor in the process for which the Federal Constitution provides.' Id., 283 U.S. at page 95, 51 S.Ct. at page 384. Concededly the Herron case was decided before Erie R. Co. v. Tompkins, but even when Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, was governing law and allowed federal courts sitting in diversity cases to disregard state decisional law, it was never thought that state statutes or constitutions were similarly to be disregarded. Green v. Neal's Lessee, 6 Pet. 291, 8 L.Ed. 402. Yet Herron held that state statutes and constitutional provisions could not disrupt or alter the essential character or function of a federal court. [FN14]

FN13. 'The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury.' s 5, Art. 18, A.R.S.

FN14. Diederich v. American News Co., 10 Cir., 128 F.2d 144, decided after Erie R. Co. v. Tompkins, held that an almost identical provision of the Oklahoma Constitution, art. 23, s 6, O.S.1951 was not binding on a federal judge in a diversity case.

[14][15] Third. We have discussed the problem upon the assumption that the outcome of the litigation may be substantially affected by whether the issue of immunity is decided by a judge or a jury. But clearly there is not present here the certainty that a different result would follow, cf. Guaranty Trust Co. of New York v. York, supra, or even the strong possibility that this would be the case, cf. Bernhardt v. ***540** Polygraphic Co., supra. There are factors present here which might reduce that possibility. The trial judge in the federal system has powers denied the judges of many States to comment on the weight of evidence and credibility of witnesses, and discretion to grant a new trial if the verdict appears to him to be against the weight of the evidence. We do not think the likelihood of a different result is so strong as to require the federal practice of jury determination of disputed factual issues to yield to the state rule in the interest of uniformity of outcome. [FN15]

FN15. Stoner v. New York Life Ins. Co., 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284, is not contrary. It was there held that the federal court should follow the state rule defining the evidence sufficient to raise a jury question whether the state-created right was established. But the state rule did not have the effect of nullifying the function of the federal judge to control a jury submission as did the Arizona constitutional provision which was denied effect in Herron. The South Carolina rule here involved affects the jury function as the Arizona provision affected the function of the judge: The rule entirely displaces the jury without regard to the sufficiency of the evidence to support a jury finding of immunity.

The Court of Appeals did not consider other grounds of appeal raised by the respondent because the ground taken disposed of the case. We accordingly remand the case to the Court of Appeals for the decision of the other questions, with instructions that, if not made unnecessary by the decision of such questions, the Court of Appeals shall remand the case to the District Court for a new trial of such issues as the Court of Appeals may direct.

Reversed and remanded.

Mr. Justice WHITTAKER concurring in part and dissenting in part.

In 1936 the South Carolina Legislature passed an Act known as 'The South Carolina Workmen's Compensation Law.' S.C.Code, 1952, Tit. 72. It created a new, complete, detailed and exclusive plan for the compensation ***541** by an 'employer' of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

his 'employee' [FN1] for bodily injuries sustained by the latter which arise 'by accident arising out of and in the course of the employment,' whether with or without fault of the employer. s 72--14. The Act also prescribes the measure and nature of the remedy, [FN2] which 'shall exclude all other rights and remedies of such employee * * * **903 against his employer, at common law or otherwise, on account of such injury' (s 72-- 121), and vests exclusive jurisdiction in the South Carolina Industrial Commission over all claims falling within the purview of the Act (s 72--66), subject to review by appeal to the State's courts upon 'errors of law.' s 72-- 356.

FN1. The terms 'employee' and 'employer' are conventionally defined in ss 72--11 and 72--12.

FN2. S.C.Code 1952, c. 4, ss 72--151 to 72--165.

Section 72--111 expands the definition of the terms 'employee' and 'employer' (note 1) by providing, in substance, that when an "owner" of premises 'undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (called 'subcontractor') for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any workman employed in the work any compensation under this Title which he would have been liable to pay if the workman had been immediately employed by him.' (Emphasis supplied.) Employees of such subcontractors are commonly called 'statutory employees' of the 'owner.'

Petitioner, a lineman employed by a 'subcontractor' who had contracted to build more than 25 miles of new transmission lines and to convert from single-phase to double-phase more than 87 miles of existing transmission lines and to construct two substations and a breaker station for the 'owner,' was severely injured by an accident *542 which arose out of and in the course of that employment. Subsequent to his injury he sought and received the full benefits provided by the South Carolina Workmen's Compensation Law.

Diversity existing, petitioner then brought this common-law suit in a Federal District Court in South Carolina against the 'owner,' the respondent here, for damages for his bodily injury, which, he alleged, had resulted from the 'owner's' negligence. The respondent-'owner' answered setting up, among other defenses, the affirmative claim that petitioner's injury arose by accident out of and in the course of his employment, as a lineman, by the subcontractor while executing the contracted work 'which (was) a part of (the owner's) trade, business or occupation.' It urged, in consequence, that petitioner was its 'statutory employee' and that, therefore, his exclusive remedy was under the South Carolina Workmen's Compensation Law, and that exclusive jurisdiction of the subject matter of his claim was vested in the State's Industrial Commission and, hence, the federal court lacked jurisdiction over the subject matter of this common-law suit.

At the trial petitioner adduced evidence upon the issue of negligence and rested his case in chief. Thereupon respondent, in support of its affirmative defense, adduced evidence tending to show (1) that its charter, issued under the Rural Electric Cooperative Act of South Carolina (S.C.Code, 1952, s 12--1025), authorized it to construct and operate electric generating plants and transmission lines essential to its business of generating and distributing electricity; (2) that it had (before the Second World War) constructed substations with its own direct employees and facilities, although the six substations which it was operating at the time petitioner was injured had been built by contractors, and that when *543 petitioner was injured it did not have in its direct employ any person capable of constructing a substation; [FN3] (3) that it regularly employed **904 a crew of 16 men--8 linemen and 8 groundmen--two-thirds of whose time was spent in constructing new transmission lines and extensions, and that such was 'a part of (its) trade, business (and) occupation.' This evidence stood

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

undisputed when respondent rested its case.

FN3. As I see it, the evidence referred to in '(1)' is only collaterally material, and that referred to in '(2)' is wholly immaterial, to the issue of whether petitioner was respondent's statutory employee at the time of the injury, because that question, under the South Carolina Workmen's Compensation Law, does not depend upon what particular trade, business or occupation the 'owner' lawfully might pursue, or lawfully might have pursued in the past. Rather, it depends upon what work he is engaged in at the time of the injury--i.e., whether the contracted work 'is a part of (the owner's) trade, business or occupation.' The statute thus speaks in the present tense, and, hence, the relevant inquiry here is limited to whether the work being done by petitioner for the 'owner' at the time of the injury was a part of the trade, business, or occupation of the 'owner' at that time.

At the close of respondent's evidence petitioner moved to strike respondent's affirmative jurisdictional defense, and all evidence adduced in support of it. Respondent made known to the court that when petitioner had rested it wished to move for a directed verdict in its favor. Thereupon the colloquy between the court and counsel, which is set forth in substance in Mr. Justice FRANKFURTER'S dissenting opinion, occurred. The District Court sustained petitioner's motion and struck respondent's affirmative jurisdictional defense and its supporting evidence from the record. His declared basis for that action was that the phrase in s 72--111 'a part of his trade, business or occupation' related only to work being performed by the 'owner' 'for somebody else.' Thereafter, ***544** the district judge heard arguments upon and overruled respondent's motion for a directed verdict, [FN4] and submitted the case to the jury which returned a verdict for petitioner.

FN4. The Court's opinion and Mr. Justice FRANKFURTER'S dissent comment upon the fact that the district judge stated to respondent's counsel that he would 'allow' him to include in his motion for a directed verdict the affirmative jurisdictional defense which had just been stricken. To my mind this is wholly without significance, for the district judge was without power to control what points and arguments respondent's counsel might urge in support of his motion for a directed verdict.

On appeal, the Court of Appeals found that the district judge's construction of s 72--111 was not supportable under controlling South Carolina decisions. It further found that respondent's evidence disclosed that respondent 'was not only in the business of supplying electricity to rural communities, but (was) also in the business of constructing the lines and substations necessary for the distribution of the product,' (238 F.2d 351), and that the contracted work was of like nature and, hence, was 'a part of (respondent's) trade, business or occupation,' within the meaning of s 72--111, and, therefore, petitioner was respondent's statutory employee, and, hence, the court was without jurisdiction over the subject matter of the claim. Upon this basis, it reversed the judgment of the District Court with directions to enter judgment for respondent. 238 F.2d 346.

This Court now vacates the judgment of the Court of Appeals and remands the case to it for decision of questions not reached in its prior opinion, with directions, if not made unnecessary by its decision of such questions, to remand the case to the District Court for a new trial upon such issues as the Court of Appeals may direct.

I agree with and join in that much of the Court's opinion. I do so because-- although, as found by the ***545** Court of Appeals, respondent's evidence was ample, prima facie, to sustain its affirmative jurisdictional defense-- petitioner had not waived his right to adduce evidence in rebuttal upon that issue, in other words had not 'rested,' at the time the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

district judge erroneously struck respondent's jurisdiction defense and supporting evidence from the record. In these circumstances, I believe that the judgment of the Court of Appeals, insofar ****905** as it directed the District Court to enter judgment for respondent, would deprive petitioner of his legal right, which he had not waived, to adduce evidence which he claims to have and desires to offer in rebuttal of respondent's prima facie established jurisdictional defense. The procedural situation then existing was not legally different from a case in which a defendant, without resting, moves, at the close of the plaintiff's case, for a directed verdict in its favor which the court erroneously sustains, and, on appeal, is reversed for that error. It could not fairly be contended, in those circumstances, that the appellate court might properly direct the trial court to enter judgment for the plaintiff and thus deprive the defendant, who had not rested, of his right to offer evidence in defense of plaintiff's case. Rule 50, Fed.Rules Civ.Proc. 28 U.S.C.A. It is urged by respondent that, from the colloquy between the district judge and counsel, which, as stated, as set forth in substance in Mr. Justice FRANKFURTER'S dissenting opinion, it appears that petitioner had 'rested,' and thus had waived his right to adduce rebuttal evidence upon the issue of respondent's jurisdictional defense, before the district judge sustained his motion to strike that defense and the supporting evidence. But my analysis of the record convinces me that petitioner, in fact, never did so. For this reason I believe that so much of the judgment of the Court of Appeals as directed the District Court to enter judgment for respondent deprives petitioner of his right to adduce rebuttal evidence upon the ***546** issue of respondent's prima facie established jurisdictional defense, and, therefore, cannot stand.

But the Court's opinion proceeds to discuss and determine the question whether, upon remand to the District Court, if such becomes necessary, the jurisdictional issue is to be determined by the judge or by the jury--a question which, to my mind, is premature, not now properly before us, and is one we need not and should not now reach for or decide. The Court, although premising its conclusion 'upon the assumption that the outcome of the litigation may be substantially affected by whether the issue of immunity [FN5] is decided by a judge or a jury,' holds that the issue is to be determined by a jury--not by the judge. I cannot agree to this conclusion for the following reasons.

FN5. Here, as at other places in its opinion, the Court treats with the South Carolina Workmen's Compensation Law as an 'immunity' of the employer from liability. To me, the question is not one of immunity. Rather, it is which of two tribunals--the Industrial Commission of the court of general jurisdiction--has jurisdiction, to the exclusion of the other, over the subject matter of the action, and, hence, the power to award relief upon it.

As earlier shown, the South Carolina Workmen's Compensation Law creates a new, complete, detailed and exclusive bundle of rights respecting the compensation by an 'employer' of his 'employee' for bodily injuries sustained by the latter which arise by accident out of and in the course of the employment, regardless of fault, and vests exclusive jurisdiction in the State's Industrial Commission over all such claims, subject to review by appeal in the South Carolina courts only upon 'errors of law.' Consonant with s 72--66, which vests exclusive jurisdiction over such claims in the Commission, and with s 72--356, which allows judicial review only upon 'errors of law,' the Supreme Court of the State has uniformly held that the question, in cases like the present, whether ***547** jurisdiction over such claims is vested in the Industrial Commission or in the courts presents a question of law for determination by the court, not a jury. In Adams v. Davison-Paxon Co., 1957, 230 S.C. 532, 96 S.E.2d 566, which appears to be the last case by the Supreme Court of the State on the question, plaintiff, an employee of a concessionaire operating ****906** the millinery department in defendant's store, was injured, she claimed by negligence, while using a stairway in the store. She brought a common-law suit for damages against the owner of the store. The latter defended upon the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ground, among others, that the operation of the millinery department, though under a contract with the concessionaire, plaintiff's employer, was 'a part of (its) trade, business or occupation,' that the plaintiff was therefore its statutory employee under s 72--111 and exclusive jurisdiction over the subject matter of plaintiff's claim was vested in the Industrial Commission, and that the court was without jurisdiction over the subject matter in her common-law suit. It seems that the trial court submitted this issue, along with others, to the jury which returned a verdict for plaintiff. On appeal the Supreme Court of the State reversed, saying:

> 'It has been consistently held that whether the claim of an injured workman is within the jurisdiction of the Industrial Commission is a matter of law for decision by the court, which includes the finding of the facts which relate to jurisdiction. Knight v. Shepherd, 191 S.C. 452, 4 S.E.2d 906; Tedars v. Savannah River Veneer Co., 202 S.C. 363, 25 S.E.2d 235, 147 A.L.R. 914; McDowell v. Stilley Plywood Co., 210 S.C. 173, 41 S.E.2d 872; Miles v. West Virginia Pulp & Paper Co., 212 S.C. 424, 48 S.E.2d 26; Watson v. Wanamaker & Wells, Inc., 212 S.C. 506, 48 S.E.2d 447; ***548**Gordon v. Hollywood-Beaufort Package Corp., 213 S.C. 438, (439), 49 S.E.2d 718; Holland v. Georgia Hardwood Lbr. Co., 214 S.C. 195, 51 S.E.2d 744; Younginer v. J. A. Jones Const. Co., 215 S.C. 135, 54 S.E.2d 545; Horton v. Baruch, 217 S.C. 48, 59 S.E.2d 545.
>
> 'Thus the trial court should have in this case resolved the conflicts in the evidence and determined the fact of whether Emporium (the concessionaire) was performing a part of the 'trade, business or occupation' of the department store-appellant and, therefore, whether respondent's remedy is exclusively under the Workmen's Compensation Law.' Id., 230 S.C. at page 543, 96 S.E.2d at page 571. (Emphasis supplied.)

It thus seems to be settled under the South Carolina Workmen's Compensation Law, and the decisions of the highest court of that State construing it, that the question whether exclusive jurisdiction, in cases like this, is vested in its Industrial Commission or in its courts of general jurisdiction is one for decision by the court, not by a jury. The Federal District Court, in this diversity case, is bound to follow the substantive South Carolina law that would be applied if the trial were to be held in a South Carolina court, in which State the Federal District Court sits. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. A Federal District Court sitting in South Carolina may not legally reach a substantially different result than would have been reached upon a trial of the same case 'in a State court a block away.' Guaranty Trust Co. of New York v. York, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079.

The Court's opinion states (78 S.Ct. 900): 'Concededly the nature of the tribunal which tries issues may be important in the enforcement of the parcel of rights making up a cause of action or defense, and bear significantly upon achievement of uniform enforcement of the right. It may well be that in the instant personal-injury case the outcome ***549** would be substantially affected by whether the issue of immunity is decided by a judge or a jury.' And the Court premises its conclusion 'upon the assumption that the outcome of the litigation may be substantially affected by whether the issue of immunity is decided by a judge or a jury.' Upon that premise, the Court's conclusion, to my mind, is contrary ****907** to our cases. 'Here (as in Guaranty Trust Co. of New York v. York, supra) we are dealing with a right to recover derived not from the United States but from one of the States. When, because the plaintiff happens to be a non-resident, such a right is enforceable in a federal as well as in a State court, the forms and mode of enforcing the right may at times, naturally enough, vary because the two judicial systems are not identic. But since a federal court adjudicating a state-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State, it cannot afford recovery if the right to recover is made unavailable by the State nor can it substantially affect the enforcement of the right as given by the State.' Guaranty Trust Co. of New York v. York, supra, 326 U.S. at pages 108--109, 65 S.Ct. at page 1469. (Emphasis

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

supplied.)

The words 'substantive' and 'procedural' are mere conceptual labels and in no sense talismanic. To call a legal question by one or the other of those terms does not resolve the question otherwise than as a purely authoritarian performance. When a question though denominated 'procedural' is nevertheless so 'substantive' as materially to affect the result of a trial, federal courts, in enforcing state-created rights, are not free to disregard it, on the ground that it is 'procedural,' for such would be to allow, upon mere nomenclature, a different result in a state court from that allowable in a federal court though both are, in effect, courts of the State and 'sitting side by side.' Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477. 'The federal court enforces the state-created right ***550** by rules of procedure which it has acquired from the Federal Government and which therefore are not identical with those of the state courts. Yet, in spite of that difference in procedure, the federal court enforcing a state-created right in a diversity case is, as we said in Guaranty Trust Co. of New York v. York, 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079, in substance 'only another court of the State.' The federal court therefore may not 'substantially affect the enforcement of the right as given by the State.' Id., 326 U.S. 109, 65 S.Ct. 1470.' Bernhardt v. Polygraphic Co., 350 U.S. 198, 203, 76 S.Ct. 273, 276, 100 L.Ed. 199. (Emphasis supplied.) 'Where local law qualifies or abridges (the right), the federal court must follow suit. Otherwise there is a different measure of the cause of action in one court than in the other, and the principle of Erie R. Co. v. Tompkins is transgressed.' Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 533, 69 S.Ct. 1233, 1234, 93 L.Ed. 1520. 'It is therefore immaterial whether (state-created rights) are characterized either as 'substantive' or 'procedural' in State court opinions in any use of those terms unrelated to the specific issue before us. Erie R. Co. v. Tompkins was not an endeavor to formulate scientific legal terminology. It expressed a policy that touches vitally the proper distribution of judicial power between State and federal courts. In essence, the intent of that decision was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court. The nub of the policy that underlies Erie R. Co. v. Tompkins is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a substantially different result. And so, putting to one side abstractions regarding 'substance' and 'procedure', we have held that in diversity cases the federal ***551** courts must follow the law of the State * * *.' ****908**Guaranty Trust Co. of New York v. York, supra, 326 U.S. at page 109, 65 S.Ct. at page 1470. (Emphasis supplied.)

Inasmuch as the law of South Carolina, as construed by its highest court, requires its courts--not juries--to determine whether jurisdiction over the subject matter of cases like this is vested in its Industrial Commission, and inasmuch as the Court's opinion concedes 'that in the instant personal-injury case the outcome would be substantially affected by whether the issue of immunity is decided by a judge or a jury,' it follows that in this diversity case the jurisdictional issue must be determined by the judge--not by the jury. Insofar as the Court holds that the question of jurisdiction should be determined by the jury, I think the Court departs from its past decisions. I therefore respectfully dissent from part II of the opinion of the Court.

Mr. Justice FRANKFURTER, whom Mr. Justice HARLAN joins, dissenting.

This is a suit for common-law negligence, brought in a United States District Court in South Carolina because of diversity of citizenship, 28 U.S.C. s 1332, 28 U.S.C.A. s 1332. Respondent is a cooperative, organized and operating under the South Carolina Rural Electric Cooperative Act, S.C.Code 1952, s 12--1001 et seq., engaged in distributing electric power to its members, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

extending the availability of power to new users, in rural areas of the State. Incident to the expansion of its facilities and services, it had made a contract with R. H. Bouligny, Inc., whereby the latter was to construct 24.19 miles of new power lines, to rehabilitate and convert to higher capacity 87.69 miles of existing lines, and to construct two substations and a breaker station. In the execution of this contract, petitioner, a citizen of North Carolina, and a lineman for Bouligny, was seriously burned when he attempted to make a connection between the equipment in one of the ***552** new substations and an outside line through which, by a mistake on the part of another of Bouligny's employees, current was running. Petitioner filed a claim against Bouligny pursuant to the South Carolina Workmen's Compensation Law, S.C.Code 1952, s 72--1 et seq., under which both Bouligny and respondent operated, and recovered the full benefits under the Law. He then brought this suit.

Respondent defended on the ground, among others, that, since petitioner was injured in the execution of his true employer's (Bouligny's) contract with respondent to perform a part of its 'trade, business or occupation,' respondent was petitioner's 'statutory employer' and therefore liable to petitioner under s 72--111 of the State's Workmen's Compensation Law. [FN1] It would follow from this that petitioner, by virtue of his election to proceed against Bouligny, was barred from proceeding against respondent, either under the statute or at common law (ss 72--121, 72--123). [FN2] After all the evidence ****909** was in, the ***553** court granted petitioner's motion to strike the defense, on the ground that an activity could not be a part of a firm's 'trade, business or occupation' unless it was being performed 'for somebody else.' The court also denied respondent's motion for a directed verdict and submitted the case to the jury, which returned a verdict for petitioner in the amount of $126,786.80.

FN1. 's 72--111. Liability of owner to workmen of subcontractor.
'When any person, in this section and ss 72--113 and 72--114 referred to as 'owner', undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (in this section and ss 72--113 to 72--116 referred to as 'subcontractor') for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any workman employed in the work any compensation under this Title which he would have been liable to pay if the workman had been immediately employed by him.'

FN2. 's 72--121. Employee's rights under Title exclude all others against employer.
'The rights and remedies granted by this Title to an employee when he and his employer have accepted the provisions of this Title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin as against his employer, at common law or otherwise, on account of such injury, loss of service or death.
's 72--123. Only one remedy available.
'Either the acceptance of an award under this Title or the procurement and collection of a judgment in an action at law shall be a bar to proceeding further with the alternate remedy.'

On appeal, the United States Court of Appeals for the Fourth Circuit found the District Court's construction of s 72--111 unsupportable under controlling South Carolina decisions. [FN3] In concluding that respondent had sustained its defense, the appellate court cited the following evidence elicited at trial. Respondent employed a sixteen-man 'outside crew,' two-thirds of whose time was spent in such construction work as building new power lines and extensions; since World War II the demand for electrical service had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

been so great that independent contractors had to be employed to do much of the necessary construction work. All of respondent's construction work, regardless of who was actually performing it, was done under the supervision of an engineering firm with which respondent has an engineering service contract. Testimony as to the construction of substations was not altogether consistent; however, stated most favorably to petitioner--and that is the light in which the Court of Appeals considered it--that evidence was to the effect ***554** that respondent had with its own facilities constructed three substations, although it had built none of the six it was operating at the time petitioner was injured, nor was respondent at that time employing personal capable of constructing substations. The construction work in connection with which petitioner was injured was clearly among the functions respondent was empowered to perform by the statute under which it was organized; moreover, this construction was necessary to the discharge of respondent's duty to serve the area in which it operated. Finally, respondent was the 'main actor' in this particular construction project: it secured the necessary financing; its consulting engineer prepared the plans (approved by respondent) and supervised the construction; it purchased the materials of which the substations were constructed; it had the responsibility of de-energizing and re-energizing existing lines that were involved in the work. From this evidence the Court of Appeals was satisfied that 'there can be no doubt that Blue Ridge was not only in the business of supplying electricity to rural communities, but also in the business of constructing the lines and substations necessary for the distribution of the product,' 238 F.2d 346, 351. The Court of Appeals, having concluded that respondent's defense should have been sustained, directed the District Court to enter judgment for the respondent. The District Court had decided the question of whether or not respondent was a statutory employer without submitting it to the jury. It is not altogether clear whether it did so because it thought it essentially a nonjury issue, as it is in the South Carolina courts under Adams v. Davison-Paxon Co., 230 S.C. 532, 96 S.E.2d 566, or because there was no controverted question of fact to submit to the jury.

FN3. It may be noted that not even petitioner's counsel supports the trial court's theory regarding the South Carolina Workmen's Compensation Law.

The construction of the state law by the Court of Appeals is clearly supported by the decisions of the Supreme Court of South Carolina, and so we need not ****910** rest on the ***555** usual respect to be accorded to a reading of a local statute by a Federal Court of Appeals. Estate of Spiegel v. Commissioner, 335 U.S. 701, 708, 69 S.Ct. 301, 304, 93 L.Ed. 330. It is clear from the state cases that a determination as to whether a defendant is an 'employer' for purposes of s 72--111 will depend upon the entire circumstances of the relationship between such defendant and the work being done on its behalf; no single factor is determinative. Both the approach of the Court of Appeals and the conclusions that it reached from the evidence in this case are entirely consistent with prior declarations of South Carolina law by the highest court of that State. [FN4]

FN4. For example, whether or not the defendant had ever itself performed the work contracted out has not been thought to be a conclusive criterion. In fact, in Boseman v. Pacific Mills, 193 S.C. 479, 8 S.E.2d 878, the court rejected the defendant's contention that, because it had never performed the work in question, it could not be held an employer. See also Hopkins v. Darlington Veneer Co., 208 S.C. 307, 38 S.E.2d 4; Kennerly v. Ocmulgee Lumber Co., 206 S.C. 481, 34 S.E.2d 792. Nor is the question whether or not the accomplishment of the work involved requires specialized skill determinative. See Marchbanks v. Duke Power Co., 190 S.C. 336, 2 S.E.2d 825.

In holding respondent a statutory employer, the Court of Appeals was giving the South Carolina

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Workmen's Compensation Law the liberal construction called for by the Supreme Court of that State. In Yeomans v. Anheuser-Busch, Inc., 198 S.C. 65, 72, 15 S.E.2d 833, 835, 136 A.L.R. 894, that court said:

> '(T)he basic purpose of the Compensation Act is the inclusion of employers and employees, and not their exclusion; and we add that doubts of jurisdiction must be resolved in favor of inclusion rather than exclusion.'

It would be short-sighted to overlook the fact that exclusion of an employer in a specific case such as this one ***556** might well have the consequence of denying any recovery at all to other employees vis-a -vis this employer and others similarly situated. The Court of Appeals, through the experienced Judge Soper, recognized the short-sighted illiberality of yielding to the temptation of allowing a single recovery for negligence to stand and do violence to the consistent and legislatively intended interpretation of the statute in Berry v. Atlantic Greyhound Lines, 4 Cir., 114 F.2d 255, 257:

> 'It may well be, and possibly this is true in the instant case, that sometimes a recovery might be had in a common law action for an amount much larger than the amount which would be received under a Compensation Act. This, though, is more than balanced by the many advantages accorded to an injured employee in a proceeding under a Compensation Act which would not be found in a common law action.'

When, after the evidence was in, petitioner moved to strike respondent's defense based on s 72--111, the following colloquy ensued:

> 'The Court: In the event I overrule your motion, do you contemplate putting up any testimony in reply? You have that right, of course. On this point, I mean.
>
> 'Mr. Hammer (petitioner's counsel): We haven't discussed it, but we are making that motion. I frankly don't know at this point of any reply that is necessary. I don't know of any evidence in this case--
>
> 'The Court: The reason I am making that inquiry as to whether you intend to put up any more testimony in the event I overrule your motion, counsel ***557** may wish to move for a directed verdict on that ground since it is a question of law. But ****911** that is his prerogative after all the evidence is in. Of course, he can't move for a directed verdict as long as you have a right to reply.
>
> 'Mr. Hammer: We are moving at this time in the nature of a voluntary dismissal.
>
> 'The Court: You move to dismiss that defense?
>
> 'Mr. Hammer: Yes, sir, at this stage of the game.'

After argument by counsel, the court made its ruling, granting petitioner's motion. Respondent having indicated its intention to move for a directed verdict, the court then said, 'I will allow you to include in that Motion for Directed Verdict your defense which I have stricken, if you desire. * * *' Respondent's motion was overruled.

It is apparent that petitioner had no intention of introducing any evidence on the issue of whether respondent was his statutory employer and that he was prepared to--and did--submit the issue to the court on that basis. Clearly petitioner cannot be said to have relied upon, and thus to have been misled by, the court's erroneous construction of the law, for it was before the court had disclosed its view of the law that petitioner made apparent his willingness to submit the issue to it on the basis of respondent's evidence. If petitioner could have cast any doubt on that evidence or could have brought in any other matter relevant to the issue, it was his duty to bring it forward before the issue was submitted to the court. For counsel to withhold evidence on an issue submitted for decision until after that issue has been resolved against him would be an abuse of the judicial process that this Court surely should not countenance, however strong the philanthropic appeal in a particular case. Nor does ***558** it appear that petitioner had any such 'game' in mind. He gave not the slightest indication of an intention to introduce any additional evidence, no matter how the court might decide the issue. It seems equally clear that, had the trial court decided the issue--on any construction--in favor of the respondent, the petitioner was prepared to rely

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

solely upon his right of appeal.

We are not to read the record as though we are making an independent examination of the trial proceedings. We are sitting in judgment on the Court of Appeals' review of the record. That court, including Chief Judge Parker and Judge Soper, two of the most experienced and esteemed circuit judges in the federal judiciary, interpreted the record as it did in light of its knowledge of local practice and of the ways of local lawyers. In ordering judgment entered for respondent, it necessarily concluded, as a result of its critical examination of the record, that petitioner's counsel chose to have the issue decided on the basis of the record as it then stood. The determination of the Court of Appeals can properly be reversed only if it is found that it was baseless. Even granting that the record is susceptible of two interpretations, it is to disregard the relationship of this Court to the Courts of Appeals, especially as to their function in appeals in diversity cases, to substitute our view for theirs.

The order of the Court of Appeals that the District Court enter judgment for the respondent is amply sustained on either theory as to whether or not the issue was one for the court to decide. If the question is for the court, the Court of Appeals has satisfactorily resolved it in accordance with state decisions. And if, on the other hand, the issue is such that it would have to be submitted to the jury if there were any crucial facts in controversy, both the District Court and the Court of Appeals agreed that there was no conflict as to the relevant ***559** evidence--not, at any rate, if such inconsistency as existed was resolved in favor of petitioner. According to the governing view of South Carolina law, as given us by the Court of Appeals, that evidence would clearly have required the District Court ****912** to grant a directed verdict to the respondent. Accordingly, I would affirm the judgment.

Mr. Justice HARLAN, dissenting.

I join in Mr. Justice FRANKFURTER'S dissenting opinion, but desire to add two further reasons why I believe the judgment of the Court of Appeals should be affirmed. As I read that court's opinion, it held that under South Carolina law the construction of facilities needed to transmit electric power was necessarily a part of the business of furnishing power, whether such construction was performed by the respondent itself or let out to others, and that in either case respondent would be liable to petitioner for compensation as his statutory employer. Since there is no dispute that respondent at the time of the accident was engaged in the business of furnishing power and that petitioner was injured while engaged in construction in furtherance of that business, I do not perceive how any further evidence which might be adduced by petitioner could change the result reached by the Court of Appeals. In any event, in the circumstances disclosed by the record before us, we should at the very least require petitioner to make some showing here of the character of the further evidence he expects to introduce before we disturb the judgment below.

356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Supreme Court of Rhode Island.
CHORNEY
v.
METROPOLITAN LIFE INS. CO.
**No. 7110.**

May 2, 1934.

Exceptions from Superior Court, Providence and Bristol Counties; Leonidas Pouliot, Jr., Judge.

Action in assumpsit by Louis Chorney, administrator of the estate of Mary Chorney, deceased, against the Metropolitan Life Insurance Company. A verdict was directed in favor of the plaintiff for the amount of the premiums paid, and the plaintiff brings exceptions.

Exception overruled, and case remitted for entry of judgment on the verdict as directed.

West Headnotes

**Insurance 3042**
217k3042 Most Cited Cases
(Formerly 217k136(4))
Where insured, at time of issuance of industrial life policy, was not in sound health, and, within two years, had been attended by physician for serious disease, constituting breach of condition of policy, beneficiary held entitled to recover only premiums paid.

**Insurance 3003(2)**
217k3003(2) Most Cited Cases
(Formerly 217k265)
Difference exists between obtaining contract of life insurance through misrepresentation of fact, and existence of that fact as condition upon which contract is dependent. Gen.Laws 1923, c. 342, § 53.

**Insurance 3001**
217k3001 Most Cited Cases
(Formerly 217k268)
Statutory provision relating to effect of misstatement made in procuring life insurance policy held inapplicable to condition contained in policy. Gen.Laws 1923, c. 342, § 53.

***392** Hartigan, Mullen & Roberts and John E. Mullen, all of Providence, for plaintiff.

Tillinghast, Morrissey & Flynn and M. Walter Flynn, all of Providence, for defendant.

RATHBUN, Justice.

This is an action in assumpsit to recover the proceeds of a policy of life insurance issued by defendant on the life of plaintiff's intestate, Mary Chorney. At the conclusion of the testimony at the trial in the superior court the trial justice ruled that, as certain conditions of the contract of insurance had been violated, the plaintiff could recover only the amount of the premiums paid and directed the jury to return a verdict as follows: "By direction of the Court the jury find that the defendant did not promise in manner and form as the plaintiff hath in his declaration thereof complained against it. The jury further find that the plaintiff is entitled to the sum of $28, having considered the defendant's plea in tender." The case is here on plaintiff's exception to such direction.

The policy was issued subject to conditions, among others, as follows: "If, (1) the insured is not alive or is not in sound health on the date hereof * * * or has, within two years before the date hereof, been attended by a physician for any serious disease or complaint, or, before said date, has had any pulmonary disease, or chronic bronchitis or cancer, or disease of the heart, liver or kidneys, unless such rejection, medical attention or previous disease is specifically recited in the 'Space for Endorsements' * * * then, in any such case, the company may declare this policy void and the liability of the company in the case of any such declaration or in the case of any claim under this policy, shall be limited to the return of premiums paid on the policy, except in the case of fraud, in which case all premiums will be forfeited to the company."

It appeared that at the time the policy was issued the plaintiff's intestate was not in sound health; that within two years prior thereto she had been attended by a physician for a serious disease; and, also, that prior thereto she had suffered from a disease of the heart.

In rebuttal the plaintiff produced medical testimony to the effect that the cause of intestate's death was "arteriosclerosis, hypertension." The plaintiff contends that notwithstanding ***393** the violation of said condition the defendant is liable for the face value of the policy unless it appears that the health conditions, the existence of which breached the conditions in question, contributed to the death of the insured and that, by reason of the provisions of section 53, chapter 342, G. L. 1923, it was a question of fact for the jury whether such health conditions contributed to her death. Said section is as follows: "No misstatement made in procuring a policy of life insurance shall be deemed material or render the policy void unless the matter thus represented shall have actually contributed to the contingency or event on which the policy is to become due and payable; and whether the matter so represented contributed to said contingency or event, in any case, shall be a question for the jury."

[1][2][3] The insurance effected by the policy in question was of the type known as industrial insurance. No medical examination was had and, so far as appears, no statements or representations as to health were required or made. The first sentence on the policy under the heading "Conditions" is as follows: "This policy constitutes the entire agreement between the company and the insured and the holder and owner hereof."

The plaintiff confuses the law applicable to negotiations and applications for a policy of insurance with the law applicable to a condition in the policy itself. As the court said in Connell v. Metropolitan Life Ins. Co., 16 Pa. Super. Ct. 520, at page 529: "There is a difference between obtaining a contract through a misrepresentation as to a fact, and making the existence of that fact a condition upon which the contract, by its written terms, is dependent."

In Barker v. Metropolitan Life Ins. Co., 188 Mass. 542, 74 N. E. 945, it was held that statutes similar to our said section 53, relating to a misstatement made in procuring a policy of life insurance, have no application to a condition in the policy itself. Such appears to be the almost, if not quite, universal rule in all jurisdictions where the question has been considered, except in Missouri. See Barker v. Metropolitan Life Ins. Co., supra; 1 Joyce on Insurance (2d Ed.) § 97a; Packard v. Metropolitan Life Ins. Co., 72 N. H. 1, 54 A. 287, 288; Metropolitan Life Ins. Co. v. Howle, 62 Ohio St. 204, 56 N. E. 908; Murphy v. Metropolitan Life Ins. Co., 106 Minn. 112, 118 N. W. 355; Sulski v. Metropolitan Life Ins. Co., 196 Ill. App. 76; Gallant v. Metropolitan Life Ins. Co., 167 Mass. 79, 44 N. E. 1073; Montgomery v. John Hancock Mutual, etc., 140 Misc. 233, 250 N. Y. S. 403. The promise of the defendant was conditional and dependent upon the existence of the conditions relating to health as stated in the policy.

In Packard v. Metropolitan Life Ins. Co., supra, where the policy contained a similar clause, it was said: "That they (the parties) had authority to limit the contract in this way cannot be doubted." 37 C. J. 404, 405; Popowicz v. Metropolitan Life Ins. Co., 114 Conn. 333, 158 A. 885; Souza v. Metropolitan Life Ins. Co., 270 Mass. 189, 170 N. E. 62; Orsini v. Metropolitan Life Ins. Co., 154 A. 201, 8 N. J. Misc. 407; Youngblood v. Prudential Ins. Co., 109 Pa. Super. Ct. 20, 165 A. 666.

The plaintiff's exception is overruled, and the case is remitted to the superior court for the entry of judgment on the verdict as directed.

54 R.I. 261, 172 A. 392

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H

Supreme Court of Rhode Island.
COLUMBIAN NAT. LIFE INS. CO.
v.
INDUSTRIAL TRUST CO. ET AL.
**No. 1260.**

Feb. 6, 1937.

Appeals from Superior Court, Providence and Bristol Counties; Alexander L. Churchill, Judge.

Suit by the Columbian National Life Insurance Company against the Industrial Trust Company and another. From the decree rendered, the defendants appeal.

Appeals denied and dismissed, decree appealed from affirmed and cause remanded.

FLYNN, C. J., and CONDON, J., dissenting.

West Headnotes

**Evidence 80(1)**
157k80(1) Most Cited Cases
In suit involving construction of Massachusetts contract, where no evidence was offered as to law of Massachusetts, it was presumed that applicable law of Massachusetts was same as common law of Rhode Island on subject.

**Insurance 1091(7)**
217k1091(7) Most Cited Cases
(Formerly 217k365.1)
Where insurer accepted check and notes, executed for required additional premium for reinstatement of life policy, at its home office in Massachusetts, and affixed rider to policy evidencing reinstatement, last act essential to meeting of minds was done in Massachusetts and reinstatement agreement became a Massachusetts contract.

**Insurance 2052**
217k2052 Most Cited Cases
(Formerly 217k365.3)
Where application for reinstatement of life policy states that any untrue statement shall operate to limit insurer's liability under policy, such policy is voidable by insurer where procured by material false representations made as of insured's own knowledge, notwithstanding that insured believed them to be true.

**Insurance 2055**
217k2055 Most Cited Cases
(Formerly 217k365.4)
Where insured never had right to elect to take paid-up extended insurance because of failure to comply with provisions of life policy relating thereto, insured's successors were not entitled after lapse to exercise such right and could not defeat insurer's suit for cancellation of reinstatement of policy on theory that they were entitled to exercise such right.

**Insurance 2052**
217k2052 Most Cited Cases
(Formerly 217k370.1)
Where insurer's suit for cancellation of reinstatement of life policy on ground of insured's misrepresentations was governed by Rhode Island common law, insurer was not required to prove that matter misrepresented contributed to insured's death, and submission of such question to jury was not required.

**Trial 392(4)**
388k392(4) Most Cited Cases
Refusal of trial court to make requested findings of fact held not reversible error where they were substantially covered by findings made. Gen.Laws 1923, c. 339, § 29.

**Trial 397(5)**
388k397(5) Most Cited Cases
Refusal of trial court to make requested findings of fact held not reversible error where they were not material to issues in case. Gen.Laws 1923, c. 339, § 29.

**Insurance 1091(7)**
217k1091(7) Most Cited Cases
(Formerly 217k365.1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rhode Island statute applied only to life policies made in Rhode Island and
could not be considered in suit for cancellation of Massachusetts contract for reinstatement of life policy. Laws 1931, c. 1757, § 12.

**Insurance ⚷2052**
217k2052 Most Cited Cases
(Formerly 217k365.3)
Where questions in application for reinstatement of life policy indicated that insurer deemed it material whether insured had been ill or had consulted a physician, fact that insured disbelieved physician's diagnosis of insured's illness, occurring pending negotiations for reinstatement, as angina pectoris held not to preclude cancellation of reinstatement for failure to disclose such illness to insurer.

**Insurance ⚷2052**
217k2052 Most Cited Cases
(Formerly 217k365.3)
Insured applying for reinstatement of life policy had duty to disclose material change in health between time of application for reinstatement and time of acceptance, notwithstanding that contract of reinstatement was to take effect as of a date prior to that on which insured became ill.

**Insurance ⚷2052**
217k2052 Most Cited Cases
(Formerly 217k365.3)
Insurer in reinstating life policy on application stating that insured had had no illness since policy was issued and was in sound health did not assume risk that insured then had had angina pectoris.

**Appeal and Error ⚷1011.1(1)**
30k1011.1(1) Most Cited Cases
(Formerly 30k1011(1))
Finding of facts from conflicting evidence made by justice sitting without jury is entitled to great weight, and finding would not be set aside where it did not fail to do justice between parties.

**Appeal and Error ⚷1099(6)**
30k1099(6) Most Cited Cases
Decision on former appeal that allegations of insurer's bill to cancel reinstatement of life policy entitled insurer to cancellation was law of case on second appeal after hearing on merits.

**Insurance ⚷3001**
217k3001 Most Cited Cases
(Formerly 217k268)
Under Rhode Island common law, life policy procured by material false representation by insured which he warranted to be true is voidable by insurer, irrespective of whether representation contributed to insured's death.

**Insurance ⚷2050**
217k2050 Most Cited Cases
(Formerly 217k370)
In insurer's suit to cancel reinstatement of life policy, variance arising from absence of proof of allegation that insured remained in bed for a week after a certain illness held immaterial.

**Insurance ⚷2050**
217k2050 Most Cited Cases
(Formerly 217k370)
Insurer by offering to pay insured's successors' net paid-up value of life policy at time of lapse and all consideration received subsequent to lapse with interest on such items tendered all that was required to entitle it to cancellation of reinstatement of policy on ground of fraud.

**Insurance ⚷2050**
217k2050 Most Cited Cases
(Formerly 217k370)
Insurer held not barred by laches from maintaining suit for cancellation of reinstatement of life policy because suit was not brought before insured's death, where insurer had no notice of fraud on which suit was based until subsequent to death.

**Insurance ⚷2035**
217k2035 Most Cited Cases
(Formerly 217k392(1))
Insurer by receiving amount of defaulted premium note held not to have waived right to treat life policy as lapsed, where payment was never approved at insurer's home office as a payment removing default and where insurer and insured, subsequent thereto, took steps looking toward

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reinstatement of policy.

***14** Claude R. Branch, of Providence, and F. H. Nash and E. K. Nash, both of Boston, Mass., for complainant.

***15** Comstock & Canning and Andrew P. Quinn, all of Providence, for Industrial Trust Co.

Joseph E. Beagan and Robert P. Beagan, both of Providence, for Elizabeth V. Wholey.

MOSS, Justice.

This is a suit in equity brought by the complainant as the insurer in a policy of insurance on the life of Timothy V. Wholey. It was brought after his death against the Industrial Trust Company as assignee of the policy and Elizabeth V. Wholey, who is the widow of the insured and executor of his will and sole beneficiary of the policy; and the relief prayed for is the cancellation of a reinstatement of it after it had lapsed for a default in the payment of a premium. The suit was heard in the superior court on an amended bill, answers thereto, and evidence; and it is now before us on the respondents' appeals from the final decree for cancellation of the reinstatement, upon payment to the respondents of certain sums admitted by the complainant to be due for the net paid-up value of the policy at the time of the default and for money paid thereafter by the insured on premiums, and interest on these sums, and upon the surrender by the complainant of certain notes given by the insured on account of such premiums.

This is the second time that this case has been before this court. The respondent beneficiary demurred to the first amended bill and the Industrial Trust Company answered it, alleging that after the bill had been filed it had instituted an action at law on the policy. After this fact had been admitted by the complainant's replication, the Industrial Trust Company filed a motion to dismiss the suit on that ground. A decree of the superior court, sustaining the demurrer and the motion, was reversed by this court, which held that this amended bill stated a case for cancellation which should be heard in equity by the superior court, notwithstanding the action at law. Columbian National Life Insurance Co. v. Industrial Trust Co., 53 R.I. 334, 166 A. 809.

The facts that were set forth in this amended bill as the ground for cancellation of the reinstatement were that after the policy had lapsed on October 24, 1931, for default in payment of a premium note, the insured had made the application of November 12, 1931, for reinstatement, on which the reinstatement was based, and had therein stated that he had not been ill since he was last examined for the complainant, that he had not consulted a physician since then, and that he was in sound health; that he had therein agreed that any untrue statement therein should operate to limit the obligation of the complainant to that which existed at that date, with a return of any payments made in connection with the application; that the complainant believed these statements to be true, and in reliance upon their truth and by agreement with the insured, reinstated the policy on January 15, 1932, at a certain increased rate of premium, due to his blood pressure being slightly elevated and to his weight having previously been reduced by dieting from about 216 pounds to about 180 pounds; that on or about October 30, he paid to the complainant, with interest, the amount of the defaulted note due October 24, 1931, and before the reinstatement paid a part but not all of another premium note, when it was due; that these payments were accepted by the complainant conditionally, subject to an express agreement by him that the policy should not be considered reinstated or in force by reason of such payments until formal approval of the reinstatement should be given at the home office of the company at Boston, Mass.; that in December, 1931, the insured sustained an attack of angina pectoris, which was accompanied with severe pain extending from the shoulder down the arm and hand and on account of which he consulted a physician and remained in bed for more than a week; and that the complainant did not learn of these facts, as to this attack, until after his death in May, 1932, from angina pectoris and myocarditis, and would not have reinstated the policy, if it had known these facts.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In its previous opinion this court, 53 R.I. 334, at page 340, 166 A. 809, 812, held that the representations in the application "were continuing representations by the insured," and added: "There was a duty on the part of Wholey to disclose any material change in the condition of his health occurring between the time when he made his application for reinstatement and the time of the acceptance of the risk by the insurer." In the opinion this court also held that on the facts set forth in the bill concerning the final meeting of the minds of the parties as to the contract of reinstatement (facts which the superior court found after the hearing on the merits to have been established by clear and convincing evidence), that contract was a Massachusetts contract; and ***16** that therefore Public Laws of Rhode Island 1931, c. 1757, § 12, to the effect that no misstatement made in procuring a policy of life insurance shall render the policy void, unless the matter thus represented shall have actually contributed to the death of the insured, and making the question of such contribution one for the jury, had no application to such contract.

After the suit had been returned to the superior court, the complainant by leave of court, granted against the objection of the respondents, again amended its bill, by adding, as a further ground for a cancellation of the reinstatement, that on two occasions in 1931, prior to October 24, 1931, and after his last examination for the complainant prior to the date of his application for reinstatement, he had consulted a certain physician and had complained to that physician of cardiac pains possibly indicating a condition of angina pectoris, and that the complainant had no notice of this until after his death.

[1] After the hearing of the case on the merits in the superior court, this additional ground for cancellation was sustained by the court both in fact and in law. Before us the respondents have strenuously contended against these rulings and have urged that for several reasons that court erred in permitting the complainant to amend its bill by adding this ground. We do not find it necessary or advisable in this opinion to discuss the questions raised as to the new matter thus added, as we find ample justification for deciding the case upon other grounds without going into those questions. This court in its former opinion held that on the allegations of the bill as first amended the complainant was entitled to cancellation and we find no justification for differing, in the same case, from that conclusion or the rulings upon which it was based and which are now the law of this case.

[2] After the case had been fully heard on its merits, the superior court filed a decision and made therein numerous findings of fact, which it said were supported by credible evidence that was clear and convincing, and then stated: "The findings of fact made in this case bring it within the allegations of the bill which was before the Supreme Court on demurrer. The only variance between the allegations of the bill and the proof is this: the bill alleged in paragraph eighth that after the attacks in December, 1931, Mr. Wholey remained in bed on account of this seizure for more than a week. This portion of the allegation was not made out by proof but is an immaterial variance." With both of these statements we fully agree, and we hold that the findings, relied upon therein are supported by the evidence.

[3] As to the weight to be given by this court to such findings of fact by the superior court, the law of this state is well stated as follows in Prudential Insurance Co. v. Tanenbaum, 53 R.I. 355, at page 359, 167 A. 147, 148: "We have frequently held that the finding of facts from conflicting evidence made by a justice sitting without a jury is entitled to great weight and will not be set aside unless such finding clearly fails to do justice between the parties. Raferty v. Reilly, 41 R.I. 47, 102 A. 711; Preble v. Higgins, 43 R.I. 10, 109 A. 707." In the instant case we are of the opinion that the finding of facts which was made by the justice by whom it was heard on the evidence in the court below and which was set forth in his decision does not fail to do justice between the parties.

The principal facts, found by him in his decision

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and supported by the evidence, which pertain to the case stated in the bill as first amended and which have not been covered sufficiently supra, are in substance as follows: The policy was issued to the insured on June 2, 1925; and his wife, who is one of the respondents, was named as sole beneficiary therein and afterwards became the executrix of his will. On February 2, 1931, the insured and the beneficiary assigned all their interests therein to the other respondent, Industrial Trust Company. No question was raised as to the validity of this assignment, nor is any contention made that the assignee has any higher right than the beneficiary would have had if no assignment had been made.

The annual premium which was due on June 2, 1931, was, by agreement, paid partly in notes made by the insured. Each note provided that if it should not be paid "when due, without grace, said policy shall, without further notice, become void and the insurance thereunder then terminate, subject to the conditions therein relating to surrender values." Some of these premium notes were taken up by partial payments and the unpaid balances covered by other notes. One such note for an unpaid balance, containing the above-stated provision, fell due on October 24, 1931. ***17** It was defaulted and the policy therefore lapsed on that date.

It contained the provision that "should this policy lapse it may be reinstated at any time upon evidence of insurability satisfactory to the company." Over the telephone the insured was notified of the lapse by the cashier of the company's local office in the city of Providence; and he replied that he would fill out an application for reinstatement. She, the cashier, therefore, on October 29, 1931, sent him a printed form of application for reinstatement, to be filled out and executed by him, and a letter stating that "upon receipt of the completed form same will be forwarded to our home office for approval." This form, as printed and as executed, contained, besides the clause above stated as to the effect of any untrue statement therein, the following: "I further agree that said policy or policies shall not be considered reinstated or in force by reason of any cash paid or settlement made in payment or on account of said premium or note until formal approval is given at the home office of the company at Boston, Mass., with delivery of receipt for said premium or of said note and I agree to accept the return of any payment made on account thereof if the company shall decline to approve." The application stated that the policy had lapsed for nonpayment of a note for $64.96 due October 24, 1931.

[4] On October 29, 1931, the insured sent to the company's Providence branch office a check for the amount of the note due on October 24. This check was deposited by the cashier in the bank for collection and was paid through the clearinghouse on November 2, 1931. Meantime, on October 30 and 31, 1931, the insured filled out and executed the application and sent it to the same office, from which it was sent to the home office in Boston; and he followed it with another similar application for reinstatement, containing the same clauses and dated November 12, 1931. This application, also, described the policy as lapsed for nonpayment of the premium note due October 24, 1931. The money paid by the insured's check of October 29, 1931, was never receipted for by the company at its home office as a payment of the defaulted premium note nor was it ever approved there as a payment removing the default or as a ground for reinstating the policy. On the contrary both the company and the insured treated the whole matter as purely one of a reinstatement of a lapsed policy under his application of November 12, 1931, therefor. The respondents strongly contend that the default by the insured was waived by the company, but it is clear to us that the superior court was fully justified on the evidence in overruling this contention and holding that "the complainant did not waive its right to treat the policy as lapsed."

In connection with the application of November 12, 1931, the company had the insured examined by a physician, who reported that he was overweight. The company also ascertained the fact that between 1925 and the time when the policy lapsed "Mr. Wholey's weight had been excessive, his blood

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pressure had been elevated, and his weight and blood pressure had been reduced by dieting and treatment." As a result of learning these facts, the company, acting in accordance with what the superior court reasonably found from the evidence to be usual life insurance practice, treated him as an impaired risk and reasonably refused to reinstate the policy, except at a considerably increased rate of premium.

Acting on the knowledge which it had thus obtained but without having any notice that his health was otherwise in any way impaired, and relying on his statements in his applications for reinstatement that he had consulted no physicians since he was last examined for the company, except certain ones that he named, and had had no illness since the policy was issued and was in sound health, the company, on December 11, 1931, offered to reinstate the policy, "subject to Table D rating," which meant the considerably increased rate of premium. In response to a request for further information, the company notified him, in the latter part of that month, that to get the policy reinstated at the increased rate, he would have to pay the sum of $1,077.74, made up of the amount of the outstanding premium notes and interest thereon and an item of $308.03, described as "Temporary Extra Premium from 12/8/31 to 6/2/32," being the difference for the period from December 8, 1931, to the next premium date, between the old and new rates of premiums. The former date does not correspond to any date of application for reinstatement or of any examination of the insured, but seems to be about the date when the company ***18** decided to offer him a reinstatement at the increased rate.

On or just after January 5, 1932, he notified the company, for the first time, that he would pay the required sum of $1,077.74 for a reinstatement at the new rate, but imposed the condition that he could pay it in six monthly payments, the first one to be due January 15. A few days later it replied to him that he could pay that sum in six notes for $179.62 each, the first payable on January 15, 1932, and the others on the 15th of each succeeding month to and including June; and sent him notes, made out accordingly, for his signature. He did not accept this offer, but instead of the first note, payable January 15, 1932, he sent to the company his check for $78.92 and a note for $100.70, signed by him and payable February 15, 1932, and he signed and at the same time sent to the company the other notes which it had sent him. It did not accept the check and notes, thus sent by him, until they were received at its home office in the city of Boston within a few days after January 15, 1932, and then and there it accepted them as satisfactory, made a memorandum dated January 22, 1932, of the change of the policy to the new premium rate and executed a rider, which was dated January 15, 1932, and evidenced the reinstatement and was to be attached to the policy. This rider said: "In consideration of the reinstatement of this policy it is hereby provided and agreed that an extra annual premium shall be added to this policy based on Table D rating to become effective December 8, 1931." The rider also set out the amount of "the extra premium due from December 8, 1931, to June 2, 1932." Within a few days after January 22, 1932, the rider, a premium receipt and the old unpaid premium notes were sent to the insured.

After the applications for reinstatement had been made and while the negotiations for a reinstatement at the increased rate were pending, namely, on December 13 and 15, 1931, the insured, as above stated, had severe attacks of pain, for which he consulted a physician, and was informed that they were attacks of angina pectoris. He had studied medicine and knew what angina pectoris was, yet he never disclosed the attacks or the diagnosis to the company, which had no notice, until after his death in May, 1932, that he had ever had any heart trouble or that he had ever been told that he had heart trouble, and which, as the superior court found from clear and convincing evidence, would not have reinstated the policy if it had been informed of these attacks and the diagnosis of them.

[5][6] On the facts which in the first amended bill were set forth as to the making of the contract of reinstatement and which are consistent with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

above pertinent facts proved by the evidence, this court in its previous opinion held that the contract was made in Boston and was a Massachusetts contract, since the last act constituting the "meeting of the minds" of the parties took place there. On the above-recited pertinent evidence the justice of the superior court, in his decision on the merits, came to the same conclusion, saying: "I find that the contract of reinstatement was not made until the home office of the complainant accepted the notes, and I rule that the contract of reinstatement was made in Boston, Massachusetts." With this conclusion we agree, in view of the previous ruling of this court on allegations of substantially the same facts. This conclusion prevents the application of the above-mentioned Rhode Island statute, on which the respondents strongly rely, relating to the effect to be given to misstatements in applications for life insurance policies, since that applies only to life insurance contracts made in this state. Columbian National Life Insurance Co. v. Industrial Trust Co., supra, 53 R.I. 334, at page 341, 166 A. 809.

[7][8][9] No evidence was offered as to the law of Massachusetts and therefore the presumption must be that the applicable law of Massachusetts, when the contract of reinstatement was made, was the same as the common law of Rhode Island on the subject. O'Reilly v. New York & N. E. R. Co., 16 R.I. 388, 17 A. 171, 906, 19 A. 244, 5 L.R.A. 364, 6 L.R.A. 719; O'Donnell v. Johnson, 36 R.I. 308, 90 A. 165. This law was that such a contract, if procured by material false representations by the insured, which he warranted to be true, would be voidable by the insurer irrespective of whether the matter of the false representation contributed to his death. This, and not the statute, being the rule of law applicable to the instant case, the complainant is not required, in order to show itself entitled to the relief prayed for, to prove the fact, which the superior court, however, found from the evidence to be true, ***19** that the matter misrepresented contributed to the death of the insured. The conclusion that the statute does not apply refutes also the respondents' contention that the question whether such matter did so contribute must be submitted to a jury for decision. Whether the contention would be valid, if the statute applied to this contract, we do not decide.

[10] Each of the applications made by the insured in the instant case contained these words, which referred to the above-mentioned statements by him: "I warrant each of the answers on the reverse side of this sheet to be full, complete and true, and I agree that they shall, with the following agreements, be taken as the basis for the reinstatement or placing in force of the policy. I further agree that any untrue statement shall operate to limit the company's liability under the said policy or policies to that which exists at this date." It is well settled that in such a case, if a policy is procured by material representations, made as of the applicant's own knowledge, which are in fact false, the policy is voidable by the insurer, even though the applicant believed them to be true, or had no intent to defraud. Sweeney v. Metropolitan Life Ins. Co., 19 R.I. 171, 36 A. 9, 38 L.R.A. 297, 61 Am.St.Rep. 751; Leonard v. State Mutual Life Assurance Co., 24 R.I. 7, 51 A. 1049, 96 Am.St.Rep. 698; Prudential Insurance Co. v. Tanenbaum, supra, 53 R.I. 355, at page 365, 167 A. 147. See, also, Metropolitan Life Ins. Co. v. Carter, 252 Mich. 432, 233 N.W. 370; New York Life Ins. Co. v. McCarthy (C.C.A.) 22 F.(2d) 241; AEtna Life Ins. Co. v. Bolding (C.C.A.) 57 F.(2d) 626; New York Life Ins. Co. v. Bullock (D.C.) 59 F.(2d) 747.

[11] The respondents contend that the insured did not believe that he had angina pectoris, in spite of what happened on December 13 and 15, 1931; and that therefore his failure to disclose it to the complainant was no ground for canceling the reinstatement. But he knew that he had had two attacks of illness, which were serious enough to cause him to send for a physician for each one, and he knew, as found by the superior court from sufficient evidence, that the physician diagnosed them as angina pectoris. He knew, also, from the language of the application for reinstatement, that the company deemed it material whether he had been ill and whether he had consulted a physician

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and, if so, what physician, so that it could find out from such physician the diagnosis and the seriousness of such illness. He knew, on December 15, 1931, that the statements which he had made in the application, and which he had warranted to be true, and which the company was relying upon in deciding whether to reinstate his policy, were no longer true. Therefore, on principle and authority, his disbelief in the physician's diagnosis could be no excuse for his failure to disclose the facts to the company, so that it could consider and investigate them.

[12] The respondents vigorously contend that the contract of reinstatement was made to take effect as of December 8, 1931, and that the applicant was under no duty to disclose anything with regard to his health that occurred after that date, and they rely strongly on the cases of Mutual Benefit Life Ins. Co. v. Higginbotham, 95 U.S. 380, 24 L.Ed. 499, and New York Life Ins. Co. v. Moats (C.C.A.) 207 F. 481. In the former of these cases, which was an action on a reinstated life insurance policy, it was held that the insurer was not entitled to an instruction to the jury to the effect that if the insured, in applying for a reinstatement, certified that his health was then good, and between that time and the time of reinstatement he had a derangement of health and did not disclose that fact to the company, the jury should return a verdict in its favor. It was held that such instruction was not proper because on the evidence the jury could properly find that although the contract of reinstatement was actually made on October 14, it was understood and intended by the parties to take effect by relation as of October 1, when the application and certificate for reinstatement were filed with the company, and could properly find that the whole contract was intended to be and was of October 1 and that it spoke from that date.

The Moats Case, supra, involving the original issuance of a policy, rests on the same basis, because the premium was paid with the application, and it was provided in the application and the policy that upon payment of the first premium and delivery of the policy in the lifetime of the insured, the policy should relate back and take effect as of the date of the application.

The Supreme Court of the United States in ***20**Stipcich v. Metropolitan Life Ins. Co., 277 U.S. 311. at page 315, 48 S.Ct. 512, 513, 72 L.Ed. 895, explained its decision in the Higginbotham Case by saying: "Where the parties contract exclusively on the basis of conditions as they existed at the date of the application, the failure of the insured to divulge any later known changes in health may well not affect the policy." But this reasoning has no application in the instant case, because this court, in its former opinion, 53 R.I. 334, at page 340, 166 A. 809, 812, held that, on the facts alleged in the bill, "The provision in the rider that the additional premium on the new rating should become effective December 8, 1931, had no effect on the time when the contract was made. * * * The offer to insure Wholey on a new basis was made on the assumption that the facts were as they were stated to be in the application. The representations made therein were continuing representations by the insured. * * * There was a duty on the part of Wholey to disclose any material change in the condition of his health occurring between the time when he made his application for reinstatement and the time of the acceptance of the risk by the insurer," citing the Stipcich Case, supra, and other cases supporting its statement. The superior court, after the hearing on the merits, held to the same effect on the evidence, and, in our judgment, correctly, in view of the previous opinion of this court in this case.

It should be noticed also that even if the contract of reinstatement in the instant case had been made on the basis of the state of the insured's health at the time of his application, or on December 8, 1931, still the doctrine of the Higginbotham Case would not operate to relieve the insured from the duty of disclosing to the company what happened to him on December 15, 1931. This is so because what happened then not merely was evidence of an intervening change in his health since the date of his application for reinstatement, but clearly and strongly indicated that his health had been seriously

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

impaired at that date. It was surely his duty to disclose to the company anything which came to his knowledge between the making of his application and its acceptance and which thus indicated that the warranty of sound health in the application was untrue when he made it. On the theory of the respondents, that the insured's health on December 8, 1931, was the vital thing, this case is quite different from a case in which the applicant's health became impaired after the making of the application, by reason of an accident or the contraction of a contagious disease, for example.

[13] We find no support, in law or in fact, for the respondents' contention that the company, in reinstating the policy, assumed the risk that the insured then had had angina pectoris.

[14] They also contend that before the policy was reinstated the insured had the right to elect to take paid-up extended insurance to a date which was after the date when he actually died, and that if a complainant is to have a right to a rescission of a contract by reason of fraud "it must restore the respondent, as far as possible, to the position which he occupied before the transaction which is sought to be rescinded," and that therefore the respondents here, as successors to the rights of the insured under the policy, are entitled to exercise the above-described right of election, which they contend that the insured had at the time of the lapse of the policy. A short, but conclusive, answer to this contention is that at the time of the lapse the insured had no such right of election.

[15] The applicable provision of the policy comes just after the provision that in case of default in the payment of a premium the policy shall become effective automatically for paid-up insurance, according to a table of values set forth, and is as follows: "In lieu of such Paid-up Insurance, the Insured may, by written notice filed at the Home Office within the days of grace, elect to have this policy continued as Extended Insurance, payable as provided on the first page hereof, for the period stated in the table of values herein, and having a cash surrender value; or may procure the Cash Value on satisfactory release and surrender of this policy." The insured never filed any such notice, and under this provision he at no time after the lapse of his policy had any such right of election; and his application for a reinstatement was not made until after the lapse, it being expressly provided in the defaulted promissory note that it was payable at the date stated, "without grace." The complainant has offered to pay and deliver to the respondents the net paid-up value of the policy at the time of the lapse, and all the consideration which it received from the insured after the lapse of the policy, and interest on the amounts of these items; and the decree appealed from provides for such payment and delivery, which ***21** is all that is required under the law of rescission for fraud.

[16] One of the respondents contends that the complainant is barred by laches from maintaining this suit for cancellation, because it did not bring it before the death of the insured. But until after his death it did not have any notice of the facts upon which it based its suit and therefore it was not guilty of laches as contended.

The respondents urge that the decree should be reversed because of certain rulings by the superior court as to the admission of certain testimony. We find nothing in these rulings which should prevent us from affirming the decree.

[17] The respondent beneficiary also contends that the decree should be reversed because of the refusal of the court to make, at her request, certain findings of fact. The court, as stated supra, made numerous findings of fact. We have also stated supra, in substance, that in our opinion some of these findings that are supported by the evidence make out a case for cancellation of the reinstatement, not deeming it necessary to consider others of these findings, none of which is inconsistent with the decree. The only statutory requirement is General Laws 1923, c. 339, § 29: "The justice of the superior court shall, if so requested at the hearing by either party, report the material facts found by him, otherwise such report shall be within the discretion of the justice." We cannot see that any of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the requested findings that are supported by any evidence, and that are not at least substantially covered by the findings made, are material to the issues in the case upon which we base this opinion or are in any way inconsistent with this opinion. We therefore find no merit in this contention.

It may be well to add that this opinion should be construed strictly in view of three considerations. The first is that the inferences of fact and conclusions of law pertinent to the facts stated in the first amended bill of complaint were determined by this court upon the previous hearing of this case, and under all the circumstances we feel that we cannot hold that these inferences and conclusions were not correctly drawn from the facts so stated.

The second consideration is that, after a full hearing upon the merits, the superior court filed a decision, which bears all the marks of careful preparation and deliberation and in which it was held that with one immaterial exception all of the facts alleged in the first amended bill were proved by the evidence and the same inferences of fact and conclusions of law were arrived at as had been stated by this court, and no facts were found that would be inconsistent with such inferences and conclusions.

The third consideration is that findings of fact by the justice before whom an equity case is heard should not be set aside unless they clearly fail to do justice between the parties--Simeone v. Antonelli, 52 R.I. 41, 156 A. 799; Dwyer v. Curria, 52 R.I. 264, 160 A. 206--and we cannot say that the findings of fact in the instant case clearly fail to do justice between the parties.

Any future life insurance case the decision of which will depend upon whether it is governed by the rule of continuing representations applied in the Stipcich Case, supra, or by the rule applied in the Higginbotham and Moats Cases, supra, or upon whether the contract of insurance was made in one state or another, must be decided according to the evidence in that case upon such issue. But in the instant case our determination of these issues has been controlled by the above considerations.

The appeals are denied and dismissed, the decree appealed from is affirmed and the cause is remanded to the superior court for further proceedings.

FLYNN, C. J., and CONDON, J., dissent.

57 R.I. 325, 190 A. 13

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.