Supreme Court of the United States
Eddie V. HANNA, Petitioner,
v.
Edward M. PLUMER, Jr., Executor.
**No. 171.**

Argued Jan. 21, 1965.
Decided April 26, 1965.

Diversity action. The United States District Court for the District of Massachusetts rendered summary judgment for defendant, and the plaintiff appealed. The United States Court of Appeals for the First Circuit, 331 F.2d 157, affirmed. Certiorari was granted. The Supreme Court, Mr. Chief Justice Warren, held that service should be made in manner prescribed by federal rule of civil procedure rather than by state law, so that service on defendant, an executor, did not have to be by the 'in hand' method set forth in Massachusetts statute but was properly made by leaving copies of summons and complaint with defendant's wife at his residence as permitted by federal rule of civil procedure.

Reversed.

West Headnotes

[1] **Executors and Administrators** **437(3)**
162k437(3) Most Cited Cases
The purpose of Massachusetts statute providing that executor need not answer to action which is not commenced within one year from time of his giving bond is to speed settlement of estates. M.G.L.A. c. 197, § 9.

[2] **Executors and Administrators** **437(4)**
162k437(4) Most Cited Cases
The purpose of Massachusetts statute providing that executor shall not be held to answer unless within the year he has been served "in hand" is to insure that executors will receive actual notice of claims. M.G.L.A. c. 197 § 9.

[3] **Federal Civil Procedure** **413**
170Ak413 Most Cited Cases
Actual notice is the goal of federal rule of civil procedure relating to personal service of summons. Fed.Rules Civ.Proc. rule 4(d) (1), 28 U.S.C.A.

[4] **Federal Courts** **455.1**
170Bk455.1 Most Cited Cases
(Formerly 170Bk455, 106k383(1))
The Supreme Court granted certiorari because of the threat to the goal of uniformity of federal procedure posed by the decision below.

[5] **Federal Civil Procedure** **33**
170Ak33 Most Cited Cases

[5] **Federal Civil Procedure** **413**
170Ak413 Most Cited Cases
The adoption of federal civil procedure rule for personal service of summons, designed to control service of process in diversity actions, neither exceeded the congressional mandate embodied in the Rules Enabling Act nor transgressed constitutional bounds, and the rule is therefore the standard against which the district court should have measured the adequacy of the service. Fed.Rules Civ.Proc. rules 1, 4(d) (1), 28 U.S.C.A.; 28 U.S.C.A. § 2072.

[6] **Federal Civil Procedure** **32**
170Ak32 Most Cited Cases
Federal civil procedure rule prescribing the manner in which a defendant is to be notified that a suit has been instituted against him relates to "practice and procedure of district courts" within Rules Enabling

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Act providing that Supreme Court has power to prescribe practice and procedure of district courts. 28 U.S.C.A. § 2072.

**[7] Federal Civil Procedure 1951**
170Ak1951 Most Cited Cases
"Procedure" is the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them.

**[8] Federal Civil Procedure 51**
170Ak51 Most Cited Cases

**[8] Federal Courts 373**
170Bk373 Most Cited Cases
(Formerly 106k359)
Federal courts apply state substantive law and federal procedural law.

**[9] Federal Civil Procedure 423.1**
170Ak423.1 Most Cited Cases
(Formerly 170Ak423)
Service in diversity case should be made in manner prescribed by federal rule of civil procedure rather than by state law, so that service on defendant, an executor, did not have to be by the "in hand" method set forth in Massachusetts but was properly made by leaving copies of summons and complaint with defendant's wife at his residence as permitted by federal rule of civil procedure. Fed.Rules Civ.Proc. rule 4(d) (1), 28 U.S.C.A.; M.G.L.A. c. 197 § 9.

**[10] Federal Courts 371**
170Bk371 Most Cited Cases
(Formerly 106k359)
Choices between state and federal law are to be made not by application of any
automatic, "litmus paper" criterion, but rather by reference to the policies underlying the rule of Erie v. Tompkins.

**[11] Federal Courts 371**
170Bk371 Most Cited Cases
(Formerly 106k359)
The rule of Erie v. Tompkins is rooted in part in a realization that it would be unfair for the character or result of litigation materially to differ because suit had been brought in a federal court.

**[12] Federal Courts 371**
170Bk371 Most Cited Cases
(Formerly 106k359)
The twin aims of the rule of Erie v. Tompkins are: discouragement of forum-shopping and avoidance of inequitable administration of the laws.

**[13] Federal Courts 373**
170Bk373 Most Cited Cases
(Formerly 106k359)
When a federal court sitting in a diversity case is faced with a question of whether or not to apply state law, the importance of a state rule is relevant, but only in the context of asking whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum state, or whether application of rule would have so important an effect upon fortunes of one or both of litigants that failure to enforce it would be likely to cause plaintiff to choose federal court.

**[14] Federal Civil Procedure 413**
170Ak413 Most Cited Cases
Under the federal rule of civil procedure relating to process, "in hand" service is not required in federal courts. Fed.Rules Civ.Proc. rule 4(d) (1), 28 U.S.C.A.

**[15] Federal Courts 371**
170Bk371 Most Cited Cases
(Formerly 106k359)
Neither Congress nor the federal courts can, under guise of formulating rules of decision for federal courts, fashion rules which are not supported by a grant of federal authority contained in the constitution; in such areas state law must govern because there can be no other law.

**[16] Federal Civil Procedure 21**
170Ak21 Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The constitutional provision for a federal court system (augmented by the Necessary and Proper Clause) carries with it congressional power to make rules governing practice and pleading in those courts, which in turn includes power to regulate matters which, though falling within uncertain area between substance and procedure, are rationally capable of classification as either.

[17] **Federal Civil Procedure** 21
170Ak21 Most Cited Cases
Congress has power to prescribe housekeeping rules for federal courts even though some of rules will inevitably differ from comparable state rules.
****1138 *460** Albert P. Zabin, Boston, Mass., for petitioner, pro hac vice, by special leave of Court.

James J. Fitzpatrick, Boston, Mass., for respondent.

***461** Mr. Chief Justice WARREN delivered the opinion of the Court.

The question to be decided is whether, in a civil action where the jurisdiction of the United States district court is based upon diversity of citizenship between the parties, service of process shall be made in the manner prescribed by state law or that set forth in Rule 4(d)(1) of the Federal Rules of Civil Procedure.

[1][2][3][4] On February 6, 1963, petitioner, a citizen of Ohio, filed her complaint in the District Court for the District of Massachusetts, claiming damages in excess of $10,000 for personal injuries resulting from an automobile accident in South Carolina, allegedly caused by the negligence of one Louise Plumer Osgood, a Massachusetts citizen deceased at the time of the filing of the complaint. Respondent, Mrs. Osgood's executor and also a Massachusetts citizen, was named as defendant. On February 8, service was made by leaving copies of the summons and the complaint with respondent's wife at his residence, concededly in compliance with Rule 4(d)(1), which provides:

> 'The summons and complaint shall be served together. The plaintiff shall furnish the person making service with such copies as are necessary. Service shall be made as follows:
> '(1) Upon an individual other than an infant or an incompetent person, by delivering a copy of the summons and of the complaint to him personally or by leaving copies thereof at his dwelling house or usual **1139** place of abode with some person of suitable age and discretion then residing therein * * *.'

Respondent filed his answer on February 26, alleging, inter alia, that the action could not be maintained because it had been brought 'contrary to and in violation of the ***462** provisions of Massachusetts General Laws (Ter.Ed.) Chapter 197, Section 9.' That section provides:

> 'Except as provided in this chapter, an executor or administrator shall not be held to answer to an action by a creditor of the decrased which is not commenced within one year from the time of his giving bond for the performance of his trust, or to such an action which is commenced within said year unless before the expiration thereof the writ in such action has been served by delivery in hand upon such executor or administrator or service thereof accepted by him or a notice stating the name of the estate, the name and address of the creditor, the amount of the claim and the court in which the action has been brought has been filed in the proper registry of probate. * * *' Mass.Gen.Laws Ann., c. 197, s 9 (1958).

On October 17, 1963, the District Court granted respondent's motion for summary judgment, citing Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520, and Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, in support of its conclusion that the adequacy of the service was to be measured by s 9, with which, the court held, petitioner had not complied. On appeal, petitioner admitted noncompliance with s 9, but argued that Rule 4(d)(1) defines the method by which service of process is to be effected in diversity actions. The Court of Appeals for the First Circuit, finding that '(r)elatively recent amendments (to s 9) evince a clear legislative purpose to require personal notification within the year,' [FN1] concluded that the conflict of state ***463** and federal rules was over 'a substantive rather than a procedural matter,' and unanimously affirmed. 331 F.2d 157. Because of the threat to the goal of uniformity of federal procedure posed by the decision below, [FN2] we granted ****1140** certiorari, 379 U.S. 813, 85 S.Ct. 52, 13 L.Ed.2d 27.

FN1. Section 9 is in part a statute of limitations, providing that an executor need not 'answer to an action * * * which is not commenced within one year from the time of his giving bond * * *.' This part of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statute, the purpose of which is to speed the settlement of estates, Spaulding v. McConnell, 307 Mass. 144, 146, 29 N.E.2d 713, 715 (1940); Doyle v. Moylan, 141 F.Supp. 95 (D.C.D.Mass.1956), is not involved in this case, since the action clearly was timely commenced. (Respondent filed bond on March 1, 1962; the complaint was filed February 6, 1963; and the service--the propriety of which is in dispute-- was made on February 8, 1963.) 331 F.2d, at 159. Cf. Guaranty Trust Co. of New York v. York, supra; Ragan v. Merchants Transfer & Warehouse Co., supra.

Section 9 also provides for the manner of service. Generally, service of process must be made by 'delivery in hand,' although there are two alternatives: acceptance of service by the executor, or filing of a notice of claim, the components of which are set out in the statute, in the appropriate probate court. The purpose of this part of the statute, which is involved here, is, as the court below noted, to insure that executors will receive actual notice of claims. Parker v. Rich, 297 Mass. 111, 113--114, 8 N.E.2d 345, 347 (1937). Actual notice is of course also the goal of Rule 4(d)(1); however, the Federal Rule reflects a determination that this goal can be achieved by a method less cumbersome than that prescribed in s 9. In this case the goal seems to have been achieved; although the affidavit filed by respondent in the District Court asserts that he had not been served in hand nor had he accepted service, It does not allege lack of actual notice.

FN2. There are a number of state service requirements which would not necessarily be satisfied by compliance with Rule 4(d)(1). See, e.g., Cal.Civ.Proc.Code s 411, subd. 8; Idaho Code Ann. s 5--507, subd. 7 (1948); Ill.Rev.Stat., c. 110, s 13.2 (1963); Ky.Rev.Stat., Rules Civ.Proc., Rule 4.04 (1962); Md.Ann.Code, Rules Proc., Rule 104 b (1963); Mich.Rev.Jud.Act s 600.1912 (1961); N.C.Gen.Stat. s 1--94 (1953); S.D.Code s 33.0807(8) (Supp.1960); Tenn.Code Ann. s 20--214 (1955).

[5] We conclude that the adoption of Rule 4(d)(1), designed to control service of process in diversity actions, [FN3] ***464** neither exceeded the congressional mandate embodied in the Rules Enabling Act nor transgressed constitutional bounds, and that the Rule is therefore the standard against which the District Court should have measured the adequacy of the service. Accordingly, we reverse the decision of the Court of Appeals.

FN3. 'These rules govern the procedure in the United States district courts in all suits of a civil nature whether cognizable as cases at law or in equity with the exceptions stated in Rule 81. * * *' Fed.Rules Civ.Proc. 1.
This case does not come within any of the exceptions noted in Rule 81.

[6][7] The Rules Enabling Act, 28 U.S.C. s 2072 (1958 ed.), provides, in pertinent part:

'The Supreme Court shall have the power to prescribe, by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure of the district courts of the United States in civil actions.

'Such rules shall not abridge, enlarge or modify any substantive right and shall preserve the right of trial by jury * * *.'

Under the cases construing the scope of the Enabling Act, Rule 4(d)(1) clearly passes muster. Prescribing the manner in which a defendant is to be notified that a suit has been instituted against him, it relates to the 'practice and procedure of the district courts.' Cf. Insurance Co. v. Bangs, 103 U.S. 435, 439, 26 L.Ed. 580.

'The test must be whether a rule really regulates procedure,--the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them.' Sibbach v. Wilson & Co., 312 U.S. 1, 14, 61 S.Ct. 422, 426, 85 L.Ed. 479. [FN4]

FN4. See also Schlagenhauf v. Holder, 379 U.S. 104, 112--114, 85 S.Ct. 234, 239--241, 13 L.Ed.2d 152.

In Mississippi Pub. Corp. v. Murphree, 326 U.S. 438, 66 S.Ct. 242, 90 L.Ed. 185, this Court upheld Rule 4(f), which permits service of a summons anywhere within the State (and not merely the district) in which a district court sits:

'We think that Rule 4(f) is in harmony with the Enabling Act * * *. Undoubtedly most alterations ***465** of the rules of practice and procedure may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and often do affect the rights of litigants. Congress' prohibition of any alteration of substantive rights of litigants was obviously not addressed to such incidental effects as necessarily attend the adoption of the prescribed new rules of procedure upon the rights of litigants who, agreeably to rules of practice and procedure, have been brought before a court authorized to determine their rights. Sibbach v. Wilson & Co., 312 U.S. 1, 11--14, 61 S.Ct. 422, 425--427, 85 L.Ed. 479. The fact that the application of Rule 4(f) will operate to subject petitioner's rights to adjudication by the district court for northern Mississippi will undoubtedly affect those rights. But it does not operate to abridge, enlarge or modify the rules of decision by which that court will adjudicate its rights.' Id., at 445--446, 66 S.Ct. at 246.

[8] Thus were there no conflicting state procedure, Rule 4(d)(1) would ****1141** clearly control. National Equipment Rental, Limited v. Szukhent, 375 U.S. 311, 316, 84 S.Ct. 411, 414, 11 L.Ed.2d 354. However, respondent, focusing on the contrary Massachusetts rule, calls to the Court's attention another line of cases, a line which--like the Federal Rules--had its birth in 1938. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, overruling Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, held that federal courts sitting in diversity cases, when deciding questions of 'substantive' law, are bound by state court decisions as well as state statutes. The broad command of Erie was therefore identical to that of the Enabling Act: federal courts are to apply state substantive law and federal procedural law. However, as subsequent cases sharpened the distinction between substance and procedure, the line of cases following Erie diverged markedly from the line construing the Enabling Act. Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, made it clear that Erie-type problems were not to be solved by ***466** reference to any traditional or common-sense substance-procedure distinction:

'And so the question is not whether a statute of limitations is deemed a matter of 'procedure' in some sence. The question is * * * does it significantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?' 326 U.S., at 109, 65 S.Ct., at 1470. [FN5]

FN5. See also Ragan v. Merchants Transfer & Warehouse Co., supra; Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524; Bernhardt v. Polygraphic Co., 350 U.S. 198, 203--204, 207--208, 76 S.Ct. 273, 276--277, 278--279, 100 L.Ed. 199; cf. Byrd v. Blue Ridge Rural Elec. Cooperative, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953.

[9] Respondent, by placing primary reliance on York and Ragan, suggests that the Erie doctrine acts as a check on the Federal Rules of Civil Procedure, that despite the clear command of Rule 4(d)(1), Erie and its progeny demand the application of the Massachusetts rule. Reduced to essentials, the argument is: (1) Erie, as refined in York, demands that federal courts apply state law whenever application of federal law in its stead will alter the outcome of the case. (2) In this case, a determination that the Massachusetts service requirements obtain will result in immediate victory for respondent. If, on the other hand, it should be held that Rule 4(d)(1) is applicable, the litigation will continue, with possible victory for petitioner. (3) Therefore, Erie demands application of the Massachusetts rule. The syllogism possesses an appealing simplicity, but is for several reasons invalid.

[10] In the first place, it is doubtful that, even if there were no Federal Rule making it clear that in-hand service is not required in diversity actions, the Erie rule would have obligated the District Court to follow the Massachusetts procedure. 'Outcome-determination' analysis was never ***467** intended to serve as a talisman. Byrd v. Blue Ridge Rural Elec. Cooperative, 356 U.S. 525, 537, 78 S.Ct. 893, 900, 2 L.Ed.2d 953. Indeed, the message of York itself is that choices between state and federal law are to be made not by application of any automatic, 'litmus paper' criterion, but rather by reference to the policies underlying the Erie rule. Guaranty Trust Co. of New York v. York, supra, 326 U.S. at 108--112, 65 S.Ct. at 1469--1471. [FN6]

FN6. See Iovino v. Waterson, 274 F.2d 41, 46--47 (C.A.2d Cir.1959), cert. denied sub nom. Carlin v. Iovino, 362 U.S. 949, 80 S.Ct. 860, 4 L.Ed.2d 867.

[11][12][13] The Erie rule is rooted in part in a realization that it would be unfair for the character of result of a litigation materially to differ because the suit had been brought in a federal court.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> ****1142** 'Diversity of citizenship jurisdiction was conferred in order to prevent apprehended discrimination in state courts against those not citizens of the state. Swift v. Tyson (16 Pet. 1, 10 L.Ed. 865) introduced grave discrimination by noncitizens against citizens. It made rights enjoyed under the unwritten 'general law' vary according to whether enforcement was sought in the state or in the federal court; and the privilege of selecting the court in which the right should be determined was conferred upon the noncitizen. Thus, the doctrine rendered impossible equal protection of the law.' Erie R. Co. v. Tompkins, supra, 304 U.S. at 74--75, 58 S.Ct. at 820--821. [FN7]

FN7. See also Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477; Woods v. Interstate Realty Co., supra, note 5, 337 U.S. at 538, 69 S.Ct. at 1237.

The decision was also in part a reaction to the practice of 'forum-shopping' which had grown up in response to the rule of Swift v. Tyson. 304 U.S., at 73--74, 58 S.Ct. at 819--820. [FN8] That the York test was an attempt to effectuate these policies is demonstrated by the fact that the opinion framed the inquiry in terms of 'substantial' variations between state ***468** and federal litigation. 326 U.S., at 109, 65 S.Ct. at 1469. Not only are nonsubstantial, or trivial, variations not likely to raise the sort of equal protection problems which troubled the Court in Erie; they are also unlikely to influence the choice of a forum. The 'outcome-determination' test therefore cannot be read without reference to the twin aims of the Erie rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws. [FN9]

FN8. Cf. Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 276 U.S. 518, 48 S.Ct. 404, 72 L.Ed. 681.

FN9. The Court of Appeals seemed to frame the inquiry in terms of how 'important' s 9 is to the State. In support of its suggestion that s 9 serves some interest the State regards as vital to its citizens, the court noted that something like s 9 has been on the books in Massachusetts a long time, that s 9 has been amended a number of times and that s 9 is designed to make sure that executors receive actual notice. See note 1, supra. The apparent lack of relation among these three observations is not surprising, because it is not clear to what sort of question the Court of Appeals was addressing itself. One cannot meaningfully ask how important something is without first asking 'important for what purpose?' Erie and its progeny make clear that when a federal court sitting in a diversity case is faced with a question of whether or not to apply state law, the importance of a state rule is indeed relevant, but only in the context of asking whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court.

The difference between the conclusion that the Massachusetts rule is applicable, and the conclusion that it is not, is of course at this point 'outcome-determinative' in the sense that if we hold the state rule to apply, respondent prevails, whereas if we hold that Rule 4(d)(1) governs, the litigation will continue. But in this sense every procedural variation is 'outcome-determinative.' For example, having brought suit in a federal court, a plaintiff cannot then insist on the right to ***469** file subsequent pleadings in accord with the time limits applicable in state courts, even though enforcement of the federal timetable will, if he continues to insist that he must meet only the state time limit, result in determination of the controversy against him. So it is here. Though choice of the federal or state rule will at this point have a marked effect upon the outcome of the litigation, the ****1143** difference between the two rules would be of scant, if any, relevance to the choice of a forum. Petitioner, in choosing her forum, was not presented with a situation where application of the state rule would wholly bar recovery; [FN10] rather, adherence to the state rule would have resulted only in altering the way in which process was served. [FN11] Moreover, it is difficult to argue that permitting service of defendant's wife to take the place of inhand service of defendant himself alters the mode of enforcement of state-created rights in a fashion sufficiently 'substantial' to raise the sort of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

equal protection problems to which the Erie opinion alluded.

FN10. See Guaranty Trust Co. of New York v. York, supra, 326 U.S. at 108--109, 65 S.Ct. at 1469; Ragan v. Merchants Transfer & Warehouse Co., supra, 337 U.S. at 532, 69 S.Ct. at 1234; Woods v. Interstate Realty Co., supra, note 5, 337 U.S. at 538, 69 S.Ct. at 1237.

Similarly, a federal court's refusal to enforce the New Jersey rule involved in Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528, requiring the posting of security by plaintiffs in stockholders' derivative actions, might well impel a stockholder to choose to bring suit in the federal, rather than the state, court.

FN11. Cf. Monarch Insurance Co. of Ohio v. Spach, 281 F.2d 401, 412 (C.A.5th Cir. 1960). We cannot seriously entertain the thought that one suing an estate would be led to choose the federal court because of a belief that adherence to Rule 4(d)(1) is less likely to give the executor actual notice than s 9, and therefore more likely to produce a default judgment. Rule 4(d)(1) is well designed to give actual notice, as it did in this case. See note 1, supra.

[14] There is, however, a more fundamental flaw in respondent's syllogism: the incorrect assumption that the rule of Erie R. Co. v. Tompkins constitutes the appropriate test ***470** of the validity and therefore the applicability of a Federal Rule of Civil Procedure. The Erie rule has never been invoked to void a Federal Rule. It is true that there have been cases where this Court has held applicable a state rule in the face of an argument that the situation was governed by one of the Federal Rules. But the holding of each such case was not that Erie commanded displacement of a Federal Rule by an inconsistent state rule, but rather that the scope of the Federal Rule was not as broad as the losing party urged, and therefore, there being no Federal Rule which covered the point in dispute, Erie commanded the enforcement of state law.

'Respondent contends in the first place that the charge was correct because of the fact that Rule 8(c) of the Rules of Civil Procedure makes contributory negligence an affirmative defense. We do not agree. Rule 8(c) covers only the manner of pleading. The question of the burden of establishing contributory negligence is a question of local law which federal courts in diversity of citizenship cases (Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188) must apply.' Palmer v. Hoffman, 318 U.S. 109, 117, 63 S.Ct. 477, 482, 87 L.Ed. 645. [FN12]

FN12. To the same effect, see Ragan v. Merchants Transfer & Warehouse Co., supra; Cohen v. Beneficial Indus. Loan Corp., supra, note 10, 337 U.S. at 556, 69 S.Ct. at 1230; id., at 557, 69 S.Ct. at 1230 (DOUGLAS, J., dissenting); cf. Bernhardt v. Polygraphic Co., supra, note 5, 350 U.S. at 201--202, 76 S.Ct. at 275; see generally Iovino v. Waterson, supra, note 6, 274 F.2d at 47--48.

(Here, of course, the clash is unavoidable; Rule 4(d)(1) says--implicitly, but with unmistakable clarity--that inhand service is not required in federal courts.) At the same time, in cases adjudicating the validity of Federal Rules, we have not applied the York rule or other refinements of Erie, but have to this day continued to decide questions concerning the scope of the Enabling Act and the constitutionality of specific Federal Rules in light of ***471** the distinction set ****1144** forth in Sibbach. E.g., Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152.

Nor has the development of two separate lines of cases been inadvertent. The line between 'substance' and 'procedure' shifts as the legal context changes. 'Each implies different variables depending upon the particular problem for which it is used.' Guaranty Trust Co. of New York v. York, supra, 326 U.S. at 108, 65 S.Ct. at 1469; Cook, The Logical and Legal Bases of the Conflict of Laws, pp. 154--183 (1942). It is true that both the Enabling Act and the Erie rule say, roughly, that federal courts are to apply state 'substantive' law and federal 'procedural' law, but from that it need not follow that the tests are identical. For they were designed to control very different sorts of decisions. When a situation is covered by one of the Federal Rules, the question facing the court is a far cry from the typical, relatively unguided Erie Choice: the court has been instructed to apply the Federal Rule, and can refuse to do so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN13]

FN13. Sibbach v. Wilson & Co., supra, 312 U.S. at 13--15, 61 S.Ct. at 426--427; see Appointment of Committee to Draft Unified System of Equity and Law Rules, 295 U.S. 774; Orders re Rules of Procedure, 302 U.S. 783; Letter of Submittal, 308 U.S. 649; 1A Moore, Federal Practice 0.501(2), at 5027--5028 (2d ed. 1961).

[15][16] We are reminded by the Erie opinion [FN14] that neither Congress nor the federal courts can, under the guise of formulating rules of decision for federal courts, fashion rules which are not supported by a grant of federal authority contained in Article I or some other section of the Constitution; in such areas state law must govern ***472** because there can be no other law. But the opinion in Erie, which involved no Federal Rule and dealt with a question which was 'substantive' in every traditional sense (whether the railroad owed a duty of care to Tompkins as a trespasser or a licensee), surely neither said nor implied that measures like Rule 4(d)(1) are unconstitutional. For the constitutional provision for a federal court system (augmented by the Necessary and Proper Clause) carries with it congressional power to make rules governing the practice and pleading in those courts, which in turn includes a power to regulate matters which, though falling within the uncertain area between substance and procedure, are rationally capable of classification as either. Cf. M'Culloch v. State of Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579. Neither York nor the cases following it ever suggested that the rule there laid down for coping with situations where no Federal Rule applies is coextensive with the limitation on Congress to which Erie had adverted. Although this Court has never before been confronted with a case where the applicable Federal Rule is in direct collision with the law of the relevant State, [FN15] courts of appeals faced with such clashes have ****1145** rightly discerned the implications of our decisions.

FN14. Erie R. Co. v. Tompkins, supra, 304 U.S. at 77-79, 58 S.Ct. at 822--823; cf. Bernhardt v. Polygraphic Co., supra, note 5, 350 U.S. at 202, 76 S.Ct. at 275; Sibbach v. Wilson & Co., supra, 312 U.S. at 10, 61 S.Ct. at 424; Guaranty Trust Co. of New York v. York, supra, 326 U.S. at 105, 65 S.Ct. at 1467.

FN15. In Sibbach v. Wilson & Co., supra, the law of the forum State (Illinois) forbade the sort of order authorized by Rule 35. However, Sibbach was decided before Klaxon Co. v. Stentor Electric Mfg. Co., supra, note 7, and the Sibbach opinion makes clear that the Court was proceeding on the assumption that if the law of any State was relevant, it was the law of the State where the tort occurred (Indiana), which, like Rule 35, made provision for such orders. 312 U.S., at 6--7, 10--11, 61 S.Ct. at 423, 424--425.

'One of the shaping purposes of the Federal Rules is to bring about uniformity in the federal courts by getting away from local rules. This is especially true of matters which relate to the administration of legal proceedings, an area in which federal courts ***473** have traditionally exerted strong inherent power, completely aside from the powers Congress expressly conferred in the Rules. The purpose of the Erie doctrine, even as extended in York and Ragan, was never to bottle up federal courts with 'outcome-determinative' and 'integral-relations' stoppers--when there are 'affirmative countervailing (federal) considerations' and when there is a Congressional mandate (the Rules) supported by constitutional authority.' Lumbermen's Mutual Casualty Co. v. Wright, 322 F.2d 759, 764 (C.A.5th Cir. 1963). [FN16]

FN16. To the same effect, see D'Onofrio Construction Co. v. Recon Co., 255 F.2d 904, 909--910 (C.A.1st Cir. 1958).

[17] Erie and its offspring cast no doubt on the long-recognized power of Congress to prescribe housekeeping rules for federal courts even though some of those rules will inevitably differ from comparable state rules. Cf. Herron v. Southern Pacific Co., 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857. 'When, because the plaintiff happens to be a non-resident, such a right is enforceable in a federal as well as in a State court, the forms and mode of enforcing the right may at times, naturally enough, vary because the two judicial systems are not identic.' Guaranty Trust Co. of New York v. York, supra, 326 U.S. at 108, 65 S.Ct. at 1469; Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 555, 69 S.Ct. 1221, 1229. Thus, though a court, in measuring a Federal Rule against the standards contained in the Enabling

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Act and the Constitution, need not wholly blind itself to the degree to which the Rule makes the character and result of the federal litigation stray from the course it would follow in state courts, Sibbach v. Wilson & Co., supra, 312 U.S. at 13--14, 61 S.Ct. at 426--427, it cannot be forgotten that the Erie rule, and the guidelines suggested in York, were created to serve another purpose altogether. To hold that a Federal Rule of Civil Procedure must cease to function whenever it alters the mode of enforcing state-created rights would be to disembowel ***474** either the Constitution's grant of power over federal procedure or Congress' attempt to exercise that power in the Enabling Act. [FN17] Rule 4(d)(1) is valid and controls the instant case.

FN17. Mississippi Pub. Corp. v. Murphree, supra, 326 U.S. at 445-- 446, 66 S.Ct. at 246; Iovino v. Waterson, supra, note 6, 274 F.2d at 46.

Reversed.

Mr. Justice BLACK concurs in the result.

Mr. Justice HARLAN, concurring. It is unquestionably true that up to now Erie and the cases following it have not succeeded in articulating a workable doctrine governing choice of law in diversity actions. I respect the Court's effort to clarify the situation in today's opinion. However, in doing so I think it has misconceived the constitutional premises of Erie and has failed to deal adequately with those past decisions upon which the courts below relied.

Erie was something more than an opinion which worried about 'forum-shopping and avoidance of inequitable administration of the laws,' ante, p. 1142, although to be sure these were important elements of the decision. I have always regarded that decision as one of the modern cornerstones of our federalism, expressing policies that profoundly touch the allocation of judicial power between the state and federal systems. Erie recognized****1146** that there should not be two conflicting systems of law controlling the primary activity of citizens, for such alternative governing authority must necessarily give rise to a debilitating uncertainty in the planning of everyday affairs. [FN1] And it recognized that the scheme of our Constitution envisions an allocation of law-making functions between state and federal legislative processes which is undercut if the federal judiciary can make substantive law affecting ***475** state affairs beyond the bounds of congressional legislative powers in this regard. Thus, in diversity cases Erie commands that it be the state law governing primary private activity which prevails.

FN1. Since the rules involved in the present case are parallel rather than conflicting, this first rationale does not come into play here.

The shorthand formulations which have appeared in some past decisions are prone to carry untoward results that frequently arise from oversimplification. The Court is quite right in stating that the 'outcome-determinative' test of Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, if taken literally, proves too much, for any rule, no matter how clearly 'procedural,' can affect the outcome of litigation if it is not obeyed. In turning from the 'outcome' test of York back to the unadorned forum-shopping rationale of Erie, however, the Court falls prey to like oversimplification, for a simple forum-shopping rule also proves too much; litigants often choose a federal forum merely to obtain what they consider the advantages of the Federal Rules of Civil Procedure or to try their cases before a supposedly more favorable judge. To my mind the proper line of approach in determining whether to apply a state or a federal rule, whether 'substantive' or 'procedural,' is to stay close to basic principles by inquiring if the choice of rule would substantially affect those primary decisions respecting human conduct which our constitutional system leaves to state regulation. [FN2] If so, Erie and the Constitution require that the state rule prevail, even in the face of a conflicting federal rule.

FN2. See Hart and Wechsler, The Federal Court and the Federal System 678. Byrd v. Blue Ridge Rural Elec. Coop., Inc., 356 U.S. 525, 536-- 540, 78 S.Ct. 893, 900-902, 2 L.Ed.2d 953, indicated that state procedures would apply if the State had manifested a particularly strong interest in their employment. Compare Dice v. Akron, C. & Y.R. Co., 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398. However, this approach may not be of constitutional proportions.

The Court weakens, if indeed it does not submerge, this basic principle by finding, in effect, a grant of substantive legislative power in the constitutional provision for a federal ***476** court system (compare

Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865), and through it, setting up the Federal Rules as a body of law inviolate.

'(T)he constitutional provision for a federal court system * * * carries with it congressional power * * * to regulate matters which, though falling within the uncertain area between substance and procedure, are rationally capable of classification as either.' Ante, p. 1144. (Emphasis supplied.)

So long as a reasonable man could characterize any duly adopted federal rule as 'procedural,' the Court, unless I misapprehend what is said, would have it apply no matter how seriously it frustrated a State's substantive regulation of the primary conduct and affairs of its citizens. Since the members of the Advisory Committee, the Judicial Conference, and this Court who formulated the Federal Rules are presumably reasonable men, it follows that the integrity of the Federal Rules is absolute. Whereas the unadulterated outcome and forum-shopping tests may err too far toward honoring state rules, I submit that the Court's 'arguably procedural, ergo constitutional' ****1147** test moves too fast and far in the other direction.

The courts below relied upon this Court's decisions in Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520, and Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528. Those cases deserve more attention than this Court has given them, particularly Ragan which, if still good law, would in my opinion call for affirmance of the result reached by the Court of Appeals. Further, a discussion of these two cases will serve to illuminate the 'diversity' thesis I am advocating.

In Ragan a Kansas statute of limitations provided that an action was deemed commenced when service was made on the defendant. Despite Federal Rule 3 which provides that an action commences with the filing of the complaint, ***477** the Court held that for purposes of the Kansas statute of limitations a diversity tort action commenced only when service was made upon the defendant. The effect of this holding was that although the plaintiff had filed his federal complaint within the state period of limitations, his action was barred because the federal marshal did not serve a summons on the defendant until after the limitations period had run. I think that the decision was wrong. At most, application of the Federal Rule would have meant that potential Kansas tort defendants would have to defer for a few days the satisfaction of knowing that they had not been sued within the limitations period. The choice of the Federal Rule would have had no effect on the primary stages of private activity from which torts arise, and only the most minimal effect on behavior following the commission of the tort. In such circumstances the interest of the federal system in proceeding under its own rules should have prevailed.

Cohen v. Beneficial Indus. Loan Corp. held that a federal diversity court must apply a state statute requiring a small stockholder in a stockholder derivative suit to post a bond securing payment of defense costs as a condition to prosecuting an action. Such a statute is not 'outcome determinative'; the plaintiff can win with or without it. The Court now rationalizes the case on the ground that the statute might affect the plaintiff's choice of forum (ante, p. 1143, n. 10), but as has been pointed out, a simple forum-shopping test proves too much. The proper view of Cohen is in my opinion, that the statute was meant to inhibit small stockholders from instituting 'strike suits,' and thus it was designed and could be expected to have a substantial impact on private primary activity. Anyone who was at the trial bar during the period when Cohen arose can appreciate the strong state policy reflected in the statute. I think it wholly legitimate to view Federal Rule 23 as not purporting to deal ***478** with the problem. But even had the Federal Rules purported to do so, and in so doing provided a substantially less effective deterrent to strike suits, I think the state rule should still have prevailed. That is where I believe the Court's view differs from mine; for the Court attributes such overriding force to the Federal Rules that it is hard to think of a case where a conflicting state rule would be allowed to operate, even though the state rule reflected policy considerations which, under Erie, would lie within the realm of state legislative authority.

It remains to apply what has been said to the present case. The Massachusetts rule provides that an executor need not answer suits unless in-hand service was made upon him or notice of the action was filed in the proper registry of probate within one year of his giving bond. The evident intent of this statute is to permit an executor to distribute the estate which he is administering without fear that further liabilities may be outstanding for which he could be held personally liable. If the Federal District Court in Massachusetts applies ****1148**Rule 4(d) (1) of the Federal Rules of

Civil Procedure instead of the Massachusetts service rule, what effect would that have on the speed and assurance with which estates are distributed? As I see it, the effect would not be substantial. It would mean simply that an executor would have to check at his own house or the federal courthouse as well as the registry of probate before he could distribute the estate with impunity. As this does not seem enough to give rise to any real impingement on the vitality of the state policy which the Massachusetts rule is intended to serve, I concur in the judgment of the Court.

380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8, 9 Fed.R.Serv.2d 1.3, 1

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Supreme Court of the United States
HERRON
v.
SOUTHERN PAC. CO.
**No. 131.**

Submitted March 2, 1931.
Decided April 13, 1931.

On Certificate from the United States Circuit Court of Appeals for the Ninth Circuit.

Action by G. E. Herron against the Southern Pacific Company. Judgment for defendant, and plaintiff appealed to the Circuit Court of Appeals. On certificate from the Circuit Court of Appeals for the Ninth Circuit.

Questions answered.

West Headnotes

**[1] Federal Civil Procedure 2155**
170Ak2155 Most Cited Cases
Issues.
(Formerly 106k352(5))
Provision of State Constitution that contributory negligence or assumed risk shall always be for jury is not binding on federal court sitting within state. Conformity Act, Fed.Rules Civ.Proc., rule 1 et seq., 28 U.S.C.A.; 28
U.S.C.A. § 1652; A.R.S.Const. art. 18, § 5.

**[2] Federal Civil Procedure 2155**
170Ak2155 Most Cited Cases
(Formerly 106k352(5))
Federal court sitting in Arizona may direct verdict for defendant in personal injury action when it appears as matter of law that plaintiff was contributorily negligent or assumed risk, notwithstanding State Constitution. A.R.S.Const. art. 18, § 5.

**[3] Federal Courts 2**
170Bk2 Most Cited Cases
(Formerly 106k259)
The jurisdiction of the courts of the United States is derived alone from the constitution and laws of the United States, and cannot be enlarged, diminished, or affected by state laws or regulations.

**[4] Federal Civil Procedure 1952**
170Ak1952 Most Cited Cases
(Formerly 106k352(5))
In trial by jury in federal court, judge is not mere moderator, but is governor of trial.
****383 *91** Messrs. P. H. Hayes, of Phoenix, Ariz., M. J. Dougherty, of Mesa, Ariz., and J. A. Walsh, of Mesa, Ariz., for Herron.

Messrs. Charles H. Bates, of Washington, D. C., and Alexander B. Baker and Louis B. Whitney, both of Phoenix, Ariz., for Southern Pac. Co.

***92** Mr. Chief Justice HUGHES delivered the opinion of the Court.

This action was brought in the District Court of the United States for the District of Arizona to recover damages for personal injuries resulting from a collision between the plaintiff's automobile and the defendant's train. The accident occurred in Phoenix, Ariz. At the close of the testimony on the part of the plaintiff, the court directed a verdict for the defendant, upon the ground that the plaintiff was guilty of contributory negligence. The plaintiff appealed to the Circuit Court of Appeals. That court states that, if the court below was at liberty to follow the settled rule in the courts of the United States that 'whenever, in the trial of a civil case, it is clear that the state of the evidence is such as not to warrant a verdict for a party, and that if such a verdict were rendered the other party would be entitled to a new trial, it is the right and duty of the judge to direct the jury to find according to the views of the court' (Barrett v. Virginian Railway Company, 250 U. S. 473, 476, 39 S. Ct. 540, 541, 63 L. Ed. 1092), the action of the trial court was justified. But section 5, article 18, of the Constitution of Arizona, provides: 'The defense of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury.'

[1][2] In view of this requirement, the Circuit Court of Appeals has certified the following questions of law for the decision of this Court:

'First. Is the above provision of the constitution of the State of Arizona binding and controlling upon a Federal court sitting in that State? Or, putting the question in another form:

'Second. May a Federal court sitting in the State of Arizona direct a verdict for the defendant in an action to recover damages for personal injuries, when it appears as a matter of law that the plaintiff was guilty of contributory ***93** negligence, notwithstanding the state constitutional provision to the contrary?'

Construing the constitutional provision, the Supreme Court of Arizona in Inspiration Consolidated Copper Company v. Conwell, 21 Ariz. 480, 486, 487, 190 P. 88, 90, 91, said: 'The language of the provision is plain and unambiguous, and to our minds clearly indicates that the power or duty to finally and conclusively settle the question of contributory negligence or assumption of risk is by its terms, transferred from the court to the jury. * * * We think that the evident purpose and intent of the provision is to make the jury the sole arbiter of the existence or nonexistence of ****384** contributory negligence or assumption of risk in all actions for personal injuries.' [FN1]

FN1 See, also, Davis v. Boggs, 22 Ariz. 497, 199 P. 116; Wiser v. Copeland, 23 Ariz. 325, 203 P. 565; Varela v. Reid, 23 Ariz. 414, 204 P. 1017; Morenci Southern Railway Co. v. Monsour, 24 Ariz. 49, 206 P. 589. Cf. Southern Pacific Co. v. Fisher, 35 Ariz. 87, 274 P. 779.

It does not appear to be insisted by the appellant, and it could not be maintained, that this constitutional provision must be followed by the federal courts by virtue of the Conformity Act, U. S. C. tit. 28, s 724 (28 USCA s 724). The state, without violating the requirements of due process, may provide such a rule for its own courts, as it may do away with the jury altogether (Chicago, Rock Island & Pacific Railway Company v. Cole, 251 U. S. 54, 56, 40 S. Ct. 68, 64 L. Ed. 133), but, in view of its nature and effect, the rule cannot be regarded as one that relates merely to practice or to a 'form' or 'mode of proceeding.' The provision 'cuts deep into the right, observed at common law, by which a defendant can obtain a decision by the court upon a proven state of facts.' Atchison, Topeka & Santa Fe Railway Company v. Spencer (C. C. A.) 20 F.(2d) 714, 718. Even with respect to the burden of proof as to contributory negligence, this Court has said: 'But it is a misnomer to say that the question as to the burden of proof as to contributory negligence is a mere matter ***94** of state procedure. For, in Vermont, and in a few other states, proof of plaintiff's freedom from fault is a part of the very substance of his case. * * * But the United States courts have uniformly held that, as a matter of general law, the burden of proving contributory negligence is on the defendant. The Federal courts have enforced that principle even in trials in states which hold that the burden is on the plaintiff.' Central Vermont Railway Company v. White, 238 U. S. 507, 512, 35 S. Ct. 865, 867, 59 L. Ed. 1433, Ann. Cas. 1916B, 252. See, also, Beutler v. Grand Trunk Junction Railway Company, 224 U. S. 85, 88, 32 S. Ct. 402, 56 L. Ed. 679.

[3] Nor is the provision applicable, which the appellant invokes, that 'the laws of the several states, except where the Constitution, ereaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply.' U. S. C. tit. 28, s 725 (28 USCA s 725). The controlling principle governing the decision of the present question is that, state laws cannot alter the essential character or function of a federal court. The function of the trial judge in a federal court is not in any sense a local matter, and state statutes which would interfere with the appropriate performance of that function are not binding upon the federal court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

under either the Conformity Act or the 'Rules of Decision' Act. Thus, a federal court is not subject to state regulations, whether found in constitutional provisions or in statutes, providing that the court shall not give an instruction to the jury unless reduced to writing, or that written instructions shall be taken by the jury in their retirement (Nudd v. Burrows, 91 U. S. 426, 441, 442, 23 L. Ed. 286; Lincoln v. Power, 151 U. S. 436, 442, 14 S. Ct. 387, 38 L. Ed. 224); or that the court shall require the jury to answer special interrogatories in addition to their general verdict (Indianapolis & St. Louis Railroad Company v. Horst, 93 U. S. 291, 300, 23 L. Ed. 898); or that the court shall not express any opinion upon the facts (Vicksburg & Meridian Railroad Company v. Putnam, 118 U. S. 545, 553, 7 S. Ct. 1, 30 L. Ed. 257); or charge the jury with regard to matters of fact (***95**St. Louis, Iron Mountain & Southern Railway Company v. Vickers, 122 U. S. 360, 363, 7 S. Ct. 1216, 30 L. Ed. 1161); or shall not direct a verdict, where the evidence is such that a verdict the other way would be set aside (Barrett v. Virginian Railway Company, supra).

[4] In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. This discharge of the judicial function as at common law is an essential factor in the process for which the Federal Constitution provides. As was said by Mr. Justice Story, in United States v. Battiste, 2 Summn. 240, 243, Fed. Cas. No. 14,545: 'It is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court.'

'Trial by jury,' said the court in Capital Traction Company v. Hof, 174 U. S. 1, 13, 14, 19 S. Ct. 580, 585, 43 L. Ed. 873, 'in the primary and usual sense of the term at the common law and in the American constitutions, is not merely a trial by a jury of 12 men before an officer vested with authority to cause them to be summoned and empaneled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by a jury of 12 men in the presence and under the superintendence of a judge emplowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict, if, in his opinion, it is against the law or the evidence.' See, also, United States v. Philadelphia & Reading Railroad Company, 123 U. S. 113, 114, 8 S. Ct. 77, 31 L. Ed. 138; Patton v. United States, 281 U. S. 276, 288, 289, 50 S. Ct. 253, 74 L. Ed. 854, 70 A. L. R. 263.

****385** Where, in an action in a federal court to recover damages for personal injuries, contributory negligence or assumption of risk constitutes a defense, [FN2] and, by reason of ***96** the facts being undisputed and of the absence of conflicting inferences, the evidence of contributory negligence or assumption of risk is conclusive and the question is one of law, the judge has the right and duty to direct a verdict for the defendant. Railroad Company v. Houston, 95 U. S. 697, 702, 24 L. Ed. 542; Northern Pacific Railroad Company v. Freeman, man, 174 U. S. 379, 384, 19 S. Ct. 763, 43 L. Ed. 1014; Southern Pacific Company v. Berkshire, 254 U. S. 415, 418, 419, 41 S. Ct. 162, 65 L. Ed. 335; Baltimore & Ohio Railroad Company v. Goodman, 275 U. S. 66, 69, 70, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645.

FN2 Under the Federal Employers' Liability Act (U. S. C. tit. 45, s 53 (45 USCA s 53)) contributory negligence is not a defense, but only goes in mitigation of damages. Chicago, Rock Island & Pacific Railway Co. v. Ward, 252 U. S. 18, 21, 23, 40 S. Ct. 275, 64 L. Ed. 430; Grand Trunk Western Railway Co. v. Lindsay, 233 U. S. 42, 49, 34 S. Ct. 581, 58 L. Ed. 838, Ann. Cas. 1914C, 168. As to the defense of assumption of risk under that act, see Seaboard Air Line Railway v. Horton, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Jacobs v. Southern Railway, 241 U. S. 229, 235, 36 S. Ct. 588, 60 L. Ed. 970; Chicago, Rock Island & Pacific

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Railway Co. v. Ward, supra. See, also, Longshoremen's and Harbor Workers' Compensation Act (U. S. C. tit. 33, s 905 (33 USCA s 905)); Nogueira v. New York, New Haven & Hartford Railroad Co., 281 U. S. 128, 131, 137, 50 S. Ct. 303, 74 L. Ed. 754.

The first question is answered, 'No'; the second, 'Yes.'

283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Supreme Court of Rhode Island.
JERRETT ET AL.
v.
JOHN HANCOCK MUT. LIFE INS. CO.

Dec. 21, 1894.

Action by John Jerrett and others against the John Hancock Mutual Life Insurance Company. Judgment for defendant.

West Headnotes

**Insurance 3001**
217k3001 Most Cited Cases
(Formerly 217k289)
An application for a life insurance provided that the policy should be void if the statements in the application were untrue, and declared that the applicant knew that untrue answers or suppressions of facts as to her health would vitiate the policy. Held, that where both the mother and sister of an applicant, who afterwards died of consumption, had died of that disease, the applicant's failure to mention the sister's death avoided the policy, though the doctor who examined her had previously rejected her, during her mother's life, as being liable to contagion from the latter.

**Insurance 3003(11)**
217k3003(11) Most Cited Cases
(Formerly 217k292.1(1), 217k292.1)
A life insurance company issued a policy dated July 6, 1892, on an application which contained the following questions and answers: "Has this company ever refused to issue a policy on this life?" Answer, "No." "Have any members of your immediate family (parents, brothers or sisters) ever been or are they now affected with consumption? If so, state age, and relationship, and whether living or dead." Answer, "Yes, mother died of phthisis, aged 37." The facts were that the applicant had made an application to the company for insurance April 3, 1892, which had been rejected; that the applicant's sister had died of consumption June 25, 1891, at the age of about 21 years, and that the applicant knew the cause of her sister's death. The policy expressly made the application a part thereof, and it was also stipulated therein and in the application that if the statements or answers in the application were in any respect untrue, the policy should be void. The assured died of consumption or phthisis August 23, 1893, at the age of about 23 years. Held, that the policy was void.
***793** Hugh J. Carroll, for plaintiffs.

McGuinness & Doran, for defendant.

ROGERS, J.

This is an action of covenant on a policy of insurance issued by the defendant corporation on the life of Rose Harney (afterwards Jerrett), and payable to her father, David Harney. The assured, after the issuance of the policy, and before her death, married John Jerrett, and this suit, originally brought in the name of John Jerrett and David Harney, has been discontinued as to John Jerrett. The policy was dated July 6, 1892, and contained, inter alia, these provisions: "If any statement or answer in said application, which application is hereby referred to and made a part hereof, is in any respect untrue, * * * then this policy shall be void." "No person, except the president or secretary, is authorized to make, alter, or discharge contracts, or waive forfeiture." It was also in proof that rejections could only be made at the home office. The application showed that the assured was born January 13, 1871, and the proof showed that she died August 23, 1893, of consumption. The application contained various questions to be answered, and that were answered, by the assured; and following the questions, and immediately preceding the signature of the assured, was this declaration: "I hereby declare that I am the person described in this application; that I have given true answers to all questions put to me, and I am aware that any untrue or fraudulent answers to any questions, or any suppression of facts with regard to my health, will vitiate the policy." The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

application, at its beginning, contained this statement, viz.: "Application is hereby made to the John Hancock Mutual Life Insurance Company for insurance, and, as the basis of such insurance, the following statements are made, which, including those made to the medical examiner, shall form a part of the contract for insurance, and, if in any respect untrue, the policy issued on this application shall be void." To one of these questions in the application, viz. "Has this company ever refused to issue a policy on this life?" the assured answered, "No"; but the proof was that the assured had made a previous application to the defendant company for insurance, April 3, 1892, which had been refused. To one of the questions in the application, viz. "Have any members of your immediate family (parents, brothers, or sisters) ever been, or are they now, affected with consumption? If so, state age and relationship, and whether living or dead," the assured answered, "Yes; mother died of phthisis, aged 37"; but the evidence showed that the assured's sister, Mary A. Harney, had died of pulmonary tuberculosis, June 25, 1891, aged 21 years, 3 months, and 16 days. The proof was that it was a rule of the company, though not printed on the application, that a death from consumption in each of two succeeding generations would cause rejection of the application of a member of that family. It was in proof that consumption, phthisis, and pulmonary tuberculosis are only different names of the same disease. Dr. F. G. Bennett was the medical examiner upon both of the assured's applications. At the date of the assured's first application, her mother was sick with consumption, and the medical examiner recommended rejection, and it was rejected at the home office, where alone the power to reject existed. At the date of the assured's second application, assured's mother had died of consumption; and the medical examiner recommended that a policy be issued, and the home office issued one. The testimony showed that the reason for rejection, by examining physician, of the first application, was because, the mother then being sick, and the assured being at home, attending her, there was danger of infection or contagion, whereas after the mother's death the only danger was from heredity, so far as the mother's sickness or death was concerned. The examining physician knew at the time of the second application by assured that the assured was the same person that he had examined and recommended for rejection; but there was no proof that he knew whether her application had been rejected at the home office, or whether she had voluntarily withdrawn it, or what disposition had been made of it. At the time of neither application did the medical examiner know that the assured's sister had died of consumption.

***794** The defendant contends that the policy is void on account of the assured's misrepresentations and suppression of facts, both as to her sister's death from consumption, and as to the defendant's refusal to issue a policy on assured's own life. The plaintiff contends that there is no proof that assured knew that her sister, Mary, died of consumption; and he also contends that there was a waiver of any forfeiture or avoidance of the poncy on account of the misrepresentation in regard to the rejection of the assured's first application, because the same medical examiner examined her at time of both applications. In the opinion of the court, the policy was avoided. The assured's answers to questions were warranties, at least as to important subjects; and the death of assured's sister, near her own age, from consumption, but a year or so before her own application, especially when her mother had also died of consumption, was information of such importance as the defendant company was entitled to, in determining whether it would accept the risk. 1 May, Ins. § 201. It was not claimed that assured did not know that her sister, Mary, had died of consumption, but only that there was no proof that she did know it. Even granting that it was necessary to prove knowledge on the part of the assured of the cause of her sister Mary's death,--which the court does not think necessary,--yet the proof does show that the assured was on friendly terms with her family; her policy being made payable to her father, and she having been home, caring for her mother, during her mother's sickness, after her sister's death. The assured was nearly or quite 20 years old when her sister died, and the court is satisfied from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the evidence that the assured must have known of the cause of her sister Mary's death, which occurred no further away than Attleborough, she living at Central Falls, and it appearing in proof that the sister was buried at Pawtucket. The court is also of the opinion that there was no waiver of the avoidance of the policy on account of the misrepresentation as to defendant's refusal to issue a policy. The decision of the court is that, for the reasons above set forth, the defendant corporation is entitled to judgment for costs.

18 R.I. 754, 30 A. 793

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

District Court, D. Delaware.
KEATLEY
v.
GRAND FRATERNITY.
**No. 5.**

January 24, 1912.

At Law. Action by Mary C. Keatley against the Grand Fraternity. Demurrers to pleas sustained, and to replications overruled.

See, also, 198 Fed. 272.

West Headnotes

**Insurance ⚷2986**
217k2986 Most Cited Cases
(Formerly 217k723, 217k723(2))
An applicant for a certificate of beneficial membership in a fraternal organization held not guilty of making any misstatement or concealment in the application sufficient to forfeit the certificate.

**Insurance ⚷2986**
217k2986 Most Cited Cases
(Formerly 217k723, 217k723(2))
A fraternal order issuing a certificate subject to forfeiture for misstatements or concealments in the application may not take advantage of an irresponsive answer to a question in the application.

**Insurance ⚷2986**
217k2986 Most Cited Cases
(Formerly 217k723, 217k723(2))
A fraternal organization existing under the laws of Pennsylvania is governed by Acts Pa. June 23, 1885, P.L. 134; and a certificate may not be forfeited by reason of misrepresentation or untrue statement in the application, though there is a warranty of the truth thereof, provided the same is made in good faith, and does not relate to some matter material to the risk.

**Insurance ⚷3019**
217k3019 Most Cited Cases
(Formerly 217k723, 217k723(9))
Questions in an application for a certificate of beneficial membership in a fraternal order, "What is your daily practice in regard to the use of wines, spirits or malt liquors?" and "What has been your practice in the past?" must be construed together, and, when so done, they call for the applicant's daily practice as to the use of intoxicants.

**Insurance ⚷3571**
217k3571 Most Cited Cases
(Formerly 217k815, 217k815(3))
In an action on a fraternal benefit certificate, a replication to a plea setting up facts which were relied on for a forfeiture of the certificate held good as against a demurrer.

***266** John Biggs and Armon D. Chaytor, Jr., both of Wilmington, Del., for plaintiff.

Leonard E. Wales, of Wilmington, Del., for defendant.

BRADFORD, District Judge.

[1] The questions now for determination arise on demurrer to certain pleas and replications in an action of covenant brought by Mary C. Keatley, widow of William J. Keatley, against The Grand Fraternity, a fraternal organization and a corporation of Pennsylvania, on a certificate of beneficial membership under seal issued by the defendant to him, to recover damages for the nonpayment of the sum of $3,000, being the amount alleged to have become payable to the plaintiff as a death benefit under the certificate of membership, and to remain wholly unpaid. It appears from the facts admitted on demurrer that Keatley made written application to the defendant June 24, 1909, for beneficial membership, and that on or about July 1, 1909, the sealed certificate of membership in question was issued to him, whereby it was certified that he was a beneficial member and entitled to all and every right, option and benefit given and granted in, to and by its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

constitution and by-laws, under a death certificate in the above-mentioned sum, payable to the plaintiff in manner and as prescribed in and by such constitution and by-laws, upon satisfactory proof of Keatley's death during the continuance in full force of such certificate of membership. The declaration contains three counts, and the defendant has filed ten pleas, each of which is interposed to all of the counts. The plaintiff has demurred to the third, fifth, seventh and tenth pleas. She has filed replications to the fourth and sixth pleas, in their application to the second count, and to the eighth and ninth pleas in their application to the third count. To these four replications the defendant has demurred. There has been joinder in all the demurrers. The third plea sets forth in substance, among other things, that Keatley in and by his application for membership promised and agreed for himself and his beneficiary or beneficiaries that each and every statement and answer in the application should be deemed a warranty; that in case any statement or answer should not be absolutely true in every respect, or in case of any misstatement or misleading statement, or omission or concealment of ***267** fact by or on his behalf, the benefit certificate issued upon such application should be absolutely void; that the application contained the following question: physician? Give particulars, with name and address of physician'; that Keatley made answer to these questions as follows: 'Indigestion. 1909. April. Dr. Kelly, 9th & West, Wil. Del. '; that this statement or answer was not then and there absolutely true in every respect, and that Keatley did thereby omit and conceal from the defendant the fact that about one month prior to the date last mentioned he had been afflicted with and was subject to and infected with a certain other and more serious complaint, to wit, cystitis, for which he had consulted a physician and received treatment, and from which complaint, as the defendant was informed and believed and therefore averred, Keatley had not reasonably had time to recover before making his application, all of which was unknown to the defendant at the time of receiving his application and delivering the certificate of membership; and that by reason of the premises the defendant was deceived and misled and the death benefit certificate thereafter issued to him was rendered void. To the third plea there is a general demurrer. Keatley was asked when he last consulted a physician, and said it was in April, 1909. There is nothing in the plea showing or tending to show that the answer was not absolutely correct. He was asked for what complaint he consulted a physician, and he said it was indigestion. The truthfulness of this reply is wholly unchallenged by the plea. He was asked to give the name and address of such physician, and he replied Dr. Kelly, 9th & West, Wilmington, Delaware. The plea contains nothing to impeach this statement. He truthfully and directly answered all he was required to reply to. There was no misstatement or misleading statement. Nor was there any omission or concealment of fact within the meaning of the conditions of the application.
He did not conceal or omit to state any fact which the questions addressed to him called for. Furthermore, while it is stated that he had previously been afflicted with cystitis, it is not alleged that he fraudulently omitted to state the fact, nor is it even stated that Keatley had not wholly recovered from that ailment before making his application. It is merely alleged that as the defendant is informed and believes, and therefore avers, Keatley 'had not reasonably had time to recover. ' Keatley in truthfully and directly answering the questions put to him observed good faith and fully performed his duty. To hold otherwise would be practically to decide that although the defendant was at liberty fully to interrogate him touching all matters material to the risk and had formulated in the application the questions it desired answered, and although he answered in good faith and truthfully all questions addressed to him, yet the death benefit should be forfeited if he failed to mention some matters that in the judgment, not of himself, but of physicians or experts, might have a bearing upon the risk assumed. Such surely is not law. In Penn Mut. Life Ins. Co. v. Mechanics' Savings Bank & Trust Co., 72 Fed. 413, 435, 19 C.C.A. 286, 308, 38 L.R.A. 33, 70, the circuit court of appeals for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sixth circuit well said:

***268** 'The subject of life insurance is always present for physical examination by medical experts of the insurer, who often acquire, by lung and heart tests, and by chemical analysis of bodily excretions, a more intimate knowledge of the bodily condition of the applicant than he has himself. Then, too, the practice has grown of requiring the applicant for both fire and life insurance to answer a great many questions carefully adapted to elicit facts which the insurer deems of importance in estimating the risk. * * * When the applicant has fully and truthfully answered all these questions, he may rightfully assume that the range of the examination has covered all matters within ordinary human experience deemed material by the insurer, and that he is not required to rack his memory for circumstances of possible materiality, not inquired about, and to volunteer them. He can only be said to fail in his duty to the insurer when he withholds from him some fact which, though not made the subject of inquiry, he nevertheless believes to be material to the risk, and actually is so, for fear it would induce a rejection of the risk, or, what is the same thing, with fraudulent intent.'

The demurrer to this plea must be sustained.

[2][3] The fifth plea sets forth in substance, among other things, that Keatley's application for membership contained a promise, agreement and warranty on his part substantially the same as alleged in the third plea; that in the application he also declared that 'his personal habits were clearly, distinctly and truthfully set forth in the questions and answers therein contained'; that the application contained the following questions: 'What is your daily practice in regard to the use of wines, spirits or malt liquors?' 'What has been your practice in the past?'; that Keatley said 'No' to each of these questions; that he for a long time prior to and at the time of making the application had been and was strongly addicted to the use of wines, spirits or malt liquors and indulged therein at frequent and regular intervals, all of which was unknown to the defendant at the time of receiving his application and delivering the certificate of membership, and that by reason of his above 'answers' and 'omission and concealment of fact' the defendant was deceived and misled and the death benefit certificate thereafter issued to him was rendered void. To the fifth plea there is a general demurrer. The two questions addressed to Keatley were, 'What is your daily practice in regard to the use of wines, spirits or malt liquors?' and 'What has been your practice in the past?' The latter question standing alone is wholly vague and indefinite; for the 'practice in the past' would apply as well to tobacco as any other subject or subjects. The two questions must be read together in order to render the latter intelligible; and when this is done the latter on a reasonable construction may be read 'What has been your daily practice in the past in regard to the use of wines, spirits or malt liquors?' It is obviously necessary to limit the 'practice in the past' to wines, spirits or malt liquors through the adoption from the preceding question of the subject of the practice; and it is a natural and reasonable construction also to adopt the word 'daily.' Thus construed the inquiry was 'What is and what in the past has been your daily practice in regard to the use of wines,' etc. The latter question being fairly susceptible of two constructions, namely, that above mentioned, and one which would relate, not to daily, but only to general practice, ***269** and the language being, not that of Keatley, but of the defendant, any doubt which may attach to the subject should, according to an elementary canon of construction, be resolved against the defendant and in favor of Keatley. He having thus been asked as to his then and previous daily practice in regard to the use of wines, etc., said 'No' to each inquiry. I should have much difficulty in reaching a conclusion that 'No' was an answer to either of the questions. If it was not, it cannot be said to be an untrue answer, nor an untrue statement, for that monosyllable seems to have no intelligible connection with either of the questions. But 'No' was either responsive or irresponsive to the two questions. If it was irresponsive it is well settled that the defendant cannot now take advantage of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

want of an answer to these questions or either of them. In Phoenix Life Ins. Co. v. Raddin, 120 U.S. 183, 7 Sup.Ct. 500, 30 L.Ed. 644, the court through Mr. Justice Gray said:

'Where upon the face of the application a question appears to be not answered at all, or to be imperfectly answered, and the insurers issue a policy without further inquiry, they waive the want or imperfection in the answer, and render the omission to answer more fully immaterial.'

This proposition has been repeatedly recognized and enforced and is not open to question. If, then, 'No' was not an answer to either of the questions no advantage can be derived by the defendant from the mere fact that they remained unanswered. If, on the other hand, 'No' be treated as responsive to those questions, Keatley in making his application in substance averred that it was not then and had not in the past been his daily practice to use vinous, spirituous or malt liquors. There is nothing in the plea to show that such an averment was or would have been untrue. It does not allege that it was then or theretofore his daily practice so to indulge. It does state he then was and theretofore had been strongly addicted to the use of wines, spirits or malt liquors, and indulged therein at frequent and regular intervals. But this is very different from a statement of daily practice, as to which alone he was interrogated in the two questions. Having been asked only as to his daily practice, and having, on the assumption that 'No' was responsive, fully answered the questions, there was certainly, in the absence of fraud, no 'omission or concealment of fact' in not volunteering something he had not been asked about. Further, the plea does not allege that he fraudulently or wrongfully omitted to state, or concealed, that he was and had been strongly addicted to the use of wines, spirits or malt liquors and indulged therein at frequent and regular intervals, or even that he drank to excess, or how often he drank, or that his indulgence in wines, spirits or malt liquors had injuriously affected his health, or in any manner was material to the insurance risk. I can perceive no ground on which the fifth plea can be supported, and therefore the demurrer to that plea must be sustained.

The seventh plea is substantially similar to the third, and the same considerations which require the demurrer to that plea to be sustained necessitate a like disposition of the demurrer to the seventh plea. ***270** So, the tenth plea is substantially similar to the fifth, and the demurrer to it must be sustained for the same reasons.

[4][5] As before stated, the defendant has demurred to the replications to the fourth and sixth pleas in their application to the second count, and to the replications to the eighth and ninth pleas in their application to the third count. The fourth plea sets forth in substance, among other things, that it was expressly stipulated and warranted that the certificate of membership issued and delivered to Keatley should be absolutely void if he made any statement or answer in his application which was not absolutely true in every respect or in case there had been any misstatement or misleading statement or omission or concealment of fact by or on behalf of Keatley; that in the application for membership Keatley in response to the question, 'Have you ever been subject to or had, or now have, any of the following disorders or diseases? (Answer 'Yes' or 'No' to each), inter alia, 'Piles,' 'Bladder, gravel or kidney disease?' answered 'No' to each;' that Keatley prior to the date of the application had been afflicted with and was subject to and infected with diabetes, cystitis and piles, all of which he knew, but which was unknown to and not discovered by the defendant at and prior to the time of receiving the application and of executing and delivering the certificate of membership; and that the defendant was misled and deceived in the premises whereby the certificate became and was absolutely void. The replication to this plea consists of a special traverse in the inducement of which it is averred that at and prior to the time Keatley made his application for membership there was in full force and effect a certain Pennsylvania statute, approved June 23, 1885 (P.L. 134), which provided, among other things, as follows:

'That hereafter whenever the application for a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

policy of life insurance contains a clause of warranty of the truth of the answers therein contained, no misrepresentation or untrue statement in such application made in good faith by the applicant, shall effect a forfeiture or be a ground of defense in any suit brought upon any policy of insurance issued upon the faith of such application, unless such misrepresentation or untrue statement relate to some matter material to the risk.'

The replication further avers that at the time of making the application Keatley 'had not nor had he had any serious disease, illness or ailment, or any disease, illness or ailment that was other than trivial and temporary in its nature and which did not affect his general health or the disclosure of which was material to the risk of insuring his life'; and that the answers which he made to the questions mentioned in the plea 'were in good faith and without intention to mislead or deceive, without this that,' etc. That the Pennsylvania statute is applicable to cases like the present there can be no question. And under its provisions there is no forfeiture by reason of a misrepresentation or untrue statement in an application for life insurance, even where there is a warranty of the truth of the representation or statement, if it be made 'in good faith' and does not 'relate to some matter material to the risk.' The defendant assigns as grounds of demurrer argumentativeness, duplicity and the allegation of conclusions ***271** of law. The objection of argumentativeness is palpably unsound, for the distinguishing feature of the inducement in a special traverse is precisely that quality. It is a qualified or argumentative denial of the allegations in the preceding pleading, the absque hoc clause, containing a direct traverse, being added in order to cure what would be objectionable argumentativeness in the inducement, if taken alone. Nor is the replication justly chargeable with duplicity. The fact that the plaintiff not only alleges that Keatley's answers were made in good faith but denies that he had any disease, illness or ailment, material to the insurance risk, cannot constitute duplicity. Whether Keatley did or did not observe good faith in giving the answers in question, and whether he had or had not any disease, illness or ailment material to the risk are not questions of law, but of fact for a jury. The position that the replication is objectionable for the allegation of a question of law is clearly untenable. The demurrer to the replication in question must, therefore, be overruled.

[6] The sixth plea alleges in substance, among other things, that Keatley in response to the question contained in his application for membership, 'Has your weight recently increased or diminished? If so, why?' answered 'No'; that in fact for a long time prior to the making of such application and continuing until such application Keatley had been falling off in weight, which was known to him but not known by the defendant at the time of receiving his application and of executing and delivering to him the certificate of membership; and that by reason of the premises the defendant was deceived and misled and the death benefit certificate issued to Keatley became void. The replication to this plea also consists of a special traverse in the inducement of which the above-mentioned Pennsylvania statute is set forth. It further avers that Keatley at the time of making his application had been and was in good health and his weight was 'that which it normally was at that time of the year, and there was and had been no material or marked change in his weight, and no change in his weight which indicated an impairment of his health, and no change in his weight that was material to the risk of insuring his life,' and his answers 'to the questions in the said plea mentioned were in good faith and without intention to mislead or deceive, without this that' etc. The same principles and rules of pleading apply to this replication as to that to the fourth plea. It requires no independent discussion. The demurrer to the replication must be overruled. The replications to the eighth and ninth pleas present questions substantially similar to those raised by the replications to the fourth and sixth pleas respectively, and it is unnecessary to treat them separately from the latter. The demurrers to the replications to both the eighth and ninth pleas must be overruled.

198 F. 264

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

United States Court of Appeals,
Eighth Circuit.
Peggy A. LeBUS, Plaintiff-Appellant,
v.
NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, Defendant-Appellee.
**No. 94-2668.**

Submitted Feb. 13, 1995.
Decided June 9, 1995.

Beneficiary of life insurance policy brought action to recover death benefits. The United States District Court for the District of Minnesota, Paul A. Magnuson, Chief Judge, determined that insured intentionally misled insurer on form for reinstatement of policy. Beneficiary appealed. The Court of Appeals, Hansen, Circuit Judge, held that: (1) insured's attempt to reinstate policy was void for misrepresentation, and (2) amount of paid-up value of whole life adjustable life insurance policy was question of fact precluding summary judgment.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Federal Courts 776**
170Bk776 Most Cited Cases
Court of Appeals reviews summary judgment de novo, applying same standard as district court.

**[2] Insurance 2052**
217k2052 Most Cited Cases
(Formerly 217k365.3)
Under Minnesota law, insured's failure to disclose on reinstatement form that insured was consulting physician and undergoing diagnostic tests to discover cause of abnormal mass in lung was wilfully false or intentionally misleading, and, thus, insured's attempt to reinstate life insurance policy was void for misrepresentation, even if insured did not appreciate seriousness of condition and did not have definitive diagnosis of lung cancer; form required insured to disclose whether he had consulted with physician for any reason, and insured disclosed only that he had seen physician for cold. M.S.A. § 61A.11.

**[3] Insurance 2959**
217k2959 Most Cited Cases
(Formerly 217k256.1)

**[3] Insurance 2965**
217k2965 Most Cited Cases
(Formerly 217k259)
Under Minnesota law, whether insurer must demonstrate subjective intent to deceive depends greatly upon specificity and nature of questions asked in insurance policy application; when insurance application requests disclosure of specific information, wilfulness depends on (1) whether insured had full knowledge of facts that were concealed when completing application and (2) whether concealed facts probably would have precluded issuance of policy if known to insurance company. M.S.A. § 61A.11.

**[4] Federal Civil Procedure 2501**
170Ak2501 Most Cited Cases
Amount of paid-up value of whole life adjustable life insurance policy was question of fact precluding summary judgment on beneficiary's claim to recover paid-up value of policy after it had lapsed for insured's failure to pay premium. M.S.A. § 61A.24.

***1375** Daniel W. Schermer, Minneapolis, MN, argued, for appellant.

Bridget M. Ahmann, Minneapolis, MN, argued, for appellee.

Before BOWMAN, BEAM and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

Peggy A. LeBus appeals the district court's grant of summary judgment in favor of Northwestern Mutual Life Insurance Company (Northwestern) in this action to recover death benefits on a life

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

insurance policy that Northwestern issued to Peggy LeBus's now deceased husband, L. Martin LeBus. The district court concluded that because the undisputed facts disclose that Martin intentionally misled Northwestern concerning material health-related facts, Northwestern was entitled to deny Peggy's claim on the policy. We affirm in part and reverse in part.

## I.

The following facts are undisputed. Peggy LeBus's husband, L. Martin LeBus, originally applied for and obtained a life insurance policy from Northwestern in 1986, naming Peggy as the beneficiary. Over the years, Martin allowed the policy coverage to lapse several times due to delinquent premium payments. Each time, Martin would request reinstatement of the policy when he had the money available to pay the premiums. The most recent lapse of coverage occurred on October 13, 1991, due to Martin's nonpayment of the August 6, 1991, premium. Martin tendered payment and completed a request for reinstatement form on October 21, 1991.

Northwestern's reinstatement request form requires the insured to make a statement of health, declaring that since the policy lapsed, the insured has not "consulted, been treated or advised to be treated by a physician or health practitioner for sickness, disease, injury or other reason." (Jt. App. at A-15.) The insured is instructed to give specific dates and details if any exceptions to this declaration exist. On Martin's October 21, 1991, request for reinstatement, he declared that he had not "consulted, been treated or advised to be treated by a physician" during the lapse in coverage beginning August 6, 1991. In the space provided to list exceptions to the declaration, Martin noted that he had seen Dr. LaFond for a cold. Martin provided no dates and no further details.

Dr. LaFond's deposition testimony and Martin's medical records reveal that during the policy lapse, Martin consulted Dr. LaFond for what he originally thought was a cold, but the focus of the consultation and treatment quickly changed from treatment of a cold to diagnosing an abnormal mass found in Martin's lung. Martin, a heavy smoker with a long history of lung and upper respiratory ***1376** difficulties (disclosed to Northwestern in his initial policy application), visited Dr. LaFond on September 25, 1991, complaining of persistent cold symptoms. Dr. LaFond diagnosed an upper respiratory infection for which he prescribed antibiotics. Martin returned on October 15, 1991, because the infection did not respond to the antibiotics. Dr. LaFond then diagnosed bronchitis with "possible pneumonia," (Jt.App. at A-33) and changed the antibiotics prescription. Dr. LaFond also took chest X rays, which he showed to Martin that day. The X rays revealed an "abnormality" which, in Dr. LaFond's opinion, needed a closer look "to see if this was clearly just a pneumonia or if there was something more serious going on." (*Id.* at A-41, - 42.)

Dr. LaFond scheduled Martin for a CT scan on October 18, 1991. The CT scan showed "a significant abnormality highly suggestive of cancer." (*Id.* at A-43.) Because of this finding, Dr. LaFond scheduled a bronchoscopy, which is in essence a lung tissue biopsy, for October 21, 1991, which was the day that Martin signed the request for reinstatement form. Dr. LaFond informed Martin of the risks and reasons for these various procedures. Dr. LaFond made a definitive diagnosis of lung cancer after the bronchoscopy on October 21, 1991. Whether or not Dr. LaFond communicated the definitive cancer diagnosis to Martin on the same day or sometime later is in dispute, but it is not material to our resolution of this case.

Peggy LeBus testified by affidavit that she urged Martin to see Dr. LaFond because of a persistent cold. She said that Martin's demeanor, behavior, and personality (always an optimist) were unchanged while he was going through the tests on October 18 and 21, and that Martin told her that Dr. LaFond would not speculate on what might be wrong until he got the results of the tests. She further testified that Martin was extremely distraught when he called her from his office on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

October 25, 1991, to tell her that he had just learned of the cancer diagnosis. She maintains that Martin did not know he had cancer until October 25, 1991, so he did not intentionally mislead Northwestern on the request for reinstatement form.

On May 14, 1993, Martin LeBus died of lung cancer. After Martin's death, Peggy sought to recover $100,000 in death benefits on the life insurance policy that Northwestern had issued to her husband. Northwestern refused to pay benefits on the policy, asserting that Martin had misrepresented his health condition in his most recent application for policy reinstatement, dated October 21, 1991.

Peggy brought this diversity of citizenship suit against Northwestern, seeking to recover the proceeds allegedly due under the life insurance policy. Based upon the undisputed facts, the district court granted Northwestern summary judgment, concluding that Martin had made material misrepresentations in his request for reinstatement form--not because he had knowledge of a cancer diagnosis but because he failed to disclose the facts he knew regarding the abnormal lung mass and the diagnostic testing. Peggy appeals, arguing that the district court improperly resolved disputed facts on a motion for summary judgment. She also contends that she is entitled to the paid-up value of the policy.

**II.**

[1] We review a grant of summary judgment de novo, applying the same standard as the district court. *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir.1995). Summary judgment is proper when, construing all evidence in favor of the nonmoving party, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.;* Fed.R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). When a motion for summary judgment is made and properly supported, the nonmoving party may not rely on bare allegations but must set forth specific facts showing that there is a genuine issue for trial. *See Marshall v. UNUM Life Ins. Co.,* 13 F.3d 282, 284 (8th Cir.1994).

[2] The first issue in this case is whether Martin LeBus made intentional misrepresentations on the request for policy reinstatement***1377** form dated October 21, 1991, within the meaning of Minnesota law, which the parties agree applies to this case. The request for reinstatement form specifically provided that "on the basis of a misstatement in this Request or application, [Northwestern] may rescind the insurance or deny a claim." (*Id.* at A-16.) Minnesota law allows an insurance company to void an insurance contract if the policy was issued on the basis of statements about the insured's medical condition that were wilfully false or intentionally misleading, as those terms are used in Minn.Stat. § 61A.11. *See Ellis v. The Great-West Life Assurance Co.,* 43 F.3d 382, 386 (8th Cir.1994). Minn.Stat. § 61A.11 provides in pertinent part as follows:

> In any claim upon a policy issued in this state without a previous medical examination ..., the statements made in the application as to the age, physical condition, and family history of the insured shall be valid and binding upon the company, unless wilfully false or intentionally misleading.

Minnesota courts have held that "a willfully false and intentionally misleading answer is one which is consciously made with a premeditated design so as to falsify facts so as to lead the insurer to act when he otherwise would not" and that "[w]ilfully false denotes knowingly concealed." *Siemers v. United Benefit Life Ins. Co.,* 246 Minn. 459, 75 N.W.2d 605, 608 (1956). We have observed, however, that the Minnesota courts do not always require proof of a subjective "premeditated design." *Ellis,* 43 F.3d at 386-87 (discussing *Howard v. Aid Ass'n for Lutherans,* 272 N.W.2d 910 (Minn.1978); *St. Cloud Nat'l Bank & Trust Co. v. Woodmen of the World Life Ins. Soc'y,* 451 N.W.2d 75 (Minn.Ct.App.1990); *Berthiaume v. Minnesota Mutual Life Ins. Co.,* 388 N.W.2d 15 (Minn.Ct.Ap.1986); *Useldinger v. Old Republic Life Ins. Co.,* 377 N.W.2d 32 (Minn.Ct.App.1985)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"[A]lthough a statement by an insured would be wilfully false or intentionally misleading if an insured acted with an intent to deceive the insurer, the phrase 'wilfully false or intentionally misleading' as used in Minn.Stat. 61A.11 does not require that there be an intent to deceive." *Ellis,* 43 F.3d at 387.

[3] Whether it is necessary to demonstrate a subjective intent to deceive depends greatly upon the specificity and nature of the questions asked in the insurance application. When an insurance application requests disclosure of specific information, wilfulness depends on (1) whether the insured had full knowledge of the facts that were concealed when completing the application and (2) whether "the concealed facts probably would have precluded issuance of the policy if known to the insurance company." *Ellis,* 43 F.3d at 387.

After reviewing the record in this case, we are satisfied that the district court correctly granted summary judgment in favor of Northwestern on this issue. The undisputed facts disclose that Martin concealed relevant facts of which he was fully aware. The reinstatement request form required disclosure not only of medical treatment but also of whether the insured had "consulted" with a physician for any reason. (Jt.App. at A-15.) Martin signed the statement of health on the request for reinstatement form, noting only that he had seen Dr. LaFond for a cold during the period from August 6, 1991, through October 21, 1991. Martin at the very least knew that he was currently consulting with Dr. LaFond about something potentially much more serious than a cold and that he was undergoing diagnostic tests to discover the cause of an abnormal mass found in his lung. Dr. LaFond first discovered the abnormal mass through the X rays taken on October 15, 1991. The mass was confirmed in a CT scan performed on October 18, 1991. Dr. LaFond then scheduled Martin for a bronchoscopy on October 21, 1991, the very day that Martin signed the reinstatement request form.

The only disputes of fact that Peggy raises are disputes as to Martin's subjective knowledge of his condition. She contends that Martin did not know that he had cancer until October 25, 1991, when he told her the diagnosis over the telephone and that he did not subjectively appreciate the seriousness of his condition at the time he completed the request for reinstatement form. However, these disputed facts, for the reasons previously mentioned, are not material to our ***1378** resolution of this case. This case turns not on Martin's subjective state of mind but on the objective facts of which Martin was aware yet failed to disclose in the request for reinstatement form. It is clear that Martin knew he was consulting Dr. LaFond and specialists concerning the abnormal mass in his lung. Even if Martin did not appreciate the seriousness of his condition and did not have a definitive diagnosis of cancer, the request for reinstatement form obligated him to reveal the consultations to give the insurance company an opportunity to assess their importance and his then-existing physical condition.

The insurance company, having asked on the request for reinstatement form whether the insured had consulted with a physician for any reason, was entitled to that information so that it could assess the significance of the facts. *See Ellis,* 43 F.3d at 388. In this case, the true facts present a much different picture than Martin's singular cryptic response of "Dr. LaFond-- cold." Martin's actual consultations on October 18 and October 21, 1991, suggest a serious health condition. We conclude, as did the district court, that the facts concealed were of such probative force that Northwestern would not have reinstated the policy had it known all of the facts. Therefore, Martin's reinstatement attempt was void for misrepresentation, and Northwestern was not obligated to pay death benefits on the reinstated policy.

[4] The second issue in this case is whether any paid-up value remained on the original policy which lapsed for failure to pay a premium in August 1991. The misrepresentation on the request for reinstatement form did not affect the validity of the original defaulted policy. There is no dispute that Martin originally obtained this life insurance policy in 1986 without fraud or misrepresentation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and that he maintained the policy until his last payment default in August 1991. The policy is a whole life-adjustable life insurance policy that accumulates a cash value and which received annual dividends. Section seven of the policy encompasses the basic requirements of Minn.Stat. § 61A.24, known as the standard nonforfeiture law for life insurance. These provisions work to prevent forfeiture of a life insurance policy upon an insured's failure to pay a premium.

The district court concluded that no law supported Peggy's theory that she was entitled to the paid-up value of the policy, but the court did not expressly consider what effect the nonforfeiture provisions might have had on Martin's policy at the time of his last default, or what value (if any) might have remained at the time of his death by reason of these provisions. The district court noted in a footnote that "the parties disagree as to what the paid-up value of the policy would be if the Plaintiff were allowed to recover." (Appellant's Addend. at 10 n. 1.) On appeal, Peggy argues that the district court should have awarded her the paid-up value of the life insurance policy as of the date of the last default since the reinstatement attempt was void. At oral argument, Northwestern's attorney conceded that if any paid-up value remained on the policy, Peggy should be entitled to that amount. We find that material questions of fact and law remain to be resolved on this issue, not the least of which is whether Martin's borrowings against the policy's cash values left anything of value in it.

Because the original policy lapsed for failure to pay a premium, the district court should have determined the legal effect, if any, of section seven and Minnesota's nonforfeiture law, and because questions of material fact exist, the court erred by granting summary judgment on this issue. Whether any death benefit value remained in this policy at the time of Martin's death must be determined by reference to the terms of the policy, Minnesota's life insurance nonforfeiture law, and the particular facts of this case. Therefore, we remand to the district court for further proceedings on this issue.

## III.

We find no material dispute of fact concerning Martin's misrepresentation in the request for reinstatement form, and we affirm the district court's granting of summary judgment to Northwestern on that issue. However, because material disputes of fact and law exist concerning whether section seven of the policy and Minnesota's nonforfeiture ***1379** law work to preserve any value in the original policy, we reverse and remand this issue to the district court for further proceedings consistent with this opinion.

55 F.3d 1374

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**C**
Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
NEW ENGLAND LIFE INSURANCE COMPANY, Plaintiff,
v.
Madeline TAVERNA and the Estate of Raymond Delprete Defendants,
Madeline TAVERNA, Third Party Plaintiff,
v.
Mitchell HERSH, Third Party Defendant.
**No. 00-CV-2400 (ILG).**

March 1, 2002.

Michelle J. d'Arcambal, Esq., Morgan & d'Arcambal, New York.

Michael J. Burke, Esq., Matarazzo Blumberg & Associates, P.C., New York.

Norman R. Ferren, Esq., Babchick & Young, White Plains.

MEMORANDUM AND ORDER
GLASSER, District J.

SUMMARY

***1** Plaintiff New England Life Insurance Company ("New England") brings this diversity action seeking rescission of a life insurance policy it issued to decedent, Raymond DelPrete ("DelPrete"), and a declaratory judgment that the policy is void *ab initio,* based on alleged material misrepresentations made by DelPrete. Defendant and third-party plaintiff Madeline Taverna ("Taverna"), the sister of DelPrete and the beneficiary of the life insurance policy, has filed a third-party complaint against Mitchell Hersh ("Hersh"), an agent of New England, alleging negligence and intentional "misadvise" and breach of contract. New England and Hersh separately move for summary judgment. For the reasons that follow, the motions are granted.

BACKGROUND

The relevant facts, viewed in the light most favorable to plaintiff (as this Court must do on a motion for summary judgment by the defendant, *see Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987)), are as follows. On or about March 25, 1998, DelPrete filled out Part I of an application for a New England Term Life Policy with the assistance of one of New England's agents, Hersh. (*See* Application, attached to Christopher Demeo Affidavit ("Demeo Aff."), as Ex. B; Mitchell Hersh Affidavit ("Hersh Aff.") ¶ 4.) After completing Part I, DelPrete declared just above his signature that "[t]o the best of my knowledge and belief the answers recorded are true and complete." (*See* Application.) The signature page also contained a "Limitation on Authority of Agents and Examiners" clause which stated that neither agent nor examiner could determine insurability, change any term in the application for insurance or make a contract on behalf of the insurance company. (*Id.*) The following day, DelPrete submitted to a paramedical examination where Part II of the insurance application was filled out. (*Id.*) There is no indication that Hersh was present at this examination. On or about April 1, 1998, an underwriter from New England conducted a personal history interview with DelPrete which completed the application process. [FN1] (*See* Personal History Interview, attached to Demeo Aff. as Ex. B.) About one month later, in May 1998, New England issued DelPrete a Variable Life Insurance Policy with a face amount of $700,000. (*See* Policy, attached to Demeo Aff. as Ex. A.) The policy included a clause, stating: "This Policy is a legal contract between the Owner of the Policy (called 'you') and New England Variable Life Insurance Company, (called 'the Company'). The Policy, which includes the attached Application ... is the entire contract between you and the Company." (*Id.* at 6.) As of August 27, 1998, Taverna was the named beneficiary under the policy. (*See* Defs.' Local Rule 56.1 Statement ¶ 3.) DelPrete died on or about April 17, 1999. (*See*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Death Certification, attached to Demeo Aff. as Ex. C.)

FN1. "Part I" of the application filled out by DelPrete on the first day actually includes a part I and a part II. Plaintiff's reference in its papers to "Part I" appears to include both sections, including part I and part II. The paramedics report, which was filled out on the second day, is also labeled "Part II." Plaintiff's reference to "Part II" relates to this report and not to the second part of "Part I."

Because DelPrete's death occurred within two years after the policy was issued, New England conducted a customary investigation concerning the truth of the representations made by DelPrete in his application. (*See* Demeo Aff ¶ 30.) That investigation revealed that DelPrete had made various false statements in his application and at his personal interview, some of which are not contested by Taverna in this action. Specifically, New England alleges that DelPrete misrepresented his employment status, salary, and net worth; medical and hospitalization history; and history of drug dependency.

*Employment Misrepresentations*

*2 On Part I of the application, DelPrete provided his business name and address as "Taverna Sales" in Brooklyn, New York, and stated under "Occupation and Financial" that he worked in "sales" for Taverna Sales; that he earned $125,000 per year; and that he had a net worth of $500,000. (*See* Application Part I, 8(b), 33, 34.) He also stated during his personal history interview that he had earned $117,000 in 1994, $120,000 in 1995, and $125,000 in 1996. (*See* Personal History Interview, "Employment Duties".) Taverna does not dispute that her brother lied about his employment status, prior earnings, and net worth. In fact, she told an International Claims Specialists ("ICS"), hired by New England in this matter, that DelPrete was unemployed and was being supported by his mother, which she again confirmed at her deposition. [FN2] (*See* ICS Notes, dated 5/10/99, and Madeline Taverna Deposition ("Taverna Dep .") at 25, attached to Demeo Aff. as Exs. F and G.)

FN2. Also parts of the record clearly establishes that DelPrete lied in this regard. A medical report dated the same day DelPrete filled out Part I of the application states that DelPrete told his doctor he was not currently working. (*See* Medical Report, dated Mar. 25, 1998, attached to Demeo Aff. as Ex. D.) Moreover, copies of DelPrete's and his wife's jointly filed tax returns for the years 1995, 1996, and 1997 show that their combined income never exceeded $22,000 per year. (*See* Tax Returns, attached to Demeo Aff. as Ex. E.)

New England's underwriting consultant, Christopher Demeo, filed an affidavit in support of New England's motion, describing the relevant sections of New England's underwriting guidelines. According to Demeo, the underwriting guidelines require that applicants for variable life insurance policies meet certain financial requirements. (*See* Demeo Aff. ¶ 34.) For the type of variable life policy at issue here, with a face value of $700,000, New England requires that an applicant "be reasonably capable of withstanding the risk of fluctuating values associated with investment in the variable accounts." (*Id.;* Memorandum regarding suitability for Variable Life Insurance, dated Jan. 21, 1997 ("Suitability Mem."), attached to Demeo Aff. as Ex. H.) The guidelines also state that the NASD Rules of Fair Practice require that each issuance of a variable life insurance policy be "suited to the customer, as determined by information provided by the customer about his/her financial situation." (*See* Suitability Mem.) One of the key determinations of suitability is that "the customer ... be able to afford the investment in the case of a single premium payment or, if the variable contract requires periodic payments, the customer [has] the capacity to make payments over an extended period of time." (*Id.*) In addition, New England requires that an insured's annual premium

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be no more than 10% of his annual salary. (*See* Demeo Aff. ¶ 34; Suitability Mem. (1)(b).) DelPrete's premium was $4,800 and therefore, to qualify for the policy, he must have earned at least $48,000 per year. (*See* Demeo Aff. ¶ 34.) The underwriting guidelines states that, "[i]f suitability is not established, clarifying information must be obtained ... [and] if the response does not explain the situation to the reviewer's satisfaction, the application must be rejected...." (*See* Suitability Mem.) According to Demeo, had DelPrete been truthful about his unemployment status or his insufficient annual income, his application for this policy would have been rejected. (*See* Demo Aff. ¶ 34.)

*Medical History Misrepresentations*

***3** Question 45(d) of Part I and question 6(d) of Part II of the application asked DelPrete to state whether he had been treated or diagnosed as having a "disease or disorder of the kidneys; lungs; stomach; liver; digestive system or urinary system." [FN3] (*See* Application Part I, 45(d), Part II, 6(d).) DelPrete answered "no" to this question. (*Id.*) However, the ICS investigation revealed that DelPrete had been diagnosed with and hospitalized for kidney stones and "acute left renal colic" in 1995, and had been again admitted to the hospital in August 1998, because he was experiencing "knife-like chest and epigastric pain, coupled with "nausea and vomiting." (*See* Medical Notes, attached to Demeo Aff. as Ex. I.) The doctor who examined DelPrete in 1998 noted that DelPrete had a history of renal colic 2-3 years ago "which had the same presentation" and a history of "nephrolithiasis" (kidney stones) approximately 1-2 years earlier. (*Id.*)

FN3. Demeo's affidavit refers to this question as 43(b) of Part I; however, the question regarding diseases and disorders is question 45(d) in the application. (*Compare* application and Demeo Aff. ¶ 9.)

*Pain Management and Elective Surgery Misrepresentations*

Question 46 of Part I of the application asked DelPrete whether he had, "within the past five years, had a check-up or consultation; been a patient in a medical facility; or been advised to have any diagnostic test *other than* an HIV test, hospitalization or surgery?" (*See* Application Part I, 46) (emphasis added). DelPrete answered "no" to this question. (*Id.*) At his personal history interview, DelPrete stated that he was not currently taking any medications or under any treatment or therapy and that he had never been hospitalized. (*See* Personal History Interview.) However, in February 1998, one month before filling out the application, DelPrete saw a neurosurgeon who recommended that he undergo elective back surgery. [FN4] (*See* Examination Report by Doctor Steven I. Ravich, dated Feb. 25, 1998, attached to Demeo Aff. as Ex. I) Apparently, DelPrete had been suffering from back pain ever since he injured himself in June of 1997. DelPrete had consulted with at least two doctors, Drs. Ravich and Bakshi, for his back pain nine times from June 1997 to March 1998, including a consultation on March 25, 1998, the same day he filled out Part I of the application. (*See* Medical Examination Reports, attached to Demeo Aff. as Exs. D, K and L.) Moreover, as indicated above, DelPrete had been hospitalized within the past five years when he underwent treatment for kidney stones in 1995.

FN4. According to Demeo, DelPrete underwent elective back surgery shortly after completing the application for life insurance. (*See* Demeo Aff. ¶ 39.)

According to Demeo, New England's underwriting guidelines are based on the "mortality risk" associated with each applicant, and recognizes the specific risks associated with elective surgery. (*See* Demeo Aff. ¶¶ 39, 43.) The mortality risk is weighed in relation to the necessity of the surgery, which "may far outweigh the extra risks of the operation and anesthesia." (*See* Underwriting Guidelines at G33, attached to Demeo Aff. as Ex. M.) Taverna points out that the guidelines do not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

specifically list elective back surgery as a high, middle or low risk operation. (*Id* .) According to Demeo, however, the elective surgery contemplated by DelPrete is considered "too risky, and would have rendered [him] uninsurable," especially when coupled with DelPrete's documented history of back problems. (*See* Demeo Aff. ¶ 39.)

*Drug Dependency Misrepresentations*

*4 In response to question 43(b) of Part I of the application which asked, "[h]ave you ever: used cocaine or other drugs except as prescribed by a physician or a licensed practitioner?," DelPrete answered in the negative. (*See* Application Part I, 43(b).) In addition, DelPrete stated at his personal history interview that he had never "sought treatment for or [had] been advised to seek treatment for drug or alcohol dependency." (*See* Personal History Interview, "Habits.") However, DelPrete had been prescribed Percocet for his pain associated with his back injury in 1997, and was advised at that time of precautions with taking addictive medication. (*See* Medical Examination Report, dated June 11, 1997, attached to Demeo Aff. as Ex. K.) In February 1998, DelPrete was warned by Dr. Ravich about the "possibility of being addicted" to the medication. (*See* Medical Report, dated Feb. 5, 1998, attached to Demeo Aff. as Ex. K.) Later that month, Dr. Ravich again advised DelPrete to "wean himself off of the medication," which DelPrete had promised he would do. (*See* Medical Examination Report, dated Feb. 26, 1998, attached to Demeo Aff as Ex. J.) [FN5] In March 1998, DelPrete informed Dr. Bakshi that Dr. Ravich would not prescribe him any more Percocet, and so Dr. Bakhshi gave DelPrete one more prescription for fifty pills. (*See* Medical Examination Report, dated Mar. 25, 1998, attached to Demeo Aff. as Ex. D.) According to Dr. Bakhshi, DelPrete wanted more than fifty pills, but Dr. Bakhshi refused to increase the quantity. (*Id* .) Despite answering on the application that he was not currently receiving any treatment or medication, [FN6] DelPrete took from six to seven pills of Percocet a day. (*See* Application Part II, 7; Medical Report, dated Mar. 25, 1998, attached to Demeo Aff. as Ex. D .) In April 1998, one month after completing the life insurance application, DelPrete enrolled himself in a detoxification and rehabilitation program to help him "stop using ... addictive drugs." (*See* Patient Consent for Ambulatory Detoxification form, attached to Demeo Aff. as Ex O). Evidently failing to heed the various warnings about addiction on April 30, 1999, DelPrete died of "acute methadone intoxication." (*See* Death Certificate, attached to Demeo Aff. as Ex. C.)

FN5. Both Demeo's affidavit and plaintiff's Local Rule 56.1 Statement of Undisputed Facts incorrectly state that Dr. Ravich's medical report, dated February 26, 1998, is attached to Demeo's affidavit as Ex. K. (*See* Demeo Aff. ¶ 40; Local Rule 56.1 Statement ¶ 40.) Curiously, plaintiff's "Corrected Memorandum of Law" states that the medical report is attached as Ex. D. In fact, as indicated above, this report is actually attached as Ex. J.

FN6. Question 7 of Part II asked "[a]re you now receiving treatment or medication?" DelPrete answered "no." (*See* Application Part II, 7.)

According to Demeo, certain high-risk activities, such as drug or alcohol abuse render an applicant uninsurable. (*See* Demeo Aff. ¶ 43.) New England's underwriting guidelines require that a life insurance policy be declined if the applicant is currently using narcotics, or has been a habitual user within the past two years. [FN7] (*See* Underwriting Guidelines DA1, attached to Demeo Aff. as Ex. M.) In addition, an applicant's employment record is one of the factors used by New England in determining the severity of the drug problem. (*Id.*) Demeo avers that, had New England known about DelPrete's "sketchy employment history," and his dependency on narcotics, New England would not have issued him the policy. (*See* Demeo Aff. ¶ 43.)

FN7. Taverna disputes this fact in her Local Rule 56.1 Statement in which she

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> states that New England's underwriting guidelines do not state that drug or alcohol abuse renders an applicant uninsurable. (*See* Pl. Local Rule 56.1 Statement ¶ 21.) Taverna also seems to argue that a genuine issue of fact exists because the guidelines do not specifically list methadone, codeine or Percocet individually (the drugs taken by DelPrete) in the guideline's list of narcotics, which does list "heroin, cocaine, morphine and related drugs, opium and its derivatives, Demerol, etc." (*See* Underwriting Guidelines Manual DA1, attached to Demeo Aff. as Ex. M.) The Court finds that there are no triable issues presented here because the underwriting guidelines at DA1 states that any current narcotics usage renders an applicant uninsurable, and Percocet is an opioid which is defined as a synthetic narcotics analgesic with opium-like properties. *See* Physician's Desk Reference, 1211 (55th ed.2001); 4 Attorney's Dictionary of Medicine, O-66 (1995).

*5 On or about July 6, 2000, New England Underwriting Officer William R. Hurley stated: "If we had known on 3/25/98, one day before the insurance exam of 3/26/98 that the insured had consulted Dr. Sanjay Bakhshi on 3/25/98 for pain management and that he had also consulted Dr. Steven Ravich[,] both Drs. consulted nine times from 9/17/97-3/25/98[,] and also that he was not working as of 3/25/98 we would have declined to issue insurance." (*See* Claim Referral form, attached to Demeo Aff. as Ex. I)

*Facts Relating to Third-Party Defendant Hersh*

Mitchell Hersh is a New York State licensed insurance agent who assisted DelPrete in filling out his application for life insurance on behalf of New England. (*See* Hersh Aff. ¶¶ 3-4.) Hersh avers that he never advised DelPrete to lie about any aspect of his application, and that he cautioned DelPrete to answer the questions truthfully. (*Id.* ¶¶ 5, 9.) Taverna alleges however that DelPrete told both her and her husband that Hersh knew that DelPrete did not work as the manager for Taverna Sales and did not earn $125,000 per year, and that Hersh told DelPrete to lie on his application regarding these questions. (*See* Madeline Taverna Affidavit ("Taverna Aff.") ¶¶ 7-8.) Neither Taverna nor her husband were present during the meeting between Hersh and DelPrete. (*See* Taverna Dep. at 29; Hersh Aff. ¶ 8.) Taverna admits that she does not know whether Hersh told DelPrete to lie about any other aspect of the application. (*See* Taverna Dep. at 29.)

After assisting DelPrete in March 1998, Hersh filled out an Agent's Certificate, which he was required to do in order to be paid his commission. (*See* Agent's Certificate, dated Mar. 25, 1998, attached to Hersh Aff.) As indicated on New England's claim referral form dated July 30, 1999, New England intended to pay Taverna life insurance upon receipt of DelPrete's death certificate. (*See* Claim Referral form, dated Jul. 30, 1999, attached to Pl. Local Rule 56.1 Statement as Ex. C.) Taverna points out that the claim referral form noted that there was no agent's contestable insurance statement, and this omission raises issues of fact as to whether Hersh knew that DelPrete had lied on his application. (*Id.*) According to Hersh however an agent only is required to fill out an Agent's Certificate at the time the application is filed, and New England only sends a contestable insurance form to an agent when an insured dies under suspicious circumstances. (*See* Hersh Aff. ¶¶ 10, 11). In this case, New England sent Hersh a contestable insurance form after DelPrete's death, which Hersh filled out and returned to New England. (*Id.* ¶ 11.) Question 3 on that form asked: "Where was the application completed?" and "Who supplied the information on the application?" Hersh answered DelPrete's home for the first part of the question, and left the second part of the question blank. (*See* Agent's Statement, dated Aug. 12, 1999, attached to Pl. Local Rule 56.1 Statement as Ex. D.) [FN8] Question 4 on the form asked: "At any time of taking the application, did the insured or Applicant disclose any information to you or were you aware of any information which is inconsistent with the information shown on the application?"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Id.*) In response to this question, Hersh checked the box labeled "no." (*Id.*)

FN8. Plaintiff's exhibit is marked by a tab labeled "J," although it is apparent that Hersh's Statement would be exhibit "D" in sequence.

***6** In April 2000, New England filed a complaint against Taverna and the Estate of DelPrete, seeking a declaration that the policy be rescinded and voided *ab initio* due to the allegedly material misrepresentations made by DelPrete on his application. Shortly after, Taverna filed a third-party complaint against Hersh, alleging that, in the event she is prevented from collecting under the life insurance policy due to misrepresentations in the application or at the underwriter's interview, such lack of coverage is due to the "negligence and carelessness and intentional misadvise of .... Hersh" and/or the "breach of contract of ... Hersh in his role as insurance agent and broker" Taverna seeks damages against Hersh in the amount of the life insurance policy, $700,000.

DISCUSSION

I. *Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if the pleadings, depositions ... together with the affidavits ... show that there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1985) (internal quotation marks and citations omitted). In deciding a summary judgment motion, a court should not resolve disputed issues of fact; rather, it simply must decide whether there is any genuine issue to be tried. *Eastman Mach. Co. v. United States,* 841 F.2d 469, 473 (2d Cir.1988). A disputed fact is material only if it might affect the outcome of the suit under the governing law. A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a reasonable jury could return a verdict in her favor. *Anderson,* 477 U.S. at 248-49. The motion "will not be defeated merely ... on the basis of conjecture or surmise." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

II. *New England v. Taverna*

As an initial matter, New England asserts that it may contest the payment of death benefits under the policy because it is within the prescribed two year contestable period Pursuant to New York Insurance Law § 3203(a)(3), "the policy shall be incontestable after being in force during the life of the insured for a period of two years from its date of issue." N.Y. Ins. Law § 3203(a)(3) (McKinney's 2000). The policy in this case was issued to DelPrete in May 1998, and New England filed its complaint in April 2000. Because New England brought this action before the expiration of two years from the date the policy was issued, it properly may contest the policy in this proceeding.

*7 Under New York law, any material misrepresentation, even an innocent one, allows " 'the insurer to avoid the contract of insurance or defeat recovery thereunder." ' [FN9] *Mutual Benefit Life Ins. Co. v. JMR Electronics Corp.,* 848 F.2d 30, 32 (2d Cir.1988) (*per curiam* ) (quoting *Process Plants Corp. v. Beneficial Nat'l Life Ins. Co.,* 53 A.D.2d 214, 216, 385 N.Y.S.2d 308, 310 (1st Dep't 1976), *aff'd,* 42 N.Y.2d 928, 397 N.Y.S.2d 1007 (1977)). "[I]t is the applicant's duty to disclose ... every fact bearing on or pertaining in any way to the insurability of [his] life, especially where specific questions are put to the applicant calling for such information." *Cohen v. Mutual Benefit Life Ins. Co.,* 638 F.Supp. 695, 698 (E.D.N.Y.1986) (quoting *Klapholtz v. N.Y. Life Ins. Co.,* 218 A.D. 695, 699, 210 N.Y.S. 64, 67 (1st Dep't 1926)). "[A]n applicant's only partial disclosure 'is as much

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a misrepresentation as a false affirmative statement." ' *Id.* (quoting *Vander Veer v. Cont'l Cas. Co.,* 34 N.Y.2d 50, 52, 356 N.Y.S.2d 13, 14 (1974)). Taverna concedes that her brother misrepresented his employment status and net worth on his life insurance application, but argues that such misrepresentations are not material and, alternatively, that Hersh is responsible for allowing her brother to lie. She disputes however New England's assertion that DelPrete answered untruthfully to the questions regarding medical and hospitalization history and drug usage, but argues, in any event, that these alleged misrepresentations are not material. Taverna does not allege that Hersh had anything to do with DelPrete's answers to these questions.

FN9. This matter is governed by New York insurance law because a federal court sitting in diversity generally applies the law of the forum state and the parties here both apply New York law in their papers. *See Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 121 n.5 (2d Cir.1998) (applying forum law, in this case, New York law, in diversity action when parties both present arguments based on New York law); *see also JMR Electronics Corp.,* 848 F.2d at 32 (applying New York law in diversity action brought by insurance company seeking to rescind life insurance policy).

A. *Medical, Hospitalization and Drug Dependency Misrepresentations*

In response to question 45(d) on Part I of the application, which inquired as to whether the applicant had ever been treated for or diagnosed as having a disease or disorder of the kidneys, stomach, liver, digestive system or urinary system, DelPrete answered in the negative, despite the fact that he had been hospitalized for "kidney stones" and "acute left renal colic" in 1995, and for "knife like chest and epigastric pain," and "nausea and vomiting" in August 1998. Question 46 asked the applicant whether he has "within the past five years: had a check up or consultation; been a patient in a medical facility; or been advised to have any diagnostic test other than an HIV test, hospitalization, or surgery?" to which DelPrete answered "no," despite his prior hospitalizations and the fact that he recently had been advised to undergo elective back surgery. Taverna argues that DelPrete's negative answers to these questions raise issues of fact as to whether DelPrete lied about his medical history. Taverna asserts that a one time incident of kidney stones or renal colic may or may not be a "disease or disorder" of the type listed in the question, and chest and gastric pains are not necessarily indicative of any disease or disorder. She also argues that her brother answered truthfully to question 46, which based on her own reading of that question did not require disclosure of prior hospitalizations. According to Taverna, the "other than" in question 46 was meant to exclude disclosure of HIV tests, hospitalization and surgery, and therefore DelPrete was not required to disclose his prior hospitalizations.

***8** "A misrepresentation is defined by statute as a false 'statement as to past or present fact, made to the insurer ... at or before the making of the insurance contract as an inducement to the making thereof." *JMR Electronics,* 848 F.2d at 32 (quoting N.Y. Ins. Law § 3105(a) (McKinney 1985)). Moreover, the insured must "furnish *truthful, accurate and complete* responses in order to allow the insurer to adequately evaluate any risks revealed." *Schondorf v. SMA Life Assurance Co.,* 745 F.Supp. 866, 871 (E.D.N.Y.1990) (emphasis added). The Court rejects Taverna's arguments that questions of fact exist as to whether DelPrete gave false statements regarding his medical history. The wording of question 45 makes clear that New England wanted to know if DelPrete had "ever" been treated for a disease or disorder of the kidneys, and a truly responsive answer to that question would have disclosed a one time diagnosis of kidney stones which unquestionably relates to the kidneys. This answer, coupled with DelPrete's untruthful answer to the next question concerning prior hospitalizations or future surgery, leaves this Court with no doubt that DelPrete misrepresented

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

his medical history on his life insurance application. Based on the wording of question 46, New England undoubtedly was interested in whether the applicant had ever been hospitalized or had been advised to undergo surgery within the past five years, and the "other than" language, excepting an applicant's full disclosure, applied only to whether or not he had been advised to have an HIV test. There also can be no doubt that DelPrete lied in question 46 because, in addition to inquiring about hospitalization and surgery the question asked whether the applicant had had a medical check up or consultation or had been a patient in a medical facility within the past five years. Taverna does not address these parts of the question, which were clearly ignored by DelPrete when he responded in the negative to this question.

With respect to drug dependency, Taverna argues that an issue of fact exists as to whether DelPrete misrepresented his drug usage based on his arguably truthful answer in the application. Question 43(b) asked the applicant whether he has "ever used cocaine or other drugs *except as prescribed* by a physician or a licensed practitioner?" to which DelPrete answered "no." Taverna argues that, because DelPrete was prescribed codeine, Percocet and methadone by his doctor, his negative answer to the question was arguably truthful. Even if DelPrete's answer was truthful based on the fact that he was prescribed Percocet by a doctor, the Court finds as a matter of law that DelPrete failed to disclose his use of narcotics as part of his pain management regimen because he failed to do so in other parts of the application. In response to question 7 of Part II of the application, DelPrete answered that he was not currently receiving *any* treatment or medication, an answer that was clearly false. Moreover, at his personal interview, he again denied that he was taking any medication or was under any treatment or therapy, or that he had ever been advised to seek treatment for drug dependency. It is beyond dispute, based on DelPrete's medical records submitted by New England, that DelPrete was not only being treated for and taking serious narcotic pain medications for his back pain, but that he had been warned about the possibility of addiction to his pain medications on several occasions.

***9** Having conceded that DelPrete misrepresented his employment status and salary history, and the Court having now concluded that DelPrete failed to disclose the truth about his medical and hospitalization history his being advised to undergo elective back surgery and his apparent drug dependency, the Court must now determine whether such misrepresentations were material as a matter of law. Should it be determined that the misrepresentations were material, the Court must grant summary judgment for New England. *See JMR Electronics,* 848 F.2d at 32.

B. *Materiality of Misrepresentations*

A misrepresentation is material if it "seriously interferes with the exercise of the insurance company's right to accept or reject the application," *Process Plants Corp.,* 53 A.D.2d at 216, 385 N .Y.S.2d at 311, and "knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such contract." *JMR Electronics,* 848 F.2d at 32 (quoting N.Y. Ins. Law § 3105(b)). The test therefore "is not whether the company might have issued the policy even if the information had been furnished; the question in each case is whether the company has been induced to accept an application which it might *otherwise have refused.*" ' *Id.* (quoting *Geer v. Union Mutual Life Ins. Co.,* 273 N.Y. 261, 269 (emphasis in original)); *accord Jackson v.. Travelers Ins. Co.,* No. 94-CV-5895, 1996 WL 350677, at * 5 (S.D.N.Y. Jun. 26, 1996); *Aetna Casualty & Sur. Co. v. Retail Local 906 of AFL-CIO Welfare Fund,* 921 F.Supp. 122, 131 (E.D.N.Y.1996). The burden of establishing that misrepresentations are material rests with the insurer seeking to rescind the policy. *See, e.g., Dipippo v. Prudential Ins. Co. of Am.,* 88 A.D.2d 631, 450 N.Y.S.2d 237 (2d Dep't 1982).

Generally, materiality is a question of fact to be determined at trial; however, "where the evidence concerning materiality is clear and substantially uncontradicted, the matter is one of law for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court to determine." *JMR Electronics,* 848 F.2d at 32 (quoting *Process Plants Corp.,* 53 A.D.2d at 216, 385 N.Y.S.2d at 310-11); *accord Cohen,* 638 F.Supp. at 697; *L. Smirlock Realty v. Title Guarantee Co.,* 70 A.D.2d 455, 462, 421 N.Y.S.2d 232, 237 (2d Dep't 1979). To determine whether an insurer would have issued the life insurance policy had all relevant disclosures been made, courts may look to evidence of the insurer's practice with respect to similar risks. *See Cohen,* 638 F.Supp. at 697. Such evidence usually takes the form of sworn affidavits or testimony of a qualified underwriting agent who testifies that the insurer would not have issued the particular contract it did had the facts been disclosed, as well as underwriting guideline manuals or rules. *See, e.g., Schondorf,* 745 F.Supp. at 870; *Cohen,* 638 F.Supp. at 697; *Friedman v. Prudential Life Ins. Co. of Am.,* 589 F.Supp. 1017, 1027 (S.D.N.Y.1984); *L. Smirlock Realty Corp.,* 70 A.D.2d at 463, 421 N.Y.S.2d at 237.

***10** As an initial matter, Taverna argues that New England failed to satisfy its burden of establishing materiality based on the affidavit of New England's underwriter, Demeo, and portions of the underwriting guidelines. Taverna essentially relies on *Dipippo, supra* and *Sonkin Assocs, Inc. v. Columbia Mutual Life Ins., Co.,* 150 A.D.2d 764, 541 N.Y.S.2d 611 (2d Dep't 1989), in which the courts held that the insurer had failed to satisfy its burden because the evidence in the record was "conclusory" in nature. *Dipippo,* 88 A.D.2d at 631, 450 N.Y.S.2d at 237-38 (holding that the evidence consisting only of a "conclusory" statement by a senior underwriting consultant and a section from the underwriting manual "which [was] not adequately described" was insufficient to demonstrate materiality as a matter of law); *Sonkin,* 150 A.D.2d at 765, 541 N.Y.S.2d at 612 ("The evidence in the record [which was not described by the court]... is conclusory in nature and does not establish as a matter of law, that the defendant would have rejected the insured's application if the insured's application had been truthful."). Contrary to Taverna's contentions, New England has provided a highly detailed affidavit of one of its underwriting agents describing the various attached portions of the underwriting guidelines and concluding, based on those guidelines, that New England would never had issued the precise insurance policy it did with a face value of $700,000 had DelPrete been truthful about any one of his misrepresentations. In appropriate circumstances, courts in this Circuit frequently have found misrepresentations to be material as a matter of law. *See, e.g., Jackson,* 1996 WL 350677, at * 6; *Retail Local 906,* 921 F.Supp. at 132; *Saint Calle v. Prudential Ins. Co. of Am.,* 815 F.Supp. 679, 686 (S.D.N.Y.1993); *Schondorf,* 745 F.Supp. at 873; *Cohen,* 638 F.Supp. at 699. Based on New England's clear and substantial evidence, the Court must conclude that, at least some, if not all, of DelPrete's misrepresentations had induced New England to issue the policy it did and New England may therefore properly rescind the contract. [FN10] *See Schondorf,* 745 F.Supp. at 866 (granting summary judgment because "at least some of the misrepresentations [were] material as a matter of law").

FN10. The Court also is not persuaded by the other cases relied upon by plaintiff which provide either minimal or no analysis in support of their conclusions that issues of fact exist as to materiality. *See Cont'l Ins. Co. v. RLI Ins. Co.,* 161 A.D.2d 385, 387-88, 555 N.Y.S.2d 325, 328 (1st Dep't 1990); *Equitable Life Assurance Society of the United States v. Rocanova,* 162 A.D.2d 265, 266, 556 N.Y.S.2d 624, 625 (1st Dep't 1990).

1. *Employment and Net Worth*

Taverna urges the Court to find that questions of fact exist as to whether DelPrete's misrepresentations regarding his employment status and net worth are material. She argues that the underwriting guidelines are ambiguous and never actually define a minimum required salary for variable life insurance eligibility or address matters of unemployment. She also argues that the suitability section relied upon by Demeo in support of his conclusion that New England would have

rejected DelPrete's application does not in fact mandate an outright rejection when suitability is questioned but first requires further inquiry into the applicant's financial situation (other sources of income). Thus, she argues that DelPrete's statement is unsubstantiated by the guidelines. Her arguments are specious. It is beyond question that New England's underwriting guidelines require applicants for variable life insurance policies to meet certain financial requirements. Although it does not directly state any minimum income or net worth requirement, the language in the guidelines clearly requires applicants to "be reasonably capable of withstanding the risk of fluctuating values," and "must be able to afford the investment in the case of a single premium payment or, if the variable contract requires periodic payments, the customer must have the capacity to make payments over an extended period of time." (*See* Demeo Aff. ¶ 34; Suitability Mem.) Thus, at a minimum, some financial stability on the part of the applicant is required. Contrary to Taverna's assertion that such provisions are ambiguous, the Court finds as a matter of law that these guideline provisions require the applicant to have some minimal financial resources to cover premium costs and other variables associated with this particular type of life insurance policy. The fact that DelPrete earned no income at all and did not have a net worth of $500,000, or anywhere near that figure, makes it difficult to believe that DelPrete would have been able to carry this burden.

***11** Moreover, the undisputed fact that DelPrete lied about his employment and earnings deprived New England of essential information necessary to make a reasonable determination regarding DelPrete's suitability or, at least, to put New England in a position to know that it needed to inquire further. *See Schondorf,* 745 F.Supp. at 873 (misrepresentations are material if they prevent the insurer from being able to adequately assess the risk involved in issuing the policy); *Process Plants Corp.,* 53 A .D.2d at 216, 385 N.Y.S.2d at 311 (materiality rests on whether insured "seriously interfere[d] with the exercise of the insurance company's right to accept or reject the application"). The fact that the guidelines do not provide for an outright rejection of an applicant who is unemployed does not persuade this Court that Demeo's conclusion regarding DelPrete's insurability was baseless. As noted above, materiality rests on whether the misrepresentation prevented the insurer from being able to assess the risks of insuring the individual, which DelPrete's falsehoods clearly did. Moreover, had DelPrete been truthful, prompting New England to seek clarifying information about his financial situation, there is no indication in the record nor does Taverna allege that DelPrete would have provided New England with the requisite "clarifying information" that would have guaranteed his insurability under this policy. Thus, this Court is driven to conclude that DelPrete's misrepresentations were material as a matter of law and summary judgment must be granted in favor of New England.

2. *Estoppel*

As a last resort, Taverna argues that New England is estopped from seeking rescission of the policy because its agent, Hersh, had knowledge of the misrepresentations. Taverna relies on a New York rule which states that an insurance company is estopped from seeking rescission when it has accepted premiums after learning of an event allowing for cancellation of the policy. *See, e.g., Cont'l Ins. Co. v. Helmsley Enterprises, Inc.,* 211 A.D.2d 589, 622 N.Y.S.2d 20, 21 (1st Dep't 1995); *Zeldman v. Mutual Life Ins., Co. of N.Y.,* 269 A.D. 53, 56, 53 N.Y.S.2d 792, 794 (1st Dep't 1945). Relying on *Tannenbaum v. Provident Mutual Life Ins. Co. of Philadelphia,* 41 N.Y.2d 1087 (1977), which applied principles of estoppel against an insurance company based on an agent's misrepresentations made in violation of statutory law. Taverna argues that Hersh's knowledge of DelPrete's misrepresentations is imputed to New England, and therefore New England may not now seek rescission of the policy under which it had received premium payments.

This argument now presented by Taverna was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

squarely addressed by the court in *Friedman v. Prudential Life Ins. Co. of Am., supra,* which found it to be meritless. Finding the reasoning in *Friedman* and cases cited therein to be sound, this Court too finds Taverna's claim to lack merit. In *Friedman,* the life insurance policy beneficiary challenged the insurance company's rescission of the policy based on material misrepresentations concerning the insured's medical history, arguing that the company waived its right to rescission because the agent was aware of or should have been aware of the insured's medical history. The *Friedman* plaintiff also relied on *Tannenbaum* in support of her claim. The court rejected plaintiffs argument on three grounds. First, the Court held that any alleged affirmative statements made by the agent were irrelevant as a matter of law because the plaintiff had signed the application which included a clause just two lines above her signature limiting the agent's authority with respect to the insurance contract, and, under New York law, any alleged knowledge by an agent is not imputable to the insurer when the insured is on notice that the agent does not have the authority to waive terms of the policy. *Friedman,* 589 F. Supp at 1023. Second, the plaintiff declared that the statements made on the application were true and complete and therefore she could not later claim that the misrepresentations were attributable to the paramedic or agent. (*Id.*) Third, the contract contained a clause stating that the application and the policy formed the entire contract between the parties and therefore extraneous evidence could not be introduced to modify the terms of the contract Id at 1023-24. Accordingly the insurance company could not be charged with knowledge of the insured's medical condition that was not disclosed on the application, even if the insurance agent was aware of that condition. *Id.*

***12** In this case, New England's contract also contained a clause limiting the agent's authority which was located on the same page as the applicant's signature; DelPrete signed the application declaring that all of his statements were true and complete; and the policy included a clause stating that the application and the policy formed the entire contract of insurance. Accordingly, any knowledge of misrepresentations by Hersh cannot be imputed to New England, and are irrelevant as a matter of law. *Friedman,* 589 F. Supp at 1023-24.

The law that a life insurance application containing a material misrepresentation attached to the policy, may be avoided by the insurer, *even if the agent had knowledge of the misrepresentation,* has been upheld time and again by New York courts. *See, e.g., Axelrod v. Metro. Life Ins. Co.,* 267 N.Y. 437, 447-48 (1935); *Stanulevich v. St. Lawrence Life Ass'n,* 228 N.Y. 586, 587 (1920); *Simon v. Gov't Employees Life Ins. Co. of N.Y.,* 79 A.D.2d 705, 706, 434 N.Y.S.2d 447, 449 (2d Dep't 1980); *Bloom v. Mutual of Omaha Ins. Co.,* 161 A.D.2d 1047, 1049, 557 N.Y.S.2d 614, 616 (3d Dep't 1990).

The *Friedman* court also specifically rejected plaintiff's argument under *Tannenbaum* and others similar cases, holding that those cases were inapposite as they involved agents who explicitly violated Insurance Department regulations concerning the issuance of replacement policies by misrepresenting the law and misleading applicants, and that the plaintiff in this case had not alleged that the agent had violated any regulations. *Friedman,* 589 F. Supp at 1024. Here, too, Taverna's reliance on *Tannenbaum* is misplaced. Like the plaintiff in *Friedman,* Taverna does not allege that Hersh violated any Insurance Department regulations or that be in any way misrepresented the law.

Moreover, uncontroverted evidence in this case shows that DelPrete had made similar misrepresentations regarding his employment and earnings history at his personal history interview when Hersh was not present. Taverna's estoppel argument also must be rejected based on the Court's finding, *see infra,* that DelPrete made material misrepresentations regarding his medical history and drug dependency, which again had nothing to do with Hersh.

The Court cannot refrain from remarking that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Taverna's argument is breath taking for its disingenuousness. Simply put, Taverna acknowledges that her brother lied, knowingly (whether allowed to or not), but nevertheless claims that she is entitled to $700,000 whether from New England or Hersh which she would not have received had her brother told the truth.

3. *Medical History, Hospitalizations, and Drug Dependency*

As discussed above, DelPrete failed to disclose any of his prior medical problems, including his bout with kidney stones and chest and gastric pains, his numerous visits to doctors for pain management treatment resulting from a previous back injury, his being advised to undergo elective back surgery, and his dependency on his narcotic pain medication, thereby giving New England the false impression that he was the perfect model of health. Based on the undisputed medical records submitted in this case, nothing could be further from the truth. Pursuant to Section 3105(d) of New York Insurance Law:

> ***13** A misrepresentation that an applicant for life ... insurance has not had previous medical treatment, consultation or observation, or has not had previous treatment or care in a hospital or other like institution, shall be deemed, for the purpose of determining its materiality, a misrepresentation that the applicant has not had the disease, ailment or other medical impairment for which such treatment or care was given or which was discovered by any licensed medical practitioner as a result of such consultation or observation. *If in any action to rescind any such contract or to recover thereon, any such misrepresentation is proved by the insurer, and the insured or any other person having or claiming a right under such contract shall prevent full disclosure and proof of the nature of such medical impairment, such misrepresentation shall be presumed to have been material.*

N.Y. Ins. Law § 3501(d) (McKinney's 2001) (emphasis added). Having determined above that DelPrete's concealment of his medical and drug problems were misrepresentations of the truth, *see Cohen,* 638 F.Supp. at 698, the Court must presume under the statute that such misrepresentations are material. Case law defining when misrepresentations are material also supports this conclusion. *See, e.g., Friedman,* 589 F.Supp. 1017 (failure to disclose diagnosis and treatment for heart disease is material misrepresentation as matter of law); *Vander Veer,* 34 N.Y.2d 50 (failure to disclose heart condition and medication, despite having revealed other treatment for other disorders, was material misrepresentation as matter of law); *Process Plants Corp.,* 53 A.D.2d 214, 358 N.Y.S.2d 308 (failure to disclose treatment for hypertension material as matter of law).

Indeed, had DelPrete disclosed the fact that he had been taking Percocet when asked whether he was "currently receiving treatment or medication," the underwriting guidelines mandate the denial of his application on this basis alone because of the risk of addiction. (*See* Underwriting Guidelines, "Drug Abuse," attached to Demeo Aff. as Ex. M). That DelPrete had been warned several times about the risk of addiction, had enrolled in a drug detoxification program shortly after executing the application and ultimately had died of a drug overdose illustrates what can happen to an individual who takes an addictive narcotic drug and provides the justification for New England's underwriting rules. Contrary to Taverna's suggestion therefore, Demeo's statement regarding DelPrete's drug usage can hardly be considered conclusory or unsubstantiated. Moreover, DelPrete's failure to disclose the fact that he had been advised to undergo elective back surgery and had problems with kidney stones and chest and gastric troubles "seriously interfere[d]" with New England's ability to assess the risk of insuring DelPrete at the price it did. *See Process Plants Corp.,* 53 A.D.2d at 216, 385 N.Y.S.2d at 311. Therefore, based on the multiple material omissions made by DelPrete, the Court concludes that, had DelPrete been truthful, New England would not have issued the $700,000 life insurance policy. Accordingly, New England properly may rescind the policy *ab initio.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

III. *Taverna v. Hersh*

***14** Taverna fails to provide any substantive arguments in opposition to third-party defendant Hersh's motion for summary judgment. Instead, she urges the Court to deny his motion because he failed to file his own affidavit, and instead filed the affidavit of his attorney who stated that Hersh did not advise DelPrete to lie. Taverna argues that the attorney's affidavit is insufficient for the purpose of summary judgment. In reply to Taverna's brief, Hersh filed a sworn affidavit averring that he never advised DelPrete to lie.

Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits be made on personal knowledge. Fed.R.Civ.P. 56(e). Although Hersh should have filed his own affidavit with his motion for summary judgment his failure to do so in this instance is not fatal to his motion. As discussed above, whether or not Hersh advised DelPrete to lie on his insurance application regarding his employment history and net worth is immaterial to the outcome of the case because New England would not have issued this policy based on other material omissions. *See Anderson,* 477 U.S. at 248-49 (summary judgment must be denied only when issues of fact are material to the outcome of the case).

In any event, Taverna's breach of contract and negligence claims must be rejected as baseless. Because DelPrete and Hersh were never parties to a contract, Hersh can not be in breach of any contract with DelPrete. Second, even if Hersh negligently and intentionally advised DelPrete to lie about his employment status, it is undisputed that Hersh did not tell DelPrete to misrepresent his medical history and drug dependency, both of which would have permitted New England to rescind the policy.

CONCLUSION

For the foregoing reasons, the motions for summary judgment by plaintiff and third-party defendant are granted.

SO ORDERED:

Not Reported in F.Supp.2d, 2002 WL 718755 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.