UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COLLEEN LITTLEFIELD, | : | |
| Plaintiff | : | |
| vs. | : | C.A. No. 06-157 ML |
| CATHOLIC FAMILY LIFE INS. CO., | : | |
| Defendant | : | |

**DEFENDANT CATHOLIC FAMILY LIFE INSURANCE COMPANY'S RESPONSE TO PLAINTIFF COLLEEN LITTLEFIELD'S STATEMENT OF DISPUTED FACTS**

Defendant Catholic Family Life Insurance Company ("CFLI") hereby responds to Plaintiff Colleen Littlefield's ("Littlefield") Statement of Disputed Facts in Support of her Objection to Defendant's Catholic Family Life Ins. Co.'s Motion for Summary Judgment as follows:

1. Littlefield's husband, Michael Littlefield ("Michael"), of approximately 9 years (they were married on July 12, 1996) died prematurely and tragically on May 25, 2005 at the age of thirty-six years old. See Littlefield Deposition at p. 13, l. 24 attached hereto as Exhibit A and Death Certificate of Michael attached hereto as Exhibit B.

**Response to Fact No. 1:** For purposes of this Motion for Summary Judgment (the "Motion"), this fact is undisputed.[1]

2. Michael was born on February 16, 1969 and died on May 25, 2005. See Exhibit B.

**Response to Fact No. 2:** For purposes of this Motion, this fact is undisputed. *See* footnote 1.

[1] The facts set out in several of Plaintiff's "Disputed" Facts include information within Plaintiff's knowledge, the accuracy of which CFLI has not independently verified. For purposes of this Motion, CFLI does not dispute these facts.

3. The Littlefields have a young daughter REDACTED who was born on REDACTED, 1999 and was only six years old when her father died. See Littlefield Deposition at p. 14, ll. 9-17 attached hereto as Exhibit C.

**Response to Fact No. 3:** For purposes of this Motion, this fact is undisputed. *See* footnote 1.

4. Michael died of metastatic colon cancer. See Exhibit B.

**Response to Fact No. 4:** It is undisputed that Exhibit B is a true copy of the death certificate for Mr. Littlefield and that the immediate cause of death listed on the certificate is "metastatic colon cancer." By contrast, in interrogatories signed by Plaintiff under oath in her medical malpractice litigation, she avers that her husband died of "appendiceal cancer." *See* Plaintiff Colleen Littlefield as Executrix of the Estate of Michael Littlefield Response to Defendant John Abadier, M.D. Interrogatories, Ans. No. 10, at 4. (Attached at Tab A). This discrepancy is not material to the pending Motion: it is undisputed that Mr. Littlefield's death was caused by metastatic cancer that began in the area of his appendix. *See also* "Disputed" Fact 21, *infra.*

5. He suffered from this condition for approximately nine months prior to his death. See Exhibit B.

**Response to Fact No. 5:** CFLI admits that Mr. Littlefield's death certificate indicates that he suffered from "metastatic colon cancer" for approximately "nine months." Further, the undisputed record establishes that Mr. Littlefield's cancer was diagnosed in August 2004, nine months prior to his death in May 2005. Also pertinent is the undisputed fact in Plaintiff's interrogatory answers filed in her medical malpractice action against Dr. Abadier, in which she avers under oath the Mr. Littlefield's cancer existed **prior** to August 2004 and "would have been earlier diagnosed," "had Dr. Abadier

properly undertaken further testing and examination." Her interrogatory answers further aver under oath that her husband's complaints, as well as the results of the June 18, 2003 CT Scan and the June 20, 2003 barium enema, were enough to make clear that further work-up and testing was necessary. *See* Tab A, Ans. No. 10; *see also* Plaintiff Colleen Littlefield as Executrix of the Estate of Michael Littlefield Answers to Interrogatories Propounded by Defendant Kent General & Vascular Surgeons, Inc., Ans. Nos. 8, 9 and 20 (Attached at Tab B).

6. Michael and Littlefield each purchased life insurance from the Insurer in 1997. See Demers Deposition at p. 34 ll. 1-12 attached hereto as Exhibit D.

**Response to Fact No. 6:** This fact is undisputed.

7. Michael responded to a direct mailing offered by the Insurer. See Demers Deposition at p. 31, line 21 through p. 32 line 2 attached hereto as Exhibit E.

**Response to Fact No. 7:** This fact is undisputed.

8. Michael initially sought $50,000 in life insurance because he couldn't afford to purchase more. See Exhibit E.

**Response to Fact No. 8:** For purposes of this Motion, this fact is undisputed.

*See* footnote 1.

9. Both Michael and Littlefield each applied for and obtained $50,000 in life insurance from the Insurer as a result of their response to the Insurer's direct mailing solicitation. See Exhibit D.

**Response to Fact No. 9:** This fact is undisputed.

10. Additionally, Michael also purchased an annuity policy from the Insurer using the same Agent. See Demers Deposition at p. 149, ll. 3-7 attached hereto as Exhibit F.

**Response to Fact No. 10:** This fact is undisputed.

11. In June 2003 Littlefield's sister's husband died prematurely and tragically. See Littlefield Deposition p. 25, ll. 17-25; p.26, ll. 1-4; p. 26 ll. 19-21 attached hereto as Exhibit G.

**<u>Response to Fact No. 11</u>:** For purposes of this Motion, this fact is undisputed. *See* footnote 1.

12. This prompted Littlefield and Michael to re-evaluate their life insurance needs. See Exhibit G.

**<u>Response to Fact No. 12</u>:** For purposes of this Motion, this fact is undisputed. *See* footnote 1.

13. Prior to this, Michael had also obtained a $10,000 rider to his policy in February 2003 which had increased his benefits from $50,000 to $60,000. See Exhibit G.

**<u>Response to Fact No. 13</u>:** This fact is undisputed. [The reference to Exhibit G is an error, this fact may be found in Exhibit H.]

14. In August 2003, Michael and Littlefield contacted the Insurer and sought to increase coverage on Michael from $60,000 to $300,000. See Demers p. 35, ll. 21-22 and p. 50, ll. 11-20 attached hereto as Exhibit H.

**<u>Response to Fact No. 14</u>:** Exhibit H reflects the undisputed fact that Mr. Littlefield told Mr. Demers during the application meeting on August 25, 2003 that he wanted to purchase a 10-year term policy for $300,000 and "this is what he wanted." Demers Dep., at 50, line 15 through 23 (Exhibit H). There is no record evidence that Plaintiff and Mr. Littlefield together contacted CFLI or that they together sought to "increase coverage on Michael from $60,000 to $300,000." Were such evidence to be introduced, it would likely be disputed, but would also be immaterial to this Motion.

15. The Insurer issued the term life insurance policy in the amount of $300,000 with a term of September 9, 2003 through September 9, 2023. The Insurer then cancelled Michael's $50,000 policy with the $10,000 rider. See Demers deposition at p. 47 ll. 7-15 attached hereto as Exhibit I and Hartwig deposition at p. 86, ll. 17-18 attached hereto as Exhibit J.

**<u>Response to Fact No. 15</u>:** These facts are undisputed.

16. In fact, Littlefield claims that Michael disclosed to the Insurer's Agent all the facts surrounding the hernia and the subsequent follow-up treatment at length in their meeting. See Littlefield deposition p. 57 line 12 through 58 line 6, p. 70, ll. 16-23 and p. 71, ll. 8-12 attached hereto as Exhibit K.

**Response to Fact No. 16:** Plaintiff's "claim" about what Mr. Littlefield said to Mr. Demers is set out in Exhibit K; it does not include "subsequent follow-up treatment at length." In any event, what Mr. Littlefield (or Plaintiff) said to Mr. Demers is disputed. Nevertheless, this factual dispute is immaterial to the outcome of this motion.

17. From an insurance point of view, however, a hernia was not a severe medical problem. See Demers Deposition at p. 43 ll. 15-17 attached hereto as Exhibit L.

**Response to Fact No. 17:** It is undisputed that a hernia that has been surgically repaired with no further complication does not raise issues from an underwriting prospective. *See* CFLI Undisputed Facts at ¶¶45-48, 50-51. Therefore, this fact is undisputed.

18. Additionally in the Insurer's own "Risk Selection Life Underwriting Guidelines" for Hernia the only thing the Underwriters are instructed to ask about for a Hernia condition is the location and whether surgery has been performed or whether it is planned in the future. It is considered "Usually Standard. May be necessary to postpone if surgery is planned." See attached "CFL000449" and "CFL000450" as Exhibit M.

**Response to Fact No. 18:** This fact is undisputed.

19. "Hernia operations are – hernias are not considered major problems for underwriting. In order to cut down costs and speed the underwriting process, hernia operations are not – are just considered not a major – major problem. Don't spend the money and time." See Demers deposition at p. 133 line 20 – p. 134 line 1 attached hereto as Exhibit N.

**Response to Fact No. 19:** This fact is undisputed.

20. Prior to becoming a sales advisor in 1992 he was an Underwriting Manager and admits to currently being aware of underwriting requirements. See Demers deposition at p. 21 ll. 16-23 attached hereto as Exhibit O.

**Response to Fact No. 20:** This fact is undisputed.

21. In August, 2004 Michael was diagnosed with cancer of the appendix. See Manzo Medical Records Bates 0000041-0000045 and 0000060-0000067 attached hereto as Exhibit P.

**Response to Fact No. 21:** This fact is undisputed.

22. On August 8, 2004 Michael and his wife "openly and frankly" discussed his condition and cancer diagnosis with Dr. Manzo when it was discovered. See Exhibit P.

**Response to Fact No. 22:** For purposes of this Motion, this fact is undisputed. *See* footnote 1.

23. In a surgical pathology report from a procedure Michael underwent on July 29, 2004 in a report printed on August 3, 2004, it is reported for the first time, *inter alia*, that Michael has a tumor directly invading other organs and the muscularis propria, and that distant metastasis cannot be assessed. A true copy of the report is attached hereto as Exhibit Q.

**Response to Fact No. 23:** This fact is undisputed.

24. The so-called "paramedical" exam performed by the Insurer was not conducted by a physician or even a nurse. The person who performed it (Carroll) did not even fill out the entire form that contained more specific medical questions. See form attached hereto as Exhibit R.

**Response to Fact No. 24:** The facts in record that underlie in this argumentative statement are undisputed. Donna Carroll, who performed the paramedical examination in connection with the 2003 policy application, had performed paramedical examinations for many life insurance companies for approximately fifteen years. Exhibit S. Further, Ms. Ingram explained that Ms. Carroll properly did not fill in the portions of the form that pertain to a physical examination that she was not qualified to perform. Ingram Dep. at 102-105 (Attached at Tab C). Finally, it is undisputed that Ms. Carroll left nothing out that she was supposed to include; she completed the form as it was supposed to be completed. *See* Carroll Dep. at 39, ll. 7-9, CFLI Undisputed Facts, at ¶ 39.

25. The "paramedical's" training was only a matter of hours. "It's just basically how to deal with the medical form." See Carroll deposition at p. 7, ll. 14-18 attached hereto as Exhibit S.

**<u>Response to Fact No. 25:</u>** This fact is undisputed. It is also argumentative in that it omits that Donna Carroll's credentials included attendance at St. Joseph's Hospital School of Medical Technology, work for seventeen years as a laboratory technician and work for fifteen years performing paramedical examinations for many different insurance companies. *See* Carroll Dep. at 6 through 8 (Exhibit S).

26. Carroll testified that she did not complete the entire form because she was instructed not to by the insurance company presumably in order to save time and money. See Carroll deposition at p. 19, ll. 11-18 attached hereto as Exhibit T.

**<u>Response to Fact No. 26:</u>** CFLI is unable to ascertain how Plaintiff derives "Disputed" Fact 26 from the testimony in Exhibit T. In fact, Donna Carroll testified that she correctly and fully completed her portions of the paramedic examination form; Ms. Ingram explained that she properly did not fill in the section that required a physical examination that she was not qualified to perform. *See* Response to "Disputed" Fact 24, *supra*. CFLI is also unaware any record evidence supporting the presumption referred to in "Disputed" Fact 26.

27. Carroll believes she spent about 20-30 minutes with Michael although she has no specific recollection of the meeting. See Carroll deposition p. 10, ll.15-23, p. 50 ll. 16-19 and p. 58, ll. 14-16 attached hereto as Exhibit U.

**<u>Response to Fact No. 27:</u>** This fact is undisputed.

28. Most of that time would have necessarily been occupied by taking Michael's blood pressure, obtaining a urine sample and a blood sample, and weighing and measuring Michael. See Carroll deposition at p. 29, ll. 15-22, and p. 47 line 15 through p. 48 line 14 attached hereto as Exhibit V.

**<u>Response to Fact No. 28:</u>** CFLI is unable to ascertain where in the record Plaintiff finds the conclusion that most of the paramedic examination would

"necessarily" have been taken up by the itemized activities. There is no record evidence regarding the allocation of time during the paramedic examination.

29. Additionally, as part of the application process Michael gave HIPPA releases to the Insurer entitling the Insurer to obtain all of Michael's medical records. See Demers deposition p. 108, ll. 9-24 and p. 114, ll. 9-22 attached hereto as Exhibit W.

**Response to Fact No. 29:** This fact is undisputed.

30. Not filling out the form in its entirety was a time saver. "Don't spend the money and time." See Demers Deposition at p. 133 line 18 through p. 134 line 5 attached hereto as Exhibit X.

**Response to Fact No. 30:** CFLI is unable to ascertain how Plaintiff draws the conclusion that "not filling out the form in its entirety was a time saver." In fact, there is no dispute regarding the evidence that each person involved with Mr. Littlefield's application filled out his or her form in its entirety, with the exception that Donna Carroll did not complete the portion reserved for a physician or nurse performing a physical examination which she was not qualified to perform. *See* Response to "Disputed Fact 24 *supra*. In addition, the Demers testimony referenced in "Disputed" Fact 30 is completely out of context as it is unrelated to the completion of forms. Rather, it refers to the underwriting protocol that a hernia that has been surgically repaired and has no complications does not trigger the need to prolong the application process by requesting medical records. *See* CFLI Undisputed Facts at ¶52.

31. Michael's hernia doctor (Dr. Abadier) did not know or tell Michael of any problems following the April 2003 surgery. In Dr. Abadier's patient notes he indicates that on May 1, 2003 Michael was seen and "is doing well." See Abadier Medical Records Bates 0000001-0000006 attached hereto as Exhibit Y.

**Response to Fact No. 31:** It is undisputed that the document attached as Exhibit Y is a true copy of Dr. Abadier's office notes. Beyond what is contained in the notes,

there is no evidence in the record regarding what Dr. Abadier actually knew. Undisputed for purposes of this Motion is Plaintiff's assertion under oath that Dr. Abadier was negligent for his failure to follow-up on Mr. Littlefield's complaints during the spring and summer of 2003 and the results of the June CT Scan and barium enema. *See* Tab A, Ans. No.10; Tab B, Ans. Nos. 8-9. Mr. Littlefield's testimony in his deposition regarding what Dr. Abadier told him about the April 2003 surgery is also undisputed for purposes of this Motion. *See* CFLI Undisputed Facts ¶¶14-29; *see also* Tab A, Ans. Nos. 10, 18; Tab B, Ans. Nos. 7-9. Also undisputed is Mr. Littlefield's own knowledge of his pain, the feeling that "there is a baseball there," his many medical appointments, and that fact that he was "increasingly unable to engage in activities as he had before" all during the period following the hernia surgery up to and during the time of the application for the 2003 policy. *See* CFLI Undisputed Facts ¶¶ 14-31. *See also* Tab A, Ans. No. 24.

32. Two weeks later, Dr. Abadier's notes indicate that Michael "is doing all right … I reassured him and I will see him again as is needed." See Exhibit Y.

**<u>Response to Fact No. 32</u>:** *See* response to "Disputed" Fact 31.

33. On June 2, 2003 Dr. Abadier's notes state that Michael developed pain in the right groin after vigorously waxing some floors. Dr. Abadier's notes reveal that Michael did not have a recurrent hernia thereafter despite some pain. Dr. Abadier prescribed painkillers and an anti-inflammatory. He was to be seen in 10 days. See Exhibit Y.

**<u>Response to Fact No. 33</u>:** *See* response to "Disputed" Fact 31.

34. In ten days on June 12, 2003, it was noted that Michael "is feeling better." Dr. Abadier again "reassured" Michael. See Exhibit Y.

**<u>Response to Fact No. 34</u>:** *See* response to "Disputed" Fact 31.

35. There is no indication that either Dr. Abadier or Dr. Menzo wrote any prescriptions for painkillers or any other prescription after June 2, 2003. See Exhibit Y. See also Exhibit P.

**Response to Fact No. 35:** This fact is undisputed.

36. When the "paramedic" (Carroll) saw Michael on August 28, 2003 she asked and Michael acknowledged candidly that he had been treated for a hernia. See Exhibit R and Carroll deposition at p. 35 line 5 through p.39 line 20 attached hereto as Exhibit Z.

**Response to Fact No. 36:** This fact is undisputed.

37. The word "hernia" is underlined and the boxed is checked as "yes." Under details it is disclosed that Michael "had hernia surgery 4-20-03 Dr. Abadier, 300 Tollgate Rd., Warwick, RI 02886. Kent County Hospital, Warwick, RI. Outpatient." See Exhibit R.

**Response to Fact No. 37:** This fact is undisputed.

38. Moreover, Michael disclosed that he had surgery in response to the inquiry in question. See Exhibit R.

**Response to Fact No. 38:** This fact is undisputed.

39. Michael disclosed the hernia and the attendant appointments to the Insurer's Agent (Demers) when he applied for the $300,000 policy. See Littlefield deposition at p. 137 line 17 through page 140 line 13 attached hereto as Exhibit AA. See also Exhibit K.

**Response to Fact No. 39:** This fact is disputed. However, this dispute is immaterial to the outcome of this motion.

40. The Agent, however, told Michael (and Littlefield) that as long as he had already had the surgery it was not a concern to the Insurer. See Exhibit K.

**Response to Fact No. 40:** This fact is disputed. However, this dispute is immaterial to the outcome of this motion.

41. In reviewing all of the forms used by the Insurer, there is no question that asks whether an applicant has undergone a barium enema or CT Scan. See Exhibit R. The Agent form is attached as Exhibit BB. The Teleunderwriter form is attached as Exhibit CC. See also Carroll Deposition at p. 52 line 15 through p. 53 line 13 attached hereto as Exhibit DD.

**Response to Fact No. 41:** It is undisputed that neither the term "barium enema" nor the term "CT Scan" occurs in any of the forms used by CFLI in connection with the

2003 policy application. It is further undisputed that forms are designed to ask open ended questions and to avoid the use of technical terms so that the applicant is asked to disclose all medical appointments, diagnostic tests and other interaction with health care providers without regard to whether the applicant understood the procedure to be "an x-ray", "a CT Scan" or otherwise. *See* CFLI Undisputed Facts at ¶¶38, 72. *See also* Exhibit EE (Carroll Dep. at 79 ll. 11-22) ("sometimes when I say have you had any testing, it might not even say x-rays, it might just say testings and, you know, people will just tell you what tests they've had.")

42. The paramedical (Carroll) could not recall even one instance where any applicant responded in response to any of the questions that they had had a barium enema. See Carroll deposition at p. 79 line 11 through p. 80 line 1 attached hereto as Exhibit EE.

**Response to Fact No. 42:** The fact as stated is somewhat inconsistent with the testimony attached at Exhibit EE. It is undisputed that Donna Carroll testified that she could not "off the top of her head" say that someone had told her they had had barium. *See* Exhibit EE.

43. The paramedical (Carroll) and the teleunderwriter both testified that they followed the forms as written without explanation or further inquiry. See Carroll deposition at p. 55 ll. 6-19 and p. 56 ll. 19-23 attached hereto as Exhibit FF and Hartwig depositions at p. 20 line 9 through page 23 line 1 attached hereto as Exhibit GG.

**Response to Fact No. 43:** This fact misstates the testimony attached at Exhibits FF and GG. The actual testimony is undisputed. For example, Donna Carroll testified that it is her practice, and she considers it important, to make sure that the client understands "if there's a question and sometimes they'll say, well, what do you mean by treatment or observation? And, you know, so I would elaborate at that point, that I cannot tell you if I did that at this exam." Exhibit FF (Carroll Dep.at 55, ll. 20 to 56 l.

23). Cathy Hartwig, the teleunderwriter, testified that she asks follow-up questions when needed for any yes answers and that she did follow-up in connection with Mr. Littlefield's teleunderwriting interview with respect to several questions. Exhibit GG, (Hartwig Dep. at 21, ll. 11 to 23, l. 1).

44. In fact, the "teleunderwriter" interview only took about ten minutes. See Exhibit GG.

**Response to Fact No. 44:** This testimony is undisputed.

45. Instead, the form asks about "x-rays and electrocardiograms." See Exhibit R.

**Response to Fact No. 45:** This fact is undisputed. It is also undisputed that the form asks open ended question about many other health related matters. The content of the form is undisputed.

46. Michael told the insurer about his x-rays for a sinus infection. And, he had already informed the Insurer of his Hernia operation and all of the doctors he treated with for that ailment. See Exhibit R. See also Littlefield deposition at p. 57 line 12 through p. 58 line 6 attached hereto as Exhibit HH. See also Exhibit FF.

**Response to Fact No. 46:** It is undisputed that Mr. Littlefield disclosed a sinus x-ray, the hernia surgery and the names of certain physicians as set forth on Exhibit R and Exhibit CC. To the extent that this fact refers to oral disclosures made to Mr. Demers, that aspect of this fact is disputed. However, this dispute is immaterial to the outcome of this motion.

47. Michael was told that the barium enema and CT Scan were fine and that it was just a pocket of blood. See Exhibit HH.

**Response to Fact No. 47:** To the extent that "Disputed" Fact 47 purports to describe the evidence in the record regarding everything that Mr. Littlefield was told about the results of these tests, it is inaccurate in that it omits the other communications

sworn to under oath by Mr. Littlefield and affirmed by Plaintiff. *See* CFLI Undisputed Facts ¶¶ 24-26.

48. Littlefield also testified that Michael never had nor was he advised to have further follow-up following the barium enema and CT Scan and that she and Michael were never shown the reports from the tests. See Littlefield deposition at p. 108, ll. 7-14 and p. 137 line 23 through p. 138 line 16 attached hereto as Exhibit II.

**Response to Fact No. 48:** It is undisputed that Mr. Littlefield was advised to follow-up on the CT scan. *See* CFLI Undisputed Fact ¶ 24. It is also undisputed that both Mr. Littlefield and Plaintiff have testified that they did not understand that Dr. Abadier recommended another CT scan during the appointment on August 25, 2003. *See* Exhibit II. There is no evidence in the record with regard to whether Mr. Littlefield or Plaintiff reviewed the reports from the CT scan or the barium enema prior to the time of the making of the application for the 2003 policy. Therefore, to that extent, this fact may be disregarded.

49. In a different interview completed by the Insurer by its teleunderwriter, Michael disclosed that he had hernia surgery and was treated with Dr. Manzo for his follow-up. See Exhibit CC.

**Response to Fact No. 49:** This fact is undisputed.

50. In fact, the Agent (Demers) in his deposition admits that Michael answered the questions "completely and honestly." See Demers depositions at p. 58 ll. 13-15 attached hereto as Exhibit JJ.

**Response to Fact No. 50:** "Disputed Fact" 50 misstates the evidence that Plaintiff marshals in support. It is undisputed that Mr. Demers testified that Mr. Littlefield **seemed** to answer all of his questions completely and honestly. *See* Exhibit JJ, Demers at 58, line 13 through 15.

51. Michael's doctor thought his symptoms might be Lyme Disease. See Exhibit P.

**Response to Fact No. 51:** To the extent that "Disputed" Fact 51 refers to all symptoms, it seems to misstate Dr. Manzo's notes, the contents of which are undisputed. In fact, Dr. Manzo's notes regarding the symptom of abdominal pain state that the patient is to "f/u with his surgeon." *See* Exhibit P.

52. Michael's follow-up to the tests performed for Lyme Disease were equally unremarkable. The report of Dr. Manzo states on June 16, 2003: "Seen last week with abdominal pain, status-post surgery about 1 month or so back. He had symptoms which I felt might have been consistent with Lyme with a tick bite with a negative Lyme titer. However responded nicely to Doxycycline. He is Afebrile. His abdominal discomfort is still present **but improved**." (Emphasis added.) See Exhibit P.

**Response to Fact No. 52:** The first sentence of "Disputed" Fact 52 is undisputed. It is further undisputed that the balance is an accurate but partial quotation from Dr. Manzo's office note regarding the "return visit" with Mr. Littlefield on June 16, 2003. *See* Exhibit P.

53. Importantly, the vicodin was prescribed on June 2, 2003 by Dr. Abadier. On June 12, 2003, Dr. Abadier stated that Michael is "feeling better. The pain is now just a dull ache in one area. He was reassured and he will be seen again as is needed." See Exhibit Y.

**Response to Fact No. 53:** This fact is undisputed in that it accurately quotes from the office notes of Dr. Abadier.

54. Littlefield testified in her deposition that Michael did not take vicodin unless he had pain. She stated that she threw a bottle of it away because he did not take it. "Mostly he would take Tylenol or ibuprofen." See Littlefield deposition p. 107, ll. 1-24 attached hereto as Exhibit KK.

**Response to Fact No. 54:** The underlying testimony on which "Disputed" Fact 54 is based is not in dispute. Plaintiff testified that Mr. Littlefield was put on a different pain medication after he was diagnosed with cancer and that he never finished taking the Vicodin so that she threw a bottle of it away. Exhibit KK (Littlefield Dep.at 107, l. 10-

13). She also testified that he was intermittently taking Vicodin from June 2003 until July 2004 when he was diagnosed with cancer. Exhibit KK (Littlefield Dep. at 107, ll. 14-17. The foregoing testimony is undisputed for purposes of this Motion.

55. Dr. Manzo is part of the same group of doctors whom he sees including Dr. Blackmere and he had already been disclosed to the Insurer when he met with the Insurer's Agent. See Littlefield deposition at p. 37 line 23 through p. 38 line 1 attached hereto as Exhibit LL. See also Exhibit P.

**Response to Fact No. 55:** It is undisputed that Dr. Manzo and Dr. Blackmere are in the same group. There is no record evidence to support the assertion in "Disputed" Fact 55 that Dr. Mazo's name "had already been disclosed to the Insurer when [Mr. Littlefield] met with the Insurer's Agent." Rather, the undisputed record evidence reveals that Dr. Manzo was identified for the first time during the 2003 policy application process in connection with the paramedical examination with Donna Carroll. *See* Exhibit R.

56. Carroll wrote that Michael's father died at age 68, Mother died at age 59 and brother died at age 39 when all three were in fact still alive. See Carroll deposition at p. 41 line 18 through p. 43 line 14 attached hereto as Exhibit MM. See also Exhibit R.

**Response to Fact No. 56:** It is undisputed that Donna Carroll made an error in filling out the paramedical form in that she mistakenly recorded the ages of Mr. Littlefield's family in the column that designated them as deceased. *See* Exhibit MM. It is further undisputed that the teleunderwriter, Cathy Hartwig, followed up on this error in her interview of Mr. Littlefield because the family history mistakenly recorded by Ms. Carroll, if accurate, would have raised underwriting concerns. Mr. Littlefield corrected the error, informing the teleunderwriter that all of these individuals were still living. *See* Exhibit CC.

/s/ Patricia A. Sullivan
Patricia A. Sullivan (#2120)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)

Attorneys for Defendant
Catholic Family Life Insurance
Company

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of September, 2007, a true and accurate copy of the within *Defendant Catholic Family Life Ins. Co.'s Response To Plaintiff Colleen Littlefield's Statement Of Disputed Facts* was served by ECF on:

Karen Davidson, Esq.
One Ship Street
Providence, RI 02903

/s/ Patricia A. Sullivan